MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
KATHRYN A. EIDMANN, SBN 268053
keidmann@publiccounsel.org
MALKA S. ZEEFE, SBN 343153
mzeefe@publiccounsel.org
AMANDA K. PERTUSATI, SBN 296669
apertusati@publiccounsel.org
PUBLIC COUNSEL LAW CENTER
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:  (213) 385-2977
Facsimile:  (213) 385-9089

EVE L. HILL, SBN 202178
EHill@browngold.com
EVAN MONOD, Pro Hac Vice to be filed
EMonod@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, Maryland 21202
Telephone:  (410) 962-1030
Facsimile:  (401) 385-0869

ROMAN M. SILBERFELD, SBN 62783
RSilberfeld@RobinsKaplan.com
DAVID MARTINEZ, SBN 193183
dmartinez@robinskaplan.com
TOMMY H. DU, SBN 305117
TDu@RobinsKaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone:  (310) 552-0130
Facsimile:  (310) 229-5800

KARA MAHONEY, SBN 288076
KMahoney@innercitylaw.org
T.E. GLENN, SBN 155761
TGlenn@innercitylaw.org
AMANDA POWELL, SBN 318036
APowell@innercitylaw.org
CHARLES KOHORST, SBN 327558
CKohorst@innercitylaw.org
INNER CITY LAW CENTER
1309 East Seventh Street
Los Angeles, CA 90021
Telephone:  (213) 891-2880
Facsimile:  (213) 891-2888

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY POWERS, DEAVIN SESSOM, LAURIEANN WRIGHT, SAMUEL CASTELLANOS, JOSEPH FIELDS, LAVON JOHNSON, BILLY EDWARDS, JESSICA MILES, JOSHUA ROBERT PETITT, GLENN SURRETTE, NARYAN STIBBIE, DOES 1-2, and NATIONAL VETERANS FOUNDATION, individually, on behalf of themselves and all others similarly situated, | Case No.: 2:22-cv-08357-DOC(JEMx) <br> Hon. David O. Carter <br><br> **FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION** |

-1-

Plaintiffs,

vs.

DENIS RICHARD MCDONOUGH, in his official capacity, Secretary, Department of Veterans Affairs;

MARCIA L. FUDGE, in her official capacity, Secretary, Department of Housing and Urban Development;

DOUGLAS GUTHRIE, in his official capacity, President, Housing Authority of the City of Los Angeles;

STEVEN BRAVERMAN, in his official capacity, Director, VA Greater Los Angeles Healthcare System;

KEITH HARRIS, in his official capacity, Senior Executive Homelessness Agent, VA Greater Los Angeles Healthcare System,

Defendants.

Date Filed: November 15, 2022

The following allegations are based on information and belief, unless otherwise specified.

## INTRODUCTION

1.      Despite a lawsuit, two Acts of Congress, and two reports of the Office of Inspector General detailing the VA's failings, Defendants are leaving thousands of veterans to live and die on the streets of Los Angeles. While deplorable to all veterans, those effects will disproportionately impact veterans with Serious Mental Illnesses and Traumatic Brain Injuries who need the VA's services the most. The VA must do more, and now, to comply with its obligations under the law, and to fulfill the promise we all make to those who serve in our military.

2.      We, as a people, owe our security and the preservation of our most cherished values to the military service members and veterans who serve our nation, not for remuneration or glory, but out of fealty to honor, duty, and sacrifice. One horrific consequence of war is that it exacts heavy and lifelong consequences on the

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

men and women who serve on our behalf: many return suffering from invisible wounds, including depression, Post Traumatic Stress Disorder ("PTSD") and traumatic brain injuries ("TBI"). For countless veterans, military service has rendered them unable to fully resume their civilian lives, sustain their family relationships, maintain employment, continue their education, or even maintain a permanent residence.

3.      Our leaders, regardless of political party, have repeatedly expressed our country's obligation to our veterans. In March 2009, 20 years after the Department of Veterans Affairs ("VA") was officially elevated to a cabinet-level agency, President Obama expressed our debt to our veterans this way: "We provide new help for homeless veterans, because those heroes have a home; it's the country they served, the United States of America. And until we reach a day when not a single veteran sleeps on our Nation's streets, our work remains unfinished."[1] President Trump reiterated the promise 10 years later, stating "Each warrior who fights for our nation, along with their families, has earned our eternal gratitude . . . Together, we remain committed to fostering a national community of support for these brave heroes and their families."[2] President Biden agreed in 2021, proclaiming, "Our Nation has only one truly sacred obligation: to properly prepare and equip our service members when we send them into harm's way and to care for them and their families when they come home."[3]

4.      But for more than 33,000 veterans nationwide, these promises of home

---

[1] Remarks on the 20th Anniversary of the Department of Veterans Affairs, 1 Pub. Papers 258, 259 (Mar. 16, 2009).

[2] Proclamation No. 9962, National Veterans and Military Families Month, 2019, 3 C.F.R. 206, 207 (2020).

[3] Proclamation 10305, Veterans' Day, 2021, 3 C.F.R. 300 (2021).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

and healthcare are aspirational at best.[4] Twenty percent of low-income veterans will experience homelessness in their lifetime,[5] higher than nonveterans.[6]

5. Los Angeles is the homeless veterans' capital of the United States, with 3,458 unhoused veterans as of 2022,[7] approximately 10% of the national total.[8] Of these, 1,125 or 32% identified as Black/African American, despite the fact they

---

[4] U.S. Dep't Vet. Aff., VA Homeless Programs: Point-in Time (PIT) Count, https://www.va.gov/homeless/pit_count.asp (last visited Nov. 14, 2022) (indicating the January 2022 point-in-time count of "the total number of Veterans who experienced homelessness was 33,136"); *see also* Meghan Henry et al., U.S. Dep't Hous. & Urb. Dev., The 2020 Annual Homeless Assessment Report to Congress 52 (2020), https://www.huduser.gov/portal/sites/default/files/pdf/2020-AHAR-Part-1.pdf ("2020 AHAR Report") (displaying the PIT estimates of homeless veterans between 2009-2020, with a January 2020 count of 37,252).

[5] Jack Tsai et al., *Service Use and Barriers to Care Among Homeless Veterans: Results from the National Veteran Homeless and Other Poverty Experiences (NV-HOPE) Study*, J. Cmty. Psych. 6 (2022).

[6] Jack Tsai et al., *Risk Factors for Homelessness Among US Veterans*, 37 Epidemiologic Rev. 177, 188 (2015) (collecting studies that found "a greater risk for homelessness among veterans compared with nonveterans").

[7] L.A. Homeless Servs. Auth., Veterans HC2022 Data Summary (2022), https://www.lahsa.org/documents?id=6630-veterans-hc2022-data-summary.

[8] 2020 AHAR Report, *supra* note 4, at 60.

-4-

make up only 9% of Los Angeles County's overall population.[9]

EXHIBIT 5.11: **CoCs with the Largest Numbers of Veterans Experiencing Homelessness**
By CoC Category, 2020

| CoC Name | Homeless Veterans | CoC Name | Homeless Veterans |
|---|---|---|---|
| **Major City CoCs** | | **Other Largely Urban CoCs** | |
| Los Angeles City & County, CA | 3,681 | St. Petersburg, Clearwater, Largo/Pinellas County, FL | 265 |
| San Diego City and County, CA | 940 | Eugene, Springfield/Lane County, OR | 167 |
| Seattle/King County, WA | 813 | Reno, Sparks/Washoe County, NV | 158 |
| Las Vegas/Clark County, NV | 734 | St. Louis City, MO | 143 |
| Oakland, Berkeley/Alameda County, CA | 722 | Spokane City & County, WA | 143 |
| **Largely Suburban CoCs** | | **Largely Rural CoCs** | |
| Honolulu City and County, HI | 353 | Texas Balance of State | 555 |
| Santa Ana, Anaheim/Orange County, CA | 342 | Washington Balance of State | 394 |
| San Bernardino City & County, CA | 234 | Oregon Balance of State | 329 |
| Riverside City & County, CA | 233 | Indiana Balance of State | 309 |
| Chester County, PA | 222 | Georgia Balance of State | 295 |

Fact Sheet: Homelessness in LA, Senate Housing Committee,
https://shou.senate.ca.gov/sites/shou.senate.ca.gov/files/Homelessness%20in%20

6.     This should never be. The phrase "homeless veteran" should be an American oxymoron. But this is the cruel truth—the federal government consistently refuses to keep its word and take meaningful actions to bring the abomination of veteran homelessness to an end.

7.     Many veterans experience "Serious Mental Illness," or "SMI," meaning "a mental, behavioral or emotional disorder that results in serious functional impairment, which substantially interferes with or limits one or more major life activities."[10] Examples include major depression, PTSD, bipolar disorder, panic

---

[9] *See* L.A. Homeless Servs. Auth., *supra* note 9; *see also* U.S. Census Bureau, QuickFacts Los Angeles County, California (July 1, 2021), https://www.census.gov/quickfacts/losangelescountycalifornia.
[10] Nat'l. Inst. Mental Health, Mental Illness, https://www.nimh.nih.gov/health/statistics/mental-illness (last visited Nov. 14, 2022).

disorder, obsessive-compulsive disorder, borderline personality disorder, and schizophrenia-spectrum disorder.[11]

8.      Post 9/11 veterans have higher rates and ratings of severe disability, mental health disorders, trauma-related injuries, and substance abuse than both their nonveteran peers and veterans of prior wars.[12] Vietnam veterans were twice as likely to have depression and anxiety than their older peers.[13]

9.      Yet only half of veterans with mental health challenges connected to military service access treatment and only about half of those receive minimally adequate care. Less than half of those with a probable TBI even receive a medical evaluation.[14] Veterans with unmet mental health needs are more likely to live in poverty than other veterans.[15]

10.      An incontrovertible body of research has established the close causal and mutually reinforcing relationship between Serious Mental Illness and long-term

---

[11] U.S. Dept. Vet. Aff., Serious Mental Illness 1 (2020), https://www.va.gov/PREVENTS/docs/PRE013_FactSheets_SeriousMentalillness_508.pdf.

[12] Jonathan Vespa, U.S. Census Bureau, *Post-9/11 Veterans More Likely to Have a Service-Connected Disability* (June 2, 2020), https://www.census.gov/library/stories/2020/06/who-are-the-nations-veterans.html.

[13] Christine Gould et al., *Depression and Anxiety Symptoms in Male Veterans and Non-Veterans: the Health and Retirement Study*, 30 Int'l. J. Geriatric Psychiatry 623 (2014); *see also* U.S. Dept. Vet. Aff., Off. Res. & Dev., VA research on Mental Health, https://www.research.va.gov/topics/mental_health.cfm (discussing Vietnam veterans) (last visited Nov. 14, 2022).

[14] Terri Tanielian et al., RAND Ctr. Mil. Health Pol'y Res., *Invisible Wounds: Mental Health and Cognitive Care Needs of America's Returning Veterans* 3 (2008), https://www.rand.org/content/dam/rand/pubs/research_briefs/2008/RAND_RB9336.pdf. This is true in California, where only one in four veterans received minimally adequate treatment. *See* Linda Diem Tran et al., *The Mental Health Status of California Veterans*, Pol'y Brief UCLA Ctr. Health Pol'y Res. 1, 3 (2016).

[15] Tran, *supra* note 16.

homelessness, including among veterans.[16]

11.    Numerous scientific studies demonstrate, consistent with common sense, that unhoused individuals with TBI and Serious Mental Illness such as PTSD, schizophrenia, and severe depression can meaningfully access and benefit from physical and mental health services only after they are stabilized in permanent community-based housing readily accessible to appropriate services and support— i.e., Permanent Supportive Housing.[17] Absent Permanent Supportive Housing, these conditions worsen significantly, leading to additional problems impairing the capacity of these individuals to conduct everyday life.

12.    Nonetheless, the VA and its constituent healthcare systems do not provide adequate Permanent Supportive Housing to ensure that veterans with severe disabilities in Los Angeles have the stability and support they desperately need to access the medical treatment and other services for which they are eligible. Instead, the VA provides institutional services and temporary housing, leaving veterans with Serious Mental Illness and TBI who could live in community-based Permanent Supportive Housing with no options but to accept institutionalization or go without services. As a result, the VA remains a principal cause of continuing homelessness among veterans.

13.    This is true despite the VA's Greater Los Angeles Healthcare System's ("VAGLAHS") flagship West Los Angeles Medical Center & Community Living Center Grounds ("WLA Grounds" or "Grounds"), a lush 388-acre parcel that was donated to the VA as a Charitable Trust, expressly for the purpose of serving as a

---

[16] *See, e.g.*, Sonya Gabrielian, *Improving services for homeless adults with serious mental illness* (Presentation) 6 (Oct. 28, 2020), https://www.mirecc.va.gov/visn5/training/sst/Gabrielian_PsychosisColloquium2020 1022.pdf ("SMI and homelessness are mutually reinforcing").

[17] Tsai, *supra* note 6, at 191.

-7-

home for disabled war veterans.[18]

 

*West LA Grounds (Credit: 2022 Master Plan)*



*Outside the Grounds, before November 2021*

14.     VAGLAHS does not offer, on the WLA Grounds or elsewhere within its service area, anything close to adequate Permanent Supportive Housing coordinated with the medical, mental health, and other supportive services that veterans with Serious Mental Illness or brain injuries need.

15.     In fact, VAGLAHS has skirted its responsibility by leaving it to private

---

[18] Tess Banko, Am. Legion, Dep't Cal., *About the Redevelopment of the West Los Angeles VA Campus* (Nov. 8, 2021), https://calegion.org/about-the-redevelopment-of-the-west-los-angeles-va-campus/.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

1   housing developers to develop housing on the WLA Grounds without the benefit of

2   VA or HUD funding. These developers must rely on other public and private

3   sources of funding, which impose additional income limits that exclude individuals

4   from the VA services for which they are eligible. Ironically, because VA disability

5   benefits "count" as income for these purposes, the more disabled a veteran is

6   determined by the VA to be, the less likely he or she is to be able to access

7   permanent supportive housing.

8          16.    This unforgivable state of affairs has resulted in the proliferation of

9   thousands of homeless veterans with disabilities and a long-term crisis of lack of

10  access to medical, mental health, and other essential supportive services. Veterans

11  have suffered grievously. Many have died. Over seven years after the VA

12  committed to provide them Permanent Supportive Housing, they are still suffering

13  and dying on the streets of Los Angeles. Even under the VA's most optimistic and

14  recent plans, thousands of veterans will continue to live and die on the streets of Los

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

Angeles for years to come.

17.    In 2011, ten unhoused veterans with severe disabilities sued the VA for its failure to provide housing on the WLA Grounds. Multiple leases on the WLA Grounds that failed to benefit veterans were invalidated by the lawsuit. In January 2015, the plaintiffs entered into an agreement in good faith with the VA under which the VA agreed to draft and implement a Master Plan to provide housing and supportive services for veterans on the WLA Grounds. Pursuant to the Master Plan





"Veterans Row" homeless encampment of veterans by the VA West Los Angeles Grounds from which residents were forcibly evicted in November 2021. (Credit:

-10-

the VA agreed to build 1,200 Permanent Supportive Housing units for veterans on the WLA Grounds, 770 of which were to be completed by 2022.[19]

18.     Still, the VA did not mend its ways. In 2021, the VA Office of Inspector General ("OIG") reported that, more than 7.5 years after the settlement, the VA has not constructed a single new unit of Permanent Supportive Housing pursuant to the settlement agreement.[20] It has failed even to make essential infrastructure upgrades for utilities like water, sewer, and stormwater systems, let alone provide housing for the 1,200 unhoused veterans with disabilities to which it committed.[21] Other than 55 housing units started before the agreement and completed in May 2017, OIG concluded that "VA has not completed any housing units on the campus" or even come close to doing so.[22] Indeed, it added: "VA envisions all phases of construction will be completed in the *next 17 years. However, the OIG has no assurance that this goal will be met.*"[23]

19.     The OIG also identified seven noncompliant land-use agreements—meaning the property is being leased illegally even still to entities that do not serve the veteran population.[24] Shockingly, the OIG found some of "the agreements were not veteran focused," "allowed drilling to extract nonfederally owned oil from neighboring land and allowed a lease with a private school for continued use and improvement of student athletic fields that did not principally benefit veterans and

---

[19] 1887 Fund, *West Los Angeles VA Campus Draft Master Plan*, https://www.1887fund.org/master-plan/ (last visited Nov. 14, 2022).

[20] U.S. Dep't Vet. Aff., Off. Inspector Gen., VA's Management of Land Use under the West Los Angeles Leasing Act of 2016: Five-Year Report 10 (2021), https://www.va.gov/oig/pubs/VAOIG-20-03407-253.pdf ("OIG Five Year Report").

[21] *Id.* at 11.

[22] *Id.* at 10.

[23] *Id.* at 19 (emphasis added).

[24] *Id.* at 20.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

their families."[25]

20.    Veterans themselves have repeatedly admonished the VA for its broken promises to no avail. The VA has failed even to consult veterans about plans to construct, and recently expand, UCLA's state-of-the-art baseball facilities[26] on land where the VA is required to build Permanent Supportive Housing.[27] Indeed, the VA






*Examples of improperly leased properties the OIG identified on the WLA Grounds, including Brentwood School, oil leases, and UCLA's Jackie Robinson Stadium (Credit: Amanda Pertusati, 2022).*

[25] *Id.* at ii.

[26] The construction is part of UCLA's baseball facilities on the grounds, ironically named after UCLA alumnus and civil rights icon Jackie Robinson. *See* Jamie Loftus, *The West Los Angeles VA Would Prefer You Didn't Look Into its Corrupt Land Deals, Thanks*, Knock LA (Feb. 26, 2021), https://knock-la.com/west-los-angeles-va-campus-corrupt-deal-ucla-stadium-a1be1e7baaf8/.

[27] *See, e.g.*, Rec. 12-05A, Vet. & Cmty. Oversight & Engagement Bd., Fed. Adv. Comm. Mtg. 18-19 (Mar. 23, 2021),

-12-

1   and UCLA agreed to conceal these recent plans and UCLA's subsequent



*Parking kiosk at parking lot by Brentwood School on WLA Grounds*
*(Credit: Amanda Pertusati. 2022).*

construction of athletic facilities in order to evade compliance with the law.

Veterans must console themselves with the fact that they can park for free where

they should have homes. But even this "free" parking lot is not nearly the same as a

mobile home site that could grant some of these veterans far greater freedom.

21.     Unfortunately, counsel for the prior plaintiffs did not insist on

enforceability of the settlement agreement in the belief that the VA would act in

_____

https://www.va.gov/ADVISORY/MINUTES/Minutes-VCOEBMar2021.pdf
("WHEREAS, at no point in time prior to the announcement, did VAGLAHS advise
the Veterans and Community Oversight and Engagement Board (VCOEB) of its
intention to amend the existing lease with UCLA for its baseball complex . . . .
NOW THEREFORE LET IT BE: RECOMMENDED, that the Secretary of
Veterans Affairs terminate the UCLA 'Second Lease Amendment' on the grounds
that it is not consistent with the Master Plan; does not sufficiently benefit veterans
and their families; and disproportionally favors UCLA's interests on campus,
without proof of any expansion of UCLA's services to the campus to justify
enlargement of the Regents' rights . . . .") (unanimously approved); *see also* Rec.
12-05B, *id.* at 20-21 ("NOW THEREFORE LET IT BE: RECOMMENDED, that
before VAGLAHS is authorized to enter into or modify any existing leases with the
Regents of the University of California, that VAGLAHS must make a presentation
to VCOEB establishing its due diligence to assure itself that the lease is consistent
with the Master Plan.") (unanimously approved).

-13-

good faith to comply with its terms and that court enforcement would not be necessary against the United States government, to whom they had given so much and from whom they had received such sacred promises. Tragically, this trust in the VA to keep its word was, yet again, misplaced.[28]

22.     While our government has shown its ability to erect whole cities for troops halfway around the world that are hardened against attack, the VA has attempted to offload its responsibility for constructing Permanent Supportive Housing to third parties who are dependent on fundraising from public and private sources, which severely limits housing eligibility based on Area Median Income (AMI).[29] History teaches that strategy is likely to fail the veterans it is intended to serve because those who need the housing most are disqualified from gaining residence by other VA benefits they receive.[30]

---

[28] In private, VA officials have made clear their contempt for "testy" advocates who try to hold the VA accountable to veteran interests. In one leaked audio called, a VA official complained that advocates "are going to get up in arms about another ball field being built" and then strategized how the VA and UCLA might contain public relations blowback. Cristy Fajardo, *Veteran Advocates Accuse VA in West LA of Putting Private Interests over the Law*, Fox 11 L.A. (May 27, 2022), https://www.foxla.com/news/veteran-advocates-accuse-va-in-west-la-of-putting-private-interests-over-the-law; *see also* Loftus, *supra* note 28.

[29] *See* Letter from the Los Angeles Housing Department to the Los Angeles City Council (Jan. 12, 2023) ("HACLA Letter"), https://lacity.primegov.com/Portal/viewer?id=425876&type=2 ("In order to build affordable housing, developers apply for funding from multiple sources, including City, County, State and private financial institutions, each of which may have different eligibility restrictions tied to its funding. In order to be competitive for public funding, developers often agree to the most restrictive income limitations, generally the 30% AMI level.").

[30] Currently AMI counts service-connected disability benefits as income. *See* Letter from Rep. Mark Takano, Ranking Member, House Committee on Veterans' Affairs, to Secretary McDonough, Mar. 7, 2023. Accordingly, "[t]he cruel irony is that if [these veterans] were less disabled, they would qualify [for more housing]."

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

23.     The Department of Housing and Urban Development ("HUD") and the Housing Authority of the City of Los Angeles ("HACLA"), via their leadership, also refuse to exercise their funding authorities to address the needs of homeless veterans in Los Angeles, declining to work with the VA to fund the construction of housing on the VA WLA Grounds, and declining to fund HUD-VASH vouchers at rates which would allow veterans with disabilities to live near the VA medical services they desperately need and are entitled to.

24.     Individual plaintiffs in the current case are veterans with Serious Mental Illness and/or brain injuries or physical disabilities who, as a result of their disabilities, are unhoused and are in or at risk of entering institutional settings such as hospitals, residential treatment programs, homeless shelters, or jails. These individual plaintiffs cannot access necessary VA medical and mental health treatment for which they are eligible and which they need to have a fighting chance at leading normal lives.

25.     Plaintiffs are being denied meaningful access to the medical, mental health, and other services offered by VAGLAHS for which they are otherwise eligible, and are being unnecessarily institutionalized or placed at serious risk of institutionalization, solely by virtue of their disabilities, which represents unlawful discrimination under Section 504 of the Rehabilitation Act of 1973.[31]

26.     The VAGLAHS administers its service delivery system in a manner that denies veterans like Plaintiffs with SMI and TBI access to community-based VA mental health, housing, and other supportive services that they need and for which they are eligible. Instead of providing the Permanent Supportive Housing veterans with Serious Mental Illness and TBI need, VAGLAHS over-relies on

---

Catalina Villegas, 100% disabled homeless veterans are being rejected for housing, Spectrum News 1, Mar. 27, 2023, https://spectrumnews1.com/ca/la-west/homelessness/2023/03/28/disabled-homeless-veterans-rejected-housing#.
[31] 29 U.S.C. § 794(a).

-15-

inappropriate institutional and temporary housing, on third-party developers reliant on income-restricting funding, and on HUD-VASH vouchers that are insufficient to allow veterans to access the VA health services they need. Veterans with Serious Mental Illness and TBI for whom institutionalization is unnecessary and inappropriate must attempt to find community-based housing on their own or live desperately on the streets. In either case, they are unable to meaningfully access the VA's healthcare services, located primarily on the WLA Grounds consistently and, as a result, risk aggravation of their disabilities and, in a vicious cycle, institutionalization in VA or non-VA hospitals, homeless shelters, or jails.

27.     VAGLAHS administers its medical, mental health, and other services only at the WLA Grounds and a few other sites scattered across VAGLAHS's large service area.[32] Its failure to provide permanent or long-term housing that facilitates access to those services denies Plaintiffs and others like them access to needed healthcare services for which they are eligible and forces them to rely on unnecessary institutional services. Just as elimination of programming that "focuses on the needs of disabled individuals . . . and that provides services disproportionately required by the disabled and available nowhere else" is unlawful disability discrimination,[33] VAGLAHS's decision not to offer sufficient coordinated housing and healthcare services to veterans with severe disabilities who need them also constitutes discrimination in violation of the Rehabilitation Act.

28.     As the VA has repeatedly acknowledged, providing Permanent Supportive Housing can be reasonably accommodated within the VA's service system. Some Permanent Supportive Housing exists within VAGLAHS's service system, but on a scale and of a quality grossly inadequate to serve veterans with

---

[32] *See* U.S. Dep't Vet. Aff., Locations, https://www.va.gov/greater-los-angeles-health-care/locations/ (last visited Nov. 14, 2022).

[33] *See Rodde v. Bonta*, 357 F.3d 988, 997 (9th Cir. 2004).

-16-

Serious Mental Illness and TBI who are unnecessarily institutionalized or at risk of institutionalization.

29.     Furthermore, there are unreasonably prohibitive eligibility requirements on the limited housing that is currently available—or even anticipated in the near future. Several of these plaintiffs and others like them have received a service-connected disability rating of 100% from the VA. In other words, the VA has recognized that these individuals suffer disabilities incurred directly on account of their service to this country which, in turn, directly *and completely* impair their earning capacity now and into the future. These individuals—including the majority of plaintiffs—then receive compensation corresponding to that disability rating. However, because of existing use limits on the public funds the developers contracted by the VA receive to fund their construction, those developers impose an eligibility requirement based on income, prohibiting anyone exceeding a certain percentage of area median income (AMI) from applying for a unit in their buildings. Often these public funds cap AMI eligibility at 30%, some up to 50%. But currently 100% disability compensation for an individual with no dependents equates to more than 50% (closer to 60%) AMI. Veterans who receive any type of additional compensation based on disability or age exceed 60%.

30.     Because of this, most of the plaintiffs have been advised for years that they are not eligible for most housing on the WLA Grounds; and others who have managed to submit applications have received formal rejections. As a result, the more disabled these veterans are and the more they require accessible VA services by the VA's own assessment, the less they are able to meaningfully access them. This is an absurd result, and a horrific choice. "The cruel irony is that if they were less disabled, they would qualify."[34]

31.     The VA holds the WLA Grounds in trust for veterans with disabilities.

[34] Villegas, *supra* note 30.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

By authorizing uses of the WLA Grounds that do not directly contribute to housing and healthcare for veterans with disabilities, Defendants have breached their fiduciary duties as trustees of the Charitable Trust. Defendants' land deals involving the WLA Grounds also violate the West Los Angeles Leasing Act of 2016 ("WLALA2016"),[35] because they do not "primarily benefit" veterans. Defendants' failure to comply violates the Administrative Procedure Act.[36]

32.     Homeless veterans commit suicide at a rate of approximately 81 per 100,000, compared to 35.8 per 100,000 for veterans generally.[37] Other causes of death, including death by violence, occur at substantially higher rates to homeless veterans.[38]

33.     Plaintiffs seek to avoid the tragic fate of so many of their brothers and sisters—JT, AA, SL, DH, FK, and many many others—shut out of VA services and housing and dead on the streets, in shabby tents, or in dangerous tiny sheds around the magnificent WLA Grounds. The government they served has refused to serve them and, far from welcoming them home, has left them homeless.

## JURISDICTION

34.     This Court has jurisdiction over Plaintiffs' claims for injunctive relief based on 28 U.S.C. § 1331 because those claims arise under federal statutes and federal common law.

35.     Additionally, this Court has jurisdiction over Plaintiffs' claims under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) based on 28 U.S.C.

---

[35] Pub. L. No. 114-226, 130 Stat. 927 (2016).

[36] 5 U.S.C. § 706(2)(A), (C), (D).

[37] VA Nat'l Ctr. Homelessness Among Vet., Homeless Evidence and Research Synthesis (HERS) Roundtable Series 3 (2018), https://www.va.gov/HOMELESS/nchav/docs/HERS_Proceedings_SuicideAndHomelessVeteransSymposium_Feb2018_508.pdf.

[38] John A. Schinka et al., Mortality and Cause of Death in Younger Homeless Veterans, 133(2) Pub. Health Reps. 177-81 (2018).

§ 1343(a)(4) and 1346(a)(2), because those claims seek to secure equitable relief under an Act of Congress and because the United States is a defendant.

36.     This Court has jurisdiction over Plaintiffs' charitable trust claims asserted herein because they implicate significant federal issues, including an analysis of whether Congress has passed a statute agreeing to assume fiduciary duties as a trustee of the charitable trust.

37.     To the extent Plaintiffs' claims to enforce the terms of the Charitable Trust and for an accounting of profits do not present a federal question sufficient to confer jurisdiction under 28 U.S.C. § 1331, this Court has jurisdiction over those under 28 U.S.C. § 1367.

38.     Finally, this Court has jurisdiction over Plaintiffs' alternative claim for relief under 28 U.S.C. § 1361.

## VENUE

39.     Venue is proper in the Central District of California under 28 U.S.C. § 139l(b) because all of the acts and/or omissions complained of herein occurred or will occur in the District.

## PARTIES

### Jeffrey Powers

40.      Plaintiff Jeffrey Powers is a 60-year old veteran. Mr. Powers has a 90% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Powers seeks treatment and housing from VAGLAHS. Mr. Powers does not want to live in an institution in order to receive services, nor does he want to again live in a tent or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

41.     Mr. Powers joined the Navy in 1980 with dreams of making a career out of flying naval jets. Unfortunately, his time in the Navy was cut short as he was

-19-

discharged in 1981 because of his sexuality and identity as a gay man. Upon his discharge, Mr. Powers tried to his best to move forward and create a stable life. In 1995, he graduated from Western Kentucky University, where he studied economics and computer science. After graduation, Mr. Powers went back to California and started a career in IT. Despite the success he experienced in school and work, Mr. Powers could not shake the feelings of shame and depression that were impressed upon him during his military service.

42.     In 2005, Mr. Powers experienced a divorce and was forced to move in with family in Arizona. He stayed in Arizona until 2015, when his life again turned upside down when his family found out he was gay and disowned him. He once again had to live through the same fear, shame, and dread he had experienced in the military. It became very hard for Mr. Powers to cope due to depression and in that same year, his house was foreclosed and he found himself homeless.

43.     Living on the streets in Phoenix was miserable for Mr. Powers. He dealt with unbearable heat and discomfort and struggled to find places to take care of daily hygiene necessities. Mr. Powers went to the VA in Phoenix to seek help because he felt like his life was no longer worth living. He requested a gay, male therapist, with hopes that he could talk about the trauma he endured due to his sexuality. Unfortunately, the VA advised him that it was not able to honor such a request because of the "Don't Ask, Don't Tell" policy still in place at that time. Mr. Powers took measures into his own hands and connected with an organization called "22 Until None." Mr. Powers credits that organization for keeping him alive.

44.     In late 2017, Mr. Powers was accepted into the Veterans Affairs Supportive Housing ("VASH") program in Phoenix, and was granted a housing voucher. He continued to live in Phoenix for two years in a VASH apartment until March 2020 when his lease expired. At that time, he was still experiencing severe depression, and was having difficulty locating a new apartment to rent with his

-20-

voucher. He decided it would be best for him to take his VASH voucher to a new city—he landed on Palm Springs—which he anticipated would be a good fit for an older gay man. In June 2020, after approval from VASH to move his voucher, Mr. Powers drove to Palm Springs; however, upon his arrival, he again had difficulty finding a place that would accept his voucher. Around that same time, his car was stolen and destroyed, and he no longer had transportation to travel to look for somewhere to live.

45.     The Riverside VA recommended that Mr. Powers go to Los Angeles. Mr. Powers followed instructions and went into the Emergency Room at the WLA Grounds to meet with a social worker. He was given a tent on the concrete floor, equipped with only a camping chair, and a thin air mattress. It was the middle of summer and it was impossible to stay inside the tent during the day because of the scorching heat. Due to the conditions, the VA moved the tents from the concrete to the grass, but that only added an additional problem of gophers destroying veterans' mattresses. As a result, the VA again adjusted the sleeping conditions to include wood pallets to keep the mattresses lifted off the ground. The pallets soon became a breeding ground for rats.

46.     Unable to tolerate the rats and other conditions in the tents, and dealing with physical conditions that made it difficult to get up and down in the tents, Mr. Powers contacted PATH and the Salvation Army, who set him up to stay at a motel while he was waiting for help with his housing voucher. Despite Mr. Powers' continuous pleas for help, the VA never assisted Mr. Powers with finding an apartment to use his voucher.

47.     With no help from the VA, the money allowance for the PATH-funded motel ran out and Mr. Powers again found himself on the streets. He went to Veterans Row and lived in a tent until November 2021 when law enforcement cleared everyone out of the area. Still unhoused, in January 2022 the VA's Care,

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

Treatment, and Rehabilitative Services ("CTRS") program put Mr. Powers in a tiny shed. The shed has no bathroom, does not allow for any appliances, and provides no locks or privacy. For Mr. Powers, the WLA Grounds feels like a slap in the face because he sees plenty of land available and several buildings, none of which provide housing for him or the rest of the unhoused veterans he knows.

48.    Since the November 2022 Complaint commencing this action (the "Original Complaint") was filed, Mr. Powers has suffered worsening conditions at CTRS, including being dragged from his shed, handcuffed, and involuntarily taken to a psychiatric unit and subjected to a "5150" hold for a week, and finally released when it became clear there was no reason to hold him. Many veterans at CTRS are observing the 5150 as a too-frequent abuse of power and infringement of their rights.

49.    Mr. Powers has now been approved for housing on the WLA Grounds in one of the buildings that opened in May 2023. He is still completing the process and has not yet been assigned a unit. Therefore, he is still currently unhoused and the "permanency" of the new assignment is still unknown, which leaves him at continued risk of future homelessness.

**Deavin Sessom**

50.    Plaintiff Deavin Sessom is a 67-year old Army veteran with severe disabilities as a result of his military service. Mr. Sessom has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Sessom seeks treatment from VAGLAHS. Mr. Sessom does not want to live in an institution in order to receive services, nor does he want to again live in a tent or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

51.    Mr. Sessom enlisted in the Army in 1978 at 17 years old, motivated to

-22-

serve his country and hoping to find community. Instead, his hopes turned into a living nightmare. Two drill sergeants attacked Mr. Sessom, including with sexual assault. Ashamed and terrified, he told no one what happened, fearing that if he reported the drill sergeants, he would be attacked again.

52. Mr. Sessom lived every day in constant fear that he would be assaulted again. He was unable to sleep, and when he did, he began experiencing terrible nightmares. He started showing up late for duty, then stopped reporting at all. After five months in the Army, Mr. Sessom received a general discharge.

53. Mr. Sessom spent the next thirty years of his life desperately trying to forget the trauma he endured in the Army. He got married and started a family, but his PTSD symptoms persisted. To calm his nerves and shut out the nightmares, he began self-medicating with drugs. He got divorced, lost custody of his children, and became homeless.

54. In 2007, living on the streets of Los Angeles, Mr. Sessom successfully enrolled in the VA healthcare system. Shortly thereafter he moved into an apartment in Bellflower with a VASH voucher. He hoped to start seeing a VA mental health provider but found that he could barely leave his apartment due to his severe anxiety and hypervigilance. He eventually lost this apartment and once again became homeless.

55. Things started to look up for Mr. Sessom when he enrolled in a 90-day rehabilitation and mental health treatment program at the Residential Rehabilitation and Treatment Program ("Domiciliary") on the WLA Grounds in 2013. For the first time, he was in rehab and talking to a psychologist about what happened to him in the Army. He successfully completed the program. He was 90 days sober and motivated to continue his treatment. Unfortunately, he was not given this opportunity. He learned that the transitional housing he had been promised was not yet ready, and that because he graduated from the Domiciliary, he was no longer

allowed to see the psychologist with whom he had formed a strong, trusting relationship.

56.     Mr. Sessom relapsed and again became homeless. Since then, he has attempted to find housing and maintain sobriety, but both have been an enormous struggle. The VA recognizes his service-connected disability of PTSD due to military sexual trauma, and he remains homeless. He is connected to and dependent on the healthcare and treatment services at the WLA Grounds. He has attempted to find an apartment through VASH but has not been able to find a landlord who is both willing to accept a VASH voucher and close enough to the WLA Grounds that he will not be cut off from his treatment team. He also applied for housing from the housing provider of one of the WLA Grounds buildings directly, but was rejected on the basis of exceeding the AMI eligibility because of his VA disability benefits.

57.     As a result, Mr. Sessom lived in a tent on Veterans Row outside the WLA Grounds for four years before moving into one of the tiny sheds in early 2022. For Mr. Sessom, the sheds are not "home," nor are they permanent. Shortly before the Original Complaint was filed, Mr. Sessom lost his shed and all his belongings when a fire destroyed his unit. As of this filing date, he has since moved into another shed, but fears every night when he goes to sleep that another fire will take his shelter, this time with him inside.

58.     Mr. Sessom needs a place of his own close to the treatment and care that has often been his lifeline. He explains that sometimes his PTSD symptoms get so bad that he needs to be able to know that his VA treatment team is right there, within walking distance. Taking several buses to get to the VA in moments like this is simply not an option. Unfortunately, for now, being able to access his healthcare also means being homeless. It also means crying himself to sleep every single night.

59.     Since the Original Complaint was filed, Mr. Sessom again has been rejected by the housing provider for housing on the WLA Grounds on account of his

-24-

100% service-connected disability rating, combined with benefits from the Social Security Administration, providing him with compensation that exceeds AMI eligibility. In dire need of community and convenient access to VA services, Mr. Sessom will remain homeless until there is housing on the Grounds that does not bar him for receiving his non-income federal compensation.

**Laurieann Wright**

60.     Plaintiff Laurieann Wright is a 54-year old Air Force veteran. Ms. Wright has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because she resides in Los Angeles, Ms. Wright seeks treatment and housing from VAGLAHS. Ms. Wright does not want to live in an institution in order to receive services, nor does she want to again live in a tiny shed or other unsafe housing placement. She could be appropriately served in the community and does not oppose community-based services and housing.

61.     Ms. Wright is originally from New York City. She joined the Air Force in 1985 and was active duty in communications, specifically Morse Code operation. She was stationed in both Italy and Greece, and took great pride in her service. During her assignment in Italy, she was sexually assaulted by her squadron commander. This caused extensive harm to her mental health, sense of self, and trust in those around her. A friend reported the incident, which led to a full-investigation. In 1989, she received an honorable discharge with cited medical needs, including antisocial personality disorder, which she believes was an effort to silence her after her assault. The investigation was closed with no official findings, despite the availability of witnesses willing to testify. Soon afterward, she continued her service in the Army Reserve in Ventura, California for six months. During this time, Ms. Wright started having seizures, which was later found to be a result of cerebral atrophy. She was again honorably discharged in 1990.

62.     After her discharge, Ms. Wright sought help at the West LA Grounds.

She had started using alcohol to self-medicate due to nightmares and symptoms of PTSD. The VA told her they could not help her. Without any resources to support her mental health, substance use, or worsening health conditions, she returned to Ventura, where she stayed for 23 years and had three children. There she admitted herself to a sober living program, but when it concluded, and fleeing an abusive relationship, she found her way to a women's and children's shelter in Oxnard, California. Meanwhile, her abuser kept her children away for prolonged periods, and his ability to rent a home allowed him to obtain sole custody.

63.    In 2006, Ms. Wright returned to the VA because she found herself on the streets; however, she was still not offered housing. Instead, she was given a bed in the Domiciliary, where she was diagnosed with PTSD from military sexual trauma. From 2009 to 2012, she was in and out of the hospital and never housed. Ms. Wright also suffers from seizures, and often experiences painful falls as a result of her disability that can and have over the years resulted in broken bones, including once breaking her neck. She was eventually diagnosed with multiple sclerosis. Ms. Wright relies on treatment through VAGLAHS for her 100% service-connected disabilities.

64.    Within two years of her diagnosis, she was told she had exhausted her options with the VA. She again found a sober living program, but it offered no veteran-specific services or support. Ms. Wright felt immense shame for her situation. She recalls that the VA would always refer her to different services. She ultimately found herself in a tent on the West LA Grounds around Thanksgiving in 2021, after she was in the hospital following a seizure, but was told they had no more capacity for beds and were sending her to "Tent City."

65.    On Veterans Row, Ms. Wright met her partner, Plaintiff Castellanos, and after five months, together they obtained a double tiny shed placement. Ms. Wright reports that the tiny shed area often had no running water, but only a shared

-26-

foot pump sink by the portable bathrooms that was often empty and always filthy, and a shared water hose that sometimes worked. There were no showers. She also recalls the rats throughout the space and under the tiny sheds. She has known several of her friends placed through CTRS who have died. There were also people with severe mental health needs that were not being addressed, and as a woman she feared for her safety while going to the bathrooms.

66.     On September 9, 2022, Ms. Wright's shared shed caught on fire, and she and her partner ran out of the shelter in only the clothes they were wearing. Ms. Wright screamed for help as her partner tried to use the water hose, which ultimately had no running water, and witnessed others trying to use a fire hydrant to no avail. The fire raged as only one security guard arrived and the fire spread to other sheds. She reports that it took 40 minutes for anyone else to arrive and help put out the fires. She was terrified as she saw the growing flames, and she and her partner stood and saw their only shelter burn along with all of their personal belongings, and items they had saved over time that supported their survival as unhoused veterans. Ten other sheds burned alongside theirs.



*Laurieann Wright and the Tiny Shed Fire*

67.     Since losing her shed to the fire, she has not received housing support or other placement options through the VA program. Ms. Wright was never able to

-27-

retrieve the rest of her items that were burned in the shed. She received some support from the Salvation Army and other individuals (i.e., not from the VA) to obtain her current placement in Lancaster, California, where she has stayed since October 7, 2022. This placement, however, comes at the expense of her sense of safety and privacy, and a great distance from her primary care provider and services she obtains through VAGLAHS at the West LA Grounds.

68.     Since the Original Complaint was filed, these hurdles have grown. Almost every day in her neighborhood Ms. Wright hears gunshots, steps over hypodermic needles, has the local store owner monitor her walk home, and barricades her back door from intruders. And beyond being more than hour away from her primary caregiver even without the typical Los Angeles traffic, as of May 11, the VA has discontinued the rideshare benefit extended as a result of the pandemic. Without a car, she now has no idea how she will access her eligible services at all. She needs accessible permanent supportive housing urgently.

### Samuel Castellanos

69.     Plaintiff Samuel Castellanos is an Army veteran who will soon turn 60 years old. Mr. Castellano is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Castellano seeks treatment and housing from VAGLAHS. He does not want to live in an institution in order to receive services, nor does he want to again live in a tent, car, tiny shed, or other unsafe housing placement. He could be appropriately served in the community and does not oppose community-based services and housing.

70.     Mr. Castellanos joined the Army at 17 years old in 1980. All his life, he wanted to be a soldier. His family has a long history of service, and he greatly admired his grandfather who served through World War II. Mr. Castellanos' first placement was in Germany, where he was involved in a combat support company. His platoon sergeant and squadron leader would harass and threaten him on a

-28-

constant basis. One night as he slept, his tent was torn open and he was beat until he lost consciousness. Mr. Castellanos woke to find himself in a ditch. As a result of this constant harassment and harm, he went AWOL (absent without leave), not wanting to return to his platoon, but subsequently received a transfer to a different company. In 1983, he returned to the U.S. briefly, and then in 1984, was sent to South Korea for approximately 16 months. Mr. Castellanos said his experience was extremely challenging, but he was proud of his service—it was his dream. But he began to experience nightmares and symptoms of PTSD due to his military trauma.

71.    Mr. Castellanos served in several countries based on the missions he supported outside of active duty, many of which remain confidential. He recalls that there was no time to process the trauma of witnessing the deaths of his friends, and describes feeling heartbreak related to the violence he witnessed and in attending funerals for other soldiers. After his last assignment with the National Guard, Mr. Castellanos was honorably discharged in 1997. He reports that upon returning home, he had great difficulty interacting with civilians. He continued to have PTSD symptoms, including severe nightmares where he has woken up hitting walls and unintentionally harming himself or those around him. He sought his own resources, which ultimately connected him to the VA.

72.    Mr. Castellanos has been in and out of West LA since the 1980s, but continued to store many of his belongings there. In September 2020, while living in Denver, Colorado, he took a trip back to Los Angeles to visit his storage unit. He discovered his family had not been paying for the unit as he believed, and found himself in debt to the storage facility. The trip was supposed to last only a few days, and he decided to sell his motorcycle and use that money to return to Denver. However, on that first night in Los Angeles, his personal truck was stolen along with the motorcycle and all the rest of his belongings. He has been unhoused ever since. Mr. Castellanos ultimately ended up on the streets in the San Fernando Valley. At

-29-

one point, he fell into such deep crisis that he admitted himself into a psychiatric

hold for 18 days. Upon his release, he performed odd jobs to survive, and ultimately

connected to the Sepulveda VA Medical Center, then to VAGLAHS.

73.     In September 2021, Mr. Castellanos was in a CTRS tent before he

obtained a double tiny shed in March 2022 with his partner, Plaintiff Wright. Mr.

Castellanos was in their shed with Ms. Wright when, on September 9, 2022, a fire

destroyed their shed along with several others. Mr. Castellanos reports that the VA

immediately threw him out to the streets, offering no support, despite his now again

having lost every single one his belongings. He received no support via an exit plan,

food, or financial resources. Both he and Ms. Wright slept on the streets, in a car,

and ultimately Ms. Wright obtained housing in Lancaster, California through

another agency (where Mr. Castellanos also takes shelter under her HUD-VASH

voucher). After several attempts of communication, they have been unable to

retrieve their packages or mail from the West LA Grounds, which had remained

their mailing address for a reasonable period after the destruction of their shed. He

has a diagnosed, service-connected disability of PTSD, but given that he is now

staying in Lancaster, he has been unable to access his appointments in West LA that

would enable him to obtain the highest possible disability rating. Mr. Castellanos

wants a home and not a temporary solution. He has an elderly mother who requires

his care (although he now recognizes he could never subject his mother to the unsafe

neighborhood where they currently are housed), and his own medical needs require

stable and supportive housing.

**Joseph Fields**

74.     Plaintiff Joseph Fields is a 51-year old Army veteran from Los Angeles

who grew up between Ventura and Riverside. Mr. Fields has a 100% service-

connected disability rating and is eligible for medical benefits from the VA. Because

he resides in Los Angeles, Mr. Fields seeks treatment and housing from

-30-

VAGLAHS. He does not want to live in an institution in order to receive services, nor does he want to again live on the street or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

75.     Since he was a child, Mr. Fields always knew he wanted to join the armed forces. This was in part influenced by his grandfather, a man he deeply admired and a Korean War veteran, who helped raise him. In 1988, at 17 years-old, he joined the National Guard, began basic training, and completed his GED. After six months he was transferred to the Army, and trained for 15 weeks at the Fort Sill Field Artillery School. After this, he served with the National Guard for six months before going to Germany. It was hard work but Mr. Fields was extremely proud of his service.

76.     In 1990, Mr. Fields began his assignment in Saudi Arabia at the onset of Operation Desert Shield. He was extensively trained in all aspects of the use of a howitzer—a long-range weapon with shells that weigh a minimum of 100 pounds. In December 1990, he joined a blockade with naval and air forces near the border of Iraq and Saudi Arabia. Mr. Fields believes he loaded and deployed at least fifty rounds from each howitzer. This was a physically challenging assignment because of the weight of the shells. He remained in the service in Saudi Arabia for approximately seven months, after which he returned to Germany, then to Fort Lewis, Washington. Mr. Fields reports that upon his return to the Unites States, he had difficulty relating with people, had difficulty with his chain of command, and began to self-medicate with alcohol.

77.     After serving for more than three years, Mr. Fields received an honorable discharge along with a list of decorations, including an Army Commendation Medal, Army Achievement Medal, Southwest Asia Service Medal Ribbon, National Defense Service Ribbon, Overseas Ribbon, and Basic Training

Ribbon.

78.     Back in Riverside County, Mr. Fields began a family and worked at a carpet care and house cleaning job. However, he had nightmares and continued drinking to cope. Eventually, he was diagnosed with service-related PTSD and Gulf War Syndrome. He also suffers from immense back pain and ringing in his ears as a result of his weapons training and deployment.

79.     Mr. Fields visited the VA in 2011 to get help to address his suicidal ideation and substance use. He first sought help from New Directions for Veterans. It was a terrible experience with no support or understanding from staff, so he ultimately entered the Domiciliary at the VA and received services from the National Center for PTSD. During this time he became addicted to painkillers.

80.     Mr. Fields graduated from the clinical rehabilitation program with the Domiciliary in 2015. Left without housing, and still dealing with his mental disability and severe back pain, he ended up on the streets of San Vicente, where he found a community of veterans. During this time, Mr. Fields felt as if his life did not matter. He slept on a piece of cardboard on the sidewalk, panhandled for money, and often went hungry. He felt deep shame. Mr. Fields has seen more people die on the sidewalks of Los Angeles than during his time in Saudi Arabia.

81.     For almost one year now he has been living in a tiny shed, which he compares to a medical cell in a county jail. There is no bathroom, sink, or lock on the door, and the bed is more like a hammock. He was told this was his only option, unless he wanted to end up back on the streets.

82.     Since the Original Complaint was filed, Mr. Fields has now been approved for housing on the WLA Grounds in one of the buildings that opened in May 2023. He is still completing the process and has not yet been assigned a unit. Therefore, he is still currently unhoused and the "permanency" of the new assignment is still unknown, which leaves him at continued risk of future

homelessness.

**Lavon Johnson**

83.     Plaintiff Lavon Johnson is a 36-year-old Army veteran with severe disabilities as a result of his service. Mr. Johnson has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Johnson seeks treatment and housing from VAGLAHS. He does not want to live in an institution in order to receive services, nor does he want to again live in a tent or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

84.     Mr. Johnson was born in Heidelberg, Germany to two military service members. His grandfather also served. He wanted to follow in the family tradition, and make his father proud. He enlisted in the Army in June 2004, giving up his German citizenship to do so.

85.     In February 2005, as a 19-year-old, Mr. Johnson was featured in an "Army of One" commercial, which he uploaded to the internet in October 2011.[39] In the commercial, Mr. Johnson is introduced to the team, and told he will be "working on the 120 today"—a Black Hawk military helicopter. He stands there strong, beaming, with a bright beautiful smile. Asked, "Have you ever been around anything this fast before," a montage scene of helicopters in combat flashes, and he responds, "Yeah, in my last job." The commercial ends with a narrator voiceover: "See how Army training gives you strength for now, strength for later, at GOARMY.com. Parts of the video are stamped with "Paid for by the U.S. Army."

86.     Mr. Johnson served 4.9 years, including in Iraq during the time of Saddam Hussein's capture and execution and where he lost his best friend due to

---

[39] Lavon Johnson, *My Last Job R2Lg001*.mpg, YouTube (Oct. 19, 2011), https://www.youtube.com/watch?v=tvjuIbn8060.

mortar fire. After an honorable discharge that came with a meager $1,000 check, he was immediately homeless. At first, he was homeless in Fort Worth, Texas, closer to where his mother lived. But he found the VA shelter and health care systems to be unworkable. Eventually, he moved to Los Angeles. He has now been homeless for 10 years. He has applied for housing directly, but has been rejected by a housing provider on the WLA Grounds on the basis of exceeding AMI eligibility because of his VA disability benefits.

87.     Mr. Johnson has mental illness and anger issues, and has been prescribed multiple medications by the VA, which have not worked. He has sought counseling, but feels it only retraumatized him.

88.     Mr. Johnson used to write and play the piano. For him, playing piano "soothes the soul." But his combat experience and consequent mental illness and homelessness have taken those joys from him. While living in the encampment on Veterans Row, he had a piano next to his tent, which he had rescued from a nearby trash. He was known by both fellow encampment residents and local passers-by for playing classical music. He even built a shelter for it. But when the VA cleared out the encampment in November 2021, they took the piano, and, although he was told he could access it there any time, the room where it is stored is always locked.

89.     Since the Original Complaint was filed, Mr. Johnson has been formally denied housing by a housing provider on the WLA Grounds on account of his 100% service-connected disability rating plus special monthly compensation providing him with compensation that exceeds AMI eligibility. He was also forced to leave his CTRS tiny shed when an electrical fire began, allegedly due to a phone charger. He then set up a tent *outside* the gate of the VA Grounds, where he lived for a few weeks until—less than one week ago—VA police cleared his encampment, disposing of his tent and all his personal belongings.

**Billy Edwards**

90.     Plaintiff Billy Edwards is a 76-year-old Army Veteran with severe disabilities resulting from his service. Mr. Edwards is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Edwards seeks treatment from VAGLAHS. Mr. Edwards does not want to live in an institution in order to receive services, nor does he want to continue living on the street or live in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

91.     Mr. Edwards is an Army Veteran who was drafted into military service in January 1966. He then served along the demilitarized zone (DMZ) of Korea for 13 months between May 1966 and June 1967. During that time (especially concentrated from late 1966 through 1969), there was significant military confrontation that included guerrilla warfare and terrorism directed against the people of South Korea and the Americans serving there. Mr. Edwards experienced dangerous and violent hand-to-hand combat, and is haunted by memories of the atrocities he witnessed.

92.     Almost certainly a result of his combat experience, he developed a mental health condition alongside several physical disabilities, including paralysis of the sciatic nerve, intervertebral disc syndrome, lumbosacral condition, paralysis of the median nerve, and tinnitus with 93% hearing loss. Mr. Edwards' physical and mental disabilities have made it difficult to work.

93.     Following his combat experience, he continued serving in active duty until May 1968 and then the reserves until May 1972, at which time Mr. Edwards received an honorable discharge. He has experienced homelessness since. He must take a bus from where he usually camps to the WLA Grounds to get medical treatment. Because Mr. Edwards does not have an address, he has difficulty receiving mail or storing his belongings, including his cell phone.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

**Jessica Miles**

94.     Plaintiff Jessica Miles is a 36-year-old resident of Los Angeles County and Army veteran with severe disabilities as a result of her military service. Ms. Miles has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because she resides in Los Angeles, Ms. Miles seeks treatment from VAGLAHS. Ms. Miles does not want to live in an institution in order to receive services, nor does she want to again live in a tent or her car or continue living in a tiny shed. She could be appropriately served in the community and does not oppose community-based services and housing.

95.     Ms. Miles enlisted in the Army at the age of 18, just out of high school. She served from 2005-2007. In 2006, she became pregnant and attempted to utilize the military's family care plan to request a discharge.

96.     Immediately following her discharge, Ms. Miles was homeless for 10 months, during which her then-infant daughter went to live with her family. Since first becoming homeless in 2007, Ms. Miles has been homeless more than 14 times due to her continued struggle with PTSD.

97.     Ms. Miles suffered extensive damage to her upper vertebrae as a result of the physical strain of the Army's weapons training. She suffers from extreme back pain. She has bilateral arthritis and a dislocated hip that, untreated, also developed into arthritis. She is prescribed both a walker and a cane to assist with mobility issues. The lack of support services made available to her to feel overwhelmed, frustrated, and traumatized. Specifically, she struggles with PTSD and major depressive disorder, experiences panic attacks if in public for an extended time, and finds it difficult to interact with civilians. Both her visible and invisible injuries have made it challenging for Ms. Miles to maintain steady employment.

98.     When she first arrived in California with her daughter in January 2019, Ms. Miles visited the VA to obtain a referral for a chiropractor to continue receiving

-36-

treatment. In West LA, Ms. Miles has received numerous unsafe housing placements—including experiencing assault—and her complaints to the VA have gone unaddressed. At first, she was not offered any support at the West LA Grounds, but was instead directed to VASH, which provided a temporary housing placement in Palmdale in January 2020.

99.   In July 2021, Ms. Miles returned to West LA, where she was placed in a tent on the VA Grounds until she was placed in a tiny shed in November. This move required her to separate from her daughter who was not allowed to join her there. She continues to live in the tiny shed. At the tiny shed location, the showers remain broken for months, there is little privacy, there is no hot water, and the portable bathrooms are unsanitary.

100.   On August 4, 2022, after raising several concerns to staff about harassment and her own need for resources, Ms. Miles was locked out of her shed by a social worker without any advance warning. Reasons cited for her eviction included accusations of loud music and disrespect to staff—both of which Ms. Miles denies. Left without any other options, Ms. Miles ended up in a motel until social media support led to a petition to readmit her into the program, which resulted in her readmission after a week. However, these VA allegations follow Ms. Miles around nationally as behavior flags in her chart, which adversely impacts any future services she might otherwise receive.

101.   Feeling failed by the VA, Ms. Miles has herself advocated with the Brentwood community counsel and the director of CTRS, but has still not received support or other relief relating to her numerous grievances, including the lack of accommodation for female veterans. Ms. Miles says she wants a home, not a temporary placement. Ms. Miles continues to advocate for all veterans, but especially female veterans her own observation and experience make clear the system is not working to accommodate.

102.   Since the filing of the Original Complaint, Ms. Miles has again been rejected for housing on the WLA Grounds, this time by the Westwood Transitional Village, housing sponsored by The Salvation Army for homeless families, including veterans with families, on two purported bases: (1) that her daughter is not currently living with her, even though (a) that is a direct result of Ms. Miles' housing situation, and would be altered by receiving such housing, and (b), as a proxy for her daughter's physical presence, she was requested to provide—and provided—a notarized letter showing she holds custody; and (2) based on an inappropriate and improper assumption that, once admitted, she would not participate in case management.

### Doe 1[40]

103.   Plaintiff Doe 1 is a 51-year old Navy veteran who served from 1990 to 1993. She is a resident of Los Angeles County and has severe disabilities as a result of her military service. Doe 1 has a 60% service-connected disability rating and is eligible for medical benefits from the VA. Because she resides in Los Angeles, Doe 1 seeks treatment from VAGLAHS. Doe 1 does not want to live in an institution in order to receive services, nor does she want to again live in her car or on the street or continue living in a tiny shed. She could be appropriately served in the community and does not oppose community-based services and housing.

104.   Doe 1 was medically discharged because of migraine headaches. In early 2022, Doe 1 moved to San Diego, fleeing an abusive marriage. She began renting a room through a veteran's assistance agency. She then became homeless and lived in her car until the car eventually needed repair work. She then lived on the streets of Vista, California for one week while waiting for it to be repaired.

---

[40] Plaintiffs intend to seek leave of the Court and file a motion to proceed under pseudonyms and for a protective order on behalf of Does 1-2 once Plaintiffs have the opportunity to meet and confer with counsel for Defendants pursuant to C.D. Cal. Local Rule 7-3.

105.   She next went to transitional veterans housing in Long Beach, California. The transitional housing lacked privacy and felt like a jail. She next went to the West LA tiny sheds. This allowed her to be closer to the VA medical facilities where she receives extensive medical services for her migraines. However, she feels the tiny sheds are inadequate to serve the needs of her and her fellow veterans. They do not accommodate her migraines and tinnitus. Nor are they helpful for someone who is starting her life over after an abusive marriage.

106.   Since the Original Complaint was filed, Doe 1 has now received housing on the WLA Grounds in one of the buildings that opened in May 2023. However, given the extreme recentness of this development, the "permanency" of the new assignment is still unknown, which leaves her at continued risk of future homelessness.

**Joshua Robert Petitt**

107.   Plaintiff Joshua Robert Petitt is a 39-year old Army veteran who served from 2001 to 2008. Mr. Petitt has severe disabilities as a result of his military service. Mr. Petitt has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Petitt seeks treatment from VAGLAHS. Mr. Petitt does not want to live in an institution in order to receive services, nor does he want to again live on the street or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

108.   Mr. Petitt grew up in Whittier, California. He enlisted on September 13, 2001, in response to the September 11 terrorist attacks. He was deployed to Iraq from 2004 to 2005. While serving in an infantry unit in Anbar province, he endured some of the most violent combat operations of the Iraq War, including the battles of Fallujah and Ramadi. He was awarded three purple hearts. About half of the approximately 600 soldiers in his unit were either killed or wounded.

-39-

109.   Mr. Petitt returned from Iraq in 2005 and began suffering from PTSD. He was beset by nightmares. He would wake up in the middle of the night and believe he was still in Iraq. He reported his mental health symptoms up the chain of command, but was ostracized. He started using drugs to self-medicate. He left the Army with an honorable discharge.

110.   Mr. Petitt divorced in 2010 and became unhoused. He has not worked in 10 years. He started going to the VA for mental health services about 10 years ago. He has a diagnosed, service-connected disability of PTSD. He also has knee, back, and hearing issues. He lives at the tiny shed park on the WLA Grounds after a long period living on the street outside of the Grounds.

111.   Since becoming homeless in Los Angeles, Mr. Petitt's case worker has repeatedly told him that he was ineligible for the new VA housing that is currently under construction because his VA disability compensation is deemed too high. However, his monthly compensation cannot independently afford him housing near the WLA Grounds, where he needs to live because of the extensive supportive services he receives for his PTSD, and because of the support he requires from living in a veteran community to help control his anger.

112.   Since the Original Complaint was filed, Mr. Petitt has been approved for housing on the WLA Grounds in one of the buildings that opened in May 2023. He is still completing the process and has not yet been assigned a unit. Therefore, he is still currently unhoused and the "permanency" of the new assignment is still unknown, which leaves him at continued risk of future homelessness.

**Glenn Surrette**

113.   Plaintiff Glenn Surrette is a 65-year old veteran with severe disabilities as a result of his military service. Mr. Surrette has a 70% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Surrette seeks treatment from VAGLAHS. Mr. Surrette does

-40-

not want to live in an institution in order to receive services, nor does he want to again live in his car or on the street or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

114.   Mr. Surrette was born in Hartford, Connecticut, and moved to Los Angeles at the age of twelve. After high school, he enlisted in the National Guard in August 1977. He then transferred to the Army, where he served until December 1979.

115.   In 1979, he received an honorable discharge on account of mental health issues and was admitted to Darnell Army Hospital. After his release from Darnell, he returned to Los Angeles, and received his exit physical in Long Beach. The VA recognizes his service-connected disabilities.

116.   After his discharge, Mr. Surrette worked in Los Angeles for several years. But in 2017, while working for the VA, he was terminated suddenly. Following his termination, he suffered an arm injury that resembled a stroke. He also became homeless. He had a car at the time, so initially stayed in the car with his girlfriend. Periodically they would spend one or two nights in a hotel for a break and to clean themselves. Then for two months they received housing from Volunteers of America.

117.   Mr. Surrette has since been offered housing through HUD/VASH and PATH, but he was told that he could not live with his girlfriend. Thus, he felt he could not accept. If he were offered housing where he could live with his girlfriend and come and go as he pleases, he would accept it.

### Naryan Stibbie

118.   Plaintiff Naryan Stibbie is an 85-year-old resident of Los Angeles County, California. Mr. Stibbie is a veteran who became severely disabled resulting from his service to this country. Mr. Stibbie has a 100% service-connected disability

rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Mr. Stibbie seeks treatment from VAGLAHS. Mr. Stibbie does not want to live in an institution in order to receive services, nor does he want to again live in his car or on the street or live in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

119.   Mr. Stibbie is a Navy veteran who served on destroyer warships in the late 1950s. He developed mental health symptoms resulting from his experiences. He has tinnitus and hearing loss because of extreme noise exposure from heavy machinery and blaring gunfire. He also suffers from continuing knee and back pain since a fall in service. Mr. Stibbie struggled through these disabilities for many years, building a small business as a building contractor. By about 2002, his disabilities made it impossible to continue working in the construction industry. His age, disabilities, and limited vocational experience significantly narrowed any further employment opportunities.

120.   Mr. Stibbie began to experience homelessness, cycling between shelters and the street. Mr. Stibbie was housed in a motel by the Salvation Army during much of the COVID-19 pandemic. In May 2022, he was deemed no longer eligible for their housing services. Since then, he has lived in his car, sleeping in various locations in the Los Angeles harbor area. He has navigated the labyrinth of homelessness services in Los Angeles County throughout the summer of 2022, but to no avail. He continues to struggle to find Permanent Supportive Housing that meets the needs of both his age and disabilities.

### Doe 2

121.   Plaintiff Doe 2 is a 61-year old Army veteran who served from 1979 to 1982. Doe 2 is a resident of Los Angeles County with severe disabilities as a result of his military service. Doe 2 has a 100% service-connected disability rating and is eligible for medical benefits from the VA. Because he resides in Los Angeles, Doe 2

seeks treatment from VAGLAHS. Doe 2 does not want to live in an institution in order to receive services, nor does he want to again live on the street or continue living in a tiny shed. He could be appropriately served in the community and does not oppose community-based services and housing.

122.    Doe 2 grew up outside Philadelphia and enlisted in the Army right after high school. After completing basic training, he entered the artillery service. He spent the next 26 months in Germany. He returned to the United States in 1982 and was issued an honorable discharge.

123.    After leaving the service, he initially worked odd jobs with his uncle, and then moved to Los Angeles to work as an extra on film sets. Eventually, work dried up and he became unhoused. He started staying at the Salvation Army shelter in or around 2012. He also spent time sleeping on the street.

124.    Doe 2 came to the WLA Grounds to live at the tiny shed park in early 2022. He has a diagnosed, service-connected disability of PTSD. His mental health symptoms have made it difficult to access and maintain housing on his own. He experiences elevated paranoia due to his PTSD. He can only sleep three to four hours per night. He is constantly tired. He fears people will steal from him while he is sleeping. He has deep trust issues. He requires deep supportive care.

125.    Doe 2's PTSD was further exacerbated by the fire at the tiny shed complex in September 2022. Not only did his shed burn down, but this was a near-death experience for him and his dog. Staying in the tiny sheds feels both depressing and dangerous.

126.    Since the Original Complaint was filed, Doe 2 has been approved for housing on the WLA Grounds in one of the buildings that opened in May 2023. He has been assigned a unit but has not yet received a move-in date. Therefore, he is still currently unhoused and the "permanency" of the new assignment is still unknown, which leaves him at continued risk of future homelessness.

-43-

**National Veterans Foundation**

127.   Plaintiff National Veterans Foundation ("NVF") is a veteran-run organization located in Los Angeles that provides life-sustaining services for veterans throughout the country, but in particular for unhoused veterans living on the streets of Los Angeles. The NVF's Homeless Veteran Outreach Program provides outreach missions each week to areas of Los Angeles with high concentrations of homeless individuals to assist unhoused veterans living in encampments and other circumstances obtain food, water, and, for the past few years, supplies to reduce the likelihood of contracting COVID-19. The Street Outreach team identifies homeless veterans and works to get them into programs that will get them off the streets. This work is an integral part of NVF's mission to stop veteran suicide, the rates of which are double that of non-veteran counterparts. Although the VA estimates that 17 veterans die each day from suicide, the number may be much higher—perhaps up to 44—because of misreported service records

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

and underreported accidental overdose deaths.[41]



*Homeless encampment near Interstate 10 where NVF Street Outreach team visits*
*(Credit: Malka Zeefe, 2022)*

128.    This year is the 37th anniversary of the NVF. The NVF's Founder and President, Shad Meshad, has worked as a therapist for veterans and as a nationally-renowned advocate for veterans' rights, including the end of veteran homelessness. Mr. Meshad has a Masters degree in psychiatric social work from Florida State University. He enlisted in the army in 1970 and served as a counselor for U.S. soldiers in Vietnam. Upon his return to the U.S., Mr. Meshad founded and directed the Vietnam Veterans Re-Socialization Unit at the VA Hospital in Los Angeles. This first of its kind program focused on readjustment challenges faced by Vietnam veterans, many leading to homelessness. Mr. Meshad was among the first to study what is now known as PTSD. He has served on the faculty of the International Critical Incident Foundation, as President and Board member of the Association of Traumatic Stress Specialists and on the Board of Directors of the Green Cross

[41] Leo Shane III, *Veterans suicide rate may be double federal estimates, study suggests*, Military Times (Sept. 17 2022), https://www.militarytimes.com/veterans/2022/09/17/veterans-suicide-rate-may-be-double-federal-estimates-study-suggests/.

Project. The U.S. government called upon Mr. Meshad to help train the critical incident and trauma teams at Ground Zero in the wake of September 11. He has devoted his life to assisting veterans to heal and readjust from the tragic consequences of service to the nation, including homelessness and lack of access to necessary mental and medical services.

129.   NVF sues on behalf of its members and constituents, who are homeless and at-risk veterans with SMI and TBI.

130.   Plaintiffs have severe mental impairments that substantially limit one or more major life activities. They are, therefore, people with disabilities for purposes of the Rehabilitation Act.

131.   Plaintiffs are veterans who are eligible for VA health and housing services. They are, therefore, qualified for VA programs for purposes of the Rehabilitation Act.

132.   Defendant Denis Richard McDonough is the Secretary of the VA.[42] He is sued in his official capacity. The VA is a federal agency with headquarters in Washington, D.C. and is covered by the Rehabilitation Act.[43] The VA is the successor entity to the National Home for Disabled Volunteer Soldiers and was previously named the Veterans Administration.[44]

133.   Defendant McDonough oversees the Veterans Health Administration ("VHA"), which operates the United States' largest integrated health care system consisting of 171 medical centers and numerous community-based outpatient clinics, community living centers, veteran centers and domiciliaries. VHA is part of

---

[42] U.S. Dep't Vet. Aff., Secretary of Veterans Affairs, https://www.va.gov/opa/bios/secva.asp (last updated Feb. 9, 2021).
[43] U.S. Dep't Vet. Aff., VA Central Offices, https://www.va.gov/directory/guide/hq.asp (last updated Nov. 3, 2021).
[44] Nat'l Park Serv., *History of the National Home for Disabled Volunteer Soldiers*, https://www.nps.gov/articles/history-of-disabled-volunteer-soldiers.htm (last updated Nov. 14, 2017).

-46-

1    the VA, and, therefore, is covered by the Rehabilitation Act.[45]

2        134.    Defendant McDonough's official duties as Secretary of the VA include

3    the proper execution and administration of all laws and programs administered by

4    the VA and the control, direction, and management of the VA.[46] As Secretary of the

5    VA, Defendant McDonough has the ultimate responsibility for ensuring that the VA

6    and its constituent agencies and programs comply with relevant federal law,

7    regulations, and policies, as well as ensuring that the VA maintains compliance with

8    contracts and land grants such as the 1888 deed referenced in this Complaint.

9        135.    Defendant Marcia L. Fudge is the Secretary of the Department of

10   Housing and Urban Development (HUD).[47] She is sued in her official capacity.

11   HUD is a federal agency headquartered in Washington, D.C. and is covered by the

12   Rehabilitation Act.[48] HUD is responsible for funding local Public Housing Agencies

13   (PHAs), which provide housing assistance and other benefits to veterans with

14   disabilities across the country.[49]

15       136.    Defendant Fudge's official duties as Secretary of HUD include the

16   coordination of Federal policies affecting housing and oversight of the distribution

17   of federal funding for housing construction and vouchers.[50] Under Secretary

18   Fudge's leadership, HUD is authorized to fund construction of public housing,

19   including, on information and belief, veteran housing, and to fund HUD-Veterans

20   Affairs Supportive Housing ("HUD-VASH") vouchers to provide rental assistance

21   ─────────────────────
22   [45] U.S. Dep't Vet. Aff., About VHA, https://www.va.gov/health/aboutVHA.asp (last
     visited Nov. 14, 2022).
23   [46] *See* 38 U.S.C. § 303.
     [47] U.S. Dep't of Hous. & Urb. Dev., Marcia L. Fudge,
24   https://www.hud.gov/about/leadership/marcia_fudge (last visited Apr. 25, 2023).
25   [48] U.S. Dept. of Hous. & Urb. Dev., About HUD, https://www.hud.gov/about (last
     visited Apr. 25, 2023).
26   [49] U.S. Dep't. of Hous. & Urb. Dev., Questions and Answers About HUD,
27   https://www.hud.gov/about/qaintro (last visited Apr. 25, 2023).
     [50] 42 U.S.C. § 3532.
28
─────────────────────
-47-

for homeless veterans.

137.   Defendant Steven Braverman is the Director of VAGLAHS. He is sued in his official capacity. VAGLAHS is part of the VA and maintains its headquarters in Los Angeles, California, and serves veterans in Los Angeles, Ventura, Santa Barbara, San Luis Obispo, and Kern counties in Southern California.[51] VAGLAHS is one of eight health care systems operated by VA Desert Pacific Healthcare Network to provide preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care to veterans.[52]

138.   Defendant Braverman's official duties as Director of VAGLAHS include supervising the day-to-day operations and services offered by all the institutions operated by VAGLAHS, including all programs operated at the WLA Grounds, and ensuring that VAGLAHS complies with relevant federal law, regulations, and policies. As the Director of VAGLAHS, Defendant Braverman is the VAGLAHS official with final responsibility and authority to approve, modify, or terminate programs or services offered as part of the VHA benefits delivered by VAGLAHS;[53] and he is the VAGLAHS official with ultimate responsibility and

---

[51] U.S. Dep't Vet. Aff., VA Greater Los Angeles Health Care, https://www.va.gov/greater-los-angeles-health-care/ (last visited Nov. 14, 2022); Press Release, U.S. Dep't Vet. Aff., Greater Los Angeles VA Offers Services for Veterans Experiencing Homelessness 2 (Oct. 14, 2021), https://www.va.gov/files/2021-12/SV%20Encampment%20Sweep%20PR_Nov21_FINAL.pdf.

[52] U.S. Dep't Vet. Aff., About the VA Desert Pacific Healthcare Network, https://www.desertpacific.va.gov/DESERTPACIFIC/about/index.asp (last visited Nov. 14, 2022).

[53] *See, e.g.*, Steven Braverman, LinkedIn, https://www.linkedin.com/in/bravermansteven? ("Provides full delegated line authority and responsibility for executive-level management with overall responsibility for planning, organizing, directing, coordinating, controlling, reviewing, evaluating and improving medical, administrative, and supporting operations of a health care system.") .

-48-

authority to approve specific uses of the WLA Grounds, including entering into land use agreements with private and public entities.[54]

139.    Defendant Douglas Guthrie is the President and Chief Executive Officer of the Housing Authority for the City of Los Angeles (HACLA). HACLA is the public housing authority for Los Angeles. He is sued in his official capacity.[55]

140.    Defendant Guthrie oversees one of the nation's largest public housing authorities (PHA), which is responsible for administering nearly 6,500 public housing units, and 27,000 housing units for the homeless. These units represent 44% of HACLA's overall housing voucher and certificate allocations. As PHAs receive federal funding from HUD, they are covered by the Rehabilitation Act.[56]

141.    Defendant Keith Harris is the senior executive homelessness agent of VAGLAHS. He is sued in his official capacity.[57]

142.    Defendant Harris' official duties as senior executive homelessness

---

[54] *See* U.S. Dep't Vet. Aff., GLA Master Plan 2022-2027 3, https://draft-master-plan-assets.s3.amazonaws.com/media/uploads/2021/08/19/GLA_Master_Plan_2022-2027_Information.pdf; U.S. Dep't Vet. Aff., Decision Tree- GLA Asset Management Review: VAGLAHS Land Use & Event Proposal, https://draft-master-plan-assets.s3.amazonaws.com/media/uploads/2019/10/18/LU_Handouts_Draft_09132019.pdf; U.S. Dep't Vet. Aff., Master Plan 2022 III, 7 (Mar. 28, 2022), https://draft-master-plan-assets.s3.amazonaws.com/media/uploads/2022/04/12/2022-03-18_WLA-VA-Master-Plan-Signed.pdf ("2022 Master Plan"); W. L.A. VA Med. Ctr., Veterans Programs Enhancement Act of 1998 (VPEA) Draft Master Plan 10 (Jan. 2011), *available at* https://www.scribd.com/document/48127448/WLA-VA-Draft-Master-Plan ("2011 Draft Master Plan").

[55] Hous. Auth. for the City of Los Angeles, President and CEO, https://www.hacla.org/en/about-us/president-and-ceo (last visited Apr. 25, 2023).

[56] Questions and Answers About HUD, *supra* note 55.

[57] Press Release, U.S. Dep't Vet. Aff., Newly Created VA Senior Level Post to Coordinate Veteran Homelessness Effort in Greater Los Angeles 1 (Dec. 22, 2021), https://www.va.gov/opa/pressrel/includes/viewPDF.cfm?id=5749.

agent of VAGLAHS include implementing the master plan for the WLA Grounds and supervising thousands of employees who provide outreach, case management, health care and housing services to veterans experiencing or at risk of homelessness.[58]

## FACTUAL ALLEGATIONS

143.   As then-Secretary of the VA, Eric K. Shinseki, said in 2009, "[t]hose who have served this nation as Veterans should never find themselves on the streets, living without care and without hope."[59] During Secretary McDonough's February 2022 visit to Los Angeles, he asserted that the funding, partnerships, and other tools necessary to reduce homelessness exist. But the VA has not, over the past 23 years, applied the "energy and effort needed to finish the job."[60] During his recent visit to attend the ribbon-cutting of two long-awaited housing buildings on the VA Grounds, he said, "Until we've fully housed every veteran, we will be unsatisfied and we'll keep working this."[61]

144.   Yet, tragically, tens of thousands of veterans still find themselves homeless and in need of medical and mental health care every night, often as consequence of service-related disabilities.[62]

---

[58] *Id.*

[59] Press Release, U.S. Dep't. Vet. Aff., *Secretary Shinseki Details Plan to End Homelessness for Veterans* (Nov. 3, 2009), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=1807.

[60] Nikki Wentling, *Q&A with VA Secretary Denis McDonough About Veteran Homelessness in Los Angeles*, Stars and Stripes (Mar. 16, 2022), https://www.stripes.com/veterans/2022-03-16/veterans-affairs-homeless-los-angeles-mcdonough-5364948.html.

[61] Nick Gerda, *Unhoused Veterans Will Get New Apartments in West LA, Though VA Is Years Behind On Its Promises*, LAist (May 2, 2023), https://laist.com/news/housing-homelessness/west-la-va-campus-housing-homeless-veterans-affairs.

[62] 2020 AHAR Report, *supra* note 4, at 52.

-50-

### **Veterans Are Especially Susceptible to Serious Mental Illness and Homelessness**

145.   The U.S. Department of Housing and Urban Development ("HUD") has estimated that 37,252 veterans were homeless on any given night.[63] Although the number of unhoused veterans was reduced for a time, progress has stalled since 2016.[64] As recognized by the VA, "both male and female veterans are at greater risk for homelessness than their non-veteran counterparts . . . ."[65]

146.   Although reliable data is difficult to find, recent veterans who served in Operation Iraqi Freedom or Operation Enduring Freedom are at high risk of becoming homeless. In December 2010, the U.S. Department of Housing and Urban Development (HUD) estimated that at least 12,700 veterans under the age of 30—likely comprising veterans who served in Iraq or Afghanistan—were homeless,[66] and that number has almost certainly grown as additional service members have left military service in the last twelve years.

147.   Women veterans are also particularly vulnerable to homelessness. In 2016, VA's National Center on Homelessness Among Veterans (NCHAV) published a report finding that women veterans are "more than twice as likely as non-Veteran women and over three times as likely as non-Veteran women living in

---

[63] Likewise, the U.S. Department of Housing and Urban Development estimates 21 out of every 10,000 U.S. veterans was experiencing homelessness on a single night, which works out to one out of every 473. *Id*.

[64] *See* U.S. Dep't Vet. Aff., Veteran Homelessness Fact Sheet (2021), https://www.va.gov/HOMELESS/Veteran_Homelessness_Fact_Sheet.asp.

[65] U.S. Dep't Vet. Aff., Off. Res. & Dev., VA Research on Homelessness, https://www.research.va.gov/topics/homelessness.cfm (last visited Nov. 14, 2022).

[66] U.S. Dep't Hous. & Urb. Dev., Veteran Homelessness: A Supplemental Report to the 2010 Annual Homeless Assessment Report to Congress, 8, 16, 42 (2010), https://www.va.gov/HOMELESS/docs/2010AHARVeteransReport.pdf.

poverty to experience homelessness."[67] NCHAV also found that "the number of women accessing VA specialized homeless programs or with a homeless identification" tripled between 2010 and 2015 and is expected to increase an additional nine percent by 2025.[68]

148.   Many veterans return to civilian life bearing scars both visible and invisible. Among veterans who had a service-connected disability, post-9/11 veterans had a 39% chance of being severely or totally disabled—significantly higher than veterans from other any other periods.[69] According to one study, one in five soldiers who were deployed as part of Operation Enduring Freedom ("OEF") or Operation Iraqi Freedom ("OIF") returned home with symptoms of PTSD or major depression, which is a substantially higher rate than the general population.[70] The invisible scars include PTSD, depression, and other Serious Mental Illness either caused or aggravated by their experiences.

149.   Like other homeless populations, unhoused veterans' risk factors for homelessness include poverty, joblessness, mental illness, and substance use.[71] Veterans also have distinctive health issues related to their military service and are more likely to suffer from trauma-related injuries, substance abuse, and mental

---

[67] U.S Dep't Vet. Aff., Nat'l Ctr. Homelessness among Veterans, Women Veterans and Homelessness: Homeless Evidence & Research Roundtable Series 5 (2016), https://www.va.gov/HOMELESS/nchav/resources/docs/veteran-populations/women/Women-Veterans-and-Homelessness-July-2016.pdf.

[68] *Id.* at 6.

[69] Jonathan E. Vespa, Those Who Served: America's Veterans From World War II to the War on Terror, ACS-43 11 (June 2020), https://www.census.gov/content/dam/Census/library/publications/2020/demo/acs-43.pdf.

[70] Tanielian, *supra* note 14, at 252.

[71] Tsai, *supra* note 6, at 188; *see also* Robert A. Rosenheck & Peter Koegel, *Characteristics of Veterans and Nonveterans in Three Samples of Homeless Men,* 44 Hosp. & Cmty. Psychiatry 858, 861 (1993).

health disorders than people who have never served in the armed forces.[72]

150. Due to the relatively higher incidence of Serious Mental Illness and associated substance use disorders among veterans, veterans are particularly vulnerable to homelessness.[73] Military service is strongly associated with factors that contribute to homelessness.[74] For example, combat exposure and the stress related to deployment and high levels of social isolation upon returning home, psychiatric disorders, and associated substance use disorders, all contribute directly to homelessness.[75]

151. Veterans of the post-Vietnam All-Volunteer Force era have an even higher risk of mental-illness-induced homelessness than veterans from earlier eras.[76]

---

[72] Maria Olenick et al., *US veterans and their unique issues: enhancing health care professional awareness*, 6 Adv. Med. Educ. & Prac. 635, 635-39 (2015).

[73] *See, e.g.*, Robert Rosenheck et al., *The Proportion of Veterans Among Homeless Men*, 84 Am. J. Pub. Health 466 (1994), https://pubmed.ncbi.nlm.nih.gov/8129068/ (finding that higher prevalence of psychiatric illness, substance abuse, and, especially, antisocial personality disorder among veterans is a contributor to their greater vulnerability to homelessness).

[74] *See, e.g.*, Robert Rosenheck & Alan Fontana, *A Model of Homelessness Among Male Veterans of the Vietnam War Generation*, 151 Am. J. Psychiatry 421, 425 (1994), https://pubmed.ncbi.nlm.nih.gov/8109652/ (reporting significant indirect effects on homelessness resulting from war zone traumatic experience).

[75] *Id.* at 421 (finding that post-military social isolation, psychiatric disorder, and substance abuse had the strongest direct effects on homelessness); *see also* Howard Balshem et al., U.S. Dep't Vet. Aff., A Critical Review of the Literature Regarding Homelessness Among Veterans 26 (2011), https://www.ncbi.nlm.nih.gov/books/n/vahomeless/pdf/.

[76] *See, e.g.*, Karen H. Seal et al., *Trends and Risk Factors for Mental Health Diagnoses Among Iraq and Afghanistan Veterans Using Department of Veterans Affairs Health Care, 2002-2008*, 99 Am. J. Pub. Health 1651, 1651 (2009) (documenting that 36.9% of veterans returning from Iraq and Afghanistan who utilized the VA health care system between 2002 and 2008 received a mental health diagnosis); Anna Kline et al., *The Relationship Between Military Service Eras and Psychosocial Treatment Needs Among Homeless Veterans with a Co-Occurring*

In one study, two-thirds of unhoused Iraq and Afghanistan veterans had PTSD, as much as an eightfold increase from earlier cohorts of unhoused veterans.[77]

152.   Researchers have identified several causes for the increased risk of Serious Mental Illness and subsequent homelessness of veterans of recent conflicts, including waning public support and lower morale among troops, the nature of modern warfare resulting in unexpected threats to life via roadside bombs and improvised explosive devices, and multiple and more-lengthy deployments.[78]

153.   Veterans who survive sexual assault and/or sexual harassment during their service[79] likewise are at higher risk of experiencing homelessness, particularly women veterans, who are "up to four times more likely to be homeless than non-veteran women."[80] A 2013 study found that a "substantial proportion of homeless

_____

*Substance Abuse and Mental Health Disorder*, 5 J. Dual Diagnosis 358, 368 (2009) (finding that mentally ill, substance-abusing veterans of recent conflicts became homeless at an earlier age than other veterans and were more likely to attribute their homelessness to mental health problems). Still, some veterans of the Vietnam Era continue to suffer debilitating mental health consequences as a result of their service. *See* Yasmin Cypel et al., *The Mental Health of Vietnam Theater Veterans— The Lasting Effects of the War: 2016-2017 Vietnam Era Health Retrospective Observational Study*, 35 J. Traumatic Stress 605 (2022).

[77] Tori DeAngelis, *More PTSD among Homeless Vets*, 44 Monitor on Psych. 22 (2013), https://www.apa.org/monitor/2013/03/ptsd-vets.

[78] *See* Seal, *supra* note 77, at 1656; *see also* Charles S. Milliken et al., *Longitudinal Assessment of Mental Health Problems Among Active and Reserve Component Soldiers Returning from the Iraq War*, 298 J. Am. Med. Ass'n 2141, 2141 (2007) (finding combat exposure was associated with higher rates of PTSD among veterans of OIF); Wayne Kinney, *Comparing PTSD among Returning War Veterans*, 20 J. Mil. & Vet. Health 21 (2012).

[79] One study found that nearly 40% of unhoused female veterans had experienced military sexual trauma. Joanne Pavao et al., *Military Sexual Trauma among Homeless Veterans*, 28 J. Gen. Internal Med. 536 (2013).

[80] Alison B. Hamilton et al., *"Homelessness and Trauma Go Hand-in-Hand": Pathways to Homelessness Among Women Veterans*, 21-4S Women's Health Issue S203, S203 (2011).

-54-

Veterans using VHA services have experienced MST [military sexual trauma], and those who experienced such trauma had increased odds of mental health diagnoses."[81]

### Serious Mental Illnesses Both Contribute to and Are Exacerbated by Homelessness

154.   In the late 1990s, researchers began studying individuals who remained unhoused for extended periods, or who frequently cycled in and out of homelessness, to try to understand the causes of long term homelessness and the barriers that prevent these individuals from attaining and maintaining stable housing.[82] This body of research has established the close correlation between homelessness and disabilities, particularly mental illness and substance use disorders.[83]

155.   One recent study in *The Lancet* concluded that more than half of unhoused and marginally housed individuals have a lifetime history of traumatic brain injury.[84] Research has also identified numerous barriers that prevent unhoused

---

[81] Pavao, *supra* note 80.

[82] *See* Randall Kuhn & Dennis P. Culhane, *Applying Cluster Analysis to Test a Typology of Homelessness by Pattern of Shelter Utilization: Results from the Analysis of Administrative Data,* 26 Am. J. Cmty. Psych. 207, 225 (1998) (finding the chronically homeless have higher levels of mental health, substance abuse, and medical problems).

[83] *See, e.g.*, David P. Folsom et al., *Prevalence and Risk Factors for Homelessness and Utilization of Mental Health Services Among 10,340 Patients with Serious Mental Illness in a Large Public Mental Health System,* 162 Am. J. Psychiatry 370, 370, 374 (2005), https://ajp.psychiatryonline.org/doi/reader/10.1176/appi.ajp.162.2.370 (finding that "[b]etween one-fourth and one-third of homeless persons have a serious mental illness such as schizophrenia, bipolar disorder, or major depression," some of whom have a co-occurring substance abuse disorder).

[84] Jacob L. Stubbs et al., *Traumatic Brain Injury in Homeless and Marginally Housed Individuals: A Systematic Review and Meta-Analysis*, 5 The Lancet Pub. Health E19, E19 (2020).

individuals from accessing the services intended to assist them.[85]

156.   For individuals with Serious Mental Illness—at least one-quarter of all unhoused individuals[86] and as many as two-thirds of unhoused Post-9/11 veterans—the disability is a barrier both to acquiring and maintaining stable housing and to accessing medical and mental health care, shelter, and other vital services once these individuals become homeless.[87] Without supports or assistance, these individuals cannot access available services to treat the disability or to meet their basic needs.

157.   For example, many individuals with Serious Mental Illness or cognitive impairment cannot complete applications or persist through intake processes or waiting periods without substantial assistance, which is often not provided.[88]

---

[85] At least one quarter of unhoused individuals have mental health conditions, and roughly half of sheltered unhoused individuals have a disability. Substance Abuse & Mental Health Servs. Admin., Current Statistics on the Prevalence and Characteristics of People Experiencing Homelessness in the United States 4 (2011) (listing 30% of chronically unhoused persons have a mental health condition); Claudia D. Solari et al., U.S. Dep't Hous. & Urban Dev., The 2015 Annual Homeless Assessment Report (AHAR) to Congress: Part 2: Estimates of Homelessness in the United States, at xix (2016) (noting about 45% of sheltered unhoused individuals had a disability).

[86] Deborah K. Padgett, *Homelessness, Housing Instability and Mental Health: Making the Connection*, 44 BJPsych Bull. 197, 197 (2020) ("[E]pidemiological studies have consistently found that only about 25-30% of homeless persons have a severe mental illness such as schizophrenia.").

[87] *See, e.g.*, Amy L. Drapalski et al., *Perceived Barriers to Medical Care and Mental Health Care Among Veterans with Serious Mental Illness,* 59 Psychiatric Servs. 921 (2008) (finding that psychiatric symptoms and mental illness severity pose one of the most significant barriers to medical and mental health care); Les B. Whitbeck, Mental Health and Emerging Adulthood among Homeless Young People (2009) (describing barriers to health care, including ignorance about treatment options and service locations, a lack of access to transportation, a lack of identification, shame, and difficulty filling out forms, among others).

[88] *See* Michael D. Nino et al., *Who are the Chronically Homeless? Social Characteristics and Risk Factors Associated with Chronic Homelessness,* 19 J. Soc.

Similarly, individuals with PTSD frequently experience memory loss and other cognitive impairments that result in difficulty remembering appointments, which can lead to dismissal from programs for noncompliance.[89]

158. Additionally, for many individuals with Serious Mental Illness, their disabilities prevent them from functioning in the settings in which the services are offered, as with individuals whose disabilities prevent them from sharing living space or sleeping quarters with others, but who are required to complete a transitional housing program that requires dorm-style living before they are eligible for permanent housing where such housing even exists.[90]

159. To even embark on treatment, individuals with Serious Mental Illness

_____

Distress & Homeless 41(2010) (finding chronically homeless individuals were more likely to report that paperwork for government benefits was too difficult to complete). These logistical barriers are often called "bureaucratic" barriers and might involve paperwork, long waits for services, inflexible scheduling for appointments, restrictive service hours, and a lack of transportation. *See* Reid R. Hoshide et al., *Barriers to Healthcare of Homeless Residents of Three Honolulu Shelters*, 70 Haw. Med. J. 214, 214 (2011).

[89] Logistical challenges pose a substantial barrier to health care access, especially at VA facilities where veterans face long wait times and must interact with bureaucracy to make an appointment. *See* Carrie M. Farmer & Terri Tanielian, RAND Res., *Ensuring Access to Timely, High-Quality Health Care for Veterans* 2-10 (Apr. 10, 2019), https://www.rand.org/content/dam/rand/pubs/testimonies/CT500/CT508/RAND_CT508.pdf.

[90] Shared housing also poses unique problems for the elderly (who might not be able to safely access bunk beds and shared bathing facilities without help) and transgender and non-binary individuals (who face elevated risk of interpersonal violence). *See* Rebecca T. Brown, *Meeting the Housing and Care Needs of Older Homeless Adults: A Permanent Supportive Housing Program Targeting Homeless Elders*, 21 Senior Hous. Care J. 126, 129 (2013); Astara van der Jagt et al., A "Safer" Space: Investigating Ways to Improve Emergency Shelter Services for Transgender and Non-Binary Clients 4 (2022).

-57-

must also overcome substantial self-doubt and shame.[91] The stigmatization of mental health treatment begins in basic training,[92] stalks soldiers into warzones,[93] and long outlasts active service.[94] The military itself has a sordid history of perpetuating mental health stigma, labeling victims as "cowards lacking moral fiber"[95] and sending high proportions back into battle within a week of symptom onset.[96]

160.   One study of mental health treatment after the Persian Gulf and Iraq Wars concluded that "soldiers most in need of mental health care do not seek it because of fear of embarrassment, difficulties with peers or officers, or interference

---

[91] *See generally* Claire Henderson et al., *Mental Illness Stigma, Help Seeking, and Public Health Programs*, 103 Am. J. Pub. Health 777, 777 (2013); SJ Coleman et al., *Stigma-Related Barriers and Facilitators to Help Seeking for Mental Health Issues in the Armed Forces: A Systematic Review and Thematic Synthesis of Qualitative Literature*, 47 Psych. Med. 1880 (2017); Sarah Clement et al., *What Is the Impact of Mental Health-Related Stigma on Help-Seeking? A Systematic Review of Quantitative and Qualitative Studies*, 45 Psych. Med. 11 (2015).

[92] Shannon K. Crowley et al., *Physical Fitness and Depressive Symptoms During Army Basic Combat Training*, 47 Med. & Sci. Sports & Exercise 151, 157 (2015) ("[T]here remains a stigma of perceived 'weakness' associated with mental illness in the military, as well as a fear of jeopardizing one's military career by reporting mental health-related issues. Thus, measurement of depressive symptoms in this study may have resulted in a conservative estimate of the prevalence of these symptoms.")

[93] Dror Ben-Zeev et al., *Stigma of Mental Illness and Service Use in the Military*, 21 J. Mental Health 264 (2012); Tiffany M. Greene-Shortridge et al., *The Stigma of Mental Health Problems in the Military*, 172 Mil. Med. 157 (2007).

[94] Ritchie Elspeth Cameron & Mark Owens, *Military Issues*, 27 Psychiatric Clinics of N. Am. 459, 460 (2004).

[95] Hans Pols & Stephanie Oak, *War & Military Mental Health*, 97 Am. J. Pub. Health 2132, 2133 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2089086/ (chronicling military responses to mental health problems through the twentieth century).

[96] *Id*. at 2135.

-58-

with career opportunities within the military."[97] Veterans describe the fight to preserve their own mental health as a "battle,"[98] a "war,"[99] and a "hellish space"[100] just as dangerous as a theater of war.[101]

161.   Homelessness also exposes veterans to trauma that both causes and aggravates PTSD and other mental disorders. For veterans with Serious Mental Illness and TBI resulting from their service to this country, effective treatment requires, as a prerequisite, the stability and regularity afforded by permanent housing readily accessible to ongoing comprehensive care and supports.

162.   Homelessness is a well-established health detriment. Research has consistently isolated homelessness as an independent risk factor of premature death.[102] One recent study in Los Angeles found that unhoused individuals suffered an all-cause mortality rate nearly three times higher than members of the general

[97] *Id*. at 2138.

[98] Rikki A. Roscoe, *The Battle Against Mental Health Stigma: Examining How Veterans with PTSD Communicatively Manage Stigma*, 36 Health Cmty. 1378 (2020).

[99] Sadie F. Dingfelder, *The Military's War on Stigma*, 40 Monitor on Psych. 52 (2009), https://www.apa.org/monitor/2009/06/stigma-war.

[100] Gregg F. Martin, Opinion, *The Three-Headed Monster We Must Now Defeat: Mental Illness, Stigma, and Suicide*, Mil. Times (Sept. 20, 2021), https://www.militarytimes.com/opinion/commentary/2021/09/20/the-three-headed-monster-we-must-now-defeat-mental-illness-stigma-and-suicide/.

[101] One study of OEF-OIF veterans found that veterans who screened positive for a psychiatric disorder were *more* likely to view mental health with stigma and to face barriers to health care. The researchers also found that negative beliefs about mental health were associated with lower likelihood of utilizing mental health counseling and medication services. Robert H. Pietrzak et al., *Perceived Stigma and Barriers to Mental Health Care Utilization among OEF-OIF Veterans*, 60 Psychiatric Servs. 1118, 1121 (2009).

[102] *See, e.g.*, David S. Morrison, *Homelessness as an Independent Risk Factor for Mortality: Results from a Retrospective Cohort Study*, 38 Int'l J. Epidemiology 877, 881-82 (2009) ("[H]omelessness should be considered an independent risk factor for subsequent mortality for some conditions.").

public.[103] Unhoused individuals face between two and twelve times higher risk of death than the general population.[104]

163.   Homelessness also exposes an individual to violence. Between 74% and 87% of unhoused people with mental illness face violence in their lifetimes, figures far higher than the national average.[105]

164.   Lack of housing also exacerbates mental disabilities and creates new health problems, thereby impairing the individual's ability to function and impeding the individual's ability to access necessary services. For example, the experience of homelessness is inherently stressful, requiring constant vigilance to avoid danger, and exposes unhoused individuals to increased risks of trauma, leading to PTSD or aggravating already existing PTSD and other mental disorders.[106] For individuals whose disability causes paranoia or severe anxiety, the uncertainty and diminished

---

[103] Will Nicholas et al., *Using Point-in-Time Homeless Counts to Monitor Mortality Trends among People Experiencing Homelessness in Los Angeles County, California, 2015-2019*, 111 Am. J. Pub. Health 2212 (2021).

[104] Melissa Gambatese et al., *Programmatic Impact of 5 Years of Mortality Surveillance of New York City Homeless Populations*, 103 Am. J. Pub. Health S193 (2013).

[105] Laurence Roy et al., *Criminal Behavior and Victimization among Homeless Individuals with Severe Mental Illness: A Systematic Review*, 65 Psychiatric Servs. 739, 739 (2014); *see also* Linda A. Teplin et al., *Crime Victimization in Adults with Severe Mental Illness*, 62 Archives Gen. Psychiatry 911 (2005) (noting individuals with a severe mental illness had been victims of a violent crime at a rate eleven times higher than members of the general public).

[106] *See* Bruce D. Levy & James J. O'Connell, *Health Care/or Homeless Persons,* 350 New Eng. J. Med. 2329, 2330 (2004) (finding that life on the street increases social isolation and the risk of psychiatric conditions). Researchers are actively debating the extent to which homelessness itself causes mental illness, including PTSD. For further discussion, *see* Michael Smolens, Opinion, *Does Homelessness Cause PTSD?*, San Diego Union Trib. (Dec. 6, 2019), https://www.sandiegouniontribune.com/columnists/story/2019-12-06/column-does-homelessness-cause-ptsd.

security and safety created by homelessness exacerbate the mental disability.[107]

165.   Additionally, individuals experiencing homelessness frequently suffer from chronic and acute health conditions that are caused or exacerbated by the lack of stable shelter, including respiratory disorders, cardiovascular diseases, frostbite and hypothermia, skin diseases, diabetes, liver disease, and traumatic injuries due to assaults, falls, and accidents.[108]

166.   Unhoused individuals know they need health care[109] and accurately

---

[107] *See* Kevin M. Fitzpatrick et al., *Dangerous Places: Exposure to Violence and Its Mental Health Consequences/or the Homeless,* 69 Am. J. Orthopsychiatry 438, 444-45 (1999) (finding that the symptoms of patients experiencing anxiety and paranoia were "significantly affected by the perceived dangers inherent in the homeless environment"). It is well established that homelessness can exacerbate mental illness. *See* Lilanthi Balasuriya et al., *The Never-Ending Loop: Homelessness, Psychiatric Disorder, and Mortality*, 37 Psychiatric Times 12 (2020); Lori Teresa Yearwood, *Trauma in Plain Sight*, Slate (Oct. 23, 2009), https://slate.com/news-and-politics/2019/10/homeless-life-ptsd-overlooked.html.

[108] *See* Bruce D. Levy & James J. O'Connell, *Health Care for Homeless Persons,* 350 New Eng. J. Med. 2329, 2330 (2004); Mayur M. Desai & Robert A. Rosenheck, *Unmet Need for Medical Care Among Homeless Adults with Serious Mental Illness,* 27 Gen. Hosp. Psychiatry 418 (2005) (finding that 44% of persons who are homeless and have serious mental illnesses had unmet needs for medical care at the time of program entry); Sameed Ahmed M. Khatana et al., *Association of Homelessness with Hospital Readmissions—an Analysis of Three Large States*, 35 J. Gen. Internal Med. 2576, 2576 (2020) ("Individuals who are homeless represent an especially medically vulnerable population, with mortality rates that are significantly higher than the general population. This is related to a greater burden of disease, including chronic diseases, mental illness, and substance use disorders, as well as the financial and structural barriers that impede access to appropriate care.")

[109] According to one survey from New York State, unhoused individuals ranked medical and dental treatment as one of their five most important needs—yet one more difficult to obtain than a free meal. Olga Acosta & Paul A. Toro, *Let's Ask the Homeless People Themselves: A Needs Assessment Based on a Probability Sample of Adults*, 28 Am. J. Cmty. Psych. 343, 353 (2000).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

understand their own health care use and needs.[110] Yet they less consistently access routine health care services, despite living in much poorer health, because of systemic barriers.[111]

167.    Thus, homelessness resulting from mental disability, and mental disability aggravated by homelessness, interfere both with the ability to obtain treatment and with the amelioration of the mental disability itself, including the ability to obtain and use appropriate psychotropic medications.[112] Lacking effective access to appropriate medication and supervised treatment, unhoused individuals with mental disabilities frequently resort to inappropriate medication, in the form of illegal drugs that can have powerful psychotropic effects but are also most often

---

[110] Stephen W. Hwang et al., *Accuracy of Self-Reported Health Care Use in a Population-Based Sample of Homeless Adults*, 51 Health Servs. Rsch. 282, 300 (2016) (concluding that "most individuals experiencing homelessness were quite accurate reporters").

[111] Margot B. Kushel et al., *Factors Associated with the Health Care Utilization of Homeless Persons*, 285 J. Am. Med. Ass'n 200, 203 ("This study confirms on a national scale what previous research found at the local level; homeless persons reported high rates of acute hospital-based care, low rates of ambulatory care, and difficulty accessing health care. . . . Despite evidence of poorer health, homeless persons in our study were less likely than the overall US population to report an ambulatory care visit in the previous year.").

[112] Aleena Khan et al., *Medicines Prescribing for Homeless Persons: Analysis of Prescription data from Specialist Homelessness General Practices*, 44 Int'l J. Clinical Pharmacy 717, 722 (2022) ("Many [persons experiencing homelessness] are excluded from primary care due to various factors such as lack of ability to navigate services, perceived stigma and discrimination in healthcare settings and wrong application of registration criteria in mainstream practices."). One study of unhoused individuals in Long Beach, California noted more than 30% of patients with psychiatric disorders were not taking their prescribed medication. Mok Thoong Chong et al., *Assessing Health Conditions and Medication Use among the Homeless Community in Long Beach, California*, 3 J. Rsch. Pharmacy Prac. 56 (2014).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

addictive and come with negative side effects.[113]

168.   Finally, for many individuals with Serious Mental Illness, effective health treatment presupposes stability and regularity, which are simply not possible for unhoused individuals to achieve.[114] The lack of housing itself, especially combined with a Serious Mental Illness, is a formidable barrier to accessing services. As one study of supported housing among unhoused veterans concluded, "access to housing itself may be a facilitator of positive changes in other areas of life—in this case, overall levels of social support."[115]

169.   For many unhoused individuals, the immediacy of the daily struggle for shelter, food, sleep, and other necessities relegates medical and mental health needs to a distant priority.[116] Thus, common illnesses and injuries are left untreated,

---

[113] *See* D. McCarty et al., *Alcoholism, Drug Abuse, and the Homeless*, 46 Am. Psych. 1139, 1139 (1991) ("Credible estimates of the prevalence of alcohol and drug abuse suggest that alcohol abuse affects 30% to 40% and drug abuse 10% to 15% of homeless persons."); Timothy P. Johnson & Michael Fendrich, *Homelessness and Drug Use: Evidence from a Community Sample,* 32 Am. J. Preventative Med. S211, S212 ("Homeless individuals . . . abuse drugs and alcohol in an attempt to provide self-medication for psychiatric or physical health problems.").

[114] *See* Deborah L. Dennis et al., *The Physical and Mental Health Status of Homeless Adults,* 2 Housing Pol'y Debate 815, 822 (1991) ("Homeless persons present a more advanced state of [mental] illness and are less likely, due to their homeless situation, to follow even the simplest of treatment regimens.").

[115] Maria J. O'Connell et al., *Impact of Supported Housing on Social Relationships among Homeless Veterans*, 68 Psychiatric Servs. 203 (2016).

[116] *See* Dennis, *supra* note 115, at 826 (finding mentally ill homeless persons often do not receive needed physical and mental health care because they "giv[e] higher priority to other basic needs, such as procuring food and shelter on a daily basis"). Another study found that unhoused individuals faced six times the risk of opioid overdose of low-income people who had housing. Ayae Yamamoto et al., *Association between Homelessness and Opioid Overdose and Opioid-Related Hospital Admissions/Emergency Department Visits*, 242 Soc. Sci. Med. (2019).

leading to increased emergency hospital visits and acute care admissions.[117]

170.   In sum, a robust and uncontroverted body of research has established that people, who, like the Plaintiffs, suffer SMI, such as PTSD, major depression, paranoid schizophrenia, and bipolar disorder, are often unable to meaningfully access the range of services offered to unhoused individuals to meet their day-to-day needs, including shelter, or to obtain appropriate health care, mental health care, or addiction treatment on account of symptoms of their disabilities and their lack of stable housing.

## Permanent Supportive Housing Effectively and Cost-Effectively Addresses and Prevents Homelessness of Individuals with Serious Mental Illness

171.   Research has long confirmed that the only way that unhoused individuals suffering Serious Mental Illness are able to meaningfully access and benefit from medical and psychiatric services is when they first permanently reside in appropriate community-based Permanent Supportive Housing.

172.   "Permanent Supportive Housing," or "PSH," is "permanent housing in which housing assistance (e.g., long-term leasing or rental assistance) and supportive services are provided to assist households with at least one member

---

[117] Unhoused individuals visit hospital ERs between two and nineteen times more often than members of the general public. Neha Vohra et al., *Homelessness and the Use of Emergency Department as a Source of Healthcare: A Systematic Review*, 15 Int'l J. Emergency Med. 1, 19 (2022); *see also* Margot B. Kushel et al., *Housing Instability and Food Insecurity as Barriers to Health Care among Low-Income Americans*, 21 J. Gen. Internal Med. 71 (2006); R. Rosenheck & P. Koegel, *Characteristics of Veterans and Nonveterans in Three Samples of Homeless Men,* 44 Hosp. & Cmty. Psychiatry 858, 861 (1993); Kushel, *supra* note 112, at 203 (finding that compared with the general population, the homeless are more likely to seek emergency care, and four times more likely to be hospitalized).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

(adult or child) with a disability in achieving housing stability."[118] Permanent Supportive Housing combines low barriers to entry with a Housing First model that allows people to choose whether, and to what extent, to engage in supportive services without risking their tenancy.

173.   The supportive services available through Permanent Supportive Housing include, *inter alia*:

- Case management;
- Education services;
- Employment assistance and job training;
- Life skills training;
- Mental health services;
- Outpatient health services;
- Outreach services; and
- Substance abuse treatment services.[119]

174.   Mental health services available in Permanent Supportive Housing include:

- Assertive community treatment ("ACT") teams, which are structured to serve people with the highest level of needs, such as people with persistent and Serious Mental Illness, histories of homelessness, addictions, and histories of institutionalization in hospitals and/or jails. ACT teams provide services directly in the person's home and community, rather than merely brokering or linking people to services.

---

[118] U.S. Dep't of Hous. & Urban Dev., HUD Exchange, *Permanent Supportive Housing (PSH)*, HUD Exchange, https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-program-components/permanent-housing/permanent-supportive-housing/ (last visited Nov. 9, 2022).
[119] *Id.*

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

ACT teams typically operate with a staff to patient ratio of no more than 15:1 and consist of a team leader, psychiatrist or nurse practitioner, registered nurse, peer specialist, housing specialist, mental health specialist, substance use specialist, and other specialists as needed (e.g., occupational, recreational, criminal justice, or family);[120]

- Intensive case management ("ICM") teams, serving people with less severe needs than ACT teams.[121] The ICM teams generally have a patient-to-staff ratio of 20:1 and may only involve a psychiatrist part time for consultation;[122]

- Hybrid teams, serving people with a mix of high and moderate needs and blending the roles and staff members of the ACT and ICM team models.

- Crisis services, including mobile crisis services; care coordination; intensive psychiatric rehabilitation treatment; assistance taking medication (including prompting); personal care services; and home health care.

175.   Permanent Supportive Housing is intended specifically for unhoused individuals with disabilities who, absent housing, cannot access and make effective use of the treatment and services they need to stay stable; and who, without such treatment and supportive services, cannot otherwise access and maintain stable housing in the long run.

176.   An essential element of Permanent Supportive Housing is home visits.

---

[120] U.S. Dep't Vet. Aff., VA Ctr. Homelessness Among Veterans, Permanent Supportive Housing Resource Guide, 123-26 (2015), https://www.va.gov/HOMELESS/nchav/docs/Permanent%20Supportive%20Housing%20Resource%20Guide%20-%20FINAL.PDF.
[121] *Id.* at 126-27.
[122] *Id.*

-66-

The person's home is intended to be the primary location of the services provided. The number of home visits per week depends on the then-current needs of the veteran. Neighbors and community members can also be critical members of a person's support team and home visits allow interaction with those people.[123]

177.   The VA, itself, recognizes that Permanent Supportive Housing is essential treatment for individuals with the highest needs:

> [P]ermanent supportive housing is uniquely suited to serve the subset of people experiencing homelessness whose complex health and behavioral health conditions necessitate a combination of long-term rental assistance and ongoing supportive services in order to achieve and maintain housing stability. For this subset of people experiencing homelessness, permanent supportive housing has been shown to be unparalleled in improving housing stability, while supporting physical and behavioral health. When targeted to high utilizers of health care services, supportive housing has also been shown to achieve public cost offsets by decreasing the use of emergency health care and correctional services. Paradoxically, however, the people who benefit the most from permanent supportive housing (those with intensive and complex service needs) are often the least equipped or tenacious about seeking assistance.[124]

178.   With the stability and security of permanent housing that is combined with healthcare services, the formerly unhoused veteran with Serious Mental Illness can meaningfully access mental and physical health, substance use, vocational, and

---

[123] *Id.* at 129-34.
[124] *Id.* at 91.

other services.[125]

179.   A substantial and uncontroverted body of evidence demonstrates that Permanent Supportive Housing leads to successful long-term housing outcomes for previously unhoused persons, including those with the most severe disabilities.[126] In addition to housing stability, documented outcomes include improved mental health status, decreased substance use, increased average income and productivity, and improved quality of life.[127]

---

[125] Debra J. Rog, *The Evidence on Supported Housing*, 27 Psychiatric Rehab. J. 334 ("[H]aving any stable housing has a dramatic improvement on outcomes, especially those related to residential stability and use of institutional settings, such as hospitals, detox, and jails and prisons.").

[126] For a systematic review of Housing First research, see Yinan Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review*, 26 J. Pub. Health Mgmt. & Prac. 404 (2020) ("Evidence from this systematic review indicates that Housing First programs can more effectively reduce homelessness and improve housing stability for homeless populations with a disability than Treatment First or TAU. Housing First programs offer permanent housing with accompanying health and social services, and their clients are able to maintain a home without first being substance-free or in treatment. Clients in stable housing experienced better quality of life and generally showed reduced hospitalization and emergency department use.").

[127] *See, e.g.*, Andrew J. Baxter et al., *Effects of Housing First Approaches on Health and Well-Being of Adults Who Are Homeless or at Risk of Homelessness: Systematic Review and Meta-Analysis of Randomised Controlled Trials*, 73 J. Epidemiology & Cmty. Health 379 (2019) (noting that Housing First participants experienced fewer hospitalizations, less time in hospitals, fewer visits to emergency departments, more days housed, and a higher likelihood of being housed 18-24 months after the intervention); Jennifer Perlman & John Parvensky, Denver Housing First Collaborative, Cost Benefit Analysis & Program Outcomes Report 2 (2006) (finding that 43% of residents in the Denver program had improved mental health status, 64% reported improved quality of life, and 15% had decreased substance abuse, and that average monthly income rose from $185 to $431); Joy A. Livingston & Debra Srebnik, *Approaches to Providing Housing and Flexible Supports for People with Psychiatric Disabilities,* 16 Psychosocial Rehab. J. 27 (1992) (finding participants in

-68-

180.    Aside from individual benefits for veterans, Permanent Supportive Housing also provides substantial cost savings to government at all levels.[128] When left on the streets, people who are unhoused utilize a substantial array of community resources in the form of increased health care utilization, emergency room care, public health services, and continuing use of expensive temporary shelters. Numerous studies, within and outside the VA, have long demonstrated that Permanent Supportive Housing offers substantial cost savings when compared to alternative homelessness interventions.[129]

181.    For example, Dennis Culhane, then a professor at the University of Pennsylvania, who served as the Director of Research for the National Center on

_____

Permanent Supportive Housing programs had greater housing satisfaction, improved housing stability, and greater psychological well-being).

[128] *See, e.g.*, Mary E. Larimer et al., *Health Care and Public Service Use and Costs Before and After Provision of Housing for Chronically Homeless Persons with Severe Alcohol Problems*, 301 J. Am. Med. Ass'n 1349 (2009) (concluding that Housing First saved on average $2,449 per person per month).

[129] *See* Tim Aubry et al., *Effectiveness of Permanent Supportive Housing and Income Assistance Interventions for Homeless Individuals in High-Income Countries: A Systematic Review*, 5 The Lancet Pub. Health E342 (2020) (finding that PSH "significantly improved housing stability, with little to no negative effects on other social and health outcomes," and yielded cost offsets given adequate government support); Daniel Flaming et al., Where We Sleep: Costs When Homeless And Housed In Los Angeles 26 (2009) (documenting $2,291 average monthly cost savings for each chronically homeless Los Angeles participant); Mass. Hous. & Shelter All., Home and Healthy for Good: A Statewide Housing First Program 9 (2010) (documenting cost savings of $9,507 per resident per year, including reduction in medical costs from $26,124 per person per year to $8,500); Tia E. Martinez & Martha R. Burt, *Impact of Permanent Supportive Housing on the Use of Acute Care Health Services by Homeless Adults*, 57 Psychiatric Servs. 992 (2006) (documenting $1,300 public cost reduction per resident in San Francisco); The Heartland All., Supportive Housing in Illinois: A Wise Investment (2009) (documenting overall savings of $854,477 over two years); Eric Hirsch & Irene Glasser, Rhode Island's Housing First Program First Year Evaluation 22 (2007) (documenting cost savings of $8,839 per person per year).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

Homelessness Among Veterans at the VA, conducted a comprehensive landmark study of Permanent Supportive Housing in 2002 ("Public Service Reductions Associated With Serious Mental Illness in Supportive Housing") that tracked the costs associated with unhoused persons with mental illness in New York City for two years while they were unhoused and two years after they were housed.[130] Dr. Culhane and his coauthors found that supportive housing created average annual savings of $16,282 per person per housing unit in 1999 dollars. Seventy-two percent of the savings resulted from a decline in the use of public health services, 23% of the savings resulted from a decline in shelter use, and the remaining savings resulted from reduced incarceration of unhoused people. The reduction in expenditures in these areas nearly covered the cost of developing, operating, and providing supportive housing services, resulting in a net cost to the government of only $995 per unit per year.

182.   A 2009 study conducted by the Economic Roundtable for the Los Angeles Homeless Services Authority found that the public costs attributed to chronically unhoused persons in Permanent Supportive Housing averaged $27,504 per year less than the costs attributed to similar persons when they were on the streets or in shelters.[131]

183.   One 2020 randomized controlled trial in Santa Clara County, California found that among chronically unhoused high users of county-funded services, Permanent Supportive Housing increased housing and use of community-based mental health services while lowering use of psychiatric emergency departments and

---

[130] *See* Dennis P. Culhane et al., *Public Service Reductions Associated with Placement of Homeless Persons with Severe Mental Illness in Supportive Housing,* 13 Hous. Pol'y Debate 107 (2002).

[131] Flaming, *supra* note 130.

shelters.[132]

184.   Most likely, these studies significantly *under*-estimate the savings from Permanent Supportive Housing, since "no study assesses all or even most of the cost drivers associated with leaving people unsheltered," including the costs of police sweeps; first responders; outreach workers; business disruption; environmental hazards; police, courts, jail and prison time; probation; lost economic productivity; and, perhaps most significantly of all, the "psychological and emotional tolls on homeless people and the surrounding community."[133]

185.   Finally, communities with Permanent Supportive Housing programs are safer, more efficient, and more attractive. In some instances, property values in neighborhoods surrounding Permanent Supportive Housing programs increased.[134]

186.   The success of Permanent Supportive Housing has long been demonstrated in Los Angeles, as first shown in 2007 by Project 50 and later by other

---

[132] Maria C. Raven et al., *A Randomized Trial of Permanent Supportive Housing for Chronically Homeless Persons with High Use of Publicly Funded Services*, 55 Health Servs. Rsch. 797 (2020). An older study in San Francisco concluded that supportive housing was associated with a significant decline in the number of emergency department visits. The researchers also observed that exiting supportive housing was correlated with an increase in emergency department visits, leading to the conclusion that "service use reductions are tied directly to remaining in housing." Martinez & Burt, *supra* note 130.

[133] Lavena Staten & Sara K. Rankin, Penny Wise but Pound Foolish: How Permanent Supportive Housing Can Prevent a World of Hurt 28-29 (2019), https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1016&context=hrap.

[134] *See, e.g.*, Furman Ctr. Real Est. & Urb. Pol'y, The Impact Of Supportive Housing On Surrounding Neighborhoods: Evidence From New York City 6-7 (2008) (examining the impact of 7,500 supportive housing units in New York City and finding a statistically significant rise in the value of nearby properties); Arthur Andersen, Connecticut Supportive Housing Demonstration Program: Final Program Evaluation Report chp. III 13 (2002) (finding supportive housing improved neighborhood safety and beautification and increased or stabilized property values).

similar projects in the region.[135] The goal of Project 50 was to identify, then place into Permanent Supportive Housing, the 50 most vulnerable people sleeping on the streets of Skid Row. Many of these individuals had been designated "shelter resistant," because they preferred sleeping on the streets to being in a crowded shelter situation. But all of those offered their own housing, albeit a small, private room in a nonprofit housing facility, accepted the offer.

187.   Individuals were placed into Permanent Supportive Housing, and 88% remained housed one year later. Ninety-one percent of tenants were diagnosed with a mental illness and 84% reported a history of substance use. Similar to other studies, Project 50 showed that health care costs for participants declined from $677,000 the year prior to participation in the program to $185,000 for the year after they began living in supportive housing.[136]

188.   In short, both experience and empirical research have demonstrated conclusively that Permanent Supportive Housing is the only approach that consistently ensures that individuals with Serious Mental Illness are able to meaningfully access necessary medical care, mental health services, and other social services.

189.   These lessons can and must be applied to address the crisis of veteran

---

[135] For a comprehensive guide to the long history of homelessness in Los Angeles, *see* Kirsten Moore Sheeley et al., The Making of a Crisis: A History of Homelessness in Los Angeles 53-55 (2021), https://luskincenter.history.ucla.edu/wp-content/uploads/sites/66/2021/01/LCHP-The-Making-of-A-Crisis-Report.pdf (discussing Project 50 as a success that also saved taxpayers money).

[136] *See* L.A. Cnty. Bd. Supervisors, Project 50 – 1 year Progress Report (2009), https://zevyaroslavsky.org/wp-content/uploads/Project50-ONE-YEAR-SNAPSHOT-2.4.09.pdf; *see also* Flora Gil Krisiloff & Elizabeth S. Boyce, Project 50: A Two Year Demonstration Project in Skid Row (2011), https://www.cwda.org/sites/main/files/file-attachments/homeless-project-50-la-county.pdf?1449619925.

1  homelessness in order to ensure that our veterans receive the medical care and

2  support to which they are entitled and that they deserve.

3  ### The WLA Grounds Was Given to Defendants for the Purpose of Providing Housing and Healthcare to Veterans with Disabilities

4

5  190.   In 1865, Congress incorporated the National Home for Disabled

6  Volunteer Soldiers ("National Home") to operate branch homes throughout the

7  nation for soldiers who had been honorably discharged.[137] The branch homes were

8  intended as true homes offered as a debt of gratitude to those who had served the

9  country. Accordingly, residents were provided housing, food, medical care,

10  recreation activities, and employment opportunities.[138] There were no limitations on

11  how long a veteran could stay at a branch home once admitted. Thus, the National

12  Home offered the promise and certainty of a permanent home for veterans who had

13  served their country and, by virtue of their service, were not able to support

14  themselves in civilian life.

15  191.   In March 1888, Senator John P. Jones and Arcadia B. DeBaker donated

16  by deed, as a charitable trust, 300 acres of land in Los Angeles expressly "for the

17  purpose of such branch Home for Disabled Veterans Soldiers to be thereon so

18  located, established, constructed and permanently maintained."[139] This deed

19

20  ---

[137] Suzanne Julin, National Home for Disabled Volunteer Soldiers Assessment of

21  Significance and National Historic Landmark Recommendations 1 (2009),

22  http://npshistory.com/publications/nhl/special-studies/national-home-disabled-vol-soldiers.pdf.

23  [138] Trevor K. Plante, *The National Home for Disabled Volunteer Soldiers*, 36

24  Prologue Mag. (2004),
https://www.archives.gov/publications/prologue/2004/spring/soldiers-home.html.

25  [139] Deed of 1888 1–2 (1888), *available at* https://draft-master-plan-

26  assets.s3.amazonaws.com/media/uploads/2018/07/31/1888_Deed.pdf; *see also* U.S.
Dep't Vet. Aff., Off. Inspector Gen., VA's Management of Land Use under the

27  West Los Angeles Leasing Act of 2016 i (2018),

28  https://www.va.gov/oig/pubs/VAOIG-18-00474-300.pdf ("OIG WLALA Report").

conveying the WLA Grounds contained significant language expressing this pertinent intent:

> Witnesseth: that whereas by an act of Congress approved March 2nd 1887 to provide for the location and erection of a branch home for disabled volunteer soldiers West of the Rocky Mountains, the Board of Managers of the National Home for Disabled Volunteer Soldiers were authorized, empowered, and directed to locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers, to be by such Board, located at such place in the States West of the Rocky Mountains as to said Board should appear most desirable and advantageous.

> And whereas, the [grantors] in consideration that the [National Home] should locate, establish, construct and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers on a site to be selected by its Board of Managers along the dividing line between the Ranchos San Jose de Buenos Ayres and San Vicente y Santa Monica offered to donate to the [National Home], three hundred acres of land, being a portion of said Rancho San Vicente y Santa Monica belonging to them, the [grantors], on which to locate, establish, construct and permanently maintain such branch of said National Home for Disabled Volunteer Soldiers. . . .

> Now, Therefore, in consideration of the premises and of the location, establishment, construction and permanent maintenance of a branch of said National Home for Disabled Volunteer Soldiers on such tract of land, so selected, and of the benefits to accrue to

-74-

the [grantors], by such location, have given and granted and by these presents do give and grant unto the [National Home] all the [herein] described land and premises, situate, lying and being in the County of Los Angeles, State of California and particularly bounded and described as [set forth herein] . . . for the purpose of such branch Home for Disabled Volunteer Soldiers to be thereon so located, established, constructed and permanently maintained.[140]

192.   The Pacific Branch of the National Home ("Pacific Branch Home") opened in 1888, and for some 80 years, the VA's predecessors operated a Pacific Branch Home at this site in keeping with the 1888 Deed, providing a permanent home for tens of thousands of veterans with disabilities who resided on the Grounds and accessed necessary and therapeutic services there.[141]

193.   Consistent with the intent of providing a home for soldiers, the grounds at the Pacific Branch Home—estimated to cover more than 600 or even 700 acres in total at its inception—were transformed into a beautiful, park-like setting.[142] A hospital and other buildings were erected on the Grounds throughout the 1890s.[143] The Pacific Branch Home also built a trolley line and erected a streetcar depot,

---

[140] Deed of 1888.

[141] Paul R. Spitzeri, *"Men who Gave Their Young Manhood's Years to Their Country": A Photo-Gravure Booklet of the Pacific Branch of the National Home for Disabled Volunteer Soldiers, Los Angeles, 1907*, The Homestead Blog (Nov. 11, 2021), https://homesteadmuseum.blog/2021/11/11/men-who-gave-their-young-manhoods-years-to-their-country-a-photo-gravure-booklet-of-the-pacific-branch-of-the-national-home-for-disabled-volunteer-soldiers-los-angeles-1907/.

[142] *See, e.g., id.* (stating that "[b]y 1907, the Home was on 737 acres"); Nat'l Home for Disabled Volunteer Soldiers, Rep. of the Bd. of Mgrs. for the Fiscal Year Ended June 30 (1930), at 8, 24, 139, https://www.va.gov/vetdata/docs/NHDVSFY1930.pdf (listing the total Pacific Branch acreage as 675.5 in 1929 and 671.709 in 1930).

[143] *Id.*

-75-

which transported freight and mail to and from the Grounds.[144] Residents could easily travel to the nearby Santa Monica beaches from the Grounds for rest and recreation.[145] A chapel was built in 1900 to hold daily services and burial services for deceased veterans.[146]

194.   In the early 1900s, the Pacific Branch Home built dormitories with wide porches to replace the original barracks.[147] A post office and store operated on the Grounds.[148]

195.   In addition to ensuring residents' access to housing, food and medical care, the Pacific Branch Home also developed the Grounds to provide educational and vocational activities for the veteran residents. For example, the Pacific Branch Home boasted a library with more than 10,000 volumes and newspapers and periodicals from around the country.[149] The residents grew vegetables and tended orchards and livestock on the Grounds, supplying their own needs and selling the surplus.[150]

196.   The Pacific Branch Home maintained a baseball team and athletic facilities, built a billiard hall for the residents, founded an aviary where residents could spend time, and developed work programs to employ residents around the Grounds in various capacities.[151] The Pacific Branch Home also had a home band

---

[144] *Id.*

[145] *See Life at the National Home, Circa 1922*, 1887 Fund, https://www.1887fund.org/about/life-at-the-national-home/ (last visited Nov. 9, 2022).

[146] Spitzzeri, *supra* note 142.

[147] Cecilia Rasmussen, *Peacefully, the disabled and the dead from . . .* , L.A. Times (Aug. 29, 1994), *available at* https://www.latimes.com/archives/la-xpm-1994-08-29-me-32587-story.html.

[148] *Id.*; *Spitzzeri, supra* note 142.

[149] *Life at the National Home, supra* note 146.

[150] Spitzzeri, *supra* note 142.

[151] *Id.*

that performed daily, and lectures and movies were regularly hosted on the Grounds.[152] Residents could attend all classes on the Grounds free of charge.[153]

197.   By 1922, approximately 4,000 veterans were provided permanent housing at the Pacific Branch Home.[154]

198.   In 1930, Congress consolidated the National Home with other veterans' programs in the newly established Veterans Administration, the immediate predecessor to the VA.[155] Accordingly, control over the various branch homes, including the Pacific Branch Home, transferred to the Veterans Administration.[156] Title to the land upon which the branch homes were situated was also transferred to the Veterans Administration.[157]

199.   Following the transfer, the Pacific Branch Home Grounds experienced tremendous change. Various land transfers[158] reduced the total Grounds by hundreds of acres to 388 acres, which the VA is now statutorily prohibited from reducing further.[159]

---

[152] *Life at the National Home*, *supra* note 146.
[153] *Id.*
[154] *An Examination of Waste and Abuse Associated With VA's Management of Land-Use Agreements*, Am. Legion (Feb. 10, 2015), https://www.legion.org/legislative/testimony/226037/examination-waste-and-abuse-associated-vas-management-land-use; Spitzzeri, *supra* note 142.
[155] *History – Department of Veterans Affairs (VA)*, VA History Off. (last updated May 27, 2021), https://www.va.gov/HISTORY/VA_History/Overview.asp.
[156] *Id.*
[157] *See id.*
[158] Examples include "improvement of the San Diego Freeway," *see* Interstate 405, https://www.cahighways.org/ROUTE405.html; and the national cemetery, Nat'l Cemetery Adm., https://www.cem.va.gov/CEMs/nchp/losangeles.asp (currently "more than 127 acres").
[159] Pub. L. 110-161 § 224(a) (2007), https://www.congress.gov/bill/110th-congress/house-bill/2764/text (providing that "[t]he Secretary of Veterans Affairs may not declare as excess to the needs of the Department of Veterans Affairs, or

200.   The remaining Grounds also experienced development in the 1940s, and many of the existing buildings on the WLA Grounds were erected during this time.[160] For instance, the Veterans Administration built additional hospital buildings and medical care centers on the Grounds, in addition to updating and upgrading the hospital and the residences for veterans with disabilities who continued to reside on the Grounds.[161]

201.   In the 1970s, a replacement hospital, the VA Wadsworth Medical Center in Building 500, shifted the focal point of the Grounds south of Wilshire Boulevard.[162] Beginning in the 1960s and 1970s, however, the VA's predecessor, the Veterans Administration, ceased accepting new residents at the WLA Grounds. Instead, the property fell into squalor and disuse.[163]

202.   The VA took this action without authorization from Congress and in response to homeowner complaints from affluent communities bordering the Grounds who wanted to keep the Grounds property to themselves and to keep Vietnam veterans out of the neighborhood as undesirables.[164]

---

otherwise take any action to exchange, trade, auction, transfer, or otherwise dispose of, or reduce the acreage of, Federal land and improvements at the Department of Veterans Affairs West Los Angeles Medical Center, California, encompassing approximately 388 acres on the north and south sides of Wilshire Boulevard and west of the 405 Freeway."); *see also* OIG WLALA Report, *supra* note 140, at 57.

[160] *Veterans Affairs West Los Angeles Healthcare Center,* Los Angeles Conservancy, https://www.laconservancy.org/locations/veterans-affairs-west-los-angeles-healthcare-center (last visited Nov. 9, 2022).

[161] Nat'l Park Serv., Pacific Branch: Los Angeles, California, https://www.nps.gov/places/pacific-branch-los-angeles-california.htm (last updated Nov. 21, 2017).

[162] *Id.*

[163] *See* Stanley O. Williford, *Afraid to Speak: Few at Veterans Center Willing to Tell Complaints*, L.A. Times, Apr. 29, 1970, at 3.

[164] *See* David Rosenzweig, *VA Move Sounds 'Last Call': Twilight Hits Vets' 'Western Front' Taverns*, L.A. Times, Jan. 16, 1972, at B ("In recent years, the

203.    Conditions reached a crisis in 1970, when several doctors told a U.S. Senate subcommittee about the "filthy" and "medieval" conditions at the Wadsworth facility.[165] Patients often died there unattended from "breathing in their own secretions."[166] The *Los Angeles Times* reported that the facility had fallen into decay: creaky floors, blown-out windows, shingles peeling from the roof, plaster falling off the walls, mounting filth, and rusting sprinklers.[167] "It is cheerless," the *Times* reported, "and seems to reflect the general gloom of the men."[168] Yet the veterans did not complain. They did not want to get thrown out onto the streets.[169]

204.    The VA allowed the facility to dilapidate in plain violation of the 1888 Deed. The VA broke its trust with veterans who counted on it to keep its word that

---

[area] has come under fire from community groups and homeowners in posh Brentwood. The neighborhood residents complain that winos from the VA panhandle on the streets and litter lawns with empty pint bottles of Thunderbird and Triple Jack.")

[165] The doctors took their complaints to Washington, D.C., only after months of discussions with a majority of hospital staff and Veterans Administration personnel failed to rectify their issues. *See* Stanley O. Williford, *Patient Care Affected, Doctors Contend: Wadsworth Hospital Pay and Equipment Hit*, L.A. Times, May 31, 1970, at H1.

[166] *2 Doctors Hit Care at Veteran Hospital Here*, L.A. Times, Apr. 29, 1970, at 3. The hospital chief denied the accusations, and an investigation dispatched by Administrator of Veterans Affairs Donald E. Johnson claimed the hospital was providing adequate care to its patients. *Medical Investigation Team Praises Veterans Hospital*, Highland Park (L.A., Cal.) News-Herald & J., May 28, 1970, at 34.

[167] Stanley Williford, *Few at Veterans Center Willing to Tell Complaints*, L.A. Times, Apr. 29, 1970, at 3.

[168] *Id.*

[169] *Id.* ("Generally, the patients who live in the center's domiciliary area charge they are denied their constitutional rights, such as freedom from search and seizure and freedom from indiscriminate punishment. . . . But most of the men are unwilling to talk, mainly some say, from a fear of being thrown out of the facility, since many are incapable of taking care of themselves outside.").

they could live productive lives and heal their service-induced wounds.[170]

205.   There are today more than 100 buildings on the WLA Grounds, many vacant, closed, or underutilized, as well as acres of available land.[171] In contrast to what once existed and was intended, virtually no permanent housing is available to veterans with disabilities on the WLA Grounds.



[170] *See, e.g.*, Letter from Rob Reynolds, Veteran Outreach Coordinator, AMVETS Post 2, & Ray Delgado, Commander, AMVETS Post 2, to AMVETS Dep't Cal. (Aug. 21, 2022) (on file with counsel) ("At the beginning of 2022, we were told that housing construction for the first units would be completed in the fall, and Veterans would be able to move in by the end of the year. Now, we are told that construction will not be completed until January 2023. . . . Due to the long history of housing delays at the WLA VA, it is imperative to be transparent every step of the way. . . . The trust between Veterans, advocates, many VSO members, and the VA is fractured. There is a concerted effort by congressional reps, VA, and developers to avoid discussing or addressing the OIG reports and federal court rulings regarding illegal land use agreements at the West LA VA. This has been an ongoing issue for decades and must be resolved.").

[171] *See* U.S. Dep't Vet. Aff., Campus Map, https://www.va.gov/greater-los-angeles-health-care/locations/west-los-angeles-va-medical-center/campus-map/ (last visited Nov. 14, 2022) (January 2022 map of the grounds listing over 100 buildings at least 9 of which are vacant).

*Brentwood Theatre[172]*

206.   Rather than housing veterans, the VA has built multiple houses on the WLA Grounds for VAGLAHS senior staff. And, in contrast to the original intent of the grantors that the land be used to provide a permanent home to veterans with disabilities, the mission statement of VAGLAHS, which administers the WLA Grounds, focuses exclusively on providing medical treatment and serving as a research and teaching hospital.[173]

207.   According to VAGLAHS, the WLA Grounds "is perceived to be one of the most valuable parcels of real estate in the western United States."[174] Lucrative commercial and other non-VA programs now operate on the WLA Grounds, all of which were approved by Defendant Braverman or his predecessors as Director of

---

[172] The Brentwood Theatre opened in 1942 as an entertainment facility for veterans. *See generally* B Counter, *Brentwood Theatre*, L.A. Theatres, https://losangelestheatres.blogspot.com/2017/03/brentwood-theatre-va.html (last visited Nov. 9, 2022). Today the building is vacant, unused, and unattended.

[173] U.S. Dep't Vet. Aff., Mission and Vision, https://www.va.gov/greater-los-angeles-health-care/about-us/mission-and-vision/ (last visited Nov. 14, 2022) ("VA Greater Los Angeles Healthcare System's mission is to offer options to timely, quality services for Veterans through care and respect for one's physical, psychological, and spiritual health.").

[174] West Los Angeles VA Medical Center, Veterans Programs Enhancement Act Of 1998 (VPEA) Draft Master Plan at 8 (Jan. 2011), https://www.scribd.com/document/48127448/WLA-VA-Draft-Master-Plan. Tuition at the private Brentwood School starts at $40,730 for kindergarteners and $48,180 in sixth grade. *Affording BWS*, Brentwood Sch., https://www.bwscampus.com/admissions/affording-bws (last visited Sept. 14, 2022). The Jackie Robinson Stadium is home to the top-ranked UCLA baseball team, which won the College World Series in 2013. *UCLA Bruins Win 109th National Title — Their First in Baseball*, UCLA Newsroom (June 25, 2013), www.newsroom.ucla.edu/stories/ucla-bruins-win-109th-national-247061.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

VAGLAHS.[175]

## Defendants Offer Institutional Services and Temporary Housing

208.   Defendants know that Permanent Supportive Housing is the solution needed to address the needs of unhoused veterans with Serious Mental Illness. According to a report co-authored by the VA, "For the large percentage of veterans with disabilities, Permanent Supportive Housing would be effective in helping them achieve long-term stability."[176]

209.   "We have a proven strategy called Housing First that has reduced the number of homeless veterans in the country by half," as VA Secretary McDonough said in a recent interview from Los Angeles. "What remains is for us to underscore that we will not tolerate the idea that there's a homeless veteran in this country."[177] But Defendants have not followed through on their own advice.

210.   The Veterans Health Administration ("VHA") within the VA is tasked with providing "a complete medical and hospital service for the medical care and

---

[175] *See* OIG Five Year Report, *supra* note 20, at ii, https://www.oversight.gov/report/VA/VA%E2%80%99s-Management-Land-Use-under-West-Los-Angeles-Leasing-Act-2016-Five-Year-Report (last visited Sept. 14, 2022) ("The new noncompliant agreements . . . provided the Department of Homeland Security use of a building to develop and evaluate technology for real-time indoor positioning and tracking for emergency responders and enhanced security services to benefit the public at large . . . allowed the public to use VA parking lots located on the northwest corner of the Campus . . . .").

[176] U.S. Dep't Hous. & Urb. Dev. & U.S. Dep't Vet. Aff., Veteran Homelessness: A Supplemental Report to the 2009 Annual Homeless Assessment Report to Congress 30 (2009), https://www.huduser.gov/portal/sites/default/files/pdf/2009AHARVeteransReport.pdf.

[177] Nikki Wentling, *Q&A with VA Secretary Denis McDonough about Veteran Homelessness in Los Angeles*, Stars & Stripes (Mar. 16, 2022), https://www.stripes.com/veterans/2022-03-16/veterans-affairs-homeless-los-angeles-mcdonough-5364948.html.

-82-

treatment of veterans . . . ." [178] VAGLAHS is the VA healthcare system that serves all or parts of Los Angeles County, Ventura County, Kern County, Santa Barbara County, and San Luis Obispo County.[179]

211.   The benefits package offered through VHA includes outpatient medical, surgical, and mental healthcare; inpatient hospital, medical, surgical, and mental healthcare; prescription drug coverage; emergency care; substance abuse treatment, and other services.[180] VHA is required to provide preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care, which includes residential treatment and housing services. These services are collectively referred to herein as "VHA benefits."

212.   The focal point of healthcare services offered by VAGLAHS is the VA Greater Los Angeles Medical Center located on the WLA Grounds. It offers 24/7 services, including inpatient and outpatient treatment for mental health conditions and short-term residential treatment for substance use disorders.

213.   The West Los Angeles VA Medical Center on the WLA Grounds offers care in the following areas: medicine, surgery, psychiatry, physical medicine and rehabilitation, neurology, oncology, dentistry, geriatrics, and extended care. Research and academic medical training are also conducted on-site.

214.   VAGLAHS stated in its 2018 annual report that, in total, it operates 716 beds on the WLA Grounds, comprising 296 domiciliary beds, 224 community living center beds, 82 surgical beds, 48 intensive care beds, 46 inpatient mental health beds, and 20 physical medicine and rehabilitation beds.[181] The State of

---

[178] 38 U.S.C. § 7301(b).
[179] *See* Press Release, *supra* note 44.
[180] *See* 38 C.F.R. § 17.38(a) (listing details of the medical benefits package).
[181] U.S. Dep't Vet. Aff., 2018 Annual Report, https://www.va.gov/files/2021-08/2018-VAGLA-Annual-Report-web.pdf; *see also* U.S. Dep't Vet. Aff., About Us, https://www.va.gov/greater-los-angeles-health-care/about-us/ (last visited Nov. 9,

California also operates a skilled geriatric nursing facility on the WLA Grounds.[182]

215.   VAGLAHS provides long-term rehabilitative care on the WLA Grounds at the West Los Angeles Polytrauma site. This facility is dedicated to patients with injuries to more than one physical region or organ system resulting in physical, cognitive, psychological, or psychosocial impairments and functional disabilities.[183]

216.   By contrast to the 24/7/365 services on the WLA Grounds, VAGLAHS's facilities outside the WLA Grounds provide only outpatient services and are open only during regular business hours and only on weekdays. For example, the average wait times to get a new patient mental health appointment from VAGLAHS's affiliated clinics and medical centers within a 25-mile radius ranges from 52 to 111 days.[184]

---

2022). This represents a decrease in operational beds since 2010; according to that year's annual report, VAGLAHS reported operating 770 beds, including 226 acute hospital beds, 188 skilled nursing home beds, 52 non-acute hospital beds, and 304 Domiciliary beds.

[182] CalVet, West Los Angeles, https://www.calvet.ca.gov/VetHomes/Pages/West-Los-Angeles.aspx.

[183] *See* L.A. Cty., U.S. Department of Veterans Affairs: VA Polytrauma System of Care,
https://losangeles.networkofcare.org/mh/services/agency.aspx?pid=USDepartmentof VeteransAffairsVAPolytraumaSystemofCare_2_68_1 (last visited Nov. 15, 2022); *see also* U.S. Dep't Vet. Aff., Polytrauma/TBI System of Care,
https://www.polytrauma.va.gov/facilities/west_Los_angeles.asp (last visited Nov. 14, 2022).

[184] West Los Angeles VA Medical Center, https://www.va.gov/greater-los-angeles-health-care/locations/west-los-angeles-va-medical-center/ (last visited Nov. 14, 2022); East Los Angeles VA Clinic, https://www.va.gov/greater-los-angeles-health-care/locations/east-los-angeles-va-clinic/ (last visited Nov. 14, 2022); Los Angeles VA Clinic, https://www.va.gov/greater-los-angeles-health-care/locations/los-angeles-va-clinic/ (last visited Nov. 14, 2022); Sepulveda VA Medical Center, https://www.va.gov/greater-los-angeles-health-care/locations/sepulveda-va-medical-center/ (last visited Nov. 14, 2022).

217.   Veterans must travel often considerable distances to the WLA Grounds or another VAGLAHS service location with limited hours if they wish to access inpatient or outpatient services from VAGLAHS. While VAGLAHS provides bus transportation between the WLA Grounds and other treatment centers, it does not assist veterans with transportation to or from where they live.[185] And the pandemic-era rideshare benefit that did provide that service starting in August 2021—and used by Plaintiffs and those similarly situated since then—expired on May 11, 2023.[186] Given their disabilities, the size of Los Angeles County, and the limited public transportation options in West LA, getting to the WLA Grounds is an almost-impossible task for veterans with SMI or TBI.

218.   VAGLAHS also offers temporary shelter services through the 321-bed Domiciliary. This program provides only temporary shelter beds, along with medical, psychiatric, and substance abuse treatment, and other therapeutic services. However, upon information and belief, even these temporary shelter beds are decreasing on account of a new policy requiring sixty beds to be reserved for Covid-19 patients to the exclusion of other veterans in need.

219.   The Domiciliary is very institutional. Residents generally live in a barracks-style room with several other residents, even if they have a mental health

---

[185] *See* U.S. Dep't Vet. Aff., Transportation services and schedules, https://www.va.gov/greater-los-angeles-health-care/programs/transportation-services-and-schedules/ (last visited Nov. 14, 2022). The VA launched a nationwide rideshare benefit in August 2021 in connection with the declaration of a national emergency; however, that benefit expired on May 11, 2023,

[186] *See* Patricia Kime, Free Uber, Lyft Rides for Vets Program Will End in May. The VA Is Pleading with Congress to Extend It, Military.com (Apr. 25, 2023), https://www.military.com/daily-news/2023/04/25/free-uber-lyft-rides-vets-program-will-end-may-va-pleading-congress-extend-it.html; VA Rideshare Program Overview, VA Office of Healthcare Innovation and Learning, https://innovation.va.gov/ecosystem/assets/documents/VARideshareProgramOverview.pdf.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

condition that makes it difficult or impossible to function in such tight quarters with other people, particularly as strangers.[187] Residents may not leave the facility without a pass and may not leave the facility at all for more than 96 hours, are penalized for missing planned activities, and must eat the meals provided by the facility.[188]

220.   By its own admission, the VA notes that Domiciliary programs "must not be used as a simple substitute for community housing."[189] However, the VA fails to provide adequate community housing for these veterans, and half the unhoused veterans who enter the Domiciliary are unable to transition into permanent housing at the end of their program and remain unhoused.[190]

221.   In October 2021, the VA built new 8-by-8-foot tiny shed structures on the WLA Grounds. The sheds are reserved for high-risk unhoused veterans, namely veterans with disabilities, but do not provide treatment or other services.[191] According to Robert McKenrick, the former Executive Director of Community Engagement & Reintegration Service and Master Plan for VAGLAHS, "[t]he average stay is about 30 days, and then [the veterans] move on to other types of

---

[187] Although a few single rooms (fewer than 20) are available, veterans generally must "earn" their way into in a single room by maintaining compliance with the treatment program over a fixed period of time. Therefore, these rooms are not made available on the basis of need.

[188] VHA Directive 1162.02, Mental Health Residential Rehabilitation Treatment Program, E5-7, https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=8400.

[189] *Id.* at A-4.

[190] 2022 Master Plan, *supra* note 47, at 38 ("The West LA Campus DOM serves nearly 1,000 Veterans each year, approximately 50% of Veterans who participate in DOM programming transition into permanent housing.").

[191] Juliet Lemar, *West LA Vets Offers Tiny Home Shelters for Homeless Veterans*, Santa Monica Mirror (Nov. 8, 2021), https://smmirror.com/2021/11/west-la-va-offers-tiny-home-shelters-for-homeless-veterans/.

-86-

housing or assistance or shelters."[192]

 

*Tiny Sheds*

222.    There were approximately 140 tiny sheds before a fire in September 2022 destroyed 11 of them and damaged four more.[193] Overheated lithium batteries ignited the blaze, causing some $165,000 in damage and exposing the inadequacy of the tiny-home scheme.[194]

---

[192] *Id.*

[193] Nathan Solis, *Fire Destroys 11 Tiny Homes that Housed Homeless Vets at West L.A. Veterans Affairs Campus*, L.A. Times (Sept. 9, 2022), https://www.latimes.com/california/story/2022-09-09/fire-tiny-homes-homeless-veterans-west-los-angeles.

[194] *Fire Destroys 11 Tiny Homes, Damages 4 Others at Veterans Affairs Campus in West Los Angeles*, Eyewitness News ABC 7 (Sept. 9, 2022), https://abc7.com/fire-tiny-homes-veterans-homeless/12216051/.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION



*Tiny Sheds Fire, 2022*

223.    The sheds have heating and cooling units, but the heaters "are hard to control and have been known to make the concrete floors so hot that people have burned their feet getting out of bed."[195] The sheds have locking capabilities, but veterans are not provided with unit keys, meaning they are unable to securely store

---

[195] Sasha Plotnikova, *A Cage By Any Other Name*, City Watch (May 9, 2022), https://www.citywatchla.com/index.php/cw/los-angeles/24538-a-cage-by-any-other-name.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

their belongings when they exit the pallet shelter.[196] Notably, the tiny sheds do not include a sink, toilet, or shower, meaning the veterans using them must share showers—often broken and filthy—and portable toilets. None of these tiny sheds provide Permanent Supportive Housing.




*Tiny Sheds (Credit: Rob Reynolds, 2022)*

224.   In addition to being temporary and offering virtually no services, the tiny sheds are so institutional as to be carceral. Residents are forced to undergo

---

[196] *See id.*; Jamie Feiler & Jon Peltz, *30 Tiny Homes Sat Vacant While Veterans Awaited Housing*, Knock LA (Sep. 6, 2022), https://knock-la.com/vacant-west-la-va-tiny-homes/.

-89-

searches, are denied visitors, and are surrounded by fencing and security.[197]

225.   Yet even temporarily, these tiny sheds accommodate fewer than the number of veterans in need, restricted based on staffing and other policies. Upon information and belief, staffing ratios previously left several sheds vacant despite there being several veterans in need of shelter, and now admissions are being capped at two per day.

226.   None of these beds are permanent housing and the vast majority of those that provide any treatment services at all are institutional.

227.   In addition to the beds operated by VAGLAHS, several other institutional or temporary programs are operated by third parties on the WLA Grounds.

228.   The Veterans Home of California, which opened on the WLA Grounds in 2010, is run by the State of California and provides nursing care to veterans over age 62. The 396-bed institution includes an 84-bed elderly residential care facility, a 252-bed skilled nursing facility, and a 60-bed unit designed for Alzheimer's and dementia patients.[198]

229.   New Directions, Inc. operates two residential programs on the WLA Grounds. The New Directions' Regional Opportunity Center serves 161 veterans for detoxification, transitional housing, and residential substance abuse and mental health services.[199]

230.   As with the VAGLAHS-run Domiciliary, virtually all of the emergency and transitional beds operated by the non-profit providers on the WLA Grounds mandate residents to share rooms. Because veterans living in these transitional

---

[197]

[198] CalVet, West Los Angeles, https://www.calvet.ca.gov/VetHomes/pages/west-los-angeles.aspx (describing the institution and its resources).

[199] New Directions for Vet., Transitional & Emergency Housing, https://ndvets.org/transitional-emergency-housing/.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

housing programs do not have the option to have their own rooms, many with mental health disabilities like PTSD are unlikely to be successful. For example, veterans with PTSD who experience symptoms such as hypervigilance, sleep disturbance, irritability, and distrust of others are likely to have these symptoms aggravated when forced to share a room with strangers.

231.   Finally, by their nature as short-term and transitional beds, these programs cannot provide the long-term stability that veterans with severe disabilities require in order to meaningfully access medical and therapeutic services offered by VAGLAHS on the WLA Grounds. That was not, and is not, their purpose.

232.   The Salvation Army operates a 40-unit Westwood Transitional Village on the WLA Grounds, housing approximately 150 individuals. Only unhoused families are eligible, including both veterans' and non-veterans' families, and participants are only allowed to stay for a fixed period of time.[200]

233.   Safe Parking LA operates a parking lot on the WLA Grounds for unhoused veterans who are living in their cars. Veterans accepted into the Safe Parking LA program can park in the lot overnight during set hours. Veterans have access to a portable (often filthy) toilet and are provided with one meal a day, but there are no shower or kitchen facilities (such as a refrigerator or microwave). Participants are provided case management and are allowed to stay in the program as long as they are "actively pursuing their next steps."[201] The parking lot program does not provide, nor is it intended to serve as, Permanent Supportive Housing.

---

[200] *See* Salvation Army, Westwood Transitional Village, https://westwoodtlc.salvationarmy.org/ (last visited Nov. 9, 2022) ("The Westwood Transitional Village is a 40 unit residential housing facility that provides support services for homeless families. Families can live here for a designated amount of time while they stabilize and acquire the skills needed for independent living. . . . Approximately 150 individuals live at The Village at all times . . . .").

[201] *FAQs for Applicants*, Safe Parking LA, https://safeparkingla.org/who-we-are/faqs/ (last visited Nov. 9, 2022) (explaining how long individuals can stay).

234.   What the WLA Grounds does not provide is exactly what it was intended to provide—community-based Permanent Supportive Housing for veterans. Only one building on the WLA Grounds—Building 209—provides any permanent housing for veterans with disabilities. Building 209 contains 54 housing units for veterans.[202]

235.   Aside from that, VAGLAHS and the other entities operating on the WLA Grounds offer only inpatient hospital care and emergency or transitional shelter beds for disabled and unhoused veterans. These institutional healthcare and housing services meet neither the needs of Plaintiffs and other veterans with severe disabilities nor the legal obligations of Defendants to serve veterans in the most integrated setting appropriate. VAGLAHS could integrate housing through the use of categorical caps, as proposed in the prayer for relief, so as to avoid their historic and discriminatory institutionalization.

**Defendants' Limited Permanent Supportive Housing Program is Inadequate, in Terms of Both Quantity and Quality**

236.   The VA and HUD's joint HUD-VASH program is VAGLAHS's only purported Permanent Supportive Housing program.[203] It provides vouchers for rental

---

[202] *See* 2022 Master Plan, *supra* note 47 (Building 209 and its services are described on page 8 (and several other places) in the 2022 Master Plan).

[203] *See* Press Release, U.S. Dep't Vet. Aff., Greater Los Angeles VA Offers Services for Veterans Experiencing Homelessness (Oct. 14, 2021), https://www.va.gov/greater-los-angeles-health-care/news-releases/greater-los-angeles-va-offers-services-for-veterans-experiencing-homelessness/; *see also* U.S. Dep't Vet. Aff., VA Homeless Programs, https://www.va.gov/homeless/for_homeless_veterans.asp (last updated Nov. 22, 2021); *see also* L.A. Cty. Dev. Auth., Rental Assistance for Homeless Veterans, https://www.lacda.org/homelessness/veterans-affairs-supportive-housing. The VA also maintains the Supportive Services for Veteran Families (SSVF) program, which provides case management and financial assistance to stabilize veterans' housing, but the program is only intended to "provide a short-term intervention." U.S. Dep't

assistance, along with VA case management and clinical services, to unhoused

| PHA Name | PHA Code | VASH Total Effective Awards | VASH Total Leased | VASH Leasing % |
|----------|----------|-----------------------------|-------------------|----------------|
| Housing Authority of the County of Los Angeles | CA002 | 3,192 | 1,772 | 55.51% |
| Housing Authority of the City of Los Angeles | CA004 | 4,615 | 2,686 | 58.20% |
| Housing Authority of the County of Kern | CA008 | 217 | 122 | 56.22% |
| Housing Authority of the City of Oxnard | CA031 | 77 | 36 | 46.75% |
| County of Monterey Hsg Auth | CA033 | 324 | 223 | 68.83% |
| Housing Authority of the City of San Luis Obispo | CA064 | 226 | 181 | 80.09% |
| City of Long Beach Housing Authority | CA068 | 830 | 689 | 83.01% |
| Housing Authority of the City of Santa Barbara | CA076 | 30 | 8 | 26.67% |
| Housing Authority of the City of Pasadena | CA079 | 32 | 16 | 50.00% |
| Housing Authority of the City of Inglewood | CA082 | 50 | 41 | 82.00% |
| Housing Authority of the County of Ventura | CA092 | 20 | 20 | 100.00% |
| Housing Authority of the City of Redondo Beach | CA103 | 40 | 34 | 85.00% |
| Housing Authority of the City of Burbank | CA105 | 15 | 9 | 60.00% |
| Housing Authority of the City of Santa Monica | CA111 | 35 | 23 | 65.71% |
| Housing Authority of the City of Torrance | CA121 | 25 | 9 | 36.00% |
| Housing Authority of the City of Pomona | CA123 | 60 | 43 | 71.67% |
| **Total** | | **9,788** | **5,912** | **60.40%** |

*VASH Vouchers Awarded and Utilized as of August 2022, generated from HUD Housing Choice Voucher Program Dashboard*

veterans. Greater Los Angeles has been allocated approximately 9,800 vouchers, but only about 5,900 (60%) are in use:[204]

237.   The HUD-VASH program allocated 585 VASH vouchers for Greater Los Angeles in FY2020 (500 for Los Angeles County) and 75 in FY2021 (0 for Los Angeles County or City).[205] This is obviously not sufficient to house the 3,500 unhoused veterans in the County. Worse, only approximately 60% of HUD-VASH voucher recipients in Greater Los Angeles (less in Los Angeles City and County)

Vet. Aff., Supportive Services for Veteran Families (SSVF Program), Program Guide (Mar. 2021), https://www.va.gov/HOMELESS/ssvf/docs/SSVF_Program_Guide.pdf.
[204] Self-generated report ("GLA VASH Utilization"), U.S. Dep't of Hous. & Urb. Dev., Housing Choice Voucher Program Dashboard, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/dashboard (last updated Aug. 2022).
[205] HUD-Veterans Affairs Supportive Housing, HUD-VASH Vouchers 2008-2021, https://www.hud.gov/sites/dfiles/PIH/documents/VASH_Awards_2008-2021.pdf.

are successful in finding housing using the voucher, and often only after a long period of time without housing or services.[206] In a vicious cycle, the failure to use all its allocated vouchers results in Los Angeles receiving fewer vouchers in subsequent years. And the need for Permanent Supportive Housing in Los Angeles grows. Defendants could reasonably take additional steps to increase the number and value of the vouchers or otherwise incentivize their acceptance by landlords in the area of the WLA Grounds, assist veterans to secure apartments accepting HUD-VASH vouchers, assist veterans with landlord-tenant relationships, and/or purchase units to house HUD-VASH voucher recipients.

238.   Finding housing for HUD-VASH voucher participants takes a long time, leaving veterans with disabilities languishing on the streets or in institutional settings without adequate services. This makes it even more difficult for them to find housing at all.

239.   The HUD-VASH program is supposed to offer wrap-around services and health and substance use disorder treatments as discussed above, but primarily provides case management to connect residents with VA services, without actually bringing the services to them. Instead, individuals with Serious Mental Illness are expected to navigate the systems, endure the long waits for appointments, and overcome transportation and other barriers to getting to the West LA Grounds from

---

[206] *See* GLA VASH Utilization, *supra* note 204; Hous. Auth. City of L.A., *L.A., Council Report Back: The Housing Authority of the City of Los Angeles and the Los Angeles Housing & Community Investment Department Consultation from the City Attorney Office's Report Regarding City Ordinance to Protect Affordable Housing Opportunities for Renters Utilizing Rental Assistance or Other Sources of Income as Payment* 2 (Nov. 16, 2018), http://clkrep.lacity.org/onlinedocs/2018/18-0462_rpt_HACLA_12-03-2018.pdf. In February 2022, Defendant McDonough announced a goal of increasing GLA's VASH voucher utilization rate to "at least 75%." VA outlines new goals towards ending Veteran homelessness (Feb. 22, 2022), U.S. Dep't Vet. Aff., https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5767.

housing outside the Grounds area in order to access the treatment services that make Permanent Supportive Housing necessary in the first place. These inadequacies make the HUD-VASH program fail at serving veterans with Serious Mental Illness, who need the program the most.

240.   Defendants have too-long maintained the erroneous position that Veterans Affairs does not, itself, have the ability to build housing for homeless veterans with disabilities, a position this Amended Complaint challenges directly. Under the cloak of that position, Defendants have contracted with third-party developers to build the very housing Defendants are obligated—and agreed—to provide.

241.   "In order to build affordable housing, developers apply for funding from multiple sources, including City, County, State and private financial institutions, each of which may have different eligibility restrictions tied to its funding. In order to be competitive for public funding, developers often agree to the most restrictive income limitations, generally the 30% AMI level."[207] For the purpose of calculating veteran eligibility, this means that a veteran can only apply for specific housing if their "income" is at or below the corresponding level of AMI, or Area Median Income. Although not considered reportable taxable income by the Internal Revenue Service, compensation that disabled veterans receive from the Veterans Benefits Administration on account of their diagnosed service-connected disabilities is counted toward the housing AMI restrictions. Other federal benefits such as benefits from the Social Security Administration also count.

242.   Under current rates of disability compensation and AMI, a single veteran in Los Angeles, with a 100% disability rating from the VA and no dependents, generally receives more than 50%, closer to 60%, AMI. Certain veterans receive additional special monthly compensation above the basic disability

---

[207] HACLA Letter, *supra* note 29.

compensation for certain severe loss categories, which of course increases their AMI level even more. Some veterans who began receiving social security benefits before securing housing also have to add that benefit to their calculation.

243.   So beyond the materially insufficient housing there is available, what is available is not offered to those the VA itself has determined are most in need of accessible VA medical and social services.

**Plaintiffs Are Qualified to Receive VA Housing and Healthcare Services In Integrated Settings and Do Not Oppose It, But the VA Institutionalizes Them Puts Them at Risk of Institutionalization, Or Bars Their Entry Altogether**

244.   To qualify for VHA benefits, a former service-member must have been "discharged or released'' from service "under conditions other than dishonorable"[208] and must have "served in the active military, naval, air, or space" services.[209]

245.   Veterans who qualify for VHA benefits are placed into one of eight "priority" groups established by VA regulations to determine their eligibility for benefits.[210] Depending on the amount of funding provided by Congress, the VA may

---

[208] 38 U.S.C. § 101(2).

[209] *Id.* There is no length of service requirement for former enlisted persons who started active duty before September 8, 1980, or for former officers who entered active duty before October 17, 1981. 38 U.S.C. § 5303A(b)(2). All other veterans must have 24 months of continuous active duty unless they qualify for an exception to the minimum service requirement. 38 U.S.C. § 5303A(b)(l). Exceptions to the minimum service requirement include discharges "for a disability incurred or aggravated in the line of duty." 38 U.S.C. § 5303 A(b)(3)(B).

[210] Veterans in the highest priority categories, 1 through 3, have service-connected disabilities of varying degrees. 38 C.F.R. § 17.36(b)(l)-(3). Veterans in priority group 4 have serious disabilities that are not service-connected. 38 C.F.R. § 17.36(b)(4). Priority group 5 comprises low-income veterans. 38 C.F.R. § 17.36(b)(5). Priority group 6 includes veterans exposed to toxic substances, as well as recent combat veterans. 38 C.F.R. § 17.36(b)(6). Veterans in priority groups 7 and 8 have no compensable service-connected disabilities and have greater incomes than those in priority group 5. 38 C.F.R. § 1 7.36(b)(7)-(8). "A veteran will be placed

"prioritize" the higher priority groups and provide VHA benefits only to veterans in those priority groups. Individuals in the lower priority groups may also be required to pay copays. Currently, any veteran within any one of the first seven priority groups is eligible for the full VHA benefits package, and some veterans who fall within priority group 8 are also eligible.[211]

246.   Plaintiffs, NVF members, and individuals who are similarly situated are eligible for the full panoply of VA health and housing services. Of the individual Plaintiffs, most currently belong—and military and medical records support that all *should* belong—to the highest priority group on account of a VA-assigned "singular or combined rating of 50 percent or greater based on one or more service-connected disabilities or unemployability."[212] Plaintiffs, NVF members, and individuals who are similarly situated do not wish to live in psychiatric hospitals, homeless shelters, jails, or tiny sheds, and their disabilities do not require such institutional services. Plaintiffs want, need, and deserve, community-based Permanent Supportive Housing—meaning housing in their communities, with meaningful access to effective supportive and treatment services.

247.   Because Permanent Supportive Housing is the only approach that effectively affords individuals like Plaintiffs with Serious Mental Illness and TBI meaningful and integrated access to the medical, mental health, and other services to which they are legally entitled by virtue of their service to this country, the VA's failure to provide sufficiently high-quantity and quality Permanent Supportive Housing to Plaintiffs and other unhoused veterans with Serious Mental Illness and

---

[211] *See* U.S. Dep't Vet. Aff., VA Priority Groups, https://www.va.gov/health-care/eligibility/priority-groups/ (last visited Nov. 9, 2022) ("If you're assigned to priority group 8, your eligibility for VA health care benefits will depend on which subpriority group we place you in.").

[212] 38 C.F.R. § 17.36(b)(l).

in the highest priority category or categories for which the veteran qualifies." 38 C.F.R. § 17.36(d)(3)(ii).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

TBI excludes them from services to which they are entitled solely because of their disabilities.

248.   In addition, as a result of the VA's inadequate planning, structuring, administration, and funding of Permanent Supportive Housing within its system of care and in coordination with its healthcare services, veterans with Serious Mental Illness and TBI are forced to receive services unnecessarily in VA-operated and non-VA institutional settings, such as hospitals, residential treatment programs, homeless shelters, and jails, or are at risk of unnecessary institutionalization.

249.   Veterans with Serious Mental Illness and TBI who are homeless or at risk of homelessness are qualified to receive the VA's housing and healthcare services and are capable of being served in community-based settings if Permanent Supportive Housing were available to them.[213]

250.   Providing Permanent Supportive Housing to veterans with Serious Mental Illness and TBI receiving services in, or at risk of entry into, VA institutions and other institutions, homelessness, and jail, can be accomplished with reasonable modifications to the VA's programs and services.

251.   Permanent Supportive Housing exists within VAGLAHS's mental health service system and could be expanded to serve many more individuals like Plaintiffs with Serious Mental Illness and TBI.

252.   However, very few veterans with Serious Mental Illness or TBI can access VAGLAHS's and HUD's Permanent Supportive Housing programs due to the insufficient supply of affordable supported housing units for currently unhoused veterans in VAGLAHS's and HACLA's service area because of the inadequacy of the supportive services made available, and because of other unjustly extraneous restrictions barring their entry. Many Plaintiffs have been advised by their VA case

---

[213] *See* U.S. Dep't Vet. Aff., Eligibility for VA Health Care, https://www.va.gov/health-care/eligibility/ (last visited Nov. 14, 2022).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

workers for years that they are not eligible to even apply for most VA-accessible housing; and others who have managed to submit applications have received formal rejections.

253.    Serving individuals with Serious Mental Illness residing in, or at risk of entry into, institutional settings in supported housing rather than institutions would not significantly adversely impact the VA's ability to serve other individuals with disabilities. In fact, the VA has previously committed to do just that, but has failed to follow through on its commitment.

### **Plaintiffs Have Been Denied Access to the VHA Benefits Offered by VAGLAHS Solely by Reason of Their Disabilities**

254.    Plaintiffs have been and continue to be denied meaningful access to benefits offered by VAGLAHS solely because of their disabilities, in violation of the Rehabilitation Act.

255.    The program structure and design of benefits offered by VAGLAHS denies them meaningful access, because without stable housing that is readily accessible to the necessary mental health and other supportive services offered by VAGLAHS, they cannot access the benefits offered by VAGLAHS on equal terms as nondisabled veterans and less severely disabled veterans. Thus, the administration of VAGLAHS's services denies "certain disabled individuals meaningful access to government-provided services because of their unique needs, while others . . . retain access to the same class of services."[214]

256.    Defendant McDonough and other senior officials within the VA and Defendants Braverman and Harris and other senior officials within VAGLAHS, are well aware that many veterans eligible for VHA benefits within the VAGLAHS service area have Serious Mental Illness or brain injuries that require that they have

---

[214] *Rodde*, 357 F.3d at 998.

stable housing in order to access necessary services.

257. Nonetheless, Defendants have discriminated and will continue to discriminate against veterans with Serious Mental Illness solely by virtue of their disabilities.

258. Defendants and their predecessors have made decisions that discriminate against Plaintiffs on account of their disabilities. They reneged on the terms of the 1888 deed. They failed to provide sufficient Permanent Supportive Housing to those veterans who, by reason of their Serious Mental Illness and TBI, are unable to meaningfully access appropriate treatment without it, even though providing such housing and services is reasonable.

259. In designing and implementing their VASH program, they failed to provide sufficient affordable housing, failed to provide adequate voucher numbers and rates to afford the housing that is available near VAGLAHS services, and failed to provide sufficiently robust services to support those with Serious Mental Illness.

260. Defendants reneged on the terms of a 2015 settlement agreement to provide a limited amount of such Permanent Supportive Housing. They even entered into illegal leases of property on the Grounds, thereby reducing available land for Permanent Supportive Housing and prioritizing non-veterans over veterans with disabilities.

261. In addition, Defendants have denied Plaintiffs meaningful access to VAGLAHS services solely because of their Serious Mental Illness by:

- Refusing to provide services through the HUD-VASH program that are necessary for the treatment of Plaintiffs' Serious Mental Illness or TBI, while providing services necessary for the treatment of veterans who do not have Serious Mental Illness or TBI;
- Overrelying on services or treatment provided in settings that Plaintiffs are unable to access as a result of symptoms or characteristics of their disabilities;

-100-

- Geographically and administratively separating housing services from healthcare services and thus making it virtually impossible for Plaintiffs and others with Serious Mental Illness and TBI to access both.

262.   Finally, Defendants have failed to carry out their commitments to create Permanent Supportive Housing units on the WLA Grounds. Despite having committed in 2015 to create 1,200 units, including 770 units by 2022, the VA only signed a lease to develop 900 of those units in July of 2022.[215]

263.   The VA's 2022 Master Plan,[216] released in March 2022, acknowledges that it agreed to provide 1,200 units of Permanent Supportive Housing in the 2016 Master Plan and that "[t]he need for this additional housing on the West LA Grounds is urgent with more than 3,681 Veterans presently experiencing homelessness in LA County."[217] Nonetheless, the VA expects to have only 182 units completed in the next five years and 885 units in up to ten years. 352 remaining units are not expected until over 11 years after 2022.[218]

## The VA and HUD Have the Authority to Build Permanent Supportive Housing on the WLA Grounds

264.   The VA and HUD have authority under existing federal law to build more housing for veterans with disabilities on the WLA Grounds. This may either be done through direct building authorization, capital advances to nonprofit partners, or through applicable grant programs.

---

[215] Press Release, U.S. Dep't Vet. Aff's, VA Signs Lease with the West LA Veterans Collective to Develop 900 Units of Housing for Veterans Experiencing Homelessness (July 11, 2022), https://www.va.gov/greater-los-angeles-health-care/news-releases/va-signs-lease-with-the-west-la-veterans-collective-to-develop-900-units-of-housing-for-veterans/.
[216] 2022 Master Plan, *supra* note 47.
[217] *Id*. at 5.
[218] *Id*. at 10-11.

-101-

265.    The VA Handbook 5975.6 provides guidance on the VA's implementation of Section 504 of the Rehabilitation Act of 1973. Examples of accessibility measures that comply with Section 504 include the "alteration and construction of new facilities." U.S. Dep't Veteran Affairs, VA Handbook 5975.6, *Compliance Procedures Implementing Section 504 of the Rehabilitation Act of 1973 – Nondiscrimination Based on Disability in Federally Conducted Programs or Activities* 12 (2020).

266.    The VA is likewise required to "give priority to those methods that offer programs and activities eligible individuals with disabilities in the most integrated setting appropriate." *Id.*

267.    The VA's own implementing guidelines for Section 504 therefore contemplate an obligation to construct new, accessible facilities for veterans with disabilities stemming from the VA's nondiscrimination obligation under Section 504. *See id.*

268.    Likewise, federal law grants the VA Secretary the authority to "construct or alter any medical facility" subject to certain constraints. *See* 38 U.S.C. § 8103.

269.    One of those restrictions is that the Secretary may not "obligate or expend funds. . . for any major medical facility project unless funds for that project have been specifically authorized by  law." 38 U.S.C. § 8104 (emphasis added).

270.    A "major medical facility project" is defined as "a project for the construction, alteration, or acquisition of a medical facility involving a total expenditure of more than $20,000,000[.]" 38 U.S.C. § 8104.

271.    A "medical facility" is defined as "any facility or part thereof which is, or will be, under the jurisdiction of the Secretary, or as otherwise authorized by law, for the provision of health-care services (including hospital, outpatient clinic, nursing home, or domiciliary care or medical services)[.]" 38 U.S.C. § 8103(a).

-102-

272.   Because permanent supportive housing necessarily incorporates the provision of healthcare services in the home (i.e. "domiciliary care"), this would authorize the VA to build a "medical facility" for the provision of permanent supportive housing under $20 million. *See* 38 U.S.C. § 8103.

273.   Beyond direct construction authorization, both the VA and HUD have the authority to fund construction through capital advance and other grantmaking programs.

274.   The HUD Secretary may authorize capital advances to nonprofit organizations to create "supportive housing for people with disabilities." 42 U.S.C. §§ 8013(b), (b)(2).

275.   Such "supportive housing" refers to dwellings that "are designed to meet the permanent housing needs of very low-income persons with disabilities;" and "are located in housing that makes available supportive services that address the individual health, mental health, or other needs of such persons." 42 U.S.C. § 8013(k)(3).

276.   HUD may also award grants through its "Continuum of Care" program. This program gives HUD the authority to issue grants to qualified partners that serve homeless individuals or families, including the "construction of new housing units to provide. . .permanent housing." 42 U.S.C. § 11383(a)(1).

277.   Likewise, the VA may provide grants to states to finance the construction of state home facilities to provide domiciliary or nursing home care to veterans. *See* 38 U.S.C. § 8131 *et seq.*

278.   This shows that the VA and HUD could build more permanent supportive housing under existing construction and grantmaking authorities. Neither agency would have to go to Congress to obtain this authority. Furthermore, the VA and HUD could subsidize current (and, if necessary, future) third party developers by providing grants that would eliminate the AMI threshold eligibility requirements

-103-

1  imposed by other funders.

2    279.   In addition to these authorizations, spending to construct housing is

3  authorized by the Necessary Expense Doctrine. 31 U.S.C. §1301, et seq.

4

5  **The WLA Grounds Violates the West Los Angeles Leasing Act of 2016**

6    280.   For decades, VAGLAHS has leased portions of the WLA Grounds to

7  private entities and entered into a variety of land use agreements, including long-

8  and short-term leases, memoranda of understanding, revocable licenses, and

9  <u>enhanced</u> sharing agreements, with both for-profit and not-for-profit entities.

10   281.   Congress enacted the WLALA2016, allowing non-VA entities to use

11  the WLA Grounds only if the real property leases and land-use agreements

12  "*principally benefit* veterans and their families."[219] Pursuant to this act, the VA OIG

13  must submit a report to Congress "on all leases carried out at the Grounds and the

14  management by the Department of the use of the land at the Grounds . . . ."[220] The

15  OIG reports cited earlier are pursuant to this mandate.

16   282.   But the VA has not stopped its illegal leasing of the land. In 2018 the

17  OIG issued a 120-page report, *VA's Management of Land Use under the West Los*

18  *Angeles Leasing Act of 2016.*[221] The OIG found that "25 of 40 of the land use

19  agreements (63 percent) on the WLA Grounds were improper."[222]

20   283.   The OIG Report was the first of two indictments of the VA's treatment

21  of unhoused veterans. It was a call to immediate action, but the VA ignored the call.

22   284.   In its 2021 report, the OIG "identified seven land-use agreements that

23  did not comply with the West Los Angeles Leasing Act of 2016."[223] The "OIG

---

24

25  [219] WLALA2016 (emphasis added).

   [220] *Id.*

26  [221] OIG WLALA Report, *supra* note 140.

27  [222] *Id.* at 14.

   [223] OIG Five Year Report, *supra* note 20, at ii.

28

-104-

identified five agreements created since the release of the prior audit in 2018 that did not comply with the West Los Angeles Leasing Act of 2016, the draft master plan, or other federal statutes."[224] Two other noncompliant land-use agreements remained noncompliant despite being previously reported.[225]

285.   More specifically, OIG determined that "the agreements were not veteran focused or did not comply with other provisions of the act such as limits on VA's leasing authority under the act. The prior noncompliant agreements allowed drilling to extract non-federally owned oil from neighboring land and allowed a lease with the private Brentwood School for continued use and improvement of student athletic facilities that did not principally benefit veterans and their families."[226]

---

[224] *Id*. Around this time law enforcement exposed the land's role in a corruption scheme. The owner of a parking lot business on the grounds was sentenced to 70 months in federal prison for orchestrating a longstanding bribery scheme in which he bilked the VA out of more than $13 million. Press Release, U.S. Att'y's Off. Cent. Dist. Cal., Parking Lot Operator Sentenced to Nearly 6 Years in Federal Prison for Bribery Scheme That Defrauded Department of Veterans Affairs (Aug. 20, 2018), https://www.justice.gov/usao-cdca/pr/parking-lot-operator-sentenced-nearly-6-years-federal-prison-bribery-scheme-defrauded. A man who took $286,000 in cash bribes for more than a decade, pleaded guilty to tax fraud and lying to federal investigators about his role in the scheme. Adrienne Alpert & Lisa Bartley, *EXCLUSIVE*: *Inside a $13 Million Fraud and Bribery Scheme at the VA*, Eyewitness News ABC 7 (Sept. 26, 2018), https://abc7.com/va-fraud-veterans-administration-tax/4345157/.

[225] OIG Five Year Report, *supra* note 20.

[226] *Id*. The VA has admitted that the private school is noncompliant. As put recently by the VA's former manager of the master plan, "The arrangement with the school is noncompliant on the land use." Still, the VA feared that "if we terminated the lease they would take us to court." Nick Watt, *Why Prime Real Estate Owned by the VA Is Leased for a Private School, a Ballpark, and an Oil Well — and Not for Homes for Veterans*, CNN (Apr. 6, 2022), https://www.cnn.com/2022/03/28/us/va-real-estate-los-angeles/index.html.

286.   Noncompliant agreements included deals with the Brentwood School, CAlTrans, Breitburn energy company, the Department of Homeland Security, and a parking lot company.[227]



287.   The OIG concluded that "VA's protracted noncompliance on two prior agreements, noncompliance on five new agreements (two of which are new iterations of previously noncompliant land uses), and its deviation from VA policy in not documenting three land-use agreements in its capital asset inventory (VA's system of record) require immediate corrective action."[228]

288.   As a result of these land use deals, veterans have limited access to, or are restricted altogether from much of the WLA Grounds and that land is consequently unavailable to provide housing to veterans or otherwise expand the services offered to veterans on the WLA Grounds.

289.   Defendants failed to take immediate corrective action on all but one of these findings or on other illegal land uses on the Grounds. Noncompliance still exists.

---

[227] *Id.* at 21-25.
[228] *Id.* at iii.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

290.   There has never been a full public accounting of how much money VAGLAHS has received under these private deals, where such revenue has been directed, or how these deals were initiated or negotiated.

## **CLASS ALLEGATIONS**

291.   All named Plaintiffs (the "Named Plaintiffs") bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the classes of disabled homeless veterans who are, have been, or will be left homeless and without access to necessary VA health and housing services. Each of the Named Plaintiffs is or has been left homeless near the WLA Grounds. The Named Plaintiffs and members of the Proposed Class/Subclass are similarly situated with respect to their legal claims and harms.

292.   As described above, the Named Plaintiffs have all experienced homelessness and an inability to access crucial VA services for which they are eligible. They have suffered harm as a result. Given the Defendants' past and current practices, the Named Plaintiffs and members of the Proposed Class/Subclass recognize a danger that the Defendants' conduct and attendant harms are continuous or will reoccur.

293.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as:

294.   All homeless Veterans with SMI or TBI who reside in Los Angeles County.

295.   In addition, the Named Plaintiffs bring this action on behalf of a proposed subclass:

A. All class members whose income (including veterans disability benefits) exceeds 50% of the Area Median Income (AMI).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

296.   **Numerosity–Fed. R. Civ. P. 23(a)(1):** Plaintiffs allege that the class members are so numerous that joinder of all class members is impractical. Upon information and belief, nearly 3500 homeless veterans currently live in Los Angeles.[229] As many as two-thirds of these individuals may have SMI.[230] Many of these homeless veterans qualify for and would benefit from permanent supportive housing. Therefore, the proposed class is so numerous that joinder of all class members is impracticable.

297.   **Commonality–Fed. R. Civ. P. 23(a)(2):** As discussed below, members of the proposed class and subclass are homeless veterans with disabilities. As such, there are multiple questions of law and fact common to the class and subclass, including:

a. Whether Defendants administer the benefits offered by VAGLAHS in the most integrated setting appropriate.

b. Whether Defendants administer the benefits offered by VAGLAHS in a manner that denies class members meaningful access to those benefits solely because of their disabilities, in violation of Section 504 of the Rehabilitation Act of 1973.

c. Whether Defendants' denial of appropriate integrated services – exposes class members to institutionalization or risk of institutionalization, including pursuant to psychiatric holds.

d. Whether under the terms of the 1888 Deed and the fiduciary duties arising from it and the below-referenced statutes, and as the trustee of the Charitable Trust, Defendants have a duty to use the land given by the Deed for the establishment, construction, and permanent maintenance (and operation) of permanent supportive housing for veterans, including class members.

e. Whether Defendants have breached a duty pursuant to the Charitable Trust by authorizing the many uses of the WLA Grounds that do not directly contribute to the operation of housing and healthcare for veterans with disabilities.

f. Whether Defendants' land deals involving property and facilities on

---

[229] Veterans HC2022 Data Summary, *supra* note 7.

[230] Tori DeAngelis, *More PTSD among Homeless Vets*, 44 Monitor on Psych. 22 (2013), https://www.apa.org/monitor/2013/03/ptsd-vets

the WLA Grounds have been improperly executed pursuant to the WLALA2016.

g. Whether the Secretary and the VA have failed and refused to account for the proceeds, funds, and land use revenues from the leases on the premises of the WLAVA as required by law and by the Charitable Trust.

h. Whether class members have no adequate remedy at law to compel defendants to comply with their obligation to apply the proceeds, funds, and land use revenues as required by law or to ascertain the amount to be so applied.

298. **Typicality–Fed. R. Civ. P. 23(a)(3):** Each of the Named Plaintiffs, like all putative Class Members, are veterans with disabilities who are eligible for permanent supportive housing. The Named Plaintiffs' claims are therefore typical of the proposed Class Members' claims, as well as the Subclass Members' claims. The claims asserted by Plaintiffs are capable of repetition yet evading review.

299. **Adequacy of Representation–Fed. R. Civil P. 23(a)(4):** Each of the Named Plaintiffs will fairly and adequately represent the interests of the Proposed Class and Subclass and will diligently serve as class representatives. Their interests are co-extensive with the Proposed Class and Subclass and they have retained a team of counsel experienced with class actions and alleging federal civil rights, constitutional, breach of trust, accounting, and administrative claims against federal government agencies. Putative Class Counsel possess the experience and resources required to fairly and adequately represent the Proposed Class and Proposed Subclasses.

300. **Defendants' Actions–Fed. R. Civ. P. 23(b)(2):** Defendants have either acted or failed to act on grounds generally applicable to the Proposed Class and Proposed Subclass. Specifically, Plaintiffs are informed and believe that Defendants have discriminated on the basis of disability in the provision of their services, failed to provide meaningful access to their services for veterans with disabilities, breached their fiduciary duty as trustee of the Charitable Trust, violated the

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

WLALA2016 and failed to provide an adequate accounting of the revenues derived from the lease on the WLA Grounds. Defendants' acts and omissions make final injunctive relief and declaratory relief appropriate.

### SUBCLASS

301.   In addition, Plaintiffs Deavin Sessom and Lavon Johnson (the "Subclass Representatives") further represent a subclass of disabled homeless veterans who, in addition to meeting the Class description, receive disability compensation that renders them ineligible for certain VA housing. The Subclass Representatives and members of the Proposed Subclass are similarly situated with respect to their legal claims and harms.

302.   **Numerosity–Fed. R. Civ. P. 23(a)(1):** Plaintiffs allege that the subclass members are so numerous that joinder of all subclass members is impractical. Upon information and belief, a substantial portion of the nearly 3,500 homeless veterans who currently live in Los Angeles have a 100% disability rating from the VA which, by itself or paired with additional disability compensation, exceeds 50% AMI. Therefore, the proposed subclass members are so numerous that joinder of all subclass members is impracticable.

303.   **Commonality–Fed. R. Civ. P. 23(a)(2):** As discussed below, members of the proposed subclass are homeless veterans with disabilities for which they receive compensation in an amount that counts toward and exceeds housing eligibility thresholds. As such, there are multiple questions of law and fact common to the subclass, including:

    a. Whether, by delegating its housing obligations to private providers, Defendants have allowed veteran housing to be subjected to an income eligibility criterion that is not applicable to VA services.

    b. Whether Defendants administer the benefits offered by VAGLAHS in the most integrated setting appropriate.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

c. Whether Defendants' denial of appropriate integrated services to subclass members exposes subclass members to institutionalization or risk of institutionalization.

d. Whether Defendants administer the benefits offered by VAGLAHS in a manner that denies subclass members meaningful access to those benefits because of their disabilities, in violation of Section 504 of the Rehabilitation Act of 1973.

304. **Typicality–Fed. R. Civ. P. 23(a)(3):** Each of the Subclass Representatives, like all putative Subclass Members, are veterans with disabilities who would already be eligible for permanent supportive housing. The Subclass Representatives' claims are therefore typical of the proposed Subclass Members' claims. The claims asserted by Subclass Members are capable of repetition yet evading review.

305. **Adequacy of Representation–Fed. R. Civil P. 23(a)(4):** Each of the Subclass Representatives will fairly and adequately represent the interests of the Proposed Subclass and will diligently serve as class representatives. Their interests are co-extensive with the Proposed Subclass and they have retained a team of counsel experienced with class actions and alleging federal civil rights, constitutional, breach of trust, accounting, and administrative claims against federal government agencies. Putative Class Counsel possess the experience and resources required to fairly and adequately represent the Proposed Subclass.

306. **Defendants' Actions–Fed. R. Civ. P. 23(b)(2):** Defendants have either acted or failed to act on grounds generally applicable to the Proposed Subclass. Specifically, Defendants have discriminated on the basis of disability in the provision of their services, failed to provide meaningful access to their services for veterans with disabilities, breached their fiduciary duty as trustee of the Charitable Trust, violated the WLALA2016 and failed to provide an adequate accounting of the revenues derived from the lease on the WLA Grounds. Defendants' acts and omissions make final injunctive relief and declaratory relief appropriate.

-111-

**FIRST CAUSE OF ACTION**

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

**(Discrimination)**

**(All Plaintiffs and Proposed Class Against All Defendants)**

307.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

308.   Plaintiffs have disabilities within the meaning of the Rehabilitation Act and are otherwise eligible for the health care and housing benefits offered by the VA and HUD, both federal agencies.

309.   Defendants administer the benefits offered by VAGLAHS and HUD-VASH in a manner that denies veterans the benefits of VAGLAHS services, programs, or activities in the most integrated setting appropriate to their needs.

310.   With reasonable modifications, Defendants could serve veterans in community-based settings.

311.   Defendants' plan for providing community-based services to veterans is neither comprehensive, nor effectively working, and does not move at a reasonable rate. In addition, Defendants are not complying with their own plan.

312.   Plaintiffs are capable of living in integrated settings and do not oppose integrated placement.

313.   Defendants' denial of appropriate integrated services to Plaintiffs is solely because of their disabilities, and Plaintiffs are institutionalized or placed at risk of institutionalization because of Defendants' discrimination.

314.   Defendants' discrimination has irreparably harmed Plaintiffs and will continue to harm them irreparably unless this Court intervenes.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

**SECOND CAUSE OF ACTION**

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
(Discrimination)
(Plaintiffs Sessom and Johnson and Proposed Subclass Against All Defendants)**

315.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

316.   Plaintiffs Sessom and Johnson have disabilities within the meaning of the Rehabilitation Act and are otherwise eligible for the health care and housing benefits offered by the VA and HUD, both federal agencies.

317.   Defendants' delegation of its housing construction obligations to allow imposition of restrictive AMI measures and counting veterans' disability benefits as income discriminates on the basis of disability. The more disabled a veteran is the less likely they are to qualify for the housing services delegated to private providers by the VA.

318.   Defendants' discrimination has irreparably harmed Plaintiffs and will continue to harm them irreparably unless this Court intervenes.

**THIRD CAUSE OF ACTION**

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
(Meaningful Access)
(All Plaintiffs Against All Defendants)**

319.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

320.   Plaintiffs have disabilities within the meaning of the Rehabilitation Act and otherwise eligible for the housing and health care benefits offered by the VA, a federal agency.

321.   Defendants administer the benefits offered by VAGLAHS and HUD-

-113-

VASH in a manner that denies Plaintiffs meaningful access to those benefits solely because of their disabilities, in violation of Section 504 of the Rehabilitation Act of 1973.

322.   With reasonable modifications, Defendants could provide meaningful access to VAGLAHS services to Plaintiffs.

323.   Defendants' discrimination has irreparably harmed Plaintiffs and will continue to harm them irreparably unless this Court intervenes.

<u>**FOURTH CAUSE OF ACTION**</u>

<u>**Breach of Fiduciary Duty as Trustee of Charitable Trust**</u>
<u>**(Injunctive Relief)**</u>
<u>**(All Plaintiffs Against Defendants McDonough, Braverman, and Harris)**</u>

324.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein. ·

325.   The 1888 Deed created a Charitable Trust, and, as the successor-in-interest to the National Soldiers' Home, the VA holds that land, on which the WLA Grounds now sits, in trust for the intended beneficiaries of the Charitable Trust—veterans with disabilities—and must use the land for purposes that directly contribute to the establishment and permanent operation of housing and healthcare for veterans with disabilities. Specifically, the 1888 Deed required the land to be used "for the purpose of such Branch Home for Disabled Volunteer Soldiers to be thereon so located, established, constructed, and permanently maintained"—that is, the establishment and permanent maintenance of housing for veterans, which housing is particularly needed by veterans with Serious Mental Illness such as Plaintiffs and the other members of NVF.

326.   The Government had statutory authority to accept the deed. The Government accepted the land that is now the WLA Grounds under the authority of 24 U.S.C. § 111, 14 Stat. 10 (1866) (the "1866 Act"). The 1866 Act established the

-114-

National Asylum for Disabled Volunteer Soldiers, "an establishment for the care and relief of the disabled volunteers of the United States army . . . ." 14 Stat. 10 § 1. The board of managers of the National Asylum was given authority to procure land to erect buildings to house veterans with disabilities. *Id.* at § 4. The 1866 Act also provided: "[T]he said board of managers are hereby authorized to receive all donations of money or property made by any person or persons for the benefit of the asylum, and to hold or dispose of the same for its sole and exclusive use." *Id.* at § 5. As alleged above, the DVA is the successor-in-interest to the National Asylum.

327. In 2016, Congress enacted and the President signed the "West Los Angeles Leasing Act of 2016" by which the Government imposed mandatory duties upon the Secretary with respect to the operation of the West LA Grounds and thereby accepted the role as trustee of the charitable trust created by the 1888 Deed, and imposed the duties of trustee upon the Secretary, including by doing all of the following:

  B. Prohibiting the Secretary from carrying out any land-sharing agreement that does not "(1) provide[] additional health-care resources to the Grounds; and (2) benefits veterans and their families other than from the generation of revenue for the Department of Veterans Affairs," the latter subdivision being defined to (1) mean services "(A) provided exclusively to veterans and their families; or (B) that are designed for the particular needs of veterans and their families, as opposed to the general public, and any benefit of those services to the general public is distinct from the intended benefit to veterans and their families; and (2) exclude[s] services in which the only benefit to veterans and their families is the generation of revenue for the Department of Veterans Affairs." (WLALA2016 at § 2(c, l).)

C.  Imposing a mandatory duty on the Secretary to use any funds received by the Secretary under leases of the Grounds property to "be credited to the applicable Department medical facilities account and shall be available, without fiscal year limitation and without further appropriation, exclusively for the renovation and maintenance of the land and facilities at the Grounds." (WLALA2016 at § 2(d).)

D.  Imposing a mandatory duty on the Secretary to use any "land use revenue"[231] received by the Secretary to be credited to the applicable Department medical facilities accounts or minor construction accounts and shall be available, without fiscal year limitation and without further appropriation, exclusively for any of the following:

"(A)  Supporting construction, maintenance, and services at the Grounds relating to temporary or permanent supportive housing for homeless or at-risk veterans and their families.

"(B)  Renovating and maintaining the land and facilities at the Grounds.

"(C)  Carrying out minor construction projects at the Grounds.

"(D)  Carrying out community operations at the Grounds that support the development of emergency shelter or supportive housing for homeless or at-risk veterans and their families. ("West Los Angeles VA Grounds Improvement Act of 2021," Pub. Law 117-18 (2021) at §2(a).)

---

[231]  "Land use revenue" is defined to mean ``(A) any funds received by the Secretary under a lease described in subsection (b); and (B) any funds received as proceeds from any assets seized or forfeited, and any restitution paid, in connection with any third-party land use at the Campus.''.

E. Imposing a mandatory duty on the Secretary to certify "to the Committees on Veterans' Affairs of the Senate and House of Representatives, the Committees on Appropriations of the Senate and House of Representatives, and each Member of the Senate and the House of Representatives who represents the area in which the Grounds is located that all recommendations included in the [Inspector General's] audit report or evaluation have been implemented" before entering into or renewing any lease or land-sharing agreement if the Inspector General finds, as it has in the above-referenced report, that "the Department is not in compliance with all Federal laws relating to leases and land use at the Grounds." (WLALA2016 at §2(h).)

328.   These statutes, adopted to implement and limit the use of the DVA's WLA Grounds land, make crystal clear that Congress's intention was to ensure that the DVA's land was used primarily to benefit veterans, including by assuming and imposing upon the Secretary enforceable, mandatory duties as a trustee of the Charitable Trust.

329.   As the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Grounds now sits, in trust for the intended beneficiaries of the Charitable Trust, including but not limited to plaintiffs and other unhoused veterans with Serious Mental Illness.

330.   Plaintiffs and members of NVF are intended beneficiaries of the Charitable Trust and the trustee's obligations by virtue of their lack of permanent supportive housing, medical conditions, and geographic proximity to and their desire and intent to use and take advantage of, and continue to use and take advantage of, Permanent Supportive Housing and related services on the subject land.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

331.   Therefore, under the terms of the Deed and the fiduciary duties arising from it and the above-referenced statutes, and as the trustee of the Charitable Trust, Defendants have a duty to use the land for the establishment, construction, and permanent maintenance (and operation) of Permanent Supportive Housing for veterans, including Plaintiffs.

332.   Defendants have breached that duty by failing to, and failing to act adequately and/or timely as a reasonably careful trustee would have acted under the same or similar circumstances to use the land for the establishment, construction, and permanent maintenance (and operation) of Permanent Supportive Housing for veterans, including Plaintiffs, and by adopting but failing to implement the Master Plan as referenced in the report of the Inspector General, and instead have taken final agency actions resulting in the property being used for other activities that do not benefit veterans as contemplated by the 1888 Deed and the resulting Trust, and the Master Plan, and by permitting activities other than, and that conflict with, the provision of Permanent Supportive Housing, and plaintiffs are informed and believe by failing to apply the funds received from the other uses of the land in the manner required by law.

333.   Defendants' failures have been and continue to be a substantial factor in causing harm to Plaintiffs, NVF members, and individuals who are similarly situated.

334.   By authorizing the many uses of the WLA Grounds that do not directly contribute to the operation of housing and healthcare for veterans with disabilities, and by failing to take substantial affirmative steps to administer the trust solely with a view to the accomplishment of this purpose, Defendants have breached their fiduciary duties as trustees of the Charitable Trust.

335.   Defendants' failures have been and continue to be a substantial factor in causing harm to Plaintiffs, NVF members, and individuals who are similarly

situated.

336.   Plaintiffs have no adequate remedy at law to compel defendants to cease breaching their fiduciary duty as trustees of the charitable trust, and are entitled to specific performance of the obligations imposed upon Defendants as trustees of the trust.

### FIFTH CAUSE OF ACTION

#### Breach of Fiduciary Duty as Trustee of Charitable Trust
#### (Mandamus Relief)
#### (All Plaintiffs Against Defendants McDonough, Braverman, and Harris)

337.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

338.   The 1888 Deed created a Charitable Trust, and, as the successor-in-interest to the National Soldiers' Home, the VA holds that land, on which the WLA Grounds now sits, in trust for the intended beneficiaries of the Charitable Trust—veterans with disabilities—and must use the land only for purposes that directly contribute to the establishment and permanent operation of housing and healthcare for veterans with disabilities.

339.   As trustees of the Charitable Trust, Defendants have a non-discretionary and nondelegable fiduciary duty, which they have breached by authorizing the many uses of the WLA Grounds that do not directly contribute to the operation of housing and healthcare for veterans with disabilities, and by failing to take substantial affirmative steps to administer the trust solely with a view to the accomplishment of this purpose.

### SIXTH CAUSE OF ACTION

#### Administrative Procedure Act, Violation of West Los Angeles Leasing Act of

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

**2016, Pub. L. No. 114-226, 130 Stat. 926 (2016)**
**(All Plaintiffs Against Defendants McDonough, Braverman, and Harris)**

340.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

341.   Defendants' land deals involving property and facilities on the WLA Grounds have been improperly executed pursuant to the WLALA2016, which authorizes only agreements that "primarily benefit" veterans.

342.   Defendants' failure to comply constitutes arbitrary and capricious agency action; is an abuse of discretion; is in excess of statutory jurisdiction, authority, or limitations, or otherwise without statutory right; and is contrary to law and to procedures required by law.[232]

## SEVENTH CAUSE OF ACTION

### Accounting
**(All Plaintiffs Against Defendants McDonough, Braverman, and Harris)**

343.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

344.   The 1888 Deed created a Charitable Trust, and, as the successor-in-interest to the National Soldiers' Home, DVA holds that land, on which the WLA Grounds now sits, in trust for the intended beneficiaries of the Charitable Trust, veterans with disabilities, and must use the land only for purposes that directly contribute to the establishment and permanent operation of a home for veterans with disabilities.

345.   Pursuant to the WLALA2016, the Secretary is required to apply any funds received under leases of the WLA Grounds property to be "credited to the applicable Department medical facilities account and shall be available, without fiscal year limitation and without further appropriation, exclusively for the

---

[232] 5 U.S.C. § 706(2)(A), (C)-(D).

renovation and maintenance of the land and facilities at the Grounds." And pursuant to the "West Los Angeles VA Grounds Improvement Act of 2021," Pub. Law 117-18 (2021) at §2(a), the Secretary is required to use any land use revenue received by the Secretary to be "credited to the applicable Department medical facilities accounts or minor construction accounts and shall be available, without fiscal year limitation and without further appropriation, exclusively for any of the following": "(A) Supporting construction, maintenance, and services at the Grounds relating to temporary or permanent supportive housing for homeless or at-risk veterans and their families; (B) Renovating and maintaining the land and facilities at the Grounds; (C) Carrying out minor construction projects at the Grounds; (D) Carrying out community operations at the Grounds that support the development of emergency shelter or supportive housing for homeless or at-risk veterans and their families."

346.   Together, the WLALA2016 and the West Los Angeles VA Grounds Improvement Act of 2021 both imposed obligations on Defendants that required the use of funds received from the use of the land that were intended to benefit Plaintiffs, NVF members, and individuals who are similarly situated, but that Plaintiffs and NVF are informed and believe have not been used for those purposes, such that that relationship and the use of the funds requires an accounting, and the balance of the funds that ought to be, and that have been applied as required by the aforementioned laws can only be ascertained by an accounting.

347.   The financial arrangements and payment structure from the many uses of the WLA Grounds are complicated and the information about them is within the control of the defendants. An accounting is necessary to ascertain whether proceeds from the leases on the WLA Grounds, if any, are due to Plaintiffs and other beneficiaries of the Charitable Trust and have been applied as required by law or misapplied contrary to law and to the detriment of Plaintiffs.

348.   Defendants have been requested to provide but have not provided complete and accurate information regarding the administration of the property, including full details regarding the many leases on the WLA Grounds into which VA has entered with private entities and how the proceeds from those leases, if any, have been used.

349.   Plaintiffs are informed and believe and thereon allege that the Secretary and the VA have failed and refused to account for the proceeds, funds, and land use revenues from the leases on the premises of the WLAVA as required by law and by the trust.

350.   Other than as set forth above, Plaintiffs have no adequate remedy at law to compel defendants to comply with their obligation to apply the funds as required by law or to ascertain the amount to be so applied.

## **REQUEST FOR RELIEF**

351.   Plaintiffs, therefore, respectfully request that this Court grant the following:

        A. Declare that Defendants administer the benefits program of VAGLAHS in a manner that discriminates against veterans with SMI and TBI solely by reason of their disabilities in violation of Section 504 of the Rehabilitation Act of 1973.

        B. Declare that the federal government's acceptance of the land transferred under the 1888 Deed created a Charitable Trust.

        C. Declare that Defendants have breached and continue to breach their fiduciary duties as trustees of the Charitable Trust by allowing VAGLAHS to use the WLA Grounds for purposes that are not directly related to providing housing and healthcare for veterans with disabilities.

        D. Enjoin Defendants from failing to provide Plaintiffs and veterans

-122-

with SMI and TBI appropriate Permanent Supportive Housing so they can reasonably access the health care and housing benefits for which they are eligible in the most integrated setting appropriate to their needs. Permanent Supportive Housing should be made available within six (6) months, both on the WLA Grounds and in apartments near the WLA Grounds for at least 3,500 eligible homeless veterans as follows:[233]

    i.  Within five (5) years, 1,200 new homes on the WLA Grounds offering a mix of Permanent Supportive Housing as follows:

        1.  At least 10% and no more than 25% per building providing ACT, ICM and/or hybrid mental health services appropriate to the needs of the individual in the home;

        2.  In addition, at least 10% and no more than 25% per building providing general Permanent Supportive Housing services, including case management; education services; employment assistance and job training; life skills training; mental health services; outpatient health services; outreach services; and substance abuse treatment services appropriate to the needs of the individual with severe mental

---

[233] For the avoidance of doubt, 100% of the housing described in this section must be for the benefit of veterans and their families. Any caps enumerated below are proposed to apply solely to the provision of specific types of "Permanent Supportive Housing" on a per-building basis to ensure the building community is appropriately integrated to avoid continuation of the historic and discriminatory institutionalization of those veterans in need of specific types of support.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION

illness.

3. In the interim, until the new homes on the WLA Grounds are completed, at least 1,200 new scattered-site homes within five (5) miles of the WLA Grounds providing Permanent Supportive Housing as appropriate to the needs of the individual with severe mental illness, including ACT, ICM, and hybrid in-home services.

ii. At least 2,500 new scattered-site homes within five (5) miles of the WLA Grounds providing Permanent Supportive Housing as appropriate to the needs of the individual with severe mental illness, including ACT, ICM, and hybrid in-home services.

1. No more than 20% of the units in any building shall be providing Permanent Supportive Housing;

iii. Defendants shall provide other permanent forms of housing on the WLA Grounds, such as a community RV park.

iv. Eligible veterans with severe disabilities shall have priority for assignment to Permanent Supportive Housing and shall have the option to choose either housing on the WLA Grounds or in scattered-site homes.

v. All Permanent Supportive Housing services must meet evidence-based practice standards, must be provided according to a Person-Centered Care Plan, and must be monitored by an expert in Permanent Supportive Housing.

vi. Defendants must conduct outreach offering Permanent

-124-

Supportive Housing to all veterans living in the tiny sheds, to all patients of the WLA Grounds who show indications of homelessness, and to all homeless shelters and encampments within five (5) miles in each direction of the WLA Grounds to identify and assess eligible veterans and offer them Permanent Supportive Housing appropriate to their needs.

vii.  Defendants must develop a waiting list until the Permanent Supportive Housing called for is available. While individuals are on the waiting list, Defendants must offer them appropriate housing and supportive services (Temporary Supportive Housing). Only if an individual affirmatively declines housing or supportive services may the individual be removed from the waiting list. Once the Permanent Supportive Housing called for is available, Defendants must ensure that any waiting list moves at a reasonable pace, that individuals with the most severe impairments are prioritized, that no individual remains on the waiting list more than six (6) months, and that individuals are provided temporary housing and supportive services while on the waiting list.

viii.  For each individual identified as a homeless veteran eligible for VA health services, Defendants must conduct an assessment to determine his/her housing and service needs and preferences within one (1) week of identification. Each assessment must identify the housing that is the most integrated setting appropriate for the

-125-

individual and the supportive services needed to support the individual in such housing, based on the individual's needs and personal preferences.

ix. Within one (1) week of assessment, for each eligible individual, Defendants must develop a Person-Centered Care Plan based on the assessment, that considers the current and unique psychosocial and medical needs and history of the individual, and arranges the housing and supportive services appropriate for the individual to live successfully in the most integrated setting appropriate to his/her needs.

x. In addition to financial housing subsidies sufficient to enable Defendants to identify and secure sufficient housing to meet the requirements of this Order, Defendants must provide assistance to eligible veterans in managing landlord/tenant relations.

xi. To the extent supportive services and treatment are provided other than in the eligible individual's home, Defendants must offer transportation services, including, as necessary, transportation vouchers, to assist individuals to access those services.

E. Enjoin Defendants from denying Plaintiffs, NVF members, and individuals who are similarly situated meaningful access to the health care and housing benefits for which they are eligible on the WLA Grounds by providing Permanent Supportive Housing on or near the WLA Grounds and providing transportation services and subsidies to the WLA Grounds for scattered-site Permanent

-126-

Supportive Housing.

F.  Enter an injunction mandating that Defendants faithfully execute their obligations as trustees of the WLA Grounds and utilize the WLA Grounds primarily for purposes directly related to providing housing and healthcare for veterans with disabilities or, in the alternative, enter an order mandating that Defendants refrain from allowing uses of the WLA Grounds for purposes that are not primarily related to providing housing and healthcare for veterans with disabilities.

G.  Enter an injunction prohibiting Defendants from executing and maintaining any land use agreements under the WLALA2016 that do not primarily benefit veterans.

H.  Appoint a Monitor to oversee and report to the Court on implementation of the Order.

I.  Grant such other relief as this Court deems just and proper, including but not limited to awarding Plaintiffs attorney's fees and costs.

DATED: May 15, 2023

PUBLIC COUNSEL LAW CENTER
  MARK D. ROSENBAUM
  KATHRYN A. EIDMANN
  MALKA S. ZEEFE
  AMANDA K. PERTUSATI

By:   /s/ Mark D. Rosenbaum
        MARK D. ROSENBAUM

Attorneys for Plaintiffs

BROWN GOLDSTEIN & LEVY, LLP
  EVE L. HILL
  EVAN MONOD

By:   /s/ Eve L. Hill
        EVE L. HILL

Attorneys for Plaintiffs

ROBINS KAPLAN LLP
  ROMAN M. SILBERFELD
  DAVID MARTINEZ
  TOMMY H. DU

By:   /s/ Roman M. Silberfeld
        ROMAN M. SILBERFELD

Attorneys for Plaintiffs

INNER CITY LAW CENTER
  KARA MAHONEY
  T.E. GLENN
  AMANDA POWELL
  CHARLES KOHORST

By:   /s/ Kara Mahoney
        KARA MAHONEY

Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MANDAMUS RELIEF CLASS ACTION