MARK D. ROSENBAUM, 59940
mrosenbaum@publiccounsel.org
KATHRYN A. EIDMANN, 268053
keidmann@publiccounsel.org
AMANDA K. PERTUSATI, 296669
apertusati@publiccounsel.org
AMANDA MANGASER SAVAGE, 325996
asavage@publiccounsel.org
AMELIA PIAZZA, SBN 342473
apiazza@publiccounsel.org
YI LI, SBN 354281
yli@publiccounsel.org
PUBLIC COUNSEL LAW CENTER
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:    (213) 385-2977
Facsimile:    (213) 385-9089

EVE L. HILL, 202178
EHill@browngold.com
JAMIE STRAWBRIDGE, Pro Hac Vice
JStrawbridge@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, Maryland 21202
Telephone:    (410) 962-1030
Facsimile:    (401) 385-0869

ROMAN M. SILBERFELD, 62783
RSilberfeld@RobinsKaplan.com
DAVID MARTINEZ, 193183
dmartinez@robinskaplan.com
TOMMY H. DU, 305117
TDu@RobinsKaplan.com
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:    (310) 552-0130
Facsimile:    (310) 229-5800

T.E. GLENN, 155761
TGlenn@innercitylaw.org
AMANDA POWELL, 318036
APowell@innercitylaw.org
CHARLES KOHORST, 327558
CKohorst@innercitylaw.org
INNER CITY LAW CENTER
1309 East Seventh Street
Los Angeles, CA 90021
Telephone:    (213) 891-2880
Facsimile:    (213) 891-2888

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY POWERS, DEAVIN SESSOM, LAURIEANN WRIGHT, SAMUEL CASTELLANOS, JOSEPH FIELDS, LAVON JOHNSON, BILLY EDWARDS, JESSICA MILES, JOSHUA ROBERT PETITT, GLENN SURRETTE, NARYAN STIBBIE, DOES 1-2, and NATIONAL VETERANS FOUNDATION, all individually and as class representatives,<br><br>Plaintiffs, | Case No.: 2:22-cv-08357-DOC-KS<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date:        May 6, 2024<br>Time:        10:00 A.M.<br>Courtroom: 10A<br>Judge:        Honorable David O. Carter |

vs.

DENIS RICHARD MCDONOUGH, in his official capacity, Secretary of Veterans Affairs;

MARCIA L. FUDGE, in her official capacity, Secretary of Housing and Urban Development;

DOUGLAS GUTHRIE, in his official capacity, President, Housing Authority of the City of Los Angeles;

ROBERT MERCHANT, in his official capacity, Acting Director, VA Greater Los Angeles Healthcare System;

KEITH HARRIS, in his official capacity, Senior Executive Homelessness Agent, VA Greater Los Angeles Healthcare System,

Defendants.

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on May 6, 2024 at 10:00 A.M., and as soon thereafter as the matter may be heard, in Courtroom 10A, located at 411 West Fourth Street, Santa Ana, CA 92701, before the Honorable David O. Carter, or as otherwise provided by the Court, Plaintiffs Jeffrey Powers, Deavin Sessom, Laurieann Wright, Samuel Castellanos, Joseph Fields, Lavon Johnson, Billy Edwards, Jessica Miles, Joshua Robert Petitt, Glenn Surette, Naryan Stibbie, Does 1-2, and the National Veterans Foundation (collectively, "Plaintiffs") will, and hereby do, move this Court, pursuant to Federal Rule of Civil Procedure 23, for an order certifying the Class defined as:

**Proposed Class.** All homeless veterans with Serious Mental Illness or Traumatic Brain Injuries, who reside in Los Angeles County.

In addition, Plaintiffs seek an order certifying a Subclass defined as:

**Proposed Subclass.** All Class Members whose income (including veterans disability benefits) exceeds 50% of the Area Median Income.

Plaintiffs also hereby move the Court to appoint Plaintiffs Powers, Sessom, Fields, Johnson, Wright, Petitt, Castellanos, Stibbie, Doe 1, and National Veterans Foundation

2

94801272.4

as Class Representatives for the Proposed Class and Plaintiff Johnson as Class Representative for the Proposed Subclass.

Plaintiffs further move the Court to appoint Public Counsel Law Center, Inner City Law Center, Brown Goldstein & Levy, LLP and Robins Kaplan LLP as Class Counsel for both the Proposed Class and Subclass pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

This Motion for Class Certification ("Motion") is based upon this notice, the concurrently filed Memorandum of Points and Authorities, the exhibits and declarations submitted in connection thereto, the pleadings, documents, and records on file in this action, any argument that may be presented to the Court on this motion, and such other matters as the Court deems appropriate.

This Motion is made following the conference of counsel pursuant Local Rule 7-3, which took place in-person on March 22, 2024.

DATED: April 1, 2024

**PUBLIC COUNSEL LAW CENTER**
MARK D. ROSENBAUM
KATHRYN A. EIDMANN
AMANDA K. PERTUSATI
AMANDA MANGASER SAVAGE
AMELIA PIAZZA
YI LI

/s/ *Mark D. Rosenbaum*
MARK D. ROSENBAUM

Attorneys for Plaintiffs

DATED: April 1, 2024

**BROWN GOLDSTEIN & LEVY, LLP**
EVE L. HILL
JAMIE STRAWBRIDGE

/s/ *Eve L. Hill*
EVE L. HILL

Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

94801272.4

1    DATED: April 1, 2024

2

3

4

5

6

7    DATED: April 1, 2024

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INNER CITY LAW CENTER**
  T.E. GLENN
  AMANDA POWELL
  CHARLES KOHORST

s/ *T. E. Glenn*
T. E. GLENN

Attorneys for Plaintiffs

**ROBINS KAPLAN LLP**
  ROMAN M. SILBERFELD
  DAVID MARTINEZ
  TOMMY H. DU

/s/ *ROMAN M. SILBERFELD*
ROMAN M. SILBERFELD

Attorneys for Plaintiffs

4

94801272.4

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 12

II.   STATEMENT OF FACTS ............................................................ 14

  A.    BACKGROUND ..................................................................... 14

      1.    History of the West Los Angeles Grounds ..................... 14

      2.    Obligations of the Veterans Health Administration ........ 16

      3.    History of Legal Action................................................... 19

      4.    Plaintiffs ........................................................................ 20

  B.    Claims for Relief ................................................................... 23

III.  ARGUMENT................................................................................ 24

  A.    Standards for Class Certification........................................... 24

  B.    Plaintiffs Meet the Rule 23(a) Requirements ....................... 25

      1.    The Proposed Class is sufficiently numerous. ............... 25

      2.    There are common questions of law and fact.................. 26

      3.    Plaintiffs' claims are typical.......................................... 30

      4.    Plaintiffs and counsel will adequately represent the proposed
            Class. ............................................................................. 33

  C.    Plaintiffs Satisfy Rule 23(b)(2) ............................................ 36

IV.   CONCLUSION............................................................................ 37

94801272.4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Davis*,
   275 F.3d 849, 868 (9th Cir. 2001) ...................................................................27

*Cal. Rural Legal Assistance v. Legal Servs. Co.*,
   917 F.2d 1171, 1175 (9th Cir. 1990.................................................................33

*Church v. City of Huntsville*,
   30 F.3d 1332, 1337-38 (11th Cir. 1994)..........................................................32

*Crawford v. Honig*,
   37 F.3d 485, 487 (9th Cir.1994.......................................................................34

*Davis v. Astrue*,
   250 F.R.D. 476 (N.D. Cal. 2008.....................................................................34

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970, 983 n.8 (9th Cir. 2011) .............................................................26

*Fowler v. Guerin*,
   899 F.3d 1112, 1120 (9th Cir. 2018) ...............................................................37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167, 181 (2000)................................................................................33

*Glover v. City of Laguna Beach*,
   2017 WL 4457507 (C.D. Cal. June 23, 2017) .................................................32

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011, 1019-20 (9th Cir. 1998) *overruled on other*
   *grounds by Wal-Mart* 564 U.S. 338.........................................................31, 34

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497, 508 (9th Cir. 1992....................................................................31

*Harris v. Palm Springs Alpine Estates, Inc.*,
   329 F.2d 909, 913-4 (9th Cir. 1964)................................................................27

*J.P. v. Sessions*,
   2019 WL 6723686 (C.D. Cal. 2019) ..............................................................28

94801272.4

*Johnson v. California*,
    543 U.S. 499 (2005)..................................................................27

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162, 170 (2016)..........................................................32

*Midwest Cmty. Council v. Chicago Park Dist.*,
    87 F.R.D. 457, 460 (N.D. Ill. 1980 ...........................................29

*Monaco v. Stone*,
    2002 WL 32984617 (EDNY 2002 .............................................33

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651, 665 (9th Cir. 2022), *cert. denied sub nom. StarKist*
    *Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424
    (2022 ........................................................................................26

*Parsons v. Ryan*,
    754 F.3d 657, 681 (9th Cir. 2014) ..............................28, 29, 37, 38

*In re Payment Card Interchange Fee and Merchant Discount*
    *Antitrust Litigation*,
    MDL 1720 (MKB)....................................................................36

*Perez-Funez v. District Director, INS*,
    611 F. Supp. 990, 995 (C.D.Cal.1984) ......................................27

*Rannis v. Recchia*,
    380 F.Appx. 646, 651 (9th Cir. 2010) .......................................27

*Roshandel v. Chertoff*,
    554 F.Supp.2d 1194, 1203 (W.D. Wash. 2008............................28

*S. Pac. Terminal Co. v. ICC*,
    219 U.S. 498, 514-15 (1911). ...................................................32

*B.K. ex rel. Tinsley v. Snyder*,
    922 F.3d 957, 971 (9th Cir. 2019) .............................................37

*Valentini v. Shinseki, et al.*,
    No. 2:11-cv-04846-SJO-MRW (June 8, 2011 ......................16, 20

*Vietnam Veterans of Am. v. C.I.A.*,
    288 F.R.D. 192 (N.D. Cal. 2012 ...........................................28, 33

94801272.4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................*passim*

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ........................................... 37

**STATUTES**

5 U.S.C. §§ 551-559............................................... 18, 25, 28, 30

29 U.S.C. § 701 et seq. .................................................... 20

38 U.S.C. § 7301(b) ......................................................... 18

42 U.S.C. § 1201 et seq. .................................................. 32

Pub. L. No. 114-226, 130 Stat. 927 (2016)........................ 17

West Los Angeles Leasing Act 2016.............................*passim*

**OTHER AUTHORITIES**

Accessed at https://www.aclusocal.org/sites/default/files/wp-
    content/uploads/2015/02/012815-West-Los-Angeles-California-
    Principles-for-Partnership-Framework-for-Settlement-
    Executed.ocr.pdf .................................................... 20

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    Federal Practice & Procedure § 1775 (3d ed. 2023)....................... 37

Fed. R. Civ. P.
    23.................................................................. 14, 26
    23(a) ........................................................ 25, 26, 34, 38
    23(a)(1) ............................................................ 26
    23(a)(2) ............................................................ 27
    23(a)(3) ............................................................ 33
    23(b) ........................................................... 25, 26
    23(b)(2) ...................................................... 26, 37, 38

Homestead Blog (Nov. 11, 2021),
    https://homesteadmuseum.blog/2021/11/11/men-who-gave-their-
    young-manhoods-years-to-their-country-a-photo-gravure-
    booklet-of-the-pacific-branch-of-the-national-home-for-disabled-
    volunteer-soldiers-los-angeles-1907/................................ 15

8

, https://draft-master-plan-
    assets.s3.amazonaws.com/media/uploads/2022/04/12/2022-03-
    18_WLA-VA-Master-Plan-Signed.pdf ........................................................ 17

https://westlamasterplan.org/p/CERS ................................................................ 19

https://www.va.gov/greater-los-angeles-health-care/about-us/;
    https://www.va.gov/greater-los-angeles-health-care/health-
    services/............................................................................................................ 18

https://www.va.gov/greater-los-angeles-health-care/locations/ ......................... 18

, https://www.va.gov/HISTORY/VA_History/Overview.asp ............................. 15

https://www.va.gov/homeless/hud-vash.asp...................................................... 18

HUD-Veterans Affairs Supportive Housing, HUD-VASH Vouchers
    2008-2021,
    https://www.hud.gov/sites/dfiles/PIH/documents/VASH_Awards
    _2008-2021.pdf............................................................................................... 19

Jack Tsai et al., *Risk Factors for Homelessness Among US Veterans*................. 16

*Land-Use Agreements*, Am. Legion (Feb. 10, 2015),
    https://www.legion.org/legislative/testimony/226037/examinatio
    n-waste-and-abuse-associated-vas-management-land-use ............................. 15

*Life at the National Home, Circa 1922*, 1887 Fund,
    https://www.1887fund.org/about/life-at-the-national-home/ (last
    visited Apr. 1, 2024) ...................................................................................... 15

Paul R. Spitzzeri, *"Men who Gave Their Young Manhood's Years to
    Their Country": A Photo-Gravure Booklet of the Pacific Branch
    of the National Home for Disabled Volunteer Soldiers, Los
    Angeles, 1907*................................................................................................. 15

Principles for a Partnership and Framework for Settlement By and
    Between the U.S. Department of Veterans Affairs and
    Representatives of the Plaintiffs - Valentini v. McDonald, dated
    January 28, 2015 (Accessed at
    https://www.aclusocal.org/sites/default/files/wp-
    content/uploads/2015/02/012815-West-Los-Angeles-California-
    Principles-for-Partnership-Framework-for-Settlement-
    Executed.ocr.pdf)........................................................................................... 20

9

SMI, PSH–*i.e* ................................................................................................. 16

Stanley O. Williford, *Afraid to Speak: Few at Veterans Center Willing to Tell Complaints* ......................................................................... 16

U.S. Dep't of Hous. & Urb. Dev., Housing Choice Voucher Program Dashboard, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/dashboard ...................................................................... 18

U.S Dep't of Housing and Urban Development, The 2023 Annual Homelessness Assessment Report (AHAR) to Congress at 73 (Dec. 2023), https://www.huduser.gov/portal/sites/default/files/pdf/2023-AHAR-Part-1.pdf.............................................................................. 15

U.S. Dep't Vet. Aff., Transportation services and schedules, https://www.va.gov/greater-los-angeles-health-care/programs/transportation-services-and-schedules/ (last visited Apr. 1, 2024) ................................................................................................. 19

U.S. Dep't Veterans Affair, About VHA, https://www.va.gov/health/aboutVHA.asp (last visited Nov. 14, 2022) ........................................................................................................... 18

U.S. Dep't of Veterans Affairs, VA Opens Two Buildings (Apr. 11, 2023) https://www.va.gov/greater-los-angeles-health-care/news-releases/va-opens-two-buildings-to-provide-120-units-of-housing-for-homeless-and-at-risk-veterans-on-west-la/; ........................... 16

VA Nat'l Ctr. Homelessness Among Vet., Homeless Evidence and Research Synthesis (HERS) Roundtable Series 3 (2018), https://www.va.gov/HOMELESS/nchav/docs/HERS_Proceedings_SuicideAndHomelessVeteransSymposium_Feb2018_508.pdf ................... 16

7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ. §1763 (4th ed. Update 2023) ................................................................................. 28

94801272.4

1

## **GLOSSARY**

2

| Abbreviation | Expansion |
|---|---|
| HACLA | Housing Authority of the City of Los Angeles |
| HUD | Department of Housing and Urban Development |
| HUD-VASH | Housing and Urban Development - Veterans Affairs Supportive Housing |
| PSH | Permanent Supportive Housing |
| SMI | Serious Mental Illness |
| TBI | Traumatic Brain Injury |
| VA | U.S. Department of Veterans Affairs |
| VAGLAHS | VA Greater Los Angeles Health System |
| WLALA 2016 | West Los Angeles Leasing Act of 2016 |
| 2021 Amendment | West Los Angeles VA Campus Improvement Act of 2021 |

94801272.4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3         The Court should certify this action as a class action to avoid piecemeal litigation

4    by homeless veterans who suffer from serious mental illness ("SMI") or traumatic brain

5    injuries ("TBI") in Los Angeles and those within the VA Greater Los Angeles

6    Healthcare System ("VAGLAHS") catchment area (*i.e.* Los Angeles, Ventura, Kern,

7    Santa Barbara, and San Luis Obispo counties). Only by a class action can veterans and

8    the advocacy group championing their cause be assured that veterans will receive the

9    Permanent Supportive Housing ("PSH") that is vital to their care and treatment.

10        For the past fifty years, the Department of Veterans Affairs ("VA") has failed to

11   comply with the terms of the 1888 Deed granting it hundreds of acres in Los Angeles

12   (the "WLA Grounds" or the "Grounds") for the express purpose of housing "disabled

13   volunteer soldiers." It took four years of the prior litigation to cajole the VA into even

14   initiating a plan to build housing on the Grounds. Now nine years later, and well behind

15   schedule, the VA has completed only a de minimis number of units. Even assuming no

16   further delays, the timeline to complete more than a thousand units is nearly a decade

17   from completion. And even that number is insufficient to satisfy the needs of homeless

18   veterans in Los Angeles.

19        Through the West Los Angeles Leasing Act of 2016 ("WLALA 2016") and its

20   2021 Amendment, the VA assumed fiduciary duties as a charitable trustee under the

21   1888 Deed to use the Grounds to provide Permanent Supportive Housing ("PSH") to

22   homeless and disabled veterans. By failing to provide that housing, the VA has breached

23   its duty and, under its own timeline, will remain in breach for years. Rather than

24   satisfying its obligations to the veterans it purports to serve, the VA sold off parcels of

25   land to third parties, and entered into leases and renewed others that did not primarily

26   benefit veterans and their families. And instead of housing veterans on the WLA

27   Grounds as the 1888 Deed mandates, the VA, in conjunction with the Department of

28   Housing and Urban Development ("HUD"), provided HUD-VASH housing vouchers

94801272.4

that failed to provide the resources necessary to support disabled veterans in securing rentals. And when those vouchers could finally be used for units on the Grounds, the terms of the financing obtained to facilitate the construction disqualified the most disabled veterans from accessing that housing based upon their "income," income they received based on their service-connected disabilities.

In large part, due to Defendants' violations of their statutory obligations to disabled veterans, veterans in Los Angeles County and in VAGLAHS' catchment area–the very individuals the VA is charged to protect–are suffering a devastating homelessness crisis whose scale is unparalleled. Plaintiffs' strong showing on class certification set out below warrants this Court's condemnation of Defendants' conduct as to the entire class, not one at a time.

This case is ideally suited for adjudication under Rule 23. The Proposed Class consists of thousands of homeless, disabled veterans in Los Angeles and the catchment area for whom joinder in a single proceeding would prove unworkable. Plaintiffs' claims are typical because they are substantially similar and based on identical legal theories to those of absent class members. Plaintiffs and their counsel will fairly and adequately represent the absent class members' interests. Finally, in seeking declaratory and injunctive relief to remedy Defendants' unlawful practices and policies, Plaintiffs seek to resolve issues common to all members of the Proposed Class. Defendants' actions have discriminated against the Proposed Class and failed to provide meaningful access to the medical and other benefits to which they are entitled. Given the likely course of this case and its appeal, and that some homeless veterans will obtain housing over time, these claims are plainly capable of repetition and evading review. Certification of the Proposed Class is therefore not only appropriate, but essential to vindicate the rights of homeless veterans.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

94801272.4

## II.    STATEMENT OF FACTS

### A.    BACKGROUND

#### 1.    History of the West Los Angeles Grounds

Close to 11% of all homeless veterans in the United States reside in Los Angeles County.[1] In 2023, the most recent data available, 3,874 unhoused veterans lived in the City.[2] Over 70% of the veterans who reside in the city are unsheltered.[3] These statistics are particularly galling in light of the United States' ownership of 388 acres in the Brentwood neighborhood deeded expressly for the purpose of housing "disabled volunteer soldiers."[4]

After the initial gift to the United States and until the 1920s, the WLA Grounds housed a thriving community of veterans. In 1888, the VA's predecessors opened the Pacific Branch Home within a beautiful, park-like setting that encompassed between 600 and 700 acres.[5] Through 1930, the area fulfilled its intended purpose, housing nearly 4000 veterans.[6]

In 1930, Congress consolidated veterans' care under the Veterans Administration, the immediate predecessor to the VA.[7] That consolidation transferred the deed to the Pacific Branch Home to the Veterans Administration, which immediately began transferring parcels of land to various organizations, reducing the Grounds' acreage to

---

[1] U.S DEP'T OF HOUSING AND URBAN DEVELOPMENT, THE 2023 ANNUAL HOMELESSNESS ASSESSMENT REPORT (AHAR) TO CONGRESS at 73 (Dec. 2023), https://www.huduser.gov/portal/sites/default/files/pdf/2023-AHAR-Part-1.pdf.
[2] *Id.*
[3] *Id.*
[4] Decl. of Tommy H. Du ("Du Decl.") ¶ 2, Ex. 1 ("1888 Deed").
[5] Paul R. Spitzzeri, *"Men who Gave Their Young Manhood's Years to Their Country": A Photo-Gravure Booklet of the Pacific Branch of the National Home for Disabled Volunteer Soldiers, Los Angeles, 1907*, The Homestead Blog (Nov. 11, 2021), https://homesteadmuseum.blog/2021/11/11/men-who-gave-their-young-manhoods-years-to-their-country-a-photo-gravure-booklet-of-the-pacific-branch-of-the-national-home-for-disabled-volunteer-soldiers-los-angeles-1907/.
[6] *Id.; see also Life at the National Home, Circa 1922*, 1887 Fund, https://www.1887fund.org/about/life-at-the-national-home/ (last visited Apr. 1, 2024); *An Examination of Waste and Abuse Associated With VA's Management of Land-Use Agreements*, Am. Legion (Feb. 10, 2015), https://www.legion.org/legislative/testimony/226037/examination-waste-and-abuse-associated-vas-management-land-use.
[7] *History – Department of Veterans Affairs (VA)*, VA History Off. (last updated Mar. 28, 2024), https://www.va.gov/HISTORY/VA_History/Overview.asp.

14

94801272.4

388.[8] By the 1970s, the Veterans Administration stopped accepting new residents and left the property to fall into decay and disrepair.[9] The Grounds have never returned to fulfilling their purpose. Of the more than 100 buildings on the WLA Grounds today, many remain vacant, closed, or underutilized, along with acres of available land.[10]

Considerable scientific research demonstrates that, for unhoused individuals suffering from TBI or SMI, PSH–*i.e.* permanent community-based housing readily accessible to appropriate services and support–is essential to ensuring meaningful access to, and benefit from, physical and mental health services.[11] Without such housing, unhoused veterans commit suicide at a rate that is more than double the rate of veterans generally.[12]

Nevertheless, Defendants have failed to provide Permanent Supportive Housing to ensure that veterans with severe disabilities in Los Angeles and the areas serviced by VAGLAHS have the stability and support they need to access the medical benefits and other services for which they are eligible.

Over eight years after the settlement of *Valentini*, the VA still has just 233 units of PSH available on the Grounds.[13] The only other housing on the Grounds is a hodge-podge of inadequate "emergency" units erected by VAGLAHS, including the hundred or so tiny sheds that lack even fundamental necessities such as bathrooms or

---

[8]  Pub. L. 110-161 § 224(a) (2007), https://www.congress.gov/bill/110th-congress/house-bill/2764/text
[9]  *See* Stanley O. Williford, *Afraid to Speak: Few at Veterans Center Willing to Tell Complaints*, L.A. Times, Apr. 29, 1970, at 3
[10]  *See* Du Decl. ¶ 7, Ex. 6 ("Reynolds Letter").
[11]  Du Decl. ¶ 8, Ex. 7 (Expert Report of Benjamin F. Henwood ("Henwood Report")) ¶ 13; Jack Tsai et al., *Risk Factors for Homelessness Among US Veterans*, 37 Epidemiologic Rev. 177, 188 (2015) (collecting studies that found "a greater risk for homelessness among veterans compared with nonveterans").
[12]  VA Nat'l Ctr. Homelessness Among Vet., Homeless Evidence and Research Synthesis (HERS) Roundtable Series 3 (2018), https://www.va.gov/HOMELESS/nchav/docs/HERS_Proceedings_SuicideAndHomelessVeteransSymposium_Feb2018_508.pdf.
[13]  *See* U.S. Dep't of Veterans Affairs, VA Opens Two Buildings (Apr. 11, 2023) https://www.va.gov/greater-los-angeles-health-care/news-releases/va-opens-two-buildings-to-provide-120-units-of-housing-for-homeless-and-at-risk-veterans-on-west-la/; Du Decl. ¶ 3, Ex. 2 ("WLA EUL Housing Phasing Plan & Release Parcel Schedule").

94801272.4

appliances.[14] It provides temporary shelter for up to 124 chronically homeless veterans at the Domiciliary–where veterans can sleep for medical, psychiatric or substance abuse treatment programs.[15]

### 2. Obligations of the Veterans Health Administration

The VA is supposed to provide benefits and other services to veterans and their dependents and beneficiaries. Consistent with its purpose, the WLA Grounds were supposed to be used to house disabled veterans. (*See* Du Decl. Ex. 1 ("1888 Deed").) Not only does the VA violate the terms of the 1888 Deed, but it has also spurned subsequent attempts by Congress to ensure that the WLA Grounds are used for their intended purpose. For decades, the VA leased portions of the WLA Grounds to private entities and entered into a variety of other land-use agreements that had no or marginal benefits for veterans and their families. In 2016, Congress attempted to curtail this unlawful activity by enacting the West Los Angeles Leasing Act 2016, which allowed non-VA entities to use the WLA Grounds only if the real property leases and land-use agreements "*principally benefit* veterans and their families."[16] As part of the Act, Congress required the VA Office of Inspector General ("OIG") to submit to it an annual report detailing "all leases carried out at the Grounds and the management by the Department of the use of the land at the Grounds."[17] The most recent report details the VA's failure to comply with the Act, including seven land-use agreements that violate the original Deed and WLALA 2016 itself; they remain in effect today.[18]

Separate from land management, the Veterans Health Administration ("VHA") operates the VA's health care system, which consists of 171 medical centers and related community-based outpatient clinics, community living centers, veteran centers, and

---

[14] U.S. Dep't of Veterans Affairs, Master Plan 2022 at 38 (March 18, 2022) ("Master Plan 22), https://draft-master-plan-assets.s3.amazonaws.com/media/uploads/2022/04/12/2022-03-18_WLA-VA-Master-Plan-Signed.pdf.
[15] *Id.*
[16] Pub. L. No. 114-226, 130 Stat. 927 (2016).
[17] *Id.*
[18] *See* Du Decl. ¶ 4, Ex. 3 ("2021 OIG Report") at ii, 20-25.

16

94801272.4

domiciliaries.[19] The VHA is tasked with providing "a complete medical and hospital service for the medical care and treatment of veterans…"[20]  Veterans' healthcare in the Los Angeles metropolitan area is administered by VAGLAHS. Veterans receive outpatient medical, surgical, and mental healthcare; inpatient hospital, medical, surgical, and mental healthcare; prescription drug coverage; emergency care; substance abuse treatment; and other services through VAGLAHS.[21] The primary location of VAGLAHS's services is the VA Greater Los Angeles Medical Center located on the WLA Grounds.[22] VAGLAHS services five counties in Southern California, including Los Angeles, Ventura, Kearn, Santa Barbara, and San Luis Obispo.[23]

In administering these healthcare benefits, the VA and its subagencies must comply with Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against people with disabilities. Specifically, Section 504 prohibits the denial of benefits to otherwise qualified people solely by reason of their disability. The VA Handbook provides guidance on ensuring compliance with Section 504, including the "alteration of existing facilities and construction of new facilities."[24] Furthermore, the VA is required to "give priority to those methods that offer programs and activities to eligible individuals with disabilities in the most integrated setting appropriate."[25]

The VA and HUD jointly operate the HUD-VASH program purportedly to provide Permanent Supportive Housing to veterans. Under the program, eligible unhoused veterans receive housing vouchers, along with VA case management and clinical services.[26] Historically, only 60% of HUD-VASH recipients in greater Los Angeles have successfully found housing with the voucher.[27] Despite the presence of

---

[19]    U.S. Dep't    Veterans    Affair,    About    VHA, https://www.va.gov/health/aboutVHA.asp (last visited Nov. 14, 2022).
[20] 38 U.S.C. § 7301(b).
[21] https://www.va.gov/greater-los-angeles-health-care/about-us/; https://www.va.gov/greater-los-angeles-health-care/health-services/
[22] https://www.va.gov/greater-los-angeles-health-care/locations/
[23] Id.
[24] Du Decl. ¶ 5, Ex. 4 ("VA Handbook 5975.6") at 12.
[25] Id.
[26] https://www.va.gov/homeless/hud-vash.asp
[27] Self-generated report ("GLA VASH Utilization"), U.S. Dep't of Hous. & Urb.

94801272.4

over 3,500 unhoused veterans in Los Angeles County, not a single voucher was issued in Los Angeles County or City in 2021.[28] Even where veterans are able to obtain housing using their vouchers, such housing is often far from the WLA Grounds and the vouchers do not cover transportation thereto.[29] Further, in 2023, some 30% of those who received PSH "exited" the program.[30] Among HUD-VASH vouchers issued by the Housing Authority of the City of Los Angeles ("HACLA"), the majority of exits from PSH were for "program violations,"[31] something which should rarely, if ever, happen in a program that purports to offer low barriers to housing and intensive case management. Worse, the predominant cause of exits from PSH issued by the Los Angeles County Development Authority was "failure to complete/submit annual recertification,"[32] an administrative hurdle that any competent level of case management would avoid. Under this system, the VA and HUD expect individuals with Serious Mental Illness to navigate public transportation to West Los Angeles, an area with limited accessibility, just to receive the treatment services that make Permanent Supportive Housing necessary in the first place.

By failing to provide Permanent Supportive Housing on or near the WLA Grounds, VAGLAHS consistently denies veterans with SMI and TBI access to the community-based VA mental health, housing, and other supportive services they need and for which they are eligible. Rather than build PSH, VAGLAHS relies upon HUD-VASH vouchers that are demonstrably insufficient to allow veterans to access their benefits. Moreover, to the extent even limited housing is available on the WLA Grounds, the eligibility requirements for veterans to obtain such housing are unreasonably prohibitive. Because Defendants treat as income compensation provided to veterans in

---

[28] Dev., Housing Choice Voucher Program Dashboard, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/dashboard.

[28] HUD-Veterans Affairs Supportive Housing, HUD-VASH Vouchers 2008-2021, https://www.hud.gov/sites/dfiles/PIH/documents/VASH_Awards_2008-2021.pdf.

[29] *See* U.S. Dep't Vet. Aff., Transportation services and schedules, https://www.va.gov/greater-los-angeles-health-care/programs/transportation-services-and-schedules/ (last visited Apr. 1, 2024).

[30] https://westlamasterplan.org/p/CERS

[31] *Id.*

[32] *Id.*

94801272.4

proportion to their disability rating, Plaintiff Johnson and others who have 100% disability ratings are barred from the housing they require because the severity of their disability causes their "income" to exceed eligibility limits.

### 3.    History of Legal Action

Despite the availability of land the VA is required to use to house disabled veterans and a clear policy to alter or construct new facilities to comply with the Rehabilitation Act of 1973, veterans have limited permanent housing options, largely operated by outside agencies,[33] on or near the WLA Grounds. These include a nursing home for veterans over the age of 62 and approximately one hundred tiny sheds built by the VA that lack kitchens and bathrooms. The VA also allows veterans to sleep in cars overnight at a parking lot on the property.[34] These paltry options are, needless to say, inadequate to ensure that veterans are able to access the healthcare and other benefits they need. Without permanent housing options on or near the WLA Grounds, many veterans do not have access to their benefits.[35]

In 2011, ten unhoused veterans with severe disabilities sued the VA for its failure to provide housing on the Grounds.[36] After four years of litigation, the parties entered into an agreement under which the VA committed to creating a Master Plan to build PSH on the Grounds in coordination with the provision of supportive services.[37]

In its 2021 report, the VA OIG found that the VA had yet to construct any new Permanent Supportive Housing on the WLA Grounds.[38] Instead, the VA "envisioned" completion of construction by 2030.[39]

---

[33] Master Plan 2022 at 38.
[34] Master Plan 2022 at 178
[35] Henwood Report ¶ 36.
[36] *Valentini v. Shinseki, et al.*, No. 2:11-cv-04846-SJO-MRW (June 8, 2011).
[37] Principles for a Partnership and Framework for Settlement By and Between the U.S. Department of Veterans Affairs and Representatives of the Plaintiffs - Valentini v. McDonald, dated January 28, 2015 (Accessed at https://www.aclusocal.org/sites/default/files/wp-content/uploads/2015/02/012815-West-Los-Angeles-California-Principles-for-Partnership-Framework-for-Settlement-Executed.ocr.pdf)
[38] 2021 OIG Report at 10.
[39] *Id.* at 19.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

94801272.4

### 4.    Plaintiffs

Jeffrey Powers is a 60-year-old veteran with a 90% service-connected disability rating eligible for healthcare benefits from the VA. (Decl. of Jeffrey Powers ¶ 7.) In the summer of 2020, Mr. Powers moved to Los Angeles and currently seeks treatment and housing from VAGLAHS. (*Id.* ¶¶ 6, 8–9.) Despite requests for assistance from the VA, he has never had permanent housing since moving to Los Angeles, and has instead, lived in tents, a motel, and a tiny shed without a bathroom, appliances, or lock. (*Id.* ¶¶ 6, 8–11.) While he is currently living on the WLA Grounds, he has to regularly reapply for a HUD-VASH voucher to remain in the unit and is aware that he may lose his housing because of the paperwork necessary to keep the voucher. (*Id.* ¶ 6.)

Deavin Sessom is a 67-year-old veteran with a 100% service-connective disability rating eligible for medical benefits from the VA. (Decl. of Deavin Sessom ("Sessom Decl.") ¶ 7.) Since 2007, he has been enrolled in the VA healthcare system in Los Angeles and seeks treatment from VAGLAHS, but finds it difficult to receive mental health benefits due to his severe anxiety and hypervigilance. (*Id.* ¶ 8.) During a 90-day period in 2013, he enrolled in a mental health treatment program on the WLA Grounds during which time he remained sober and motivated to continue treatment. (FAC ¶ 55.) After completion of the program, however, the VA did not provide Mr. Sessom with permanent housing assistance. (*Id.* ¶ 56.) Mr. Sessom relapsed and became unhoused. (*Id.*; *see also* Sessom Decl. ¶¶ 8–9.) Recognizing the need to be near his mental health treatment facilities, Mr. Sessom first moved into tents and then into a tiny shed on the WLA Grounds that had no bathroom, appliances, or lock. (Sessom Decl. ¶ 8–9.) He has been denied permanent housing on the WLA Grounds because of the severity of his disability, and he remained homeless until relatively recently when he obtained housing in the community. (*Id.* ¶ 10.)

Laurieann Wright is a 54-year-old veteran with a 100% service-connected disability rating eligible for medical benefits from the VA. (Decl. of Laurieann Wright ¶ 7.) She receives treatment from VAGLAHS. (*Id.* ¶ 9.) In 2006, Ms. Wright sought

treatment from the VA and was given temporary housing at the Domiciliary after a PTSD diagnosis. (*Id.*) Later diagnosed with multiple sclerosis, the VA placed Ms. Wright with a tent and then a tiny shed with no bathroom, appliances, or lock. (*Id.* ¶¶ 10–11.) In 2022, Ms. Wright's shed caught fire and she lost all of her possessions. (*Id.* ¶ 12.) Again, the VA did not provide any housing support. (*Id.* ¶ 13.) Instead, Ms. Wright relied on assistance from the Salvation Army for a placement in Lancaster, California. (*Id.*) An hour away from her medical care on the WLA Grounds, Ms. Wright has difficulty attending her appointments. (*Id.* ¶ 14.)

Samuel Castellanos is a 60-year-old veteran eligible for medical benefits from the VA with a service-connected disability of PTSD. (Decl. of Samuel Castellanos ¶¶ 7–8.) Mr. Castellanos has been unhoused in Los Angeles County since September 2020 and seeks treatment and housing from VAGLAHS. (*Id.* ¶ 9.) Falling into a crisis, he admitted himself into a psychiatric hold for 18 days. (*Id.*) He lived in a tent and then a tiny shed on the WLA Grounds, which had no bathroom, appliances, or lock. (*Id*. ¶¶ 10–11.) In 2022, the shed caught fire and Mr. Castellanos lost all of his possessions. (*Id.* ¶ 11.) He has also been unable to retrieve packages or mail from the Grounds, which remained his mailing address for some time after the fire. (*Id.*) While he has obtained housing in Lancaster, an hour from the WLA Grounds, Mr. Castellanos has been unable to attend his medical appoints due to the distance. (*Id.*)

<u>Joseph Fields</u> is a 51-year-old veteran eligible for medical benefits from the VA with a 100% service-connected disability rating. (Decl. of Joseph Fields ¶ 7.) In 2011, Mr. Fields sought assistance from the VAGLAHS for suicidal thoughts. (*Id.* ¶ 8.) He was temporarily housed at the Domiciliary and received services from the National Center for PTSD but became addicted to painkillers. (*Id*.) After graduating from the treatment program at the Domiciliary in 2015, he was not provided permanent housing. (*Id*. ¶ 9.) For seven years he slept on a piece of cardboard on the sidewalk. (*Id.* ¶¶ 6, 9.) More recently, Mr. Fields has lived in a tiny shed on the WLA Grounds with no bathroom, appliances, or a lock on the door. (*Id*. ¶ 9.) While he is currently living on the

94801272.4

WLA Grounds in Building 208, he has to regularly reapply for a HUD-VASH voucher to remain in the unit and is aware that he may lose his housing because of the paperwork necessary to keep the voucher. (*Id.* ¶ 6.)

Lavon Johnson is a 36-year-old veteran with a 100% service-connected disability rating eligible for medical benefits from the VA. (Decl. of Lavon Johnson ("Johnson Decl.") ¶ 7.) Mr. Johnson has been homeless in Los Angeles for the past ten years and seeks treatment and housing from VAGLAHS. (*Id.* ¶ 8.) With mental illness and anger issues, he has been prescribed multiple medications and attended counseling with mixed results. He has periodically resided in tents near the WLA Grounds, but the police cleared out the encampment in 2023. (*Id.* ¶ 8–9.) After filing the lawsuit, Mr. Johnson was provided housing on the WLA Grounds in Building 208. (*Id.* ¶ 6.) However, prior to this, his housing application was rejected because of the AMI Rule as his "income" from his VA disability benefits exceeded the AMI eligibility. (*Id.* ¶ 9.) Mr. Johnson recognizes that this rule could change at any time that could result in him losing his current housing. (*Id.*)

Naryan Stibbie is an 85-year-old veteran with a 70% service-connected disability rating but compensated at the 100% rate due to his individual unemployability. (Decl. of Naryan Stibbie ¶ 7.) He resides in Los Angeles and seeks treatment from VAGLAHS. (*Id.* ¶ 4.) Often homeless, Mr. Stibbie has been sleeping in his car since May 2022 and has been deemed ineligible for housing services. (*Id.* ¶¶ 8–9.)

Joshua Robert Petitt is a veteran with a 100% service-connected disability rating eligible for medical benefits from the VA. (Decl. of Joshua Petitt ¶ 7.) As a resident of Los Angeles, he seeks treatment from VAGLAHS. (*Id.*) For many years, he lived on the streets outside of the Grounds to ensure access to his treatment for service-connected PTSD, and knee, back, and hearing issues. (*Id.* ¶ 8.) More recently, he lived in a tiny shed on the WLA Grounds because he needed access to the extensive support services he receives for his PTSD. (*Id.*) While he was approved and currently lives in a building

94801272.4

that opened in May 2023 on the WLA Grounds, he remains at risk of future homelessness. (*Id.* ¶ 6.)

Doe 1 is a veteran with a 60% severe service-connected disability rating eligible for medical benefits from the VA. (Decl. of Doe 1 ¶ 7.) In 2022, Doe 1 fled an abusive marriage only to end up homeless. (*Id.* ¶ 8.) She eventually transitioned to living in a shed on the WLA grounds to ensure access to medical services. (*Id.* ¶ 9.) After filing the lawsuit, she was approved and currently lives in a building on the WLA Grounds, but she remains at risk of future homelessness. (*Id.* ¶ 10.)

Plaintiffs are veterans with SMI, brain injuries and/or physical disabilities who are unhoused due to these disabilities. As a result, they are unable to access necessary VA medical and mental health treatment to which they are entitled.

National Veterans Foundation ("NVF") is veteran-run organization located in Los Angeles that provides life-sustaining services to veterans throughout the country. (Decl. of Floyd "Shad" Meshad ("Meshad Decl.") ¶ 4.) NVF's Homeless Veteran Outreach Program assists unhoused veterans in the VAGLAHS catchment area, which includes Los Angeles, Ventura, Kern, Santa Barbara, and San Luis Obispo counties, in obtaining food, water, and housing assistance. (*Id.* ¶¶ 2, 4.) This work is integral to NVF's mission of stopping veteran suicide. (*See id.* ¶ 6.) NVF sues on behalf of its members and constituents, who are homeless and at-risk veterans with SMI and TBI. (*Id.* ¶¶ 7, 9.)

### B.    **Claims for Relief**

In this action, Plaintiffs challenge the VA's failure to provide Permanent Supportive Housing on and near the WLA Grounds. As this Court recognized in its Order Denying Defendants' Motion to Dismiss, ECF No. 106, Plaintiffs do not challenge prior benefits decisions, nor do they allege PSH is a benefit to which they are entitled under VA regulations. "Instead, Plaintiffs allege that PSH is a reasonable accommodation that is necessary for them to access the benefits that they have already been awarded." (Order at 19.) Plaintiffs, in their individual capacities and on behalf of the Proposed Class, assert that all Defendants administer the benefits offered by VAGLAHS and HUD-VASH in a

94801272.4

manner that discriminates against veterans by (i) denying them the benefits to which they are entitled, and (ii) failing to provide meaningful access to those benefits in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Likewise, Plaintiff Johnson, in his individual capacity and on behalf of the Proposed Subclass, assert that all Defendants discriminate against them by imposing restrictive income measurements and counting a veteran's disability benefits as income for eligibility for housing eligibility. Plaintiffs seek a declaration by this Court that Defendants administer the VAGLAHS benefits program in a manner that discriminates against veterans with SMI and TBI solely by reason of their disabilities in violation of § 504 of the Rehabilitation Act of 1973.

Plaintiffs also seek a declaration that (i) the federal government's acceptance of the 1888 Deed created a Charitable Trust, and (ii) the VA Defendants breached their fiduciary duty in administering that trust by allowing the WLA Grounds to be used for purposes not directly related to providing housing and healthcare for veterans with disabilities. Plaintiffs request injunctions including: (1) preventing Defendants from failing to provide Plaintiffs and similarly situated veterans with SMI and TBI appropriate Permanent Supportive Housing to allow reasonable access, within six months, to the health care and housing benefits for which they are eligible; (2) mandating that the VA Defendants faithfully execute their obligations as trustees of the WLA Grounds, and (3) requiring that the VA Defendants refrain from executing or maintaining land leases on the WLA Grounds in violation of WLALA 2016 and its 2021 Amendment. Finally, Plaintiffs seek appointment of a monitor to oversee Defendants and report to the Court on implementation of all injunctions.

## III.   ARGUMENT

### A.   Standards for Class Certification

Federal Rules of Civil Procedure 23(a) and (b) establish the criteria for class certification. Rule 23(a) requires that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3)

the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class." In addition to those prerequisites, a plaintiff must satisfy one of the Rule 23(b) prongs. Here, Rule 23(b)(2) allows for class certification because Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed R. Civ. P. 23(b)(2). "[P]laintiffs may use any admissible evidence" to demonstrate by a preponderance of the evidence that the facts satisfy the criteria for certification. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 665 (9th Cir. 2022), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).

Courts should conduct a "rigorous analysis" to determine whether Rule 23 has been satisfied, which may "entail some overlap with the merits" of the underlying claim. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). But as the Ninth Circuit cautioned in *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 983 n.8 (9th Cir. 2011), the district court need "examine the merits . . . only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims . . . . To hold otherwise would turn class certification into a mini-trial."

### B. Plaintiffs Meet the Rule 23(a) Requirements

The Proposed Class and Subclass satisfy all of Rule 23(a)'s requirements: (1) the size of the Proposed Class and Subclass make joinder impracticable; (2) the members of the Proposed Class and Subclass share common questions of law and fact; (3) Plaintiffs' claims are typical of the classes; and (4) Plaintiffs and their counsel will vigorously protect the classes' interests.

### 1. The Proposed Class is sufficiently numerous.

The first requirement under Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Ninth Circuit has

interpreted this requirement as to mean that joinder is difficult or inconvenient, not impossible. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-4 (9th Cir. 1964). While no bright line rule exists, "courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F.Appx. 646, 651 (9th Cir. 2010). In addition, "the exact size of the class need not be known so long as 'general knowledge and common sense indicate that it is large.'" *Perez-Funez v. District Director, INS,* 611 F. Supp. 990, 995 (C.D.Cal.1984)

Here, there can be no dispute that numerosity is satisfied. By the VA's own counts and estimates, there are at least 2200 homeless veterans residing in Los Angeles County suffering from SMI or TBI and eligible for benefits from VAGLAHS. (Du Decl. ¶ 6, Ex. 5 ("Hammitt Dep.") at 117:20-118:8.) This number could potentially be as high as 4000. (*Id.* at 137:19–138:7.) Joinder of all members of the Classes would be impracticable. Therefore, the class is sufficiently numerous.

### 2. There are common questions of law and fact.

The commonality prong requires there be "questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). While "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Wal-Mart*, 564 U.S. at 349-50 (citation omitted), it does not require every issue be common to the claims of all class members. *Id.* at 359. Rather, the class members' "claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

"[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citations omitted) overruled on other grounds by *Johnson v. California*, 543 U.S. 499 (2005). Where a class challenges a system-wide practice or policy, "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." Id. "The[] policies and practices

[at issue] are the 'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every [class member] or it is not." Parsons v. Ryan, 754 F.3d 657, 678 (9th Cir. 2014).

Cases combining challenges to uniform practices with requests for declaratory or injunctive relief by their very nature deal with common questions of law and fact. 7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ. §1763 (4th ed. Update 2023). Courts routinely certify classes in cases involving statutory challenges to agency actions and inactions. *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) ("numerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices. . . ."); *J.P. v. Sessions*, 2019 WL 6723686, at *17 (C.D. Cal. 2019) ("In general, commonality is satisfied where the causes of action challenge 'a system-wide practice or policy that affects all of the putative class members.'"); *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192 (N.D. Cal. 2012) (certifying class alleging government systematically determined there were no long-term effects resulting from experimental research on volunteer service members); *Roshandel v. Chertoff,* 554 F.Supp.2d 1194, 1203 (W.D. Wash. 2008) (where plaintiffs "challenge the legality of the same government program, they inherently share common issues").

All of Plaintiffs' claims have common issues of law and fact for all members of the Proposed Class and Subclass.

**Section 504 of the Rehabilitation Act Claims**

Plaintiffs' Rehabilitation Act Claims are based upon a common contention: that Defendants violated Section 504 by failing to reasonably accommodate unhoused veterans suffering from disabilities with  housing on or near the WLA Grounds. The resolution of Plaintiffs' claims will turn on three central questions: (1) whether Defendants administer the benefits offered by VAGLAHS in the most integrated setting appropriate; (2) whether Defendants administer the benefits offered by VAGLAHS in a manner that denies class members meaningful access to those benefits solely because of their disabilities, in violation of Section 504; and (3) whether Defendants' denial of

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

94801272.4

appropriate integrated services exposes class members to institutionalization or the risk of institutionalization, including psychiatric holds.

Where "broad discriminatory policies and practices constitute the gravamen of a class suit, common questions of law or fact are necessarily presented." *Midwest Cmty. Council v. Chicago Park Dist.,* 87 F.R.D. 457, 460 (N.D. Ill. 1980) (citation omitted).

To the extent Defendants argue that individual inquiries are necessary to determine the propriety of PSH for each individual, Defendants misunderstand Plaintiffs' claims. Plaintiffs are not claiming a right to PSH or any specific individual grant of housing. Nor do they seek any particular outcome for any particular class member. Rather, Plaintiffs ask the Court to find that Defendants are failing to fulfill their duties as to all class members, and that Defendants' failure to provide PSH on or near the WLA Grounds results in the systematic discrimination against class members, preventing them from accessing the medical and other benefits to which they are entitled. "That inquiry does not require [the Court] to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination." *Parsons*, 754 at 678 (affirming certification of classes based upon, *inter alia,* common questions regarding uniform statewide practices creating risk of future harm).

**Fiduciary Duty Claims**

Resolution of Plaintiffs' Fiduciary Duty Claims likewise rests upon several common questions: (1) whether, when the federal government accepted the 1888 Deed, it created a Charitable Trust; (2) whether, under the terms of the 1888 Deed, WLALA 2016 and its 2021 Amendment and the fiduciary duties arising from them, Defendants have a duty to use the Grounds for the establishment, construction, permanent maintenance, and operation of PSH for veterans, including class members; and (3) whether Defendants breached this duty pursuant to the Charitable Trust by failing to construct PSH and authorizing the many uses of the Grounds that do not directly contribute to the operation of housing and healthcare for veterans with disabilities. These

94801272.4

questions are uniform for all class members, and their resolution will have uniform impact. To prove the answers to these common questions, Plaintiffs will rely solely upon evidence applicable across the Class, including Defendants' documentary evidence related to the acceptance and implementation of the duties arising from the 1888 Deed. Plaintiffs will not require any individual evidence from class members other than to generally show the wide-ranging effects of the breaches of duty. Resolution of these issues will apply uniformly to all class members.

### Administrative Procedure Act Claim

The resolution of Plaintiffs' Administrative Procedure Act claims rests upon the question of whether Defendants' land deals involving property and facilities on the WLA Grounds violate the WLALA 2016 and its 2021 Amendment. This issue is common to all class members. To prove this claim, Plaintiffs will rely solely upon evidence that is applicable across the Class, including the VA Defendants' documentary evidence related to the land leases and other encumbrances on the Grounds. Plaintiffs will not require any individual evidence from class members and resolution of the issue will uniformly impact all class members.

### Accounting

Finally, Plaintiffs' claim for accounting rests upon common questions of: (1) whether the Secretary and the VA have failed and refused to account for the proceeds, funds, and land use revenues from the leases on the premises of the WLAVA as required by law and by the Charitable Trust; and (2) whether class members have no adequate remedy at law to compel Defendants to comply with their obligation to apply the proceeds, funds, and land use revenues as required by law or to ascertain the amount to be applied. These questions are common to the class. Likewise, the evidence required to prove this claim is within Defendants' control and will not require any individual evidence from Plaintiffs. Resolution of this issue will affect the class uniformly.

As the Supreme Court envisioned in *Wal-Mart*, determination of the truth or falsity of these contentions will resolve the issues central to the claims of each member

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
94801272.4

of the Proposed Class and Subclass. *See* 564 U.S. at 350. Thus, Plaintiffs' claims are ideal for resolution on a class-wide basis.

### 3.    Plaintiffs' claims are typical.

A representative's claims are typical "if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998) *overruled on other grounds by Wal-Mart* 564 U.S. 338. The typicality analysis evaluates "whether other [class] members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and quotation marks omitted). Plaintiffs meet this requirement.

**Individual Plaintiffs**

This action is based on conduct by Defendants that is not unique to the named Plaintiffs; rather, Defendants' actions are common to all class members. Plaintiffs' claims are typical of the class:

- Each individual plaintiff is eligible for medical benefits from the VA;

- Each individual plaintiff has a service-connected disability rating;

- Each individual plaintiff seeks treatment from VAGLAHS;

- Each individual plaintiff has sought housing from VAGLAHS;

- Each individual plaintiff has been denied permanent housing on or near the Grounds;

- Each individual plaintiff has been or remains unhoused, or is at risk of being unhoused;

- Each individual plaintiff has faced difficulty or been unable to access their medical or other VA benefits.

In relation to these claims, Defendants' actions affect every member of the class in the same way they affect the individual Plaintiffs.

94801272.4

Defendants may also assert, as they have previously, that the individual Plaintiffs' claims are moot because some have obtained housing. However, Plaintiffs' claims are not moot because they are "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514–15 (1911). To be capable of repetition yet evading review, "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016).

Plaintiffs' claims satisfy both prongs here. The transient nature of homelessness means any controversy linked to a person's homelessness is inherently of limited duration. (*See* Decl. of Benjamin Henwood ¶ 16, ECF No. 62-1 (describing the "institutional circuit" that makes the population of homeless people with disabilities fluid).) Likewise, because 20% of persons placed in housing end up reentering the homeless population, there is a reasonable expectation that Plaintiffs will become homeless again, and again fail to qualify for a HUD-VASH voucher because of the AMI restriction. (*Id.* at ¶¶ 16, 18.) Courts have accepted this premise when dealing with homeless individuals, whose status and resulting injuries are involuntary. *See, e.g. Glover v. City of Laguna Beach*, 2017 WL 4457507, at *2 (C.D. Cal. June 23, 2017) (holding that homeless plaintiff's ADA claim was not moot after he obtained PSH because it was capable of repetition yet evading review); *Church v. City of Huntsville*, 30 F.3d 1332, 1337–38 (11th Cir. 1994) (holding that homeless plaintiffs demonstrated standing because their homelessness was involuntary because of their disabilities, leaving them subject to challenged conduct in the future).

**National Veteran's Foundation**

Likewise, NVF's members have been similarly injured. NVF is a veteran-run organization whose members and constituents are the homeless and at-risk veterans with service-related SMI and TBI. (Meshad Decl. ¶ 5.) Its outreach to these veterans is integral to its mission of stopping veteran suicide. (*See id.* ¶¶ 4, 6.) The lack of PSH for

veterans near or at the WLA Grounds makes it more difficult to achieve its mission. (*Id.* ¶ 6.) NVF has "representational standing" to bring this lawsuit, *i.e.*, standing that arises vicariously from that of its members who fall within the classes. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Vietnam Veterans of Am.*, 288 F.R.D. at 204–205 (finding that Vietnam Veterans of America had organizational standing where "the underlying purpose of the organization is to represent the interests of the class"). The relationship between homelessness and suicide is well documented. (Henwood Report ¶ 18.) The interests at stake in this litigation are directly related to NVF's goal of eliminating veteran suicide. Moreover, other than establishing standing, the facts at issue in this case rely upon Defendants' conduct and do not require participation by individual class members. NVF has standing to litigate the claims in this case, and to do so on a class-wide basis. *See, e.g. Vietnam Veterans of Am.*, 288 F.R.D. at 203–10 (holding that veterans' association had institutional standing).

Because NVF has institutional standing, it satisfies the typicality requirement. *See Monaco v. Stone,* 2002 WL 32984617, at *38 (EDNY 2002) (collecting cases demonstrating that a showing of organizational standing "is enough to satisfy the typicality requirement of Rule 23(a)(3)"); *see also Cal. Rural Legal Assistance v. Legal Servs. Co.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (allowing unions to proceed as class representatives where "in their associational capacity, the unions are acting on behalf of section 245A legalized aliens"); *Vietnam Veterans of Am.*, 288 F.R.D. at 215–16 (holding that organization with institutional standing had claims typical of class).

Each member of the Proposed Class, like each individual Plaintiff, has a service-related disability rating and is unhoused in Los Angeles. Plaintiffs' claims are typical of the Proposed Class. Moreover, because NVF has members with injuries typical of the

94801272.4

class, NVF in its representational capacity satisfies the typicality requirement for the Proposed Class.

###    4.    Plaintiffs and counsel will adequately represent the proposed Class.

The adequacy requirement under Rule 23(a) requires that named plaintiffs and class counsel adequately protect the interests of the class. "Adequate representation depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir.1994) (internal quotation omitted). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Class Representatives: There are no conflicts of interest between the individual Plaintiffs and the class members. Plaintiffs are not seeking monetary rewards or special treatment. As detailed above and in their declarations, the individual Plaintiffs initiated this lawsuit and will vigorously represent the interests of the class. There is no basis to suggest that Plaintiffs lack the capacity to represent the class as a result of their disabilities; if the rule were otherwise, no class whose members lack capacity could ever effectively seek redress. *See, e.g. Davis v. Astrue*, 250 F.R.D. 476 (N.D. Cal. 2008) (certifying class of mentally disabled claimants).

Likewise, there are no conflicts of interest between class members, who are by definition veterans, and NVF, a national veterans' organization dedicated to providing life-sustaining assistance to veterans. Moreover, NVF is particularly well positioned to vigorously prosecute this action on behalf of the Proposed Class. NVF is a national organization that has existed for almost 40 years, providing services to thousands of veterans around the country. (Meshad Decl. ¶ 4.) As such, NVF has the resources commensurate with a large, national organization. (*Id.*)

1      <u>Class Counsel:</u> There is no conflict of interest between counsel and class members

2  and counsel will vigorously represent the interests of the class.

3      Founded in 1970, **Public Counsel Law Center** is the largest provider of pro bono

4  legal services in the nation. Together with pro bono counsel, Public Counsel's over 140

5  attorneys and staff provide free legal services to tens of thousands of people, small

6  businesses, and nonprofit organizations in Los Angeles and throughout the United

7  States. Public Counsel's Center for Veterans' Advancement is a national leader in

8  veterans' advocacy, ensuring that veterans and their families can access government

9  benefits, employment, housing, and healthcare. Public Counsel's principal attorney in

10 this matter, Mark D. Rosenbaum, has argued five times before the United States Supreme

11 Court, three times before the California Supreme Court, and once before the Court of

12 Military Appeals. He has also argued multiple times before the Ninth Circuit Court of

13 Appeals, and has tried cases throughout California and the United States. A sample of

14 Mr. Rosenbaum's extensive resume be found in his concurrently filed declaration. (*See*

15 Decl. of Mark Rosenbaum.)

16     **Inner City Law Center** is a nonprofit dedicated to ensuring decent, safe, and

17 fully habitable housing for the homeless and working poor families and individuals

18 residing in Los Angeles. (See generally Decl. of Amanda Powell.) In 1998, Inner City

19 Law Center launched its Homeless Veterans Project, one of a handful of programs in the

20 country offering free legal services to homeless Veterans. It has continuously offered

21 those services since then. Inner City Law Center's attorneys work to obtain benefits for

22 homeless veterans who have disabilities as a result of their military service and have

23 represented veterans who have served in Iraq, Afghanistan, Vietnam, Korea, and even

24 World War II. Amanda Powell is a Supervising Attorney with the Homeless Veterans

25 Project at Inner City Law Center, which she joined in 2018. For the past six years, Ms.

26 Powell has represented unhoused veterans with severe mental health conditions. She has

27 assisted over 200 veterans and secured over $4 million in retroactive benefits for

28 veterans disabled as a result of their military service.

94801272.4

**Brown, Goldstein & Levy LLP** (BGL), and its principal attorney, Eve Hill, have a long history of representing people with disabilities. BGL frequently represents plaintiffs in class and collective actions in a variety of contexts. (See Decl. of Eve Hill ¶ 3.) BGL has obtained significant relief for plaintiffs. (*Id.*) Ms. Hill has over 30 years of experience as a disability rights attorney, including serving in the leadership of the Civil Rights Division of the U.S. Department of Justice, serving as the Director of the District of Columbia's Office of Disability Rights, and serving as a Visiting Associate Professor at Loyola Law School, where she was Executive Director of the Disability Rights Legal Center. In her seven years at BGL, she has been lead counsel in numerous disability rights cases against state, local, and federal agencies.

Finally, **Robins Kaplan** is a firm with over 200 lawyers across the country, largely focused on litigation, and well-qualified to represent the class. (Decl. of David Martinez ¶ 3.) The firm has a long history of handling class actions and representing underrepresented communities pro bono. Its unwavering dedication in class action cases is most recently illustrated by the conclusion of its 19-year commitment to *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO), in which Robins Kaplan was co-lead class counsel for the nationwide class of merchants and is now working on the administration of a more than $5.5 billion settlement. It has represented veterans and veterans' organizations in numerous cases, including providing approximately 4000 hours of pro bono service to veterans as part of its Vet Law initiative; its immediate past Board Chair is a veteran of the Marines; and a member of the case team, David Martinez, is a veteran of the Navy. In addition, Robins Kaplan's principal attorneys handling this matter are well-qualified to represent the Proposed Class and Proposed Subclass. (*Id.* ¶¶ 6–8.)

Accordingly, the proposed representatives and counsel for the Proposed Class have the ability, resources, and motivation to vigorously pursue the current case on behalf of the Proposed Class.

### C.     **Plaintiffs Satisfy Rule 23(b)(2)**

Plaintiffs clearly meet the requirements of Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Where, as here, the primary purpose of the action is to seek injunctive relief, the action is properly certifiable under Rule 23(b)(2). *See Fowler v. Guerin,* 899 F.3d 1112, 1120 (9th Cir. 2018) (remanding case for reconsideration of class certification because the relief sought was injunctive).

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. " *Wal-Mart,* 564 U.S. at 360 (internal citation omitted). This does not require every member be aggrieved in the same way or actively seek the same remedy. Under this provision, "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998); *see* 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1775 (3d ed. 2023) ("All the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)."). The concern in certifying a Rule 23(b)(2) class is ensuring that plaintiffs do not seek individualized injunctions. *Wal-Mart,* 564 U.S. at 360. Here, they do not.

The Ninth Circuit has held that Rule 23(b)(2)'s requirements are "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K. ex rel. Tinsley v. Snyder,* 922 F.3d 957, 971 (9th Cir. 2019) (quoting *Parsons*, 754 F.3d at 687). To ascertain whether these requirements were met in *Parsons*, the Ninth Circuit

36

94801272.4

asked whether "all members of the putative class and subclass [we]re allegedly exposed
to a substantial risk of serious harm by a specified set of centralized ADC policies and
practices of uniform and statewide application." 754 F.3d at 688.

The same reasoning applies here. Plaintiffs have not raised individual claims
requiring individual injunctive relief. Rather, Plaintiffs allege Defendants' practices and
policies uniformly discriminate against members of the Proposed Class and have failed
to provide meaningful access to the healthcare benefits to which they are entitled.
Similarly, the VA Defendants have breached their fiduciary duty to class members to
provide housing on the WLA Grounds and have violated the APA by maintaining land
leases on the Grounds that do not principally benefit veterans. The VA Defendants'
actions uniformly impact class members by placing them at a substantial risk of harm.
Plaintiffs seek declaratory and injunctive relief to ensure that Defendants fulfill their
obligations to the entire class.

## IV.    **CONCLUSION**

For the foregoing reasons, this case meets all the requirements of Rules 23(a) and
23(b)(2) for class certification. Plaintiffs therefore request that the Court grant their
motion to certify the class action, to appoint the Plaintiffs as representatives, and to
appoint Public Counsel Law Center, Inner City Law Century, Brown Goldstein & Levy,
LLP and Robins Kaplan LLP as Co-Class Counsel.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

94801272.4

DATED: April 1, 2024      **PUBLIC COUNSEL LAW CENTER**
     MARK D. ROSENBAUM
     KATHRYN A. EIDMANN
     AMANDA K. PERTUSATI
     AMANDA MANGASER SAVAGE
     AMELIA PIAZZA
     YI LI

/s/ *Mark D. Rosenbaum*
MARK D. ROSENBAUM

Attorneys for Plaintiffs


DATED: April 1, 2024      **BROWN GOLDSTEIN & LEVY, LLP**
     EVE L. HILL
     JAMIE STRAWBRIDGE

/s/ *Eve L. Hill*
EVE L. HILL

Attorneys for Plaintiffs


DATED: April 1, 2024      **INNER CITY LAW CENTER**
     T.E. GLENN
     AMANDA POWELL
     CHARLES KOHORST

s/ *T. E. Glenn*
T. E. GLENN
Attorneys for Plaintiffs


DATED: April 1, 2024      **ROBINS KAPLAN LLP**
     ROMAN M. SILBERFELD
     DAVID MARTINEZ
     TOMMY H. DU

/s/ *ROMAN M. SILBERFELD*
ROMAN M. SILBERFELD

Attorneys for Plaintiffs

94801272.4