ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ERNEST J. GUADIANA, State Bar No. 276095
  *eguadiana@elkinskalt.com*
JULIE Z. KIMBALL, State Bar No. 252449
  *jkimball@elkinskalt.com*
SEAN A. McCORMICK, State Bar No. 295711
  *smccormick@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Intervenor Bridgeland
Resources, LLC

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY POWERS, et al., | Case No. 2:22-cv-08357-DOC-JEMx |
| Plaintiff, | *Hon. David O. Carter* |
| v. | **BRIDGELAND RESOURCES, LLC'S COMPLAINT IN INTERVENTION** |
| DENIS RICHARD MCDONOUGH, et al., | |
| Defendants, | Action Filed: November 15, 2022 |
| | Trial Date: July 23, 2024 |
| BRIDGELAND RESOURCES, LLC, | |
| Intervenor. | |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Pursuant to Federal Rule of Civil Procedure 24, Intervenor-Plaintiff Bridgeland Resources, LLC ("Bridgeland") hereby files its Complaint for Declaratory Relief against all Plaintiffs as follows:

## **INTRODUCTION**

1.     Bridgeland operates oil and gas wells located on a small portion of the West Los Angeles VA Campus ("WLA Grounds" or "Grounds").

2.     Bridgeland's operations are conducted pursuant to two mineral leases with the U.S. Bureau of Land Management ("BLM") that give Bridgeland the right to occupy the WLA Grounds.  In addition, Bridgeland has a surface property license with the Department of Veterans Affairs ("VA") for the same portion of the WLA Grounds.  This surface property license enables Bridgeland to operate a single slant-drilled well that produces non-federally owned oil and gas from outside the WLA Grounds.  The surface property license requires Bridgeland to pay a royalty of 2.5% of the proceeds of oil and gas produced, which must be used "solely" for providing transportation to veterans on and around the VA's greater Los Angeles healthcare system campus.

3.     Plaintiffs in this case challenge the VA's land-use agreements with various third parties, including Bridgeland's surface property license.  Plaintiff seek to enjoin the VA from "maintaining" this agreement, among others.  First Am. Compl. (Doc. 33) Prayer ¶ G.

4.     Should the Court grant Plaintiffs' requested relief, it will have no effect on Bridgeland's use of the WLA Grounds, and Bridgeland's existing footprint on the WLA Grounds will remain, since Bridgeland will continue to have rights to produce federal oil and gas under its leases with BLM.  The only effect will be to (i) eliminate the 2.5% royalty

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  used for veterans transportation services and (ii) require Bridgeland to

2  plug and cap a single well on the WLA Grounds while it continues to

3  operate others in the same location.

4      5.    Bridgeland seeks a declaration that Plaintiffs are not entitled

5  to the relief they seek with respect to Bridgeland or its operations on the

6  WLA Grounds.

7

8              **THE PARTIES**

9      6.    Plaintiff Jeffrey Powers is an individual.

10      7.    Plaintiff Deavin Sessom is an individual.

11      8.    Plaintiff Laurieann Wright is an individual.

12      9.    Plaintiff Samuel Castellanos is an individual.

13      10.    Plaintiff Joseph Fields is an individual.

14      11.    Plaintiff Lavon Johnson is an individual.

15      12.    Plaintiff Billy Edwards is an individual.

16      13.    Plaintiff Jessica Miles, is an individual.

17      14.    Plaintiff Joshua Robert Petitt is an individual.

18      15.    Plaintiff Glenn Surrette is an individual.

19      16.    Plaintiff Naryan Stibbie is an individual.

20      17.    Bridgeland is ignorant of the true names and capacities of

21  DOES 1 through 2.

22      18.    Plaintiff National Veterans Foundation, is California

23  corporation.

24      19.    Defendant Denis Richard McDonough is an individual.

25      20.    Defendant Marcia L. Fudge is an individual.

26      21.    Defendant Douglas Guthrie is an individual.

27      22.    Defendant Steven Braverman is an individual.

28      23.    Defendant Keith Harris is an individual.

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

24.    Intervenor Bridgeland Resources, LLC is a Delaware limited liability company.

## JURISDICTION AND VENUE

25.    This Complaint in Intervention is brought pursuant to Federal Rule of Civil Procedure, Rule 24.  Declaratory relief is sought pursuant to 28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure, Rule 57.

26.    An actual, judiciable controversy exists within the meaning of 28 U.S.C. § 2201 between Plaintiffs and Intervenor Bridgeland regarding Bridgeland's rights with respect to the WLA Grounds and whether Bridgeland's surface property license with the VA complies with the West Los Angeles Leasing Act of 2016, Pub. L. 114-226 ("WLALA2016"), as described more particularly herein.  Accordingly, this controversy is within the Court's jurisdiction under 28 U.S.C. § 1331.

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the underlying events giving rise to this declaratory relief action took place in this district.

## GENERAL ALLEGATIONS

28.    Bridgeland is an oil and gas producer.  It operates wells throughout Los Angeles County and California.

29.    Bridgeland owns the majority of the working interest in 11 active oil and gas wells and associated infrastructure on the WLA Grounds at a designated drillsite (the "WLA Drillsite") south of Constitution Avenue along the 405 freeway.  Additionally, through a joint operating agreement with the other working interest owner, Bridgeland operates these 11 active oil and gas wells.  The WLA Drillsite

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    is approximately 3 acres, of the WLA VA's total 388 acres.

2        30.    Bridgeland came to own and operate these wells by becoming

3    the successor-in-interest to Breitburn Operating LP's interests at the

4    WLA Drillsite in June 2021.

5        31.    Bridgeland's rights to produce oil and gas at the WLA

6    Drillsite are governed by a series of agreements entered into by

7    Bridgeland's predecessors in interest.  As explained below, Bridgeland is

8    the successor-lessee on two leases for mineral rights entered into with

9    the United States Bureau of Land Management ("BLM") for minerals

10   below and surrounding the WLA Grounds.  Bridgeland also licenses from

11   the Department of Veterans Affairs the right to use the surface at the

12   WLA Drillsite where Bridgeland operates wells that produce oil from its

13   leases with BLM.

14       32.    A diagram depicting the WLA Drillsite, as well the areas

15   covered by the leases under which Bridgeland operates at the WLA

16   Drillsite is attached as <u>Exhibit A</u>.

17   **A.    <u>Bridgeland's BLM Leases</u>**

18       33.    Of Bridgeland's 11 active wells at the WLA Drillsite, 10 of

19   them produce oil and gas pursuant to two leases entered into with the

20   United States of America through the Bureau of Land Management

21   ("BLM") (described immediately below) for lands on and around the WLA

22   Grounds.  These wells are referred to as "Dowlen-Federal" or "DF" wells

23   Nos. 2, 4-7, 10, 12-15.

24       34.    The first of Bridgeland's BLM leases is the "Offer to Lease for

25   Oil and Gas Noncompetitive Acquired Lands Lease," with the United

26   States of America, as lessor, and Tom Dowlen, as lessee, dated February

27   21, 1956 (the "1956 BLM Lease").  *See* <u>Exhibit B</u>.

28       35.    Bridgeland is the current successor lessee under the 1956

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

BLM Lease.

36.    Under the 1956 BLM Lease, Bridgeland, as lessee, has the right to produce oil and gas from 670 acres beneath and surrounding the WLA Grounds.  This includes the area south of Constitution Avenue where the current WLA Drillsite exists.

37.    The 1956 BLM Lease does not expire so long as the lessee continues producing oil or gas in paying quantities.

38.    The second of Bridgeland's BLM leases is the "Protective Oil and Gas Lease" with the United States of America, as lessor, and Occidental Petroleum Corporation, as lessee, dated January 1, 1969 (the "1969 BLM Lease", and referred together with the 1956 BLM Lease as the "BLM Leases").  *See* <u>Exhibit C</u>.

39.    Bridgeland is the current successor lessee under the 1969 BLM Lease.

40.    Under the 1969 BLM Lease, Bridgeland, as lessee, has the right to produce oil and gas from 70.58 acres beneath and adjacent to the WLA Grounds.

41.    The 1969 BLM Lease enabled the lessee to drill directly above the leased lands, which include the area on the north side of Constitution Avenue (the "North Constitution Drillsite").  *See* 1969 BLM Lease, Attachment A(c)(1) & Attachment C-1.

42.    The 1969 BLM Lease also granted the lessee a subsurface easement to utilize a drillsite on the south side of Constitution Avenue, overlying lands leased under the 1956 BLM Lease.  As explained below, the lessee ultimately utilized the drillsite on the south side of Constitution Avenue (the current WLA Drillsite).

43.    The 1969 BLM Lease does not expire so long as the lessee continues producing oil or gas in paying quantities.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

BRIDGELAND'S COMPLAINT IN INTERVENTION

**B.    Bridgeland's Subsurface Leases with Private Parties Outside the WLA Grounds**

44.    Bridgeland is the successor-lessee under multiple oil and gas leases with private parties covering land outside of the boundaries of the WLA Grounds (the "Bridgeland Private Leases"). A representative example of one Bridgeland Private Lease is attached as Exhibit D.

45.    By their terms, the Bridgeland Private Leases generally do not grant the lessee rights for surface access, so Bridgeland produces oil and gas under these leases using a slant-drilled well whose wellhead is located at the WLA Drillsite, but is bottom-holed in an area leased by the Bridgeland Private Leases. Of Bridgeland's 11 active oil and gas wells at the WLA Drillsite, only one produces exclusively pursuant to the Bridgeland Private Leases: Sawtelle-2.

**C.    Bridgeland's Surface Rights at the WLA Grounds**

46.    The Department of Veterans Affairs ("VA") has entered into surface agreements under which the lessees under the 1956 BLM Lease and the 1969 BLM Lease may use the WLA Drillsite to maintain slant-drilled wells bottomed outside the WLA Grounds to produce non-federally owned oil and gas.

47.    In 1966, VA entered into a surface lease with Occidental Petroleum Corporation (the "1966 Surface Agreement"). *See* Exhibit E.

48.    The 1966 Surface Agreement allowed the lessee to drill and maintain wells that bottomed under the WLA Grounds, as well as wells that bottomed outside the WLA Grounds. In exchange, the lessee was required to pay the VA a royalty of 2.5% of the proceeds of all oil and gas produced under the agreement. The 1966 Surface Agreement was for a renewable term of 3 years, and it was subsequently renewed several times. It ultimately lapsed on October 1, 1990, although the lessee at the

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1    time continued to occupy the drill site.

2        49.    On January 1, 1997, VA entered into a new agreement—a

3    Revocable License for Non-Federal use of Real Property No. 691-97-01-

4    1L (the "1997 Revocable License")—for the WLA Drillsite, with Westside

5    Operating Partners LP, which was then occupying the drill site.  *See*

6    Exhibit F.

7        50.    The 1997 Revocable License continued to permit the licensee

8    to use the WLA Drillsite "for slant drilling of wells bottomed under land

9    outside of VA property."  1997 Revocable License § 2; *id.* Ex. 1.  It also

10   required the licensee to continue paying a 2.5% royalty to the VA.  *Id.* §

11   4.

12       51.    In 2016, Breitburn Operating LP ("Breitburn"), the BLM, and

13   the VA entered into an agreement under which Breitburn agreed to

14   surrender its surface rights to the North Constitution Drillsite (which

15   were granted under the 1969 BLM Lease) in exchange for continued use

16   of the WLA Drillsite south of Constitution Avenue.  A copy of this

17   agreement, known as the "2016 Partial Surrender of Surface Rights,"

18   dated December 23, 2016, is attached as Exhibit G.  Bridgeland is the

19   successor to Breitburn's interests under the 2016 Partial Surrender of

20   Surface Rights.

21       52.    As "material consideration" to Breitburn under 2016 Partial

22   Surrender of Surface Rights, the VA agreed to provide continued surface

23   rights at the WLA Drillsite.  2016 Partial Surrender of Surface Rights,

24   § 3.

25       53.    On March 7, 2017, Breitburn and the VA entered into an

26   "amendment, revival, and extension" of the 1997 Revocable License.

27   Attached as Exhibit H is a copy of the Amendment, Revival and

28   Extension of the Revocable License for Non-Federal Use of Real Property

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Agreement, between the Department of Veterans Affairs as licensor and
Breitburn Operating LP as licensee, dated March 7, 2017 (the "2017
Amendment"). Bridgeland is the successor to Breitburn's interests under
the 2017 Amendment.

54. The 2017 Amendment incorporates and extends many of the
terms of the 1997 Amendment, including that the licensee maintains and
agrees to use the WLA Drillsite south of Constitution Avenue, and that
the licensee may use the WLA Drillsite for operating slant-drilled wells
that are bottom-holed outside of the VA's property. 1997 Revocable
License Ex. 1; 2017 Amendment, pg. 1.

55. The 2017 Amendment requires Bridgeland to pay to the
Disabled American Veterans Los Angeles Chapter ("DAV-LA") an
overriding royalty of 2.5% of the proceeds of all oil and gas produced from
certain wells located on the WLA Drillsite. 2017 Amendment, Section 3.
The 2017 Amendment requires the DAV-LA to use the royalty proceeds
"solely for the purpose of providing transportation to Veterans on and
around the VA Greater Los Angeles Healthcare System Campus." *Id.*

56. Pursuant to the 2017 Amendment, Bridgeland currently pays
the DAV-LA a 2.5% overriding royalty on 10 wells at the WLA Drillsite,
to be used solely for veterans' transportation services. Based on January
2024 production records, this royalty amounts to approximately $160,000
on an annualized basis. Bridgeland intends to continue paying this
overriding royalty as long as the 2017 Amendment or any subsequent
agreement remains in place.

57. On or around June 2021, Bridgeland became the successor-in-
interest to Breitburn's interests under the 2017 Amendment and at the
WLA Drillsite.

/ / /

**D.    Bridgeland's Operations at the WLA Grounds**

58.    Bridgeland currently operates and maintains 11 active oil and gas wells at the WLA Drillsite: DF Nos. 2, 4-7, 10, and 12-15; and Sawtelle-2.  Bridgeland intends to continue operating and maintaining wells at the WLA Drillsite as long as economically feasible.

59.    Bridgeland's wells at the WLA Drillsite currently produce approximately 280 barrels of oil per day.

60.    Sawtelle-2, the sole well maintained pursuant to the Bridgeland Private Leases, currently produces approximately 130 barrels of oil per day.  Based on January 2024 production records, Bridgeland and its other working interest owner currently earn $224,584.10 in monthly gross revenue from Sawtelle-2.

**E.    Plaintiffs' Complaint**

61.    Plaintiffs seek to void the 2017 Amendment.  Plaintiffs challenge the VA's land-use agreements with various third parties, including Bridgeland.  Plaintiffs cite the 2017 Amendment between the VA and Bridgeland's predecessor-in-interest, Breitburn, as an agreement that Plaintiffs contend is "noncompliant" with the WLALA2016 and should be voided.  First Am. Compl. (Doc. 33) ¶ 286.  Plaintiffs seek an injunction "prohibiting Defendants from . . . maintaining any land use agreements under the WLALA2016 that do not primarily benefit veterans."[1]  First Am. Compl. (Doc. 33), Prayer ¶ G.

62.    If Plaintiffs obtain the relief they seek, it will invalidate the

_____

[1] Plaintiffs appear to misquote the operative language under the WLALA2016 in alleging that it requires leases and land-use deals to "primarily benefit veterans."  First Am. Compl. (Doc. 33) ¶ 341, Prayer ¶ G.  But the WLALA2016 concerns leases and land-use deals that "*principally* benefit veterans."  Pub. L. 114-226 §§ 2(b), (l).

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

2017 Amendment, and impair Bridgeland's interests thereunder, through which Bridgeland licenses use of the WLA Drillsite and produces oil and gas under the Bridgeland Private Leases.

63.    If the 2017 Amendment is invalidated, Bridgeland will need to plug the Sawtelle-2 well, depriving Bridgeland of revenues from that well and from the Bridgeland Private Leases, since Bridgeland would arguably lack surface rights to maintain the Sawtelle-2 well.

64.    Further, if the 2017 Amendment were invalidated, Bridgeland would stop paying the DAV-LA the 2.5% overriding royalty for veterans' transportation services on its wells.

65.    Also, if the 2017 Amendment is invalidated, Bridgeland will no longer have an agreement with the VA to limit its operations to the WLA Drillsite, and Bridgeland's rights will revert back to those under the BLM Leases.  As the successor-lessee under the BLM Leases, Bridgeland will continue to have rights to access the surface property above those leased lands as necessary to produce oil and gas under those leases.  In other words, if the 2017 Amendment is invalidated, Bridgeland would continue utilizing the WLA Drillsite and continue producing oil and gas from wells producing pursuant to the BLM Leases: DF Nos. 2, 4-7, 10, 12-15.  Bridgeland may also expand back to the North Constitution Drillsite, as that drillsite is available under the 1969 BLM Lease.

## FIRST CAUSE OF ACTION
### (For Declaratory Relief against Plaintiffs)

66.    Bridgeland incorporates by reference and realleges herein paragraphs 1 through 65 of this Complaint.

67.    An actual and present controversy has arisen and now exists

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

between Plaintiffs and Bridgeland concerning their respective rights, obligations and interests.  Specifically, Bridgeland maintains the Sawtelle-2 well in accordance with the 2017 Amendment with the VA. Plaintiffs in this case seek to enjoin the VA from "maintaining" the 2017 Amendment on the grounds that it does not comply with the WLALA2016.  Plaintiffs contend that the 2017 Amendment does not comply with the WLALA2016 because it does not "primarily benefit veterans."

68.    Bridgeland contends that the 2017 Amendment complies with the WLALA2016.  Bridgeland occupies the WLA Drillsite pursuant to its leases with the BLM.  The 2017 Amendment enables Bridgeland to maintain one of its wells at the WLA Drillsite—the Sawtell-2 well—and it requires Bridgeland to pay a 2.5% royalty to the DAV-LA.  The DAV-LA is required to use "solely" for providing transportation to veterans on and around the VA's greater Los Angeles healthcare system campus. Without the 2017 Amendment, the DAV-LA would not receive the 2.5% royalty for veteran transportation services, and Bridgeland would continue occupying the WLA Drillsite pursuant to its BLM Leases. Accordingly, the 2017 Amendment "principally benefits veterans" and it complies with the WLALA2016.

69.    Bridgeland desires a judicial determination and declaration of Bridgeland's rights, obligations and interests with respect to its land-use agreement with the VA, and specifically, a judicial determination and declaration that the 2017 Amendment complies with the WLALA2016 because it principally benefits veterans and that the Secretary of the VA is authorized to continue maintaining it.

70.    Such a judicial declaration is necessary and appropriate at this time in order for Bridgeland to ascertain its rights, duties, and

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

1  interests with respect to the 2017 Amendment.

2

3                      **PRAYER FOR RELIEF**

4          WHEREFORE, Bridgeland prays for judgment as follows:

5

6          1.    For a declaration that the 2017 Amendment complies with

7  the WLALA2016 because it principally benefits veterans and that the

8  Secretary of the VA is authorized to continue maintaining it.

9          2.    For costs of suit; and

10         3.    For such other and further relief as the Court deems just and

11 proper.

12

13 DATED:  April 5, 2024          ELKINS KALT WEINTRAUB REUBEN
                                   GARTSIDE LLP
14

15

16                          By:    _/s/ Ernest J. Guadiana_
17                                 ERNEST J. GUADIANA
                                   JULIE Z. KIMBALL
18                                 SEAN A. MCCORMICK
                                   Attorneys for Bridgeland Resources,
19                                 LLC
20

21

22

23

24

25

26

27

28

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone:  310.746.4400 • Facsimile: 310.746.4499

# EXHIBIT A



# EXHIBIT B

Form No. 4-1196
(Dec. 1954)

"RECEIVED
LAND OFFICE
LOS ANGELES, CALIF."

1955 FEB 23 AM

Form approved,
Budget Bureau No. 42-R1140.

*Now Riverside*

Office —Los Angeles—

Serial No. —4438800—

Receipt No. —303556—

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT

## OFFER TO LEASE AND LEASE FOR OIL AND GAS
## NONCOMPETITIVE ACQUIRED LANDS LEASE

(See reverse side for instructions as to filing)

1. Mr.
   Mrs.
   Miss  T. Tom H. Dowlen
                (Name)

   10525 Edgeley Place
        (Number and Street)

   Los Angeles 24, California
           (City and State)

PLEASE NOTIFY THE
SIGNING OFFICER OF
ANY CHANGE OF ADDRESS.

hereby offers to lease all or any of the lands described in item 2 that are available for lease, pursuant and subject to the terms and provisions of the act of August 7, 1947 (61 Stat. 913, 30 U. S. C. secs. 351–359), hereinafter referred to as the act, and to all reasonable regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof.

| 2. Land requested | 3. Land included in lease |
|---|---|
| | (Not to be filled in by offeror) |
| California  Los Angeles  Meridian T. ____ R. ____
(State) | California, ___ S.B. ___ Meridian T. 1 S. R. 15 W.
(State) |
| | Los Angeles County |
| U. S. interest if
less than 100 percent | U. S. interest if
less than 100 percent |
| | See attached metes and bounds
description (5 pages) of land, included
in this lease |
| | Total area ____670____ acres |
| Total area 809.276 acres | Net area for rental ____670____ acres |
| | Rental retained $ ___335.00___ |

4. Amount remitted: Filing fee $10, rental $ _404.64_ total $414.64.

5. Undersigned certifies as follows:
   (a) Offeror is a citizen of the United States. Native-born ____Yes____ Naturalized _____ Corporation or other legal entity (specify what kind) : _____
   (b) Agency having administrative control over surface use of land, and unit or project of which land is a part are ____Veteran's Administration Center Los Angeles___
   (c) Offeror's interests direct and indirect in oil and gas leases on acquired lands and applications or offers therefor, including this offer, in the same State do not exceed 46,080 chargeable acres.
   (d) Offeror accepts as a part of this lease, to the extent applicable, the stipulations provided for in 43 CFR 191.6.
   (e) Offeror is 21 years of age or over (or if a guardian or a corporation or other legal entity, is duly qualified to receive a lease as shown by statements made or referred to herein).
   (f) Offeror has described all lands as provided for in 43 CFR 200.8 (d).

6. Offeror's signature to this offer shall also constitute offeror's signature to, and acceptance of, this lease and any amendment thereto that may cover any land described in this offer open to lease application at the time the offer was filed but omitted from this lease for any reason, and signature to, and acceptance of, any separate lease for such land. The offeror further agrees that (a) this offer cannot be withdrawn, either in whole or in part, unless the withdrawal is received before this lease, an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed in behalf of the United States, and (b) that this offer and lease shall apply only to lands not within a known geologic structure of a producing oil or gas field at the time the offer is filed.

7. If this lease form does not contain all of the terms and conditions of the lease form in effect at the date of filing, the offeror further agrees to be bound by the terms and conditions contained in that form.

8. It is hereby certified that the statements made herein are true, complete and correct to the best of offeror's knowledge and belief, and are made in good faith.

IN WITNESS WHEREOF, Offeror has duly executed this instrument this ____21____ day of ____February____, 1955.

WITNESSES

_____  135 _____ Dr.
(Name and address)                           (Lessee signature)

_____  2211 Pine Ave. Long Beach
(Name and address)  Calif.                    (Lessee signature)

_____
(Attorney in fact)

A lease for the lands described in item 3 above is hereby issued, subject to the provisions of the offer and on the reverse side hereof.

(This form is submitted in lieu of official form 4-1196 and contains all of the provisions thereof as of the date of filing of this offer.)

NOV 1 1953

Effective date of lease _____

THE UNITED STATES OF AMERICA

By __Charles R. Schaefer__
              (Signing Officer)

Chief, Mineral Adjudication Unit    OCT 1 9 1953
              (Title)                        (Date)

18 U. S. C., section 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.
This form may be reproduced provided that the copies are exact reproductions on one sheet of both sides of this official form in accordance with the provisions of 43 CFR 200.8 (a).

EXHIBIT "A"

THIS CONTRACT (LEASE, LICENSE, PERMIT) IS SUBJECT TO THE PROVISIONS OF SEC. 301 OF EXECUTIVE ORDER NO. 10925, A COPY OF WHICH IS ATTACHED.

NONDISCRIMINATION IN EMPLOYMENT

T. I. & T. CO.

Order No. 4434500
Sub No. 18
2/17/56

0138800

## DESCRIPTION

All the right, title and interest of the United States
of America in a parcel of land partly within the city
of Los Angeles, in the county of Los Angeles, state of
California, including portions of the Rancho San
Vicente y Santa Monica and of the Rancho San Jose de
Buenos Ayres, described as a whole as follows:

Beginning at the most southerly corner of Tract No.
7181, as shown on the map recorded in book 120 page
79 of maps, in the office of the county recorder of
said county; thence along the southeasterly line of
said tract and the prolongation of said southeasterly a.
line North 54° 50' 25" East 1221.50 feet to the southwest
line of block 22 of the Subdivision of Rancho de San Jose
de Buenos Ayres recorded in book 26 pages 19 et seq, of
Miscellaneous Records, in the office of said county
recorder; thence along said southwest line North 35° 30'
00" West 1403.01 feet, more or less, to the most westerly
corner of lot 5 in said block 22; thence along the
northerly lines of lots 6 and 19 in said block 22, North
72° 23' 20" East 1904.03 feet to the most northerly corner
of said lot 19; thence southerly and southeasterly along the
easterly and northeasterly line of said block 22 to the
westerly prolongation of the northerly line of lot 4 in
block 23 of said Subdivision of the Rancho San Jose de
Buenos Ayres; thence to and along said northerly line,
North 72° 23' 17" East 725.07 feet to the most northerly
corner of said lot 4; thence South 35° 32' 33" East 2538.72
feet; thence South 72° 24' 05" West 620.55 feet; thence
South 33° 03' 55" East 62.25 feet; thence North 72° 24' 05"
East 2.77 feet; thence South 35° 32' 50" East 1949.60 feet,
more or less, to the most easterly corner of lot 10 in block
13 of said subdivision; thence along the southerly lines of
lots 10 and 3 in said block 13 and the westerly prolongation
of said southerly line of lot 3, South 71° 36' 45" West
1386.16 feet; thence South 35° 32' 14" East 785.98 feet,
more or less, to the northwesterly line of Ohio Avenue as
shown on the map of the Barrett Villa Tract, recorded in

Continued

"A"

"RECEIVED
LAND OFFICE
LOS ANGELES, CALIF."

book 70 pages 32 and 35 of said Miscellaneous Records; thence along said northwesterly line South 54° 27' 56" West 2046.47 feet; thence North 36° 30' 57" West 933.40 feet; thence South 54° 29' 28" West 933.40 feet; thence North 35° 29' 25" West 5910.73 feet, more or less, to an angle point in the southwesterly line of the 235.5 acre parcel shown on the map filed in book 5 page 25 of Record of Surveys, in the office of said county recorder; thence North 8° 44' 55" West 1028.84 feet; thence North 44° 34' 10" East 927.08 feet; thence South 58° 07'15" East 456.24 feet; thence South 42° 38' 45" East 933.64 feet; thence South 8° 09' 55" East 522.43 feet; thence South 35° 32' 45" East 1460.42 feet to the point of beginning.

The above description compiled without title examination and may not conform to title lines as they now exist.

C. C. Rea

Case 2:22-cv-08357-DOC-KS   Document 172   Filed 04/05/24   Page 20 of 80   Page ID #:2906

# LEASE TERMS

*Section 1. Rights of lessee.*—The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations or other structures necessary to the full enjoyment thereof, for a period of 5 years, and so long thereafter as oil or gas is produced in paying quantities; subject to any unit agreement heretofore or hereafter approved by the Secretary of the Interior, the provisions of and agreement to govern the lands subject thereto where inconsistent with the terms of this lease. Within the period of 90 days prior to the expiration of the initial lease term, an application may be made for extension of the lease in accordance with the regulation 43 CFR 192.120.

[Body text continues in small print across multiple columns and is not legibly reproducible.]

# INSTRUCTIONS

U.S. GOVERNMENT PRINTING OFFICE: 1951—O—914116

Printed by WOLCOTTS
214 S. Spring St., Los Angeles 12, Calif.

Los Angeles 0138800

### METES AND BOUNDS DESCRIPTION
### OF LANDS EMBRACED IN
### OIL AND GAS LEASE

That parcel of land in T. 1 S., R. 15 W., S.B.M., in the
county of Los Angeles, State of California, including
portions of Rancho San Vicente of Santa Monica and of
Rancho San Jose de Buenos Ayres described as follows:

Beginning at the most southerly corner of Tract No.
7181 as shown on the map recorded in book 120 page
79 of Maps, in the office of the county recorder of
said county; thence along the southwesterly line of
said Tract No. 7181 and its northwesterly prolongation
North 35° 32' 45" West 1466.42 feet to the true point
of beginning for this description in the boundary line
of the land annexed to the City of Los Angeles in the
Westgate Annexation on June 14, 1916 as described in
Ordinance No. 34184; thence along said boundary line
southerly 205.9 feet, more or less, to Station 12 as
shown on the map attached to the deed to National
Home for Disabled Volunteer Soldiers, recorded on
June 5, 1900 as Instrument No. 20 in book 1368 page
167 of Deeds, records of said county; thence still
along said boundary line southeasterly 1223.7 feet,
more or less, to Station 13 and 1004.44 feet, more or
less, to Station 14 as shown on the map attached to
said deed; thence still along said boundary line north-
easterly 1386 feet, more or less, to the southwest line
of block 22 of the Subdivision of Rancho de San Jose de
Buenos Ayres recorded in book 26 pages 19 et seq., of
Miscellaneous Records, in the office of said county
recorder; thence along said southwest line North 35°
30' 00" West 2316.22 feet, more or less, to the most
westerly corner of lot 6 in said block 22; thence along
the northerly lines of lots 6 and 19 in said block 22,
North 72° 23' 20" East 1504.03 feet to the most northerly
corner of said lot 19; thence southerly and southeasterly
along the easterly and northeasterly line of said block

Continued

1

22 to the most easterly corner of lot 14 in said block
22; thence southeasterly across Wilshire Boulevard to
the most northerly corner of lot 12 in block 13 of said
subdivision; thence along the northeasterly lines of
lots 12, 11 and 10, in said block 13, South 35° 32' 50"
East 1896.74 feet, more or less, to the most easterly
corner of lot 10 in block 13 of said subdivision; thence
along the southerly lines of lots 10 and 3 in said block
13 and the westerly prolongation of said southerly line
of lot 3 South 71° 36' 40" West 1385.16 feet; thence
South 35° 32' 14" East 785.98 feet, more or less, to
the northwesterly line of Ohio Avenue as shown on the
map of the Barrett Villa Tract recorded in book 70
pages 32 and 33 of said Miscellaneous Records; thence
along said northwesterly line South 54° 27' 56" West
2046.47 feet; thence North 35° 30' 57" West 933.40 feet;
thence South 54° 29' 28" West 933.40 feet; thence North
35° 29' 25" West 5910.73 feet, more or less, to an angle
point in the southwesterly line of the 235.5 acre parcel
shown on the map filed in book 5 page 26 of Record of
Surveys, in the office of said county recorder; thence
North 8° 44' 55" West 1828.84 feet; thence North 44° 34'
12" East 927.08 feet; thence South 58° 07' 15" East
496.24 feet; thence South 42° 38' 45" East 953.64 feet;
thence South 8° 09' 55" East 522.43 feet, more or less,
to the true point of beginning.

EXCEPTING therefrom those portions of said land included
within the lines of parcels 1, 2 and 3 hereinafter described.

Parcel 1:
A parcel of land situated in the county of Los Angeles,
state of California, being a portion of that certain
parcel of land marked "Soldiers Home 300 Acres" as
shown on map of that portion of the Rancho San Vicente
y Santa Monica, known as the Villa Farms, recorded in
book 70 pages 54 et seq., of Miscellaneous Records, in
the office of the county recorder of said county, described
as follows:

Commencing at the point of intersection of the center line
of Wilshire Boulevard, 100 feet wide, as described in a
deed, recorded in book 7317 page 371 of Official Records,
in the office of said recorder and as shown on county
surveyor's filed Map No. 10261 on file in the office of
the county surveyor of said county, with the northeasterly

Continued

line of Federal Avenue 40 feet wide, as shown on said
county surveyor's map; thence along said northeasterly
line South 35° 36' 18" East 50.56 feet to the south-
easterly line of said Wilshire Boulevard; thence along
said southeasterly line North 45° 50' 42" East 78.86
feet to the true point of beginning; thence continuing
along said southeasterly line North 45° 50' 42" East
44.27 feet to the beginning of a tangent curve concave
northwesterly, having a radius of 500.00 feet; thence
northeasterly along said curve through a central angle
of 37° 26' 25", an arc distance of 326.73 feet; thence
continuing along said southeasterly line North 8° 25' 17"
East 191.36 feet; thence South 35° 36' 18" East 660.00
feet; thence South 54° 23' 42" West 500.00 feet to a
line parallel with and distant northeasterly 40 feet,
measured at right angles from said northeasterly line
of Federal Avenue; thence along said parallel line
North 35° 36' 18" West 68.73 feet; thence North 24° 50'
49" West 203.58 feet; thence North 35° 36' 18" West
100.00 feet to the true point of beginning.

Parcel 2:
A parcel of land situated in the county of Los Angeles,
state of California, being a portion of that certain
parcel of land marked "Soldiers Home 300 Acres", as
shown on map of that portion of the Rancho San Vicente
y Santa Monica, known as the Villa Farms, recorded in
book 70 pages 54 et seq., of Miscellaneous Records, in
the office of the county recorder of said county,
described as follows:

Commencing at the point of intersection of the center
line of Wilshire Boulevard, 100 feet wide, as described
in a deed recorded in book 7313 page 371 of Official
Records, in the office of said recorder, and as shown
on county surveyor's filed Map No. 10261 on file in
the office of the county surveyor of said county, with
the northeasterly line of Federal Avenue 40 feet wide,
as shown on said county surveyor's map; thence along
said northeasterly line South 35° 36' 18" East 50.56
feet to the southeasterly line of said Wilshire
Boulevard; thence along said southeasterly line North
45° 50' 42" East 78.88 feet; thence South 35° 36' 18"

Continued

East 100.00 feet; thence South 24° 50' 49" East
203.58 feet to a line parallel with said north-
easterly line of Federal Avenue and distant north-
easterly therefrom 40 feet, measured at right angles;
thence along said parallel line South 35° 36' 18"
East 68.73 feet to the true point of beginning;
thence North 54° 23' 42" East 400.00 feet; thence
South 35° 36' 18" West 545.00 feet; thence South 54°
23' 42" West 400.00 feet to said parallel line;
thence along said parallel line North 35° 36' 18"
West 545.00 feet to the true point of beginning.

Parcel 3:
A parcel of land situated in the county of Los Angeles,
state of California, being a portion of that certain
parcel of land marked "Soldiers Home 300 Acres", as
shown on map of that portion of the Rancho San Vicente
y Santa Monica, known as the Villa Farms, recorded in
book 70 pages 54 et. seq., of Miscellaneous Records, in
the office of the county recorder of said county,
described as follows:

"Commencing at the point of intersection of the center
line of Wilshire Boulevard, 100 feet wide, as described
in a deed, recorded in book 7317 page 371 of Official
Records, in the office of said recorder and as shown on
county surveyor's filed Map No. 10261 on file in the
office of the county surveyor of said county, with the
northeasterly line of Federal Avenue, 40 feet wide, as
shown on said county surveyor's map; thence along said
northeasterly line South 35° 36' 18" East 50.56 feet to
the southeasterly line of said Wilshire Boulevard;
thence along said southeasterly line North 45° 50' 42"
East 78.88 feet; thence South 35° 36' 18" East 100.00
feet; thence South 24° 50' 49" East 203.58 feet to a
line parallel with said northeasterly line of Federal
Avenue and distant northeasterly therefrom 40 feet,
measured at right angles; thence along said parallel
line South 35° 36' 18" East 613.73 feet to the true
point of beginning; thence North 54° 23' 42" East
400.00 feet; thence South 35° 36' 18" East 419.44
feet to the southerly boundary line of said "Soldiers

Continued

Home" as said southerly boundary was established by the
deed to Santa Monica Land & Water Company recorded on
May 24, 1900 as Instrument No. 41 in book 1369 page
104 of Deeds, in the office of the said county recorder;
thence along said boundary line South 54° 22' 57" West
400.00 feet to said parallel line;thence along said
parallel line North 35' 36' 18" West 419.52 feet to the
true point of beginning."

# EXHIBIT C

Form 2270-1
(January 1966)
(formerly 4-F633)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

PROTECTIVE OIL AND GAS LEASE

Office and Serial Number

Riverside

R 1956

THIS LEASE, entered into as of   January 1, 1969   , by and between the United States of America, through the Bureau of Land Management, hereinafter called the lessor, and Occidental Petroleum Corporation, 5000 Stockdale Highway, Bakersfield, California 93309,

hereinafter called the lessee, under the supervisory authority of the Secretary of the Interior (40 Op. Atty. Gen. 41), and subject to the provisions of Public Land Order 4270 of September 11, 1967, as amended by Public Land Order 4312 of October 31, 1967.

WITNESSETH:

Sec. 1. *Rights of lessee.* In consideration of rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, the lessor does hereby grant to the lessee the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits owned by the lessor, except helium gas, in or under the following-described land situated in   Sawtelle Field,

San Bernardino Meridian

T. 1 S., R. 15 W.,

as more particularly described
as Parcels A and B in Exhibit B
attached hereto and made a part
hereof,

containing   70.58   acres, more or less, for a period of five years and so long thereafter as oil or gas is produced in paying quantities: *Provided, That* this lease shall not be deemed to expire by reason of suspension of operations or production pursuant to any order or consent of the Secretary of the Interior. Except as otherwise provided and subject to the conditions herein specified, the lessee shall have the right to construct and maintain upon the leased lands all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipe lines, reservoirs, tanks, pumping stations, or other structures as may be necessary to the full enjoyment of this lease.

Sec. 1(a)  See following Sec. 10.

Sec. 2. The lessee hereby agrees:

(a) *Bonds.* To furnish and maintain at all times as required by the Lessor a bond in the penal sum of $ 10,000 with approved corporate surety, conditioned upon compliance with the terms of this lease.

(b) *Drilling agreement or unit plan.* Within 30 days of demand to subscribe to and operate under such reasonable communitization or drilling agreement, or under such cooperative or unit plan, embracing all or a portion of the lands included herein as the Secretary of the Interior may determine to be practicable and necessary or advisable, which agreement or plan shall adequately protect the rights of all parties in interest, including the United States, and which shall modify the terms hereof to the extent provided in such agreement or plan.

(c) *Wells.* To commence the drilling of a well or wells within the time and at such location as may be prescribed in Attachment A which is made a part hereof.

(d) *Rentals and royalties.* (1) To pay annual rentals and royalties on production under this lease as provided in Attachment B which is made a part hereof.

(2) At the option of the Lessor to pay the respective royalties herein provided for in value or in amount of produc-

tion. If paid in value such royalties shall be due and payable monthly on the last day of the month next following the month in which produced. If paid in amount of production the respective royalty products shall be delivered in merchantable condition on the premises where produced without cost to Lessor, unless otherwise agreed to by the parties hereto, at such times and at such shipping point as may be designated by the Lessor, or in the case of crude oil, in such tanks provided by the Lessee as reasonably may be required by the Lessor, but in no event shall the Lessee be required to hold royalty oil or other royalty products in storage beyond the last day of the month next following the month in which produced. The Lessee shall not be responsible or held liable for the loss or destruction of royalty oil or other products in storage from causes over which the Lessee has no control.

(3) It is expressly agreed that the Secretary of the Interior may establish reasonable minimum values for purposes of computing royalty on any or all oil, gas, natural gasoline and other products obtained from gas; due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the Lessee, to posted prices and to other relevant matters and, whenever appropriate, after notice and opportunity to be heard.

(4) Royalties shall be subject to reduction on the entire leasehold or on any portion thereof segregated for

royalty purposes if the Secretary of the Interior finds that due diligence, or that such action . . . encourage the greatest ultimate recovery of oil or gas or promote conservation. . . .

—— (e) *Contracts for disposal of products.* To file with the Oil and Gas Supervisor of the Geological Survey not later than 30 days after the effective date thereof, any contract, or evidence of other arrangement, for the sale or disposal of oil, gas, natural gasoline, and other products of the leased land: *Provided, That* nothing in any such contract or other arrangement shall be construed as modifying any of the provisions of this lease, including, but not limited to provisions relating to gas waste, the Government's option to purchase gas, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation, and in accordance with the Oil and Gas Operating Regulations.

(f) *Statements, plats, and reports.* At such time and in such form as the Lessor may prescribe, to furnish detailed statements showing the amounts and quality of all products removed and sold from the lease, the proceeds therefrom, and the amounts used for production purposes or unavoidably lost; a plat showing development work and improvements on the leased lands and a report with respect to stockholders, investment, depreciation, and costs.

(g) *Well records.* To keep a daily drilling record, a log, and complete information on all well surveys and tests in form acceptable to or prescribed by the Lessor of all wells drilled on the leased lands, and an acceptable record of all subsurface investigations affecting said lands, and to furnish them, or copies thereof to the Lessor when required.

(h) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized officer of the Department, the leased premises and all wells, improvements, machinery, and fixtures thereon and all books, accounts, maps, and records relative to operations and surveys or investigations on the leased lands or under the lease.

(i) *Payments.* Unless otherwise directed by the Secretary of the Interior, to make rental, royalty, or other payments to the Lessor, to the order of the United States Geological Survey, such payments to be tendered as directed by the Oil and Gas Supervisor of the Geological Survey.

(j) *Diligence, prevention of waste, health and safety of workmen.* To exercise reasonable diligence in drilling and producing the wells herein provided for unless consent to suspend operations temporarily is granted by the Lessor; to carry on all operations in accordance with approved methods and practice as provided in the operating regulations, having due regard for the prevention of waste of oil or gas or damage to deposits or formations containing oil, gas, or water or to coal measures or other mineral deposits, for conservation of gas energy, for the preservation and conservation of the property for future productive operations, and for the health and safety of workmen and employees; to plug properly and effectively all wells before abandoning the same; to carry out at expense of the Lessee all reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's expense: *Provided, That* the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond Lessee's control.

(k) *Taxes and wages, freedom of purchase.* To pay when due, all taxes lawfully assessed and levied under the laws of the State or of the United States, upon improvements, oil or gas produced from the lands hereunder, or other rights, property, or assets of the Lessee, to accord all workmen and employees complete freedom of purchase, and to pay all wages due workmen and employees at least twice each month in the lawful money of the United States.

(l) *Equal Opportunity clauses.* During the performance of this contract, the Lessee agrees as follows:

(1) The Lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The Lessee will take affirmative action to ensure that applicants are employed, and employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the Lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

(3) The Lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the Lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Lessee will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however, That* in the event the Lessee

becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Lessee may request the United States to enter into such litigation to protect the interests of the United States.

(m) *Assignment of lease or interest therein.* To file with the Lessor within 90 days from the date of final execution any instrument of transfer made of this lease, or any interest therein, such instrument to take effect upon its final approval by the Bureau of Land Management, as of the first day of the month following the date of filing.

(n) *Pipe lines to purchase or convey at reasonable rates and without discrimination.* If owner, or operator, or owner of a controlling interest in any pipe line or of any company operating the same which may be operated accessible to the oil or gas derived from lands under this lease, to accept and convey and, if a purchaser of such products, to purchase at reasonable rates and without discrimination the oil or gas of the Government or of any citizen or company not the owner of any pipe line, operating a lease or purchasing or selling oil, gas, natural gasoline, or other products obtained under a lease or permit granted by the United States.

(o) *Reserved deposits.* To comply with all statutory requirements and regulations thereunder, if the lands embraced herein have been or shall hereafter be disposed of under the laws reserving to the United States the deposits of oil and gas therein, subject to such conditions as are or may hereafter be provided by the laws reserving such oil or gas.

(p) *Overriding royalties.* Not to create overriding royalties or payments out of production in excess of 5 percent on the leasehold or any part thereof or any zone segregated for the computation of royalties without approval by the Lessor.

(q) *Use and protection of property.* To comply with the stipulations governing the use and protection of the leased lands prescribed in Attachment C which is made a part hereof.

(r) *Damage to property.* To pay the Lessor or his tenant, as the case may be, for any and all damage to or destruction of property caused by Lessee's operations hereunder; to save and hold the Lessee harmless from all damage or claims for damage to persons or property resulting from the Lessee's operations under this lease.

(s) *Restoration of surface of land.* Upon any partial or total relinquishment, cancellation, or expiration of lease, Lessee shall, as to that part of the leased land as to which his rights have terminated, and to the extent deemed necessary by the Lessor fill all sump holes, ditches and other excavations, remove or cover all debris, and shall, so far as reasonably possible, restore the surface of the leased land to its former condition.

(t) *Local agent.* To appoint and maintain at all times during the term of this lease an agent upon whom may be served written orders or notices respecting matters contained in this section, and within 15 days after the date of this lease to inform the Oil and Gas Supervisor of the U. S. Geological Survey, in writing, the name and address of such agent. If a substitute agent is appointed, Lessee shall immediately so inform the said official.

(u) *Oil and gas operating regulations.* To comply with and operate in accordance with the provisions of the Oil and Gas Operating Regulations (30 CFR, Part 221), to the extent that

such regulations are not inconsistent with the specific terms hereof.

Sec. 3. The Lessor expressly reserves:

(a) *Easement and rights-of-way.* The right to permit for joint or several use easements or rights-of-way, including easements in tunnels upon, through, or in the lands leased, occupied, or used as may be necessary or appropriate to the working of the same, and the treatment and shipment of products thereof by or under authority of the Government, its Lessees or Permittees, and for other public purposes.

(b). *Disposition of surface.* The right to lease, sell, or otherwise dispose of the surface of any of the lands embraced within this lease which are owned by the United States under existing law or laws hereafter enacted, insofar as said surface is not necessary for the use of the Lessee in the extraction and removal of the oil and gas therein.

(c) *Monopoly and fair prices.* Full power and authority to promulgate and enforce all orders necessary to insure the sale of the production of the leased lands to the United States and to the public at reasonable prices, to protect the interests of the United States, to prevent monopoly, and to safeguard the public welfare.

(d). *Helium.* The ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary of the Interior. In case the Lessor elects to take the helium the Lessee shall deliver all gas containing same, or portion thereof desired, to the Lessor at any point on the leased premises in the manner required by the Lessor, for the extraction of the helium in such plant or reduction works for that purpose as the Lessor may provide, whereupon the residue shall be returned to the Lessee with no substantial delay in the delivery of gas produced from the well to the Purchaser thereof. The Lessee shall not suffer a diminution of value of the gas from which the helium has been extracted, or loss otherwise, for which he is not reasonably compensated, save for the value of the helium extracted. The Lessor further reserves the right to erect, maintain, and operate any and all reduction works and other equipment necessary for the extraction of helium on the premises leased.

Sec. 4. *Drilling and producing restrictions.* It is covenanted and agreed that the rate of prospecting and developing and the quantity and rate of production from the lands covered by this lease shall be subject to control in the public interest by the Secretary of the Interior, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, and regulations issued thereunder, or lawful agreement among operators regulating either drilling or production, or both. After unitization, the Secretary of the Interior, or any person, committee or State or Federal officer or agency so authorized in the unit plan, may alter or modify from time to time, the rate of prospecting and development and the quantity and rate of production from the lands covered by this lease.

Sec. 5. *Surrender and termination of lease.* The Lessee may surrender this lease, as to all or part of the leased land, by filing in the proper land office a written relinquishment, in triplicate, which shall be effective as of the date of filing subject to the continued obligation of the Lessee and its surety to make payment of all accrued rentals and royalties and to place all wells on the land to be relinquished in condition for suspension or abandonment in accordance with the applicable operating regulations and lease terms.

**Sec. 6.** *Purchase of mate etc., on termination of lease.* Upon the expiration of th.. lease, or the earlier termination thereof pursuant to the last preceding section, the **Lessee** shall have the privilege at any time within a period of **90 days** thereafter of removing from the premises all machinery, **equipment**, tools, and materials other than improvements needed for producing wells. Any materials, tools, appliances, machinery, structures, and equipment subject to removal as above provided, which are allowed to remain on the leased lands shall become the property of the Lessor on expiration of the 90-day period of such extension thereof as may be granted because of adverse climatic conditions throughout said period: *Provided, That* the Lessee shall remove any or all of such property where so directed by the Lessor.

**Sec. 7.** *Proceedings in case of default.* If the Lessee fails to comply with any of the provisions of the lease or defaults in the performance or observance of any of the terms hereof and such noncompliance or default shall continue for a period of 30 days after service of written notice thereof by the Lessor, this lease may be canceled by the Secretary of the Interior, but this provision shall not be construed to prevent the exercise by the Lessor of any legal or equitable remedy which the Lessor might otherwise have. Upon cancellation of this lease, any casing, material or equipment determined by the Lessor to be necessary for use in plugging or preserving any well drilled on the leased land shall become the property of the Lessor. A waiver of any particular cause of forfeiture shall not prevent the cancellation and forfeiture of this lease for any other cause of forfeiture, or for the same cause occurring at any other time.

**Sec. 8.** *rence of Government to purchase gas.* Any executive department of the Government shall have the option to purchase at the market price on the date of sale up to 50 percent, or such greater percentage as may be agreed upon, of the gas produced and saved from the leased premises after 6 months advance notice to the Lessee by the Secretary of the Interior; *Provided,* such gas is not being utilized for repressuring or secondary recovery purposes for the benefit of this lease.

**Sec. 9.** *Heirs and successors in interest.* It is further covenanted and agreed that each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

**Sec. 10.** *Unlawful interests.* It is also further agreed that no Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, shall hold any share or part in this lease or derive any benefit that may arise therefrom; and that the provisions of Section 3741 of the Revised Statutes of the United States, and sections 431, 432, and 433, Title 18, United States Code, relating to contracts, shall enter into and form a part of this lease as the same may be applicable.

**Sec. 1(a).** Pursuant to Lessor's reservation of easements and rights of way under Sec. 3a of oil and gas lease Los Angeles 0138000, the Lessee is hereby granted subsurface easements and rights of way through such leasehold as may be necessary for the orderly development of "Parcel A" hereof, subject to any conditions deemed necessary by, and subject to the approval of, the Regional Oil and Gas Supervisor of the Geological Survey having supervision over the operations hereunder.

INITIAL

IN WITNESS WHEREOF:

Witnesses:

_R. W. Bruce_
R. W. Bruce

_J. W. Kunau_
J. W. Kunau

THE UNITED STATES OF AMERICA

By _Charles L. Schaefer_
(Authorized Officer)
Chief, Branch of Lands & Minerals Adjudicatio

January 16, 1969
(Date)

Lessee:

OCCIDENTAL PETROLEUM CORPORATION

By: _E. F. Reid_
E. F. REID, Executive Vice President

By: _Leo T. Adams_
LE'O T. ADAMS, Assistant Secretary

Oil and Gas Lease R 1956

## ATTACHMENT A

(1) Rentals and Royalties

(c) <u>Wells</u>    while shall pay the lessor, in advance, an annual rental

1. Lessee shall commence drilling operations within 90 days from
   the effective date hereof. Lessee shall complete said well
   on the leased lands to production or abandonment at a depth
   sufficient to test the formation found productive in wells
   on lands adjacent to the leased lands. Such operations
   may be conducted on the leased lands at a surface location
   on the area described in Attachment C-1, and shown on
   Exhibit A or from a surface location on lands other than
   the leased lands.

2. Lessee shall drill and produce such other wells as are
   necessary to protect the leased lands from drainage, or in
   lieu of any part of such drilling and production, with the
   consent of the Regional Oil and Gas Supervisor of the
   Geological Survey, compensate the lessor in full each month
   for the estimated loss of royalty through drainage in the
   amount determined by said Supervisor.

3. Lessee may elect to drill and produce other wells in
   conformity with any system of well spacing or production
   allotments affecting the field or area in which the leased
   lands are situated, which is authorized and sanctioned by
   applicable law or by the Secretary of the Interior.

4. Promptly after due notice in writing, lessee shall drill
   and produce such other wells as the lessor may reasonably
   require in order that the leased premises may be properly
   and timely developed and produced in accordance with good
   operating practice.

INITIAL

**OII and Gas Lease R 1956**

## ATTACHMENT B

**(d)** Rentals and Royalties

**1.** Lessee shall pay the lessor, in advance, an annual rental
of two dollars per acre or fraction thereof for each lease
year which commences prior to a discovery of oil or gas in
paying quantities on the leased lands.

**2.** Lessee shall pay the lessor a royalty of 16-2/3 percent
of the amount or value of production obtained and saved
from the leased lands.

**3.** Lessee shall pay the lessor, in lieu of rental, at the
expiration of each lease year beginning after a discovery
of oil or gas on the leased lands, a minimum royalty of
one dollar per acre or fraction thereof, or if there is
production, the amount, if any, that such minimum royalty
exceeds royalties on production.

**4.** Prior to a discovery of oil or gas on the leased lands,
the lessee shall make rental payments due the lessor to
the order of the Bureau of Land Management at the Land
Office having jurisdiction over the area in which the leased
lands are located.

**5.** After discovery of oil or gas on the leased lands, the
lessee shall make royalty and minimum royalty payments due
the lessor to the order of the Geological Survey at the
office of the Regional Oil and Gas Supervisor having super-
vision over the operations hereunder.

INITIAL

0 3 0 2 0 4 0 8 0

11. After drilling is completed, the area **Oil and Gas Lease R 1956**
facilities shall be landscaped with trees, shrubbery, and such as
to screen the facility from public view and blend with the
surrounding area, and **ATTACHMENT C**      if buildings are
constructed adjacent to the structure, the wellsite shall             have
have as practical design consistent compatible with the adjacent

(q)  Use and Protection of Property

12.  **1.** The portion of the surface of the leased lands available for
drilling and production facilities shall be limited to the
area designated in Attachment C-1, and shown on Exhibit "A".

13.  **2.** Drilling equipment shall be operated by muffled internal
combustion engines or electric motors.

**3.** During production periods pumping operations shall be
conducted by adequately muffled internal combustion engines
or electric motors.

**4.** When pumping is conducted by bottom hole hydraulic pumps,
these may be powered by muffled internal combustion engines,
provided these are completely enclosed within buildings
insulated with sound-deadening materials.

**5.** The derrick shall be soundproofed with standard materials
used at the present time and which are acceptable to the
City Fire Chief; drilling operations shall be conducted so
as to prevent objectionable noise. Derrick and drilling
equipment shall be removed from the wellsite within sixty
days after completion of drilling operations.

**6.** Application shall be made for an Industrial Waste Disposal
Permit, and all regulations and requirements of the Air
Pollution Control District shall be complied with.

**7.** Illumination from excess gas-burning standpipes shall be
shielded from adjacent properties on which residences are
located, or on which Veterans Administration Hospital
buildings or other installations are located.

**8.** The producing wellsite and necessary field storage and
production facilities shall be fenced so as to prevent
access thereto by unauthorized persons, such fence to be
chain link and wood lath fence eight feet in height.

**9.** Storage and tank facilities shall not exceed the capacity
reasonably necessary for producing operations.

**10.** All sumps shall be fenced so as to prevent access thereto
by unauthorized persons, such fence to be chain link or
other Industrial type fence and not less than six feet in
height.

Page 1 of 2

Items 11 through 13
continued on page 2.

11. After drilling is completed, the producing wellsite and storage
    facilities shall be landscaped with trees, shrubbery, and plants
    to screen the facilities from public view and blend with the
    surrounding area, and shall be maintained. If buildings are
    constructed adjacent to the wellsite, the wellsite shall always
    have an aesthetic design reasonably compatible with the adjacent
    improvements or changes.

12. Permanent structures and equipment shall be painted in neutral
    colors so as to blend with the natural surroundings.

13. The yard area shall be maintained in a neat and orderly condition,
    and so far as practicable all operations conducted on said site and
    service roads shall be carried on with a minimum of objectionable
    noise and dust.

14. All pipes laid outside the drilling site in connection with drilling
    or production operations shall be covered to a depth of not less than
    one foot. The location of these pipe lines must be approved by the
    Director of the Veterans Administration Center.

15. Existing water lines and fire hydrants on the drilling and production
    area must be relocated at the sole cost of the Lessee as directed by
    the Director of the Veterans Administration Center.

16. All private roads used for ingress and egress to and from the drill
    site shall be surfaced and maintained during drilling and production
    operations.

17. Signs shall not be constructed, erected, maintained, or placed on the
    premises or any part thereof except those required by law or ordinance
    to be displayed in connection with the drilling or maintenance of the
    well and those required for public safety.

18. Whenever the operations of the Lessee hereunder are conducted in a
    manner which in the judgment of the Administrator of Veterans Affairs,
    or his designate, is inimical to the safety and welfare of the patients
    of the Veterans Administration Center, the Lessee, upon notice thereof,
    shall cease and desist such operations immediately. Such operations
    shall continue suspended until corrective measures satisfactory to the
    Administrator, or his designate, have been adopted by the Lessee,
    and in addition, the Lessee, within 60 days from the date of cessation
    of such operations, shall begin in good faith and with reasonable
    diligence to take corrective measures acceptable to the Administrator,
    or his designate, to remedy such operations.

INITIAL

Oil  d Gas Lease R 1956

## ATTACHMENT C-1

### Approximate Description of Drill Site

**Starting** at the abutment at the southwest corner of the San Diego
Freeway and Constitution Avenue 59.75 feet South 54°25' West to a
fence separating the Veterans Administration properties from the
Freeway right-of-way, thence 38.2 feet South 54°25' West, thence
15 feet at a right angle, being North 35°35' West, to the point of
beginning.  From the point of beginning 237.3 feet North 29°49' West,
thence 161.9 feet South 54°25' West, thence 235.1 feet South 35°35'
East, thence 131 feet North 54°25' East, to the point of beginning:
approximately 0.8 acres.  (See Exhibit A)

INITIAL



SAN DIEGO

FREEWAY

ABUTMENT

TOE OF BANK

FENCE & WALK

52.75'

36.2'

T-63

84° 18'

O F.H.

N 89°49'W
237.3'

95°46'

40'

161.9'
S 54°25'W

131'
N 54°25'E

CONSTITUTION AVE.

90°

O F.H.
S 35°35'E    235.1'

90°

OILED SURFACE

▭ ⊏ DESIGNATED DRILL SITE

SAWTELLE FIELD

SCALE 1" = 40'

EXHIBIT A

0 3 0 4 0 6 4

Oil and Gas Lease R 1956

EXHIBIT B

## Parcel A:

Beginning at the southeasterly corner of lot 1, block 23, said corner being at the intersection of the northeasterly line of said lot 1 and the northwesterly line of Wilshire Boulevard (formerly Sunset Boulevard); thence south seventy-two degrees nineteen minutes thirty seconds west a distance of six hundred and sixty-two and eighty-nine one-hundredths feet along said northwesterly line of Wilshire Boulevard to an intersection with the northeasterly line of Veteran Avenue (formerly Lookout Avenue); Thence north thirty-three degrees eight minutes twenty-five seconds west a distance of seven hundred and thirty-three and eighty-five one-hundredths feet along said northeasterly line of Veteran Avenue to the south-westerly corner of that portion of said lot 2 deeded to the City of Los Angeles for fire station purposes November 15, 1945, in accordance with Public Law 37, Seventy-ninth Congress, approved April 23, 1945; thence north fifty-six degrees fifty-one minutes thirty-five seconds east a distance of one hundred and fifty feet to the southeasterly corner of said portion of said lot 2; thence north thirty-three degrees eight minutes twenty-five seconds west a distance of one hundred feet to the northeasterly corner of said portion of said lot 2; thence south fifty-six degrees fifty-one minutes thirty-five seconds west a distance of one hundred and fifty feet to the northeasterly line of said Veteran Avenue; thence north thirty-three degrees eight minutes twenty-five seconds west a distance of four hundred and fifty-four and thirty-three one-hundredths feet along said northeasterly line to an intersection with the northwesterly line of said lot 2; thence north thirty-seven degrees fifty-seven minutes fifty-four seconds west a distance of one thousand two hundred and sixty-one and forty eight one-hundredths feet along the northeasterly line of Veteran Avenue to a point; thence north seventy-two degrees fourteen minutes twenty-one seconds east a distance of one and sixty-nine one-hundredths feet to a point, said point being the southwesterly corner of lot 3, block 10, tract 9617, on file in Map Book 134, Pages 78 to 82, inclusive, of the records of the City of Los Angeles; thence north seventy-two degrees nineteen minutes forty-one seconds east a distance of six hundred and fifty-seven and thirty-six one-hundredths feet to the southeasterly corner of lot 11 of said block 10; thence south thirty-five degrees thirty-six minutes twenty-seven seconds east a distance of two thousand five hundred and forty-eight and fifty-four one-hundredths feet along the northeasterly line of lots 4, 3, 2 and 1 of said block 23, to the point of beginning.

Containing approximately 34.83 acres.

INITIAL

030240315
0 3 0 4 0 8 5

**Parcel B:**

Beginning at the most southerly corner of Tract No. 7181 as shown on the map recorded in book 120 page 79 of Maps, in the office of the county recorder of said county; thence along the southwesterly line of said Tract No. 7181 and its northwesterly prolongation North 35°32'45" West 1466.42 feet to the true point of beginning for this description in the boundary line of the land annexed to the City of Los Angeles in the Westgate Annexation on June 14, 1916, as described in Ordinance No. 34184; thence along said boundary line southerly 205.9 feet, more or less, to Station 12 as shown on the map attached to the deed to National Home for Disabled Volunteer Soldiers, recorded on June 5, 1900, as Instrument No. 20 in book 1368 page 167 of Deeds, records of said county; thence still along said boundary line southeasterly 1223.7 feet, more or less, to Station 13 and 1004.44 feet, more or less, to Station 14 as shown on the map attached to said deed; thence still along said boundary line northeasterly 1386 feet, more or less, to the southwest line of block 22 of the Subdivision of Rancho de San Jose de Buenos Ayres recorded in book 26 pages 19 et seq., of Miscellaneous Records, in the office of said county recorder; thence along said southwest line North 35°30'00" West 978.65 feet, more or less; thence south 54°30'25" West a distance of 1221.50 feet, more or less; thence North 35°32'45" West a distance of 1466.42 feet, more or less, to point of beginning.

Containing approximately 35.70 acres.

0 3 0 2 4 ° 2

UNITED STATES
DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT
District & Land Office
1414 University Ave., Box 723
Riverside, California 92502

IN REPLY REFER TO:

R 1956
3210-C (ADJ)

16-070-221

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

JAN 16 1969

D E C I S I O N

Occidental Petroleum Corporation :
5000 Stockdale Highway                :
Bakersfield, California 93309         :

Oil and Gas

Lease Issued

Pursuant to office decision of December 31, 1968, Occidental Petroleum
Corporation has executed the three copies of the lease form for Pro-
tective Oil And Gas Lease R 1956, furnished a bond in the sum of
$10,000, filed an Equal Opportunity Compliance Report Certification on
Form 1140-1, has remitted the sum of $203,396.14 covering the balance
of the bonus bid, publication costs and the first year's lease rental,
furnished the statements of the other interested parties required under
43 CFR 3123.2(c)(3), and has requested that lease R 1956 be dated
effective January 1, 1969.

Under the circumstance cited above, it appears that Occidental Petroleum
Corporation, the high bidder for lease R 1956, has complied with the
terms of the notice for the sale of the lease.

Accordingly, Protective Oil And Gas Lease R 1956 is hereby issued
effective January 1, 1969. Occidental Petroleum Corporation's counter-
part of the lease is enclosed with its copy of this decision.

Charles L. Schaefer
Charles L. Schaefer
Chief, Branch of Lands and
Minerals Adjudication

Enclosure

RECEIVED
JAN 17 1969

Form 1140–1
(November 1966)
(formerly 1510–12)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

EQUAL OPPORTUNITY
COMPLIANCE REPORT CERTIFICATION

Bid or invitation number or other identification:

R-1956

In accordance with 41 CFR 60–1.6(b) and Executive Order No. 11246 of September 24, 1965, the following certification will be completed by prospective contractors and subcontractors.

1. Have you participated in any contractual agreement which contained the Equal Opportunity Clause? ☐ Yes  ☒ No  *(If "yes," answer question 2)*

2. Were you required pursuant to the regulations on Equal Opportunity (41 CFR 60–1) to file a compliance report * as a result of such contractual agreements?  ☐ Yes  ☐ No  *(If "yes," answer question 3)*

3. Did you file the compliance report as required?  ☐ Yes  ☐ No

In the event any work under this proposed contractual agreement is subcontracted, I will secure this same certification *(paragraphs 1 through 3 hereof)* from proposed subcontractors prior to award of any subcontract.

Exploration and Production Division of Occidental Petroleum Corporation has not participated in a contractual agreement containing the EEO clause. However, on November 19, 1968 this Division was reviewed by a representative of the Office of Contracts Compliance, Department of Defense to determine compliance status. The findings of this Agency were that the Division complied with the Equal Employment Opportunity Program.

OCCIDENTAL PETROLEUM CORPORATION
(Name of Bidder)

_____, E. F. REID
(Signature of Authorized Officer)

Executive Vice President
(Title)

January 9, 1969
(Date)

* Any person or entity subject to Executive Order 11246 who (a) has 50 or more employees; (b) is a prime contractor or first-tier subcontractor; and (c) whose contract, subcontract, or purchase order amounts to $50,000 or more ($100,000 or more if solely for standard commercial supplies and raw materials) must report on Standard Form 100. Construction contractors meeting requirements of $50,000 and employees performing construction work at the construction site are also required to report on Standard Form 100.

Form 1140-1
(November 1966)
(formerly 1510-12)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

EQUAL OPPORTUNITY
COMPLIANCE REPORT CERTIFICATION

Bid or invitation number or other
identification:

R-1956

In accordance with 41 CFR 60-1.6(b) and Executive Order No. 11246 of September 24, 1965, the following
certification will be completed by prospective contractors and subcontractors.

1. Have you participated in any contractual agreement which contained the Equal Opportunity Clause?
   ☒ Yes  ☐ No  *(If "yes," answer question 2)*

2. Were you required pursuant to the regulations on Equal Opportunity (41 CFR 60-1) to file a compliance
   report* as a result of such contractual agreements?  ☒ Yes  ☐ No  *(If "yes," answer question 3)*

3. Did you file the compliance report as required?  ☒ Yes  ☐ No

In the event any work under this proposed contractual agreement is subcontracted, I will secure this same
certification *(paragraphs 1 through 3 hereof)* from proposed subcontractors prior to award of any subcontract.

LOFFLAND BROS. CO.
~~(Subcontractor)~~
(Drilling Contractor)

*T. S. Cameron*
(Signature of Authorized Officer)

*DIVISION SALES MANAGER*
(Title)

*1-8-69*
(Date)

* Any person or entity subject to Executive Order 11246 who (a) has 50 or more employees; (b) is a prime contractor or
first-tier subcontractor; and (c) whose contract, subcontract, or purchase order amounts to $50,000 or more ($100,000
or more if solely for standard commercial supplies and raw materials) must report on Standard Form 100. Construction
contractors meeting requirements of $50,000 and employees performing construction work at the construction site are
also required to report on Standard Form 100.

GPO 831-614

# EXHIBIT D

OPC-500 R (4/78)

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

Name
Street
Address
City
State
Zip

————— SPACE ABOVE THIS LINE FOR RECORDER'S USE —————

# SUBSURFACE OIL AND GAS LEASE

THIS LEASE, made this 1st day of September , 19 84 , by and between the parties whose names are subscribed hereto as Lessor on the signature page attached hereto, hereinafter called "Lessor" (whether one or more), and OXY PETROLEUM, INC., a Corporation, hereinafter called "Lessee".

## WITNESSETH

1. The Lands covered by this lease are all that portion lying below five hundred feet (500') from the surface of the land described on the Lessor's Signature Page attached hereto and is hereinafter referred to as the "leased land." Notwithstanding any provision to the contrary contained herein, this lease and all rights granted to Lessee hereunder are expressly limited to those depths lying below five hundred feet (500') from the surface of the land described on the Lessor's Signature Page, and Lessee shall not have the right to enter upon or use the surface of such land lying above said depth.

2. Lessor, for and in consideration of the sum of One Dollar ($1.00) and of other valuable consideration in hand paid, the receipt and adequacy of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of Lessee to be kept and performed, does hereby let, demise and lease unto Lessee, its successors and assigns the leased land now owned or hereafter acquired by Lessor, by operations of law or otherwise, with the exclusive and sole right to prospect, explore, mine, drill and operate the leased land for oil, gas and other hydrocarbon substances, hereinafter referred to as "said substances," and to produce, take, treat, store, remove and to dispose of said substances from the leased land, and the right to inject into the leased land, gas, water or other fluids for purposes of pressure maintenance or secondary recovery of oil, gas and other hydrocarbon substances from the leased land and the right to conduct secondary recovery operations, together with all other rights necessary or convenient for any and all of said purposes including, but not limited to subsurface rights of way for drilling, repairing, redrilling, deepening, maintaining, operating, abandoning, reworking and removing wells, into and through said leased lands, and such other necessary subsurface easements in and through the leased lands.

3. This lease, except as otherwise herein provided, shall remain in force for a term of twenty (20) years from the date hereof (hereinafter referred to as the "Primary Term"), and for so long thereafter (but not to exceed ninety-nine [99] years from the date hereof) as oil, gas or other hydrocarbon substances shall be produced from the leased land, or land with which the leased land may be pooled, in quantities deemed paying by Lessee, or as Lessee shall conduct drilling operations (including, but not limited to, drilling, deepening, plugging back, redrilling, repairing, cleaning out and similar operations) on the leased land or land with which the leased land may be pooled, or shall be excused therefrom as hereinafter set forth; provided, however, that so long as Lessee shall continue to drill wells within the intervals permitted in Paragraph 9 hereof, Lessee shall be deemed to be conducting drilling operations within the meaning of this provision.

one-fifth (1/5)

4. The expression "royalty share" as used hereinafter shall mean the fraction ~~one-sixth (1/6)~~ and all royalties shall be payable on a quarterly basis not later than the last day of January, April, July and October of each calendar year for the preceding calendar quarters ending December 31, March 31, June 30 and September 30, respectively.

5. Lessee shall pay to Lessor as royalty on oil the royalty share of all oil produced, saved and removed from the leased land. Lessee may purchase Lessor's royalty oil at the public posted market price currently offered and paid in the field in which the leased land is located for oil of like gravity and quality the day the oil is removed from gauging tanks. In the event there is no such public posted market price, Lessee may purchase Lessor's royalty oil at the same price the company or companies purchasing the majority of the oil in the field in which the leased land is located shall be paying for crude oil of like gravity and quality. In the event Lessee shall treat the oil produced for the purpose of making the same marketable, Lessor shall bear his royalty share, of the cost of treating such oil and for disposing of water or other waste materials by Lessee, which Lessee may deduct from any payments due Lessor. In determining the gravity, quality and quantity of oil purchased, the methods and practices including metering which are usual and customary among major oil purchasing companies shall be followed. The customary temperature corrections and deductions for injected oil, water and other substances shall be made.

6. In case of sale by Lessee of gas produced from said leased land in the natural state as produced, Lessee shall pay Lessor in cash the royalty share of the net proceeds of such sale received by Lessee. In case gas produced from said leased land is utilized by Lessee (in excess of the amount herein allowed to be used by Lessee free of royalty) in the natural state as produced, Lessee shall pay Lessor in cash the royalty share of the market value of the gas so utilized. In case Lessee delivers such gas to a third party for treatment, Lessee shall pay Lessor in cash (a) the royalty share of the market value of the net natural gasoline and/or net other liquefied petroleum gases redelivered to Lessee and utilized by Lessee (in excess of the amount herein allowed to be used by Lessee free of royalty) and (b) the royalty share of any net proceeds received by Lessee from the sale of natural gasoline and/or other liquefied petroleum gases redelivered to Lessee after deducting the royalty share of the cost of delivery for sale and (c) the royalty share of any net proceeds received by Lessee from the sale of residual dry gas redelivered to Lessee and (d) the royalty share of the market value of residual dry gas redelivered to Lessee and utilized by Lessee (in excess of the amount herein allowed to be used by Lessee free of royalty). In case Lessee shall extract in its own plant or facility on said leased land or elsewhere natural gasoline and/or other liquefied petroleum gases from the gas produced from said leased land, Lessee shall pay Lessor in cash as royalty (a) the royalty share of 40% of the market value of the

6— 0412999

File 0412999

—1—

84-071-0275

net natural gasoline and/or net other liquefied petroleum gases so extracted and utilized by Lessee (in excess of the amount herein allowed to be used by Lessee free of royalty) and (b) the royalty share of 40% of any net proceeds received by Lessee from the sale of the net natural gasoline and/or other net liquefied petroleum gases so extracted and sold by Lessee after deducting the royalty share of the cost of delivery for sale and (c) the royalty share of 60% of any net proceeds received by Lessee from the sale of residual dry gas and (d) the royalty snare of 60% of the market value of residual dry gas utilized by Lessee (in excess of the amount herein allowed to be used by Lessee free of royalty). The market value of natural gasoline or other liquefied petroleum gases for the purposes hereof shall be the price as posted and generally paid by major processors for products of like specifications and quality effective in the same district on the date of extraction by Lessee or of redelivery to Lessee. The market value of gas in its natural state and residual dry gas for the purposes hereof shall be the price generally paid to Lessee by the major purchaser for gas of like specifications and quality effective in the same district on the date of delivery or redelivery to Lessee. Lessee shall have the right to deduct from Lessor's royalty on any gas produced hereunder the royalty share of the cost, if any, of compression for delivery, transportation and/or delivery thereof. Lessee shall have the right to commingle gas produced from said leased land with other gas and thereupon the royalty shall be computed upon an appropriate fraction of the commingled gas. Nothing in this agreement contained shall require Lessee to save, market or utilize gas from said leased land unless there be a surplus above lease requirements and a market at the well for same, nor shall Lessee be required to extract or cause to be extracted any products therefrom.

7. Lessee shall not be required to account to Lessor for or pay royalty on oil, gas, natural gasoline, other liquefied petroleum gases, hydrocarbons, associated substances or water used by Lessee in its operations hereunder (including, without limiting the generality hereof), for fuel and/or lifting and/or injection purposes anywhere in said leased land, and gas or other substances used as fuel or lost or consumed in the gathering, compressing for processing and processing thereof and Lessee may use such oil, gas and other substances free of charge and same shall not be deemed to be "utilized" within the meaning hereof. In no event shall Lessee be responsible to Lessor for its failure or inability to save any of said substances, or for shrinkage or loss thereof, and royalty shall not be payable in respect to any of such substances lost through evaporation, leakage, fire or otherwise. In the event Lessee in its operations hereunder shall substitute other fuel or power for fuel obtained from said leased land, Lessee shall be entitled to deduct from the amount of the increased royalty accruing thereby to Lessor the royalty share of the cost of such other fuel or power, provided that no deduction hereunder shall in any event exceed the amount of such increased royalty.

8. Lessee agrees to commence drilling operations on the leased lands or lands pooled therewith within said primary term and to prosecute such drilling operations with reasonable diligence until oil or gas is found in paying quantities, or to a depth at which further drilling operations would, in the judgment of Lessee, be unprofitable or impractical, or it may at any time within said primary term terminate this lease and surrender said lands; provided that, commencing five (5) years from the date hereof, if Lessee has not theretofore terminated this lease or commenced drilling operations, Lessee shall pay or tender yearly in advance, as rental to Lessor, a sum equal to the rental specified on the Lessors signature page until operations have been commenced on leased lands or lands pooled therewith. Should Lessee elect to commence drilling operations on leased lands or lands pooled therewith, and if oil, gas or other hydrocarbons shall not be obtained in paying quantities in such well, and such well is abandoned, Lessee shall: Commence drilling operations on said leased lands or lands pooled therewith for another well within six (6) months after the completion as a dry hole or the abandonment of the last preceding well and prosecute such drilling operations with reasonable diligence until oil, gas or other hydrocarbons shall have been found in paying quantities by Lessee, or until further drilling would, in the judgment of Lessee, be unprofitable or impracticable; or terminate this lease; or Lessee may defer the commencement of further drilling operations (except offset wells) during any period for which rentals have theretofore been paid or until six (6) months after the abandonment of the last preceding well, whichever is later, and so long thereafter as Lessee continues the payment of rentals annually on a pro rata basis and in the manner and at the rate above provided, but in no event shall the commencement of drilling operations be deferred beyond the expiration of the primary term by the payment of such rentals. The consideration expressed in Paragraph 2 above covers all rental for the first five (5) years of the primary term hereof.

9. Within six (6) months after the completion and testing of a well producing oil in quantities deemed paying by Lessee, Lessee shall commence drilling operations for another well for oil or gas, and thereafter continuously operate one string of tools, allowing six (6) months (subject to extension as provided in this lease) between the completion or abandonment of one well and the commencement of drilling operations for the next succeeding well until one well has been drilled for each forty (40) acres, or major fraction thereof, of the leased land or land with which the leased land may be pooled; provided, however, that if and when drilling on the leased land or lands with which the leased land may be pooled shall indicate that oil cannot be produced therefrom in quantities deemed paying by Lessee but that gas can be produced in quantities deemed paying by Lessee, the obligation of Lessee hereunder shall be to drill only one (1) well for each one hundred sixty (160) acres, or major fraction thereof; the number of wells to be an average of one (1) to forty (40) acres for oil wells and one (1) to one hundred sixty (160) acres for gas wells, regardless of where drilled. Lessee shall be given credit for so much of the time in each such six (6) months drilling interval as is not utilized because of drilling by Lessee sooner than required and such credit may be used to extend subsequent drilling intervals in such manner as Lessee may determine. Lessee may drill as many additional wells as it may elect in excess of the number hereinabove specified. Lessee shall not be obligated to use more than one (1) string of tools for drilling on the leased land or lands with which the leased land may be pooled.

10. Definition of "paying quantities" as used in this lease shall mean production that in Lessee's opinion assures to Lessee a reasonable profit over and above the cost of drilling and producing such well including royalties, taxes and other charges in respect thereto.

11. In the event a well is drilled and completed upon adjacent property in which Lessor has no interest and the producing interval of such well is located within 330 feet of the exterior boundaries of the leased land and oil or gas in paying quantities is produced therefrom, Lessee agrees providing it is not then drilling or has not theretofore drilled in the leased land an offset thereto, within six (6) months after production of oil or gas in paying quantities from said well, if said well is then still producing oil or gas in paying quantities, either to offset such well by the formation of an operating unit under Paragraph 29 hereof and the commencement of drilling operations hereunder, or to surrender and terminate this lease under the provisions of Paragraph 17 hereof as to a portion of the leasehold, no dimension of which portion shall be less than 330 feet.

12. Lessee may commingle oil produced from any operating unit or units created under the provisions of Paragraph 29 hereof with oil produced from any other operating unit which is producing from the same pool or structure and located in the vicinity thereof. For the purpose of accounting hereunder, the quantity of oil produced and saved from each operating unit shall be determined on the basis of gauges or meter readings and adjusted to conform to the shipping tank measurements

of the commingled oil. Lessee shall take samples and make tests of the oil produced and saved from each operating unit or units prior to commingling and such samples and tests shall be the basis of determining the gravity and water, sand and other foreign substance of such oil.

13. After completion of the first well herein required, there shall be no obligation upon the part of Lessee to drill in or produce from and operate the leased land, except as to offset wells when wells offset are being operated, so long as the market price in the field for oil of the quality and gravity produced on said property shall be One Dollar and Fifty Cents ($1.50) or less per barrel at the well. Lessee may at any time and from time to time suspend the production of gas from the leased land, but for any period during which such production is entirely suspended, oil not having been discovered in quantities deemed paying by Lessee in the leased land, Lessee shall pay to Lessor quarterly in advance, commencing on the first day of the month following such suspension, as advanced royalty, the sum of Twenty-five Cents (25¢) per acre on the leased land then covered by this lease and Lessee shall have the right to reimburse itself for any such payment out of one-half (½) of any royalties which shall thereafter become payable hereunder. Such production may not be suspended, however, when there is a market for the gas in the field at a price which will pay Lessee to drill for and produce the same with a reasonable profit.

14. Lessee agrees to perform all operations in a careful, workmanlike manner and in accordance with the laws of the State of California. Lessee further agrees that any and all structures erected in connection with its drilling operations shall be designed to be noise-proof and fire-proof, and that the latest techniques and refinements in equipment and material shall be used. All drill-sites from which drilling operations are conducted will be fenced and screened. Lessee will remove the derrick used in connection with drilling operations at the cessation of such operations and all permanent production facilities will be buried in cellars or screened from view. Lessee shall keep full records covering the production and sale of gas, oil and natural gasoline from the leased land, and such records shall be open at all reasonable times to the inspection of Lessor or Lessor's duly authorized representative.

15. Lessee agrees, subject to the other provisions of this lease, to operate each completed oil or gas well with reasonable diligence and in accordance with good oil field practice so long as such well shall produce oil or gas in quantities deemed paying by Lessee; provided, however, that Lessee shall not be obligated to remove any oil, gas or other hydrocarbon substances produced from the leased land by any means other than a subsurface line. Lessee will not use trucking facilities to remove oil, gas or other hydrocarbon substances except during the drilling and testing periods of each well.

16. All the labor to be performed and materials to be furnished in the operations hereunder shall be at the sole cost and expense of Lessee, and Lessor shall not be chargeable with, nor liable for, any part thereof, and Lessee shall keep said land duly and fully protected against all liens of every character arising from or connected with its operations. Lessor hereby grants unto Lessee full power and authority to do and perform all and every act and thing necessary or appropriate to be done to protect said leased land against all liens of every character arising from or connected with its operations, including the right to post a Notice of Non-Responsibility on behalf of Lessor.

17. In consideration of the payment made by Lessee to Lessor for the execution of this lease, it is agreed that Lessee may at any time, or from time to time, either before or after discovery of oil in the leased land, quitclaim this lease, either in its entirety or in part, and thereupon Lessee shall be released from all further obligations as to the part or parts so quitclaimed, and all rentals and drilling obligations as set forth in this lease shall be reduced pro rata according to the amount of acreage so quitclaimed by Lessee; it being particularly understood, however, that all leased lands so quitclaimed shall remain subject to— and Lessee shall have the right to use and enjoy—such subsurface rights of way and easements through the quitclaimed portion of the leased land as may be necessary or convenient, in whole or in part, for Lessee's operations in the leased land retained under this lease or other lands whether or not pooled with the leased land; provided, however, that any well drilled through any such quitclaimed portion of the leased land shall have no part of its producing interval in such quitclaimed portion.

18. Lessee shall pay all taxes levied on its improvements and personal property. Lessor shall pay all taxes and assessments on the leased land, exclusive of Lessee's mineral rights therein, and on all other improvements and personal property thereon. All increase in the taxes and assessments on the leased land or if Lessee shall have quitclaimed a portion thereof, on such part thereof as is retained by Lessee under this lease, caused by or resulting from the discovery or production of the oil, gas or other hydrocarbon substances thereon and therefrom, whether assessed upon the leased land as a whole or as mineral rights or otherwise, and all charges and taxes of whatsoever kind are collected by reason of the production, sale or removal of oil, gas or other hydrocarbon substances from the leased land shall be borne by the parties hereto in the proportion of the royalty share by Lessor and the remainder by Lessee. If Lessor shall fail to pay any taxes, assessments or charges required to be paid by Lessor, Lessee may at its option pay the same and in such event Lessee may reimburse itself for such taxes, assessments or charges so paid by it from any royalties or rentals accruing hereunder.

19. On the expiration of this lease, or its sooner termination, Lessee shall quietly and peaceably surrender possession of the leased lands to Lessor, and shall cause a good and sufficient quitclaim deed to be placed of record in said County.

20. In case of default in performance by Lessee of any of its obligations under this lease, and the failure to commence to remedy the same within ninety (90) days after receipt of written notice so to do signed by parties owning a majority of Lessor's interest or in the event the leased land is pooled with other lands as provided in paragraph 29 hereof by parties owning a majority of the landowners' interest in all the lands so pooled, specifying the particulars in which it is claimed Lessee is in default and thereupon to continue such remedying with reasonable diligence to completion, then at the option of Lessor all rights of Lessee under this lease shall forthwith cease and terminate except that Lessee shall have the right to retain all wells then producing or in the course of drilling or having work done on them, as to which Lessee is not in default, together with forty (40) acres surrounding the producing interval of each well producing or being drilled for oil or one hundred sixty (160) acres surrounding the producing interval of each well producing or being drilled for gas with full right to drill new wells on the lands so retained and to operate, produce, redrill, deepen or plug back to any depth, and to perforate casing at any depth believed to be in an oil or gas zone, and properly to maintain all such wells subject to all provisions of this lease, so long as such wells respectively shall produce oil or gas in quantities deemed paying by Lessee. Temporary discontinuance of production from any well in order to work on such well, or cessation of production in any well which is followed by work on such well diligently conducted to restore production therefrom shall not be deemed to be an end of producing from such well within the meaning of this paragraph. Forfeiture of rights in this paragraph provided shall be the exclusive remedy of Lessor for the breach of any obligations hereunder except the obligations of Lessee to make payment of rentals or royalties.

21. Notwithstanding anything in this lease contained to the contrary, it is expressly understood and agreed that the obligations of Lessee hereunder shall be suspended so long as and to the extent that Lessee is prevented or hindered from complying with such obligations in part or in whole by the elements, accidents, strikes, lockouts, riots, delays in transportation, inability to secure materials in the open market, acts of war or conditions attributable to war or compliance by Lessee with

—3—

federal, state, county, municipal or other governmental agency regulations, rules or orders including but not limited to failure or refusal to grant land use or operating licenses or permits, or with proration or curtailment regulations of authorities constituted by law, or other causes beyond the reasonable control of Lessee, whether similar or dissimilar to the foregoing. This lease shall remain in full force and effect during any suspension of any of Lessee's obligations under any provisions of this paragraph and for a reasonable time thereafter, provided, that after the removal of the cause or causes preventing or hindering the performance of such obligation, Lessee diligently commences or resumes the performance of such obligation. Lessee shall have the right to join in the execution of and to comply with the voluntary agreement of producers representing a majority of the production in the district in which the leased land is located with respect to proration or curtailment of production in said district, provided such agreement is not contrary to law or to comply with any laws, regulations or governmental orders with respect to any such proration or curtailment of production. Whenever Lessee is required to make a payment or suffer termination of this lease as to any of the lands included hereunder as an alternative to commencing drilling operations, then, so long as the obligation to commence drilling operations is suspended by any provision of this paragraph, Lessee shall not be required to make such payment nor shall this lease be terminated. If before Lessee may commence drilling operations in the leased land it must secure a permit therefor or approval thereof in any form from any federal, state, county or municipal body or agency, than if Lessee shall have applied for such permit within sixty (60) days prior to the date upon which such drilling operations must be commenced under the terms of this lease to avoid a forfeiture or termination thereof, the obligation to commence such drilling operations shall be suspended until such time as such permit is granted, or in the event such permit is denied so long as Lessee shall in good faith and with due diligence conduct proceedings appealing from such denial, for a period of thirty (30) days thereafter; provided, however, that in no event shall such obligation be suspended under this paragraph beyond a period of one (1) year from the time upon which such drilling operations should otherwise have been commenced.

22. "Drilling operations" as used in this lease is defined to mean any work or operations for the actual purpose of drilling a well hereunder including but not limited to operations commenced on other land in preparation of the ground therefor and the building of roads and facilities, provided the same be followed by the construction or erection of a derrick, the installation of drilling equipment and actual drilling in other land, for a well or wells to be slant drilled into leased lands or lands pooled with leased lands and that all such work be prosecuted diligently.

23. In the event that the leased land is less than the entire fee interest in the lands described, or if mineral rights only are leased and less than the entire mineral rights are covered, then the royalties herein provided for shall be paid Lessor only in the proportion which Lessor's interest bears to the entire undivided fee interest in the land as a whole or in the mineral rights therein. If it develops that Lessor owns less than the interest purported to be leased hereby, then the rentals herein provided for shall be paid Lessor only in the proportion which Lessor's interest bears to the interest purported to be leased hereby. If Lessor owns a greater interest in the lands described than is purported to be leased hereby or hereafter acquires any additional interest or title in the lands described, by operation of law or otherwise, then this lease shall cover such greater or additional after-acquired interest or title, and Lessor agrees to give Lessee written notice of any such acquisition as soon as the same is made, in which event the rentals and royalties payable to Lessor shall be increased proportionately.

24. Lessor hereby agrees to defend Lessor's title to the leased land and agrees that Lessee, at its option, may pay and discharge any taxes, mortgages or other liens existing, levied or assessed on or against the leased land and, in the event it exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying to the discharge of any such mortgage, tax or other lien, any royalty or rentals accruing hereunder. Lessee, at its option, shall have the right to defend any suit brought attacking Lessor's title to the leased land, or to bring a quiet-title action in Lessor's name to validate Lessor's title thereto or in its own name to validate Lessee's title to the leasehold created hereby and in such case Lessor agrees fully to assist and cooperate with Lessee in any such action. The reasonable cost and expense of any action to defend or validate Lessor's title shall be deductible by Lessee from monies becoming due to Lessor hereunder.

25. If the estate of either party hereto is assigned or conveyed (and the privilege of assigning in whole or in part is expressly allowed), the rights and obligations created hereby and the covenants hereof shall extend to and be binding upon such party's assigns or transferee, and the party so assigning or transferring such interest shall thenceforth be released from all obligations hereunder to the extent of the interest so assigned or transferred, but no change of ownership in the land or in the rentals or royalties shall be recognized by Lessee until Lessee has been furnished with written notice of such transfer or assignment, with evidence thereof satisfactory to Lessee, which notice shall designate in writing the address to which checks covering payments affected by such change shall be mailed. If this lease shall be assigned as to a particular part or as to particular parts of the leased land, such division or severance of the lease shall constitute and create separate and distinct holdings under the lease of the several portions of the leased land as thus divided, and the holder of each such portion of the leased land shall be required to comply with and perform the Lessee's obligations under this lease for, and only to the extent of, his portion of the leased land; provided that nothing herein shall be construed to enlarge the drilling or rental obligations, and provided further that the commencement of the drilling operations and the prosecution thereof, as provided in Paragraph 8 hereof, either by the Lessee or any assignee hereunder, shall protect the lease as a whole.

26. All statements of production and royalty and all payments to be made by Lessee to Lessor hereunder shall be sent to the persons whose names are hereunto subscribed as Lessor on the Signature Page attached hereto, respectively, at the addresses shown thereon. Lessee shall, upon notification of change of ownership in the lands or in rentals or royalties hereunder, as provided in Paragraph 25 hereof, divide and distribute the same to the new owners of such interests; provided, however, that at any time after royalty becomes payable hereunder, Lessee may, at its option, withhold payment of such rentals or royalties until parties owning a majority of Lessor's interest designate in writing a recordable instrument delivered to Lessee, a bank, trust company or corporation in California, as a common agent and depository, to receive all payments due hereunder to such persons. Such designation may be changed at any time in the same manner. Delivery of all statements and payments hereunder may be made by depositing the same in the United States mail duly addressed to Lessor at the above address or addresses or to such agent and depository which shall constitute full performance of Lessee's obligation to make such delivery. In the event that the amount payable under this lease shall result in a payment of less than Twenty-five Dollars ($25.00) becoming due Lessor, Lessee may, at its option, withhold and accrue sufficient periodic payments until the total due Lessor exceeds Twenty-five Dollars ($25.00).

27. Lessee may give any notice or deliver any document hereunder to Lessor in person or by delivering the same by mail addressed to Lessor at the address shown on the signature page attached hereto. Any notice from Lessor to Lessee shall be given by sending the same by mail addressed to Lessee at 5000 Stockdale Hwy., Bakersfield, Calif. All notices so given by mail shall be deemed delivered when deposited in any United States Post Office in the State of California. Either party may at any time by

OPC 500 R (4/78)

appropriate written notice to the other change the address to which that party's notices are to be sent.

28.  For the consideration paid at the time of execution of this agreement and without any additional consideration to be paid therefor, Lessor hereby grants to Lessee and its assigns the exclusive easement and right to drill into and through the leased land, by means of a well or wells drilled from surface locations outside the leased land together with the sole and exclusive right to repair, redrill, deepen, maintain, rework and operate such wells and produce oil, gas and other hydrocarbons from such wells which may be drilled into or through the leased land or into other land, whether or not pooled with the leased land; such subsurface rights-of-way, easements and servitudes to continue for the duration of this lease and thereafter as hereinafter provided. If Lessee shall assign to any third party or parties such subsurface rights granted to Lessee under this paragraph, the said subsurface rights of Lessee shall not thereby be diminished, in such event both Lessee and its assignee shall have, hold and enjoy said rights, each independently of the other. The subsurface rights of Lessee and of each assignee of Lessee under this paragraph shall continue after the expiration, surrender, forfeiture or other termination of this lease for a period of twenty (20) years from the date of this lease and so long thereafter as oil, gas or other hydrocarbon substances are produced by means of any such well or as drilling, redrilling or remedial operations are being conducted with respect to any such well. Lessee and each such assignee utilizing any such rights after the expiration, surrender, forfeiture or other termination of this lease shall pay to Lessor a rental for each well subsequently maintained by it under or through the leased land at the rate of One Dollar ($1.00) per annum per foot of the horizontal projection (computed to the nearest foot) of the surveyed course of the part of the well of such Lessee or assignee lying within the confines of the leased land, the rental with respect to any such well to commence on the completion thereof and to continue until such well is abandoned in accordance with the requirements of the State of California; provided, however, that Lessor shall not be entitled to receive any rental under the provisions of this paragraph during such times as Lessor is entitled to receive royalty or rentals under other provisions of this lease. During the term of this lease, Lessor shall not grant any subsurface rights of way, easements or servitudes in and to the leased land in respect to the drilling for or the production of oil, gas, hydrocarbons and associated substances to any other person, firm or corporation without the written consent of Lessee.

29.  Lessee is hereby given the right at its sole option, by a written declaration of pooling, at any time or from time to time, to combine or pool all or any part of the leased land with all or any part of any other tract or tracts of land, so as to create by such combining or pooling one or more operating units for the development and production of oil, gas and other hydrocarbon substances. Any such operating unit shall not exceed three hundred and twenty (320) contiguous acres in area; provided, however, that any such operating unit may nevertheless include all or any part of the lands within any oil drilling district which embraces the leased land and which may be established by any federal, state, county or municipal body or agency acting by and pursuant to any present or future law, ordinance, rule or regulation; and provided further that such operating unit and leased land shall be subject to all of the provisions and conditions of any such oil drilling district and any present or future laws, ordinances, rules or regulations of any federal, state, county or municipal body or agency. The designation of such operating unit shall be made prior to thirty (30) days after the completion of a well capable of producing oil or gas from the lands within the operating unit, but in no event shall such unit be created later than twenty (20) years from the date of this lease; and such designation shall define the area which shall constitute such operating unit. In the event and as soon as any such operating unit is so created, Lessee shall promptly record in the office of the county recorder of the county in which the leased land is situated such written declaration of pooling and Lessee shall give written notice of such pooling to Lessor. In the event Lessee shall acquire an Oil and Gas Lease covering any interest in any land within the boundaries of any such unit, then such Lease and the rights covered thereby shall be included in such unit providing such Lease authorizes such inclusion and Lessee has recorded such Lease with the County Recorder in the County wherein such unit is situated. Such unit, as theretofore created by such Declaration of Pooling, shall be considered as amended to cover such Lease. In the event of such pooling, then in lieu of computing royalties upon substances produced from the leased land as provided in Paragraphs 4, 5 and 6 hereof, Lessor's royalty shall be computed and paid upon the value of the total of oil, gas and other hydrocarbon substances produced, saved and sold by Lessee from such operating unit or units, in the proportion that the amount of said leased land included in such unit bears to the total land in such unit; and in lieu of the taxes provided to be borne by Lessor under Paragraph 18 hereof, Lessor shall bear the royalty share of such taxes on land in such unit and taxes on the production therefrom in the same proportion as production is allocated to said leased land included in such unit. For the purpose of determining drilling obligations for such unit, which shall be equal to the drilling obligations set forth hereinabove in this lease, the entire land within such unit shall be treated as if it were covered by one lease, and the drilling of a well into such unit, whether or not in said leased land, shall fulfill Lessee's drilling obligations under this lease to the same extent as if such well were drilled in said leased land, and no offset obligations shall accrue with respect to the several tracts of land which have been pooled within the same operating unit. Upon the pooling of less than all of the leased land, as hereinabove provided, this lease shall be severed, and leased land included in such unit and leased land not included in such unit shall be segregated and constitute separate and distinct leaseholds, and the performance of the obligations of one such separate leasehold shall validate that one regardless of any default in the other separate leasehold. Lessee may, at any time, quitclaim to the persons entitled thereto all or any part of the land included within such unit, and thereupon Lessee shall be released from all further obligations with respect to land so quitclaimed, and all drilling requirements with respect to lands included within said unit shall be reduced pro rata, and any such quitclaim covering any such land, other than said leased land, shall have the same force and effect, for the purpose of clearing title to the quitclaimed land, as if Lessor had joined in such quitclaim. The division of royalties from such unit between each Lessor and other owners of interest in such unit shall, after the discovery of oil or gas in paying quantities, not be changed, altered or affected notwithstanding any subsequent surrender or quitclaim or forfeiture of any land in such unit, save and except land surrendered because of lack of good and merchantable title; provided, however, that in the event the leased land or any part thereof, after surrender or quitclaim or forfeiture shall be made subject to any other oil or gas lease or a well be commenced thereon for oil or gas, then such of the above described leased lands so surrendered or quitclaimed or forfeited shall thereupon and forever thereafter be excluded from participating in the benefits accruing from such unit, but Lessee shall not be held responsible or accountable for payments made without actual knowledge of the execution of any such other oil or gas lease or the drilling of any well for oil or gas in such quitclaimed, surrendered or forfeited land. Lessee may, at its sole option, at any time when there is no production from such unit of oil or gas in quantities deemed paying by Lessee, terminate such operating unit by a written declaration thereof, in the same manner in which it was created. Upon the termination of any such operating unit, if only a part of the leased land was included therein, this lease shall no longer be considered as a separate and distinct lease, and the effect of such termination shall be to return this lease to the status in which it was immediately prior to the creation of such operating unit as though no operating unit had been created.

30.  This agreement may be executed in any number of counterparts with the same force and effect as if all parties signed the same document. The execution hereof by any person named as Lessor herein shall bind such person's interest whether or not any other person named as Lessor herein shall execute the same.

— 5 —

31. The entire agreement between the parties is set forth in this lease, and no covenant or agreement, express or implied, other than those set forth in this lease, shall be binding upon either of the parties hereto except insofar as this lease may subsequently be modified by written agreement of the parties.

32. In the event leased land is pooled under Paragraph 29 hereof, the benefits of Lessor including rent and royalty accruing under the provisions of Paragraph 29 hereof are appurtenant to the leased land of Lessor, and any transferee or subsequent owner of the title to the leased land of Lessor shall be entitled to receive such appurtenant benefits under Paragraph 29 hereof, except to the extent that such benefits shall be expressly reserved or shall have been theretofore transferred in whole or in part. A reservation or exception of all or any specified portion of the minerals or oil or gas or other hydrocarbon substances in any instrument shall constitute, for the purpose of this agreement, a reservation or exception of all or such specified portion of the appurtenant benefits under Paragraph 29 hereof.

33. The Lessor has executed an extra copy of the Lessor's Signature Page attached to this lease, and it is hereby agreed that such Lessor's Signature Page may be attached to an identical copy of this Subsurface Oil and Gas Lease, together with other signature pages from other identical oil and gas leases executed by other lessors, for the sole purpose of recording the same in the Official Records of the county wherein said leased lands are situate, it being expressly understood that the attaching of such Signature Page to a similar lease shall not constitute a pooling or combining of the leased land with any other land.

34. Subject to the provisions hereinabove set forth, this lease and agreement shall be binding upon and inure to the benefit of the heirs, administrators, successors and assigns of the respective parties hereto.

"Exhibit A" is attached hereto and by reference made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused this lease to be executed the day and year first above written.

OXY PETROLEUM, INC.

By..................................................

W. A. HULL, JR., Attorney-in-Fact for
CITIES SERVICE OIL AND GAS CORPORATION,
SUCCESSOR IN INTEREST TO OXY PETROLEUM, INC.

STATE OF CALIFORNIA,   ⎫
                   ⎬ ss.
COUNTY OF......................................⎭

ON THIS ...................day of ....................................................., 19...., before me,
......................................................................................... , a Notary Public in and for said State

residing therein, duly commissioned and sworn, personally appeared .......................................................
known to me to be the person who executed the within instrument on behalf of Oxy Petroleum, Inc., the corporation therein named, and whose name is subscribed to the within instrument as the Attorney-in-Fact of said corporation, and acknowledged to me that he subscribed the name of said corporation thereto as principal, and his own name as Attorney-in-Fact and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

..................................................................
Notary Public in and for said County and State.

My Commission expires...................................................

O-JC-500 R (4/78)

EXHIBIT "A"

CITY OF LOS ANGELES

SUMMARY OF NORMAL REQUIREMENTS

FOR URBAN OIL DRILLING

Pursuant to Sections 12.03 and 12.24 of the Los Angeles Municipal Code, tempo-
rary geological core holes authorized by a Zoning Administrator, may be drilled.
Such core holes must be drilled and abandoned within  the time limit specified by
a Zoning Administrator.

An applicant requesting establishment of an urbanized oil drilling district
must have the authority to drill beneath at least 75% of the area comprising the
district.

Proposed districts must be at least 40 acres.
Only one drillsite of not more that 2 acres is permitted for each 40 acres of
    an urbanized oil drilling district.  One drillsite may develop a number of
    districts.
Authority to use a specific site must be obtained from the Zoning Administrator.
Only one derrick may be used at one time.
The number of wells drilled may not exceed one well for each 5 acres in a
district.
Drillsites must be enclosed, landscaped, and kept neat in appearance.
Only electric power may be used.
Derricks and drilling equipment must be soundproofed and vibration and odors
    must be reduced to a minimum.
Drillsite and equipment must be clean and neat.
No open sumps are permitted.
No pumps are permitted above ground.
Fire and other hazards are strictly controlled.
Derricks must be removed when drilling is completed.
Oil must be transported by underground pipeline.
Bonds must be posted.
Liability insurance is required.

The successful applicant for the establishment of a district must, within one
year from the date of approval to drill, make an offer in writing to each property
owner who has not joined in the lease, extending the right to share in the proceeds
of producing wells upon the same basis as the property owners who have signed leases.
Non-signers' pro rata share of royalties must be impounded for the five years this
offer remains open.

Regarding the oil royalty rate to be received by property owners the City
Attorney has stated, "...such matters are the subject of private contract with
which the City may not interfere unless facts exist which would warrant the City
Council, in the exercise of the police power in the public interest and welfare,
to protect property owners agains a condition inimical to the public interest and
welfare by providing the minimum royalty which must be paid by oil companies in
cases where they are granted the exclusive right to drill in a district."  Such a
minimum has not been specified by the Council.

The Zoning Administrator reserves the right to halt production if subsidence
occurs and impose additional restrictive conditions if necessary.

This summary is as approved by the Office of the City Administrative Officer.

OPC 500 R (4/78)

LESSOR'S SIGNATURE PAGE TO SUBSURFACE OIL AND GAS LEASE DATED ....September 1, 1984.........
ENTERED INTO WITH OXY PETROLEUM, INC.
ALL THAT PORTION OF THE LANDS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, LYING
BELOW FIVE HUNDRED FEET (500') FROM THE SURFACE OF

Lot(s) ......12.........................................................., Block .51........

Tract .......5609..................................................................................

As per map recorded in Book .65..., Page(s)..72-73....of Maps, Records of said County. Also including in said lease, any
interest (lying below five hundred (500) feet from the surface) of Lessor in waterways, ditches, sloughs, canals, dikes, levees, roads,
streets, alleys, easements and rights of way which traverse or adjoin the described land.

A.P. #4321-001-012

ANNUAL RENTAL _____$10.00_____

LESSOR

MARION DENITZ, AS EXECUTRIX
OF THE ESTATE
OF Herbert S. Denitz, DECEASED
By Marion Denitz, Exec
Marion Denitz
Marion Denitz (AS AN INDIVIDUAL)

...........................................

LESSOR

Marion Denitz, Successor Trustee
Marion Denitz, Successor Trustee

Ronald P. Denitz

MAILING    c/o Marion Denitz
ADDRESS:   499 N. Canon Drive

           Beverly Hills, CA  90210

STATE OF CALIFORNIA
COUNTY OF _LOS ANGELES_____ ss.

On _FEBRUARY  16____, 19_85_, before me, the undersigned, a Notary Public in and for said State,
personally appeared _MARION DENITZ, INDIVIDUALLY AS EXECUTRIX +
SUCCESSOR TRUSTEE, AND RONALD P. DENITZ_
known to me (or proved to me on the basis of satisfactory evidence) to be the person S whose name S ____ARE subscribed
to the within Instrument and acknowledged that ____They____ executed the same, in the capacity therein stated.
WITNESS my hand and official seal.

OFFICIAL SEAL
TOM MOORE
NOTARY PUBLIC - CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires March 17, 1987

_____
NOTARY PUBLIC in and for said State

.213 Ac

# EXHIBIT E

LEASE AGREEMENT

This Lease Agreement made and entered into by and between the United States of America, acting by and through the Administrator of Veterans Affairs (pursuant to authority of 38 U.S.Code 5012), hereinafter referred to as "the Government" and the Occidental Petroleum Corporation of Bakersfield, California, hereinafter referred to as "the Corporation."

WITNESSETH

WHEREAS, the Government, through the Bureau of Land Management, issued Acquired Lands Lease, Serial No. 0138800, over certain lands at the Veterans Administration Center, Los Angeles, California, affecting the oil and gas deposits under said lands, including the right to use a designated area on such lands as a drill site, and

WHEREAS, the Corporation desires to use said drill site, as a surface location from which to drill wells through the lands under jurisdiction of the Government and to bottom said wells under lands in which the Corporation has a right to do so, but which are outside the boundaries of said Veterans Administration Center reservation.

NOW THEREFORE, the Government does hereby lease to the Occidental Petroleum Corporation, or its assigns, the existing designated drill site at the Veterans Administration Center, Los Angeles, California, for the purpose aforesaid for a term of three (3) years commencing with the date of acceptance by the Corporation subject to renewal by agreement of the parties for such additional periods of time as may be legal and permissible under the circumstances existing at the time of expiration of the lease term herein provided.

This lease shall be subject to the following terms and conditions:

1. The Corporation shall pay to the Veterans Administration a royalty of two and one-half percent (2 1/2 %) of the proceeds from the production of all oil, gas and other hydrocarbons which are produced from any and all wells drilled under this agreement. Said royalty shall be computed in accordance with the Oil and Gas Operating Regulations (30 C F R Part 221) and shall be paid monthly to the Agent Cashier, Veterans Administration Center, Los Angeles, California.

2. The Regional Oil and Gas Supervisor of the Geological Survey shall have control over and approve:

    a. The use of the drill site by the Corporation for drilling and production of non-Federal wells.

*Renewed for 3 yrs on 7-14-69 acw*

*Now file 168-002*

b. The sequence and priority of wells drilled from the drill site in the event only one drilling rig is used.

c. The direction and location of the subsurface cylinder in which a directionally drilled well must remain while drilling through Federal land.

3. Use of the drill site shall be under the supervision of the Director, Veterans Administrator Center, Los Angeles, California, and in strict compliance with conditions of said lease Serial No. 0138800 and "Stipulation For Lands Under Jurisdiction Of Veterans Administration" attached to and forming part of said lease.

4. The Corporation hereby agrees to save and hold the Government harmless from all damages or claims for damage directly or indirectly to persons or property resulting from the Corporation's operations under this agreement.

5. In addition to any other remedies available to the Government, this agreement may be terminated by the Government upon failure by the Corporation to comply with the terms herein.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names.

UNITED STATES OF AMERICA

By: _____
W. J. DRIVER

Administrator of Veterans Affairs
Title

OCCIDENTAL PETROLEUM CORPORATION

By: _____
E. F. Reid
VICE-PRESIDENT

_____
Title ASSISTANT SECRETARY

July 21, 1966
Date of Acceptance

261-1217
310-840
6628



SAWTELLE  9-67

| Block | Sawtelle Leases (O.P.C.) | Aladdin Assignment | Unleased | Gross Ac. | % Under Lse Including Assignment |
|---|---|---|---|---|---|
| A | 28.758 | 66611 | 18024 | 113393 | 84104 |
| B | 20.247 | 42592 | 17366 | 80205 | 78347 |
| C | 3.849 | 25492 | 18358 | 47699 | 61512 |
| D | 20.816 | 84523 | 55843 | 161184 | 65354 |
| E | 17.031 | 35753 | 88064 | 140848 | 37475 |
| TOTALS: | 90.706 | 254971 | 197660 | 543329 | |

# EXHIBIT F

| **Veterans Administration** | **REVOCABLE LICENSE FOR NON-FEDERAL USE OF REAL PROPERTY** | 1. LICENSE NO. 691-97-010L |
|---|---|---|

A revocable license affecting the property described and for the purpose designated below is hereby granted to the licensee here named, subject to all of the conditions, special and general, hereinafter enumerated.

| 2. NAME OF LICENSEE | 3. ADDRESS OF LICENSEE |
|---|---|
| Westside Operating Partners Limited | c/o Breitburn Energy Corporation<br>3415 S. Sepulveda Blvd.<br>Los Angeles, Ca 90034 |

| 4. NAME AND ADDRESS OF INSTALLATION | 5. PERIOD COVERED | |
|---|---|---|
| Department of Veterans Affairs<br>West Los Angeles Medical Center<br>West Los Angeles, California 90073 | FROM (Month, day, year)<br><br>January 1, 1997 | TO (Month, day, year)<br><br>December 31, 2002 |

6. CONSIDERATION

Please see specific Conditions for delineation of consideration

7A. DESCRIPTION OF PROPERTY AFFECTED (As shown on Exhibit(s) attached hereto and made a part hereof)

Sawtelle site Los Angeles County, California, VA REE No 691/900-691-087-07313, OXY File No. S04 02548. Property located on VAMC grounds West LA between Sawtelle & Wilshire Boulevards. (Full legal description in Exhibit I, attached & made a part hereof.

7B. EXHIBIT(S) ATTACHED

By the acceptance of this license, the licensee agrees to abide by and be bound by the general and special conditions indicated hereon and attached hereto.

8. SPECIAL CONDITIONS

SPECIAL CONDITIONS ARE ATTACHED AND PAGINATED IN ASCENDING NUMERICAL ORDER WITH TITLES AND SECTION HEADINGS INDICATED AT THE TOP OF THE APPROPRIATE LEADING PAGE.

| VETERANS ADMINISTRATION LICENSOR | LICENSEE |
|---|---|
| DATE OF LICENSE (Month, day, year)<br>JAN 1, 1997 Through Dec 31, 2002 | DATE ACCEPTED (Month, day, year)<br>December 23, 1996 |
| SIGNATURE OF LICENSOR<br><br>Kenneth J. Clark | SIGNATURE(S) AND TYPED NAME OF SIGNATORY<br><br>Halbert S. Washburn |
| ADDRESS OF LICENSOR<br>11301 Wilshire Blvd.<br>Los Angeles, Ca 90073 | TITLE OF SIGNATORY<br>PRESIDENT |
| | TELEPHONE NO. OF LICENSEE (Including Area Code)<br>310-915-7272 |

If licensee is a corporation, the following Certificate of Licensee must be executed.

CERTIFICATE OF CORPORATE LICENSEE

I, Randall H. Breitenbach, certify that I am the
Secretary of the corporation named as licensee herein; that
who signed said license on behalf of the licensee was then
of said corporation; that said license was duly signed for and in behalf of said corporation by authority of its governing body, and is within
the scope of its corporate powers.

(CORPORATE)
(SEAL    )

(Signature)

VA FORM
AUG 1981 08-6211

EXISTING STOCKS OF VA FORM 08-6211,
APR 1974, WILL BE USED.

621723

## SPECIAL CONDITIONS TO SAWTELLE-OXY LICENSE

### DEPARTMENT OF VETERANS AFFAIRS

### LICENSE NO.   691-97-01-1LI

1. The Bureau of Land Management, (BLM), Department of the Interior, under authority of the UNITED STATES OF AMERICA issued Acquired Lands Lease, Serial No. 0138800, to Mr. Tom Dowlen, affecting land at the VA Wadsworth Medical Center, Los Angeles, California, (now West Los Angeles VA Medical Center) (Exhibit II) affecting the oil and gas deposits under said lands, including the right to use a designated area on such lands as a drill site. Lease No. 0138800 was subsequently assigned by Mr. Dowlen to the Gulf Oil Corporation who in turn appointed Occidental Petroleum Corporation, now OXY USA INC. as Operator. On April 6, 1993 Westside Operating Partners succeeded to Operator as ratified by Veterans Administration May 12, 1993.

2. On July 21, 1966, the Department of Veterans Affairs leased a designated surface drilling site under the BLM Lease No. 0138800 to OXY for a three year term to also use the drill site for slant drilling of wells bottomed under land outside of VA property.

3. After successive three year periods of signing supplemental lease agreements, starting on July 14, 1969 and terminating on October 1, 1990, the succession of supplemental lease agreements was broken, by allowing a supplemental lease agreement to expire on October 1, 1990. Oxy USA INC., as successor in interest to the domestic oil and gas assets of Occidental Petroleum Corporation of Bakersfield, California, continues to occupy and exercise those rights and benefits from use of said drill site, as a surface location from which to remove petroleum, and as a platform from which to drill wells as it did before. Both parties therefore, have found themselves without benefit of formal agreement, and are now both desirous of again joining together in an agreement for their mutual benefit.

4. The licensee shall pay to the Department of Veterans Affairs, rental in the amount of: a two and one-half percent (2-1/2%) averred royalty on the total gross production of all oil, gas and other hydrocarbons which are produced from any and all wells now operating or to be drilled under this agreement * Said royalty shall be computed in accordance with the Oil and Gas Operating Regulations (30 C.F.R. Part 218) and shall be paid monthly to the:

*where such wells bottom under lands outside of V.A. property.

1

Agent Cashier,
Department of Veterans Affairs
Medical Center West Los Angeles,
Wilshire and Sawtele Boulevards,
Los Angeles, California 90073

and in addition, the licensee shall pay to the Government on demand any sum
which may have to be expanded after the expiration or termination of this license to
restore and premises to a condition satisfactory to the VA Director. Any monetary
compensation shall be made payable to the Treasurer of the United States and
forwarded by the lessee directly to the Agent Cashier, VAMC, West Los Angeles,
California.

5. All notices to be given pursuant to this licensee shall be addressed, if to the
licensee:

Westside Operating Partners Limited Partnership
C/O Breitburn Energy Corporation
3415 S. Sepulveda Blvd.
Los Angeles, Ca 90034

if to VA

Director,
VA Medical Center West Los Angeles
Wilshire and Sawtelle Boulevards
Los Angeles, California 90073

or as may from time to time otherwise be directed by the parties. Notice shall be
deemed to have been duly given if and when enclosed in a properly sealed
envelope, addressed as aforesaid and deposited, postage prepaid, in a public mail
box maintained by the U.S. Postal Service.

6. The use and occupancy of the licensed property shall be subject to the general
supervision and approval of VA Medical Center Director, West Los Angeles,
California, and to such rules and regulations as may be perscribed by the Director
from time to time.

7. The licensee has inspected and knows the condition of the property to which
this license pertains, and it is understood that the license is hereby granted without
any representation of warranty by VA whatsoever and without obligation on the
part of VA to make any alterations, repairs, or additions thereto.

2

8. The right is hereby reserved to VA, its officers, agents, and employees to enter upon said premises at any time for the purpose of inspection and inventory and when otherwise deemed necessary for the protection of the interests of VA and the licensee shall have no claims of any character on account thereof against VA or any officer, agent, or employee thereof.

9. The licensee shall pay the cost, as determined by the VA Medcial Center Director, West Los Angeles, California, of producing and/or supplying any utilities and other services furnished by the Government. The Government shall be under no obligation to furnish utilities or services. Payment shall be made in the method prescribed by the VA Medical Center Director, upon bills rendered.

10. The licensee shall neither transfer nor assign this license or any property on the demised premises, nor sublet the demised premises or any part thereof or any property thereon, nor grant any interest, privilege or license whatsover in connection with this license without prior permission in writing from the VA Medical Center Director, West Los Angeles, California.

11. For such period as the licensee is in possession of the denoted premises pursuant to the provisions and conditions of this license, the licensee shall procure and maintain at its cost a standard fire and extended coverage insurance policy or policies on the licensed property to the full insurable value thereof. The licensee shall procure such insurance from any responsible company or companies, and furnish either the original policy or policies or certifications of insurance to the Government. The policy or policies evidencing such insurance shall provide that in the event of loss thereunder the proceeds of the policy or policies, at the election of the Government, shall be payable to the licensee to be used solely for the repair, restoration, or replacement of the property damaged or the insurer, after payment of any proceeds to the licensee in accordance with the provisions of the policy or policies shall have no obligation or liability with respect to the use or disposition of the proceeds by the licensee. Nothing herein contained shall be construed as an obligation upon VA to repair, restore, or replace the leased premises, or any part thereof.

12. The licenses shall obtain and keep in force and effect public liability insurance coverage in the minimum amount of $1,000,000 to protect the Government from third party property damage and bodily injury claims arising out of use of the property by the licensee. Evidence of such insurance coverage shall be furnished to the Government upon request.

3

13. The licensee shall cut no timber, conduct no mining or drilling operations, remove no sand, gravel, or similar substances from the ground, except in the exercise of mineral rights heretofore reserved to the record owner thereof, and encompassed within the scope of this license, commit o waste of any kind, or in any manner substantially change the contour or condition of the property hereby leased, except changes required in carrying out soil and water conservation measures, or any other measure consistant with the duties and good practices required to perform those functions for which this license is granted.

14. On or before the date of expiration of this license, or its termination by the licensee shall vacate the demised premises, remove the personal property of the licensee therefrom and at the option of the Government, remove the fixtures therefrom, and restore the premises to as good order and condition as that existing upon the date of commencement of the term of this license, damages beyond date of commencement of the term of this license, damages beyond the control of the licencee and due to fair wear and tear excepted. In the event that the licensee should fail to comply with the duties set forth in this paragraph, then the licensee shall pay to VA on demand any sum which may have to be expended after the expiration or termination of this license to restore the premises to the condition as stated herein. Any monetary compensation shall be made payable to the Treasurer of the United States and forwarded by the lessee directly to the Agent Cashier, VA Medical Center, West Los Angeles, California.

15. If this license has been negotiated without advertising, the licensee agrees that the Comptroller General of the United States, the Secretary of Veterans Affairs, or any of their duly authorized representatives shall, until the expiration of 3 years after final payment under this license, have access to and the right to examine any direclty pertinent books, documents, papers, and records of the licensee involving tranactions related to this license. The licensee further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States, the Secretary of Veterans Affairs,or their representatives shall, until the expiration of 3 years after final payment under this license with the Government, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor involving transactions related to the subcontract.

16. The licensee shall pay to the proper authority, when and as the same becomes due and payable, all taxes, assessments, and similar charges, which at any time during the term of this license, may be taxed, assessed or imposed upon the Government or upon the licensee with respect to or upon the licensed premises.

4

17. This license is further subject to the following provisions and conditions:

A. The Regional Oil and Gas Supervisor of the Geological Survey shall have control over and approve:

1. The use of the drill site by the licensee for drilling and production of non-Federal wells.

2. The sequence and priority of wells drilled from the drill site in the event only one drilling rig is used.

3. The direction and location of the subsurface cylinder in which a directionlly drilled well must remain while drilling through Federal land.

B. Use of the drill site shall be under the supervision of the Director, VAMC West Los Angeles, California and in strict compliance with conditions of said lease Serial No. 0138800 and "Stipulation for Lands under Jurisdiction of the Department of Veterans Affairs" which are hereby attached to and made part of this license.

C. In addition to any other remedies available to the Government, this agreement may be terminated by VA upon failure by the Licensee to comply with the terms herein.

5

## EXHIBIT I

## LEGAL DESCRIPTION OF DEMISED AREA

A parcel of land situated in the county of Los Angeles, state of California,
commonly known as the Sawtelle area drill site, lying within and being a portion of
the United States Department of Veterans Affairs lands as shown on a map of that
portion of the Rancho San Vicente and Santa Monica known as the Villa Farms,
recorded in Book 70, page 54 et seq. of miscellaneous records in the office of the
recorder of said county; said parcel being more particularly described as follows:

Commencing at the point of intersection of the centerlines of Sepulveda
Boulevard and Consititution Avenue, said point being south 35% 31' 59" east
958.55 feet along the said centerline of Sepulveda Boulevard from its intersection
with the Northeasterly prolongation of the Southereasterly line of tract no. 7181,
as said tract is shown on map recorded in book 120, page 79 of maps, records of
said county; thence south 54% 25' 10" west along the said centerline of
constitution avenue 282.24 feet; thence south 32% 20' 40", east 40.06 feet to a
point in a line that is parallel with and distant southeasterly 40 feet, measured at
right angles, from said centerline of constitution avenue, last said point being the
true point of beginning of the parcel herein described; thence from said true point of
beginning, and continuing south 32% 20' 40" east 443.76 feet: thence south 46%
49' 50" west 480.36 feet to a point in the aforesaid parallel line; thence north
54% 25' 10" east 328.06 feet to the true point of beginning.

6

# EXHIBIT G

**This page is part of your document - DO NOT DISCARD**



## 20170033917



**Pages: 0012**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**01/10/17 AT 09:12AM**

| | |
|---|---:|
| FEES: | 99.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 99.00 |



**L E A D S H E E T**



201701103270013

**00013218050**

008070782

**SEQ:
01**

DAR - Counter (Upfront Scan)

**THIS FORM IS NOT TO BE DUPLICATED**

RECORDING REQUESTED BY AND
WHEN RECORDED PLEASE RETURN TO:

Breitburn Operating LP
707 Wilshire Boulevard
Suite 4600
Los Angeles, CA  90017
Attn:  Land Department



01/10/2017

*20170033917*

*Space above for Recorder's use only, please.*

# AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION OF PROTECTIVE OIL AND GAS LEASE

<u>Affects Assessor's Parcel(s) No</u>.    N/A

The Undersigned Declare that no Documentary Transfer Tax is due in connection with the recordation of this instrument, being a conveyance of an easement (Oil & Gas) and the consideration or value is less than $100.00.  Rev. & Tax. Code § 11911.

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION OF PROTECTIVE OIL AND GAS LEASE

(Serial Number: Riverside R 1956)

This Amendment, Partial Surrender of Surface Rights and Ratification of Protective Oil and Gas Lease (the "Agreement") is made and entered into as of the 23rd day of December, 2016 ("Execution Date"), by and between the United States of America, through the Bureau of Land Management, as "Lessor", the U.S. Department of Veteran Affairs, "VA", and Breitburn Operating LP, a Delaware limited partnership, a successor in interest, as "Lessee," to allow the Lessee (with the consent and concurrent access rights from VA) the use of certain property located on VA's West Los Angeles Campus, located at 11301 Wilshire Boulevard, Los Angeles, California 90073.

NOW THEREFORE, in consideration of the above, the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    KNOW ALL MEN BY THESE PRESENTS, that the undersigned, as successor Lessee, in accordance with certain provisions of the hereinafter described Lease, does hereby release, relinquish and surrender to Lessor all of the right and interest to the surface only, with certain limitations as described below, of Lessee in, to, and under that certain Protective Oil and Gas Lease (CARI01956) entered into as of January 1, 1969, by and between the United States of America, through the Bureau of Land Management as Lessor, and Occidental Petroleum Corporation as original Lessee, recorded in Book M3252 at Page 886 of the records of Los Angeles County, State of California (the "Lease"), INSOFAR ONLY as said Lease covers the following described Surface Location Drill Site Lands located in Los Angeles County (the "Original Drill Site"), and in return VA hereby simultaneously substitutes and provides to Lessee access to the "Replacement Drill Site" per Paragraph 4 and as described and depicted in Attachment B below, in lieu of the Original Drill Site except as otherwise stated and permitted in this Agreement.    The term of such access from VA shall be concurrent with the term of and shall automatically terminate or expire concurrently with this Agreement.    The Lessee's former drill site a/k/a the "Original Drill Site" is described and depicted in Attachment A below as well as in Attachment C-1 to the Lease.    The Lessee will have continued access rights to the 8" water line associated with the Original Drill Site in connection with its activities at the Replacement Drill Site which is described and depicted in Attachment C below.

2.    Notwithstanding the foregoing, there is excepted from this partial surrender (i) any and all right and interest of the Lessee under said Lease and in any other surface lands covered by said Lease which are not specifically described in this surrender, and (ii) Lessee's right and interest in that certain fresh water eight inch (8") pipeline, commencing at a vault located on Waterford Street and continuing through the extreme northerly portion of the subject surrendered Original Drill Site and ending at Lessee's existing Sawtelle field facilities.    Said water pipeline is more particularly described in Attachment C. VA, at no cost to the Lessee, reserves the right to relocate the aforementioned fresh water eight inch (8") pipeline below grade so as to facilitate the construction of the proposed columbarium north of Constitution Avenue, in conjunction with all applicable laws, rules, and regulations.

3.    As material consideration for this 'Partial Surrender', VA hereby provides Lessee surface rights to a Replacement Drill Site, also known as the former "Fox" parcel as described and depicted in Attachment B, to use to conduct its existing oil and gas operations located south of Constitution Avenue and west of Highway 405, including, but not limited to, passage over, through, from, upon, and across, with ingress and egress to and from, the Replacement Drill Site.    Lessee shall use reasonable efforts to ensure that its structures will not adversely affect VA's mission or operations, and will coordinate and cooperate with VA as necessary in that regard.

4.    VA agrees that Lessee shall have access to, and surface rights for the Replacement Drill Site, also known as the former "Fox" parcel, as further described in Attachment B, to permit Lessee to use the Replacement Drill Site in conducting its existing and future oil and gas operations located south of Constitution Avenue and west of Highway 405, by accessing: (i) those mineral rights as described in Acquired Lands Lease, Serial No. 138800, dated effective November 1, 1963, to Tom H. Dowlen, Lessee, as amended; (ii) those mineral rights as described in the 'Protective Oil and Gas Lease Riverside R 1956' dated January 1, 1969, to Occidental Petroleum Corporation, as Lessee, and; (iii) those mineral rights in other sub-surface lands through which Lessee has rights to drill for, mine, extract, remove, and dispose of oil and gas deposits.

5.    VA agrees to cooperate in good faith with Lessee to establish a fire line to service the Replacement Drill Site using nearby VA water lines in reasonably close proximity to the Replacement Drill Site.    Subject to applicable law, the Lessee shall, at its sole cost, construct and maintain such fire line and install a meter to monitor Lessee's water usage.    Lessee shall pay the local municipality directly for such water use.

6.    In addition, and as material consideration for VA's cooperation with respect to this Agreement and Lessee's access to and use of the Replacement Drill Site, Lessee agrees that commencing with the execution of this Agreement and continuing throughout the remaining term of this Lease, to donate a

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

monthly monetary payment to the Disabled American Veterans Los Angeles Chapter ("DAV-LA") (whose address is VARO Federal Building, 11000 Wilshire Blvd., Rm. 5227, Los Angeles, CA 90024 and whose telephone number is (310) 477-2530), that is equal to a two and one-half percent (2.5%) overriding royalty on the total gross production of all oil, gas and other hydrocarbons, which are produced from any and all future wells to be drilled under this Agreement, or where such wells are drilled from the Replacement Drill Site but bottom under lands outside of VA property. DAV-LA's use of the aforementioned donated funds shall be solely for the purpose of providing transportation to Veterans on and around the VA Greater Los Angeles Healthcare System campus (the "West Los Angeles Campus") located at 11301 Wilshire Blvd., Los Angeles, CA 9007. Disabled American Veterans' Tax Identification # is 31-0263158. Neither VA nor Lessee has reviewed DAV-LA's corporate documents, and neither can represent and/or warrant that a third party is or is not a specific type of company.

7.     Lessee shall provide statements to VA upon written request showing the timing and amount of each monetary donation payment remitted to the DAV-LA. Lessee agrees that VA and/or its contractors or designees shall be permitted during normal business hours, with Lessee's cooperation, to conduct an audit of the revenues and corresponding payments relating to such monetary donation payments from Lessee to DAV-LA, within fourteen (14) days after issuance of a written letter from VA's Contracting Officer to Lessee, or such other longer period as reasonably agreed to by Lessee. VA shall be permitted via a letter from the VA Contracting Officer to the Lessee, to require at VA's discretion that all or a portion of such monetary donation payments shall either: (a) be temporarily held in suspense for future disbursement as and when VA shall later instruct, or (b) used for an alternative veteran focused purpose, if any such VA audit reveals that the funds previously remitted from Lessee to the DAV-LA were misused in a manner contrary to the intent of this provision or any applicable rule or law.

8.     Lessee agrees that these monetary donation payments are material to VA's inducement and cooperation with this Agreement and constitute lawful consideration with respect to Lessee's related activities on the West Los Angeles campus, and that such payments properly owed during the term of this Lease shall survive the termination or expiration of this Lease, and any such unpaid amounts shall be subject to recovery procedures to the extent permitted under applicable law and equity.

9.     The parties desire to modify and now hereby amend said Lease, by replacing the description and depiction of the Original Drill Site, which is Attachment C-1 in the Lease and contained in Attachment A below, with the description and depiction of the Replacement Drill Site contained in Attachment B below.

10.     Lessor hereby agrees and acknowledges that there are no defaults currently under said Lease, and Lessor and Lessee do hereby ratify, adopt, and confirm said Lease, and Lessor does hereby lease, let, and demise the leased land, subject to all the terms, provisions, covenants, and conditions set forth in said Lease, which are incorporated herein by this reference except as amended above, and further declare that said Lease, as amended, is a valid and subsisting oil and gas lease and is confirmed to be in good standing and in full force and effect.

11.     VA hereby acknowledges and confirms Lessee's rights to the Original Drill Site under the Lease up until the Execution Date, and the Lessee's rights to the Replacement Drill Site effective as of the Execution Date and subject to the terms of this Agreement.

12.     This Agreement shall be binding upon and inure to the benefit of the parties hereto and successors, heirs and assigns.

13.     This Agreement may be executed in any number of counterparts with the same force and effect as though all parties signed the same document.

14.     All provisions of the Lease, except as modified by this Agreement, shall remain in full force and effect.

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first written above.

        EXECUTED THIS ____23rd____ day of December, 2016.


                SIGNATURES TO FOLLOW ON THE NEXT PAGE

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

LESSOR:

THE UNITED STATES OF AMERICA

(Bureau of Land Management)

Name: Debra Marsh,

Title:   Branch Chief, Branch of Adjudication

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
> document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CALIFORNIA_

County of _SACRAMENTO_    } ss.

On _Jan. 6, 2017_ before me, _CHRISTINA M RICH  NOTARY OF PUBLIC_
    _Date_            _Name and Title of Officer (e.g., "Jane Doe, Notary Public")_

Notary Public, personally appeared _DEBRA  LEE  MARSH_
                    _Name(s) of Signor(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

> CHRISTINA M. RICH
> Commission # 2057228
> Notary Public - California
> Sacramento County
> My Comm. Expires Feb 8, 2018

Signature of Notary Public

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Breitburn Operating LP


Name: William W. Weldon,

Title:   Vice President Land and Attorney-in-Fact


> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
> document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of   California

County of   Los Angeles                    } ss.

On December 29, 2016 before me,        Allison S. Foster
         Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

Notary Public, personally appeared        William W. Weldon

                              Name(s) of Signor(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

ALLISON S. FOSTER
Commission # 2059680
Notary Public - California
Los Angeles County
My Comm. Expires Mar 1, 2018

Signature of Notary Public

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

US DEPARTMENT OF VETERAN AFFAIRS

Name: Alan Trinh
Title: Contracting Officer

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Los Angeles        } ss.

On December 22 2016 before me, B. Delisle
    Date             Name and Title of Officer (e.g., "Jane Doe, Notary Public")

Notary Public, personally appeared Alan Trinh
                     Name(s) of Signor(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

B. DELISLE
Notary Public - California
Los Angeles County
Commission # 2164599
My Comm. Expires Sep 12, 2020

Signature of Notary Public

Page 5 of 10

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Attachment A

(Description and Depiction of the Original Drill Site)

Starting at the abutment at the southwest corner of the San Diego Freeway and Constitution Avenue 59.75
feet South 54°25' West to a fence separating the VA properties from the Freeway right-of-way, thence
38.2 feet South 54°25' West, thence 15 feet at a right angle, being North 35°35' West, to the point of
beginning.  From the point of beginning 237.3 feet North 29°49' West, thence 161.9 feet South 54°25'
West, thence 235.1 feet South 35°35' East, thence 131 feet North 54°25' East, to the point of beginning:
approximately 0.8 acres.



AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Attachment B
(Description and Depiction of the "Replacement Drill Site")

A PARCEL OF LAND SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, LYING WITHIN AND BEING A PORTION OF THE UNITED STATES VETERAN'S
ADMINISTRATION LANDS AS SHOWN ON THE MAP OF THAT PORTION OF THE RANCHO
SAN VICENTE AND SANTA MONICA KNOWN AS THE VILLA FARMS, RECORDED IN BOOK
70, PAGE 54 ET SEQ. OF MISCELLANEOUS RECORDS IN THE OFFICE OF THE RECORDER OF
SAID COUNTY; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE
OF INTERSTATE ROUTE 405 AND THE SOUTHERLY RIGHT-OF-WAY LINE OF
CONSTITUTION AVENUE (60' R/W) AS SHOWN ON THE RECORD OF SURVEY OF STATE
ROUTE 405 RECORDED IN BOOK 237, PAGES 41 THROUGH 70, INCLUSIVE, OF OFFICIAL
RECORDS IN THE OFFICE OF THE RECORDER OF SAID COUNTY AND IDENTIFIED BY SAID
RECORD OF SURVEY AS THE NORTHWESTERLY CORNER OF THE LAND DESCRIBED AS
UNIT III PER DEED BOOK 48033, PAGES 392 THROUGH 409 AND IN THE DEED OF
CORRECTION PER BOOK 3633, PAGES 681 THROUGH 691, OF SAID OFFICIAL  RECORDS;
THENCE SOUTH 54°39'55" WEST ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF
CONSTITUTION AVENUE 20.03 FEET TO AN INTERSECTION WITH THE WESTERLY LINE OF
THE "LICENSE TO OPERATE FREEWAY" PARCEL NO. 79711-1 SHOWN ON THE CALTRANS
SR 11-287 SURVEY REPORT DATED DECEMBER 14, 2011; THENCE SOUTH 32°07'43" EAST
ALONG SAID WESTERLY LINE, 379.78 FEET; THENCE SOUTH 25°43'33" EAST ALONG SAID
WESTERLY LINE, 58.15 FEET TO THE **TRUE POINT OF BEGINNING** AT THE INTERSECTION
WITH THE SOUTHERLY LINE OF A PARCEL OF LAND DESIGNATED AS A DRILLSITE
PURSUANT TO A LEASE ISSUED TO TOM H. DOWLEN ON OCTOBER 18, 1963 AND
ASSIGNED TO GULF OIL CORPORATION OF CALIFORNIA ON JANUARY 24, 1964, SAID
PARCEL ORIGINALLY OPERATED BY OCCIDENTAL PETROLEUM CORPORATION AND
CURRENTLY OPERATED BY BREITBURN ENERGY; THENCE CONTINUE SOUTH 25°43'33"
EAST ALONG SAID WESTERLY LINE, 117.94 FEET; THENCE LEAVING SAID WESTERLY
LINE OF THE "LICENSE TO OPERATE FREEWAY" PARCEL NO. 79711-1, SOUTH 46°48'39"
WEST, 317.94 FEET; THENCE NORTH 44°15'12" WEST, 69.34 FEET;  THENCE NORTH 11°30'44"
EAST, 31.09 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE WESTERLY AND
HAVING A RADIUS OF 263.00 FEET AND A CENTRAL ANGLE OF 18°05'24"; THENCE
NORTHERLY ALONG SAID CURVE, AN ARC DISTANCE OF 83.04 FEET; THENCE LEAVING
SAID CURVE ON A NON-TANGENTIAL LINE NORTH 49°15'41" EAST, 60.60 FEET TO AN
INTERSECTION WITH THE WESTERLY LINE OF SAID DRILL SITE CURRENTLY OPERATED
BY BREITBURN ENERGY;  THENCE SOUTH 43°36'35" EAST ALONG SAID WESTERLY LINE,
30.00 FEET TO THE MOST SOUTHERLY CORNER OF SAID DRILL SITE; THENCE NORTH
46°48'39" EAST ALONG THE SOUTHERLY LINE OF SAID DRILL SITE, 209.34 FEET TO THE
SAID **POINT OF BEGINNING**.

TOGETHER WITH THE RIGHT TO USE THE SURFACE LOCATION REPLACEMENT DRILL
SITE FOR THE PURPOSE OF DRILLING AND BORING FOR OIL, GAS, PETROLEUM AND
OTHER MINERAL OR HYDROCARBON SUBSTANCES, UNDER SAID LEASE OR ANY OTHER
LANDS, TOGETHER WITH ALL RIGHTS AND PRIVILEGES NECESSARY AND PROPERLY
INCIDENT THERETO, INCLUDING THE RIGHT TO COMPLETE, RECOMPLETE, MAINTAIN,
OPERATE, DEEPEN, REDRILL AND/OR REPAIR ANY AND ALL WELLS DRILLED ON THE
SURFACE LOCATION REPLACEMENT DRILL SITE, THE RIGHT TO PRODUCE WATER FROM
SURFACE LOCATION REPLACEMENT DRILL SITE AND USE THE WATER SO PRODUCED IN
CONNECTION WITH THE PRODUCTION AND DEVELOPMENT OF OIL, GAS, PETROLEUM
AND OTHER MINERAL OR HYDROCARBON SUBSTANCES, THE RIGHT TO INJECT WATER,
OTHER FLUIDS AND/OR GAS INTO THE SUBSURFACE STRATA, AND THE RIGHT TO
CONSTRUCT, MAINTAIN, USE AND REMOVE SUCH TANKS, BUILDINGS, APPLIANCES,
MACHINERY, FIXTURES AND APPURTENANCES AS MAY BE REASONABLY NECESSARY IN
CARRYING ON SUCH OPERATIONS, AND THE RIGHT TO CONSTRUCT, MAINTAIN AND USE
OVER, THROUGH, AND ACROSS THE SURFACE LOCATION REPLACEMENT DRILL SITE,
AND TO REMOVE THEREFROM SUCH TELEPHONE, TELEGRAPH OR ELECTRIC LINES, PIPE
LINES, ROADWAYS AND OTHER STRUCTURES AS MAY BE NECESSARY IN CONNECTION
WITH THE DEVELOPMENT OF OIL, GAS, PETROLEUM AND OTHER MINERAL OR
HYDROCARBON SUBSTANCES UNDER SAID LEASE AND UNDER ANY OTHER LANDS.

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Attachment B "Continued"
(Description and Depiction of the "Replacement Drill Site")



AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Attachment C
(Description and Depiction of the 8" Water Pipeline To
Support the Lessee's Activities At the Replacement Drill Site)

# Gulf Oil Corporation of California

UNIVERSAL PRODUCTION DIVISION

December 16, 1964

1801 Avenue of the Stars
Los Angeles 67, California

Dr. Harold M. Engle
Director, Veterans Administration
Center
Wilshire and Sawtelle Boulevards
Los Angeles 25, California

Re:  United States Oil and Gas Lease
Los Angeles 0138800

Dear Dr. Engle:

Reference is made to the above subject lease affecting
the Veterans Administration Center, the lessee's interests under
which lease are now held by Gulf Oil Corporation of California.

As an incident to drilling and other operations under
said lease it is necessary that we provide for water and gas on
the drillsite area located near Sepulveda Boulevard and Consti-
tution Avenue. We propose to make a meter connection for water
north of the drillsite area near Waterford Avenue and a meter
connection for gas south of the drillsite area in the Center's
service area. Water and gas will be piped to the drillsite by
three (3") inch lines located within the Center adjacent to the
westerly boundary of the San Diego Freeway.

There is attached hereto a plat showing the general
location of the meter connections and the water and gas lines
which we propose to install within the Center provided such
installations are approved by you.

Gulf will, of course, make connections and install the
lines at its sole cost, risk and expense and will hold the Vet-
erans Administration free and harmless of and from any and all
claims, costs, liabilities and damages arising out of or in con-
nection with the installation and use of such facilities.

In the event the foregoing is acceptable and as evidence
of your consent thereto, will you kindly so indicate on the dupli-
cate copy of this letter as therein provided and return the same
to us.

Yours very truly,

GULF OIL CORPORATION OF CALIFORNIA

By _____
    DON GILKISON    Attorney in Fact

DG/a
ACCEPTED AND APPROVED
this _17_ day of
_DECEMBER_ 1964
VETERANS ADMINISTRATION
_____
H. MARTIN ENGLE, M.D.
Director

# 15

AMENDMENT, PARTIAL SURRENDER OF SURFACE RIGHTS AND RATIFICATION
OF PROTECTIVE OIL AND GAS LEASE
(Serial Number: Riverside R 1956)

Attachment C "Continued"
(Description and Depiction of the 8" Water Pipeline To
Support the Lessee's Activities At the Replacement Drill Site)



# EXHIBIT H

Amendment, Revival and Extension to Sawtelle-Breitburn License
Department of Veterans Affairs License No. 691-97-01-1L

# AMENDMENT, REVIVAL AND EXTENSION OF THE REVOCABLE LICENSE FOR NON-FEDERAL USE OF REAL PROPERTY AGREEMENT

THIS AMENDMENT REVIVAL, AND EXTENSION OF THE REVOCABLE LICENSE FOR NON-FEDERAL USE OF REAL PROPERTY AGREEMENT, hereinafter called (the "Amendment") is entered into and made effective on the 7th day of March, 2017, by and between the Department of Veterans Affairs, licensor as ("VA") and Breitburn Operating LP as ("Licensee").

<u>Recitals</u>

On July 21, 1966 the Department of Veterans Affairs leased a designated surface drilling site, hereinafter called ("Lease Agreement") under the Bureau of Land Management serial lease No. 0138800 to Occidental Petroleum Corporation ("Oxy"), for a three year term to also use the drill site for slant drilling of wells bottomed under land outside of VA property.

After successive three year periods of signing supplemental Lease Agreement's starting on July 14, 1969 and terminating on October 1, 1990, the succession of supplemental agreements was broken, by allowing the Lease Agreement to expire on October 1, 1990.

Whereas on January 1, 1997, the Department of Veterans Affairs and Westside Operating Partners Limited, as successor to Oxy, entered into a Revocable License for Non-Federal Use of Real Property No. 691-97-01-1L (said "License").

Licensee is successor to Westside Operating Partners Limited and continues to occupy and exercise those rights and benefits from use of said drill site.

WHEREAS it is the desire of the parties to extend the primary term of said License; to adopt, ratify, revive, confirm and extend said License; and amend said License; all as hereinafter provided.

Now, therefore, in consideration of the premises and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, and for the purposes of amending and reviving said License, it is now and hereby agreed notwithstanding anything to the contrary in said License as originally executed or as amended by any previous amendment, that:

1. Breitburn Operating LP is substituted as successor licensee under the License in place of Westside Operating Partners Limited.

2. The term of this Amendment (the "Extension Term") shall be extended for a period of 10 years, commencing on March 7, 2017 and expiring March 2, 2027 with one (1) Ten Year Option to extend subject to the mutual written agreement of the parties. Notwithstanding anything to the contrary whether in this License or at law or equity, this License shall at all

Amendment, Revival and Extension to Sawtelle-Breitburn License
Department of Veterans Affairs License No. 691-97-01-1L

times be revocable by either party if the revoking party provides the non-revoking party with not less than twelve (12) months prior written notice after the end of the Extension Term. The VA shall also be permitted to revoke the License if the Licensee fails to comply with the terms and conditions contained herein; if revocation is necessary due to a VA or national security event; or if the Licensee abandons the site for a continuous period that is the lesser of thirty (30) continuous days, or the timeframe and process that is otherwise provided for under California law to constitute an abandonment of the site.  Upon revocation of this License or abandonment by the Licensee, at the election of the VA, the Licensee must restore the property within sixty (60) days, to substantially the same conditions as those existing at the time of entry.  If the Licensee fails to the do so, the VA shall be permitted to pursue any and all rights and remedies available to it under this License and at law and equity.

3.   Section 4 of the License shall be deleted in its entirely and is herewith amended to read:

"As material consideration for VA's cooperation with respect to this Amendment, Licensee agrees that commencing with the execution of this Amendment and continuing throughout the remaining term of this License, to donate a monthly monetary payment to the Disabled American Veterans Los Angeles Chapter (DAV-LA) (whose address is VARO Federal Building, 11000 Wilshire Blvd., Rm. 5227, Los Angeles, CA 90024 and whose telephone number is (310) 477-2530), that is equal to a two and one-half percent (2.5%) overriding royalty on the total gross production of all oil, gas and other hydrocarbons, which are produced from any and all wells drilled under this License. DAV-LA's use of the aforementioned donated funds shall be solely for the purpose of providing transportation to Veterans on and around the VA Greater Los Angeles Healthcare System campus ("West Los Angeles Campus") located at 11301 Wilshire Blvd., Los Angeles, CA 90073.  Disabled American Veterans' Tax Identification # is 31-0263158."

4.   Licensee shall provide monthly statements to the VA upon written request showing the timing and amount of each monetary donation payment remitted to the DAV-LA.  Licensee agrees that VA and/or its contractors or designees shall be permitted with Licensee's cooperation, to conduct an audit of the revenues and corresponding payments relating to such monetary donation payments from Licensee to DAV-LA, within fourteen days after issuance of a written letter from VA's Contracting Officer to Licensee.  The VA shall be permitted via a letter from the VA Contracting Officer to the Licensee, to require at VA's discretion either that all or a portion of such monetary donation payments:  (a) be temporarily held in suspense for future disbursement as and when VA shall later instruct; or (b) used for an alternative Veteran focused purpose, if any such VA audit reveals that the funds previously remitted from Licensee to the DAV-LA were misused in a manner contrary to the intent of this provision or any applicable rule or law.

Licensee agrees that these monetary donation payments are material to VA's inducement and cooperation with this Amendment and constitute lawful consideration with respect to Licensee's related activities on the West Los Angeles Campus, and that such payments properly owed during the term of this License shall survive the termination or expiration of this License, and any such unpaid amounts shall be subject to recovery procedures to the extent permitted under applicable law and equity.

5.   Licensee shall have the right to process offsite gas.

Amendment, Revival and Extension to Sawtelle-Breitburn License
Department of Veterans Affairs License No. 691-97-01-1L

6.  Section 5 of the License shall be herewith amended to read:

"If to the Licensee:
Land Department
Breitburn Operating LP
707 Wilshire Boulevard, Suite 4600
Los Angeles, CA 90017"

VA hereby agrees and acknowledges that there are no defaults currently under said License, and VA and Licensee do hereby ratify, revive, adopt, confirm and extend said License, and VA does hereby license, let, and demise the licensed land, subject to all the terms, provisions, covenants, and conditions set forth in said License, which are incorporated herein by this reference except as amended above, and further declare that said License, as amended, is a valid and subsisting License and is confirmed to be in good standing and in full force and effect.

All other terms and conditions of the License shall remain in full force and effect.

This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs and assigns.

This Amendment may be executed in any number of counterparts with the same force and effect as though all parties signed the same document.

All provisions of the License, except as modified by this Amendment, shall remain in full force and effect.

Notwithstanding anything in this License or elsewhere to the contrary, this agreement shall at all times be subject to applicable Federal, State, and local laws, codes, ordinances, and regulations.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of License as of the date and year first written above.

LICENSOR:

U.S. DEPARTMENT OF VETERANS AFFAIRS

Name and Title: Alan Trinh, Contracting Officer

Date: 4/17/17

SUCCESSOR LICENSEE:

BREITBURN OPERATING LP

William W. Weldon, Vice President Land and Attorney-in-Fact

Date: 4-5-17