MARK D. ROSENBAUM, 59940
mrosenbaum@publiccounsel.org
KATHRYN A. EIDMANN, 268053
keidmann@publiccounsel.org
AMANDA K. PERTUSATI, 296669
apertusati@publiccounsel.org
AMANDA MANGASER SAVAGE, 325996
asavage@publiccounsel.org
AMELIA PIAZZA, SBN 342473
apiazza@publiccounsel.org
YI LI, SBN 354281
yli@publiccounsel.org
PUBLIC COUNSEL LAW CENTER
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:    (213) 385-2977
Facsimile:    (213) 385-9089

EVE L. HILL, 202178
EHill@browngold.com
JAMIE STRAWBRIDGE, Pro Hac Vice
JStrawbridge@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, Maryland 21202
Telephone:    (410) 962-1030
Facsimile:    (401) 385-0869

ROMAN M. SILBERFELD, 62783
RSilberfeld@RobinsKaplan.com
DAVID MARTINEZ, 193183
dmartinez@robinskaplan.com
TOMMY H. DU, 305117
TDu@RobinsKaplan.com
ROBINS KAPLAN LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:    (310) 552-0130
Facsimile:    (310) 229-5800

T.E. GLENN, 155761
TGlenn@innercitylaw.org
AMANDA POWELL, 318036
APowell@innercitylaw.org
CHARLES KOHORST, 327558
CKohorst@innercitylaw.org
INNER CITY LAW CENTER
1309 East Seventh Street
Los Angeles, CA 90021
Telephone:    (213) 891-2880
Facsimile:    (213) 891-2888

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY POWERS, *et. al.*, | Case No.: 2:22-cv-08357-DOC-KS |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| DENIS RICHARD MCDONOUGH, in his official capacity, Secretary of Veterans Affairs, *et al.*, | TIME: 10:00AM<br>DATE: JULY 9, 2024<br>LOCATION: FIRST STREET COURTHOUSE |
| Defendants. | |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 9, 2024, at 10:00 a.m., of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move this Court, in accordance with Rule 56 of the Federal Rules of Civil Procedure, for an order granting partial summary judgment against Defendants Denis Richard McDonough, Marcia Fudge, Douglas Guthrie, Steven Braverman, and Keith Harris, in their official capacities, and Intervenor Bridgeland Resources, LLC ("Bridgeland") as follows: (1) Plaintiffs Claims for Breach of Fiduciary Duty; (2) Plaintiff's Rehabilitation Act Claim on behalf of the Subclass; and (3) Plaintiffs' claim under the Administrative Procedure Act.

Plaintiffs seek this order on the grounds that: (a) the 1888 Deed created a Charitable Trust, and the Government assumed fiduciary duties by virtue of the West Los Angeles Leasing Act of 2016; (b) Federal Defendants' (i) delegation of the obligation to provide housing to third-party developers who impose restrictive Area Median Income measures and (ii) counting of veterans' disability benefits as income discriminate on the basis of disability; (c) the VA's leases with Brentwood School, the Safety Park Corporation, and BreitBurn Energy do not principally benefit veterans as is required under the West Los Angeles Leasing Act of 2016; and (d) the undisputed facts show that Plaintiffs are entitled to relief they seek.  This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of Tommy H. Du and supporting evidence attached thereto, the Separate Statement of Uncontroverted Facts, the pleadings and papers on file in this action, and any other evidence and argument as may be presented at the hearing on this Motion.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

94915982.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND..................................................................................... 2

I.      The WLA Grounds Were Deeded to the Federal Government to Provide Housing for Veterans. ....................................................................... 2

II.     Federal Defendants Have Failed to Provide Permanent Supportive Housing for Disabled Veterans. ......................................................................... 4

PROCEDURAL BACKGROUND ............................................................................ 6

LEGAL STANDARD ............................................................................................... 7

ARGUMENT ............................................................................................................ 8

I.      Plaintiffs Are Entitled to Partial Summary Judgment on the VA's Breach of Fiduciary Duty by Its Unlawful Land-Use Agreements. ............... 8

     A. The 1888 Deed Created a Charitable Trust.................................................. 8

     B. The Government Has Assumed An Enforceable Fiduciary Duty.............. 9

     C. The Government Has Breached Its Fiduciary Duty to Veterans By, *Inter Alia*, Entering Into Unlawful Land-Use Agreements...................... 10

II.     Plaintiffs Are Entitled to Partial Summary Judgment on Their Second Cause of Action Based the Government's Contracting with Third-Party Developers Who Use Discriminatory Income Limitations. ................. 11

     A. Subclass Members are Individuals with Disabilities. .............................. 12

     B. Members of the Subclass are Qualified to Receive Healthcare Services.      12

     C. Plaintiffs Have Established That Members of the Subclass Were Excluded "Solely by Reason of" Their Disability. .................................. 13

     D. Even if the AMI Restrictions Were Facially Neutral, They Discriminate Against Disabled Individuals by Denying Them Meaningful Access to Benefits to Which They are Entitled. .................. 15

     E. Plaintiffs have established that VAGLAHS is administered by an executive agency. ..................................................................................... 17

III.    Plaintiffs are Entitled to Summary Judgment on Their Sixth Cause of Action under the Administrative Procedure Act........................................... 18

     A. Execution of the BreitBurn Drilling License Violated WLALA and the APA.      19

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

94915982.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

B.  Execution of the Safety Park Lease Violated WLALA and the APA. ......20

C.  Execution of the Brentwood School Lease Violated WLALA and the APA. ................21

CONCLUSION.....................................................................................................21

iv

94915982.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Choate,*
469 U.S. 287 (1985) ................................................................. 13

*Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch,*
179 F.3d 725 (9th Cir. 1999) ..................................................... 14

*Estate of Breeden,*
208 Cal. App. 3d 981 (1989) ....................................................... 9

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................... 8

*Connecticut Nat. Bank v. Germain,*
503 U.S. 249 (1992) .................................................................. 18

*Crowder v. Kitagawa,*
81 F.3d 1480 (9th Cir. 1996) ............................................... 15, 16

*CVS Pharmacy, Inc. v. John Doe, One,*
141 S. Ct. 2882, (2021) ............................................................. 15

*CVS Pharmacy, Inc. v. John Doe, One,*
142 S. Ct. 480 (2021) ................................................................ 15

*Delta Sav. Bank v. United States,*
265 F.3d 1017 (9th Cir. 2001) ..................................................... 8

*Doe v. CVS Pharmacy, Inc.,*
982 F.3d 1204 (9th Cir. 2020) ................................................... 15

*Duvall v. Cnty. of Kitsap,*
260 F.3d 1124 (9th Cir. 2001), *as amended on denial of reh'g*
(Oct. 11, 2001) ......................................................................... 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) .................................................................. 14

*Hardt v. Reliance Standard Life Ins. Co.,*
560 U.S. 242 (2010) .................................................................. 18

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

*Lovell v. Chandler*,
   303 F.3d 1039 (9th Cir. 2002) ........................................................... 13, 15, 17

*Mark H. v. Lemahieu*,
   513 F.3d 922 (9th Cir. 2008) ............................................................................ 17

*Payan v. L. A. Cmty. Coll. Dist.*,
   11 F.4th 729 (9th Cir. 2021) ............................................................................ 15

*Rodde v. Bonta*,
   357 F.3d 988 (9th Cir. 2004), 357 F.3d ................................................... 15, 16

*Townsend v. Quasim*,
   328 F.3d 511 (9th Cir. 2003) ........................................................................... 14

*Valentini v. Shinseki*,
   860 F. Supp. 2d 1079 (C.D. Cal. 2012) ....................................................... 9, 10

**Statutes**

5 U.S.C. § 706 ..................................................................................................... 17, 19

24 U.S.C. § 111, 14 Stat. 10 (1866) ......................................................................... 9

29 U.S.C.
   § 504 ....................................................................................... 11, 13, 15, 17
   § 705(20)(B) ...................................................................................... 11
   § 794(a) ................................................................................ 11, 13, 17

42 U.S.C. 12101 *et seq.* ................................................................................... 11, 12

West Los Angeles Leasing Act of 2016, Pub. L. 114–226 (Sept. 29,
   2016) ...................................................................................... 4, 10, 18

**Court Rules**

Fed. R. Civ. P. 56(c) ................................................................................................. 8

**Other Authorities**

24 C.F.R.
   § 8.1 .................................................................................................... 17

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

94915982.1

38 C.F.R.

§ 15.130(b)(1)............................................................................................17
§ 15.130(b)(3)............................................................................................14
§ 17.36(a)(1).............................................................................................12
§ 17.36(b)..................................................................................................12

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

94915982.1

# INTRODUCTION

In the homeless veterans' capital of the United States, the largely empty, 388-acre expanse of the VA's West Los Angeles Grounds ("WLA Grounds") is a sprawling testament to Government dysfunction. That the federal government—which can fast-track a COVID vaccine, intervene to prevent financial collapse, and channel billions toward the expansion of transportation, energy, and digital infrastructure—continuously fails to provide sufficient housing for its disabled veterans, on land deeded for precisely that purpose, defies explanation. But facts are facts. For decades, the Government has fought tooth-and-nail to prevent disabled veterans—the intended beneficiaries of the charitable trust created when the Grounds were transferred to the Government—from residing there. It has prioritized the desires of commercial interests and the fears of NIMBY neighbors under the guise of refusing to "create a ghetto for veterans" in affluent Brentwood.[1] And it has squandered years of potential progress in bureaucratic wrangling and broken promises.

The cost of this failure is veterans' lives. Unhoused persons experience a shortened life span of, on average, approximately *two decades*.[2] On the street, they suffer "unimaginable" "[l]evels of victimization and trauma" in the form of violence, harassment, and theft.[3] In the words of Dr. Jonathan Sherin, "life on the streets is traumatic by definition," and the state of homelessness exacerbates the ravages "of mental illness and addiction while physical health conditions fester."[4]

This suffering is preventable. As Dr. Benjamin Henwood explains—and the Government does not deny—"remarkably consistent" research shows "that when

---

[1] Nick Gerda, *VA Officials Rebuff Calls to House 4,000 at West LA Campus*, LAist (Jan. 31, 2024), https://laist.com/news/housing-homelessness/veterans-housing-la-west-la.

[2] Expert Report of Benjamin F. Henwood [hereinafter "Henwood Decl."] ¶ 18.

[3] *Id.*

[4] Expert Report of Jonathan Sherin [hereinafter "Sherin Decl."] at 5.

94915982.1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

implemented correctly, [Permanent Supportive Housing] results in fewer hospitali-zations, shorter hospital stays, fewer visits to emergency departments, and less homelessness or a greater likelihood and length of time in housing."[5] Veterans struggling with debilitating disabilities require housing, "ready access to on-site healthcare and rehabilitative services," and resources to prevent their falling back into homelessness.[6] Because the undisputed record demonstrates that (1) the VA has a fiduciary duty to provide housing to disabled veterans on the WLA Grounds; (2) the VA contracts with developers who impose income restrictions that discrimi-nate on the basis of disability; and (3) the VA's land-use agreements with Breit-Burn, Safety Park, and the Brentwood School principally benefit third parties, not veterans, Plaintiffs are entitled to summary judgment on these issues.

## FACTUAL BACKGROUND

### I. The WLA Grounds Were Deeded to the Federal Government to Provide Housing for Veterans.

Approximately 3,458 unhoused veterans live in Los Angeles.[7] They sleep in cars, in temporary shelters, and on the street, just miles away from the WLA Grounds that were deeded to the Government in 1888 for the express purpose of housing "disabled volunteer soldiers."[8] For decades, the property provided housing, education, and vocational activities for as many as 4,000 veteran residents recover-ing from the trauma of war.[9]

---

[5] Henwood Decl. ¶ 16.
[6] Sherin Decl. 4.
[7] L.A. Homeless Servs. Auth., Veterans HC2022 Data Summary (2022), https://www.lahsa.org/documents?id=6630-veterans-hc2022-data-summary.
[8] Decl. of Tommy H. Du ("Du Decl.") ¶ 2, Ex. 1 ("1888 Deed").
[9] *Life at the National Home, Circa 1922*, 1887 Fund, https://www.1887fund.org/about/life-at-the-national-home/ (last visited Nov. 9, 2022); An Examination of Waste and Abuse Associated With VA's Management of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

2

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

But for the past 50 years, the Department of Veterans Affairs ("VA") has failed to abide by its obligations under the deed and the law.[10] First, it disposed of 200 to 300 acres of its 600 to 700 acres of land through a series of transfers,[11] stopping only after Congress enacted a statute to prevent it from further shrinking the property.[12] By the 1960s and 70s, notwithstanding an influx of veterans returning from the Vietnam War, the VA stopped accepting new residents altogether.[13] Those who remained faced "filthy" and "medieval" conditions in the Grounds' medical facilities.[14] Today, there are only 233 units of permanent housing on the WLA Grounds,[15] an area roughly the size of 294 football fields.

In total disregard of its duty to Los Angeles veterans, the VA has leased portions of the WLA Grounds to private entities and entered into land use agreements with for-profit and not-for-profit entities for myriad purposes—with the glaring exception of providing desperately needed Permanent Supportive Housing to veterans with disabilities.[16] The VA has, among other deals, contracted with the private

---

Land-Use Agreements, Am. Legion (Feb. 10, 2015), https://www.legion.org/legislative/testimony/226037/examination-waste-and-abuse-associated-vas-management-land-use

[10] Du Decl. ¶ 2, Ex. 1 ("1888 Deed").

[11] Examples include "improvement of the San Diego Freeway," see Interstate 405, https://www.cahighways.org/ROUTE405.html; and the national cemetery, Nat'l Cemetery Adm., https://www.cem.va.gov/CEMs/nchp/losangeles.asp (currently "more than 127 acres").

[12] Pub. L. 110-161 § 224(a) (2007).

[13] *See* Stanley O. Williford, *Afraid to Speak: Few at Veterans Center Willing to Tell Complaints*, L.A. Times, Apr. 29, 1970, at 3.

[14] Stanley O. Williford, *Patient Care Affected, Doctors Contend: Wadsworth Hospital Pay and Equipment Hit*, L.A. Times, May 31, 1970, at H1.

[15] Oral Arg. Tr. 12:3, 98:14–15.

[16] *See generally* Dkt. 37-9.

Brentwood School to house its student athletic facilities, with BreitBurn to extract oil from neighboring land, and with Safety Park to operate parking lots.[17]

After a parking lot operator on the Grounds defrauded the VA of more than $13 million,[18] Congress stepped up oversight, enacting the West Los Angeles Leasing Act of 2016, Pub. L. 114–226 (Sept. 29, 2016) ("Leasing Act" or "WLALA"). The Leasing Act allows non-VA entities to use the WLA Grounds only if the real property leases and land-use agreements "principally benefit veterans and their families."[19] It also requires the VA Office of the Inspector General ("OIG") to submit reports to Congress.[20] The OIG found as recently as 2021 that seven of the VA's land-use agreements failed to principally benefit veterans, including those with the Brentwood School, BreitBurn, and Safety Park.[21]

## II.   Federal Defendants Have Failed to Provide Permanent Supportive Housing for Disabled Veterans.

The VA is tasked with providing veterans with preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care, which includes residential treatment and housing services.[22] The VA Greater Los Angeles Healthcare System ("VAGLAHS"), covering all or parts of Los Angeles, Ventura, Kern, Santa Barbara, and San Luis Obispo Counties, offers these services primarily at the VA Greater Los Angeles Medical Center on the WLA Grounds.[23] But as the VA knows,[24] veterans with traumatic brain injuries and serious mental

---

[17] *Id.*; AR_SafetyPark_017 (original lease).
[18] Dkt. 37-12 at 24.
[19] WLALA § 2(b)(1).
[20] WLALA § 2(j)(2)(A)
[21] Dkt. 37-9 at 29–34.
[22] *See* 38 C.F.R. § 17.38(a) (2023) (listing details of the medical benefits package).
[23] Federal Def.'s First Am. Answer to Pls' First Am. Compl. ¶¶ 210, 212.
[24] Braverman Dep. Tr. 145:23–146:1.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

4

94915982.1

illness, such as Post-Traumatic Stress Disorder ("PTSD"), schizophrenia, and severe depression, often face challenges accessing healthcare services. For example, Plaintiff Laurieann Wright, who lives with PTSD related to sexual assault she experienced during her service, struggles with the hours-long journey from her apartment in Lancaster to her medical appointments on the WLA Grounds.[25] Consequently, only half of veterans with service-connected mental illness get treatment, and even less than half with probable brain injuries receive a medical evaluation.[26]

In order to access the critical services located on the WLA Grounds, veterans with serious mental illness and traumatic brain injuries require Permanent Supportive Housing, which combines housing assistance with supportive services for persons with disabilities, including case management, education, employment assistance, and mental health services.[27] Braverman Tr. 26:17–19 (acknowledging that lack of "stable housing situations" and "moving a lot . . . may result in less-than-stable access to medical care"). Insofar as the Government provides Permanent Supportive Housing at all, it does so in large part through the VA and HUD's joint HUD-VA Supportive Housing ("HUD-VASH") program.[28] The HUD-VASH program provides vouchers for rental assistance, but nearly 2500 vouchers are out of use in the Greater Los Angeles area.[29] Insufficient support services have resulted in an unacceptably high rate of turnover.

Rather than provide Permanent Supportive Housing itself, the VA outsources

[25] Wright Tr. 19:22-23, 35:25-36:16 [rough].

[26] Terri Tanielian et al., RAND Ctr. Mil. Health Pol'y Res., *Invisible Wounds: Mental Health and Cognitive Care Needs of America's Returning Veterans* 3 (2008), https://www.rand.org/content/dam/rand/pubs/research_briefs/2008/RAND_RB9336.pdf.

[27] Dkt. 33 at ¶¶ 172–73.

[28] Kuhn Tr. 35:5-8 (naming HUD-VASH one of the "main permanent housing programs that the VA has").

[29] VA Greater Los Angeles Healthcare System, CERS Data Dashboard https://westlamasterplan.org/p/CERS (last visited May 13, 2024).

94915982.1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

this responsibility to third-party developers. These developers in turn must apply for public funding, which imposes restrictive income limitations on housing eligibility. Of 46 buildings in Los Angeles providing Permanent Supportive Housing for veterans, thirty-eight have "either some or all of their units set at 30 percent [of the Area Median Income]."[30] Veterans are only eligible for housing in these units if their income is at or below the income threshold.[31]

Because State and local funders count disability benefits as income, a single veteran in Los Angeles with no dependents and a 100 percent disability rating receives over 30 percent of the Area Median Income ("AMI").[32] Some veterans may receive additional benefits, like Social Security payments. Astoundingly, the veterans with the most severe disabilities are also those who are ineligible for *all* Permanent Supportive Housing in Los Angeles. As the VA itself acknowledges, this devastating outcome is "a problem of justice":[33] The exclusion of fully disabled veterans "who, by their service, would most benefit from being in these units" is manifestly unjust.[34]

## PROCEDURAL BACKGROUND

On November 15, 2022, Plaintiffs Jeffrey Powers, Deavin Sessom, Laurieann Wright, Samuel Castellanos, Joseph Fields, Lavon Johnson, Billy Edwards, Jessica Miles, Joshua Robert Petitt, Glenn Surrette, Naryan Stibbie, Does 1–2, and National

---

[30] Harris Tr. 55:3-8.

[31] Letter from the Los Angeles Housing Department to the Los Angeles City Council (Jan. 12, 2023) ("HACLA Letter"), https://lacity.primegov.com/Portal/viewer?id=425876&type=2

[32] *Id.*; Federal Def.'s First Am. Answer to Pls' First Am. Compl. ¶ 242.

[33] Kuhn Tr. 193:19–20.

[34] Braverman Tr. 145:25–146:1; *see also id.* at 145:12–19 ("And the part that is incongruous to me is that the disabilities that they have in some cases, based on service, are contributing to their homelessness . . . and they are some of the few who would explicitly benefit, in some cases, [from] being adjacent to, you know, co-located with, a medical center, and that they're not eligible for being in those units.").

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Veterans Foundation (collectively, "Plaintiffs") sued Defendants Denis Richard

2   McDonough, in his official capacity as Secretary of Veterans Affairs, Steven

3   Braverman, in his official capacity as Acting Director, VA Greater Los Angeles

4   Healthcare System, and Keith Harris, in his official capacity as Senior Executive

5   Homeless Agent, VA Greater Los Angeles Healthcare System. On May 15, 2023,

6   Plaintiffs filed a First Amended Complaint, individually and as class representa-

7   tives, adding two defendants: Marcia L. Fudge, in her official capacity as Secretary

8   of the Department of Housing and Urban Development ("HUD"), and Douglas

9   Guthrie, in his official capacity as President of the Housing Authority of the City of

10   Los Angeles ("HACLA").[35]

11      This Court denied Defendants' motions to dismiss on December 14, 2023.

12   The Court found that it has jurisdiction over Plaintiffs' Rehabilitation Act claims;

13   that justiciability doctrines do not bar Plaintiffs' claims; and that Plaintiffs ade-

14   quately pled each of their claims.[36]

15      On May 6, 2023, this Court certified a class defined as "[a]ll homeless veter-

16   ans with Serious Mental Illness [SMI] or Traumatic Brain Injuries [TBI], who re-

17   side in Los Angeles County" and appointed Plaintiffs Powers, Sessom, Fields,

18   Johnson, Wright, Petitt, Stibbie, Doe 1, and National Veterans Foundation as class

19   representatives.[37] It also certified a subclass defined as "[a]ll Class Members whose

20   income (including veterans disability benefits) exceeds 50% of the Area Median In-

21   come," and appointed Plaintiff Johnson as class representative for the subclass.[38]

22   **LEGAL STANDARD**

23      A motion for summary judgment must be granted if "there is no genuine dis-

24   pute to any material fact and the movant is entitled to judgment as a matter of

25

26   [35] Dkt. 33.

27   [36] MTD Order, Dkt. 106 at 23–27, 31, 35–40.
    [37] Class Cert. Order, Dkt. [] at 3, 16.

28   [38] *Id.*

94915982.1

law. Fed. R. Civ. P. 56(c). Rather than adduce evidence "negating the opponent's claim," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the moving party need only identify portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* (citing Fed. R. Civ. P. 56(c)). The standard for partial summary judgment is identical to that for summary judgment of a claim. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001).

**ARGUMENT**

**I.    Plaintiffs Are Entitled to Partial Summary Judgment on the VA's Breach of Fiduciary Duty by Its Unlawful Land-Use Agreements.**

**A.        The 1888 Deed Created a Charitable Trust.**

By the 1888 Deed, Senator John P. Jones and Arcadia B. de Baker transferred the land that is now the WLA Grounds to the National Soldiers' Home "in consideration" that it "should locate, establish, construct, and permanently maintain [there] a branch of said National Home for Disabled Volunteer Soldiers . . . ." Dkt. 37-3 at 2. This transfer created a charitable trust. Restatement (Third) of Trusts § 10 (Am. L. Inst. 2012); *see Estate of Breeden*, 208 Cal. App. 3d 981, 985 (1989) (charitable bequests are favored, and "liberal rules of construction" apply where a grant may be construed as a charitable trust). As the Court found in *Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012) ("*Valentini I*"), the 1888 Deed plainly manifested Senator Jones and Ms. de Baker's intent to create a trust relationship: its language "expresses far more than a *hope* on the part of the grantors that the land would be used for certain purposes; the 1888 Deed *requires* that the land be used as indicated for all time . . . ." *Id.* at 1104 (latter emphasis added).

The Government had statutory authority to accept the grant under 24 U.S.C. § 111, 14 Stat. 10 (1866), which established the National Asylum for Disabled Volunteer Soldiers and enabled its board of managers "to receive all donations of money or property made by any person or persons for the benefit of the asylum . . .

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

8

." 14 Stat. 10 at § 5. The Government's acceptance of the land created a charitable trust, with the Government as trustee and disabled veterans as beneficiaries. *Valentini I,* 860 F. Supp. 2d at 1106. As trustee, the Government has the duty to administer the trust diligently, in good faith, and in accordance with the terms governing its creation. Restatement (Third) of Trusts, §§ 76–84 (Am. L. Inst. 2012).

**B.      The Government Has Assumed An Enforceable Fiduciary Duty.**

Congress accepted and imposed enforceable fiduciary duties on the VA (the successor-in-interest to the National Soldiers' Home) by enacting two statutes—WLALA, Pub. L. No. 114–226, 130 Stat. 926 (2016), and its 2021 Amendment, Pub. Law 117–18, 135 Stat. 288 (2021)—that restrict the VA's use of the WLA Grounds in accordance with the charitable trust. *Valentini I*, 860 F. Supp. 2d at 1110 (quoting *Fitzgerald v. Baxter State Park Auth.*, 385 A.2d 189, 195 (Me. 1978)) (fiduciary duties can be made enforceable by "enumerated statutory restrictions" on property use that "duplicat[e]" those imposed in a deed). Specifically, the 2016 Act provides that:

o   Any lease must "principally benefit veterans and their families," and must be limited to certain purposes, such as "promotion of health and wellness," "[e]ducation," and "[v]ocational training";[39]

o   Any land-use agreement must "provide[] additional health care resources to the Campus," *and* "benefit[] veterans and their families";[40]

o   Any funds received from leases of the Grounds shall be used "exclusively for the renovation and maintenance of the land and facilities at the Campus,"[41] and

---

[39] WLALA § 2(b)(2).

[40] *Id.* § 2(c)(1)–(2).

[41] *Id.* § 2(d). The 2021 Amendment imposes a similar limitation, stating that land use revenue shall be available exclusively for any of the following:

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

o Before entering into or renewing any lease or land-use agreement, the Secretary must certify that the VA has implemented any Inspector General recommendations to redress noncompliance with federal laws governing those agreements.[42]

As this Court has recognized, these obligations imposed by Congress "mirror the types of fiduciary duties" traditionally assumed by trustees. Dkt. 106 at 31. By codifying these obligations in WLALA, Congress plainly signaled its intent that the VA assume the mandate of the 1888 Deed and deliver on its obligations to disabled veterans. Under the terms of the Deed and the resulting Trust, as accepted under WLALA and its 2021 Amendment, the Government has a duty to use the WLA Grounds for the establishment, construction, and permanent maintenance (and operation) of housing and healthcare for veterans with disabilities.

## C. The Government Has Breached Its Fiduciary Duty to Veterans By, *Inter Alia*, Entering Into Unlawful Land-Use Agreements.

As the OIG found, and as is set forth further below, the VA entered into numerous leases that did not comply with the WLALA and its 2021 Amendment, much less the original mandate of the 1888 Deed.[43] Execution of these leases is a clear breach of the VA's fiduciary duty. This Court can find as a matter of law that oil drilling, for example, is entirely unrelated to maintaining a permanent home for

---

(A) Supporting construction, maintenance, and services at the Grounds relating to temporary or permanent supportive housing for homeless or at–risk veterans; (B) Renovating and maintaining the land and facilities at the Grounds; (C) Carrying out minor construction projects at the Grounds; (D) Carrying out community operations at the Grounds that support the development of emergency shelter or supportive housing for homeless or at–risk veterans and their families.

WLALA 2021 § 2(a).
[42] WLALA § 2(h).
[43] *See infra*, Section III(A); Dkt. 37-9 at 29–34.

10

veterans.[44] The full extent of the VA's breach and the relief to which Plaintiffs are entitled should be determined by an evidentiary hearing at trial.

## II. Plaintiffs Are Entitled to Partial Summary Judgment on Their Second Cause of Action Based the Government's Contracting with Third-Party Developers Who Use Discriminatory Income Limitations.

Rather than provide disabled veterans with Permanent Supportive Housing on the WLA Grounds, the VA has delegated its duty to third-party developers whose properties are largely subject to draconian income restrictions that discriminate on the basis of disability.

A plaintiff establishes a violation of Section 504 of the Rehabilitation Act by showing that: (1) they are an individual with a disability; (2) they are otherwise qualified to receive the benefit; (3) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities "solely by reason of" their disability; and (4) the program is administered by an executive agency. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), (outlining first three parts of the test); 29 U.S.C. § 794(a) (applying Section 504's nondiscrimination requirement to "any program or activity conducted by any Executive agency").[45] The undisputed evidence in this case demonstrates that Plaintiffs have met all four prongs.

---

[44] Per the Director of VAGHLAHS, the committee that reviews proposed leases does not have a written set of criteria to determine whether a particular lease complies with WLALA. Braverman Dep. Tr. 254:2-8. Rather, whether a lease will benefit veterans first and foremost is "[in] the eye of the beholder." Braverman Dep. Tr. 254:14-17.

[45] Because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act," "courts have applied the same analysis to claims brought under both statutes." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

94915982.1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**A.** **Subclass Members are Individuals with Disabilities.**

*First*, Plaintiffs have established that members of the Subclass are individuals with physical and mental disabilities that inhibit one or more major life activities, making them disabled within the meaning of Section 504. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20)(B) (incorporating the Americans with Disabilities Act definition found at 42 U.S.C. § 12102); 42 U.S.C. § 12102 (defining an individual with a disability as someone with "a physical or mental impairment that substantially limits one or more major life activities," with "a record of such an impairment," or who is "regarded as having such an impairment"). By definition, Subclass members, all of whom are "homeless veterans with Serious Mental Illness [SMI] or Traumatic Brain Injuries [TBI],"[46] have a physical or mental impairment that substantially limits one or more life activities.

**B.** **Members of the Subclass are Qualified to Receive Healthcare Services.**

*Second*, members of the Subclass are "otherwise qualified" to receive VA healthcare benefits because—again by definition—they are "veterans with Serious Mental Illness [SMI] or Traumatic Brain Injuries [TBI] . . . whose income (including veterans disability benefits) exceeds 50% of the Area Median Income."[47] According to the VA's eligibility criteria, veterans with "a singular or combined rating of 50 percent or greater based on one or more service-connected disabilities" are the first among eight priority groups used to determine eligibility for benefits. 38 C.F.R. § 17.36(b); 38 C.F.R. § 17.36(a)(1) (requiring veterans to be enrolled in the VA healthcare system to receive the "medical benefits package"). To receive disability benefits sufficient to exceed 50 percent of AMI, veterans must have a high service-

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[46] Dkt 190 at 3.

[47] *Id.*

94915982.1

connected disability rating. *See* Dkt. 167-20 at ¶ 7 (declaring that Plaintiff Johnson has a 100 percent service-connected disability rating and is eligible for medical benefits from the VA). Thus, members of the Subclass—whose income, including disability benefits, exceeds 50 percent of AMI—almost necessarily have a sufficiently high service-connected disability rating to be eligible for VA health care benefits.

**C.      Plaintiffs Have Established That Members of the Subclass Were Excluded "Solely by Reason of" Their Disability.**

*Third*, the Government's delegation of its housing obligations to third parties that use restrictive AMI measures excludes Plaintiffs from healthcare services "solely by reason of" their disability. 29 U.S.C. § 794(a). Plaintiffs may establish disparate treatment in the form of a facially discriminatory policy. *See Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002). Alternatively, Plaintiffs may show that a facially neutral government policy or practice denies individuals with disabilities "meaningful access" to government benefits. *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (outlining the standard for disparate impact claims under Section 504). Here, the undisputed evidence demonstrates that the Government's tolerance of restrictive income restrictions both facially discriminates on the basis of disability and denies disabled veterans "meaningful access" to permanent supportive housing.

**1.      The Government's Reliance on Third Parties Using Income Restrictions Facially Discriminates Against Disabled Individuals.**

The record makes clear that the Government facially discriminates on the basis of disability by delegating its responsibility to provide Permanent Supportive Housing to third parties. Plaintiff Johnson and other members of the Subclass are excluded from housing on the WLA Grounds solely because their disabilities render

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

13

94915982.1

them eligible for disability benefits in excess of stringent AMI restrictions.[48] These restrictions apply to Subclass members only because the Government offloads its obligation to provide housing to third-party developers, who "often agree to the most restrictive income limitations, generally the 30% AMI level" to be competitive for public funding.[49] The Government does nothing to forbid such developers from discriminating against individuals receiving VA disability benefits in this way. *See* 38 C.F.R. § 15.130(b)(3) ("The agency may not, *directly or through contractual or other arrangements*, utilize criteria or methods of administration the purpose or effect of which would—(i) Subject qualified individuals with handicaps to discrimination on the basis of handicap; or (ii) Defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with handicaps.") (emphasis added). In fact, because the Government permits veterans' benefits to be counted as income, members of the Subclass are pushed over the income limit and therefore shut out of project–based housing, including housing on the WLA Grounds.[50] Dkt. 167-20 at ¶ 9. Despite its awareness of this issue, the VA declines to provide housing to veterans directly. Likewise, HUD refuses to use its HUD–VASH waiver authority to exclude veterans' benefits from income calculations determining housing eligibility. Dennis Dep. Tr. 90:8–13.

These policies constitute facial discrimination. A policy need not explicitly

---

[48] "HACLA Letter"

[49] *Id.*

[50] HUD's "interim changes" in response to the instant case, Letter from Off. of Pub. & Indian Hous., U.S. Dep't of HUD (Sept. 26, 2023) (HUD00000315), do not moot the issue, as "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

94915982.1

name disabled individuals to facially discriminate against them. *See Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 733 (9th Cir. 1999) (ordinance prohibiting permitting or operation of any new substance abuse clinics within 500 feet of residential property "discriminate[d] on its face," even though it did not explicitly reference disability status); *Townsend v. Quasim*, 328 F.3d 511, 518 n.2 (9th Cir. 2003) (program providing "only nursing-home based long term care services to the medically needy [while offering home-based services for others], may be read to facially discriminate against disabled persons"). Here, the Government tolerates developers' use of income restrictions that exclude the most disabled veterans from Permanent Supportive Housing. The Ninth Circuit has found facial discrimination where "disabled persons were denied [coverage in a program with a higher income threshold but given coverage in a program with a lower threshold] by the State solely because of their disabilities; that is, had they been nondisabled, they would have received . . . coverage [in the former program]." *Lovell*, 303 F.3d at 1053. The same is true here. Had Subclass members had a lower disability rating, they would have been eligible for Permanent Supportive Housing.

> **D.      Even if the AMI Restrictions Were Facially Neutral, They Discriminate Against Disabled Individuals by Denying Them Meaningful Access to Benefits to Which They are Entitled.**

The undisputed evidence shows that the Government's acceptance of developers imposing AMI restrictions "has the 'effect of denying meaningful access to public services' to people with disabilities." *Payan*, 11 F. 4th at 738–39. Even where a policy is facially neutral, it nevertheless discriminates on the basis of disability when it denies "certain disabled individuals meaningful access to government-provided services because of their unique needs," while leaving others unaffected or less affected. *Rodde v. Bonta*, 357 F.3d 988, 997–98 (9th Cir. 2004). *Cf. Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1212 (9th Cir. 2020), *cert. granted in*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

*part*, 141 S. Ct. 2882, (to run afoul of Section 504, a program need not impact the disabled group "in a unique or severe manner" so long as it denies meaningful access).

In *Crowder v. Kitagawa*, for example, the Ninth Circuit held that a quarantine requirement applicable to all persons entering the state of Hawai'i with a dog discriminated against visually impaired persons, because their "unique dependence upon guide dogs" resulted in their experiencing a different and greater burden. 81 F.3d 1480, 1484 (9th Cir. 1996). Similarly, though AMI limits may be applicable to all persons, they are particularly burdensome to disabled persons, whose VA disability income is likely to push them over the income limits and whose access to VAGLAHS services is particularly dependent on their proximity to campus and the availability of necessary supportive services. *See* Decl. of Tommy H. Du ¶ 4, Ex. 3 at 215 ("The uniqueness of the units on the GLA campus is they are proximate to services that some of the individuals need."); Braverman Dep. Tr. 145:23–146:1 (acknowledging that the AMI restrictions "limit[s] some veterans who, by their ser-vice[–related disability], would most benefit from being in these units").

Indeed, AMI limits are so burdensome that they often leave the most disabled veterans with no options for Permanent Supportive Housing at all. This is similar to the situation in *Rodde*, for example, where the Ninth Circuit found that the closure of a county hospital—and the consequent reduction or elimination of "necessary medical services for disabled Medi–Cal patients"—imposed a disproportionate burden on disabled individuals, particularly where "no equivalent programs [were] available to fill the void." 357 F.3d at 996–98. Similarly here, AMI restrictions exclude Subclass members not only from the WLA Grounds but from project-based housing entirely. *See* Braverman Dep. Tr. 144:22–145:3 (conceding that veterans with a 100 percent service-connected disability and some other income, like Social Security, "aren't eligible for *any* project–based housing") (emphasis added); Harris

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

16

94915982.1

Dep. Tr. 55:4–8 (noting that 38 out of 46 buildings operating in Los Angeles "had either some or all of their units set at 30 percent [AMI such that a 100 percent ser-vice–connected veteran will not qualify]").

AMI restrictions deny Subclass members meaningful access to VAGLAHS by excluding them from Permanent Supportive Housing on the WLA Grounds. Be-cause of the severity of their disabilities, members of the Subclass require "ready access to on-site healthcare and rehabilitative services." Sherin Decl. at 4;  *see also* Henwood Decl. ¶ 14–26 (discussing how Permanent Supportive Housing enables disabled individuals to access and benefit from medical services). Shut out of Per-manent Supportive Housing, members of the Subclass may only pursue tenant–based housing, which leaves them far from their medical services on campus and without the support necessary to benefit fully from those services.

Finally, the Government may not escape liability merely because it houses *some* disabled veterans on the WLA Grounds. "[E]vidence that appropriate services were provided to some disabled individuals does not demonstrate that others were not denied meaningful access 'solely on the basis of their disability.'" *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (emphasis in original); *see also Lovell*, 303 F.3d at 1054 ("The State's appropriate treatment of some disabled persons does not permit it to discriminate against other disabled people under any definition of 'meaningful access.'").

> **E.**      **Plaintiffs have established that VAGLAHS is administered by an executive agency.**

*Fourth*, federal Defendants are executive agencies, and their programs and activities are subject to Section 504. *See* 29 U.S.C. § 794(a); 38 C.F.R. § 15.130(b)(1) (2021) (outlining the VA's Section 504 nondiscrimination obliga-tions); 24 C.F.R. § 8.1 (2018) (same for HUD).

94915982.1

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   **III.   Plaintiffs are Entitled to Summary Judgment on Their Sixth Cause of Ac-**
2   **tion under the Administrative Procedure Act.**

3   The Administrative Procedure Act ("APA") requires a court to "set aside

4   agency action" that is "not in accordance with law" or that is "in excess of statutory

5   jurisdiction, authority, or limitations." 5 U.S.C. § 706. Because the undisputed evi-

6   dence demonstrates that the VA's execution of leases with the Brentwood School,

7   BreitBurn, and Safety Park contravenes WLALA, Plaintiffs are entitled to summary

8   judgment that the VA's action is unlawful under the APA. *Id.*

9   The analysis begins and ends with the statutory text. *Hardt v. Reliance Stand-*

10  *ard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (finding that the court "must enforce

11  plain and unambiguous statutory language according to its terms"). WLALA gener-

12  ally authorizes the VA to enter into third-party leases *only* "to provide services that

13  principally benefit veterans and their families."[51] The statute expressly defines what

14  it means for services to "principally benefit veterans and their families": Such ser-

15  vices must be either "provided exclusively to veterans and their families" or "de-

16  signed for the particular needs of veterans and their families as opposed to the gen-

17  eral public," such that "any benefit of those services to the general public *is distinct*

18  *from the intended benefit to veterans* and their families."[52] This statutory language

19  is unambiguous: The primary purpose of any third-party lease of the WLA Grounds

20  must be to provide services *for* veterans, *to* veterans. Any lease that fails this stand-

21  ard is contrary to statutory authority and in violation of the APA.

22  As the OIG explained in its 2018 report, "VA's interpretation [of the afore-

23  mentioned provisions of WLALA] does not require the underlying lease to provide

24  services that principally benefit veterans, it just requires the Lessee [to] provide ser-

25  vices that principally benefit veterans and their families."[53] That is not what

---

26

27  [51] WLALA § 2(b)(2).

     [52] *Id.* § 2(l)(1).

28  [53] Dkt. 37-12 at 113.

1  WLALA says.[54] Rather, as this Court has correctly concluded, Section 2(b)(2) re-

2  quires "any underlying leases to third parties [to] be for the purpose of providing

3  services that principally benefit veterans." Dkt. 106 at 35; *see Connecticut Nat.*

4  *Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a leg-

5  islature says in a statute what it means and means in a statute what it says there.

6  When the words of a statute are unambiguous, then, this first canon is also the

7  last.") (cleaned up). What matters is "[t]he actual use of the land," Dkt. 106 at 35,

8  and those uses—oil drilling, public parking lots, and prep school athletic facili-

9  ties—are undisputed. The challenged leases thus fail to satisfy WLALA (and conse-

10  quently, the APA) for the straightforward reason that veterans are not—and are

11  clearly not intended to be—the principal beneficiaries of those activities.

12      **A.      Execution of the BreitBurn Drilling License Violated**

13      **WLALA and the APA.**

14      The administrative record plainly demonstrates that the purpose of the Breit-

15  Burn drilling license is to extract oil and gas from the WLA Grounds for private

16  profit, not "to provide services that principally benefit veterans and their fami-

17  lies."[55] Under its license with the VA, BreitBurn keeps 97.5 percent of its royalty

18  revenues from drilling on the WLA Grounds, donating a scant 2.5 percent for the

19  transportation of veterans on and around the property. AR_Breitburn_010.

20

21

----

22  [54] Moreover, the VA's reliance on this erroneous interpretation—which it did not
    make public, but disclosed to OIG during OIG's audit, *id.*, and which is nowhere in

23  the administrative record—is precisely the type of "*post hoc* rationalization[]" the

24  Supreme Court condemns. *Dep't of Homeland Sec. v. Regents of the Univ. of Cali-
    fornia*, 140 S. Ct. 1891, 1909 (2020); *see also id.* ("[P]articularly when so much is

25  at stake--that 'the Government should turn square corners in dealing with the peo-

26  ple.'" (quoting

27  *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissent-
    ing)).

28  [55] *Id.* § 2(b)(2).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Extraction of oil and gas is plainly not a service for veterans, much less one

2  that falls in the categories enumerated in Section 2(b)(2)(A–I). And a 2.5 percent

3  donation for veterans' services is a *de minimis* benefit compared with the 97.5 per-

4  cent of revenues retained by private parties—a comparison that the VA fails even to

5  consider.[56] Therefore, even in the absence from the administrative record of the

6  OIG's 2018 and 2021 findings of noncompliance, the BreitBurn drilling license vi-

7  olates WLALA and the APA.

8  **B.  Execution of the Safety Park Lease Violated WLALA and the**

9  **APA.**

10  Nor does the administrative record demonstrate that the Safety Park lease,

11  pursuant to which Safety Park operates public parking lots on the Grounds, princi-

12  pally benefits veterans. AR_SafetyPark_017-AR_SafetyPark_049 (original lease);

13  AR_SafetyPark_001 (operative amendment). Safety Park's lots are neither exclu-

14  sive to veterans nor "designed for [veterans'] particular needs" such that they pro-

15  vide a "distinct" benefit from that of the general public.[57] And although the repeat-

16  edly renewed Safety Park lease references "specific and designated Veteran em-

17  ployment opportunities and job training," nowhere in the administrative record is

18  there evidence of Safety Park's performance under those terms—for example,

19  whether it in fact "[e]mploy[s] Veterans for no less than Eighty-Five Percent (85%)

20

21

22

23

24  [56] Trinh Dep. Tr. 127–28:11–3. Courts may consider evidence outside the adminis-

25  trative record where "necessary to determine whether [an] agency has considered
all relevant factors and has explained its decision." *Sw. Ctr. for Biological Diversity*

26  *v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (citations omit-

27  ted).

28  [57] WLALA § 2(l)(1)(B).

of the staffing requirements" for its parking lots on the Grounds. AR_Safe-tyPark_021.[58] The Safety Park lease also violates WLALA and therefore the APA.

**C.      Execution of the Brentwood School Lease Violated WLALA and the APA.**

As this Court has recognized, and as the administrative record makes clear, the Brentwood lease—under which the prep school uses 21 acres of the WLA Grounds for its athletic facilities—is "contrary to the plain terms of" WLALA. Dkt. 106 at 34; AR_Brentwood_096-AR_Brentwood_146.[59] The purpose of private school athletic facilities is not, of course, the provision of services to veterans; it is the provision of services to students. The Brentwood School's sprawling athletic complex is neither open "exclusively to veterans and their families" nor "designed for [their] particular needs." WLALA § 2(l)(1)(A)–(B). The lease has it backwards: rather than provide services to veterans with ancillary benefits to non-veterans, the Brentwood School's athletic facilities principally benefit the school's students, with ancillary benefits to veterans such as use of those facilities when not otherwise oc-cupied by said students. Nowhere in the administrative record is there evidence that the Brentwood School lease principally benefits veterans and their families. The lease therefore violates WLALA and, in turn, the APA.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment.

---

[58] Omitted from the administrative record is the OIG's 2021 report finding the Safety Park lease "noncompliant because its primary purpose is to provide parking to the public, not principally benefiting veterans." Dkt. 37-9 at 32.

[59] Also omitted from the administrative record, the OIG's 2018 and 2021 reports reached the same conclusion: "the principal purpose of this lease was to provide the Brentwood School continued use of the athletic facilities." Dkt. 37-12 at 8; Dkt. 37-9 at 33.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

94915982.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DATED: May 13, 2024

**PUBLIC COUNSEL LAW CENTER**
MARK D. ROSENBAUM
KATHRYN A. EIDMANN
AMANDA K. PERTUSATI
AMANDA MANGASER SAVAGE
AMELIA PIAZZA
YI LI

/s/ *Mark D. Rosenbaum*
MARK D. ROSENBAUM

/s/ *Amanda Mangaser Savage*
AMANDA MANGASER SAVAGE

Attorneys for Plaintiffs

DATED: May 13, 2024

**BROWN GOLDSTEIN & LEVY, LLP**
EVE L. HILL
JAMIE STRAWBRIDGE

/s/ *Eve L. Hill*
EVE L. HILL
Attorneys for Plaintiffs

DATED: May 13, 2024

**INNER CITY LAW CENTER**
T.E. GLENN
AMANDA POWELL
CHARLES KOHORST

s/ *T. E. Glenn*
T. E. GLENN
Attorneys for Plaintiffs

DATED: May 13, 2024

**ROBINS KAPLAN LLP**
ROMAN M. SILBERFELD
DAVID MARTINEZ
TOMMY H. DU

/s/ *Roman M. Silberfeld*
ROMAN M. SILBERFELD
Attorneys for Plaintiffs

22

94915982.1