**F I L E D**
CLERK, U.S. DISTRICT COURT

07-14-2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| JEFFREY POWERS et al., | Case No. 2:22-cv-08357-DOC-KSx |
|     Plaintiffs, | |
| | |
| vs. | ORDER GRANTING IN PART |
| | PLAINTIFFS' PARTIAL MOTION |
| DENIS RICHARD MCDONOUGH et al., | FOR SUMMARY JUDGMENT [192] |
|     Defendants. | AND DENYING DEFENDANTS' |
| | MOTION FOR SUMMARY |
| | JUDGMENT [193] |

Los Angeles is the homeless veterans' capital of the United States. Nearly 4,000 veterans live on the City's streets,[1] approximately 10% of the national total.[2] Unhoused veterans are disproportionately Black, with 32% identifying as Black/African-American, compared with 9% of the Los Angeles's overall population.[3] Nationwide, veterans are more likely to be unhoused than other groups—a 2016 national survey of homelessness showed that veterans comprised 9.2% of all homeless adults, although only 6.9% of Americans are veterans.[4]

Los Angeles boasts a unique asset to address the problem. In West Los Angeles's Brentwood neighborhood, the U.S. Department of Veterans Affairs ("VA") owns a 388-acre facility that was donated almost 150 years ago for the purpose of housing veterans with disabilities. Historically, the West Los Angeles Grounds ("West LA VA Grounds") were used for its intended purpose: housing veterans. However, in the late 1960s and 70s as Vietnam War veterans returned home, residential use of the campus declined, and the VA began leasing the land to private commercial interests.

The West LA VA Grounds are also home to the VA's West Los Angeles hospital, the focal point of the agency's Southern California health care system for veterans. Many types of veterans' healthcare benefits are exclusively offered at the medical center. Veterans who live far away from this facility—especially those with severe mental disabilities because of their service—find it difficult to traverse across Southern California to reach the center.[5] Because

---

[1] Ex. D to Df. Mot. ("2022 Master Plan") (dkt. 193-11) at 28.

[2] L.A. Homeless Servs. Auth. (LAHSA), *Veterans HC2022 Data Summary (2022)*, https://www.lahsa.org/documents?id=6630-veterans-hc2022-data-summary; Meghan Henry et al., U.S. Dep't Hous. & Urb. Dev., *The 2020 Annual Homeless Assessment Report to Congress* 52 (2020) at 60, https://www.huduser.gov/portal/sites/default/files/pdf/2020-AHAR-Part-1.pdf (displaying the PIT estimates of homeless veterans between 2009-2020, with a January 2020 count of 37,252).

[3] *See* L.A. Homeless Servs. Auth., *supra* note 1; *see also* U.S. Census Bureau, *QuickFacts Los Angeles County, California* (July 1, 2022), https://www.census.gov/quickfacts/losangelescountycalifornia.

[4] John A. Schinka & Thomas H. Byrne, *Aging and Life Expectancy in Homeless Veterans*, https://www.va.gov/HOMELESS/nchav/docs/Schinka_Byrne_AgingLifeExpectancyHomelessVeterans_Sept2018_508.pdf (citing Meghan Henry et al., U.S. Dep't Hous. & Urb. Dev., *The 2016 Annual Homeless Assessment Report to Congress* (2016), https://www.huduser.gov/portal/sites/default/files/pdf/2016-AHAR-Part-1.pdf.

[5] *See, e.g.*, First Amended Complaint (dkt. 33) ("FAC") ¶¶ 50-59 ("Taking several buses to get to the VA in moments [of crisis] is simply not an option [for Plaintiff Sessom]."); Transcript of Deposition of Plaintiff Laurieann Wright (rough) ("Wright Depo. Tr.") (dkt. 192-12) at 10:35:26-11:00:52 (describing the difficulty of getting from her government-provided housing in Lancaster to the WLA Grounds).

veterans without disabilities do not face similar obstacles in obtaining care at the West LA VA, Plaintiffs allege that the lack of housing on or near the West LA VA Grounds discriminates against them because of their disabilities.

In 2011, ten unhoused veterans with severe disabilities sued the VA for its failure to provide housing on the West LA VA Grounds. To settle that lawsuit, the VA pledged to draft and implement a Master Plan to provide housing and supportive services for veterans. Pursuant to the Master Plan, the VA agreed to build 1,200 Permanent Supportive Housing units for veterans on the West LA VA Grounds, 760 of which were to be completed by 2022. The VA failed to meet its obligations. In 2021, the VA Office of Inspector General ("OIG") reported that the agency had not constructed a single new unit of permanent supportive housing pursuant to the settlement agreement.[6] Instead of constructing housing on the West LA VA Grounds, the VA rented some of the land to private commercial interests, including to a private school, an oil drilling company, and a parking lot.

Since this lawsuit was filed, the VA has recently increased the pace of construction, completing over 200 units of PSH in the last two years. The government states that 500 more units will come online next year. Plaintiffs respond that the VA is not on track to meet its goal to create 1,200 units by the end of the decade. Even if the agency met its goal, Plaintiffs note that hundreds, and maybe thousands, of veterans would still remain unhoused and unable to meaningfully access the services administered on the West LA VA Grounds. To avoid this result, Plaintiffs request a judicial order requiring the VA to increase the pace and quantity of PSH construction on the West LA VA Grounds.

Both sides have moved for summary judgment.[7] The Court grants Plaintiffs' motion that the VA's practice of leasing its land to third-party housing developers who use restrictive income limitations facially discriminates against veterans based on their disabilities. Further, the Court holds that the government's acceptance of the land transferred under the 1888 Deed created a charitable trust, and the VA has enforceable fiduciary duties to veterans under the

---

[6] Ex. 7 to VA Motion to Dismiss (dkt. 37-9) at 17.

[7] *See* Plaintiff's Motion for Partial Summary Judgment ("Pl. Mot.") (dkt. 192); Defendants' Motion for Summary Judgment ("Df. Mot.") (dkt. 193). The motions are fully briefed. *See* Plaintiffs' Opposition ("Pl. Opp'n") (dkt. 196); Defendant's Opposition and Reply ("Df. Opp'n") (dkt. 202).

charitable trust. All other issues in this case will be decided at trial.

## I. BACKGROUND

### A. History of the West LA VA Grounds

The Government first acquired the land on which the West LA VA Grounds sits in 1888. The year prior, Congress had "authorized, empowered, and directed" the Board of Managers of the National Home for Disabled Volunteer Soldiers "to locate, establish, construct, and permanently maintain a branch of said National Home" at the "most desirable and advantageous" location "west of the Rocky Mountains." Act of Mar. 2, 1887, ch. 316, § 1, 24 Stat. 444; *see also* Act of March 3, 1851, ch. 25, 9 Stat. 595 (establishing the National Home). Among more than 75 propositions considered by the National Home across dozens of localities was an offer by Senator John P. Jones and Arcadia B. de Baker to donate 300 acres between Santa Monica and Los Angeles. DSUF (dkt. 193-3) 43-46. This donation of land was to be accompanied by additional monetary donations of $100,000 from other parties, as well as a promise of half-fare carriage rates for officers and residents of the National Home on the Los Angeles County Railroad. DSUF 45. Ultimately, the Board of Managers voted to "establish[] and maintain[]" the Pacific Branch of the National Home on the Jones and Baker tract, and authorized its agent "to secure a complete and unencumbered title to the lands[.]" *Id.*

The campus's first residents were Civil War veterans. The Civil War created an unprecedented quantity of veterans, many of whom had physical and psychological wounds that made it difficult to reenter society. 2022 Master Plan at 75. The campus provided them with both physical shelter and a community. An early 20th century newspaper article painted an idyllic picture of life on the campus. "Admission to the Soldiers Home [was] simple. Any discharged soldier or sailor of the army or navy of the United States may gain admission by laying on the adjutant's desk his certificate of honorable discharge and pension certificate, if a pensioner." James J. Fitzgerrell, *Soldiers Home, Calif.*, SAWTELLE TRIB. (March 18, 1922). For veterans who lived there, "every physical want"—clothing, food, shelter, medical care—was

supplied. *Id.* Residents passed their days learning in classes offered on the campus, taking in shows at a 1,000-seat theater, and shooting pool in a two-story billiards hall. *Id.* The community was self-sufficient; veterans who were able to work were responsible for everything from picking up trash around the West LA VA Grounds to growing the food used in the dining halls. *Id.* Veterans who lived off campus could also enjoy the services offered there. *Id.*

Soldiers returning from World Wars I and II had different needs than Civil War veterans, and the campus evolved accordingly. Whereas earlier generations needed housing, newer veterans were much more likely to require medical care, largely due to the implementation of mechanized warfare and toxic gases. 2022 Master Plan at 75. Therefore, the campus was reoriented to prioritizing the provision of short-term medical care that facilitated reentry into society. *Id.*

Vietnam War veterans suffered higher rates of psychological wounds than their predecessors, a trend that has continued into the most recent wars in Iraq and Afghanistan. *Id.* at 75-76. Their psychological wounds resulted in higher rates of homelessness for Vietnam Veterans than other veterans of foreign wars. *See generally* Robert Rosenheck et al., *Vietnam Era and Vietnam Combat Veterans among the Homeless*, Am. J. Public Health, 81:643-46 (1991). The rise of veteran homelessness and mental health issues, however, did not correspond to a change in use of the West LA VA Grounds. 2022 Master Plan at 76. Residential use of the campus declined in the late 1960s and 70s, and the VA began the practice of leasing land on the campus to private commercial interests.[8] *Id.* The once-thriving neighborhood that housed 5,000 veterans at its peak in the 1950s fell into disuse just two decades later.

### B. The VA Greater Los Angeles Healthcare System

The effect of fewer veterans living on the campus extends beyond increased housing

---

[8] The decreased presence of veterans on the campus was a welcome sight for the surrounding community. "We know there is a homeless veteran problem out there," the president of the Brentwood Homeowners Association commented in the 1980s, "but the Veterans Administration property is not the place to solve it." Sheldon Ito, *Plans to House Homeless on VA Property Dropped*, L.A. Times, Mar. 17, 1988, at D3; *see also* David Rosenzweig, *VA Move Sounds 'Last Call': Twilight Hits Vets' 'Western Front' Taverns*, L.A. Times, Jan. 16, 1972, at B ("In recent years, the [area] has come under fire from community groups and homeowners in posh Brentwood. The neighborhood residents complain that winos from the VA panhandle on the streets and litter lawns with empty pint bottles of Thunderbird and Triple Jack."))

insecurity. It also separates veterans geographically from the center where their healthcare benefits are administered. Plaintiffs argue that this physical separation poses unique hurdles for veterans with disabilities to access their veterans' benefits administered on the West LA VA Grounds.

The Veterans Health Administration ("VHA") within the VA is tasked with providing "complete medical and hospital service for the medical care and treatment of veterans[.]" 38 U.S.C. § 7301(b). The benefits package offered through VHA includes the following: outpatient medical, surgical and mental health care; inpatient hospital, medical, surgical, and mental healthcare; prescription drug coverage; emergency care; substance abuse treatment, and other services. The VHA is required to provide preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care, which includes residential treatment and housing services. 38 C.F.R. § 17.38(a). In Southern California, the VHA offers these services through an organization called the VA Greater Los Angeles Healthcare System ("VAGLAHS"). *See* Federal Def.'s First An. Answer to Pls' First Am. Compl. ("Answer") (dkt. 153) ¶¶ 210, 212. The focal point of the healthcare services offered by VAGLAHS is the VA Greater Los Angeles Medical Center located on the West LA VA Grounds. *Id.* ¶ 212.

For Plaintiffs—a class of veterans with serious traumatic brain injuries and mental illness in Southern California—physical separation from this medical center creates major obstacles to accessing the services exclusively offered there. Veterans with traumatic brain injuries and serious mental illness, like Post-Traumatic Stress Disorder ("PTSD") or schizophrenia, find it difficult to travel to the campus. For example, Plaintiff Laurieann Wright, who lives with PTSD related to sexual assault she experienced during her service, struggles with the hours-long journey from her apartment in Lancaster to her medical appointments on the West LA VA Grounds. Wright Depo. Tr. at 10:35:26-11:00:52. Plaintiff Sessom also suffers from PTSD. FAC ¶ 56. Sometimes, his PTSD gets so severe that he needs to immediately access his treatment team that works on the West LA VA Grounds. *Id.* ¶ 58. "Taking several buses to get to the VA in moments like this is simply not an option." *Id.* However, because Mr. Sessom has not been able to secure housing on the West LA VA Grounds, he has elected to move into a tiny

shed near the West LA VA Grounds, instead of entering a more permanent and comfortable living situation further away from the West LA VA Grounds (where he would struggle to access his benefits).

Mr. Sessom's difficulty in finding housing with convenient access to his treatment team stems in part from the regulatory provisions of the HUD-VASH program. The HUD-VASH program is a joint effort between the Department of Housing and Urban Development ("HUD") and the VA. Through the program, homeless veterans receive rental assistance in the form of Section 8 vouchers from HUD and supportive services from the VA. *See generally* 86 Fed. Reg. 53208. Some of these vouchers are "tenant-based." Veterans can use these types of vouchers to rent individual units available on the private rental market. *Id.* Although Mr. Sessom has received a tenant-based voucher, he has been unable to find a landlord who will accept his voucher for an apartment in close proximity to the West LA VA Grounds.

The other types of vouchers offered through the HUD-VASH program are "project-based." Whereas tenant-based vouchers subsidize veterans' monthly payments for rental units available in the community, project-based vouchers are tied to a specific unit or building. *Id.* The project-based voucher program subsidizes the cost of multiple rental units in a block or a building, so veterans can live near one another and the VA can service many veterans in a confined area. The housing on the West LA VA Grounds is project based PSH.

Eligibility for the project based housing on the West LA VA Grounds is limited by income: A veteran may not make more than 30% of the Area Median Income ("AMI") to qualify for housing in many residential buildings on the West LA VA Grounds. However, when calculating a veteran's income for purposes of eligibility, their veterans' disability benefits are counted as income. *See* 42 U.S.C. 1437a(b)(4). According to current veterans' disability compensation rates, a veteran with no dependents who has a 100% disability rating has an annual income of just over $40,000. This amount is above the 30% AMI income limit of $25,050 for a one-person household. Because Mr. Sessom has a 100% service connected disability rating, his annual income exceeds the income limitation. In other words, his veterans' disabilities benefits disqualify him from housing on the West LA VA Grounds.

**C. The *Valentini* Lawsuit (2011)**

In 2011, a number of plaintiffs—represented by some of Plaintiffs' counsel here—sued VA over its management of the West LA VA Grounds. *Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012) ("*Valentini I*"). The *Valentini* plaintiffs' claims were almost identical to those Plaintiffs raise in this case, and, as here, fell into three categories. *Id.* at 1087. First, the *Valentini* plaintiffs argued that "without permanent supportive housing, veterans with severe mental illness are unable to access the" the health benefits that the VA provides on the campus. *Id.* at 1116. To remedy this discrimination, the plaintiffs sought "an injunction directing that the Government provide [the] [p]laintiffs permanent supportive housing as a reasonable accommodation for their disabilities." *Id.* at 1087. Second, the plaintiffs argued that the 1888 Deed—which donated the government the West LA VA Grounds on the condition that it maintain there a National Home branch for Disabled Solders"—created a charitable trust that was enforceable in court. *Id.* The plaintiffs argued that the Government breached this trust relationship when they entered into land use agreements on the West LA VA Grounds that did not benefit veterans. *Id.* These leases were also the predicate for Plaintiffs' final set of claims under the Administrative Procedures Act. *Id.* at 1088. As a remedy for the land use claims, the *Valentini* plaintiffs sought equitable relief that would require the land be used in ways that benefitted veterans. *Id.* at 1087-88.

Ultimately, the *Valentini* court dismissed the Rehabilitation Act claims and those related to the charitable trust. *Id.* at 1117; *Valentini v. Shinseki*, 2012 WL 12882704, at *6 (C.D. Cal. June 19, 2012) ("*Valentini II*"). Regarding the APA claim, the *Valentini* court concluded that the challenged agreements were "unauthorized by law" and therefore void. *Valentini v. Shinseki*, 2013 WL 12121981, at *14 (C.D. Cal. Aug. 29, 2013) ("*Valentini III*"). The court stayed its order pending the resolution of any appeal and refused to enjoin the VA from entering into future land-use agreement on the West LA VA Grounds. *Id.* Instead, the court remanded the issue to the agency, "leav[ing] the determination of what [land use agreements] are appropriate to the VA in light of the Court's order." *Id.*

### D. The Master Plans and the West Los Angeles Leasing Act

In January 2015, while the *Valentini* case was on appeal, the parties reached a settlement agreement. *See* Ex. V to Df. Mot. ("*Valentini* Settlement") (dkt. 193-42). Under that agreement, the VA and the *Valentini* plaintiffs agreed to "coordinate to finalize a New Master Plan" for the campus "[a]fter soliciting input from pertinent stakeholders[.]" *Id.* The "key purpose of the New Master Plan" was "to set out the most effective use of the campus for veterans, particularly for homeless veterans," and those with disabilities. *Id.* However, as the plaintiffs' counsel would soon come to regret, this settlement agreement was not "enforceable in any court."[9] *Id.*

After a period for public comment, the VA created the 2016 Draft Master Plan. The plan "confirm[ed the VA's] intent to create a 21st Century campus" that would support "LA's Veteran community in the broadest sense[.]" Ex. GG to Df. Mot. ("2016 Draft Plan") (dkt. 193-53) at 8. The Government "believe[d] it [was] reasonable to include" in the framework "approximately 1,200 units of permanent housing on the" West LA VA Grounds. *Id.* at 5. Seven hundred and seventy of these units were supposed to be complete by 2022. *Id.*

The 2016 Draft Master Plan also addressed whether pre-existing leaseholders could fit within the comprehensive plan for renovating the West LA VA Grounds. The Plan noted that, in light of *Valentini*, the VA had terminated several existing land use agreements. *Id.* at 17. It further committed that the VA would negotiate with principals of certain existing land use agreements to assess whether they were compatible with the Plan. It explained that the VA would seek fair market value rents from those parties "and Veteran focused consideration" like "in-kind consideration and use of existing and future facilities under those arrangements," noting that "[t]he consideration generated will help VA significantly transform and revitalize the

---

[9] At the very first hearing in this case, Plaintiffs' counsel chided himself for not insisting on enforcement power. In the FAC, Plaintiffs stated:

> "Unfortunately, counsel for the prior plaintiffs did not insist on enforceability of the prior settlement agreement on the belief that the VA would act in good faith to comply with its terms and that court enforcement would not be necessary against the United States government, to whom they have given so much and from whom they had received such sacred promises. Tragically, this trust in the VA to keep its word was [] misplaced."

FAC ¶ 21.

campus." *Id.* at 17-18. The VA committed: "Going forward, VA's efforts to revitalize the campus will only include 'Veteran-focused' agreements, or agreements that result in additional healthcare, benefits, services, or resources being provided directly to Veterans and/or their families on the [West LA VA Grounds]." *Id.* at 17.

Shortly after the VA developed the 2016 Master Plan, Congress passed the West Los Angeles Leasing Act ("Leasing Act" or "WLALA"). *See* Pub. L. No. 114-226. The law was designed to "assist VA in carrying out" the Draft Master Plan's goal to create permanent supportive housing ("PSH") on the West LA VA Grounds. H. Rep. No. 114-570, at 6 (2016). Whereas the VA previously could lease property on the campus to allow third parties only to provide shelter and related services to unhoused veterans, the Leasing Act authorized the VA to enter enhanced use leases ("EULs") to provide PSH. Pub. L. No. 114-226 § 2(b)(2) ("The Secretary" may carry out "[a]ny [EUL] of real property" for "providing supportive housing.").

While the WLALA expanded the types of leases the VA could enter into on the West LA VA Grounds, it also reigned in the VA's practice of entering into third-party leases that were not veteran-centered. The WLALA permits the VA to enter into land use agreements with third parties only if those agreements "principally benefit veterans and their families." WLALA § 2(b)(2). Under the Leasing Act, services that "principally benefit veterans and their families" are services "provided exclusively to veterans and their families" or "designed for the particular needs of veterans and their families as opposed to the general public" and when "any benefit of those services to the general public is distinct from the intended benefit to veterans and their families." WLALA § 2(l)(1). Such services must also be targeted to specific purposes, including "promotion of health and wellness, including nutrition and spiritual wellness," "[e]ducation," "[v]ocational training, skills building, or other training related to employment," "[p]eer activities, socialization, or physical recreation," "[t]ransportation," and "[s]ervices in support" of such purposes. *Id.* § 2(b)(2). In this respect, the WLALA codified the 2016 Draft Master Plan's commitment regarding third-party leases. *See* 2016 Master Plan at 17 ("Going forward, VA will only include veteran-focused agreements.") (simplified).

### E.  The Current Litigation

Plaintiffs argue that the government's plans for the West LA VA Grounds discriminate against veterans with certain disabilities as well as violate the government's fiduciary and statutory duties. Plaintiffs' first three causes of action allege that the lack of housing on or near the West LA VA Grounds constitute discrimination on the basis of disability in violation of the Rehabilitation Act. Plaintiffs also allege that the 1888 Deed that donated the West LA VA Grounds to the U.S. Government created a charitable trust and that the government has assumed enforceable fiduciary duties to use the land in a manner that benefits veterans. Plaintiffs argue that the VA breached that duty when it entered into the following three land use agreements: (1) a lease with the Brentwood School for student athletic facilities, (2) a revocable license for an oil drilling company, and (3) a lease with a parking lot. These three land use agreements are also the subject of Plaintiffs' Administrative Procedures Act ("APA") claims, where Plaintiffs argue that the leases are contrary to WLALA's mandate that leases on the West LA VA Grounds be veteran-focused.

### F.  Procedural History

Plaintiffs filed this lawsuit in November 2022. As Defendants, they named Secretary of the VA, Denis Richard McDonough, as well as senior VA officials for the Los Angeles region and the secretary of the Housing and Urban Development. In March 2024, Bridgeland International, the operator of several oil and gas wells on the West LA VA Grounds, intervened as a plaintiff, seeking a declaratory judgment that their use of the land complied with the West Los Angeles Leasing Act of 2016.

On April 1, 2024, Plaintiffs moved for class certification. The Court granted the motion, certifying both a class and a subclass. The Class comprises "[a]ll homeless veterans with Serious Mental Illness [SMI] or Traumatic Brain Injuries [TBI], who reside in Los Angeles County." Order Certifying Class (dkt. 190) at 3. The Subclass is "[a]ll class members whose income (including disability benefits) exceeds 50% of the Area Median Income." *Id.*

In May 2024, Defendants and Plaintiffs filed cross-motions for summary judgment. The

Court heard oral argument on these motions on July 9, 2024.

## II. LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses proceed to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there

must be evidence on which the [fact-finder] could reasonably find for [the opposing party]."
*Liberty Lobby*, 477 U.S. at 252.

## III.  DISCUSSION

The Court will address Plaintiffs' three Rehabilitation Act claims and the charitable trust claim in turn.[10]

### A.  Rehabilitation Act Claims

Plaintiffs bring three claims under the Rehabilitation Act, each reflecting a distinct theory of disability discrimination.

### 1.  Rehabilitation Act Claim 1: Meaningful Access Claim

Plaintiffs allege that Defendants have denied Plaintiffs and other class members "meaningful access" to their disability healthcare benefits by not providing enough PSH units on the Campus to house the entire class. *See* FAC ¶¶ 319–23. This claim rests on a disparate-impact theory of discrimination. *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738–39 (9th Cir. 2021) (holding that a claim is one for disparate impact where it involves "systemic barriers" to accessing benefits). To prevail on a disparate impact claim, a plaintiff must identify a "reasonable modification" to a defendant's policies that would provide the plaintiff with meaningful access to their government benefits. *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999). If a plaintiff can meet their burden to show their requested modification is facially reasonable, the modification is required, unless the defendant can show that the modification would fundamentally alter the defendant's programs or would impose undue financial or administrative burdens. *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987).

Defendants move for summary judgment on this claim. They argue that Plaintiffs' requested "affirmative injunction requiring VA to develop, maintain, and support nearly three

---

[10] Both sides moved for summary judgment on the APA Claims. As the Court stated in its June 11 Minute Order (dkt. 195), it will defer ruling on the APA claims until after trial. Accordingly, this order does not discuss Plaintiffs' APA claims.

thousand units of PSH on the Campus" is (1) facially unreasonable, (2) would fundamentally alter the VA's plans for the campus, and (3) impose an undue burden. Df. Mot. at 13-23.

### a.  Facial Reasonableness

To be reasonable, an accommodation or modification must give people with disabilities "meaningful access" to the service, program, or activity in question. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). In the Ninth Circuit, the relevant inquiry is not simply whether people with disabilities have any access to the benefits a public entity provides, but whether they have "full and equal enjoyment" of those things, on par with nondisabled individuals. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (quoting 42 U.S.C. § 12182(a)). "[T]he determination of what constitutes [a] reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).

Here, whether PSH is necessary to ensure that Plaintiffs have "full and equal enjoyment" of their healthcare benefits is a factual question to be determined at trial. Plaintiffs have submitted significant evidence that the lack of PSH on or near the West LA VA Grounds denies them access to some of the benefits exclusively administered there. For example, Plaintiff Wright states that the lack of housing near the West LA VA Grounds has forced her to live in Lancaster, dozens of miles from West Los Angeles. Wright Depo. Tr. 11:00:00-11:00:47. Because she cannot drive, she must take the bus to the West LA VA Grounds, but her disabilities make it impossible for her to walk to the bus stop. *Id.* For Plaintiff Wright, then, it is arguable that PSH near the campus is necessary for her to access her healthcare benefits.

Because Plaintiffs have advanced evidence that increased PSH on or near the West LA VA Grounds would facilitate access to the government benefits offered there, they have created a factual dispute regarding whether their proposed accommodation is reasonable.

**b.  Fundamental Alteration**

Although Plaintiffs' proposed accommodation is not unreasonable as a matter of law, Defendants may still prevail if they can show that making the modification would fundamentally alter the nature of its services, programs, or activities. *See Townsend v. Quasim*, 328 F.3d 511, 519 (9th Cir. 2003).

Defendants argue that Plaintiffs' demand to build more PSH at a faster pace would "substantially and fundamentally alter its plan for developing the Campus, its administration of homeless programs in the Greater LA area, and, potentially, its provision of disability benefits to veterans nationwide." Df. Mot. at 14. However, given the "fact-based" nature of this defense, *Lentini v. Calif. Ctr. Of the Arts*, 370 F.3d 837, 845 (9th Cir. 2004), the Court rejects Defendants' argument at the summary judgment.

Defendants emphasize that Plaintiffs' proposed accommodation would disrupt the 2022 Master Plan's careful design for the Campus. "[T]he housing Plaintiffs demand," the VA argues, "would supplant the intended uses of the North Campus—uses that were decided through VA's significant planning process, as contemplated by the *Valentini* settlement and the Leasing Act— and thus would substantially and fundamentally alter VA's development plans." Df. Mot. at 15. However, that a proposed modification would change the government's plans is not sufficient to establish that the modification would fundamentally alter the government's plan. Rather, courts must inquire into the existing plan to determine whether it is "appropriate" under the Rehabilitation Act. *Crowder*, 81 F.3d at 1485. Otherwise, the government "could adopt requirements imposing unreasonable obstacles to the disabled, and when haled into court could evade the antidiscrimination mandate…merely by explaining that the state authority considered possible modifications and rejected them." *Id.* This result would render the Rehabilitation Act "substanceless." *Townsend*, 328 F.3d at 519.

The core of Plaintiff's challenge is that the government's current plans are inadequate to prevent discrimination on the basis of their disabilities. Plaintiffs are a class of veterans with mental impairments in Southern California. They argue that the 2022 Draft Master Plan's provision to build 1,200 units by 2030 will still leave several hundreds of class members

unhoused, and, as a result, unable to access their healthcare benefits. Because Plaintiffs argue that the VA's plan would not end the discrimination, the mere fact that the Plaintiffs' proposed accommodation would disrupt the VA's approach is not enough to defeat Plaintiffs' challenge. *See id.* ("[P]olicy choices [that discriminate] cannot be upheld solely because [a modification] would change the [discriminatory] way in which existing services are provided.").

The government also argues that the physical impacts of additional housing will fundamentally alter the VA's programs on the West LA VA Grounds. To incorporate the additional 2,800 units of PSH that Plaintiffs request, VA maintains that they would need approximately forty additional buildings. Df. Mot. at 15. "To find that much space on the North Campus," the VA argues, it "likely would need to displace veterans services and staff from existing buildings that could be renovated into PSH and open up parcels without existing buildings for new constructions." *Id.* The strength of this argument depends on how suitable other parts of the West LA VA Grounds, including the southern part of the campus, are for construction. The current record is too underdeveloped on this front to decide whether the physical impacts of the additional units would fundamentally alter the services offered on the West LA VA Grounds.

Therefore, Defendants have not met their burden to show that Plaintiffs' proposal would fundamentally alter the VA's programs offered on the West LA VA Grounds.[11]

### c. Undue Burden

Defendants identify several ways that increasing the quantity and pace of PSH construction would create an undue burden. Defendants' concerns can be grouped into three categories: financial, regulatory, and practical. The Court considers each in turn.

First, Defendants argue that Plaintiffs' proposed modification will pose a significant financial burden. In addition to the cost of construction, building additional units will require a

---

[11] The VA also argues that "provid[ing] the class with housing in close proximity to where they receive" benefits would, in effect, expand the scope of the scope of VA benefits to include housing. Df. Mot. at 16. This argument too cannot carry VA's burden on summary judgment, because how many veterans require this accommodation is disputed. To the extent that the government argues that Plaintiffs' proposed modification would have effects beyond the WLA Grounds, the argument ignores the unique historical and practical advantages that the WLA Grounds has in housing veterans.

costly overhaul of the campus's utility system. After construction is completed, the VA must also maintain the additional units, which will require a significant monetary commitment. Undoubtedly, Plaintiffs' proposal will be expensive. However, whether this financial burden is undue is disputed. Dr. Braverman, who works for the VA, stated that the VA "could use" revenue generated from third-party leases on the West LA VA Grounds to build PSH. Braverman Tr. 90:16-24. And, according to the VA's own reports to Congress, millions of dollars generated from the West LA VA Grounds go unused every year. Whether these funds, or alternative sources of revenue, could be used to construct PSH without unduly burdening the VA's other operations is a disputed fact, precluding summary judgment.

Additionally, Plaintiffs have put forth evidence that, in the long run, constructing and maintaining PSH is the most cost-effective method to addressing veteran homelessness. "PSH," according to one of Plaintiffs' experts, "results in fewer hospitalizations, shorter hospital stays, fewer visits to emergency departments, and less homelessness[.]" Henwood Report ¶ 16. These reductions in medical and social services costs can "entirely offset" the cost of PSH. *Id.* If this expert's calculations are correct, Plaintiffs' proposed accommodation may not financially burden the VA in the long run.

Second, Defendants argue that Plaintiffs' proposal would impose regulatory burdens. For example, planning for additional units would require the government to comply with environmental as well as historical preservation and land use regulations. However, the Court cannot determine, at this stage, whether these regulatory hurdles amount to an undue burden. To develop units of PSH already on the campus, the government has already jumped through these regulatory hoops. The previous administrative findings on those units may grease the wheels of any future administrative process.

Third, the government argues that, as a practical matter, there is not enough space to accommodate 3,000 additional units of PSH, along with the equipment necessary for constructing those units. The strength of this argument depends on how much of the West LA VA Grounds is being currently being used, where the additional units would be located, and the fate of some of the third-party leases. The record is too undeveloped on these fronts to permit

summary judgment.

Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' Meaningful Access Claim is denied.

### 2.     Rehabilitation Act Claim 2: *Olmstead* Claim

Plaintiffs argue that Defendants have violated Section 504 of the Rehabilitation Act by not providing class members their disability healthcare benefits "in the most integrated setting appropriate to their needs," causing them to be "institutionalized or placed at risk of institutionalization." FAC ¶¶ 307-14. In other words, Plaintiffs seek PSH so that they can avoid segregation from others. This claim relies on the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). Accordingly, some background on that case is helpful at the outset.

### a.   *Olmstead*: Legal Background

Soon after the Rehabilitation Act was passed in 1973, the Justice Department passed regulations requiring recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51 (1978). A few decades later, when Congress passed the ADA, it reaffirmed the Integration Mandate. In the ADA's preamble, Congress recognized that:

> "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements such forms of discrimination against individuals with disabilities continue to be a serious and pervasive societal problems."

42 U.S.C. § 12101.

To implement the ADA's deinstitutionalization policy, the Justice Department promulgated 28 C.F.R. § 35.130(d). This regulation parallels the Rehabilitation Act's integration mandate: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §

35.130(d); *see also* 42 U.S.C. § 12134 (provision of the ADA that cites the Rehabilitation Act as a model for integration). The ADA regulations define "the most integrated setting" to mean "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR pt. 35, App. A, p. 450 (1998).

However, integration is not required in all circumstances. The Rehabilitation Act requires entities to make only "reasonable modifications" to avoid discrimination, not "fundamental alteration[s]" to its "services and programs." 28 CFR § 35.130(b)(7) (1998).[12]

The Supreme Court, in 1999, addressed the integration mandate in *Olmstead*. There, two women with mental disabilities were confined in Georgia's state psychiatric institutions. *Olmstead*, 527 U.S. at 593-94. Both women's treating professionals had concluded that they could be placed in community settings, and neither woman opposed such treatment. *Id.* at 603. They filed a suit under the ADA challenging their "continued confinement in a segregated environment." *Id.* at 593. The Court agreed with the plaintiffs. "Unjustified isolation," the Court held, "is properly regarded as discrimination based on disability." *Id.* at 597. However, the Court emphasized that "[t]he State's responsibility" to provide community-based treatment "is not boundless." *Id.* at 603-04. The government must only make "reasonable modifications" to avoid discrimination, and it may "resist modifications that entail a fundamental alteration of the States services and programs." *Id.* at 603 (internal quotations omitted).

Applying *Olmstead*, the Ninth Circuit, in *M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2012), held that a plaintiff seeking injunctive relief under *Olmstead* must demonstrate that the challenged state action or inaction creates "a serious risk of institutionalization."

### b. Application

Plaintiffs argue that the lack of PSH forces them into institutionalized settings. Pl. Opp'n at 25. One of Plaintiffs' experts, Dr. Henwood, explained that the empirical evidence shows that being homeless increases a person's health problems and interactions with law enforcement. *See*

---

[12] Because the ADA and Rehabilitation Act impose virtually identical obligations on covered entities regarding integration, courts interpreting the Rehabilitation Act often look to case law interpreting the ADA for guidance. *See Zukle*, 166 F.3d at 1046 n.11.

Henwood Report ¶¶ 15-19. Consequently, unhoused people "cycle in and out of" shelters, hospitals, emergency rooms, jails, and prisons. *Id.* PSH, according to Dr. Henwood, breaks this "institutional circuit." *Id.*

The government argues that the "Plaintiffs' preferred method of housing"—housing on the West LA VA Grounds—"would remove some disabled veterans from more integrated, community-based settings[.]" Df. Mot. at 23. This argument construes Plaintiffs' request for relief too narrowly. As discussed below with Plaintiffs' AMI claim, Plaintiffs also seek to increase housing availability in the community surrounding the West LA VA Grounds. Further, Plaintiffs seek to give veterans a choice to live either on the campus or near it. Accordingly, Plaintiffs' vision for the campus is not necessarily one that would prevent veterans with disabilities from "interact[ing] with non-disabled persons to the fullest extent possible." *See Olmstead*, 527 U.S. at 592. Whether Plaintiffs' proposal accomplishes integration consistent with *Olmstead* is a factual dispute to be determined at trial.

Defendants also argue that Plaintiffs' proposed relief is a not a "reasonable modification" and would require the VA to "substantially and fundamentally alter its programs." Df. Mot. at 23. However, as explained above, whether the proposed relief meets that standard is likewise a factual question better suited for trial, not summary judgment.

Therefore, Defendants' motion to dismiss Plaintiffs' *Olmstead* claim is denied.

### 3.        Rehabilitation Act Claim 3: Income Claim

Both sides seek summary judgment on Plaintiffs' claim challenging the current eligibility requirements for housing on the Grounds. In brief, the government contracts with third-party developers who build and lease permanent supportive housing ("PSH") on the West LA VA Grounds. These developers only rent to veterans whose income is below a certain threshold. However, developers include a veteran's disability benefits when calculating income. Therefore, the more disability benefits that a veteran receives (i.e., the more disabled they are), the higher their "income" is, and the less likely they are to receive housing on the Grounds.

A concrete example helps to illustrate the issue. For many developments on the West Los Angeles VA Grounds, a veteran is ineligible to live there if their income exceeds 30% of Los Angeles's area median income ("AMI"). 30% of the area median income in Los Angeles is around $25,000. A veteran with a 100% disability rating receives approximately $40,000 in disability benefits every year. Developers count these disability benefits as "income" when assessing eligibility. Thus, a veteran with a 100% disability rating does not qualify for housing on the West LA VA Grounds, although a less disabled veteran (who receives less in disability benefits) does. Put simply: for our most disabled veterans—*e.g.*, amputees and those with traumatic brain injuries and mental trauma—their disability disqualify them from residing in permanent supportive housing on the West LA VA Grounds.

Plaintiffs argue that the VA facially discriminates when it leases land to third-party developers who (1) impose restrictive income limitations and (2) include disability benefits as income in determining eligibility for housing.

At the outset, it is important to note that Defendants do not dispute the basic facts of the underlying policy. Defendants do not dispute that the VA contracts with third-party developers who then impose income limitations on applicants for housing. *See, e.g.*, DSUF # 152 ("Most of the public programs used to fund the construction of [permanent supportive housing] impose their own income eligibility requirements "). They further do not dispute that this system can exclude the most disabled veterans, who receive the highest disability-related payments, from that housing. *See, e.g.*, *id.* # 160 ("Homeless veterans' ineligibility for project-based [permanent supportive housing] based on their income is a product of the funding sources developers rely upon to construct that housing.").

VA officials recognize that this result is unjust. Steve Braverman, the director of the West LA VA's medical system, testified:

> "[F]or veterans who have 100 percent service-connected disability…then they
> exceed the [income] cap and aren't eligible for any project-based housing…and
> that is inconsistent with the general principle that veterans are usually eligible for
> more services as they become higher rated in disability[.] So…VA is concerned, I

1    think it's fair to say, that we are limiting some veterans, who by their service,

2    would most benefit from being these units."

3  Braverman Tr. at 144:22-146:1. John Kuhn, the deputy director of the West LA VA, also

4  testified that including disability benefits as income is a "problem of justice." Deposition of

5  John Kuhn (dkt. 192-10) at 198:2-3.

6         Defendants defend their present policies by arguing that they are income-based, not

7  disability based. This argument does not overcome the fact that the most disabled veterans are

8  categorically excluded from housing on the West LA VA Grounds. This policy facially

9  discriminates against veterans based on their disabilities. The amount of a veterans' disability

10  benefits is tightly correlated with how disabled they are. Indeed, a veteran with 100% service-

11  connected disability is categorically ineligible for most housing on the Grounds. Other severely

12  disabled veterans with lower disability scores may still have incomes that exceed the AMI limit,

13  excluding them from housing on the West LA VA Grounds. Whether the VA's policy nominally

14  targets income or disability, the result is the same—the most disabled veterans remain ineligible

15  for project-based housing on the West LA VA Grounds.

16         A policy is facially discriminatory if excising its discriminatory impact would

17  fundamentally alter the policy. *See BAART v. City of Antioch*, 179 F.3d 725, 734 (9th Cir. 1999).

18  A facially discriminatory policy is a per se violation of the Rehabilitation Act. *Id.* at 735; *Lovell*

19  *v. Chandler*, 303 F.3d 1039, 1054 (9th Cir. 2002).

20         Here, the VA's policy of contracting with third parties whose eligibility requirements

21  disqualify the most disabled veterans is facially discriminatory. The offending part of this policy

22  cannot be eliminated without fundamentally altering the policy. The VA could eliminate the

23  policy's discriminatory impact by either contracting with developers who will not count

24  disability as income, or by contracting with developers whose income cutoffs are a higher

25  percentage of AMI. Either change would dramatically expand the number of veterans eligible

26  for housing. A dramatic expansion of a program is a fundamental alteration. *See BAART*, 179

27  F.3d at 734. Therefore, the VA's policy of contracting with developers who impose income

28  limitations and count disability benefits as income, thereby preventing the most disabled

veterans from receiving housing, is facially discriminatory. The policy is therefore a per se violation of the Rehabilitation Act.

The Ninth Circuit reached a similar conclusion in *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003). There, the plaintiff challenged a provision of Washington state's Medicaid program. The program grouped needy people into two categories distinguished by income level: the "categorically needy" and the "medically needy." *Id.* at 514. The categorically needy, the poorer category, could receive long-term living assistance in their own homes or adult family homes. However, the medically needy, who had a higher income, could receive these services only in a nursing home. The court concluded that this law facially discriminated against people with disabilities. Medically needy Washingtonians who needed long-term care services were disabled. *Id.* at 518 n.2. Changing the statute to remedy this discrimination would destroy the distinction at the heart of the statute. Therefore, the law was facially discriminatory. Here too, the VA's policy is facially discriminatory because removing its offending portion would fundamentally change the policy.

The VA and HUD argue that it is the third-party developers, not the agencies themselves, that impose the income limitation. However, the VA contracting with third party developers who impose discriminatory conditions does not shield Defendants from liability. The VA's longstanding regulations, codified in 38 C.F.R. § 15.130(b)(3), prohibit them from contracting with parties who discriminate against the most disabled veterans:

> "The agency may not, directly or through *contractual or other arrangements*, utilize criteria or methods of administration the purpose or effect of which would [s]ubject qualified individuals with handicaps to discrimination on the basis of handicap."

38 C.F.R. § 15.130(b)(3) (emphasis added). The VA's leasing decisions have the effect of disadvantaging those with extreme service-connected disabilities relative to less disabled veterans. That third-party developers, not the VA, are the ones directly imposing the discriminatory conditions is of no consequence. Defendants cannot outsource discrimination.

The VA and HUD also argue that, if developers cannot impose restrictive income limitations and include disability benefits as income, they may not be able to secure the tax credits from the Low Income Housing Tax Credit program that finance their construction. This result, Defendants argue, will cause fewer units of permanent supportive housing to be built on the West LA VA Grounds. Plaintiffs respond that this result is not inevitable and state that Defendants have other tools to promote construction of permanent supportive housing on the VA campus.

The parties' disagreement regarding the consequence of the Court's ruling are better addressed at the injunctive relief stage. What matters at this stage is that Ninth Circuit law is clear: An agency violates the Rehabilitation Act when they contract with third parties who systematically exclude from housing those veterans who suffered the most disabling wounds serving their country. Those who gave the most cannot receive the least.

The Court leaves the separate question of injunctive relief for a later stage. Everyone in this litigation has the same goal: increasing the amount of housing on the Grounds while ensuring that it is available on equal terms to all veterans with disabilities. The precise contours of injunctive relief that best achieves this goal will be determined after further briefing and evidentiary hearings.

Plaintiffs' motion for summary judgment on their AMI Claim is GRANTED.

### B. Charitable Trust Claim

In addition to their Rehabilitation Act Claims, Plaintiffs bring claims under the theory that the West LA VA Grounds constitute a charitable trust.

Plaintiffs claim that the VA has a fiduciary duty to disabled veterans on the West LA VA Grounds. Plaintiffs allege that the 1888 deed conveying the West Los Angeles campus created a charitable trust, with the government as trustee, and veterans with disabilities as the intended beneficiaries. FAC ¶ 31. Plaintiffs argue that as trustees, VA Defendants "have a non-discretionary and nondelegable fiduciary duty" to "use the land only for purposes that directly contribute to the establishment and permanent operation of housing and healthcare for veterans

with disabilities." FAC ¶¶ 338-39. By "authorizing the many uses of the West LA VA Grounds that do not directly contribute to the operation of housing and healthcare for veterans with disabilities and by failing to take substantial affirmative steps to administer the trust solely with a view to the accomplishment of this purpose," Plaintiffs allege that VA Defendants breached their fiduciary duty as trustees. *Id.*

Plaintiffs and Defendants filed cross-motions for summary judgment on the charitable trust claims. Pl. Mot. at 8-11; Df. Mot. at 31-37.

Plaintiffs ask for partial summary judgment on their charitable trust claims, asserting there is no genuine dispute that 1) the 1888 deed created a charitable trust; 2) the government has assumed an enforceable fiduciary duty; and 3) the government has breached its fiduciary duty to Plaintiffs by entering into unlawful land-use agreements. Pl. Mot. at 8-11. The full extent of the VA's breach and the relief to which Plaintiffs are entitled, they contend, should be determined by an evidentiary hearing at trial. *Id.* at 11.

Defendants also ask for summary judgment on Plaintiffs' charitable trust claims, arguing that 1) the 1888 Deed conveying the Campus did not give rise to a charitable trust restricting the United States' use of the Campus; 2) the United States has not assumed any enforceable fiduciary duties pursuant to such a trust; and 3) Plaintiffs have not presented sufficient evidence to establish that VA breached its purported fiduciary duties. Df. Mot. at 31-37.

### 1. The 1888 Deed created a charitable trust.

#### a. Legal Standard

In order to create a charitable trust, there must be an intention to convey the property for a charitable purpose. No "magic words" are needed to create a charitable trust. Restatement (Second) of Trusts § 24(2) ("No particular form of words or conduct is necessary for the manifestation of intention to create a trust."). The intent of the donor is the critical factor. "The intention of the parties to the deed should control the construction of the instrument. The object in construing a deed is to ascertain the intention of the parties, and especially that of the grantor, from the words which have been employed in connection with the subject-matter, and from the

surrounding circumstances." *Aller v. Berkeley Hall School Found.*, 103 P.2d 1052 (Cal. App. 1940). Moreover, "because charitable bequests are favored, they will be upheld if one can possibly be construed as valid by applying liberal rules of construction designed to accomplish the intent of the trustor or testator." *Estate of Breeden*, 208 Cal.App.3d 981, 985 (1989).

### b.  Application

Defendants' position that the 1888 Deed did not create a charitable trust repeats the same arguments and legal authorities that this Court and others have previously rejected. As the Court previously ruled:

> "Through the 1888 Deed, the grantors gave the land to the government for the benefit of disabled veterans ("1888 Deed") (Dkt. 37-3). Specifically, the land was given "in consideration" that the government "should locate, establish, construct, and permanently maintain a branch of said National Home for Disabled Volunteer Soldiers . . . ." 1888 Deed ¶ 3. The 1866 Act, in turn, authorized the Government to accept the gift and pursuant to that authority, the government did accept the gift. *See* 24 U.S.C. § 111, 14 Stat. 10 (1866). As another court has held, "[t]he language in the 1888 Deed expresses far more than a *hope* on the part of the grantors that the land would be used for certain purposes; the 1888 Deed *requires* that the land be used as indicated for all time." *Valentini*, 860 F. Supp. 2d at 1104. "Because land was given to the Government for the purpose of benefitting a defined group of beneficiaries, a charitable trust was created, with the Government as trustee and disabled veterans as beneficiaries." *Id.* at 1106."

MTD Order at 28–29.

The Court recognizes that in considering a motion for summary judgment, a district court is not bound by its prior rulings in the case and that different standards apply at the summary-judgment stage than in denial of a motion to dismiss. *See Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014). Nevertheless, the Court sees no reason to reach a different conclusion here

under the summary judgment standard. The Court relied on the language of the 1888 Deed and the 1866 Act to determine a charitable trust has been created. Defendants have not cited any evidence produced in discovery that would lead to a different interpretation of that language.

Accordingly, the Court finds that the 1888 Deed created a charitable trust and GRANTS Plaintiffs' motion for partial summary judgment on that issue.

## 2. The government has assumed an enforceable fiduciary duty.

### a. Legal Standard

The Court next considers whether the government has assumed enforceable trust duties. "The United States or a State has capacity to take and hold property in trust, but in the absence of a statute otherwise providing the trust is unenforceable against the United States or a State." Restatement (Second) of Trusts § 95 (emphasis added); *see also* Restatement (Second) of Trusts § 378 (same rule with respect to charitable trusts specifically). Unless the government has signaled an agreement, via statute, to assume enforceable trustee duties, any "duties" it assumes as a trustee are non-enforceable. *See Valentini*, 860 F. Supp. 2d at 1104. "[G]ifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress . . . . And Congress has on many occasions not only accepted conditional gifts, but has provided means for the future acceptance and encouragement of special gifts to be devoted to particular purposes[.]" *Story v. Snyder*, 184 F.2d 454, 456 (D.C. Cir. 1950).

### b. Application

Congress has twice passed acts signaling the government's assumption of enforceable duties: (1) the West Los Angeles Leasing Act of 2016, Pub. L. No. 114-226 (2016) ("WLALA"), and (2) the West Los Angeles VA Campus Improvement Act of 2021, Pub. L. No. 117-18, 135 Stat. 288. ("2021 Amendment"), which amended the WLALA.

The duties and responsibilities set forth in WLALA include the duty to review, audit, and evaluate management of leases or land use to ensure that they advance the purpose of providing housing and services that principally benefit veterans and their families. *See generally* WLALA § 2. The statute authorizes the Secretary to carry out leases at the West LA VA Grounds that "principally benefit veterans and their families." *Id.* § 2(a). It also prohibits "any land-sharing agreement" unless it "provides additional health-care resources to the Campus" and "benefits veterans and their families . . . ." *Id.* § 2(d). Moreover, the Secretary is required to prepare annual reports that describe the government's use of the West LA VA Grounds. *See* WLALA §§ 2 (d), (j).

Essentially, the WLALA requires the government to treat the property donated by the 1888 Deed in a manner consistent with the conditional donation, i.e., for the purpose of benefitting veterans. As this Court has already recognized, the statutory obligations mirror the types of fiduciary duties that trustees traditionally assume. *See e.g.*, Restatement (Third) of Trusts § 76 ("The trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law."). *See* Dkt. 106 at 31.

By codifying these obligations in WLALA, Congress signaled its intent that the VA assume the duties set out in the 1888 Deed and deliver on its century-old obligations to disabled veterans. Under the terms of the charitable trust established with the 1888 Deed, as accepted under WLALA and its 2021 Amendment, Defendants have a duty to use the West LA VA Grounds for the establishment, construction, and permanent maintenance (and operation) of housing and healthcare for veterans with disabilities. The Court therefore GRANTS Plaintiffs' motion in part, on the issue that the government has assumed an enforceable fiduciary duty on the West LA VA Grounds.

### 3. The issue of breach is a question of fact to be determined at trial.

Whether the leases at the West LA VA Grounds principally benefit veterans and their families, and whether Defendants' use of the land is consistent with its fiduciary duty as set out under WLALA and the 2021 Amendment, is a fact-intensive inquiry. For example, the

extent and frequency with which veterans use the Brentwood School's athletic facilities, or the extent to which Safety Park's programming and hiring benefits veterans, are subject to factual dispute. These details go beyond the administrative record which will be used to resolve the APA claims, as the breach of fiduciary duty claim may involve examining how the leases operate in practice.

Notably, the VA maintains numerous types of land-use agreements on the West LA VA Grounds, from oil drilling leases to private school athletic facilities. The language of these land-use agreements, in addition to how they operate and what benefits they purportedly offer to veterans, differs significantly between agreements. According to the Director of VAGHLAHS, the committee that reviews proposed leases does not have a written set of criteria to determine whether a particular lease complies with WLALA. Pls. MSJ at 11. Determining whether a breach has occurred, then, is far from clear-cut. Whether the agreements are a breach of fiduciary duty would be better answered at trial with the benefit of a complete evidentiary record on the impact and operation of the land-use agreements. Plaintiffs implicitly acknowledge some of these difficulties, saying that while they believe a breach has been established, the extent of the breach should be determined at trial.

## IV.    DISPOSITION

For the foregoing reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment. Specifically, the Court holds that the VA's practice of leasing its land to third-party housing developers who use restrictive income limitations facially discriminates against veterans based on their disabilities. The Court will hear evidence regarding the proper scope of injunctive relief to remedy this discrimination at a later date.

Further, the Court holds that the government's acceptance of the land transferred under the 1888 Deed created a charitable trust, and the VA has enforceable fiduciary duties to veterans under the charitable trust. The separate question of whether the VA has breached those duties is reserved for trial.

Defendants' Motion for Summary Judgment is **DENIED**.

The remaining issues in this case will be determined at trial.

DATED:  July 14, 2024

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

-30-