1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11

12

13    **JEFFREY POWERS, et al.,**              | Case No. **2:22-cv-08357-DOC-KS**

14          **Plaintiffs,**

15

16          **vs.**                            | **POST-TRIAL OPINION;[1] FINDINGS**

17                                             | **OF FACT & CONCLUSIONS OF LAW**

18    **DENIS RICHARD MCDONOUGH, in his**

19    **official capacity as Secretary of Veterans**

20    **Affairs; et al.,**

21          **Defendants.**

22

23

24

25

26

27

28

---

[1] This opinion serves as a Findings of Fact and Conclusions of Law. Additional enumerated Findings of Fact and Conclusions of Law are appended to this order.

In the case now before this Court, unhoused veterans with disabilities demand housing on the West Los Angeles VA campus. Their demand is not new. Over a decade ago, in 2011, a similar group of unhoused veteran plaintiffs brought a nearly identical suit, seeking shelter and housing on land given to the federal government in the 1800s for the purpose of establishing a home for disabled veterans. In the years since 2011, the Obama administration, the Trump administration, and the Biden administration have each promised that they would act swiftly to eradicate veteran homelessness in America. Yet, today, approximately 3,000 homeless veterans live in the Los Angeles area alone.

Each administration since 2011 has been warned—by the VA's own Office of the Inspector General, federal courts, and veterans—that they were not doing enough to house veterans in Los Angeles. Despite these warnings, the VA has not made good on its promise to build housing for veterans. Instead, it has continued leasing portions of the West Los Angeles campus to a private school, UCLA's baseball team, an oil company, and other private interests. The cost of the VA's inaction is veterans' lives.

Over the past five decades, the West LA VA has been infected by bribery, corruption, and the influence of the powerful and their lobbyists, and enabled by a major educational institution in excluding veterans' input about their own lands. It has allowed the drastic reduction of the size of the original plot of land deeded in 1888 to be an Old Soldiers' Home. In a series of lengthy, renewable leases, the VA authorized leaseholders to build permanent athletic facilities—after permitting these concrete structures to be built on veterans' land, the VA now points to the waste that would be incurred by tearing them down. In effect, the VA has quietly sold off these lands just as surely as granting a quitclaim deed.

The VA argues they are out of space, and that the lack of available acreage precludes any increase to the 1,200 units they have promised to open on the West LA campus by 2030. They contend that any injunctive relief by the Court would burden the VA financially and deprive them of the flexibility they need to solve the complex issue of veteran homelessness. The problem, however, is one of the VA's own making. The VA must remediate its mishandling of

this resource so that the land may once again be available for its intended purpose: the housing of veterans.

Throughout this trial, the VA and HUD have highlighted their recent policy changes and their progress in reducing veteran homelessness. Many of these changes, however, were only made once this lawsuit was revived. One policy change was announced by HUD on the third day of this trial, after the Court found Defendants had discriminated against the most injured and traumatized veterans by counting their disability payments as income and thus disqualifying them from housing.

Now, the West LA VA promises they finally have a plan that will end veteran homelessness in Los Angeles—but only if the plaintiffs leave them alone and the Court does not issue an injunction. After years of broken promises, corruption, and neglect, it is no surprise that veterans are unwilling to take them at their word.

The Court finds Plaintiffs are entitled to injunctive relief in the form of additional housing at the Grounds and termination of the illegal land-use agreements.

## I.   BACKGROUND

### a.  History of the West LA VA Grounds

The Government first acquired the land on which the West LA VA Grounds ("West LA VA," "Grounds," or "campus") sits in 1888. The year prior, Congress had "authorized, empowered, and directed" the Board of Managers of the National Home for Disabled Volunteer Soldiers "to locate, establish, construct, and permanently maintain a branch of said National Home" at the "most desirable and advantageous" location "west of the Rocky Mountains." Act of Mar. 2, 1887, ch. 316, § 1, 24 Stat. 444; *see also* Act of March 3, 1851, ch. 25, 9 Stat. 595 (establishing the National Home). Among more than 75 propositions considered by the National Home across dozens of localities was an offer by Senator John P. Jones and Arcadia B. de Baker to donate 300 acres between Santa Monica and Los Angeles. The purpose of the gift, accepted by the Government in 1888, was to "establish, construct, and permanently maintain a branch of said National Home for Disabled Veteran Soldiers[.]" Later in her life, Ms. de Baker donated an

additional 300 acres to the Government for the benefit of veterans. At its largest, the campus spanned approximately 600 acres.

Immediately after Ms. de Baker's gift, development of the campus commenced. In 1889, the Government began building dormitories to be used as a home for disabled soldiers and sailors, as well as a hospital. President McKinley, in the first ever trip by a sitting U.S. President to the state of California in 1901, visited the campus and described it as "the land of flowers." Addressing a large crowd of veterans, President McKinley stated:

> "The government for which you fought, to which you gave the best years of your lives, will see to it that in your declining years you shall not suffer but shall be surrounded with all of the comforts and all of the blessing which a grateful nation can provide."

Eight years later, when around 2,000 veterans lived on the campus, President Taft visited West Los Angeles. From the steps of one of the campus's buildings, President Taft expressed a similar sentiment:

> "I never stand before an audience like this and do not long for words to express the gratitude I feel that I have been spared to undergo such an experience and that we have through the country institutions such as this where those who were exposed to dangers, the wounds and the sufferings of the great war, may rest a time and enjoy their remaining days at the hand of a grateful country."

For the first seven decades of the campus's history, the Government's actions were consistent with presidential rhetoric about honoring and respecting veterans. By the 1920s, around 30 buildings existed on the campus. At the campus's peak in the 1930s, it was home to around 6,000 veterans. According to a contemporaneous newspaper article, "[a]dmission to the soldiers Home is simple. Any discharged soldier or sailor of the army or navy of the United States may gain admission by laying on the adjutant's desk his certificate of honorable discharge and pension certificate, if a pensioner." James J. Fitzgerrell, *Soldiers Home, Calif.*, SAWTELLE TRIB. (March 18, 1922). For veterans who lived there, "every physical want"—clothing, food, shelter, medical care—was provided. *Id.*

At the same time, the Government recognized that "something more than mere food, shelter, and clothing seem due to these men, and until adequately supplied perhaps these Homes are not all that they should" be. At the West LA campus, this "something more" included classes that veterans could take, communal dining halls, a two-story billiards hall, and a 1,000-seat theater. The community was self-sufficient; veterans who were able to work were responsible for everything from picking up trash around the campus to growing the food used in the dining halls. Veterans, though, were not isolated. The campus, only fourteen miles from downtown Los Angeles, had a railroad track running through it, and residents of the campus received half fare train tickets. In sum, the campus was more than just a place where veterans could sleep and store their belongings—it was a community they could call home.

The centerpiece of this community was the Wadsworth Chapel. In 1897, ten years after the land was donated, the Army's Inspector General wrote that "[t]he need for a proper place of divine worship is most felt at the younger Branches, specifically the Pacific; where an unsightly frame, that would make a poor barn at most, is used for the purpose." Two years later, Congress approved $14,000 for the construction of a multi-denominational church. The church contained two chapels, for Catholic and Protestant services respectively, separated by a thick interior wall to allow both denominations to hold services simultaneously so neither faith was given a preferential time slot. In addition to religious services, the church was used for weddings, substance abuse counselling, and funeral rites. The chapel was a beacon of faith and pride for veterans, welcoming them back to their home. Today, the chapel is in ruins.

Veterans returning from World War II had different needs than prior generations, and the campus's focus evolved to better serve them. Whereas the dire need for pre-WWII veterans was housing, WWII veterans were much more likely to require medical care, largely due to the implementation of mechanized warfare and toxic gases. The campus was reoriented to prioritize the provision of short-term medical care to facilitate re-entry into society. Today, the VA's West Los Angeles Hospital, the centerpiece of the VA's Greater Los Angeles healthcare system, sits on the West LA VA Grounds.

The next major generation of veterans, those coming from the war in Vietnam, had different needs than WWII veterans. Faster extraction from the battlefield and enhanced combat trauma medicine gave the gift of life to those would have died in prior wars. Vietnam veterans, however, suffered higher rates of psychological wounds than their predecessors, a trend that has continued into the more recent wars in Iraq and Afghanistan. These severe psychological wounds contributed to higher rates of homelessness compared to those who fought in earlier wars. *See generally* Robert Rosenheck et al., *Vietnam Era and Vietnam Combat Veterans among the Homeless*, Am. J. Public Health, 81:643-46 (1991).

But the campus's focus did not shift to meet Vietnam veterans' needs, most notably housing. Instead, the VA began selling off its land to private parties until about only half of the 600 acres gifted to the VA remained. These land sales only stopped in 2007 because Congress passed a law ending this practice. *See* Pub. L. No. 110-161 § 224.

Residential and other veteran-centered use of the campus also declined during the 1970s. As veterans were forced out, commercial interests moved in. The VA admitted in its 2022 Master Plan for the Grounds:

> "In the 70s, residential use of the campus declined, and the West LA VA Campus began the practice of leasing land on the campus to private commercial interests, including the UCLA baseball stadium, the Brentwood School athletic complex, Marriott Hotel laundry, Enterprise car rentals, and a rare bird sanctuary… The West LA VA Campus generated millions of dollars from this leasing policy that provided little direct benefit to Veterans."

The campus that once housed thousands of veterans in the 1940s no longer acted as a soldier's home.

### b. The VA Greater Los Angeles Healthcare System

Today, despite the decline in housing on campus, the West LA VA remains the premier healthcare facility for veterans in Southern California. Fewer veterans living on campus, however, means more veterans must live in areas that are remote from the center where their healthcare benefits are administered. For veterans with disabilities, this physical separation

poses unique hurdles to accessing their healthcare benefits administered on the West LA VA Grounds.

The Veterans Health Administration ("VHA") within the VA is tasked with providing "complete medical and hospital service for the medical care and treatment of veterans[.]" 38 U.S.C. § 7301(b). The benefits package offered through VHA includes the following: outpatient medical, surgical and mental health care; inpatient hospital, medical, surgical, and mental healthcare; prescription drug coverage; emergency care; substance abuse treatment, and other services. The VHA is required to provide preventive and primary care, acute hospital care, mental health services, specialty care, and long-term care, which includes residential treatment and housing services. 38 C.F.R. § 17.38(a). In Southern California, the VHA offers these services through an organization called the VA Greater Los Angeles Healthcare System ("VAGLAHS"). *See* Federal Def.'s First Am. Answer to Pls' First Am. Compl. ("Answer") (Dkt. 153) ¶¶ 210, 212. The focal point of the healthcare services offered by VAGLAHS is the VA Greater Los Angeles Medical Center located on the West LA VA Grounds. *Id.* ¶ 212.

For Plaintiffs—a class of veterans with traumatic brain injuries and serious mental illness in Los Angeles County—physical separation from this medical center creates major obstacles to accessing the services exclusively offered there. Veterans with traumatic brain injuries and serious mental illness, like Post-Traumatic Stress Disorder ("PTSD") or schizophrenia, find it difficult to travel to the campus. For example, Plaintiff Laurieann Wright, who lives with PTSD related to sexual assault she experienced during her military service, currently lives in VA-affiliated housing in Lancaster, approximately 65 miles away from the campus. Ms. Wright would have to commute up to three hours to access the West LA VA medical facilities. In addition to her PTSD, Ms. Wright has extensive physical disabilities and medical conditions including: osteoporosis, a neck injury she sustained after being thrown down the stairs while living on the sidewalk outside the VA, a seizure disorder that has caused multiple head injuries, back issues, and Hepatitis C she contracted while unhoused. As a result of these conditions, Ms. Wright requires certain specialty care that is only offered at the West LA VA. But due to her conditions, she is unable to make the hours-long journey from her

apartment in Lancaster to medical appointments in West LA. Although Ms. Wright benefited from the VA's then-existing ride-share program when she was first placed in Lancaster in 2022, that program has since ended, leaving Ms. Wright without transportation to the Grounds. Even if Ms. Wright had transportation, which she does not, she testified that sitting for hours in traffic or on the train would be excruciating with her disabilities.[2] Trial Tr. Aug. 23, 2024, 181-214.

### c. The *Valentini* Lawsuit (2011)

In 2011, a number of plaintiffs—represented by some of Plaintiffs' counsel here—sued the VA over its management of the West LA VA Grounds. *Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012) ("*Valentini I*"). The *Valentini* plaintiffs' claims were almost identical to those Plaintiffs raise in this case, and, as here, fell into three categories. *Id.* at 1087. First, the *Valentini* plaintiffs argued that "without permanent supportive housing, veterans with severe mental illness are unable to access the" the health benefits that the VA provides on the campus. *Id.* at 1116. To remedy this discrimination, the plaintiffs sought "an injunction directing that the Government provide [the] [p]laintiffs permanent supportive housing as a reasonable accommodation for their disabilities." *Id.* at 1087. Second, the plaintiffs argued that the 1888 Deed—which gifted the government the West LA VA Grounds on the condition that it maintain there a National Home branch for Disabled Solders—created a charitable trust that was enforceable in court. *Id.* The plaintiffs argued that the Government breached this trust relationship when they entered into land use agreements on the West LA VA Grounds that did not benefit veterans. *Id.* These land use agreements were also the predicate for Plaintiffs' final set of claims under the Administrative Procedures Act ("APA"). *Id.* at 1088. Third, as a remedy for both the charitable trust and the APA claims, the *Valentini* plaintiffs sought equitable relief that would require the land be used in ways that benefitted veterans. *Id.* at 1087-88.

Ultimately, the *Valentini* court dismissed the discrimination claims and those related to

---

[2] Trial Tr. Aug. 23, 2024, 208:6-12. "[Ms. Wright]: It seems like, in my mind, I'm going to do this, I'm a go-getter, I'm going to make sure this happens, I'm no wimp. But at the end of the day when I can't even walk to the bathroom without having to bend over because I'm in so much pain, it gets very discouraging. So I'm kind of at a wits end trying to figure out what am I going to do for -- what am I going to do."

the charitable trust. *Id.* at 1117; *Valentini v. Shinseki*, 2012 WL 12882704, at *6 (C.D. Cal. June 19, 2012) ("*Valentini II*"). Regarding the APA claim, the *Valentini* court concluded that the challenged agreements were "unauthorized by law" and therefore void. *Valentini v. Shinseki*, 2013 WL 12121981, at *14 (C.D. Cal. Aug. 29, 2013) ("*Valentini III*"). The court stayed its order pending the resolution of any appeal and declined to enjoin the VA from entering into future land-use agreement on the West LA VA Grounds. *Id.* Instead, the court remanded the issue to the agency, "leav[ing] the determination of what [land use agreements] are appropriate to the VA in light of the Court's order." *Id.* The *Valentini* court's trust in the VA to determine what land-use agreements were appropriate was misplaced. In the decade since *Valentini*, the VA has continued to misuse the veterans' land, including renewing agreements that the federal court found were illegal.

### d. The Master Plans and the West Los Angeles Leasing Act

In January 2015, while the *Valentini* case was on appeal, the parties reached a settlement agreement. *See* (Dkt. 193-42) ("*Valentini* Settlement"). Under that agreement, the VA and the *Valentini* plaintiffs agreed to "coordinate to finalize a New Master Plan" for the campus "[a]fter soliciting input from pertinent stakeholders[.]" *Id.* The "key purpose of the New Master Plan" was "to set out the most effective use of the campus for veterans, particularly for homeless veterans," and those with disabilities. *Id.* However, as the plaintiffs' counsel would soon come to regret, this settlement agreement was not "enforceable in any court."[3] *Id.*

After a period for public comment, the VA created the 2016 Draft Master Plan. The plan "confirm[ed the VA's] intent to create a 21st Century campus" that would support "LA's Veteran community in the broadest sense[.]" ("2016 Draft Plan") (Trial Ex. 154) at 8. The

---

[3] At the very first hearing in this case, Plaintiffs' counsel chided himself for not insisting on enforcement power. In the FAC, Plaintiffs stated:

> "Unfortunately, counsel for the prior plaintiffs did not insist on enforceability of the prior settlement agreement on the belief that the VA would act in good faith to comply with its terms and that court enforcement would not be necessary against the United States government, to whom they have given so much and from whom they had received such sacred promises. Tragically, this trust in the VA to keep its word was [] misplaced."

FAC ¶ 21.

Government "believe[d] it [was] reasonable to include" in the framework "approximately 1,200 units of permanent housing on the" West LA VA Grounds. *Id.* at 5. Seven hundred and seventy of these units were supposed to be complete by 2022. *Id.* In 2021, however, the VA Office of Inspector General ("OIG") reported that the VA had not constructed a single new unit of Permanent Supportive Housing pursuant to the settlement agreement.[4] The OIG reported that the "VA envisions all phases of construction will be completed in the next 17 years." *See* 2021 OIG Report at 17. In April 2022, the VA released an updated Master Plan ("2022 Master Plan") (Trial Ex. 1), which finalized their plan for building housing on the Grounds.

The 2016 Draft Master Plan also addressed whether pre-existing leaseholders could fit within the comprehensive plan for renovating the West LA VA Grounds. The Plan noted that, in light of *Valentini*, the VA had terminated several existing land use agreements. *Id.* at 17. It further committed the VA to negotiating with principals of certain existing land use agreements to assess whether they were compatible with the Plan. It explained that the VA would seek fair market value rents from those parties "and Veteran focused consideration" like "in-kind consideration and use of existing and future facilities under those arrangements," noting that "[t]he consideration generated will help VA significantly transform and revitalize the campus." *Id.* at 17-18. The VA pledged, "Going forward, VA's efforts to revitalize the campus will only include 'Veteran-focused' agreements, or agreements that result in additional healthcare, benefits, services, or resources being provided directly to Veterans and/or their families on the [West LA VA Grounds]." *Id.* at 17.

Shortly after the VA developed the 2016 Master Plan, Congress passed the West Los Angeles Leasing Act ("Leasing Act" or "WLALA"), which was amended in 2021. *See* Pub. L. No. 114-226; Pub. L. No. 117-18, 135 Stat. 288. ("2021 Amendment"). These laws were designed to "assist VA in carrying out" the Draft Master Plan's goal to create permanent supportive housing ("PSH") on the West LA VA Grounds. H. Rep. No. 114-570, at 6 (2016). Whereas the VA previously could lease property on the campus to allow third parties only to provide shelter and related services to unhoused veterans, the Leasing Act authorized the VA to

---

[4] The mission of the Office of Inspector General is "to serve veterans and the public by conducting meaningful independent oversight of the Department of Veterans Affairs." Trial Ex. 3, at 2.

enter enhanced use leases ("EULs") to provide PSH. Pub. L. No. 114-226 § 2(b)(2) ("The Secretary may" carry out "[a]ny [EUL] of real property" for "providing supportive housing.").

        While the WLALA expanded the types of leases the VA could enter into on the West LA VA Grounds, it also reigned in the VA's practice of entering into third-party leases that were not veteran-centered. The WLALA permits the VA to enter into land use agreements with third parties only if those agreements "principally benefit veterans and their families." WLALA § 2(b)(2). Under the Leasing Act, services that "principally benefit veterans and their families" are services "provided exclusively to veterans and their families" or "designed for the particular needs of veterans and their families as opposed to the general public" and when "any benefit of those services to the general public is distinct from the intended benefit to veterans and their families." WLALA § 2(l)(1). Such services must also be targeted to specific purposes, including "promotion of health and wellness, including nutrition and spiritual wellness," "[e]ducation," "[v]ocational training, skills building, or other training related to employment," "[p]eer activities, socialization, or physical recreation," "[t]ransportation," and "[s]ervices in support" of such purposes. *Id.* § 2(b)(2). In this respect, the WLALA codified the 2016 Draft Master Plan's commitment regarding third-party leases. *See* 2016 Master Plan at 17 ("Going forward, VA will only include veteran-focused agreements.") (simplified).

### e. Veteran Homelessness in the Los Angeles Area Since the Master Plans

        With no housing available on the Grounds in the years following the 2016 Master Plan, unhoused veterans were forced to create their own community. Beginning in May 2020, unhoused veterans whom the VA turned away from the West LA campus's residential program created "Veterans Row," a collection of tents on San Vicente Boulevard right outside the West LA VA. Trial Tr. Aug. 7, 2024, 54. Many of the tents were draped with American flags to signal that a veteran lived in the tent. The stark image of veterans living on the sidewalks outside the VA gates garnered public attention and prompted some community members to donate tents, food, and waste disposal services. The VA, on the other hand, did little to help the veterans living right outside its gate. The VA did not sanction Veterans' Row and did not see those veterans as their responsibility. The VA made no effort to provide these veterans with more

humane living conditions. The VA turning its back on these veterans had devastating effects on them. Mr. Fields, for example, who walks bent over at the waist, testified that his posture deteriorated the last time he returned to Veterans Row, as he no longer felt worthy to look people in the eye. Trial Tr. Aug. 23, 2024, 121:20-23.

Living on the sidewalk endangered the residents of Veterans Row and worsened their mental and physical conditions. At least one resident of Veterans Row was stabbed to death, and another died after being struck by a car. Trial Tr. Aug. 7, 2024, 68. Plaintiff Fields was hit by a truck. Plaintiff Wright became malnourished, contracted Hepatitis C, and was thrown down a flight of stairs, breaking her neck. Plaintiff Johnson was stabbed. Plaintiff Petitt described living there as "like being back in Iraq." Trial Tr. Aug. 23, 2024, 220:7-9.

Members of the veteran community, including advocate Robert Reynolds, who previously lived on the sidewalk of San Vicente while attempting to seek medical treatment at the VA, actively worked with VA officials during this time to try to move veterans inside the West LA Grounds. Trial Tr. Aug. 7, 2024, 87-89. At this time, veteran homelessness in Los Angeles was increasing. Advocates' efforts helped lead to the creation of temporary shelter within the grounds through the Community Treatment and Reintegration Services (CTRS) program. CTRS started as tents on the campus, which were later replaced by "Tiny Sheds." *Id.* This program was intended to serve as an emergency shelter option for unhoused veterans. Eventually, law enforcement led by the Los Angeles Sheriff's Department cleared out the Veteran's Row encampment in November 2021. *Id.* at 80-81.

Since Veterans Row was disbanded in 2021, more veterans have moved into the West LA grounds. Currently, there are 233 permanent supportive housing units on campus, nearly all of which are occupied. *Id.* at 130:1. Recent efforts by VA employees like Sally Hammitt, Chief of the Community Engagement and Reintegration Services (CERS) for Greater Los Angeles, the VA's homelessness program funded by the national Homeless Program Office, and John Kuhn, , Deputy Medical Center Director for VA Greater Los Angeles Healthcare System, to change the West LA VA's homelessness strategy have resulted in some improvements. The 2024 point in time (PIT) count, an annual estimate of the homeless population, reflects approximately a 25

percent decrease in the population of unhoused veterans in the greater Los Angeles area. Trial Ex. 1334. Still, nearly 3,000 veterans in the Los Angeles region lack a permanent home. *Id.*

## II.    JURISDICTION & LEGAL CLAIMS

This Court has jurisdiction over Plaintiffs' claims under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) based on 28 U.S.C. § 1343(a)(4) and 1346(a)(2) because those claims seek to secure equitable relief under an Act of Congress and because the United States is a defendant. In addition, this Court has jurisdiction over Plaintiffs' claims for injunctive relief based on 28 U.S.C. § 1331 because those claims arise under federal statutes and federal common law. This Court also has jurisdiction over Plaintiffs' claims to enforce terms of the charitable trust and for an accounting under 28 U.S.C. § 1367. This Court also has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1361. Venue is proper under 28 U.S.C. § 1391(b) because all of the acts and/or omissions occurred or will occur in this District.

### a.    Plaintiffs' Claims

Plaintiffs in this case are Joseph Fields, Lavon Johnson, National Veterans Foundation, Joshua Robert Petitt, Jeffrey Powers, Deavin Sessom, and Laurieann Wright. They bring claims on behalf of a Class consisting of "all homeless veterans with Serious Mental Illness [SMI] or Traumatic Brain Injuries [TBI], who reside in Los Angeles County" and a Subclass consisting of "all Class Members whose income (including veterans disability benefits) exceeds 50 percent of the Area Median Income."

1) Plaintiffs' first claim for relief (*Olmstead* claim) asserts that Federal Defendants violated § 504 of the Rehabilitation Act by not providing class members their disability healthcare benefits "in the most integrated setting appropriate to their needs," causing them to be "institutionalized or placed at risk of institutionalization." In other words, Plaintiffs seek permanent supportive housing so that they can avoid being segregated from others.

2) Pursuant to the Court's Order granting Plaintiffs' partial motion for summary judgment (Dkt. 218), Plaintiffs' have established their second claim for relief under

the Rehabilitation Act. There, the Court held that Federal Defendants' practice of contracting with housing developers that use income eligibility requirements that disqualify the most disabled veterans from housing is facially discriminatory.

3) Plaintiffs' third claim for relief asserts that Federal Defendants violated § 504 of the Rehabilitation Act denying Plaintiffs a reasonable accommodation they need— Permanent Supportive Housing— to access their healthcare services at VAGLAHS, solely because of their disabilities.

4) On Plaintiffs' fourth claim regarding the creation and enforcement of a charitable trust at the Grounds, this Court previously found that the 1888 Deed created a charitable trust and that the government assumed enforceable duties pursuant to the West Los Angeles Leasing Act of 2016 and the West Los Angeles VA Campus Improvement Act of 2021. (Dkt. 218). The Court left for trial the question of whether the VA had breached its duty.

5) Plaintiffs' fifth claim for relief arises under the Administrative Procedure Act (APA) and alleges that three land deals the VA entered on the West LA VA Grounds violate the West Los Angeles Leasing Act's requirement that leases to third parties on the campus "principally benefit veterans and their families." WLALA, § 2(b)(2)(A)-(I).

## III.    DISCUSSION

Plaintiffs' claims fall into two buckets. The first bucket, brought under the Rehabilitation Act, generally includes their demands related to the provision of housing at or near the WLA Grounds. The second bucket, their land-use claims, includes the allegations that the VA has been entering into illegal land-use agreements on land meant to be a home for disabled veterans. For ease of reference, the Court refers to the first bucket of claims as Plaintiffs' Housing Claims, and the second bucket as Plaintiffs' Land-Use Claims. The Court first discusses Plaintiffs' claims for additional housing under the Rehabilitation Act.

### a.   Plaintiffs' Rehabilitation Act Claims (Housing)

Plaintiffs bring three claims for relief under the Rehabilitation Act. At their core, Plaintiffs' Rehabilitation Act claims assert that VA's failure to provide supportive housing on or

near the West LA VA is disability discrimination and prevents them from meaningfully accessing their healthcare benefits.

The Court finds that Plaintiffs have proven each of their claims under the Rehabilitation Act. First, Plaintiffs have proven that the VA has violated the Rehabilitation Act by denying veterans the benefits of VA healthcare services, programs, or activities in the most integrated setting appropriate to their needs. Second, Plaintiffs have established that they are entitled to injunctive relief that ensures income eligibility requirements do not prevent the most disabled veterans from accessing housing. Third, Plaintiffs have proven that Federal Defendants violated the Rehabilitation Act by denying Plaintiffs a reasonable accommodation they need—Supportive Housing—to access their healthcare services, solely because of their disabilities. Plaintiffs are therefore entitled to injunctive relief, including the development of 750 Temporary Supportive Housing and 1,800 Permanent Supportive Housing units at the West LA VA, which would allow class members to meaningfully access their healthcare benefits. A sufficient number of these units must be free from income restrictions that disqualify the most disabled veterans to ensure that those class members have access to housing on the Grounds.

### i. Quality of VA Healthcare

A significant reason Plaintiffs seek housing at or near the WLA Grounds is the quality of the VA healthcare provided on the Grounds. A review of the healthcare services offered at the West LA VA is therefore beneficial. Dr. Steven Braverman, Network Director for the Desert Pacific Healthcare Network, which is part of the VA Integrated Service Network, and former director of the VA Greater Los Angeles Healthcare System, testified to the quality of care available at the WLA Grounds. Dr. Braverman stated at trial that it was very likely no other system in the country was better equipped than the West LA VA Medical Center to handle conditions like serious mental illness, traumatic brain injury, and post-traumatic stress disorders. Trial Tr. Aug. 12, 2024, 170:13-16.

In addition to the facilities at the West LA Grounds, the VA has clinics throughout the greater Southern California area. These clinics provide a range of services, mostly consisting of primary care, some mental health services, and homeless outreach. Clinics in Sepulveda, in the

San Fernando Valley, and in downtown Los Angeles have expanded specialty capabilities. The services, however, are not at the level of those offered at the West LA grounds. Trial Tr. Aug. 13, 2024, 39-41. West LA is the VA's "tertiary care" facility for the larger region. *Id.* at 42:5. This means the West LA facilities are home to most of the region's specialty care resources. The West LA VA serves as a referral center for clinics that are spread as far afield as Lancaster and San Luis Obispo, which lack specialty care capabilities. *Id.*

Specialty care could include services like orthopedics, psychiatry, or gastroenterology—essentially any services beyond ordinary primary care. Dr. Braverman described the West LA VA medical services as the hub of a wheel, with spokes going out to each of the clinics. When clinics do not have the capacity to treat a veteran at their facility—if for example, the veteran needs specialty care that the clinic is not set up to provide—that veteran will likely be referred and transferred to the West LA campus for more specialty treatment. The West LA VA also hosts a domiciliary for unhoused veterans in substance-abuse treatment. The domiciliary has around 300 bed spaces. Veterans' advocate Robert Reynolds, who spent time in the domiciliary himself and frequently visits the campus, testified that around 60 of those spaces are typically empty due to staffing shortages. Trial. Tr. Aug. 7, 2024, 14:14-18.

The VA's recent investment in the development of a new critical care tower on the campus underscores that the West LA VA is the preeminent healthcare complex in the wider catchment area. This tower will update and augment their existing inpatient, emergency medicine, and surgical services. Trial Tr. Aug. 13, 2024, 50:21-51:17. In sum, the West LA VA's medical facilities provide specialized and critical services that veterans in the greater Los Angeles area can only access at that facility.

### ii.  Current housing and shelter on the Grounds

At the time of trial, there exist several housing and shelter facilities on the Grounds that veterans either currently occupy or are open to veterans. An overview of the most significant

housing and shelter programs in operation, as described at trial by VA staff members, provides
useful context for Plaintiffs' requests for additional housing.

### 1. Temporary shelters

#### a. Care, Treatment, and Rehabilitation Services (CTRS)

Care, Treatment, and Rehabilitation Services (CTRS) is a program on the Grounds that
provides tiny shelters/sheds where veterans can live. When CTRS first started in around May
2020, after prolonged advocacy by homeless veterans living in Veterans Row outside the
campus, the shelter consisted of "child-size pup tents" in a parking lot next to the Eisenhower
gate bordering San Vicente. Trial Tr. Aug. 7, 2024, 40:14. The Brentwood School, a private
school that leases land from the VA, paid for the tents.

The location of the tents and their small size posed extreme challenges for the veterans
living inside them. The black-top pavement where the tents were located was uncomfortably hot
during the day, making it difficult for veterans to remain in the tents. Trial Tr. Aug. 8, 2024,
118. The VA then provided wooden pallets for the tents, but these became infested with rats.
Plaintiff Powers was removed from the CTRS program after destroying his tent while trying to
kill a rat he encountered sitting on his cot. *Id.* at 124:9-20.

As the tents were not tall enough to stand up in, veterans in wheelchairs and walkers had
to get on their hands and knees to crawl into the tent. Plaintiff Powers testified that getting up
and down off the ground aggravated his knee condition. *Id.* at 119:16-18. The tents were too
small for veterans to store their belongings inside, and veterans with service animals could not
fit their animals inside the tents. Trial Tr. Aug. 7, 2024, 41. One local veteran offered to donate
larger tents for the unhoused veterans in CTRS to live in, but the VA declined the donation,
stating the tents were too large. *Id.* at 43. Some veterans chose to remain outside the grounds
living on the sidewalks of San Vicente rather than enter CTRS tents. *Id.*

After clearing Veterans Row in late 2021, the VA instituted pallet shelters with Tiny
Sheds to replace the tents at CTRS. To be eligible for the CTRS sheds (as well as the VA's other
emergency shelter options), a veteran must be eligible for VA healthcare. Trial Tr. Aug. 9, 2024,
33. These sheds are now located on the West LA VA campus on the Great Lawn between San

Vicente and Wilshire Boulevard. The VA contracts with meal provision, monitoring, janitorial, and security services for the CTRS shelters. There are communal shower and bathroom facilities. The sheds do not have their own kitchen or bathroom facilities. Trial Tr. Aug. 7, 2024, 92. Given these are emergency shelters and are not considered long-term or permanent housing, the VA's goal is that veterans will not stay in these Tiny Sheds for longer than sixty to ninety days. Since they have opened, however, some veterans have resided in Tiny Sheds for over a year. Trial Tr. Aug. 8, 2024, 149. In Fall 2022, many of the Tiny Sheds burned down as a result of an electrical fire, causing veterans to lose their belongings and shelter. *Id.* at 93-94. Since then, many of the sheds have been rebuilt. There are currently 147 pallet shelters on the campus, with 135 falling under the CTRS program and 12 reserved for drop-ins. Trial Tr. Aug. 9, 2024, 30.

The VA has stated it is unable to pay for the Tiny Sheds directly, although it does use its own funds to set up utilities and prepare the sites for the sheds. Trial Tr. Aug. 15, 2024, 252. As a result, the sheds have historically been funded by private donations, including from Arnold Schwarzenegger and the Brentwood School.

### b. Third-party contract shelters and transitional housing

The campus is also home to a few third-party contract shelters. One of those is A Bridge Home, an emergency shelter run by Volunteers of America as of April 2024. This shelter currently has two tents, one of which is unoccupied, and one containing 32 beds. A second on-campus option is New Directions, which offers 100 spaces for transitional housing in a congregate setting. New Directions has a congregate setting and clinical treatment model, and imposes several eligibility requirements veterans must meet to receive shelter. A women's shelter, called Oasis, also operates on campus with 18 spots for women veterans. These on-campus housing options operate at varying levels of occupancy, with Oasis at around 40 percent occupancy on average and New Directions and a Bridge Home at around 80 percent. None of

these shelters offer permanent housing—instead, they are a stopgap solution until a veteran obtains more permanent housing. Trial Tr. Aug. 9, 2024, 175-79.

### 2. Permanent housing on the Grounds

In addition to temporary shelters and transitional housing, there are approximately 233 units of permanent housing in buildings currently on the WLA Grounds. These units are located in Building 207, which is reserved for veterans over the age of 62 with serious mental illness, and in Buildings 205, 208, and 209, all of which have income eligibility requirements. Trial Tr. Aug. 9, 2024, 189-190.

The developer of several of the existing project-based housing units on campus, Shangri-La, has come under public scrutiny after a recent civil suit brought by the Attorney General of California. Shangri-La in turn has alleged its CFO embezzled millions from the company. Shangri-La was the leaseholder and developer for buildings 205, 208, and 209. Trial Tr. Aug. 13, 2024, 12; Trial Ex. 219. At the time of trial, the Court heard testimony that Shangri-La is no longer a leaseholder on the campus. *Id.*

In addition to the 233 units occupied today, there are 535 permanent units in seven separate buildings that are currently under construction on the WLA Campus, with phased openings. The remaining 479 supportive units projected for construction under the Master Plan will not be completed until 2030. These units do not have a set date for occupancy, nor has construction started on any of these buildings. Trial Ex. 1616. The Court is concerned that these units will not be completed by 2030.

### a. Area Median Income eligibility requirements

Subsidized housing for veterans is primarily provided through the HUD-Veterans Affairs Supportive Housing (HUD-VASH) system, the federal government's specific housing voucher program for veterans. This program combines HUD's Housing Choice Voucher (HCV) rental assistance for homeless Veterans with case management and clinical services provided by the Department of Veterans Affairs (VA). HUD works with local public housing agencies, or PHAs, who administer the vouchers. In Los Angeles, the two largest PHAs are the Los Angeles County Development Authority (LACDA), and the Housing Authority of the City of Los Angeles

(HACLA), but other PHAs in the area also work with HUD to distribute these vouchers. The HUD-VASH system uses both project-based and tenant-based vouchers.

Significantly, the housing on the West LA VA Grounds uses project-based vouchers, meaning the vouchers are tied to a specific unit or building (rather than a specific tenant). *Id.* The project-based voucher program subsidizes the cost of multiple rental units in a block or a building, so veterans can live near one another and the VA can service many veterans in a confined area.

All permanent supportive housing units being developed under the Master Plan are pursuant to Enhanced Use Leases ("EULs") with housing developers. The government contracts with these third-party developers to build and lease housing on the West LA VA Grounds. These developers can impose separate requirements above and beyond the voucher program. A veteran may be able to obtain a HUD-VASH voucher, but they will then need to ensure that they meet any additional requirements that the developer imposes to qualify for an apartment in a given building on the Grounds.

In simple terms, veterans must complete a two-step process to obtain housing. In step one, the veteran must demonstrate eligibility for a voucher with a public housing agency, such as HACLA, by filling out a lengthy application. This application requires a veteran to gather and submit detailed financial information, which in itself can be a substantial burden for someone living on the streets. If the public housing agency determines that a veteran is eligible for the program, the veteran then receives a voucher from the agency. In step two, the veteran goes to a landlord with that voucher, at which point they must demonstrate they meet any additional criteria for housing in a particular building. Only if the veteran completes both steps can he acquire housing.

Veterans with significant service-connected disability ratings face a major obstacle, however, in completing this two-step process. Many buildings set aside for veterans in Los Angeles employ an eligibility cut-off of 30 percent of the Area Median Income (AMI), meaning a veteran must be earning less than that amount to be eligible for a unit. Around 70 percent of HUD-VASH project-based buildings in the Los Angeles area have some or all units capped at

30 percent AMI. Trial. Tr. Aug. 23, 2024. A single veteran in Los Angeles with no dependents and a 100 percent disability rating, however, receives more than 30 percent AMI in the form of disability payments.

A concrete example helps to illustrate the issue. For many developments on the West Los Angeles VA Grounds, a veteran is ineligible to live there if their income exceeds 30 percent of Los Angeles's AMI. Thirty percent of the area median income in Los Angeles is around $25,000. A veteran with a 100 percent disability rating receives approximately $40,000 in disability benefits every year. Developers count these disability benefits as "income" when assessing eligibility. Thus, a veteran with a 100 percent disability rating does not qualify for most housing on the West LA VA Grounds, although a less disabled veteran (who receives less in disability benefits) does. In other words, the more disability benefits that a veteran receives (i.e., the more disabled they are), the higher their "income" is, and the less likely they are to receive housing.

VA officials recognize that this result is unjust. Steve Braverman, the director of the West LA VA's medical system, testified:

> "[F]or veterans who have 100 percent service-connected disability…then they exceed the [income] cap and aren't eligible for any project-based housing…and that is inconsistent with the general principle that veterans are usually eligible for more services as they become higher rated in disability[.] So…VA is concerned, I think it's fair to say, that we are limiting some veterans, who by their service, would most benefit from being these units."

Braverman Dep. Tr. at 144:22-146:1.

Other veterans with lower service-connected disability ratings, but who receive additional government benefits like Social Security, also have a total "income" over the 30 percent AMI threshold. The VA estimates that one in four veterans receives disability compensation and other benefits that place them over the threshold. *Id.* The VA's counting disability benefits as income

thus disqualifies 25 percent of veterans from receiving housing. Notably, the IRS does not count disability payments as income.

At the summary judgment stage, the Court found that Federal Defendants' practice of contracting with third parties whose eligibility requirements disqualify the most disabled veterans is facially discriminatory. The Court held that Defendants cannot outsource discrimination. *See* Dkt. 218.

Prior to the Court's summary judgment ruling, HUD counted veterans' service-connected disability payments as income when calculating their eligibility for the HUD-VASH voucher program. This meant that veterans with 100 percent service-connected disability ratings were ineligible for step one of the process described above—they could not get a HUD-VASH voucher. On Thursday, August 8, 2024—the third day of this trial—HUD announced a policy change. Trial Exs. 218; 1624. In this policy change, HUD adopted an alternative definition of annual income for applicants and participants of the HUD-VASH program that excludes veterans' service-connected disability benefits when determining eligibility. Under the new policy, veterans who receive payments for severe service-related disabilities now face one less obstacle to completing step one and obtain a housing voucher through HUD-VASH.

At trial, however, Michael Dennis, Senior Program Advisor of the Office of Public Housing & Voucher Programs at HUD, and Dr. Keith Harris, Senior Executive Homelessness Agent for Greater Los Angeles at the VA testified that the real barrier to connecting veterans with high service-connected disability payments with housing was not HUD-VASH eligibility requirements, but the requirements imposed by federal, state, and local tax credits.[5] These programs use HUD's statutory definition of income, which still includes veterans' disability compensation.

The eligibility criteria that developers impose typically mirror the requirements imposed by federal, state, and local tax credits. Most significantly, developers of project-based housing for veterans often apply for Low-Income Housing Tax Credits (LIHTC), whose requirements

---

[5] "[Mr. Dennis]: [T]he primary problem has been the LIHTC eligibility requirements, yes. Q: So the real issue, to phrase it a different way, is the LIHTC and the state and local tax credit programs? A: That has been a much larger issue, yes." Trial Tr. Aug. 15, 2024, 102:13-19.

are set by the U.S. Treasury. The LIHTC program reduces a developer's federal tax liability in exchange for the acquisition, rehabilitation, or construction of affordable rental housing units that will remain income and rent restricted over a long period. The amount of tax credit allocated to developers is based on the number of qualified low-income units in their buildings that meet federal rent and income targeting requirements.

The requirements of LIHTC are set by the U.S. Treasury and use HUD's statutory definition of income, which includes veterans' disability compensation as income. HUD's statutory definition was not affected by the recent HUD policy change, which was limited to determining eligibility for a HUD-VASH waiver. Under LIHTC, veterans' service-connected disability payments are still counted as income.

As a result of the above-described rules, developers can only rent to veterans whose income falls below a certain threshold in order to receive a tax credit for their units. Developers are incentivized to make more units income-restricted than they are required to by law because their tax credit increases when more units in their buildings are income-restricted. They are also incentivized to set the income limits for their units as low as possible, usually at 30 percent AMI because their tax credit increases when they do so. In other words, the LIHTC program financially incentivizes developers to impose stringent income requirements on more and more units, decreasing the housing supply available to veterans. This problem is not limited to the housing at the WLA Grounds. Of 46 buildings in Los Angeles providing Permanent Supportive Housing for veterans, 38 have either some or all of their units set at 30 percent of the Area Median Income.

In short, HUD's recent changes mean that a disabled veteran may now be able to access a voucher, but it is unclear when, if ever, she will be able to use that voucher for housing. A voucher in the hands of a homeless disabled veteran is meaningless if she cannot actually use it to access housing. That the most disabled veterans are still likely blocked from housing on the

Grounds is particularly disturbing, as they have the greatest need for the West LA VA's premier medical facilities.

Federal Defendants argue that Treasury is reviewing this policy and is likely to similarly exclude veterans' disability compensation from the definition of income for LIHTC. They also point to potential Congressional action, including H.R. 8340, which would revise HUD's statutory definition of income to exclude veterans' disability payments. These remedies would ensure that the most disabled veterans are no longer excluded from affordable housing. At this stage, however, the proposed changes to LIHTC and potential Congressional reform are merely aspirational. No witness at trial could say when, if ever, these changes were likely to occur. The most disabled veterans cannot be asked to wait indefinitely for housing.

Prior to trial in this action, HUD took the position that it could not use its waiver authority to exclude service-connected disability benefits from the definition of income. HUD maintained this position despite a sustained, years-long push from veterans' advocates and VA officials, including Dr. Keith Harris, to change this discriminatory policy. HUD could change its policy again in the future, leaving the most disabled veterans without even access to a voucher.

What HUD giveth HUD can take away. The recent policy change by HUD therefore does not negate the need for injunctive relief to ensure the most disabled veterans can obtain permanent supportive housing at or near the WLA Grounds.

According to Federal Defendant, however, they have done all they can—HUD has used its waiver authority to allow disabled veterans to access the HUD-VASH vouchers. Trial Tr. Aug. 30, 2024. They assert that Plaintiffs should have sued the Treasury, as the VA and HUD cannot provide the relief they seek. The Court disagrees. As discussed further below in the context of Plaintiffs' proposed modifications and remedies, the VA can ensure that a sufficient quantity of the housing on the WLA Grounds is free from LIHTC restrictions, thus providing housing options for veterans whose disability income currently excludes them from housing.

### b.  Landfill Issue

On the eve of this trial, Federal Defendants informed the Court of a recent development regarding a landfill on campus and associated permitting requirements that could further delay the opening of some of the buildings being constructed under the Master Plan. *See* Dkt. 231.

Chelsea Black, Chief Planning Officer for Greater Los Angeles at the VA, the person who oversees the Master Plan, was contacted by a developer concerning a May 2023 letter from the County of Los Angeles Department of Public Health. The developer believed the letter to be a stop-work order.

The VA searched for the letter, dated May 18, 2023, but could not locate it. Testimony at trial established this was one of 70 blast form letters sent by the Department of Public Health throughout the Los Angeles area to owners of various sites with landfills requiring work stoppage until the site complied with 27 CCR 22190(g). The concern was that landfills produce methane, which could be explosive in enclosed indoor spaces. Trial Tr. Aug. 29, 2024. The VA interpreted the letter as a stop work order and initially believed it applied to the entire WLA VA Grounds. The County Department of Public Health clarified at trial that the hold applied only to permits for buildings that fall within a 1,000-foot radius of a landfill on campus that closed in 1968. *See* Trial Exs. 1422, 1639; 1642. This hold prevents new construction from happening on campus until the VA completes a post-closure land use plan (PCLUP) to comply with state law, a process that could take years. For buildings that have completed construction but are not occupied or that are currently in construction, the County set out an expedited process that would include methane monitoring in those buildings to indicate if methane levels posed a risk to residents. Until that process is completed, veterans cannot move into the buildings. Trial Tr. Aug. 29, 2024.

Building 401 was scheduled to receive veterans on September 3, 2024. Building 402 is nearing completion of construction and was scheduled to open in Fall or Winter 2024. Veterans cannot move into either building until the hold is lifted. Additionally, new construction on the campus that falls within the radius is on pause until the more extensive PCLUP is completed.

Much of the planned future construction of permanent supportive housing on campus falls within this radius. *Id.*

At trial, the Court heard testimony from Dr. Barbara Ferrer, Director of Los Angeles County Department of Public Health, as well as VA officials who have been working on addressing this issue. *Id.* Dr. Ferrer testified that veterans within the 1,000-foot radius, including the veterans currently living in Buildings 209, 208, and 205 which all fall in that circle, could remain. Veterans who had planned to move into Building 401 in early September and Building 402 in Fall 2024, however, could not move in until those buildings developed a monitoring plan. The Court fails to understand how some unhoused veterans are precluded from moving into buildings that are ready for occupancy because they fall within the 1,000-foot radius, but other veterans can remain in existing housing that falls within the same radius.

The Court received testimony from developers and scientists who have done methane testing at the site and argue the data proves the purported risk from methane off-gassing is non-existent in the area within the 1,000-foot radius. *Id.*; Trial Ex. 1643. Dr. Ferrer, however, suggested that receiving a waiver of the PCLUP requirements could take up to two years, and may be longer than completing the plan itself. Trial. Tr. Aug. 29, 2024. The VA and the developers it has been working with to develop units under the Master Plan are confused about what their obligations are, how and when they can proceed with construction projects, how this issue will affect the financing of housing developments, and most importantly when veterans will be able to move into the planned housing. As of this order, this issue has not been resolved and veterans do not know when they will be able to move into the units in Building 401, or the soon-to-be available units in Building 402. The VA is understandably frustrated by these roadblocks.

The landfill issue highlights the importance of having the maximum amount of land possible available to veterans for housing. Issues often arise when constructing housing—when

they do, the more land the VA has available, the more land it can choose from in fulfilling its duty to veterans.

### iii.   Current housing and shelter outside the WLA Grounds

In addition to the on-campus housing and shelter, the VA and HUD facilitate shelter, housing, and associated programs outside of the campus.

#### 1.   Emergency shelters

To fund spaces for veterans in emergency shelters throughout the Los Angeles area, the VA uses a program known as grant per diem. Grant per diem provides for transitional housing. Through this program, nonprofits apply for a grant and receive a per diem from the VA for each bed space occupied by a veteran on a given night. Depending on the model of care, the VA's intent is for veterans to stay in this housing for ninety days to six months before transitioning to permanent housing. There are about 600 transitional housing beds operating through the grant per diem program, set aside for veterans, in Los Angeles. According to John Kuhn, around 70 percent of these spaces are typically occupied. Trial Tr. Aug. 9, 2024, 175.

#### 2.   Supportive Services for Veterans' Families (SSVF)

Supportive Services for Veterans' Families (SSVF) is a VA program that helps bridge the gap for veterans who are in transitional housing but attempting to move into permanent housing. For example, SSVF can help with "rapid rehousing," where an unhoused veteran is moved into a hotel or motel room while they wait for permanent housing. SSVF can also help subsidize the rent for a limited period if a veteran has identified a unit but is still waiting on a HUD-VASH voucher to come through. Trial Tr. Aug. 8-9, 2024.

#### 3.   Permanent housing outside the WLA Grounds

##### a.   HUD-VASH Voucher system

The majority of permanent housing for veterans living outside the West LA VA Grounds is provided through the HUD-VASH voucher system. HUD allocates a certain number of these vouchers to different housing agencies throughout the country. The HUD-VASH voucher system is "use it or lose it"—when a particular public housing agency does not use enough of its vouchers, it is typically not be able to get additional vouchers. The rationale for this policy is

that the vouchers can then be reallocated to other geographical areas where the housing agencies are able to put them to use. In Los Angeles, HUD-VASH vouchers are underused, meaning the agencies typically cannot get additional vouchers for veterans. Trial Tr. Aug. 14, 2024, 288-290.

A veteran begins their process of applying for housing with a public housing authority, or PHA, when the VA makes a referral to the housing agency. Historically, the housing agencies have complained that the VA is not sending enough referrals—essentially, these agencies have vouchers they want to use, but no veterans to receive them. The referral rate to HACLA has increased over the past year, going from four referrals per week in 2023 to thirteen referrals per week in 2024. Trial Tr. Aug. 12, 2024, 149. This increase is significant, but still below the twenty-five referrals per week that HACLA has requested. *Id.* Carlos Van Natter, who oversees the HUD-VASH program at HACLA, testified that despite the increase in referrals, his agency still needs about twenty-five referrals a week to effectively utilize their available vouchers. Trial Tr. Aug. 23, 2024; Trial Ex. 16.

Getting referred to an agency is only the first step in what can be a complex and laborious process for an unhoused veteran. After completing the cumbersome application process, if a veteran succeeds in acquiring a voucher, they then have a limited time window to move into housing. This period is typically 180 days. Veterans involved in this case have had their voucher expire before they were placed into housing, meaning they had to start the application process over again. Trial. Tr. Aug. 7, 2024, 99. On average, it takes a veteran 161 days to be moved into housing after being referred by the VA to HACLA and 179 days after referral by the VA to LACDA. Trial Tr. Aug. 8, 2024, 55:3-7, Trial Ex. 25.

The HUD-VASH program in Los Angeles has suffered from high attrition in recent years, meaning veterans leave the program at high rates. In 2022 and 2023, more veterans left the HUD-VASH program than entered it. Trial Ex. 16, at 3. A veteran may leave the HUD-VASH program for positive reasons. For example, if a veteran obtains stable employment, they may no longer need a housing subsidy to pay their rent. Data from the housing agencies in Los Angeles, however, shows that large numbers of veterans leaving the program leave as a result of program violations. Nearly half of the individuals who were receiving HUD-VASH vouchers

through HACLA, one of the two main housing agencies in Los Angeles, and who then exited the program were removed as a result of a program violation or left without providing a reason (referred to as "skip"). These program violations typically mean the veteran has failed to recertify their eligibility for a voucher. Trial Ex. 16; Trial Tr. Aug. 23, 2024. Similarly, thirty percent of veterans who left HUD-VASH at LACDA, the other major housing agency in Los Angeles, exited the program due to failure to submit recertification documents. *Id.*

The attrition rate has seen significant improvement in the first half of 2024, seemingly in response to efforts by Sally Hammitt, John Kuhn, and others at the VA to implement a more centralized response to veteran homelessness in Los Angeles, increase referrals, and connect veterans with supportive services. Trial Exs. 1628-1633. This trend is encouraging, but it remains to be seen if it will continue.

The permanent supportive housing opportunities for veterans through HUD-VASH outside the WLA Grounds can be generally grouped into two buckets—project-based housing and tenant-based housing. Veterans can use tenant-based vouchers to rent individual units available on the private rental market. These vouchers subsize veterans' monthly payments for rental units available in the community. Project-based vouchers, meanwhile, are tied to a specific unit or building, like the permanent housing buildings on the West LA campus.

### i.  Project-based vouchers off-campus

Like the project-based housing that exists on campus, certain HUD-VASH project-based developments are scattered throughout the Greater Los Angeles area. John Kuhn testified that there are around 1,500 project-based units in the SoCal area, with around ninety percent of units filled.[6] These apartment buildings are in locations as far-flung as Templeton (north of San Luis Obispo, about 204 miles from the West LA VA) and Lancaster (out in the Antelope Valley, about 65 miles from the West LA VA). As of September 1, 2024, only one building, on Santa

---

[6] A map of current vacancies in project-based units is available at https://www.lahsa.org/veteranaffairs/home/map. Los Angeles Homeless Services Authority, Veterans Affairs Home Map, https://perma.cc/BNY8-FP77 (last visited Sept. 5, 2024).

Monica Boulevard, is located on the West Side of Los Angeles.[7] According to the VA's site, that building is limited to seniors and includes units with the thirty percent AMI restriction.[8] Veterans living in the majority of these buildings would need to find transportation for long distances to seek healthcare at the West LA VA Medical Center.

There may be some veterans who prefer to live in Lancaster or Templeton or any number of neighborhoods throughout Los Angeles. Federal Defendants argue that Plaintiffs propose to strip them of this choice, by funneling disabled veterans to the WLA Grounds. Trial Tr. Aug. 30, 2024. Plaintiffs respond that for the veterans in the class they represent—those with serious mental illness and traumatic brain injury—living far from the VA's premier medical center, in locations they did not choose, poses significant health risks.

Veterans like Laurieann Wright, who lives in Lancaster, have specialized healthcare needs, and so must travel long distances to the West LA VA to receive treatment. Housing vouchers do not cover transportation to the grounds. Veterans may not have access to a car or even have the ability to drive. Under this system, the VA and HUD expect individuals with serious mental illness to navigate the region's limited public transportation to West Los Angeles to receive medical care. For Ms. Wright, this has meant she cannot access an in-person psychiatrist that she needs for her PTSD, or a neurologist that she needs for her seizure disorder because neither are available at the VA clinic in Lancaster. Ms. Wright did not choose to live in Lancaster. When she asked for housing at the West LA VA, she was told none was available. Trial. Tr. Aug. 23, 2024, 211.

Some veterans living in dispersed apartments also miss a sense of community that housing on the campus can provide. As Dr. Jonathan Sherin, former Director, Los Angeles County Department of Mental Health, testified, there is no better therapy for veterans than conversation with fellow veterans—something that veterans living outside the West LA VA

---

[7] While not relevant to the disposition of this case, the Court notes the heavy concentration of these housing developments in the area around Skid Row and along the 110 Corridor, which is in line with historic patterns in Los Angeles of funneling the unhoused into historically Black and low-income neighborhoods that have fewer resources with which to address the problem of homelessness.

[8] See Los Angeles Homeless Services Authority, Veterans Affairs Vacancies Available, https://perma.cc/6DRX-W5H2 (last visited Sept. 5, 2024).

campus often sorely lack. Trial Tr. Aug. 15, 2024, 222:3-8. Mr. Petitt, who currently lives at the West LA VA, stated his primary reason for wanting to live at the campus was love for his fellow veterans. Trial Tr. Aug. 22, 2024, 223:18. In contrast, veteran plaintiffs testified to their experiences of deep loneliness when living far from the Grounds. Ms. Wright described feeling "very isolated" in Lancaster and missing the interactions with other veterans she had when living on campus in CTRS. Trial Tr. Aug. 23, 2024, 207:19. Mr. Johnson, who was placed for a time in an apartment in South Central Los Angeles, described loneliness and isolation that fueled feelings of paranoia. He eventually left the apartment after a year and a half because he "couldn't take the loneliness anymore. The thoughts of suicide. The voices by myself." When Mr. Johnson abandoned his HUD-VASH apartment in search of a community, he wound up living on Veterans Row, on the sidewalks outside the West LA VA. Trial Tr. Aug. 22, 2024, 253:4-5.

### ii.  Tenant-based vouchers

In addition to project-based vouchers, veterans may also obtain tenant-based vouchers through the HUD-VASH program. In theory, a veteran can use a tenant-based voucher to rent any rental unit they want, giving the tenant more choice over the location of their residence. In practice, however, the HUD-VASH tenant-based voucher program in Los Angeles is rife with problems.

The rates of tenant-based voucher utilization at the Los Angeles public housing agencies have historically been low, with these agencies using a little over 50 percent of the vouchers allocated to them by HUD-VASH, meaning nearly half of vouchers have gone unused. Trial Ex. 216. These agencies are using less of their HUD-VASH vouchers than is the norm for housing agencies nationally, with the national average being around 75 percent. Trial Ex. 25. Los Angeles has 8,436 vouchers allocated, but only 62.57 percent of vouchers are currently being used, an improvement over prior years. *Id.* This problem compounds each year. HUD allocates vouchers to different housing agencies across the country based on use. When housing agencies

use less than 70 percent of their tenant-based vouchers, they generally are not eligible for new vouchers. Trial Tr. Aug. 14, 2024, 288-290.

Given that Los Angeles has some of the highest numbers of unhoused veterans in the country, the housing agencies' low utilization rates for tenant-based vouchers cannot be attributed to lack of demand from veterans. Officials from the VA, HUD, and HACLA testified that this low utilization is likely due to several factors. The VA's historic low referral rate is one contributing factor, as public housing agencies cannot begin working with a veteran until the VA submits a referral to them.

Other obstacles facing veterans who wish to use tenant-based vouchers are attributable to the rental market in Los Angeles. Los Angeles has one of the most competitive and most expensive rental markets in the country, with the West Los Angeles VA located in one of the most expensive zip codes within the city. Trial Tr. Aug. 15, 2024; Trial Exs. 221-222. Even with vouchers, veterans struggle to find apartments they can afford in such an expensive rental market. Further, landlords who participate in the HUD-VASH voucher program are also subject to inspections required by the program. In a high-demand marketplace, a landlord may choose to rent to an applicant who has fewer administrative hurdles. Additionally, landlords may fear renting to veterans with a history of mental illness and homelessness. This stigma can keep veterans out of housing for which they would otherwise be eligible. Trial Tr. Aug. 9, 2024, 116, 185-186.

One strategy the VA is beginning to use to address some of the issues with tenant-based vouchers in Los Angeles is called "bulk leasing" or "master leasing." In brief, the VA, in partnership with the County of Los Angeles, rents an entire apartment building and then connects veterans with the units in that building and provides services to them. The County acts as a guarantor, picking up the bill only if the VA fails to fill the units. While this strategy may alleviate the problem of landlords not wishing to rent to veterans, its scope is limited. The VA has employed master leasing in only two buildings so far, one in West Hollywood with 13 units

and one in Burbank with 38 units. Both buildings are fully occupied. Trial. Tr. Aug. 9, 2024, 174.

HUD has also recently instituted a change that improves veterans' likelihood of obtaining housing with tenant-based vouchers in Los Angeles. When HUD determines how much a voucher in each area is going to be worth, they start their analysis by looking at how much an apartment costs in a particular area. There are at least two ways HUD can do this—traditional fair market rents (FMRs), and small area fair market rents. Traditional fair market rents are established on the basis of metropolitan areas, metropolitan statistical areas, or non-metro counties. For example, HUD assesses Orange County, CA as one metro area, with the one-bedroom fair market rent in the whole county set at $2,454 for fiscal year 2025. This fair market rent is the same whether you are looking for an apartment in Santa Ana, Irvine, or Anaheim. Public housing agencies offer vouchers that are worth a certain percentage of that fair market rent, depending on the particular program.

Small area fair market rents, by contrast, are established based on individual ZIP code areas. In a sprawling city like Los Angeles, where rents vary significantly from neighborhood to neighborhood, HUD can use small area fair market rents to determine with more particularity what subsidy an individual looking for housing in a certain neighborhood is likely to need to cover their rent. Trial Exs. 221-23; Trial Tr. Aug. 15, 2024, 58.

In October of 2023, HUD designated 41 metropolitan areas, including Los Angeles, as mandatory small area FMR areas. This means that public housing agencies in those metropolitan areas must use small area fair market rents in establishing payment standards for their program. This change goes into effect October 1, 2024, and PHAs have until January 1, 2025, to make those payment standard changes. *Id.* Further, PHAs may now set HUD-VASH payment standards at up to 160 percent of the fair market rent. Trial Tr. Aug. 15, 2024, 54-55; Trial Ex. 1184.

These changes are significant for veterans seeking housing at or near the West LA VA. For 90073, the ZIP code where the West LA VA is located, the small area fair market rent is $3,010 for a one-bedroom apartment. The rates are similar for neighboring zip codes, which

contain some of the most expensive real estate in Los Angeles. Trial Ex. 222. For the HUD-VASH program, the public housing agencies can set a payment standard of up to 160 percent of the small area fair market rent. In the zip codes of West LA, this means the HUD-VASH voucher for a one-bedroom could be worth up to $4,816. Trial Tr. Aug. 15, 2024, 54-55.

This development, while positive, cannot alone solve the problems that unhoused class members face in obtaining tenant-based housing. It does not, for example, eliminate stigma attached to homeless veterans with mental illnesses, or eliminate the inspection requirements that cause landlords to choose other tenants over HUD-VASH participants. It also does not increase the stock of available housing in West Los Angeles, even though it increases the number of units a voucher-holder may be able to afford. At this point, before the PHAs have even adopted the change, it is unclear how effective this rule change will be in increasing tenant-based voucher utilization in Los Angeles and providing additional housing for veterans.

### iv. Plaintiffs cannot meaningfully access their health benefits and are placed at risk of institutionalization without supportive housing at or near the Grounds

The record established at trial and set out above demonstrates that in order to access the critical services located on the WLA Grounds and avoid institutionalization, veterans with serious mental illness and traumatic brain injuries require Permanent Supportive Housing. This includes case management, education, employment assistance, and mental health services on or near the WLA Grounds.

The current project-based and tenant-based voucher options do not meet the critical needs of the class of homeless veterans in the Los Angeles area suffering from serious mental illness and traumatic brain injuries. Currently, there are only 233 units of permanent supportive housing on campus, almost all of which are occupied. There is extremely limited project-based housing in close proximity to the Grounds. In total, the supply of available housing for homeless veterans, as of the time of trial, including temporary, transitional, permanent supportive, and project–based housing in VAGLAHS' catchment area is approximately 379 units. Trial Ex. 217, 223; Trial Tr. Aug. 12, 2024, 153:10–157:9. Veterans using tenant-based vouchers cannot

always access housing near the Grounds, especially in the areas proximate to the campus. When veterans are able to obtain housing using their vouchers, such housing is often far from the WLA Grounds. Veterans struggle to transit to the Grounds for medical care and experience isolation in their scattered apartments. Their circumstances place them at risk of becoming homeless once again.

In sum, by failing to provide sufficient Permanent Supportive Housing in a community setting on or near the WLA Grounds, and failing to provide temporary housing in the interim while permanent housing is constructed, the VA consistently denies veterans with serious mental illness and traumatic brain injury meaningful access to the community-based VA healthcare, mental healthcare, and other critical supportive services they need and for which they are eligible.

This failure also places unhoused veterans at risk of institutionalization, further depriving them of access to their healthcare benefits. Plaintiff Fields succinctly described the effects of this cycle at trial:

> "[I]t seemed like we'd fall into this cycle of, you know, going to jail, getting out of jail, going to the sidewalk, going back to jail, going to VA program, getting kicked out, going back to the block, going back to jail, going back to a VA program. That was a never-ending cycle for a decade for me. There was nothing for us to go to."

Trial Tr. Aug. 23, 2024, 119:20-120:1.

### v. Recent West LA VA successes in reducing number of homeless veterans

The VA contends that their approach to building Permanent Supportive Housing under the Master Plan is sufficient. VA officials point to a recent decrease in the PIT count, which showed a 25 percent decrease in the population of homeless veterans in the Los Angeles area between 2023 and 2024, to show that their strategy is working. John Kuhn and Sally Hammitt both testified to recent successful programs initiated by the VA.

One of these programs is the Community Resource and Referral Center (CRRC), a welcome center on campus where veterans can walk in and get connected with resources,

including social workers and peer specialists. The VA has also initiated Homeless Patient Aligned Care Teams (HPACT), which are a new way of providing medical services in conjunction with housing assistance, in addition to mobile medical units. Peer specialists, or veterans who the VA employs to counsel other veterans, have also become a critical part of the VA's outreach. By employing veterans in outreach roles who have themselves experienced homelessness, addiction, mental illness, and the unique traumas associated with combat, the VA increases their chance of connecting with unhoused veterans who do not trust the agency to help them. On a macro scale, the VA has shifted to what they term a "One Team" approach, which has led to improved coordination with nonprofits, housing agencies, and other groups working to end veteran homelessness in Los Angeles. Trial Tr. Aug. 7-9, 2024; Tral Ex. 1219.

The recent efforts of the VA's staff are encouraging. The 2024 PIT count, which experts in this case all agree is an imperfect estimate, showed 2,991 unhoused veterans living in Los Angeles, an improvement over the previous years. Trial Ex. 1334. Still, many of the veterans who have moved into housing live long distances from the WLA Grounds and wish to move closer, but are unable to do so. And thousands of veterans remain on the streets of Los Angeles.

VA officials testified that they often have empty beds in the housing and shelter that currently exists on campus. They point to these empty beds as support for their contention that there is a low demand from veterans for housing on the Grounds. Trial Tr. Aug. 7-9, 2024. Plaintiffs' testimony in this case has demonstrated, however, that the VA's slow and inadequate response to veteran homelessness in Los Angeles—including a lack of housing on the Grounds and poor outreach—and history of corruption have eroded trust with the veterans it is supposed to serve.

Currently, there are only thirteen outreach personnel for the entire catchment area of the WLAVA, an area that covers 22,000 square miles. Trial Tr. Aug. 13, 2024, 199:19-201:7. In addition to the staffing shortages and outreach issues, the VA has failed to address the needs of the veterans who have come to them for help. Nearly every individual class representative in this case arrived at one point in time at the VA's Grounds asking for help and for housing, only to be turned away and sent back to the streets. Demand for housing at the campus is likely to increase

if the VA fulfills its promises by offering an attractive community living environment to veterans and conducts the necessary outreach to bring them into that community. The tide at the VA may be starting to shift, but without quick action the VA risks losing veterans' trust forever.

### vi.  Plaintiffs' proposed modifications:

#### 1.  Additional Temporary and Permanent Supportive Housing at the Grounds

To ensure that the class may meaningfully access their healthcare benefits at the West LA VA, Plaintiffs propose that within six (6) months of this Court's order, Federal Defendants, in consultation with Plaintiffs' counsel and a court-appointed monitor, develop a plan for the construction of an additional 1,800 units of permanent supportive housing units on the campus, along with community facilities. Plaintiffs further propose that within twelve (12) to eighteen (18) months of this Court's order, Federal Defendants provide 750 temporary supportive units on the WLA Grounds, which shall be placed on the WLAVA Campus so as to not interfere with current or planned construction activities that relate either to permanent supportive housing or the provision of medical services. As to both temporary and permanent supportive housing units, the Court would retain jurisdiction to adjust the number of units in each category in order to closely approximate the actual need for housing.

Plaintiffs' meaningful access claim rests on a disparate-impact theory of discrimination. *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738–39 (9th Cir. 2021) (holding that a claim is one for disparate impact where it involves "systemic barriers" to accessing benefits). To prevail on a disparate impact claim, a plaintiff must identify a "reasonable modification" to a defendant's policies that would provide the plaintiff with meaningful access to their government benefits. *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999). If a plaintiff can meet their burden to show their requested modification is facially reasonable, the modification is required, unless the defendant can show that the modification would fundamentally alter the defendant's programs or would impose undue financial or administrative burdens. *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987).  Defendants may be excused from discrimination under Plaintiffs' *Olmstead* claim if compliance would cause undue financial or

administrative burdens or would fundamentally alter the program or service at issue. In any event, Defendants must still do whatever modifications will not cause undue financial or administrative burdens or fundamental alteration.

Modifications are reasonable when they are "necessary to correct for instances in which qualified disabled people are prevented from enjoying 'meaningful access' to a benefit because of their disability." *Southeastern Community College v. Davis*, 442 U.S. 397, 410 (1979). In the Ninth Circuit, the relevant inquiry is not simply whether people with disabilities have any access to the services, programs, activities, or benefits a public entity provides, but whether they have "full and equal enjoyment" of those things, on par with nondisabled individuals. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (quoting 42 U.S.C. § 12182(a)).

Federal Defendants already provide, and plan to provide some Permanent Supportive Housing for homeless veterans with serious mental illness and traumatic brain injury. Plaintiffs seek additional, more robust, and faster provision of that housing. Increasing the amount, speed, and quality of Permanent Supportive Housing on or near the WLA Grounds is a facially reasonable modification that would ensure Plaintiffs have access to the VA's healthcare program. Additionally, building Temporary Supportive Housing units on campus is facially reasonable, given the length of time permanent housing takes to construct and the urgency of the crisis of veteran homelessness.

Federal Defendants already administer the creation of housing on and near the West LA VA campus. Increasing the quantity and speed at which housing is provided to veterans with disabilities is not a fundamental alteration of their program.

Further, the associated cost estimates Plaintiffs provide, including approximately $100 million for temporary supportive housing, are not unreasonable in the light of the VA's overall annual budget of approximately $407 billion. Trial Tr. Aug. 22, 2024, 128:5–6. Similarly, the

costs of permanent supportive housing are not unreasonable, as these costs will be spread out over the six-year timeline as units are sequenced in throughout that period.

At trial, Mr. Johnson and Mr. Steven Soboroff testified to the availability of land for at least 750 temporary units and 1,800 permanent units. Trial Tr. Aug. 22, 2024, 226:15–17. Indeed, trial testimony established that there is capacity for far more units on the Grounds, when taking the vacant buildings on campus and land from the leaseholds of UCLA, the Brentwood School, and Safety Park into account.[9] Trial Tr. Aug. 22, 2024, 80:13–17, Dkt. 270; Trial Ex. 248. Plaintiffs' experts' testimony further established that this construction could be completed without disturbing the in-progress development of housing and hospital facilities on campus. Trial Tr. Aug. 22, 2024, 226:15–17. The VA itself considered some of the parcels Plaintiffs suggest for Temporary Supportive Housing as sites for modular housing during the COVID-19 pandemic. Trial Exs. 248-250.

As to permanent housing, the Court finds that ample infrastructure exists on campus, or could be developed in the six-year timeline requested by Plaintiffs. At trial, Mr. Simms testified as to numerous problems with the utility infrastructure that the VA asserts would make the development of additional permanent housing on the campus difficult. Much of the information presented to the Court, however, was from an outdated assessment of the utility infrastructure done in 2020. Since then, the VA invested over $100 million to upgrade and expand the WLA Campus's infrastructure (e.g., utility systems) to support the 1,215 permanent supportive housing units planned for development. *See* Trial Tr. Aug. 27, 2024, 83:7–13; Trial Tr. Aug. 26, 2024, 143:23–144:13; Trial Tr. Aug. 13, 2024, 222:20–223:9. The infrastructure on campus in many areas, including electricity, power, and water, has improved as a result of those investments. Necessary improvements and expansions of the utility system could occur as the permanent units are phased in over the six-year time frame. Additionally, an environmental report conducted during the Master Plan has already demonstrated that at least 1,622 units can

---

[9] The Court is hopeful that, as Mr. Soboroff stated, the parties can "get this done without all of these privileged people going to their privileged lawyers, going to their privileged Senators, going to their privileged council members, going to the Congress." Trial. Tr. Aug. 21, 2024, 105:1-2.

be constructed on campus, indicating the infrastructure is in place for at least 400 units to be immediately developed. Trial Ex. 147.

Both temporary and permanent housing units are critical to providing a remedy to Plaintiffs. Without temporary supportive housing, countless veterans may die on the streets or in shelters while waiting for permanent housing to be built. The delays in implementation of the Master Plan and recent developments such as the late notice of post-closure landfill requirements discussed at trial have demonstrated that the process of building permanent housing can be drawn out and face roadblocks along the way. Without this Court ordering the VA to build significant temporary housing on the campus, the VA would likely continue violating the Rehabilitation Act for years to come as veterans languish waiting for permanent housing.

Federal Defendants argued at trial that the number of housing units requested by Plaintiffs is excessive, as their class is limited to homeless veterans with serious mental illness and traumatic brain injury, rather than all homeless veterans. Trial Tr. Aug. 30, 2024, 226-227. Federal Defendants argued that while 1,800 permanent supportive housing units would be sufficient to house the PIT count's estimate of all homeless veterans in Los Angeles, only a subset of those veterans suffer from those conditions. Federal Defendants suggest that number is about 24 percent, meaning about 718 permanent units would be sufficient to house veterans in the area suffering from mental illness on the campus. *Id.*

The VA's own findings indicate otherwise. In the 2016 Draft Master Plan, the VA defined one of its target populations for housing at the WLA VA as "Severely Disabled Veterans, including Chronically Homeless Veterans" and noted the prevalence of certain disabilities and conditions among homeless veterans: depression (73 percent), PTSD (66.7 percent), anxiety disorders (73 percent), traumatic brain injury (17.5 percent), and co-occurring mental illness and alcohol/substance abuse (55.6 percent). Trial Ex. 154 at 8. These prevalence rates, which may be co-occurring, demonstrate that the majority of the approximately 3,000 homeless veterans in Los Angeles are class members.

Further, in its Order certifying the class in this action, the Court adopted the definition of "homeless" veterans as those who "[have] been or remain[] unhoused, or [are] at risk of being unhoused." Dkt. 190 at 15. As VA's agency representative testified at trial, under the current HUD-VASH structure, a veteran living in tenant-based housing outside the grounds would need to become homeless again before they would be considered eligible for the project-based housing on campus. Trial. Tr. Aug. 26, 2024, 31-32. This is in part because HUD-VASH does not permit veterans to transition directly from tenant-based housing to project-based housing; instead, a veteran must once again become homeless before she can receive a project-based voucher.

Plaintiffs have proven that veterans like Ms. Wright, who lives in Lancaster, are unable to meaningfully access their healthcare benefits while living so far from the West LA VA Grounds. The class therefore extends beyond the veterans living on the streets or in shelters at this moment in time—it includes, at a minimum, veterans who reside in housing far from the Grounds who have no meaningful access to the VA healthcare benefits to which they are entitled. If a veteran with a tenant-based voucher in Templeton, about 200 miles from the West LA VA, wanted to switch to a project-based voucher on the Grounds, she would need to become homeless first to do so. Similarly, a veteran who has been living in a particular project-based unit for less than a year may also have to become homeless again in order to move to a different project-based voucher. Trial. Tr. Aug. 26, 2024, 31.

Under the current system, some disabled veterans who are currently housed face a devastating choice. They can remain in their housing, unable to meaningfully access healthcare, or they can return to the streets and become homeless again in hope of being able to access the limited housing on or near the campus. With wait times of six months or more for a veteran to get into housing once they enter the HUD-VASH voucher system, class members risk enduring the degradations of prolonged homelessness once again.

In 2024, there are 5,278 veterans using HUD-VASH vouchers in Greater Los Angeles. Trial Ex. 25, at 2. Using Federal Defendants' low estimate that only 24 percent of veterans have a serious mental illness, approximately 1,267 HUD-VASH voucher holders in the area likely

suffer from SMI. With little existing affordable housing at or near the West LA VA, those veterans are unlikely to currently live on or near the Grounds. They cannot easily move within the system to access a unit on or near the campus, and would likely need to become homeless to access the extremely limited supply of project-based units in West Los Angeles. These class members are therefore at risk of becoming homeless in order to access medical care at the West LA VA. Adding these 1,267 voucher holders to the 718 unhoused veterans (around 24 percent) that Federal Defendants suggest suffer from serious mental illness, Federal Defendants would need to provide a minimum of 1,984 units on or near the campus to provide a remedy for injured class members. The historically high attrition rates in Los Angeles, with more veterans leaving the HUD-VASH program in the last two years than entering it, further underscores that the risk of many veterans falling back into homelessness is not illusory.

While not every veteran with SMI and a HUD-VASH voucher will want to move to the West LA Campus, the rough estimate here likely understates the problem. It does not include veterans on the streets or with vouchers who have traumatic brain injuries, another component of the class. Moreover, the VA itself has cited data indicating that the number of veterans who are or have been homeless who suffer from serious mental illnesses is far greater than 24 percent.

Plaintiffs have therefore met their burden to show that 1,800 additional permanent supportive housing units at or near the WLA Grounds, as well as 750 temporary supportive housing units to be used as permanent housing is constructed, is a facially reasonable modification that is necessary to ensure Defendants' compliance with the Rehabilitation Act. At Plaintiffs' request, these numbers are subject to modification by the Court to closely approximate the actual need for housing. In the event that there were an overbuild, the additional units may be used to assist the VA's staff members who otherwise could not afford to find housing on or near the WLA Grounds. Trial Tr. Aug. 22, 2024, 196:2-25; Dkt. 270.[10]

Significantly, the disabled veterans that have moved into housing on campus during this

---

[10] In directing the Secretary of the VA to provide medical facilities, 38 U.S.C. 8101(3) defines medical facility to include, in part, "any facility or part thereof which is, or will be, under the jurisdiction of the Secretary, or as otherwise authorized by law, for the provision of health-care services (including hospital, outpatient clinic, nursing home, or domiciliary care or medical services), including…*accommodations for attending personnel*." (emphasis added).

lawsuit vigorously advocated at trial for additional housing on the Grounds, despite any potential disruption that construction might cause. During his testimony, Mr. Petitt stated, "[T]hey could set bombs off in my building, in front of my window every day if they're building housing for veterans." Trial Tr. Aug. 22, 2024, 226:21-23.

The location and details of temporary units on the campus, and the initiation of a plan for permanent units, is best determined at the injunctive relief stage, with veterans and the VA both having a voice in the process. The overlapping issues with certain parcels of land on the campus, including the landfill issue that arose at trial, demonstrate the importance of a collaborative approach to parcel selection. The availability of additional plots of land as a result of the Court's ruling on the charitable trust and APA claims is likely to alter this planning process. Thoughtful planning is also critical in ensuring that the campus provides for community spaces and engagement for veterans. As Dr. Sherin testified, a veteran community must include not only housing units, but the "connective tissue" essential to healing, thriving, and then reintegration. Trial Tr. Aug. 15, 2024, 168:10–170:2.

## 2. AMI claim

As remedy for their AMI claim, Plaintiffs seek to enjoin the VA from contracting with developers who include disability benefits as income. The Court is wary, however, of removing developers' access to federal, state, and local tax credits, which are a major source of affordable housing financing. Such an injunction would likely interfere with ongoing construction on the Grounds that has committed to using these tax credits. The Court seeks to add to the VA's financing options, rather than taking any options away from them, while still remedying the discrimination Plaintiffs face. The Court's jurisdiction here is limited—the U.S. Treasury is not a party to this suit and the Court cannot change the terms of the low-income housing tax credit (LIHTC) program through injunction. Similarly, reforming HUD's statutory definition of income to exclude disability benefits is beyond the purview of this Court in the present case.

Federal Defendants have other routes, however, to ensure that veterans who receive significant service-connected disability payments have adequate access to housing. Federal Defendants must ensure a sufficient number of housing units at the West LA Grounds are free

from discriminatory income restrictions associated with low-income tax credits. The number of units that is sufficient to provide housing for veterans affected by AMI restrictions on the Grounds will be discussed at the hearing on injunctive relief.

Contrary to the VA's argument that its only funding source for housing is these limited tax credits with discriminatory eligibility criteria, there are plenty of ways to develop housing on the campus that do not systematically exclude the most disabled veterans. The VA can, for example, contract with developers who rely on funding streams, such as conventional financing, that do not exclude veterans with high service-connected disability payments from accessing housing. Expert witness Randy Johnson, an experienced developer in Southern California, testified at trial that the recent implementation by HUD of small-area fair market rates is likely to make this option far more feasible than it has been in the past. In January 2025, the amount of rent a HUD-VASH voucher covers for a unit at the West LA VA campus could increase up to $4,800 for a one-bedroom apartment for a veteran. A developer building on the campus could therefore seek conventional financing, knowing that they can set unit rents at a price that would be profitable even without the LIHTC subsidy. Trial Tr. Aug. 22, 2024, 173. Conventional bank financing is also free from many restrictions and delays associated with affordable housing financing, making it a superior option when available. *Id.* Brett Sims, Executive Director for the Office of Asset Enterprise Management (OAEM) at the VA, agreed this increase in HUD-VASH vouchers could be a "game-changer." Trial Tr. Aug. 27, 2024, 131.

If conventional financing does not cover the entire cost of permanent supportive housing, the VA can directly fund or subsidize permanent supportive housing for veterans whose disability payments exclude them from housing due to the current tax-credit funding model. If the VA were to fund or subsidize the development of housing itself, it could ensure that once a disabled veteran accesses a voucher, he can then access housing. The Court's order takes away none of the developers' current financing options—instead, it gives the VA more flexibility with which they can build permanent supportive housing on campus and address the urgent crisis of veteran homelessness.

### a. Whether the VA can directly fund permanent supportive housing

The VA claims it lacks authority to directly fund permanent supportive housing itself. Mr. Simms testified that the VA's position is that they can only construct permanent supportive housing on campus through enhanced-use leases. Trial Tr. Aug. 15, 2024, 236:11-20. The Leasing Act authorized the VA to enter enhanced use leases ("EULs") to provide PSH. Pub. L. No. 114-226 § 2(b)(2) ("The Secretary may" carry out "[a]ny [EUL] of real property" for "providing supportive housing.").

The VA's interpretation of this provision is that it is the *only* authority with which they can construct housing on campus. But that's wrong. The plain language of the statute provides that the Secretary *may* carry out enhanced use leases for the purpose of providing permanent supportive housing on the WLA Grounds. Congress did not choose to limit the Secretary's authority by stating that the Secretary "shall" or "may only" carry out enhanced use leases to provide permanent supportive housing. The Leasing Act provides one avenue the Secretary may use to construct housing, but it is not the only avenue.

As the Leasing Act does not itself limit the VA's ability to directly fund permanent supportive housing, the Court looks to other authority granted to the VA by Congress. 38 U.S.C. 8102(a) provides, "[t]he Secretary shall provide medical facilities for veterans entitled to hospital, nursing home, or domiciliary care or medical services under this title." 38 U.S.C. 8101(3) defines "medical facility" as "any facility or part thereof which is, or will be, under the jurisdiction of the Secretary, or as otherwise authorized by law, for the provision of health-care services (including hospital, outpatient clinic, nursing home, or domiciliary care or medical services), including any necessary building and auxiliary structure, garage, parking facility, mechanical equipment, trackage facilities leading thereto, abutting sidewalks, accommodations for attending personnel, and recreation facilities associated therewith."

In the past, the VA has used this authority to directly fund housing or shelter that had connected medical services on the West LA Grounds. The VA relied on this authority to construct the Domiciliary, in which veterans live while receiving substance-abuse treatment.

Trial Tr. Aug. 15, 2024, 254. The VA also used this authority to partially fund some of the construction of the Tiny Sheds through CTRS and to fund Community Living Centers (CLCs) on the WLA Grounds. *Id.* The 2022 Master Plan defines these centers as "nursing home communities, resembling a 'home' as much as possible while offering high-quality care. Veterans may stay for a short time or, in rare instances, for the rest of their life." Trial Ex. 1, at 66.

Permanent Supportive Housing has much in common with the types of shelter or housing that the VA has already funded on the campus, using its construction authority. Veterans in permanent supportive housing receive healthcare services on site through the wrap-around services that are part of the HUD-VASH program. These services can include on-staff psychiatrists and nurses who provide medication and care. Plaintiffs Johnson and Fields, who both now live in Building 208, have received visits from nurses, medical doctors, and social workers in their units. Trial Tr. Aug. 22, 2024, 259:19-260:13; Trial Tr. Aug. 23, 2024, 128:22-129:14. The Court does not see a legal distinction between the VA funding a nursing home, where veterans may stay for the rest of their lives and receive nursing services on-site, and the VA funding a permanent supportive housing building, where veterans may stay for the rest of their lives and receive nursing services on-site. Permanent supportive housing is a form of healthcare.

Additionally, without housing on or near the WLA Grounds, many veterans are unable to access their healthcare services at the West LA VA Medical Center. Permanent supportive housing on the Grounds is therefore a critical component and "necessary building" for the "provision of health-care services." 38 U.S.C. 8101(3). As such, the Court holds that the VA has legal authority to directly fund permanent supportive housing under 38 U.S.C. 8101-2.

Furthermore, providing permanent supportive housing on or near the grounds that is free from the eligibility requirements of LIHTC and any state and local restrictions is necessary to ensure the most disabled veterans are no longer excluded from housing. If the VA's only avenue to construct housing on campus were to contract with developers who rely on these tax credits to fund their projects, then the VA could not ensure that veterans whose disability payments place

them over those developers' income eligibility thresholds could access housing on the Grounds. Under the current system, accepting the VA's interpretation of its limitations would mean permitting the agency to violate the Rehabilitation Act and discriminate against the most vulnerable subset of homeless veterans—those with the most severe disabilities.

Federal Defendants assert that Plaintiffs' overall plan will deprive them of the flexibility they need to address the problem of homelessness among veterans. The Court acknowledges that the VA has been recently employing innovative efforts to reduce homelessness in certain areas. John Kuhn testified about ongoing efforts to do bulk leasing or master leasing to address some of the long-term deficiencies with tenant-based vouchers. This is one strategy the VA may use to improve housing availability for veterans with income over the AMI limits who wish to live in tenant-based housing. By taking the position it cannot directly fund permanent supportive housing, however, it is the VA that reduces its flexibility in addressing the urgent crisis of veteran homelessness. The VA cannot bind its own hands and then claim to be helpless.

In sum, there are numerous ways for developers to fund the construction of housing on the West LA VA campus. First, they can continue to use federal, state, and local tax credits that subsidize the creation of affordable housing. Second, developers can rely on conventional financing, which is free of both the discriminatory eligibility criteria of those tax credits and many unnecessary delays associated with the limited pool of affordable housing financing. Third, the VA can directly fund or subsidize portions of the cost of development of housing on campus. Using a combination of these techniques, the VA can and must ensure that they provide sufficient housing for class members whose disability payments have barred them from housing on campus in the past.

Plaintiffs have therefore prevailed on each of their claims under the Rehabilitation Act and are entitled to injunctive relief. The precise contours of injunctive relief, including the location of temporary housing units, will be decided following a hearing on September 25, 2024.

### b. Plaintiffs' Land-Use Claims[11]

In addition to Plaintiffs' Rehabilitation Act claims, through which they seek additional housing, Plaintiffs bring several claims challenging the VA's use of land at the WLA VA Grounds. These land-use claims fall into two categories: breach of fiduciary duty (charitable trust), and claims under the Administrative Procedure Act (APA). The Court first discusses Plaintiffs' charitable trust claims.

### i. Charitable Trust

Plaintiffs claim that the VA has a fiduciary duty to disabled veterans on the West LA VA Grounds. Plaintiffs allege that the 1888 deed conveying the West Los Angeles campus created a charitable trust, with the government as trustee, and veterans with disabilities as the intended beneficiaries. To prevail on their charitable trust claim, Plaintiffs must demonstrate three things: 1) that a charitable trust was created on the Grounds; 2) that the government assumed enforceable fiduciary duties as trustee of that charitable trust; and 3) that the Defendants breached that fiduciary duty.

At summary judgment, the Court held that the first two elements had been satisfied. Specifically, the Court found that the 1888 deed created a charitable trust on the Grounds and the government assumed an enforceable fiduciary duty. Further, the Court found the scope of the government's duty was set out in the 2016 Leasing Act and its 2021 Amendment. The issue at trial was therefore limited to whether Defendants breached their fiduciary duty to disabled veterans.

As the Court held at summary judgment, Defendants' fiduciary duty was set out in the West Los Angeles Leasing Act and its 2021 Amendment, Pub. L. No. 114–226 ("Leasing Act"). Thus, if the VA violated the Leasing Act, they also violated their fiduciary duty to veterans.

---

[11] The Court is concerned by the pattern throughout this case of corporate and agency leadership hiding behind their employees. For example, UCLA designated Anthony DeFrancesco, the Executive Director and Chief Liaison for Veterans Initiatives and Partnerships at UCLA, as its corporate representative at deposition and at trial. Mr. DeFrancesco was not involved in either the negotiation of the lease in 2016 or its amendment in 2021. Individuals like Mr. DeFrancesco, rather than the UCLA Chancellor or Athletics Director, for example, have been placed in the uncomfortable position of testifying in court that their employers entered into illegal leases. This same practice has put VA representatives like Dr. Harris, Ms. Hammitt, and Mr. Kuhn in the position of testifying to decisions made by agency leadership. Throughout this month-long trial, the Court has been encouraged by the progress of the dedicated employees that have appeared on behalf of the VA in West Los Angeles and other institutions. It is concerned, however, that the top policy makers, who have left it to these employees to correct years of misuse and neglect, remain shielded from these proceedings.

The Court holds that each of the challenged land-use agreements are in violation of the Leasing Act, and therefore are a breach of the VA's fiduciary duty. This holding is consistent with prior federal court rulings and the findings of the VA's own Office of Inspector General that the VA has ignored since 2018. The VA's position that it does not have sufficient land to build housing for disabled veterans further increases the necessity of terminating the leases and returning the land to the VA so that it can be used for the purposes authorized by the Trust: caring for our homeless veterans.

### 1. The Leasing Act (2016)

The Leasing Act gives the Secretary of the VA the power to enter three types of leases. *Id.* § 2(a)-(b). First, he may enter into "enhanced use leases…for purposes of providing supportive housing…that principally benefit veterans and their families." *Id.* § 2(b)(1). Second, the Leasing Act authorizes certain leases with the Regents of the University of California on behalf of UCLA, so long as the lease satisfies several conditions including that "the provision of services to veterans is the predominant focus" of UCLA's activities on the Grounds. *Id.* § 2(b)(3). Third, the Secretary may enter into leases with third parties so long as the lessee "provide[s] services that principally benefit veterans and their families," among other conditions. *Id.* § 2(b)(2). The statute defines the phrase "principally benefit veterans and their families" as a service either (1) "provided exclusively to veterans and their families" or (2) "that are designed for the particular needs of veterans and their families, as opposed to the general public," where any benefit to the general public is "distinct from the intended benefit to veterans and their families." *Id.* § 2(l)(1)(A)-(B). Services that "principally benefit veterans" excludes those "services in which the only benefit to veterans and their families is the generation of revenue for the Department of Veterans Affairs." *Id.* § 2(l)(1)(A)-(B).

The VA argues that the four challenged land use agreements comply with the Leasing Act and therefore the agency has not violated its fiduciary duty to veterans. The VA interprets the Leasing Act as requiring that the lessee provide some services that are veteran focused. Under the VA's interpretation, the Leasing Act does not require that the underlying lease itself "principally benefit veterans," or in the case of UCLA, that "predominant focus" is the provision

of services to veterans. The VA uses no written criteria to determine whether land use agreements "principally benefit[] veterans and their families." Trial Tr. Aug. 13, 2024, 128:13–130:22. A VA committee makes determinations based on the "eye of the beholder," in nonpublic meetings with no veteran input. *Id.* 128:13–133:8. Plaintiffs, on the other hand, interpret the Leasing Act's text as requiring that the land use agreement itself either principally or predominantly benefit veterans.

The statute's language is clear and unambiguous: any land use agreement that the VA executes on the West LA VA Grounds must be veteran-focused. That is, leases with UCLA must predominantly focus on veterans, and leases with all other third parties must "principally benefit veterans." This interpretation of the Leasing Act's text is consistent with the legislative context in which Congress passed the Leasing Act.

### a. Text

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The language is "assumed to bear [its] ordinary, contemporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997). To discern this meaning, courts often analyze the statute's "grammatical structure." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989); *S.E.C. v. Franklin*, 384 F. Supp. 2d 1159, 1163 (S.D. Cal. 2004).

### b. Non-UCLA Third Party Leases

The Leasing Act authorizes "[a]ny lease of real property for a term not to exceed 50 years to a third party to provide services that principally benefit veterans and their families[.]" Leasing Act § 2(b)(2). The subject of the sentence is "lease," and the remainder specifies the attributes that the lease must have before the Secretary may execute it. Namely, the lease must (1) be for real property, (2) be shorter than 50 years (some leases, like the Brentwood School's lease, is for ten years), (3) be to a third party, and (4) provide services that principally benefit veterans and their families. That is, the phrase "principally benefit veterans and their families" refers to and modifies the sentence's subject—leases. The phrase does not refer to "services." As the Court has already held: "Congress mandat[ed] that any underlying leases to third parties be for the

purpose of providing services that principally benefit veterans. The actual use of the land is []
not secondary to any ancillary services lessees provide to veterans." Order Denying Defendant's
Motion to Dismiss (Dkt. 106) at 35. In other words, Section 2(b)(2) of the Leasing Act, by its
plain text, requires that the underlying lease's predominant purpose is to provide services that
principally benefit veterans and their families. The VA's interpretation—that a lessee need only
provide some services to veterans—is an implausible interpretation of the text.

### c.  UCLA Leases

The Leasing Act, in Section 3, creates unique requirements for VA leases with UCLA.
Section 3 has a similar grammatical structure to the previous section that the Court discussed.
Like Section 2, the subject of the sentence is leases, and then the statute lists attributes that the
lease must possess. Namely, any lease with UCLA is lawful if: (1) it is for a term shorter than 10
years; (2) it is consistent with the Draft 2016 Master Plan; (3) the provision of services to
veterans is the "predominant focus of the activities" of the lessee; (4) UCLA agrees to provide
certain additional services that principally benefit veterans; and (5) UCLA maintains records
regarding its services to veterans. Leasing Act § 2(b)(3) (emphasis added). If any of these
elements are not present, the lease is unlawful.

The statute does not define the second element—that the "predominant focus" of the
lessee be the provision of services to veterans. When a statute does not define a phrase, courts
often look to a dictionary published soon after the statute was passed for the definition. *See, e.g.*,
*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (1997); *Chacon v. Wilkinson*, 988 F.3d
1131, 1133 (9th Cir. 2021). The American Heritage Dictionary defines "predominant" as
"main." Predominant, American Heritage Dictionary,
https://www.ahdictionary.com/word/search.Html ?q=predominant (last visited August 31,
2023). Another dictionary defines the word as "preeminent." Predominant, Dictionary.com,
https://www.dictionary.com/browse/predominant (last visited August 31, 2024).

Thus, under the Leasing Act, a necessary feature of any lease with UCLA is that UCLA's
main focus of its activities on the West LA VA Grounds is providing services to veterans. Any

agreement with UCLA where UCLA's main focus is not veterans violates the Leasing Act, and consequently the VA's fiduciary duty to veterans.

### d. Legislative Context

The Court's conclusion that the Leasing Act's text unambiguously limits the VA to entering leases that principally benefit veterans suffices to end the inquiry into the statute's meaning. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last.") (cleaned up); *United States v. Pacheco*, 977 F.3d 764, 768 (9th Cir. 2020) ("The plain meaning of the text controls[.]"). Nonetheless, the Court proceeds to analyze the backdrop against which the Leasing Act was enacted. *See Pac. Coast Fed'n of Fishermen's Assocs. v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (noting that legislative history is a helpful tool in discerning Congress's intent in passing a statute). The legislative history makes clear that the Leasing Act only allows the VA to execute leases that themselves principally benefit veterans, not leases where the lessee promises to offer some services that benefit veterans.

Congress enacted the Leasing Act in response to decades of mismanagement of the West LA VA Grounds. In the 1990s, Congress expanded the VA's authority to enter leases on the West LA VA Grounds. *See* The Homeless Veterans Comprehensive Service Programs Act of 1992, Pub. L. No. 102-590, 106 Stat. 5136 ("1992 Act"); 38 U.S.C. §§ 8151-8153 (1996). At the same time, however, Congress limited the VA's leasing discretion, requiring that the agency only enter into veteran-focused leases. *See, e.g.*, 38 U.S.C. § 8151 (requiring that certain leases for health care providers do not diminish services to veterans); 1992 Act § 7(b) (requiring that leases for terms longer than three years to homeless services providers only serve "homeless veterans and the families of such veterans").

The VA, however, consistently transgressed those limits. Most egregiously, in 2002, the VA entered into a contract with Westside Staffing to provide parking services for events on the Grounds. At the time, the VA was statutorily authorized to enter only contracts that were "in the best interests of veterans" and "in the best interests of the government." Under its contract with

the parking lot lessee, Westside Staffing, the VA was entitled to receive 60 percent of the gross revenue generated by the two parking lots covered by the lease. Westside Staffing's owner, however, intentionally under-reported revenue to the VA, and bribed the VA official tasked with ensuring Westside's reports were accurate, to avoid detection. The scheme, which lasted for almost fifteen years and cost the government nearly $13 million in lost revenues, resulted in both the parking lot's manager and the high-up VA official pleading guilty to federal criminal charges. Both were sentenced to substantial prison terms. *See generally* Plea Agreement for Westside's Manager, 2:17-cr-00754-RGK (Dkt. 74); Plea Agreement for the VA Official, 2:18-cr-00012-RGK (Dkt. 3).

In 2011, as discussed above, a class of unhoused veterans sued the VA over its management of the land. *See generally Valentini*, 2013 WL 12121981. Specifically, they challenged eleven "enhanced sharing agreements," ("ESAs"), including ones the VA entered with the Brentwood School, a television studio, and a laundry facility for a hotel chain. *Id.* at *1. The plaintiffs argued that these leases were inconsistent with federal law, which at the time provided that the lessee of an ESAs must "share" healthcare resources with veterans. 38 U.S.C. § 8153. The VA argued that the challenged ESAs, none of which offered healthcare services, were lawful because the third-parties paid rent, and the VA applied this revenue to increase the campus's healthcare resources. *Valentini*, 2013 WL 12121981 at *9, *13. The *Valentini* court rejected this argument, concluding that all eleven challenged land deals were "unauthorized by law and therefore void." *Id.* at *14.

Congress enacted the Leasing Act in response to *Valentini* in order to "refocus the VA's efforts in West LA on veterans in need of services—particularly those who are homeless or at risk of homelessness." H.R. Rep. No. 114-570, at 6 (2016). Congress proclaimed that, although the land deals challenged in *Valentini* provided some benefit to veterans in the form of increased revenue for the VA, the deals were nonetheless "misuses" of the land. *Id.* at 6. Congress's characterization of land deals that provided ancillary benefits to veterans as "misuses" of the campus supports Plaintiffs' view that the Leasing Act requires that veterans be the primary focus of any lease on the campus. The VA's contrary interpretation, that non-veteran focused leases

are permissible so long as the lessee provides some services to veterans, is inconsistent with Congress's plain aim to "revitalize and preserve the West LA VA campus." *See id.*

Thus, Congress's intent in passing the Leasing Act aligns with the plain and unambiguous language that it used in the statute.

## 2.  Application

The Court now turns to the question of whether the four challenged land use agreements violate the Leasing Act, and by extension, the VA's fiduciary duty to veterans. The Court holds that the VA's land-use agreements with the Brentwood School, Safety Park, and Bridgeland Resources breach the VA's fiduciary duty because the agreements do not principally benefit veterans and their families. Similarly, the Court holds that the VA's lease with UCLA violates the agency's fiduciary duty to veterans, because UCLA's main or predominant focus under the lease is not the provision of services to veterans.

The Court analyzes each of the four challenged land use agreements in turn.

### a.  The Brentwood School

The first land use agreement that Plaintiffs challenge is a lease between the VA and the Brentwood School. This Court holds that this lease violates the VA's fiduciary duty to veterans because the lease principally benefits the Brentwood School, not veterans. Accordingly, the lease is void. To ensure the land is put to a use that principally benefits veterans, the Court will determine an exit strategy for the Brentwood School's 22 acres following the hearing on injunctive relief.

### i.  The Long-Standing Relationship Between the Brentwood School and the VA

The Brentwood School is a private school in West Los Angeles that has long had a presence on the West LA VA Grounds. The VA first began allowing Brentwood School to use its property in the mid-1970s, the same period that the campus's focus shifted away from housing veterans. For the first two decades of the parties' relationship, the Brentwood School used VA land for student parking as well as for some school and athletic events pursuant to a

series of temporary arrangements. The Brentwood School never paid any rent to the VA for these uses—they occupied veterans' land for free.

In the late 1990s, the Brentwood School wanted to create a "more formal, permanent, and long-term association with the VA." In a letter to the U.S. Senators from California, the Brentwood School's chairman, Richard Sandler, explained that the school had outgrown its current campus. Sandler informed the Senators that the VA and the Brentwood School had reached an agreement for the school to build a sprawling athletic complex occupying 20 acres West LA VA Grounds "to provide for [the] expanding needs of [Brentwood School's] boys and girls athletic teams[.]" The complex would include a football stadium, six tennis courts, as well as baseball and softball fields. In 1999, the VA and the Brentwood School eventually entered into an Enhanced Sharing Agreement for the private school to build its athletic facilities. The Enhanced Sharing Agreement's term was ten years, with a mutual option to extend it for an additional decade.

After this agreement was signed, the Brentwood School spent $15 million developing their athletic facilities, which now include three baseball fields, a workout tent, a stadium field track, a pool, and tennis courts. The completed facilities included an aquatic center featuring an Olympic-sized pool named after two donors who gifted the school $10 million. Given the size of the investment that the Brentwood School put into its facilities, it must have had some understanding with the VA that it would be a permanent occupant of the land, notwithstanding its time-limited lease. The VA essentially acquiesced in a quiet sell-off of the land. The permanence of these facilities is a tangible representation of the school and the VA's expectation that these lease renewals would lead to perpetual ownership.

The VA's Enhanced Sharing Agreement with the Brentwood School was on shaky legal ground from the start. At the time of the agreement, the VA was statutorily permitted to enter an enhanced sharing agreement only if the agreement was "related to the provision of healthcare." 38 U.S.C. § 8153 (1996); *Valentini*, 2013 WL 12121981, at *11. As the *Valentini* court held, the lease for the Brentwood School to build student athletic facilities was clearly unrelated to

healthcare, making it unlawful. *Id.* As such, the *Valentini* court voided the Brentwood School lease. *Id.*

In response to the *Valentini* court's ruling, the VA did not terminate the Brentwood School lease. Instead, the VA executed a new lease with the school, and the Brentwood School continues to use its athletic facilities built on VA-owned land.

### ii. Brentwood's Current Lease and Use of the Property

The Brentwood School's current lease was executed in 2016. In the lease's recital section, it states that the lease's purpose is to "more appropriately benefit[] Veterans and their families," while also "fortify[ing] the parties' existing partnership." Brentwood Administrative Record ("Brentwood AR") (Dkt. 193-49) at 26 (emphasis added). The lease expires in 2026, but the parties have a right to extend the term by ten years. *Id.* at 27.

The Brentwood School occupies 5.5 percent of the West LA VA campus. The lease allows the private school to maintain its student athletic facilities on these 22 acres. In exchange, the Brentwood School pays $850,000 annually to the VA. *Id.* at 30. Pursuant to the Leasing Act, these annual rental payments must be used to help maintain and renovate the Grounds. *See* The Leasing Act § 2(d) ("Any funds received by the Secretary under a lease…shall be available…exclusively for the renovation and maintenance of the land and facilities at the [West LA VA Grounds.]"). In addition to monetary consideration, the Brentwood School provides in-kind consideration of $918,000. *Id.* at 82. This in-kind consideration consists primarily of upkeep and maintenance of the 22 acres, as well as some services provided to veterans, including offering special events to veterans, donation drives spearheaded by the Brentwood School, as well as scholarships. *Id.* at 82-85.

The lease obligates the Brentwood School to provide veterans with some access to its athletic facilities. Critically, however, the Brentwood School, not the VA or veterans, decide the times and manner in which veterans may enter the campus and use the facilities. *See id.* at 8. The obvious and foreseeable consequence of the VA's decision to let the Brentwood School to decide when their students, versus when the veterans, may use the facilities is that the

Brentwood School would allocate the most desirable time to their students. This result has come to pass. Most of the facilities are open to veterans early in the morning and late in the evening. For example, on Mondays, Wednesdays, and Fridays, veterans may use the pool from 5:30 a.m. to 7:30 a.m., and, on the weekends, from 11 a.m. to 3 p.m. Veterans may use the track every weekday from 5 a.m. to 11 a.m. The Brentwood School operates a shuttle to transport veterans from other areas of the West LA VA Grounds to the athletic facilities, but the shuttle operates from 9 a.m. to 2 p.m., and thus does not align with the hours that veterans may use the facilities. Given the restricted times that veterans may use the facilities combined with the lack of adequate transportation, veteran access to the Brentwood School facilities pales in comparison to the access that Brentwood's students have.

In 2018, the VA Office of the Inspector General (OIG) audited the Brentwood School's lease. The OIG determined,

> "the Brentwood School lease violated the West Los Angeles Leasing Act because the purpose was not to principally benefit veterans and their families; rather, the principal purpose of this lease was to provide the Brentwood School continued use of the athletic facilities." Trial Ex. 3, at 32.

The VA did not accept the OIG's position that the lease with the Brentwood School was noncompliant. The VA argued that accepting the OIG's interpretation would require the VA to terminate its lease with the Brentwood School. The VA responded to the OIG,

> "As a practical consideration, VA notes that the finding that the Brentwood School lease is deficient "because the principal purpose of the lease is to provide Brentwood School continued use of the Athletic Facilities" can be corrected only by discontinuing that use. With respect to this lease, then, recommendation 1 – "take action to correct deficiencies noted in this report" – requires VA to terminate the lease and bar Brentwood School from using the facilities it has constructed on the Campus." Trial Ex. 2, at 96.

The VA feared that their failure to negotiate a new lease with the Brentwood School would result in a lawsuit brought by the Brentwood School against the VA. *See id.* (VA

expresses concerns that terminating agreement with the Brentwood School "would likely trigger a litigative challenge").

The Leasing Act provides that, if the Office of Inspector General finds that a land use agreement is unlawful, the VA may not renew the lease unless the Secretary of the VA informs certain members of Congress about the Inspector General's findings. Leasing Act § 2(h)(1). It is unclear how a dispute between the VA and OIG would be resolved.

After the 2018 report, the Brentwood School spent nearly $1 million on lobbyists to try to alter the Leasing Act to remove this notification provision. That the school spent such a large sum on lobbying efforts to create a special carve-out in the law suggests that it was aware the lease violated the West Los Angeles Leasing Act. Although the Brentwood School's lobbying efforts were unsuccessful, the VA did little to change the Brentwood School's actions or to bring the lease into compliance with the Leasing Act.

### iii.   Legal Analysis

The Court now turns to the question of whether the Brentwood School's lease is consistent with the VA's fiduciary duty to use the land in a manner that principally benefits veterans. The Court holds that the Brentwood School violates the VA's fiduciary duty because the primary beneficiary of the lease is the Brentwood School, not veterans.

In the recitals section of the lease agreement, it is evident that the Brentwood School and the VA were jointly advocating for the faulty reasoning that the Leasing Act required the Brentwood School to provide only some veteran-focused services. However, minimal services, such as limited hours of access to athletic facilities and a few volunteer drives, do not transform a lease for student athletic facilities into one that principally benefits veterans. The in-kind consideration that Brentwood provides consists primarily of upkeep and maintenance of the entire 22 acres—acreage that the school occupies and uses. As the 2018 OIG Report stated, the other in-kind services that the school provides, including offering special events to veterans, donation drives spearheaded by the Brentwood School, and scholarships are not allowed under federal law. Trial Ex. 2, at 42.

Moreover, the facilities were designed in the 1990s for student use and the predominant purpose of the 2016 lease renewal was to provide the Brentwood School with continued use of these facilities. Under any common sense reading of the lease, the Brentwood School's athletic facilities principally benefit the Brentwood School, not veterans. As such, the VA's lease with the Brentwood School violates the agency's fiduciary duty to veterans.

The VA does not argue that the Brentwood School lease principally benefits veterans. Instead, the VA defends the lease by pointing to WLALA's legislative history. The VA identifies a portion in the House Committee Report on WLALA that states, "the Committee is supportive of VA continuing the Department's long-standing community partnership with the Brentwood School under the tenets of this bill." H. Rep. No. 114-570, at 7. This section of the committee report, however, is of limited probative value in discerning congressional intent regarding the Brentwood School for two reasons. First, in other parts of the report, Congress disapproved of the Brentwood School lease. It characterized the lease as a "misuse" of the land and states that the Brentwood School "provide[s] services to the general public" and "any use of or benefit of the leased space by veterans or their families was ancillary." *Id.* Second, the Committee report predates the renewed lease between the VA and the Brentwood School. The Committee therefore could not have known the precise contours that the agreement would take and how it would measure up to WLALA's requirement that the lease "principally benefit veterans and their families." The VA's reliance on this section of the House Committee Report also suffers from a more fundamental flaw—the report, authored by a House subcommittee, was not ratified by the whole House, nor voted on by the Senate, nor signed by the President. Thus, placing dispositive weight on a section of a House Committee Report that is untethered from the statute's text would create an "end run" around the Constitution's prescribed process for enacting laws, and incentivize lobbyists or other special interests to insert language into the legislative history in the hopes that it would influence judicial interpretation. *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007); *see also Puerta v. United States*, 121 F.3d 1338, 1344 (9th Cir. 1997). The Supreme Court has cautioned:

"[L]egislative materials like committee reports, which are not themselves subject to the requirements of Article I [of the Constitution], may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text."

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *see also Puerta*, 121 F.3d at 1344 (cautioning that a committee report may reflect "what some committee members wanted in the bill but did not get, or throw a bone to some [] lobbyist whose preferred language was rejected by the House committee").

Recognizing the peril of legislative history materials, the Supreme Court and the Ninth Circuit have instructed courts to use them only in limited circumstances, namely, to define ambiguous or vague phrases contained in the statute's text. *See, e.g.*, *Pac. Coast Fishermen*, 937 F.3d at 1198 (specifying a broad term using legislative history materials); *Kane v. Zions Bancorp., N.A.*, 631 F. Supp. 3d 854, 865 (N.D. Cal. 2022) (using legislative history to define an ambiguous phrase). Conversely, when legislative history is "untethered from text in an enacted statute," it has "no compulsive legal effect." *Nw. Env't Def.*, 477 F.3d at 682 (9th Cir. 2007); *Shannon v. United States*, 512 U.S. 573, 579 (1994) (refusing to give "authoritative weight to a single passage of legislative history that is in no way anchored to the text of the statute"); *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337 (1994) ("[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law.").

Here, the Committee's reference to the Brentwood School is not merely unanchored to the Leasing Act's text—it contradicts it. The Leasing Act requires that third-party leases principally benefit veterans. A lease for a private school's athletic facilities plainly does not satisfy that requirement. The VA's contrary conclusion is inconsistent with the common sense reading of the statute's text and the lease agreement between the VA and School. Had Congress wanted to exempt the Brentwood School from the Leasing Act's requirement that leases must benefit veterans and their families, they could have created a carve out. Indeed, Congress knew how to

establish specialized requirements for leases of student athletic facilities.[12] *See* The Leasing Act § 2(b)(3) (creating special requirements for a lease with UCLA). That Congress created special requirements for one school's athletic facilities, but was silent regarding the Brentwood School's athletic facilities, demonstrates that the Brentwood School lease must follow the Leasing Act's mandate to principally benefit veterans. *See Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1055 (9th Cir. 2018) (cleaned up) ("[W]hen a statute designates certain things, all omissions should be understood as exclusions.").

The Brentwood School's lease with the VA for its student athletic facilities violates the Leasing Act, and by extension, the VA's fiduciary duty to veterans. Accordingly, the Brentwood School lease is void. To ensure the land is put to a use that principally benefits veterans, the Court will determine an exit strategy for the Brentwood School's 22 acres following the hearing on injunctive relief.

### b.  The Safety Park Lease

Plaintiffs also challenge a lease that the VA has executed with Safety Park that permits Safety Park to operate two parking lots on the West LA VA Grounds. Safety Park Administrative Record ("Safety Park AR") (Dkt. 193-51) at 18.

This parking lot has a sordid history. A prior operator of the parking lot defrauded the VA out of millions of dollars and bribed a high-ranking VA official in order to maintain the lease. After the fraud was discovered and the lease with the fraudster terminated, the VA leased the parking lots to a new lessee, Safety Park, in 2019. *Id.* at 17. The initial lease term was one year, but the parties have executed several one-year extensions. The VA has initiated these extensions despite the VA's Office of Inspector General ("OIG") finding that the leases violated WLALA. "[The Safety Park lease] is non-compliant," the Inspector General concluded in a 2021 report, "because its primary purpose is to provide parking to the public, not principally benefitting veterans." Just a few months later, however, the VA, ignoring the OIG finding, extended Safety Park's lease for an additional year.

---

[12] Whether UCLA complied with these special provisions is a separate question that the Court addresses later in this section.

The VA argues that, when executing the Safety Park lease, it faithfully exercised its duty to act as a fiduciary on behalf of veterans. The VA points to several services the parking lot offers to veterans. For example, the lease requires that Safety Park give veterans a 25 percent discount on parking in the lot, employment and job training, and a partnership with businesses in Brentwood to generate further employment opportunities and discounts for veterans. Safety Park AR at 21. In practice, the site visit and Safety Park's employee's testimony confirmed that veterans park for free at the lots. The lease further requires that at least 85 percent of Safety Park's staffing requirements be met by veterans. *Id.* Additionally, Safety Park remits its net parking revenues to the VA, although it does not pay annual rent. The government concludes that the Safety Park lease is lawful because these services "principally benefit veterans and their families."

The VA's conclusion is wrong. Safety Park operates two parking lots, both of which are along Barrington Avenue and adjacent to the nearby Brentwood Village business district. They are on the opposite side of the campus from the VA's medical center on the Grounds. The lots, by virtue of their location, primarily support the public's access to Brentwood's businesses. The parking lots, because of their location, primarily benefit the Brentwood merchants and their patrons, not veterans and their families. To the extent that veterans also use Safety Park's parking lot to patronize Brentwood businesses, their benefit is not "distinct" from that of the public, as required by the government's fiduciary duty. *See* The Leasing Act § 2(l)(1)(B).

The minimal services that Safety Park offers to veterans, like training, employment, and free parking for veterans, do not make the lease lawful. First, Safety Park has not been providing any of these services besides the free parking. Barbara Davies, the General Administrator at Safety Park, testified at trial that no programs for veterans have been implemented, no supportive services for veterans are offered, no one from the VA has ever asked for a written report regarding the services required under the lease, and the required annual audits have not occurred except for one audit in 2022. Trial Tr. Aug. 27, 2024, 199-206.

Even if the lessee were providing these services, the lease would remain unlawful because the VA, in its capacity as a fiduciary for veterans, must only execute leases that principally

benefit veterans. A lease for a public parking lot adjacent to the Brentwood Village business district, even if staffed by veterans, does not satisfy that standard. Safety Park's designated representative stated the obvious at trial: the parking lot's lease is primarily designed to facilitate the public's access to shopping and benefit the Brentwood business district. Many veterans do not have cars or are unable to drive. Even for veterans with cars, the parking lots provide little benefit. They are not located near other VA facilities and veterans cannot access those facilities from the lots. Most disabled veterans living on a fixed income cannot afford to shop in Brentwood and are unlikely to want to park near a luxury shopping center. In sum, the lease does not prioritize the interests of veterans.

Despite this fact, the VA has, on at least three occasions, decided to extend Safety Park's lease. This decision is striking, given that the VA believes that the land that the parking lot now occupies is suitable for veteran housing. Dr Braverman testified that the land is "an area that could be suitable for housing in the future if that was necessary." The decision to lease land to a parking lot that could be used to house a homeless veteran is flat-out inconsistent with the VA's fiduciary duty to use the West LA VA Grounds in a manner that benefits veterans.

Because the Safety Park lease does not principally veterans and their families, the VA violated its fiduciary duty to veterans by executing and extending the lease. Accordingly, the Court holds that the Safety Park lease is void and terminated.

### c. Bridgeland Oil[13]

Plaintiffs also argue that a 2017 revocable license between the VA and Bridgeland Resources, an oil company, violates the VA's fiduciary duty in managing the West LA VA Grounds. The license permits Bridgeland to slant drill from a drill site located on the West LA VA Grounds to private oil leases bottom holed outside of the West LA VA Grounds. In exchange for its right to drill on VA land, Bridgeland donates 2.5 percent of the gross revenue from oil extracted at its West LA VA drill site to the Los Angeles chapter of the Disabled American Veteran ("DAV-LA").

---

[13] Bridgeland Resources intervened in this lawsuit and filed a complaint-in-intervention against Plaintiffs. They seek a declaratory judgment that the 2017 Amendment complies with the Leasing Act. Bridgeland is not entitled to this declaratory judgment, because the 2017 amendment does not principally benefit veterans and their families, as discussed above.

The Court holds that Bridgeland's revocable license does not principally benefit veterans. As such, the VA's decision to enter into the revocable license with Bridgeland violates the VA's fiduciary duty to veterans and is therefore void and terminated.

### i. History of the Revocable License

In the 1950s and 1960s, the U.S. Bureau of Land Management entered a lease with Tom Dowlen that gave him the right to produce oil and gas from 670 acres of federally owned land beneath the West LA VA Grounds. These sub-surface leases do not expire so long as the lessee continues producing gas in paying quantities. Bridgeland's sub-surface leases also come with surface rights that permit Bridgeland to maintain and operate a drill site on the West LA VA Grounds. Bridgeland's drill site occupies approximately three acres of the West LA VA Grounds.

In addition to these federal leases, Bridgeland has several leases with private parties that permit it to extract oil from private lands. Historically, the VA entered into a revocable license agreement with Bridgeland's predecessors-in-interest that gave them the right to slant-drill oil wells that pass through the subsurface of the West LA campus to extract non-federal oil from the privately-owned land neighboring the West LA VA Grounds. In 2002, however, the oil company's license to slant drill from the West LA VA drill site expired, but the slant drilling did not stop. For fifteen years, oil companies slant drilled private oil lands from a drill site located on VA property without any authorization.

In 2017, after the VA discovered that Bridgeland's predecessors were slant drilling without authorization for years, the VA finally executed a new revocable license that authorized the slant drilling. In exchange for permission to slant drill from the West LA VA drill site, Bridgeland donates a 2.5 percent royalty on the proceeds that it generates from slant drilling to the Los Angeles Chapter of Disabled American Veterans. The charity must use the royalties "solely for the purpose of providing transportation to veterans on and around the VA Greater Los Angeles Healthcare System Campus." Bridgeland Oil contends that the 2.5 percent royalty is a generous gift, or as their expert said, "cutting a fat hog." Trial Tr. Aug. 30, 2024, 54-55.

The Court holds that the VA's revocable license with Bridgeland violates the VA's fiduciary duty to veterans because the revocable license does not principally benefit veterans. The only benefit to veterans from the license is a 2.5 percent royalty to a charity for veterans. This donation is a de minimis benefit compared to the 97.5 percent of the revenues retained by private parties. According to Bridgeland's testimony, the royalty amounts to between about $80,000 and $115,000 annually, meaning that private parties make over $6 million dollars per year from the drill site. Trial Tr. Aug. 30, 2024, 106-107. Because Bridgeland retains the lion's share of the money generated from its slant drilling on the West LA VA Grounds, the license violates the VA's fiduciary duties to veterans.

The fact that Bridgeland pays a royalty to a private charity to provide transportation highlights the pernicious effects of the VA's practice of leasing land to third parties. Part of the reason why the charity must provide transportation to and from the West LA VA Grounds is that so few veterans live on the campus. For many veterans with disabilities, like amputees, access to the campus would be greatly improved if the VA built housing. Instead, the VA has leased much of its land to third parties and outsourced veteran transportation to and from the campus to private charities. A veteran is better served by housing than a drilling license for an oil company that requires the company to make an almost insignificant donation to charity.

The VA argues that it cannot terminate Bridgeland's revocable license because the license is "required to ensure that the United States does not default on a lease agreement between Bridgeland and Bureau of Land Management." This argument illustrates the point that Bridgeland's drilling license is not veteran-focused. Rather, the purpose of the license is to prevent liability for another federal agency, and to facilitate Bridgeland's ability to drill pursuant to private oil leases. Prioritizing the Bureau of Land Management and an oil company, rather than veterans, violates the VA's fiduciary duty to manage the land in the best interest of veterans. In any event, the VA's prediction regarding the effect of terminating the license that permits the slant drilling is incorrect. The 2017 license permits slant drilling on non-federal property, and the Bureau of Land Management has authority only over federal mineral lands. *See* 43 U.S.C. §§ 1701-1785; *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125

(9th Cir. 2007). Contrary to the VA's contention, the Government is not contractually obligated to permit slant drilling.

The Court holds that the Bridgeland license violates the VA's fiduciary duty to manage the campus in a manner that principally benefits veterans. As such, the Bridgeland lease is void and terminated.

### d. UCLA

The final land use agreement that Plaintiffs challenge is a lease between the VA and The Regents of the University of California (UCLA) for land that UCLA uses for its baseball stadium and practice field. Under the Leasing Act, a necessary feature of any lease with UCLA is that "the provision of services to veterans is the predominant focus of the activities" of UCLA during the term of the lease. WLALA (b)(3)(B). This Court holds that this lease violates the VA's fiduciary duty to veterans because the predominant focus of UCLA's activities is the university's baseball program, not providing services to veterans. Accordingly, the lease is void. To ensure the land is put to a use that principally benefits veterans, the Court will determine an exit strategy for UCLA's 10 acres following the hearing on injunctive relief.

### i. UCLA's Current Lease and Use of the Property

UCLA's current lease with the VA began in 2016 and expires in 2026. Trial Tr. Aug. 22, 2024, 9:7-9. Under this lease, UCLA pays annual rent of $300,000 and $1,350,000 in recorded in-kind services. Trial Ex. 2 at 29. The lease covers approximately 10 acres of land that houses UCLA's Jackie Robinson baseball stadium, as well as practice fields.

Prior to the *Valentini* lawsuit, UCLA paid the VA around $56,000 a year for use of the entire baseball complex, which is approximately the same cost as one student's annual tuition at the neighboring Brentwood School. Trial Tr. Aug. 22, 2024, 66:10-12. Although the details of the prior land-use agreement are not before the Court, that the VA accepted for years this shockingly low fee for 10 acres of prime real estate in West Los Angeles indicates the VA employees negotiating that lease were not acting in the best interests of veterans.

In late 2020, UCLA and the VA amended the lease to allow for improvements to Jackie Robinson Stadium, including a new state-of-the-art practice infield called Branca Family Field. The Branca family made a donation of around $2 million for the purposes of naming rights for

that practice infield. This money went to UCLA or the Regents, which paid for practice infield. None of the money went to the VA, or to services for veterans. Trial Tr. Aug. 22, 2024, 28:8-20.

Leadership at the West LA VA and at UCLA were aware that expansion of UCLA's baseball program in 2021 was likely to upset the veterans who had been pushing for housing at the grounds. A statement by Executive Director of Community Engagement and Reintegration Services Robert McKenrick in a meeting with VA and legal associates on January 29, 2021, was leaked by a whistleblower. Mr. McKenrick stated: "Advocates who are a little testy out there are going to get up in arms when they see there's another ball field being built." "That being said, there's a FOIA request out there and the response to the FOIA request is going out in a week or two," Mr. McKenrick continued, explaining that the requester was a "UCLA news media guy." He instructed his team to work with UCLA to announce the field before this FOIA request could be independently reported on, reasoning that "this will get out ahead of us if we don't get moving on it quickly."

Fearing public criticism, the VA hid behind UCLA and asked the university, rather than the VA, to announce the expansion of the baseball complex. Mr. McKenrick, in a subsequent multi-departmental meeting, discussed the problem with Chancellor Block's Chief of Staff, members of UCLA's Offices of Community Relations and Strategic Communication, and UCLA's Associate Athletic Director, among others. Trial Tr. Aug. 29, 2024, 103.

As Mr. McKenrick continued the VA's practice of leasing off land behind veterans' backs, the residents of Veteran's Row, including several of the plaintiffs in this lawsuit, were sleeping in tents outside the front gates of the West LA VA.

### ii.  Legal Analysis

The Court now turns to the question of whether UCLA's lease is consistent with the VA's fiduciary duty to ensure that the provision of services to veterans is the predominant focus of the activities of a lease with UCLA. The Court holds that the lease with UCLA violates the VA's fiduciary duty because the main focus and principal beneficiary of the lease is UCLA's baseball program, not the provision of services to veterans.

After the *Valentini* settlement and during the lease planning phase for the UCLA baseball complex, and the Brentwood School's Athletic Complex in fiscal year (FY) 2015, VA obtained independent appraisals to determine annual rent consideration for each parcel of land. The annual rental appraised value for the UCLA baseball complex was about $2.7 million. Trial Ex. 2 at 11. However, the VA currently accepts far less in exchange for use of the land. UCLA only pays $300,000 in annual rent, in addition to $1,350,000 in in-kind services.

The OIG interviewed Alan Trinh, Deputy Director of the VISN 22 Contracting Office, and Cameron Gore, the former Real Property Law Group's Chief Counsel, to determine why consideration received in exchange for each lease was much lower than the appraised value. Neither official could provide the OIG with an analysis for the basis of the negotiated consideration. VA policy does not require price negotiations to be documented for Out Leases and Revocable Licenses. The OIG notes that "[w]ithout documentation of land use agreement negotiations, the OIG was unable to determine if VA received fair value for use of the WLA campus." Trial Ex. 2 at 12.

The value of some of the in-kind services that UCLA provides is questionable. For instance, UCLA provides free tickets for veterans and free refreshments at its baseball games. UCLA claims the full price of these tickets as part of its in-kind consideration. UCLA acknowledged that for most of the games, there are hundreds of empty seats in the stadium. Trial Tr. Aug. 22, 2024, 19:7-17. As a result, many other complimentary tickets are distributed besides those given to veterans.

Even assuming the in-kind services were correctly valued, the fact remains that the leased land is predominantly, and almost exclusively, used for UCLA's baseball program. UCLA has approximately 26 home games at the stadium per year, in addition to NCAA Regionals, Super Regionals, and some special events. *Id.* at 21:18-22. UCLA's focus during those times is hosting baseball games, not serving veterans. *Id.* at 69:17-21. UCLA's lease with the VA for its student athletic facilities therefore violates the Leasing Act, and by extension, the VA's fiduciary duty to veterans.

Accordingly, the UCLA lease is void. To ensure the land is put to a use that principally benefits veterans, the Court will determine an exit strategy for UCLA's 10 acres following the hearing on injunctive relief.

### c. Plaintiffs' APA Claims (Land-Use)

Plaintiffs' final cause of action alleges that three land use agreements— (1) the lease for the Brentwood School's athletic facilities, (2) the VA's lease to Safety Park, and (3) a revocable drilling license for Bridgeland to extract oil and gas from underneath the West LA VA Grounds and the surrounding area—is contrary to the Leasing Act and therefore void.

Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action is not in accordance with the law," and therefore violates the APA, "when it is in conflict with the language of the state" relied on by the agency. *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008) (internal quotations omitted).

Plaintiffs allege that three land deals the VA entered on the West LA VA Grounds violates the West Los Angeles Leasing Act's requirement that leases to third parties on the campus "principally benefit veterans and their families." WLALA, § 2(b)(2)(A)-(I). Specifically, Plaintiffs challenge the VA's land use agreements with the Brentwood School, Safety Park, and Bridgeland.[14]

Plaintiffs' APA claims are largely coextensive with the charitable trust claim. For both claims, the question is whether the challenged land use agreements principally benefit veterans and their families. The only relevant difference is that, for the APA claim, the Court's review of whether the VA's actions were lawful is confined to the administrative record. *See Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005). In this case, the administrative record consists of the leases for the three challenged land use agreements.

Based on the administrative record, the Court concludes that the VA's agreements with the Brentwood School, Safety Park, and Bridgeland violates the Leasing Act. The Court considers each agreement in turn.

---

[14] Plaintiffs do not challenge the UCLA lease under the APA.

First, the lease for the Brentwood School only requires that the school provide some services to veterans and upkeep the 22 acres that it occupies. It contains no provision requiring that the majority of activities on the campus benefit veterans, as opposed to the school. The VA does not argue that the Brentwood School lease principally benefit veterans. Instead, the VA relies on an erroneous interpretation of the Leasing Act, arguing that the law authorizes third-party leases that provide some services to veterans. As the Court explained above, this interpretation is unmoored from the text. Rather, the Leasing Act requires that the underlying lease itself principally benefit veterans. Under a common sense reading of the lease agreement, the Brentwood School's lease for its student athletic facilities does not primarily serve veterans. As such, it is unlawful. Similar to how the VA relied on an isolated line in a House Committee report on the Leasing Act to defend against Plaintiffs' charitable trust, it points to the same line to justify its lease under the APA. This line, however, is contrary to the text of the Leasing Act. Ninth Circuit precedent is clear that an agency exceeds its statutory authority when its sole basis for action is an isolated line in a committee report that has no footing in the statutory text. *See Bonneville Power*, 477 F.3d at 682 (concluding that the agency acted contrary to law when basing its action solely on legislative history); *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

Second, the Safety Park lease agreement violates the Leasing Act and by extension the APA. As discussed above, the parking lot, according to the lease, is along Barrington Avenue and adjacent to the Brentwood Village business district. By the lease's very terms, its purpose is for Safety Park to "manage, operate, and maintain the VA Barrington Parking Lots in a diligent, careful, and first-class manner consistent with industry standards for other similar competitive public parking facilities in the Los Angeles marketplace." Safety Park AR at 23. Although Safety Park is contractually obligated to provide some minimal services to veterans (*e.g.*, 25 percent off parking for veterans, employment and training opportunities), the lease's overriding purpose is evident—to facilitate the public's access to Brentwood's merchants, not benefit veterans. Accordingly, the lease for Safety Park violates the Leasing Act and by extension the APA.

The same is true for the final land use agreement, Bridgeland's revocable license. The agreement between Bridgeland and the VA allows Bridgeland to operate on the WLA Grounds to extract oil and gas. In exchange, Bridgeland donates 2.5 percent of the royalties to Disabled American Veterans Los Angeles ("DAV-LA"). Based on this 2.5 percent donation, the Government asserts that the agreement thus "requires the provision of veteran-focused services on Campus and complies with VA's master plans" because the entirety of the 2.5 percent donation is for veteran-focused services. This argument ignores the remaining 97.5 percent of revenues. According to the VA's logic, even if Bridgeland donated $1 to DAV-LA and that $1 is earmarked solely for "veteran-focused services," this agreement with Bridgeland would also comply with the WLALA because the entire amount being donated is being used for "veteran-focused services." Federal Defendants' interpretation strains credulity. Simply put, the purpose of the agreement with Bridgeland is to principally benefit Bridgeland, allowing it to extract oil and gas, not to principally benefit veterans and their families. It therefore violates the Leasing Act.

### d.  APA Remedies

The Court has already concluded that the proper remedy for Plaintiffs' charitable trust claim is for the Court to void and terminate the leases. The APA is an independently sufficient basis to reach the same result. "[W]hen the language of a statute is clear and unambiguous, it must be given effect." *Abramowitz v. EPA*, 832 F.2d 1071, 1078 (9th Cir. 1987). Agency action that is contrary to a clear congressional mandate should be voided. *Id.*; *see also Moisa v. Barnhart*, 367 F.3d 882, 888 (9th Cir. 2004) (declining to remand to the agency where the issue "require[d] no further agency expertise or evaluation").

The Leasing Act is clear and unambiguous: The three challenged land use agreements must principally benefit veterans and their families. The VA's agreements with the Brentwood School, Safety Park, and Bridgeland do not principally benefit veterans and their families. This Court finds that, under the APA, these three agreements are void.

The Court's decision to void the three agreements is consistent with the *Valentini* decision. The *Valentini* court similarly voided leases that were contrary to a clear statutory

command. *Valentini*, 2013 WL 12121981 at *14. Two of the leases voided in *Valentini* were the lease for the Brentwood School and the lease covering the parking lot. *Id.* at *1, *14.

Therefore, under the APA, the Court voids the leases with the Brentwood School, Safety Park, and Bridgeland.[15]

### e. Prospective Relief – Land-Use

The Court further holds that Plaintiffs are entitled to prospective relief. Specifically, the VA is enjoined from entering into new leases with the Brentwood School, Safety Park, Bridgeland Resources, and UCLA.

This injunction is warranted by the VA's persistent mismanagement of the West LA VA Grounds. Following the *Valentini* decision that voided the leases for the Brentwood School and the parking lot (as well as eleven other leases) the VA executed new leases with the school and the Safety Park. The VA also entered the revocable license for oil drilling with Bridgeland, and the amended lease with UCLA. The VA's Office of Inspector General has since notified the VA that the Brentwood School, Bridgeland, and Safety Park agreements are misuses of the land and violate the West Los Angeles Leasing Act of 2016. Despite these warnings, the VA has several times extended Safety Park's lease and has made no effort to end or renegotiate its agreements with the Brentwood School, Bridgeland, and UCLA.

The VA's persistent unlawful leasing decisions and the OIG's warnings about misuse warrants an injunction prohibiting the VA from entering new land-use agreements with the Brentwood School, Safety Park, Bridgeland, and UCLA. Further, any renegotiation of these four leases would be futile. The Court holds that it is virtually impossible for leases for a private school's athletic facilities, a parking lot near Brentwood businesses, an oil drilling operation, and a UCLA baseball stadium to principally benefit veterans. Accordingly, Federal Defendants are hereby enjoined from entering into new land use agreements with the Brentwood School, Safety Park, Bridgeland Resources, and UCLA.

---

[15] As stated above, the Plaintiffs did not challenge UCLA's lease under the APA, but the Court voids that lease under Plaintiffs' charitable trust theory.

The Court will decide the specifics of the injunction, including how to best manage the lessees' exits from the West LA VA Grounds, following a hearing on injunctive relief scheduled for September 25, 2024.

## IV.    CONCLUSION

What duty is owed to the people who risk their lives on behalf of our nation? In the aftermath of the Civil War, President Lincoln had an answer, which serves as the origin for the VA's mission statement today:

> "[L]et us strive on to finish the work we are in, to bind up the nation's wounds, to care for him who shall have borne the battle and for his widow, and his orphan, to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations."

Plaintiffs in this case, like many generations of American service-members before them, bear indelible physical and mental scars from their time in the armed forces. In the words of Lincoln and the VA—they have borne the battle.

The VA in West Los Angeles, however, has for decades strayed from its mission to care for these veterans. Charged with maintaining land deeded to the United States to be used as a home for disabled soldiers more than a century ago, the West LA VA has failed to serve the veterans who served their country. Veterans have seen the government swiftly deploy its resources to send them into conflict, then claim an inability to overcome funding shortfalls and administrative hurdles when they need shelter and housing back at home. The VA for years has failed to provide sufficient housing and has ignored warnings from their own Office of Inspector General and prior federal court rulings that their use of the land was illegal. As Plaintiffs' health deteriorated on the sidewalks of San Vicente, VA officials inside the gates entered into lucrative land deals. Instead of serving veterans, the West LA VA has served its wealthy and powerful neighbors, bowing to private interests backed by lobbyists and engaging in back-room deals and fraud. Leadership at the VA made these choices not to principally benefit veterans, but out of fear of being sued by people with far more resources than unhoused, disabled veterans. After

selling and leasing off land given to them in trust, the VA now argues they are out of land to build housing for veterans. The VA's alleged scarcity of land is self-imposed.

What was once a home for disabled soldiers must fully reopen its gates and become a robust community for veterans once again. It is time for the VA's leadership at the highest levels to recognize its obligation and mission statement to care for those who have borne the battle. It is time for the disabled veterans of Los Angeles to come home.


DATED: October 11, 2024


DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

# ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FINDINGS OF FACT

## HISTORY OF THE WLA GROUNDS

1. In 1887, Congress "authorized, empowered, and directed" the "Board of Managers of the National Home for Disabled Volunteer Soldiers" to "locate, establish, construct, and permanently maintain a branch of" the National Home "in the states west of the Rocky Mountains." (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.a, Dkt. 222-1; *see also* Plaintiffs' Request for Judicial Notice 3, Dkt. 215-3.)

2. In 1888, Senator John P. Jones and Arcadia B. de Baker deeded the land that is now the WLA Grounds to the National Home for Disabled Volunteer Soldiers. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.b, Dkt. 222-1; Trial Tr. Aug. 6, 2024, 103:17–21, Dkt. 237.)

3. The 1888 Deed transferred the land "in consideration" that the National Soldiers' Home "should locate, establish, construct, and permanently maintain [there] a branch of said National Home for Disabled Volunteer Soldiers…." (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.c, Dkt. 222-1; *see also* Plaintiffs' Request for Judicial Notice 4, Dkt. 215-4.)

4. As then-VA Secretary Robert McDonald acknowledged in the 2016 Draft Master Plan, "This land was deeded for the benefit of Veterans in 1888 to serve as a home for our nation's heroes. This plan brings us one step closer to getting the land *back to its intended purpose* as an inviting, welcoming, community for Veterans and their families." (Trial Ex. 154 (emphasis added).)

5. Through 1930, the area fulfilled its intended purpose, housing approximately 5,000-6,000 veterans and creating a community for veterans. (Trial Ex. 154, at 5; Trial Tr. Aug. 6, 2024, 105:8-106:4, Dkt. 237; Trial Tr. Aug. 15, 2024, 176:16-178:16, Dkt. 265.)

6. In 1930, Congress consolidated veterans' care under the Veterans Administration, the immediate predecessor to the VA. That consolidation transferred the deed to the Pacific Branch Home to the Veterans Administration, which immediately began transferring parcels of land to various organizations, reducing the Grounds' acreage from 600 acres to 388.

7. The Department of Veterans Affairs is the successor to the Veterans Administration.

8. By the 1970s, the Veterans Administration stopped accepting new residents and left much of the property to fall into decay and disrepair. (Trial Tr. Aug. 6, 2024, 106:3-14, Dkt. 237; Trial Tr. Aug. 12, 2024, 142:3–143:1, Dkt. 249; Trial Tr. Aug. 15, 2024, 176:16–178:16, Dkt. 265.)

9. As veterans were forced out, commercial interests moved in. The VA admitted in its 2022 Master Plan for the Grounds: "In the 70s, residential use of the campus declined, and the West LA VA Campus began the practice of leasing land on the campus to private commercial interests, including the UCLA baseball stadium, the Brentwood School athletic complex, Marriott Hotel laundry, Enterprise car rentals, and a rare bird sanctuary… The West LA VA Campus generated millions of dollars from this leasing policy that provided little direct benefit to Veterans." Trial Ex. 1, at 272.

## **THE NEED FOR PERMANENT SUPPORTIVE HOUSING**

10. Many veterans have disabilities such as Serious Mental Illness (SMI) and Traumatic Brain Injury (TBI). (Trial Tr. Aug. 12, 2024, 175:7-179:18, Dkt. 249.)

11. Veterans' disabilities such as SMI or TBI often stem from their time in military service. (Trial Tr. Aug. 22, 2024, 287:22-288:16, Dkt. 270.)

12. Rates of disabilities such as SMI or TBI are especially high among homeless veterans. In the 2016 Draft Master Plan, the VA defined one of its target populations for housing at the WLA VA as "Severely Disabled Veterans, including

Chronically Homeless Veterans" and noted the prevalence of certain disabilities and conditions among homeless veterans: depression (73 percent), PTSD (66.7 percent), anxiety disorders (73 percent), traumatic brain injury (17.5 percent), and co-occurring mental illness and alcohol/substance abuse (55.6 percent). (Trial Ex. 154, at 8.) Federal Defendants suggest that the number of unhoused veterans suffering from SMI is about 24 percent, but the VA has cited data contradicting that low estimate. (Trial Tr. Aug. 30, 2024, 226.)

13. Steven Braverman, Network Director, VA Desert Pacific Healthcare Network, estimated that approximately 90 percent of the veterans that the West LA VA serves have some history of substance use disorder, mental health disorder, or both. (Trial Tr. Aug. 12, 2024, 175:7-16, Dkt. 249.)

14. The focal point of healthcare services offered by the VA Greater Los Angeles Healthcare System ("VAGLAHS")—covering all or parts of Los Angeles, Ventura, Kern, Santa Barbara, and San Luis Obispo Counties—is the VA Greater Los Angeles Medical Center on the WLA Grounds. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.d, Dkt. 222-1.)

15. Unlike other VA facilities in Greater Los Angeles, the VA Greater Los Angeles Medical Center is the only tertiary care facility, with "the bulk of the specialty care," which acts as a "referral center for many of these clinics." (Trial Tr. Aug. 13, 2024, 38:15-50:20, Dkt. 254.) Specialty care includes anything "outside of primary care, . . . like orthopedics and surgery and psychiatry and gastroenterology." (*Id.*)

16. Many veterans living in the VAGLAHS catchment area, including those with SMI or TBI, require specialists and medical services that are only available on the WLA Grounds. (Trial Tr. Aug. 13, 2024, 38:15-50:20, Dkt. 254.)

17. Supportive housing on or near the WLA Grounds is necessary for veterans with disabilities such as SMI and TBI to access their medical benefits. (Trial Tr. Aug. 8,

2024, 134:23–135:8, Dkt. 242; Trial Tr. Aug. 15, 2024, 75:1–8, 55:17–56:1, 158:5–21, Dkt. 265; Trial Tr. Aug. 22, 2024, 259:19–260:19, Dkt. 270)

18. Veterans with SMI and TBI who are unhoused, or who are forced to live far from their healthcare services on the WLA Grounds, are impeded in their ability to access their healthcare. (Trial Tr. Aug. 15, 2024, 158:5-21, Dkt. 265, Trial Tr. Aug. 12, 2024, 165:24–166:8, Dkt. 249; Trial Tr. Aug. 23, 2024, 212:10–214:14, Dkt. 271; Trial Tr. Aug. 26, 2024, 23:11–18, Dkt. 275.)

19. The stress associated with traveling to the WLA Grounds for treatment and therapy is often an insurmountable barrier for veterans suffering from SMI (such as depression, PTSD, anxiety disorders), TBI, co-occurring mental illness, and substance abuse. (Trial Tr. Aug. 26, 2024, 23:11–18, Dkt. 275; Trial Ex. 154, at 8.)

20. When a veteran with a serious disability is placed in an apartment far away from the WLA Grounds and/or their community, they often fall back into homelessness. (Trial Tr. Aug. 7, 2024, 101:24–102:8, Dkt. 238; Trial Tr. Aug. 22, 2024, 252:25–253:18, Dkt. 270.)

21. SMI and TBI also affect "planning, various executive functions, . . . management of moods or modulation of mood." (Trial Tr. Aug. 22, 2024, 296:19–297:3, Dkt. 270.) Veterans with SMI or TBI may struggle with day-to-day tasks, such as paying rent, such that they can benefit from supportive services such as case management. (Trial Tr. Aug. 12, 2024, 166:1–8, Dkt. 249; *id.* at 167:5–168:8; Trial Tr. Aug. 23, 2024, 21:22–22:18, Dkt. 271.)

22. The VA's Housing First approach sets forth the policy that every person has a fundamental right to housing, and housing is central to everything that the VA does. (Trial Tr. Aug. 8, 2024 ,161:3–162:2, Dkt. 242; Trial Ex. 243 ("Culhane Dep. Tr.") 52:15–53:1.)

23. Veterans should be able to go through transitional services that enable them to enter housing as quick as possible and receive the supportive services necessary to remain in that housing.

24. Housing First policies are effective in ensuring that homeless individuals, including veterans with SMI and/or TBI, are able to maintain housing. (Culhane Dep. Tr. 46:7–17; 46:24–47:17.) One study showed that one year after placement in permanent supportive housing, just five to ten percent of individuals were again homeless. (*Id.*)

25. Veterans struggling with debilitating disabilities, such as SMI and TBI, require permanent supportive housing, with the ready access to on-site healthcare and rehabilitative services, case management, and other services it provides, to prevent falling back into homelessness. (Trial Tr. Aug. 8, 2024, 31:17–32:21, Dkt. 242; Trial Tr. Aug. 12, 2024, 165:20–170:6, Dkt. 249; Trial Tr. Aug. 22, 2024, 268:25–269:5, Dkt. 270; *id.* at 290:13–297:3; Trial Tr. Aug. 23, 2024, 21:16–25:2, Dkt. 271; Culhane Dep. Tr. 42:23–43:10.)

26. For permanent supportive housing to be effective, veterans must be "proactively offered" "flexible, community-based supportive services." (Culhane Dep. Tr. 64:5–67:14, 82:12–19.) These services may include "move-in assistance," "around the clock case management" and "assistance in accessing" "[e]ducational services, "employment assistance," and "supportive employment." *Id.* Additionally, street outreach, where teams of professionals proactively look for unsheltered people and offer them assistance, is "an effective part of a Housing First program." (Culhane Dep. Tr. 80:2–81:1.)

27. When people who are chronically homeless are placed in permanent supportive housing, they reduce their use of hospitals, emergency rooms, jails, and shelters. (Trial Tr. Aug. 15, 2024, 184:3–185:1, Dkt. 265; Culhane Dep. Tr. 48:20–51:2.) Consequently, "it's usually cheaper to provide them with a voucher and services than it is for them to stay homeless and overuse those other systems." (Culhane Dep. Tr. 48:20–51:2; Trial Tr. Aug. 8, 2024 46:15–22, Dkt. 242.)

28. The VA and its constituent healthcare systems do not provide adequate Permanent Supportive Housing to ensure that veterans with severe disabilities in Los Angeles

have the stability and support they need to access the medical treatment and other services for which they are eligible. (Trial Tr. Aug. 6, 2024, 207:10–17, Dkt. 237; Trial Tr. Aug. 7, 2024, 130:2–24, Dkt. 238.)

29. In its Order certifying the Class in this action, the Court adopted the definition of "homeless" veterans as those who "[have] been or remain[] unhoused, or [are] at risk of being unhoused." Dkt. 190 at 15.

30. Each year, the Los Angeles Homeless Services Authority conducts a federally required point-in-time count to estimate the number of homeless individuals within the City of Los Angeles and the Los Angeles Continuum of Care, which includes all of LA County except Pasadena, Glendale, and Long Beach. The point-in-time count also estimates the number of homeless veterans in those jurisdictions. (Trial Tr. Aug. 8, 2024, 14:24–16:3.)

31. The 2024 Point–In–Time ("PIT") count for the Los Angeles Continuum of Care estimated 2,991 homeless veterans. (Trial Ex. 144; *see also* Trial Tr. Aug. 8, 2024, 71:71–5, Dkt. 242.) The 2023 PIT count for the Los Angeles Continuum of Care estimated 3,878 homeless veterans. (Trial Ex. 143; see also Trial Tr. Aug. 8, 2024, 70:11–14, Dkt. 242.)

32. A comparison of the 2023 and 2024 point-in-time count estimates indicates that, over the last year, veteran homelessness has decreased by 32 percent in the City of Los Angeles and 23 percent in the Los Angeles Continuum of Care. (Trial Tr. Aug. 12, 2024, 49:2–51:8; Trial Ex. 1334.) This reduction reflects the efforts of the VA's present team, which helped 1,790 formerly homeless veterans obtain housing and supportive services in the Greater Los Angeles area in 2023, and housed other veterans through Supportive Services for Veteran Families ("SSVF"). (Trial Ex. 1635, also available at https://www.westladraftmasterplan.org/p/CERS; Trial Tr. Aug. 12, 2024, 82:6–17.)

33. VA seeks to coordinate its homeless programs and all those offered by other community partners through its One Team initiative. (Trial Tr. Aug. 9, 2024, 51:20–52:21; Ex. 1219.)

34. One Team convenes VA's partners on a regular basis to assess goals, progress, and program capacity, and assists VA and its partners in connecting homeless veterans to housing and services rapidly. (Trial Tr. Aug. 9, 2024, 64:15–73:8; Trial Ex. 1219.)

35. Since One Team was first implemented in Los Angeles in June 2023, housing placements have increased by 38 percent. (Trial Tr. Aug. 9, 2024, 66:13–67:8.)

36. Federal Defendants also maintain a by-name list, which is a list of homeless veterans compiled by name. (Trial Tr. Aug. 8, 2024, 154:3–7, Dkt. 242.) Based on the by-name list, Federal Defendants have identified a minimum of 1,460 veterans currently experiencing homelessness. (*Id.* at 153:2–11.) However, Sally Hammitt, VA's Community Engagement and Reintegration Services, agreed that the by-name list is underinclusive. This may be because homeless veterans may refuse to have their information taken or refuse, forget, or do not know to identify themselves as a veteran, among other reasons. (*Id.* at 156:25–157:10; Trial Tr. Aug. 9, 2024, 131:25–132:12, Dkt. 243.) Mr. Powers, for example, who was discharged by the Navy for being gay, did not know he could seek help from the VA as a veteran until a friend suggested he do so. (Trial Tr. Aug. 8, 2024, 106:2–7.)

37. There are insufficient options for permanent supportive housing within a five–mile radius of the WLA Grounds. Many project–based HUD-VASH units are in distant locations such as Paso Robles (approximately 202 miles); Lancaster (approximately 65 miles), Pomona (46 miles), El Monte (approximately 29 miles), and Gardena (20 miles). (Trial Ex. 215; Trial Tr. Aug. 9, 2024, 198:7–213:15, ECF: 243; *see also* Trial Tr. Aug. 7, 2024 110:14–111:15, Dkt. 238.)

38. Veterans using a tenant–based housing voucher also struggle in Los Angeles' tight rental market to find housing near the WLA Grounds. HUD-VASH case managers direct veterans towards a very limited set of apartments, leaving them in apartments far from health care services, especially the specialized health care offered at the Grounds, and without community. (Trial Tr. Aug. 22, 2024, 250:18–252:24, Dkt. 270; Trial Tr. Aug. 23, 2024, 204:7–208:12, Dkt. 271; Trial Tr. Aug. 6, 2024, 149:19–150:7, Dkt. 237.)

39. In 2024, there are 5,278 veterans using HUD-VASH vouchers in Greater Los Angeles. (Trial Ex. 25, at 2.) Using Federal Defendants' low estimate that only 24 percent of veterans have a serious mental illness, approximately 1,267 HUD-VASH voucher holders in the area likely suffer from SMI. With little existing housing at or near the West LA VA, those veterans are unlikely to currently live on or near the Grounds. They also cannot easily move within the system to access a unit on or near the campus, especially with almost no available project-based units in West Los Angeles. Veterans with SMI who live far away from the Grounds face significant obstacles in transiting to the Grounds to receive healthcare services. These class members are therefore at risk of becoming homeless in order to access medical care at the West LA VA. Adding these 1,267 voucher holders to the 718 unhoused veterans (around 24 percent of the unhoused veteran population) that Federal Defendants suggest suffer from serious mental illness, Federal Defendants would need to provide a minimum of 1,984 units on or near the campus to provide a remedy for injured class members.

40. In total, the supply of available housing for homeless veterans, as of the time of trial, including temporary, transitional, permanent supportive, and project–based housing in VAGLAHS' catchment area is approximately 379 units. (Trial Ex. 217; Trial Tr. Aug. 12, 2024, 153:10–157:9, Dkt. 249.)

41. By failing to provide sufficient temporary and permanent supportive housing on or near the WLA Grounds, Federal Defendants consistently deny veterans with

disabilities such as SMI and TBI access to the community–based VA healthcare, mental healthcare, and other supportive services they need and for which they are eligible.

42. This has resulted in the proliferation of homeless veterans with disabilities and a long–term crisis of lack of access to medical, mental health, and other essential supportive services.

43. Many homeless veterans who could live in community–based permanent supportive housing experience an institutional circuit of temporary housing, emergency departments, psychiatric institutions, and jails in order to receive healthcare, including mental healthcare services. (Trial Tr. Aug. 8, 2024, 30:16–31:14, Dkt. 242; Trial Tr. Aug. 15, 2024, 156:8–14, Dkt. 265; Trial Tr. Aug. 23, 2024, 119:19–120:9, Dkt. 271.) Without permanent supportive housing, they are left with no options but to accept institutionalization or go without services. (Trial Tr. Aug. 23, 2024, 117:24–119:11, 125:9–20, 195:2–197:8, Dkt. 271.)

44. Providing permanent supportive housing reduces the institutionalization of people with SMI. (Culhane Dep. Tr. 52:4–14.)

45. The VA has not calculated the cost of allowing veterans to fall into the institutional circuit instead of being consistently housed in permanent supportive housing. (Day 6 Tr. 71:19–72:25, Dkt. 254; *id.* at 209:20–211:25.)

46. The VA does not have adequate information about the location and needs of homeless veterans within the Greater Los Angeles catchment area. As result, the VA does not have the capability to tie the availability of services to the number of homeless veterans, scale the scope of services to serve those needs, or provide the required amount of access to medical care. (Trial Tr. Aug. 12, 2024, 59:24–60:17, 212:10–16, 213:19–214:4, Dkt. 249.)

47. There is significant, urgent demand for temporary and permanent supportive housing on or near the WLA Campus to ensure veterans with disabilities can access their healthcare benefits. (Trial Tr. Aug. 8, 2024, 73:3–8, Dkt. 242; Trial Tr.

Aug. 9, 2024, 162:18–23, 259:4–260:3, Dkt. 243; Trial Tr. Aug. 15, 2024, 168:10–170:10, Dkt. 265.)

## THE *VALENTINI* LAWSUIT AND MASTER PLANS

48. In 2011, ten unhoused veterans sued the VA for its failure to provide permanent supportive housing on the WLA Grounds. *Valentini v. Shinseki*, Case No. 11–cv–04846 (June 8, 2011).

49. Specifically, they challenged eleven "enhanced sharing agreements," ("ESAs"), including ones the VA entered with the Brentwood School, a television studio, and a laundry facility for a hotel chain. *Valentini*, 2013 WL 12121981 at *1. The plaintiffs argued that these leases were inconsistent with federal law, which at the time provided that the lessee of an ESAs must "share" healthcare resources with veterans. 38 U.S.C. § 8153. The VA argued that the challenged ESAs, none of which offered healthcare services, were lawful because the third-parties paid rent, and the VA applied this revenue to increase the campus's healthcare resources. *Valentini*, 2013 WL 12121981 at *9, *13. The *Valentini* court rejected this argument, concluding that all eleven challenged land deals were "unauthorized by law and therefore void." *Id.* at *14.

50. In January 2015, the parties in that case entered an agreement under which the VA agreed to draft and implement a master plan to provide housing and supportive services for veterans on the WLA Grounds. (Trial Ex. 152.)

51. As part of the Principles for a Partnership and Framework for Settlement, the VA agreed, among other items, to "[i]nclude the objective and goals of the Principles Document and the New Master Plan in VA's annual Strategic Capital Investment Plan (SCIP) ten year planning process." (Trial Ex. 152 ¶ 7; Trial Tr. Aug. 15, 2024, 279:17–20, Dkt. 265.)

52. In 2015, the VA commenced the WLA Campus master planning initiative. (Am. Final Pretrial Conference Order, Stipulated Fact 5.v.)

53. Veteran and public participation went into the development of the 2016 Draft Master Plan. (Trial Tr. Aug. 27, 2024, 222:1–17; Trial Ex. 1, at 77–87).

54. In October 2015, VA published a preliminary draft master plan in the Federal Register, and it ultimately received over 1,000 public comments. (Trial Tr. Aug. 27, 2024, 222:14–17; Trial Tr. Aug. 15, 2024, 160:25–161:4).

55. The Secretary of Veterans Affairs adopted the Draft Master Plan in January 2016. (Trial Ex. 154; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.w.)

56. Since then, the VA has elicited feedback from community stakeholders and receives advice and recommendations regarding the WLA Campus's development from the Veterans and Community Oversight and Engagement Board, a federal advisory committee established by the Leasing Act that holds public meetings several times a year. (Trial Tr. Aug. 27, 2024, 219:25–220:25; Trial Ex. 81, at 4–5)

57. The 2016 Draft Master Plan stated that 1,200 units of permanent supportive housing would be located on the WLA Campus, 770 of which were to be completed by 2022. (Trial Exs. 2, 3, 154.)

58. The VA Office of Inspector General ("OIG") found insufficient veteran input on the Master Plan. (Trial Ex. 3, at 49–50.)

59. In September 2019, the VA issued a Record of Decision on a 562–page Programmatic Environmental Impact Statement, a study that evaluated alternative proposals for the development of up to 1,622 supportive housing units on the WLA Campus. (Trial Ex. 147.)

60. In March 2022, seven years after the *Valentini* settlement, the VA promulgated the Master Plan 2022 ("Master Plan"), which details, among other things, VA's long-term plan for developing the Campus into a residential community for veterans. (Trial Ex. 1.)

61. The VA acknowledged the intent of the 1888 Deed in its Master Plans, stating that the campus should be developed as "a vibrant community that includes" not only "high quality permanent supportive housing" but "opportunities on campus for all

Veterans to interface safely and network constructively with the community at large and in the process facilitate their successful reintegration into civilian society." (Trial Ex. 154, at 6.) This includes the creation of a Town Center area and a Wellness Center providing supportive services and amenities. (Trial Ex. 1, at 160–162.)

62. The Master Plan identifies 18 parcels on the North Campus for developing 1,215 permanent supportive housing units. (Trial Ex. 1, at 214.)

## VA'S FAILURE TO BUILD SUPPORTIVE HOUSING ON CAMPUS

63. Functional Zero is a standard for eradicating homelessness. (Trial Tr. Aug. 9, 2024, 262:17–263:5, Dkt. 243.) At least 12 community, cities, and counties have eradicated veteran homelessness between 2015 and the present. (*Id.* at 263:9–265:18.) Functional Zero means that sufficient quantities of housing and supportive services exist so that a greater number of people become housed than become homeless. (*Id.* at 262:17–263:5.)

64. In 2021, six years after the *Valentini* settlement, the VA OIG reported that, despite plans to construct 770 permanent supportive housing units on the WLA Grounds by 2022, the VA had only constructed 55 units of permanent supportive housing. (Trial Ex. 3, at 12.). Those 55 units were originally constructed for a specific program and were later transitioned to general permanent supportive housing. (Trial Tr. Aug. 15, 2024, 251-252).

65. Those 55 permanent supportive housing units were restricted to veterans ages 55 and older, meaning there were still zero permanent supportive housing units on the campus for veterans under 55 years old. (Trial Tr. Aug. 7, 2024, 26:20–27:6, Dkt. 238.)

66. In addition, while Federal Defendants have recently upgraded their infrastructure, the OIG noted that as of 2021, the VA failed to even make essential infrastructure upgrades for utilities like water, sewer, and stormwater systems, let alone provide

housing for the 1,200 unhoused veterans with disabilities to which it committed. (Trial Ex. 3, at 23–24; Trial Tr. Aug. 26, 2024, 184:14–17, Dkt. 275.)

67. The VA subsequently invested over $100 million to upgrade and expand the WLA Campus's infrastructure (e.g., utility systems) to support the 1,215 PSH units planned for development under the Master Plan. (Trial Tr. Aug. 27, 2024, 83:7–13; Trial Tr. Aug. 26, 2024, 143:23–144:13; Trial Tr. Aug. 13, 2024, 222:20–223:9.)

68. Most of the sites contemplated for additional Permanent Supportive Housing have infrastructure that would support them after this $100 million investment, and those that do not are located close to existing infrastructure.

69. As of August 9, 2024, there are only 233 units of permanent housing on the WLA Grounds. (Trial Tr. Aug. 9, 2024, 167:18–21, Dkt. 243.) Essentially all of these units are filled. (*Id.* at 171:21–172:1.)

70. As of August 12, 2024, there are only 229 units of temporary or transitional housing on or near the WLA Grounds, which is not sufficient to address the number of homeless veterans within VAGLAHS catchment area. (Trial Ex. 217; Trial Tr. Aug. 12, 2024, 153:10–157:9, Dkt. 249.)

71. On the VA's estimated schedule, the remaining units called for by the 2022 Master Plan will not be completed until 2030. (Trial Tr. Aug. 9, 2024, 222:21–223:1, Dkt. 243; Trial Tr. Aug. 12, 2024, 145:15–20, Dkt. 249.)

72. Since 2016, the VA has elected to do all construction of permanent supportive housing on the WLA Campus pursuant to Enhanced Use Leases ("EULs") with housing developers. (Trial Tr. Aug. 15, 2024, 237:6–10, Dkt. 265; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.aa, Dkt. 222-1.)

73. As of July 5, 2024, pursuant to EULs, 535 permanent supportive housing units in seven separate buildings are currently under construction on the WLA Campus. (Trial Ex. 1616; Am. Final Pretrial Conference Order, Stipulated Fact 5.bb., Dkt. 222-1; Trial Tr. Aug. 27, 2024, 13:16–14:15, Dkt. 281.)

74. The remaining 479 supportive units projected for construction under the Master Plan will not be completed until 2030. These units do not have a set date for occupancy, nor has construction started on any of these buildings. (Trial Ex. 1616.)

75. The current model and mode of financing that is employed by lessees to build permanent supportive housing under the EUL, where developers must apply for a complex and limited pool of affordable housing tax credits, presents significant delays and uncertainty for the construction of permanent supporting housing. (Trial Tr. Aug. 15, 2024, 263:7–21, 267:8–268:4, Dkt. 265.) For example, Buildings 205 and 208 were opened two years behind schedule as a result of financing issues. (Trial Tr. Aug. 15, 2024, 257:22–258:18, Dkt. 265.)

76. Government witnesses unanimously agree that the VA has authority to build medical facilities. (Trial Tr. Aug. 13, 2024, 50:21–51:17, Dkt. 254; Trial Tr. Aug. 15, 2024, 247:5–248:23, Dkt. 265.) According to the VA handbook, VA "medical centers" provide "residential care," and address needs such as "medical, psychiatric, SUD, *homelessness*, vocational, educational, or social services." (Trial Tr. Aug. 9, 2024 221:13–222:20, Dkt. 243 (emphasis added); Trial Tr. Aug. 15, 2024 247:6–248:23, Dkt. 265.)

77. Government witnesses agreed that the VA, pursuant to its healthcare mandate, provides services relating to homelessness. (Trial Tr. Aug. 9, 2024, 221:13–222:20, Dkt. 243; Trial Tr. Aug. 15, 2024, 248:17–23, Dkt. 265.)

78. The precept that "housing is health and health is housing" is the bedrock of the VA's Housing First policy and program. (Trial Ex. 1, at 55; Trial Ex. 154, at 44–45; Trial Tr. Aug. 22, 2024, 289:10–290:7, Dkt. 270.)

79. The VA has directly constructed or renovated residential structures on the WLA Grounds, including Building 209, Tiny Sheds, and the Community Living Centers. (Ex. 228; Trial Tr. Aug. 15, 2024, 249:6–252:6, Dkt. 265; *id.* at 252:8–254:17.)

80. Dr. Steven Braverman used VA funds to pay for the "maintenance and upkeep" of the CTRS tiny homes. (Trial Tr. Aug. 13, 2024, 90:21–92:10, Dkt. 254.)

81. The VA provides housing on the WLAVA Grounds for officials such as Dr. Braverman and other senior VA staff for convenient access to the Medical Center. (Trial Tr. Aug. 12, 2024, 180:22–186:10, Dkt. 249.)

82. The VA claims it lacks authority to construct or even directly finance permanent supportive housing. (Trial Tr. Aug. 9, 2024, 221:1–6, Dkt. 243; Trial Tr. Aug. 15, 2024, 239:12–247:19, Dkt. 265.) Federal Defendants have not produced any analysis or support for their interpretation that the West Los Angeles Leasing Act limits them to exclusively providing PSH through EULs. (Trial Tr. Aug. 15, 2024, 237:6–247:19, Dkt. 265; Trial Tr. Aug. 22, 2024, 275:8–14, Dkt. 270.) When asked to find a reference "to the fact that permanent supportive housing must be built only through EULs," Mr. Simms conceded "that type of statement doesn't exist." (Trial Tr. Aug. 15, 2024, 245:23–247:19, Dkt. 265.)

83. Federal Defendants have not been proactive in seeking or requesting additional funding from Congress with which to construct housing. (Trial Tr. Aug. 13, 2024, 100:3–101:2, ECF 254.)

84. For the current fiscal year, the VA's budget is roughly $407 billion. (Trial Tr. Aug. 13, 2024, 108:20–109:5, Dkt. 254; Trial Tr. Aug. 14, 2024, 24:13–21, Dkt. 258.)

85. Notwithstanding the VA's commitment in 2016 to include the master plan project in SCIP, the first inclusion of SCIP of a master plan project related to housing and community development was in fiscal year 2024. (Trial Tr. Aug. 27, 2024, 142:8–12, 153:19–154:12, Dkt. 281.)

## THE HARM TO VETERANS

86. Lack of supportive housing on or near the WLA Grounds has devastating consequences for veterans with disabilities, including exacerbation of existing disabilities and health conditions and exposure to violence and other victimization (Trial Tr. Aug. 6, 2024, 148:6–149:1, Dkt. 237; Trial Tr. Aug. 7, 2024, 19:21–

20:10, 49:6–26, 64:15–65:18, 67:10–68:20, Dkt. 238; Trial Tr. Aug. 9, 2024, 151:11–19, Dkt. 243; Trial Tr. Aug. 15, 2024, 157:9–158:7, Dkt. 265; Trial Tr. Aug. 23, 2024, 120:25–122:15, Dkt. 271.)

87. Long-term homelessness can result in a shortened life span, on average, of 15 to 20 years. (Trial Tr. Aug. 8, 2024, 30:3–15, Dkt. 242; *see also* Trial Tr. Aug. 15, 2024, 176:11–15, Dkt. 265.)

88. Many homeless veterans have died on the streets near the WLA Grounds. (Trial Tr. Aug. 6, 2024, 164:19–22, Dkt. 237; Trial Tr. Aug. 23, 2024, 127:7–128:16, Dkt. 271.)

89. The VA's failure to provide sufficient supportive housing close to its Medical Center is evidenced by the hundreds of unhoused veterans who have spent days, months, or years living in deplorable conditions on the sidewalk directly outside the WLA Grounds. (Trial Tr. Aug. 7, 2024, 12:22–13:9, 24:19–25, Dkt. 238.)

90. After the COVID–19 pandemic began, the VA created its Care, Treatment, and Rehabilitation Services (CTRS) on the West LA Grounds, where unhoused veterans could set up their tents on VA property. (Trial Tr. Aug. 7, 2024, 26:10–19, 31:19–32:16, 39:12–40:7, Dkt. 238.)

91. Veterans at CTRS were provided only small tents donated to the VA by private individuals, and were told to pitch these tents on a blacktop parking lot. (Trial Tr. Aug. 7, 2024, 40:2–41:9, Dkt. 238.). The blacktop was uncomfortably hot during summer days. (Trial Tr. Aug. 8, 2024, 118)

92. The tents at CTRS were not adequate housing for veterans with disabilities and in many cases made their disabilities worse. (Trial Tr. Aug. 7, 2024 41:11–43:11, 53:14–54:1, Dkt. 238; Trial Tr. Aug. 23, 2024, 197:9–199:10, Dkt. 271.)

93. During the COVID–19 pandemic, veterans waiting for assistance from the VA set up approximately sixty tents on the sidewalk outside the VA gates, an encampment they called "Veterans Row," which was occupied by hundreds of unhoused

veterans between April 2020 and November 2021. (Trial Tr. Aug. 7, 2024, 49:6–26, 63:12–64:14, Dkt. 238.)

94. The VA declined to provide assistance to veterans outside its gates in the form of food, shelter, bedding, bathrooms, or even dumpsters stating it had no authority to do so. (Trial Tr. Aug. 7, 2024, 25:9–26:1, 39:4–11, 54:3–22, 66:22–67:5, Dkt. 238).

95. After eighteen months, engagement from the Los Angeles County Sheriff's Department, the deaths of two veterans, and significant media attention on the Veterans Row encampment, the encampment was cleared and the VA obtained temporary shelter for CTRS beyond small tents. (Trial Tr. Aug. 7, 2024, 97:12–25, Dkt. 238.)

96. In late 2021, the VA accommodated homeless veterans at CTRS in tiny sheds—8-by-10-foot metal shelters with no bathroom or kitchen—again relying largely on donations rather than spending its own funds. (Trial Tr. Aug. 7, 2024, 91:18–92:25, 95:1–12, Dkt. 238.) The VA did use some of its own funds for portions of the construction and maintenance. (Trial Tr. Aug. 13, 2024, 90:21–92:10, Dkt. 254.)

97. These tiny sheds were not adequate housing for many veterans with disabilities, and worsened some individuals' disabilities. (Trial Tr. Aug. 8, 2024, 63:22-64:6, 127:11-23, 128:25-129:22, Dkt. 242; Trial Tr. Aug. 23, 2024, 123:16–125:20, 199:14-200:2, Dkt. 271; Trial Tr. Aug. 15, 2024, 168:10-170:2, Dkt. 265.)

98. In November 2022, there was a fire at the tiny sheds that destroyed some veterans' shelters and possessions. (Trial Tr. Aug. 7, 2024, 93:20–94:25, Dkt. 238; Trial Tr. Aug. 22, 2024, 225:10-256:11, Dkt. 270; Trial Tr. Aug. 23, 2024, 123:16–124:19, 195:2–197:8, Dkt. 271.)

99. Some class members still live in the tiny sheds on the West LA Grounds. (Trial Tr. Aug. 7, 2024, 96:17:20, Dkt. 238.)

100.    Although it assessed certain parcels of the land for suitability for temporary modular housing during the COVID-19 pandemic (Trial Ex. 56), the VA is not planning on constructing additional temporary supportive housing on the WLA Grounds for veterans who are awaiting the construction of permanent supportive housing. (Trial Tr. Aug. 9, 2024, 250:24–251:5, Dkt. 243.)

## THIRD PARTY LEASES

101.    For decades, the VA has entered into leases and other land-use agreements with for-profit and not-for-profit entities on the WLA Grounds. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.h, Dkt. 222-1.)

102.    In 2016, Congress enacted the West Los Angeles Leasing Act of 2016 ("WLALA"). (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.m, Dkt. 222-1.). Congress enacted the Leasing Act in response to *Valentini* in order to "refocus the VA's efforts in West LA on veterans in need of services—particularly those who are homeless or at risk of homelessness." H.R. Rep. No. 114-570, at 6 (2016). Congress proclaimed that, although the land deals challenged in *Valentini* provided some benefit to veterans in the form of increased revenue for the VA, the deals were nonetheless "misuses" of the land. *Id.* at 6.

103.    The WLALA provides that the VA "may carry out leases described in subsection (b) at the Department of Veterans Affairs West Los Angeles Campus in Los Angeles, California," which includes "enhanced–use lease of real property . . . for purposes of providing supportive housing . . . that principally benefit veterans and their families," and "[a]ny lease of real property for a term not to exceed 50 years to a third party to provide services that principally benefit veterans and their families," and "[a] lease of real property for a term not to exceed 10 years to The Regents of the University of California . . . [and] the provision of services to veterans is the predominant focus of the activities of The Regents at the Campus

during the term of the lease." (West Los Angeles Leasing Act of 2016, 38 U.S.C. §101, et seq. (Public Law 114–226, 114th Congress), Dkt. 215–5.)

104.    The VA uses no written criteria to determine whether land use agreements "principally benefit[] veterans and their families" as required by WLALA. (Trial Tr. Aug. 13, 2024, 128:13–130:22, Dkt. 254.) A VA committee makes determinations based on the "eye of the beholder," in nonpublic meetings with no veteran input. (*Id.* 128:13–133:8.)

105.    Pursuant to the Leasing Act, the VA Office of Inspector General ("OIG") must submit a report to Congress within two years and within five years of passage of the Act (2018 and 2021) "on all leases carried out at the Grounds and the management by the Department of the use of the land at the Grounds . . . ." WLALA (j)(3)(A).

106.    Under the Leasing Act, if the "Inspector General of the Department of Veterans Affairs determines, as part of an audit report or evaluation conducted by the Inspector General, that the Department is not in compliance with all Federal laws relating to leases and land use at the Campus, or that significant mismanagement has occurred with respect to leases or land use at the Campus, the Secretary may not enter into any lease or land-sharing agreement at the Campus, or renew any such lease or land-sharing agreement that is not in compliance with such laws, until the Secretary certifies to the Committees on Veterans' Affairs of the Senate and House of Representatives, the Committees on Appropriations of the Senate and House of Representatives, and each Member of the Senate and the House of Representatives who represents the area in which the Campus is located that all recommendations included in the audit report or evaluation have been implemented." WLALA(h)(1).

107.    In 2018, the VA OIG concluded that eleven of the VA's land–use agreements failed to comply with WLALA or the Draft Master Plan. (Trial Ex. 2,

at 14; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.n., Dkt. 222-1.)

108.     The agreements that the OIG found noncompliant with federal law included the lease with the Brentwood School, the lease with parking lots bordering the Brentwood business district, and the revocable license with Breitburn Oil. (Trial Ex. 2, at 5-8).

109.     In 2018, the VA Office of the Inspector General (OIG) audited the Brentwood School's lease. The OIG determined,

> "the Brentwood School lease violated the West Los Angeles Leasing Act because the purpose was not to principally benefit veterans and their families; rather, the principal purpose of this lease was to provide the Brentwood School continued use of the athletic facilities." (Trial Ex. 3, at 32.)

110.     Despite the OIG's finding that these leases were noncompliant with federal law, the VA continued to allow leaseholders to occupy the land and exercise renewal options. *See* Trial Ex. 3.

111.     The VA did not accept the OIG's position that the lease with the Brentwood School was noncompliant. It responded to the OIG that accepting the OIG's interpretation would require the VA to terminate its lease with the Brentwood School, writing,

> "As a practical consideration, VA notes that the finding that the Brentwood School lease is deficient "because the principal purpose of the lease is to provide Brentwood School continued use of the Athletic Facilities" can be corrected only by discontinuing that use.  With respect to this lease, then, recommendation 1 – "take action to correct deficiencies noted in this report" – requires VA to terminate the lease and bar Brentwood School from using the facilities it has constructed on the Campus." (Trial Ex. 2 at 96).

112.     The VA took the position that one reason it could not discontinue the Brentwood School's lease was fear of a lawsuit from the Brentwood School.

> "Any action VA might take to comply with this recommendation would likely trigger a litigative challenge that could indefinitely suspend both the lease termination and VA's authority to carry out EULs to house homeless Veterans.  This outcome is patently unreasonable." (*Id.*)

113.    In 2021, Congress enacted the West Los Angeles VA Campus Improvement Act of 2021. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.o., Dkt. 222-1.)

114.    The 2021 Amendment to the WLALA required land use revenues to be used for certain purposes, including providing "temporary or permanent supportive housing for homeless or at–risk veterans and their families." (West Los Angeles VA Campus Improvement Act of 2021, (Public Law 117–18, 117th Congress), Dkt. 215–6.)

115.    In 2021, the VA OIG concluded that seven of the VA's land–use agreements failed to comply with the WLALA, including those with the Brentwood School, the Breitburn oil company (Bridgeland oil's predecessor), and Safety Park. (Trial Ex. 3 at 20, 22–25; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.p, Dkt. 222-1.)

116.    The VA leases 22 acres of the WLA Campus to the private Brentwood School, about 5.5% of the total acreage of the Grounds. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.i, Dkt. 222-1.)

117.    The Brentwood School athletic facilities were not designed for the particular needs of veterans and their families, and veterans can only access the facilities during limited hours when students are not using them. Most of the facilities are open to veterans early in the morning and late in the evening. For example, on Mondays, Wednesdays, and Fridays, veterans may use the pool from 5:30 a.m. to 7:30 a.m., and, on the weekends from 11 a.m. to 3 p.m. Veterans may use the track every weekday from 5 a.m. to 11 a.m. The Brentwood School operates a shuttle to transport veterans from other areas of the West LA VA Grounds to the athletic facilities, but the shuttle operates from 9 a.m. to 2 p.m., and thus does not align with the hours that veterans may use the facilities. (Trial Exs. 900, 901, 902, 904, and 905; Trial Tr. Aug. 14, 2024, 136:11–25, 138:1–22, 140:8–15, 141:19–142:20, 153:23–155:9, Dkt. 258.)

118.     Brentwood School counts 51% of its estimated routine upkeep costs for its 22-acre athletic complex (including landscaping, maintenance, utilities costs, etc.) toward its in-kind consideration to the VA.  This percentage does not reflect how many students versus veterans use the athletic facilities. (Trial Ex. 903; Trial Tr. Aug. 14, 2024, 201:2–6; 210:21–211:6, 181:13–182:6, Dkt. 258.)

119.     Following the VA OIG's findings that Brentwood School's lease is noncompliant with federal law under WLALA, Brentwood School has spent almost a million dollars lobbying Congress to amend the provision of the WLALA related to OIG findings. Currently, the VA may not renew leases the OIG finds to be noncompliant, which the OIG has found the Brentwood School lease to be. (Trial Tr. Aug. 14, 2024, 129:23–133:25, Dkt. 258.)

120.     The VA has entered into a revocable license agreement with Breitburn, an oil company, (Bridgeland Resources, LLC is the successor to Breitburn), which gives Bridgeland the right to slant-drill oil wells that pass through the subsurface of the WLA Campus to extract non-federal oil from privately-owned land neighboring the WLA Campus. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.i, Dkt. 222-1.)

121.     Under the revocable license, Bridgeland pays 2.5% royalties to the Disabled American Veterans Los Angeles (DAV-LA) on all oil produced from such wells.  (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.k, Dkt. 222-1.)

122.     In recent years, this royalty has hovered in the $75,000-$125,000 range. *See* Dkt. 257 at 9.

123.     The remaining 97.5% of the royalties is split among the remaining interest owners. *Id.*

124.     The principal purpose of the revocable license agreement with Bridgeland is to slant-drill oil, not to benefit veterans and their families.

125.     The VA has entered into a lease with SafetyPark, which operates two parking lots on the WLA Campus. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.l., Dkt. 222-1.)

126.     The primary purpose of the SafetyPark lease is "access to Barrington Village businesses," and "does not principally benefit veterans and their families." (Trial Ex. 148; Trial Tr. Aug. 27, 2024, 198:16–20; 209:14–17, Dkt. 275; *id.* at 209:14–20.) Despite promising to do so in its lease, Safety Park does not operate a program providing discounts for veterans at the Brentwood shops, or a program providing veteran employment opportunities at Barrington Village businesses, nor does it provide supportive services for veterans employed by Parking Management Services. (Trial Ex. 148; Trial Tr. Aug. 27, 2024, 200:14–203:24, Dkt. 275.)

127.     The VA has also entered into a lease agreement with the University of California Los Angeles for certain real property and facilities on the WLA Campus. (Trial Ex. 1313.)

128.     The predominant focus of UCLA's activities on the WLA Campus is its NCAA baseball program, not services to veterans. (Trial Tr. Aug. 22, 2024, 69:4–21, 21:4–22:17; 26:23–31:20; 33:23–35:20; 41:19–43:22, Dkt. 270; Trial Tr. Aug. 9, 2024, 260:24–261:2, Dkt. 243.)

129.     UCLA's Veterans Legal Clinic did not offer consistent office hours and had accessibility barriers, with "no clear marked path or a door that was marked as handicap accessible." (Trial Tr. Aug. 22, 2024, 38:5–52:25, Dkt. 270.) The door was not open during regular business hours. Despite Mr. DeFrancesco's efforts, "it took forever" to resolve the accessibility issues. (*Id.*) The VA never inquired as to what cases veterans would like to see the clinic handle. (*Id.*)

130.     UCLA refused to make the parking lot adjacent to its practice infield available for emergency housing in the midst of the pandemic, countering that sheltering unhoused veterans would interfere with the UCLA home game schedule.

(Trial Tr. Aug. 22, 2024, 34:12–35:10, Dkt. 270.) The VA never raised any objection to this. (*Id.* at 35:14–16.)

## **HUD-VASH VOUCHER SYSTEM**

131.    Rather than build permanent supportive housing on the West LA Grounds, Federal Defendants rely upon HUD-VASH vouchers that are demonstrably insufficient to allow disabled veterans to access their benefits.

132.    The VA and HUD jointly operate the HUD-VASH program to provide permanent supportive housing to veterans. Under the program, eligible veterans receive housing vouchers for rental assistance, along with VA case management and supportive services. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.q., 5.dd., Dkt. 222-1; Trial Tr. Aug. 15, 2024, 9:14–19, Dkt. 265.)

133.    According to VA data, more individuals left HUD-VASH permanent supportive housing in Los Angeles in 2022 and 2023 than entered it. (Trial Ex. 16; Trial Tr. Aug. 23, 2024, 85:17–89:25, Dkt. 271.)

134.    Greater Los Angeles PHAs historically have reported low utilization rates for tenant-based vouchers, in the 50-60 percent range, well below the national average of 75 percent and the 70 percent threshold required for the issuance of more vouchers to a PHA. (Trial Tr. Aug. 14, 2024, 269:9–270:4, Dkt. 258.) HACLA currently utilizes 59 percent of tenant-based vouchers. (Trial Ex. Trial Tr. Aug. 23, 2024, 72:7–14, Dkt. 271.)

135.    When a housing agency utilizes less than 70 percent of the available supply of vouchers, that housing agency is not eligible for the issuance of additional vouchers by HUD as part of HUD-VASH voucher increases. (Trial Tr. Aug. 15, 2024, 25:1–11, Dkt. 265.)

136.    The HUD-VASH voucher system is "use it or lose it"—when a particular public housing agency does not use enough of its vouchers, it is typically not eligible to receive additional vouchers. The rationale for this policy is that the

vouchers can then be reallocated to other geographical areas where the housing agencies are able to put them to use. Trial Tr. Aug. 14, 2024, 288-290.

137.    In total, Los Angeles has 8,436 vouchers allocated, but only 62.57 percent of vouchers are being used in the current year. This is an improvement over prior years. Trial Ex. 25.

138.    Government witnesses agree that a main barrier to voucher utilization is the lack of referrals from the VA. Dr. Keith Harris, Senior Executive Homeless Agent for Greater Los Angeles has "heard from multiple people at public housing agencies concern about the number of referrals that they were getting." (Trial Tr. Aug. 22, 2024, 265:7–9, Dkt. 270; Trial Tr. Aug. 23, 2024, 14:3–15:12, Dkt. 271.) Similarly, Michael Dennis, Senior Program Advisor at HUD, agreed that "one of the causes for low utilization in Los Angeles is the lack of timely referrals from the VA for eligible families." (Trial Tr. Aug. 14, 2024, 247:25–248:5; 270:2–8, Dkt. 258.)

139.    Carlos Van Natter, Director of Section 8 at the Housing Authority of the City of Los Angeles, identifies lack of referrals from the VA as the "primary" explanation and "the major reason" for the unused vouchers. (Trial Tr. Aug. 23, 2024, 54:4–7, 73:12–18. 84:9–85:3, Dkt. 271.) Unused vouchers just "sit[] on the shelf." (Trial Tr. Aug. 14, 2024, 291:6–10, Dkt. 258.)

140.    Since 2008, HACLA has asked for 25 referrals a week. (Trial Tr. Aug. 23, 2024, 78:21–79:20, Dkt. 271; Trial Tr. Aug. 9, 2024, 184:2–21, Dkt. 243.)

141.    For each and every year between 2008 to 2024 that the HUD-VASH voucher program has existed, the VA has failed to refer to HACLA a sufficient number of applicants to vouchers to ensure that the full supply of vouchers is deployed and utilized. (Trial Tr. Aug. 23, 2024, 74:24–75:11, Dkt. 271.)

142.    The VA referred as few as four veterans a week to HACLA in 2023. (Trial Ex. 16, at p. 5; Trial Tr. Aug. 12, 2024, 148:15–22, Dkt. 249; Trial Tr. Aug. 23, 2024, 87:9–88:2, Dkt. 271.)

143.    At present, HACLA has approximately 1,500 unused tenant-based HUD-VASH vouchers that are not utilized by HACLA. (Trial Day 11 Tr. 72:7–73:16, Dkt. 271.)

144.    HACLA requires 1,300 referrals per year in order to deploy all the available HUD-VASH vouchers. (Trial Ex. 16, at 5.) Only once, in the entire history of the program, has the VA referred 1,300 individuals to HACLA in a single calendar year. (Trial Ex. 16, at 3.)

145.    Those referral rates have improved in recent months to about 13 a week due to efforts by the present VA team at West Los Angeles to increase referrals and streamline coordination between agencies addressing veteran homelessness in Los Angeles.

146.    The VA has recognized that it has failed to perform sufficient outreach into the community to identify and help homeless veterans. (Trial Tr. Aug. 13, 2024, 7:25–8:5, Dkt. 254.)

147.    Indeed, there are only 13 outreach personnel for the entire catchment area of the WLAVA, an area that covers 22,000 square miles. (Trial Tr. Aug. 13, 2024, 199:19–201:7, Dkt. 254; Trial Tr. Aug. 23, 2024, 39:10–13, Dkt. 271.) Four of these personnel are not outward facing employees, leaving nine individuals who are required to cover a 22,000 square mile area. (Trial Tr. Aug. 23, 2024, 39:10–41:14, Dkt. 271.)  Only six are peer support specialists. (Trial Tr. Aug. 23, 2024, 42:20–44:13, Dkt. 271.)

148.    The VA's minimal outreach has pushed nonprofits, like the National Veterans Foundation, to search the streets of Los Angeles County each week to find and assist unhoused veterans. (Trial Tr. Aug. 6, 2024, 146:11–147:17, Dkt. 237.)

149.    The VA's low referral rates are accompanied with high attrition rates. According to VA data, the most common reasons for exiting the program were program violations, including "failure to complete/submit annual recertification."

Until recently, about half of LACDA's exits were due to program violations, including failures to recertify. (Trial Tr. Aug. 23, 2024, 20:3–21:3, Dkt. 271.) According to Dr. Culhane, such a high level of exits due to program violations "certainly indicates a problem." (Culhane Dep. Tr. 71:7–21.).

150.      Exits such as skips, program violations, and failure to recertify can be partially alleviated by adequate case workers. (Trial Tr. Aug. 23, 2024, 103:6–104:6, Dkt. 271.)

151.      Today, the share of exits due to program violations is 30 percent, "still higher than we want it to be." (Trial Tr. Aug. 23, 2024, 20:3–21:15, Dkt. 271.) These exit reasons demonstrate HUD-VASH's failure to provide the wraparound supportive services required as part of permanent supportive housing. John Kuhn admits that when he arrived, "we did not have enough staff" to provide "adequate services." (Trial Tr. Aug. 9, 2024, 195:15–196:4, Dkt. 243.)

152.      At the WLAVA, the HUD-VASH program has historically been understaffed, never hitting its goal of 90 percent staff and consistently hovering between 72 percent to 77 percent. (Trial Ex. 25; Trial Tr. Aug. 8, 2024, 74:25–75:7, 146:3–147:4, Dkt. 242.)

153.      HUD-VASH's staffing has improved at the WLAVA in the past year due to efforts by the present team at the West LA VA. It is currently staffed at 87%. (Trial Tr. Aug. 9, 2024, 139:23–140:5, Dkt. 243.) The program has also seen a decrease in the attrition rate in 2024. (Trial Tr. Aug. 23, 2024, 165:6–168:20; Trial Exs. 1628–1633.)

154.      The VA OIG reports that Los Angeles had the most vacancies for psychologists, followed by social workers. (Trial Ex. 220.) Psychiatrists were also in the top six. (*Id.*)

155.      In face of these staffing shortages, even given recent improvements to the program, the VA attempts to outsource its outreach, referral, case management, social work, and other tasks. It has asked public housing agencies to act as

caseworkers under the Designated Service Provider (DSP) program. (Trial Tr. Aug. 14, 2024, 267:9–268:19, Dkt. 258.) This is a voluntary program. To date, there has been no funding for DSPs and no public housing agencies have signed on to act as case workers. (Trial Tr. Aug. 15, 2024, 117:24–118:3, Dkt. 265.)

156.    The VA also outsources case management of its project-based units to outside entities like Step Up on Second. (Trial Tr. Aug. 13, 2024, 14:2–4, Dkt. 254.) These entities have also faced persistent staffing issues. (*Id.* at 20:22–25.)

157.    Even where veterans are able to obtain housing using their vouchers, because of limits on how much the vouchers will pay, such housing is often far from the WLA Grounds, and the vouchers do not cover transportation thereto.

158.    The HUD-VASH vouchers have historically not been sufficiently funded to allow recipients to rent housing in the expensive zip codes surrounding the WLA Grounds, where veteran healthcare services are provided. (Trial Tr. Aug. 14, 2024, 271:11–288:1, Dkt. 258.). The vouchers still do not pay as much as the landlord could likely collect privately. Trial Tr. Aug. 9, 2024, 186.

159.    Further, landlords who participate in the HUD-VASH voucher program are also subject to inspections required by the program. In a high-demand marketplace, a landlord may choose to rent to another applicant who has fewer administrative hurdles. Additionally, landlords may fear renting to veterans with a history of mental illness and homelessness. This stigma can keep veterans out of housing for which they would otherwise be eligible. (Trial Tr. Aug. 9, 2024, 116, 185-186).

160.    In October of 2023, HUD designated 41 metropolitan areas, including Los Angeles, as mandatory small area fair market rent (FMR) areas. This means that public housing agencies in those metropolitan areas must use small area fair market rents, which are tied to a specific ZIP code, in establishing payment standards for their program. This change goes into effect October 1, 2024, and PHAs have until January 1, 2025, to make those payment standard changes. *Id.* Further, PHAs may now set HUD-VASH payment standards at up to 160 percent

of the fair market rate. Trial Tr. Aug. 15, 2024, 54-55; Trial Ex. 1184. HUD has also instituted recent changes that allow PHAs to apply for administrative fees to help with additional barriers to leasing, such as landlord incentives and security deposit assistance. (Trial Tr. Aug. 15, 2024, 94:11–18; 94:24–25; 95:1–8). HUD recently awarded the HACLA $1.5 million in administrative fees and the Los Angeles County Development Agency approximately $1 million in administrative fees. (Trial Tr. Aug. 15, 2024, 97:6–15).

161.    These changes are significant for veterans seeking housing at or near the West LA VA. For 90073, the ZIP code where the West LA VA is located, the small area fair market rent is $3,010 for a one-bedroom apartment. The rates are similar for neighboring zip codes, which contain some of the most expensive real estate in Los Angeles. Trial Ex. 222. For the HUD-VASH program, the public housing agencies can set a payment standard of up to 160 percent of the small area fair market rent. In the zip codes of West LA, this means the HUD-VASH voucher for a one-bedroom could be worth up to $4,816, or 160 percent of the fair market rent for that area. Trial Tr. Aug. 15, 2024, 54-55.

162.    Expert witness Randy Johnson, an experienced developer in Southern California, testified at trial that the recent implementation by HUD of small-area fair market rents for HUD-VASH vouchers is likely to make conventional bank financing available for the development of on-campus project-based housing. In January 2025, the amount of rent a HUD-VASH voucher covers for a unit at the West LA VA campus could increase up to $4,800 for a one-bedroom apartment for a veteran. A developer building on the campus could therefore seek conventional financing, knowing that they can set unit rents at a price that would be profitable even without the LIHTC subsidy. (Trial Tr. Aug. 22, 2024, 173.)

163.    Brett Simms, Executive Director for the Office of Asset Enterprise Management (OAEM) at the VA, agreed this increase in HUD-VASH vouchers could be a "game-changer." (Trial Tr. Aug. 27, 2024, 131.)

164.    The HUD-VASH program does not allow veterans to transfer from a tenant-based voucher to a project-based voucher without first becoming homeless. (Trial Tr. Aug. 26, 2024, 31:10–32:12, 34:6-13, Dkt. 275.) If a veteran with a tenant-based voucher in Templeton, about 200 miles from the West LA VA, wanted to switch to a project-based voucher on the Grounds, they would need to become homeless first to do so. Similarly, a veteran who has been living in a particular project-based unit for less than a year may also have to become homeless again in order to move to a different project-based voucher. (Trial. Tr. Aug. 26, 2024, 31.) When a veteran is evicted from a project-based voucher, they also lose the voucher. (Culhane Dep. Tr. 57:11–17.)

## THE DISCRIMINATORY AREA MEDIAN INCOME (AMI) RULE

165.    For the limited housing available on the WLA Grounds, the eligibility requirements for veterans to obtain such housing can be prohibitive for many veterans.

166.    Veterans' benefits (i.e., their service–connected disability compensation) are counted as income for purposes of determining project-based housing eligibility. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.r., Dkt. 222-1.) As such, the higher their disability-based "income" is, the less likely they are to receive housing on the WLA Grounds.

167.    Some of the most disabled veterans, including a veteran who lost a leg and a veteran who is wheelchair bound, were prohibited from obtaining housing due to the AMI rule. (Trial Tr. Aug. 7, 2024, 101:3–21, Dkt. 283.) Veterans with traumatic brain injuries and serious mental illnesses who receive significant service-connected disability payments are also excluded from obtaining housing under this rule.

168.     Veterans are only eligible for housing in project-based housing units if their income is at or below the income threshold for a given unit. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.s., Dkt. 222-1.)

169.     A single veteran in Los Angeles with no dependents and a 100 percent service-connected disability rating receives over 30 percent of the Area Median Income. (*See* Am. Final Pretrial Conference Order, Stipulated Fact 5.r., Dkt. 222-1.)

170.     Federal Defendants outsource construction of permanent supportive housing units to private real estate developers, who must obtain their own financing in a competitive market. (Trial Tr. Aug. 15, 2024, 266:10–18, 267:8–20, Dkt. 265.) These developers must navigate a web of limited local, state, and federal tax credits, which are highly competitive. These tax credits require them to impose income restrictions, excluding residents above a certain percent of AMI. (Trial Tr. Aug. 12, 2024, 231:4–233:1, Dkt. 249.)

171.     Of the 60 buildings in Los Angeles providing project-based housing for veterans, 70 percent of them either have some or all of their units set at 30 percent of the Area Median Income. (Trial Tr. Aug. 22, 2024, 302:2–10, Dkt. 270; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.t., Dkt. 222-1.)

172.     The VA admits that existing AMI limits exclude a substantial number of veterans. According to the VA's own analysis, approximately 25 percent of unhoused veterans exceed 30 percent of AMI, due to receipt of VA service-connected disability payments, Social Security, and other payments related to their disability. (Trial Tr. Aug. 23, 2024, 264:18–266:5, Dkt. 271; Trial Ex. 1223.) Veterans with as low as 70 percent service connection, with some contribution factors, could exceed 30 percent of AMI. (Trial Tr. Aug. 23, 2024, 266:22–267:9, 270:5–271:18, Dkt. 271.) AMI criteria are often layered with additional criteria, consequently excluding the vast majority of unhoused veterans; for example,

Building 207's four criteria taken together exclude over 97 percent of veterans. (Trial Tr. Aug. 23, 2024, 274:15–276:18, Dkt. 271.)

173.    A concrete example helps to illustrate the issue. For many developments on the West Los Angeles VA Grounds, a veteran is ineligible to live there if their income exceeds 30 percent of Los Angeles's area median income ("AMI"). 30 percent of the area median income in Los Angeles is around $25,000. A veteran with a 100 percent disability rating receives approximately $40,000 in disability benefits every year. Developers count these disability benefits as "income" when assessing eligibility. Thus, a veteran with a 100 percent disability rating does not qualify for most housing on the West LA VA Grounds, although a less disabled veteran (who receives less in disability benefits) does.

174.    Federal Defendants recognize that AMI limitations excluding the most disabled veterans are unfair. (Trial Tr. Aug. 12, 2024, 238:15–239:4, 239:6–12, Dkt. 249; Trial Tr. Aug. 22, 2024, 303:10–304:10, Dkt. 270.) The Secretary agrees that "veterans shouldn't be penalized for eligibility based on their service-connected disabilities." (Trial Tr. Aug. 12, 2024, 239:17–22, Dkt. 249; *see also* Trial Tr. Aug. 22, 2024, 297:18–298:12, Dkt. 270.)

175.    In the lead up to trial, and as recently as May 28, 2024, HUD claimed it did not have the legal authority to exclude VA service-connected disability payments from income for the purpose of eligibility for project-based housing. (Fed. Defs' Cross-Mot. for Summ. J. at 28, Dkt. 193-1; Trial Ex. 35A; Trial Tr. Aug. 14, 2024, 252:5–254:24, 256:5-257:3, 259:23-260:5, Dkt. 258.) Similarly, HUD believed the HUD-VASH income definition did not justify using its statutory waiver authority to modify the definition of income for eligibility purposes. (Trial Tr. Aug. 14, 2024, at 257:8–258:6, Dkt. 258.) The Secretary and VA deferred to HUD's stance that they could not take administrative action. (Trial Tr. Aug. 22, 2024, 298:22–299:5, Dkt. 270.) The VA and HUD argued that third-party developers, not the agencies themselves, were responsible for imposing the income limitation. (Mot.

for Summ. J. Order ("MSJ Order") at 23, Dkt. 218; *see also* Fed. Defs' Cross-Mot. for Summ. J. at 27–28, Dkt. 193–1.)

176.    Following this Court's MSJ Order on July 14, 2024, that the AMI policy was facially discriminatory, (*see* Dkt. 218), on August 8, 2024, HUD issued revised HUD-VASH operating requirements using its waiver authority to "adopt[] an alternative definition of annual income for applicants and participants of the HUD-VASH program that excludes veterans service-connected disability benefits when determining eligibility." (Trial Ex. 218; Trial Ex. 223; Trial Tr. Aug. 14, 2024, 255:6–256:4, 257:4–7, 258:8–259:22, 261:11–14, Dkt. 258.)

177.    In this policy change, HUD also eliminated the competitiveness requirement for project-based housing located on VA medical center grounds to expedite the development of such housing. (Trial Tr. Aug. 15, 2024, 71:4–72:25, Ex. 1624, 89 Fed. Reg. 65778.)

178.    HUD also waived the requirement that there be a housing assistance payment where a veteran participating in HUD-VASH is seeking housing in a project-based development on VA medical center grounds, or where supportive services are located on-site in a project-based development. This change was made to ensure that veterans can avail themselves of the services provided in those locations, even if they do not need a housing assistance payment. (Trial Tr. Aug. 15, 2024, 73:12–74:18; 75:14–25).

179.    HUD was aware of this Court's MSJ Order finding that the AMI policy was facially discriminatory. (Trial Tr. Aug. 14, 2024, 260:6–261:10, Dkt. 258.) Dr. Harris was not aware of HUD having decided to use its waiver authority prior to this Court's summary judgment determination. (Trial Tr. Aug. 22, 2024, 297:20–299:17, Dkt. 270.)

180.    However, without further action from the Department of the Treasury and from state and local authorities, the revised HUD-VASH operating requirements still do not allow veterans currently excluded by AMI limits to access the units

from which they are excluded. (Trial Tr. Aug. 14, 2024, 262:18–264:9, 264:19–267:8, Dkt. 258; Trial Tr. Aug. 26, 2024, 19:23–20:18, Dkt. 275.) To date, Treasury has not issued regulations despite sustained efforts by VA employees such as Dr. Harris on this issue for over a year.

181.     Similarly, the Sherman Bill, H.R. 8340, which would revise the statutory definition of income to exclude VA disability benefits from the definition of income, is still awaiting Congressional action. (Trial Tr. Aug. 26, 2024, 6:17–8:22, Dkt. 275; *id.* at 8:23–9:16.). This bill is languishing in Congress—the Court cannot anticipate a timeline for when, if ever, this bill will be considered.

182.     With the recent policy change increasing the value of HUD-VASH vouchers in high-rent zip codes in Los Angeles, a model of conventional bank financing is a workable and preferable alternative to the current financing model. (Trial Tr. Aug. 27, 2024, 131:18–136:4, Dkt. 281; Trial Ex. 245.) This model does not require restrictive AMI limitations, nor does it present the unacceptable delays and uncertainty present in the current EUL model, which relies on a limited, competitive pool of affordable housing tax credits with numerous strings attached. (*Id.*). The addition of this funding mechanism does not eliminate the present tax credit funding model tied to ongoing developments on campus, but is another opportunity to increase financing choices for developers and expedite the construction of housing on the campus.

183.     The VA also has legal authority to directly fund permanent supportive housing under 38 U.S.C. 8101-2. 38 U.S.C. 8102(a) provides, "[t]he Secretary shall provide medical facilities for veterans entitled to hospital, nursing home, or domiciliary care or medical services under this title."  In the past, the VA has used this authority to directly fund housing or shelter that had connected medical services on the West LA Grounds, such as the Domiciliary, some construction of the Tiny Sheds through CTRS, and Community Living Centers (CLCs). (Trial Tr. Aug. 15, 2024, 254.) The 2022 Master Plan defines these centers as "nursing home

communities, resembling a 'home' as much as possible while offering high-quality care. Veterans may stay for a short time or, in rare instances, for the rest of their life." Trial Ex. 1, at 66.

184.    If the use of a conventional bank financing model results in a shortfall of the complete funding of a construction project, the VA also has the inherent authority under its Minor Construction Funds to use VA funds to make capital contributions towards the construction of permanent supportive housing. (Trial Tr. Aug. 27, 2024, 126:13–18, Dkt. 281.)

185.    Permanent Supportive Housing has much in common with the types of shelter or housing that the VA has already funded on the campus, using its construction authority. Veterans in permanent supportive housing receive healthcare services on site through the wrap-around services that are part of the HUD-VASH program. These services can include on-staff psychiatrists and nurses for medication and care. Plaintiffs Johnson and Fields, who both now live in Building 208, have received visits from nurses, medical doctors, and social workers in their units. (Trial Tr. Aug. 22, 2024, 259:19-260:13; Trial Tr. Aug. 23, 2024, 128:22-129:14.) There is no legal distinction between the VA funding a nursing home, where veterans may stay for the rest of their lives and receive nursing services on-site, and the VA funding a permanent supportive housing building, where veterans may stay for the rest of their lives and receive nursing services on-site. Permanent supportive housing is a form of healthcare and therefore may be funded under 38 U.S.C. 8101-2.

186.    In sum, there are numerous ways for developers to fund the construction of housing on the West LA VA campus. First, they can continue to use federal, state, and local tax credits that subsidize the creation of affordable housing. The Court's holding therefore does not interfere with presently financed construction projects on the campus. Second, developers can rely on conventional financing, which is free of both the discriminatory eligibility criteria of those tax credits and many

unnecessary delays associated with the limited pool of affordable housing financing. Third, the VA can directly fund or subsidize portions of the cost of development of housing on campus. Using a combination of these techniques, the VA can and must ensure that they provide sufficient housing for class members whose disability payments have barred them from housing on campus in the past.

## THE AVAILABLE SPACES FOR PERMANENT SUPPORTIVE HOUSING AND TEMPORARY SUPPORTIVE HOUSING UNITS

187.    There is ample open space for at least 750 temporary and 1,800 permanent supportive housing units on the grounds that would not interfere with any existing permanent housing. (Trial Tr. Aug. 22, 2024, 226:15–17, Dkt. 270.)

188.    There are today more than 100 buildings on the WLA Grounds, many of which are vacant, closed, or underutilized, as well as acres of available land.

189.    Having obtained an understanding of the available land on the WLA Grounds, Randy Johnson, a real estate developer with over 40 years of experience, prepared Trial Exhibit 248 to identify the potential locations for placement of both temporary and permanent supportive housing units. (Trial Tr. Aug. 22, 2024, 80:13–17, Dkt. 270; Trial Ex. 248.) Each of the spaces identified by Mr. Johnson, and as partially confirmed by Dr. Steven Braverman, are appropriate locations for the placement of temporary and/or permanent supportive housing units. (Trial Ex. 248; *see also* Trial Exs. 249–250.)

190.    The 2016 Draft Master Plan envisioned a "vibrant" Town Center serving as the "downtown" of the campus, enabling veterans to build relationships, "participate in events in a public square, attend outdoor concerts, coordinate a volunteer effort, develop employment opportunities, visit a library, [or] grab a bike to ride around the property." (Trial Ex. 154 at p. 15.)

191.    As Dr. Sherin testified, a veteran community must include not only housing units, but the "connective tissue" essential to healing, thriving, and then

reintegration. (Trial Tr. Aug. 15, 2024, 168:10–170:2, Dkt. 265.) Connective tissue refers to places to gather, job training opportunities, parks, recreation activities, legal resources, and related activities. (*Id.*) Dr. Harris agreed with the "importance of developing a healthy, thriving place for veterans to be." (Trial Tr. Aug. 23, 2024, 49:9–22, Dkt. 271.)

192.     Dr. Sherin testified that there is no better therapy for veterans than conversation with fellow veterans. Trial Tr. Aug. 15, 2024, 222:3-8. Dr. Harris testified that he "agree[d] with every word" of Dr. Sherin's testimony regarding the importance of veteran peers. (Trial Tr. Aug. 23, 2024, 42:14–19, Dkt. 271.)

193.     Many veterans want to live in a community with other veterans on the WLA Grounds. (Trial Tr. Aug. 23, 2024, 130:1–8, 187:4–188:22, Dkt. 271; Trial Tr. Aug. 22, 2024, 223:17–18, 252:25–253:18, Dkt. 270.) The Government has not planned, let alone constructed, any single structure that could serve as a community hub. (Trial Tr. Aug. 13, 2024, 110:14–117:12, Dkt. 254.)

## THE CLASS REPRESENTATIVES

194.     Plaintiff Lavon Johnson has a 100 percent service-connected disability rating, is eligible for VA medical benefits, seeks treatment from VAGLAHS, has sought housing from VAGLAHS, and has previously been denied housing on or near the WLA Grounds. (Trial Tr. Aug. 22, 2024, 234:17–21, 250:6–17, 254:1–11, 257:18–258:6, Dkt. 270; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.ee, Dkt. 222-1.)

195.     Plaintiff Jeffrey Powers has a 90 percent service-connected disability rating, is eligible for VA medical benefits, seeks treatment from VAGLAHS, has sought housing from VAGLAHS, and has previously been denied housing on or near the WLA Grounds. (Trial Tr. Aug. 8, 2024, 106:17–21, 109:4–23, 122:10–123:14, 123:15–125:16, Dkt. 242; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.gg, Dkt. 222-1.)

196.     Plaintiff Joseph Fields has a 100 percent service-connected disability rating, is eligible for VA medical benefits, seeks treatment from VAGLAHS, has sought housing from VAGLAHS, and has previously been denied housing on or near the WLA Grounds. (Trial Tr. Aug. 23, 2024, 112:4–5, 117:24–118, 128:19–129:18, 130:13–131:19, 126:2–22, Dkt. 271; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.ii, Dkt. 222-1.)

197.     Plaintiff Joshua Petitt has a 100 percent service-connected disability rating, is eligible for VA medical benefits, seeks treatment from VAGLAHS, has sought housing from VAGLAHS, and has previously been denied housing on or near the WLA Grounds. (Trial Tr. Aug. 22, 2024, 214:21–24, 216:10–217:3, 222:4–20, 223:17–224:14, Dkt. 270; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.jj, Dkt. 222-1.)

198.     Plaintiff Laurieann Wright has a 100 percent service-connected disability rating, is eligible for VA medical benefits, seeks treatment from VAGLAHS, has sought housing from VAGLAHS, and has previously been denied housing on or near the WLA Grounds. (Trial Tr. Aug. 23, 2024, 184:10–12, 185:1–187:1, 200:3–201:25, 203:1–205:10, Dkt. 271; *see also* Am. Final Pretrial Conference Order, Stipulated Fact 5.kk, Dkt. 222-1.)

## **THE NEED TO PHASE IN TEMPORARY SUPPORTIVE HOUSING**

199.     An important element of the Housing First Program is the availability of housing and the need to provide a low barrier to immediate access to housing. (Trial Tr. Aug. 8, 2024, 45:21–46:4, 48:1–12, Dkt. 242.)

200.     The current supply of housing on or near the WLA Grounds is not sufficient to house the number of homeless veterans with SMI or TBI, the Class of individuals that Plaintiffs represent. (*See* Trial Ex. 217 (indicating the supply of housing for *all* homeless veterans—not just veterans with disabilities—to be

approximately 379 units).) As this Court previously recognized, homeless veterans include those at risk of being unhoused. (*See* Dkt. 190 at 15).

201.  This risk is heightened by the fact that the HUD-VASH program does not allow veterans to transfer from a tenant–based voucher to a project-based voucher without first becoming homeless. (Trial Ex. 223; Trial Tr. Aug. 26, 2024, 31:10–32:12, 34:6-13, Dkt. 275.).

202.  A veteran with SMI or TBI living far from campus, i.e. in Palmdale, on a HUD-VASH tenant-based voucher, who cannot access their medical care at the West LA VA is at risk of becoming homeless, and in fact may be required by the HUD-VASH system to become homeless, in order to transition to housing closer to the West LA VA to receive medical care there.

203.  The historically high rates of attrition from the HUD-VASH program, meaning veterans leaving the program, also demonstrate that many currently housed veterans are at risk of being unhoused and therefore fall into the class. (Trial Ex. 16).

204.  In 2024, there are 5,278 veterans using HUD-VASH vouchers in Greater Los Angeles. (Trial Ex. 25, at 2.) Using Federal Defendants' low estimate that only 24 percent of veterans have a serious mental illness, approximately 1,267 HUD-VASH voucher holders in the area likely suffer from SMI. Due to high attrition rates, the limited supply of housing on or near the grounds, and the fact that a veteran often needs to become homeless again to transfer from a tenant-based voucher to project-based housing, these voucher holders are at risk of becoming homeless in order to access medical care at the West LA VA. Adding these 1,267 voucher holders to the 718 unhoused veterans (around 24 percent of the total 2,991 estimated in the 2024 PIT count) that Federal Defendants suggest suffer from serious mental illness, Federal Defendants would need to provide a minimum of 1,984 permanent supportive units on or near the campus to provide a remedy for

injured class members. This is likely an underestimate, as the VA points to data indicating rates of SMI are far greater than 24 percent among unhoused veterans.

205.     The problem of homeless veterans is exacerbated each day a veteran is on the street; not only is it a safety issue, it is also a trust issue as the longer it takes people to obtain a housing unit, the less likely they will trust the service providers offering that housing. (Trial Tr. Aug. 8, 2024, 55:22–56:9, Dkt. 242; Trial Tr. Aug. 12, 2024, 878:1–8, Dkt. 249; Trial Tr. Aug. 22, 2024, 283:6–22, Dkt. 270.)

206.     Without appropriate housing, homeless veterans experience an institutional circuit in order to receive healthcare, including mental healthcare services, and are left to either accept institutionalization or go without services. (Trial Tr. Aug. 8, 2024, 30:16–31:14, Dkt. 242; Trial Tr. Aug. 15, 2024, 156:8–14, Dkt. 265; Trial Tr. Aug. 23, 2024, 17:24–119:11, 119:19–120:9, 25:9–20, 195:2–197:8, Dkt. 271.)

207.     The intended stay for Federal Defendants' current existing transitional housing programs, i.e. Grant and Per Diem programs, is between 90 days and six months. (Trial Tr. Aug. 8, 2024, 152:8–21, Dkt. 242.) There are no plans to construct additional emergency or transitional supportive housing on or near the WLA Grounds for veterans awaiting the construction of permanent supportive housing. (Trial Tr. Aug. 9, 2024, 250:24–251:5, Dkt. 243.)

208.     There is an urgent demand for temporary supportive housing on or near the WLA Campus to "fill the gap between emergency programs…and permanent supportive housing"—to ensure veterans with disabilities can access their healthcare benefits while awaiting a permanent supportive housing unit. (Trial Tr. Aug. 13, 2024, 90:5–91:1, Dkt. 254; Trial Tr. Aug. 22, 2024, 290:20–291:1, Dkt. 270.) The need for housing for these veterans can be partially addressed by the placement/construction of 750 temporary supportive housing units phased in over the next twelve (12) to eighteen (18) months. (Trial Tr. Aug. 22, 2024, 86:13–24; 129:1–5, Dkt. 270; *see also* Trial Tr. Aug. 15, 2024, 172:15–173:6, Dkt. 265 (identifying the needs for "hundreds and hundreds of veterans" who would benefit

from temporary housing in a temporary community and up to 1000 units to make a "robust" impact).)

209.    As Dr. Sherin stated, temporary housing should be present along with a community, which includes shelter with "proper food, hygiene sanitation services, [] opportunities to do work . . . where health behaviors and where engagement with the healthcare system can occur more meaningfully." (Trial Tr. Aug. 15, 2024, 168:23–171:3, Dkt. 265.)

210.    In the event that there is an overbuild (i.e. more units are built than necessary), the additional units may be used to assist the VA staff members who otherwise could not afford to find housing on or near the WLA Grounds and keep these staff members from becoming homeless themselves. (Trial Tr. Aug. 22, 2024, 196:2–25, Dkt. 270.)

## CONCLUSIONS OF LAW

211.    Plaintiffs bring this action on behalf of the certified Class and Sub-Class.

212.    This Court has jurisdiction over Plaintiffs' claims under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) based on 28 U.S.C. § 1343(a)(4) and 1346(a)(2) because those claims seek to secure equitable relief under an Act of Congress and because the United States is a defendant. In addition, this Court has jurisdiction over Plaintiffs' claims for injunctive relief based on 28 U.S.C. § 1331 because those claims arise under federal statutes and federal common law. This Court also has jurisdiction over Plaintiffs' claims to enforce terms of the charitable trust and for an accounting under 28 U.S.C. § 1367. This Court also has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1361. Venue is proper under 28 U.S.C. § 1391(b) because all of the acts and/or omissions occurred or will occur in this District.

213.    Unless an injunction is issued, Plaintiffs and the Class will face very serious damage as a result of the VA's inability to provide adequate supportive housing.

Such harm to Plaintiffs and the Class cannot be redressed or compensated in the form of monetary damages.

214.    Plaintiffs' first claim for relief asserts that Federal Defendants violated § 504 of the Rehabilitation Act by administering the benefits offered by VAGLAHS and HUD-VASH in a manner that denies veterans the benefits of VAGLAHS services, programs, or activities in the most integrated setting appropriate to their needs.

215.    To establish its first claim, Plaintiffs must prove the following elements: (1) Plaintiff is an individual with a disability; (2) Plaintiff is otherwise qualified to receive the benefits; (3) Plaintiff was discriminated against in the program solely by reason of his disability; and (4) the program is operated by a federal agency. 38 C.F.R. §§ 15.102–103, 115.130; *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of rehg. (Oct. 11, 2001).

216.    Unnecessary segregation or institutionalization of people with disabilities is a form of unlawful discrimination. *Olmstead v. L.C.* , 527 U.S. 581 (1999). Covered entities "are required to provide community based treatment for persons with mental disabilities when . . . treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment and the placement can be reasonably accommodated, taking into account the resources available to the [jurisdiction] and the needs of others with mental disabilities." *Id*. at 607.

217.    A defendant may be excused from discrimination if it can prove compliance would cause undue financial or administrative burdens or would fundamentally alter the program or service at issue. It must still do whatever modifications will not cause undue financial or administrative burdens or fundamental alteration. Undue burden must be determined in light of the VA's overall budget. Department of Veterans Affairs, Compliance Procedures Implementing Section 504 of the Rehabilitation Act of 1973 – Nondiscrimination Based on Disability in Federally Conducted Programs or Activities [VA Handbook] § 3.j., 4.e(1)(c), 4.g(6) (2020);

38 C.F.R. § 15.150(a)(3). It must also be accompanied by a written statement of the reasons for reaching the conclusion that a proposed action would constitute an undue burden or fundamental alteration. VA Handbook 4.e(c), 4.g(6); 38 C.F.R. § 15.150(a)(3).

218.    Plaintiffs have disabilities within the meaning of the Rehabilitation Act and are otherwise eligible for the health care and housing benefits offered by the VA and HUD, both federal agencies.

219.    Members of the Class are individuals with physical and mental disabilities that substantially limit one or more major life activities, making them disabled within the meaning of Section 504.

220.    Plaintiffs are qualified for Federal Defendants' healthcare services provided at the WLA Grounds.

221.    Federal Defendants administer the benefits offered by VAGLAHS and HUD-VASH in a manner that denies veterans the benefits of VAGLAHS services, programs, or activities in the most integrated setting appropriate to their needs.

222.    Federal Defendants already provide and plan to provide permanent supportive housing for homeless veterans with serious mental illness and traumatic brain injury. Plaintiffs seek additional, more robust, and faster provision of permanent supportive housing and the implementation of temporary supportive housing in the meantime.

223.    Providing additional, more robust temporary and permanent supportive housing, on a faster timeline to veterans with serious mental illness and traumatic brain injury receiving services in, or at risk of entry into, VA institutions and other institutions, homelessness, and jail, can be accomplished with reasonable modifications that do not fundamentally alter the VA's programs and services.

224.    Federal Defendants' plan for providing community-based services to veterans is neither comprehensive nor effective, and does not move at a reasonable rate. In addition, Federal Defendants are not complying with their own plan.

225.   Federal Defendants have failed to secure adequate housing, both on the WLA Grounds and off-campus, for homeless veterans, ultimately condemning them to the institutional circuit that accompanies unstable housing and exacerbates their disabilities, all of which strains the healthcare system.

226.   Federal Defendants' denial of appropriate integrated services to Plaintiffs is solely because of their disabilities, and Plaintiffs are institutionalized or placed at risk of institutionalization because of Federal Defendants' discrimination. Federal Defendants' failure to provide sufficiently high-quantity and quality permanent supportive housing excludes Plaintiffs and the class they represent from services to which they are entitled solely because of their disabilities.

227.   Seven-hundred and fifty units of temporary supportive housing can be provided in temporary buildings at a cost of approximately $100 million. (Trial Tr. Aug. 22, 2024, 128:5–6.) This is not an undue financial burden in light of the VA's budget of $407 billion.

228.   Federal Defendants have pointed to no law that prohibits them from building permanent supportive housing. If there were such a law, it would conflict with the requirements of Section 504 of the Rehabilitation Act. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) ("[W]hen Congress has passed antidiscrimination laws such as the ADA [and the Rehabilitation Act] which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.").

229.   Increasing the amount, speed, and quality of permanent supportive housing on or near the WLA Grounds would not cause undue financial or administrative burdens and would not fundamentally alter the VA's healthcare program.

230.   Federal Defendants' discrimination has irreparably harmed Plaintiffs and will continue to harm them irreparably.

231.   Plaintiffs' second claim for relief asserts that Federal Defendants violated § 504 of the Rehabilitation Act by administering the benefits offered by VAGLAHS

and HUD-VASH in a manner that denies Plaintiffs meaningful access to those benefits solely because of their disabilities.

232. To establish its second claim, Plaintiffs must prove the following elements: (1) Plaintiff is an individual with a disability; (2) Plaintiff is otherwise qualified to receive the benefits; (3) Plaintiff was denied the benefits of the program solely by reason of his disability; and (4) the program is conducted by a federal agency or receives federal financial assistance. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of rehg. (Oct. 11, 2001).

233. Pursuant to the Court's Order granting Plaintiffs' partial motion for summary judgment (Dkt. 218), Plaintiffs have established their second claim and Federal Defendants' practice of contracting with third parties whose eligibility requirements disqualify the most disabled veterans is facially discriminatory.

234. Federal Defendants' practice of contracting with third party developers who impose discriminatory conditions violates the Rehabilitation Act and the VA's own regulations, codified at 38 C.F.R. § 15.130(b)(3). Federal Defendants cannot outsource discrimination. In order to not interfere with existing financing of ongoing construction projects, Defendants must ensure that a sufficient number of units that are free from income eligibility criteria are supplied on campus to provide housing for members of the Sub-Class, those veterans who have been excluded from housing due to their disability income.

235. To establish its third claim, Plaintiffs must prove the following elements: (1) Plaintiff is an individual with a disability; (2) Plaintiff is otherwise qualified to participate in Defendants' services; (3) Plaintiff was denied a reasonable modification that she needs in order to enjoy meaningful access to the benefits of public services; and (3) the program is conducted by a federal agency. 38 C.F.R. § 15.102–103; *A. G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F. 3d 1195, 1204 (9th Cir. 2016). A defendant may be excused from providing a reasonable modification if it can prove the modification would cause undue financial or

administrative burdens or would fundamentally alter the program or service at issue. It must still do whatever modifications will not cause undue financial or administrative burdens or fundamental alteration.

236.    Plaintiffs and the class they represent have established that they are individuals with a disability, they are eligible for Federal Defendants' services, and have been denied a reasonable modification—temporary and permanent supportive housing—in order to access the benefits offered by VAGLAHS solely by reason of their disabilities.

237.    Plaintiffs' proposed modification, the provision of temporary and permanent supportive housing on or near the WLAVA Grounds on a faster timeline, is a reasonable modification.

238.    Modifications are reasonable when they are "necessary to correct for instances in which qualified disabled people are prevented from enjoying 'meaningful access' to a benefit because of their disability." *Southeastern Community College v. Davis*, 442 U.S. 397, 410 (1979). In the Ninth Circuit, the relevant inquiry is not simply whether people with disabilities have any access to the services, programs, activities, or benefits a public entity provides, but whether they have "full and equal enjoyment" of those things, on par with nondisabled individuals. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134–35 (9th Cir. 2012) (quoting 42 U.S.C. § 12182(a)).

239.    Plaintiffs—disabled veterans with SMI and TBI— and their experts established that Plaintiffs require ready access to on-site healthcare and rehabilitative services that nearby permanent supportive housing provides to remain housed and to benefit from their health care services.

240.    Plaintiffs established that temporary supportive housing units are necessary to bring disabled veterans off the streets on a more expedited timeline as additional permanent supportive housing is phased in over a proposed six-year timeline.

241.    Federal Defendants have acknowledged that permanent supportive housing has been shown to be unparalleled in improving housing stability, while supporting physical and behavioral health for veterans with complex health needs.

242.    Plaintiffs' fourth and fifth claims assert that Federal Defendants accepted a fiduciary duty by accepting the WLA Grounds under the 1888 deed, using it for decades as a home for disabled soldiers, and subsequently breaching those duties by failing to use the WLA Grounds as a home for disabled soldiers.

243.    This Court previously found that the 1888 Deed created a charitable trust and that the government assumed enforceable duties pursuant to the West Los Angeles Leasing Act of 2016 and the West Los Angeles VA Campus Improvement Act of 2021.

244.    To prevail on a claim of breach of fiduciary duty, plaintiffs must establish: (1) the existence of a fiduciary relationship, (2) breach of that duty, and (3) the breach proximately caused the damages. *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003).

245.    The WLALA and its 2021 Amendment, through which the Federal Defendants accepted the fiduciary responsibility under the 1888 Deed, permit only leases (1) "for purposes of providing supportive housing … that principally benefit veterans and their families" and (2) "to provide services that principally benefit veterans and their families and that are limited to one or more of the following purposes:

a.    The promotion of health and wellness, including nutrition and spiritual wellness.

b.    Education.

c.    Vocational training, skills building or other training related to employment.

d.    Peer activities, socialization, or physical recreation.

e.    Assistance with legal issues and Federal benefits.

f.    Volunteerism.

g.    Family support services, including child care.

h.    Transportation.

i.    Services in support of one or more of the purposes specified in subparagraphs (A) through (H)."

246.    Federal Defendants have violated the WLALA and its 2021 Amendment by entering into various leases that do not "principally benefit veterans and their families."

247.    Specifically:

a.    Federal Defendants' agreement with SafetyPark Corporation does not principally benefit veterans and their families, and thus, constitutes a breach of their fiduciary duty.

b.    Federal Defendants' agreement with Bridgeland Resources, LLC (the successor in interest to Breitburn Operating L.P.) does not principally benefit veterans and their families, and thus, constitutes a breach of their fiduciary duty.

c.    Federal Defendants' agreement with the Brentwood School does not principally benefit veterans and their families, and thus, constitutes a breach of their fiduciary duty.

248.    The WLALA permits a lease of real property for a term of up to ten years to the Regents of the University of California at UCLA "if – (A) the lease is consistent with the master plan …; [and] (B) the provision of services to veterans is the predominant focus of the activities of The Regents at the Campus during the term of the lease; [and] (C) The Regents expressly agrees to provide . . .additional services and support (for which The Regents is not compensated . . .) that (i) principally benefit veterans and their families . . .; and (ii) may consist of activities relating to the medical, clinical, therapeutic, dietary, rehabilitative, legal, mental, spiritual, physical, recreational, research and counseling needs of veterans and their families. . . ."

249.    Federal Defendants' agreement with the University of California Los Angeles constitutes a breach of their fiduciary duty as the provision of services to veterans is not the predominant focus of the activities of The Regents on the WLA Grounds. (Trial Tr. Aug. 22, 2024, 69:4–21, Dkt. 270.)

250.    Federal Defendants have breached their fiduciary duties to veterans by leasing portions of the WLA Grounds to private entities while only providing 233 units of housing to veterans.

251.    Based on the Court's factual findings and conclusions of law, Plaintiffs are entitled to the following:

    a.    The Court finds that Federal Defendants have administered the benefits program of VAGLAHS in a manner that discriminates against veterans with serious mental illness and traumatic brain injury solely by reason of their disabilities in violation of § 504 of the Rehabilitation Act.

    b.    Federal Defendants have breached and continue to breach their fiduciary duties as trustees of the Charitable Trust by allowing VAGLAHS to use the WLA Grounds for purposes that are not directly related to providing housing, community, and healthcare for veterans with disabilities.

    c.    Federal Defendants are enjoined from failing to provide Plaintiffs and the Class they represent with appropriate permanent supportive housing on or near the WLAVA Grounds so they can reasonably access the health care benefits for which they are eligible in the most integrated setting appropriate to their needs. This includes providing homeless veterans with access to transportation to and from the WLA Grounds and increased case management services.

    d.    Within twelve (12) to eighteen (18) months of this Court's order, Federal Defendants shall provide 750 temporary supportive units on the WLA Grounds. These units shall be phased in such that all units are in place and operational within 18 months of the Court's order.  The 750 units of

temporary supportive housing units shall be placed on the WLAVA Campus so as to not interfere with current or planned construction activities that relate either to permanent supportive housing or the provision of medical services. The location of the 750 units of temporary supportive housing units is to be determined following the hearing on injunctive relief, scheduled for September 25, 2024.

e. Within six (6) months of this Court's order, Federal Defendants, in consultation with Plaintiffs' counsel and a court-appointed monitor, shall develop a plan for the construction of an additional 1,800 units of permanent supportive housing units to address veteran homelessness within VAGLAHS' catchment area and the development of the connective tissue/Town Center on the WLA Grounds. This plan shall include a timeline such that the 1800 permanent supportive housing units and the connective tissue shall be built and operational within six (6) years of this order.

f. This plan must include a specified minimum number of units that will not count disability benefits as income for purposes of eligibility. Defendants must provide a sufficient number of units on campus to meet the housing needs of entire Sub-Class, those veterans whose disability payments currently exclude them from certain housing developments and units. Federal Defendants, Plaintiffs, and the court-appointed monitor in consultation should determine the necessary minimum number of units to house the Sub-Class.

g. Federal Defendants shall commence active construction of the Town Center described in the 2022 Master Plan within eighteen (18) months of this order.

h. As to both temporary and permanent supportive housing units, the Court retains jurisdiction to adjust the number of units in each category in order to closely approximate the actual need for housing.

i.  All permanent supportive housing services must meet evidence-based practice standards, must be provided according to a person-centered care plan, and must be monitored by an expert in permanent supportive housing, to be selected in consultation with the Court-appointed monitor.

j.  Federal Defendants shall staff its HUD-VASH program to provide at least 25 referrals to public housing agencies per week.

k.  Federal Defendants shall staff its case worker ranks to an appropriate level, to be decided in consultation with a Court-appointed monitor, to reduce attrition from the HUD-VASH program due to program violations and skips by 50 percent within one (1) year of this order.

l.  Federal Defendants shall increase its street outreach staff in the catchment area to an appropriate level, to be decided in consultation with a Court-appointed monitor, within one (1) year of this order.

m. For any permanent supportive housing unit on the WLAVA Grounds built pursuant to this Order, Federal Defendants shall allow developers to use any form of financing described in the Court's opinion so long as it complies with the requirements set forth in this opinion.

n.  A monitor shall be appointed to oversee and report to the Court on Federal Defendants' compliance with this Court's order, which includes a report within six (6) months of the Court's order and subsequent annual reports and/or audits to evaluate Federal Defendants' compliance with the Court's order.

o.  Federal Defendants are prohibited from executing and maintaining any land use agreement, including those identified by this Order, that does not principally benefit veterans and their families pursuant to WLALA and its 2021 Amendment.

p.  As the prevailing party, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.