1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| JEFFREY POWERS, *et al.*, | **Case No. 2:22-CV-08357-DOC-KS** |
| Plaintiffs, | |
| v. | |
| DENIS RICHARD MCDONOUGH, in his official capacity as Secretary of Veterans Affairs; *et al.*, | **ORDER DENYING FEDERAL DEFENDANTS' MOTION FOR STAY PENDING APPEAL [394]** |
| Defendants. | |

Before the Court is Federal Defendants' Motion for Immediate Administrative Stay and Partial Stay Pending Appeal ("Motion") (Dkt. 394). To provide ample notice, the Court denied a portion of the Motion—the request for Immediate Administrative Stay—on November 7, 2024. *See* Order Denying Federal Defendants' Motion for Immediate Administrative Stay and Issuing an Order to Show Cause (Dkt. 401). The Court heard oral arguments on November 13, 2024. For the reasons described below, the Court **DENIES** Federal Defendants' Motion.

# I.    INTRODUCTION

Federal Defendants' Motion before the Court captures the fundamental disagreement at the heart of this litigation—whether this Court may direct the Department of Veterans Affairs ("VA") in how to comply with the law. Federal Defendants, at last, do not challenge the Court's holding that the leases it signed are unlawful or that Federal Defendants should provide housing for veterans *somehow at some point*. Rather, Federal Defendants challenge any oversight or continuing jurisdiction by the Court.[1] VA continues to resist accountability, while excluding veteran input.[2] Despite decades of mismanagement of the West LA VA campus, failed promises, missed deadlines, and VA ignoring prior court decisions, Federal Defendants seek to stall Plaintiffs' progress and this Court's findings. VA wants no juridical oversight and no remedy for repeated violations. This has resulted in veterans sleeping and dying on the streets of Los

---

[1] Federal Defendants' counsel stated at the Court's October 11, 2024 hearing: "The Government, and particularly the Department of Veterans Affairs, is not opposed to providing housing and housing-related services to veterans but much of what we have been in this court and discussing, whether through the trial or whether through our many post-trial meetings, concern the question of how those services can best be provided. And it's a fundamental principal of the Government and the Government's position here that VA as an agency is in the best position to make determinations about the provision of those services and the management of its own operations in providing those necessary services to veterans." Transcript of October 11, 2024 Hearing (Dkt. 361), at 6.

[2] The Court stated in its Post-Trial Opinion: Leadership at the West LA VA and at UCLA were aware that expansion of UCLA's baseball program in 2021 was likely to upset the veterans who had been pushing for housing at the grounds. A statement by Executive Director of Community Engagement and Reintegration Services Robert McKenrick in a meeting with VA and legal associates on January 29, 2021, was leaked by a whistleblower. Mr. McKenrick stated: "Advocates who are a little testy out there are going to get up in arms when they see there's another ball field being built." "That being said, there's a FOIA request out there and the response to the FOIA request is going out in a week or two," Mr. McKenrick continued, explaining that the requester was a "UCLA news media guy." He instructed his team to work with UCLA to announce the field before this FOIA request could be independently reported on, reasoning that "this will get out ahead of us if we don't get moving on it quickly." Fearing public criticism, the VA hid behind UCLA and asked the university, rather than the VA, to announce the expansion of the baseball complex. Mr. McKenrick, in a subsequent multi-departmental meeting, discussed the problem with Chancellor Block's Chief of Staff, members of UCLA's Offices of Community Relations and Strategic Communication, and UCLA's Associate Athletic Director, among others. Post-Trial Op. at 66 (citing Trial Tr. Aug. 29, 2024, 103).

Angeles.[3] After years of inaction on housing development, Plaintiffs were forced to bring this litigation once again. VA persists in claiming that no land is available for housing construction, despite having tied up vast parcels of land in lengthy leases, thereby restricting the potential for veteran housing on Campus. The Court declines to allow further delays so that VA can evade its legal obligations.

## II.    BACKGROUND

After trial, this Court largely ruled in favor of Plaintiffs on their housing claims and land use claims. Based on VA's violations of the Rehabilitation Act, the Court ordered VA to provide 750 temporary supportive housing units within 12 to 18 months on the West Los Angeles VA Campus ("Campus"). Post-Trial Opinion ("Post-Trial Op.")  (Dkt 359), at 14, 41, 122. The Court also ordered VA to provide a plan within six months for the construction of 1,800 permanent supportive housing units to be built over the next six years. *Id*. at 123. The Court stated that the exact number of temporary and permanent supportive housing units would be adjusted by the Court based on need. *Id*. at 41, 123. The Court further held that VA's leases with Brentwood School, Safety Park, Bridgeland Oil, and the University of California, Los Angeles ("UCLA") were void and terminated based on VA's fiduciary duties and the West Los Angeles Leasing Act of 2016 ("WLALA"). The Court ordered VA not to enter into new leases with the previous leaseholders. *Id*. at 71. The Court explained that this lease injunction was warranted by VA's persistent mismanagement of the West LA VA Grounds. Following the *Valentini* decision in which Judge Otero voided the leases for the Brentwood School and the parking lot (as well as eleven other leases), the VA executed new leases with the school and the Safety Park. The VA also entered the revocable license for oil drilling with Bridgeland, and the amended lease with UCLA. VA's Office of Inspector General notified VA that the Brentwood School, Bridgeland, and Safety Park agreements are misuses of the land and violate the WLALA. Despite these

---

[3] Declaration of Robert Reynolds (Dkt. 405-2), at 6 ("I have known veterans with disabilities who died living on the streets of Los Angeles"); Post-Trial Op. (Dkt. 359), at 89-90 (discussing the deaths of many unhoused veterans on the streets near the West LA VA Campus and the deaths of two veterans at the Veterans Row Encampment just outside the Campus).

warnings, VA repeatedly extended Safety Park's lease and made no effort to end or renegotiate its agreements with the Brentwood School, Bridgeland, and UCLA. Despite locking itself into these illegal, long-term leases of dozens of acres of land, VA argued repeatedly throughout this litigation and at trial that it was out of space for additional housing on the West LA VA Campus. *See* Post-Trial Op. at 1.

The Court's Final Judgment and Permanent Injunction are based on weeks of trial testimony supplemented with substantial testimony from VA officials and other knowledgeable individuals in hearings on injunctive relief. *See* Dkts. 318, 321, 327, 339, 344, 349, 361, 371, 382. This extensive record supports the Court's incremental approach providing for the construction of temporary and permanent supportive housing overseen by a Special Monitor and capable of adjustment according to need: "At Plaintiffs' request, these numbers [of housing units] are subject to modification by the Court to closely approximate the actual need for housing." Post-Trial Op. at 41.

About 3,000 veterans in Los Angeles County lack a permanent home according to the County's 2024 data. Post-Trial Op. at 79. VA lacks the housing necessary to address the needs of unhoused disabled veterans in Los Angeles. *Id*. at 81 (finding the total supply of available housing for homeless veterans in VAGHLAS' catchment area is approximately 379 units.); *see also id*. at 111–12. As the Court found, VA urgently needs more supportive housing near its WLA Medical Center—the VA medical facility providing "the bulk of the specialty care" to veterans in Southern California—to ensure that unhoused disabled veterans can access essential VA healthcare. *Id*. at 76–77, 79–80. Absent this Court's Judgment, VA's plodding development will not meet disabled veterans' need for supportive housing (and by extension, the healthcare such housing is necessary to access) nearly fast enough, if at all. *Id*. at 39 ("Without this Court ordering the VA to build significant temporary housing on the campus, the VA would likely continue violating the Rehabilitation Act for years to come as veterans languish waiting for permanent housing.").

There are presently only 307 permanent supportive housing units on the WLA Grounds. Reynolds Decl. ¶ 17. These units are in constant demand, *id*. ¶ 17, and their construction—

initiated only after the *Valentini* litigation—has been damagingly slow. Post-Trial Op. 86, 88; Reynolds Decl. ¶ 15–16. Although VA has stated its intention to increase permanent housing stock on the WLA Grounds, its proposed units will not be completed until 2030 (or later). Post-Trial Op. at 87; *see also id*. at 39 ("delays in implementation of the Master Plan and recent developments such as the [Government's] late notice of post-closure landfill"); *id.* at 88 (EUL financing model "presents significant delays and uncertainty for the construction of permanent supportive housing."). Significantly, the most severely injured and traumatized veterans have long been excluded from project-based housing on or near the WLA Grounds because their disability compensation exceeds income restrictions on that housing—a direct result of VA's outsourcing its housing development obligations to third parties. Post-Trial Op. at 3, 104–105; Reynolds Decl. ¶ 18. Although HUD and U.S. Treasury recently changed their policies and income definition to alleviate some of these barriers, income restrictions on the state and local level still bar many veterans with service-connected disability payments from housing. Post-Trial Op. at 21-23, 103-109; Transcript of September 25, 2024, hearing (Dkt. 318), at 40.

Existing emergency and transitional housing do not remedy the shortage of veteran housing. As the Court found, only 229 units of short-term housing were located on or near the WLA Grounds as of August 12, 2024—occupancy sufficient for less than ten percent of currently homeless veterans in Greater Los Angeles. Post-Trial Op. at 87. Dr. Kuhn submitted a declaration that there are on average only 45 vacant beds on the Campus. Declaration of John Kuhn ("Kuhn Decl.") (Dkt. 394-4) ¶ 6. Even beyond that population, there are disabled veterans who, due to their placement in housing far from the WLA Grounds, cannot access their healthcare at the WLA Medical Center. Reynolds Decl. ¶ 20. Transportation does not easily compensate for the lack of housing on the WLA Grounds; many severely disabled veterans struggle with the most basic day-to-day tasks, let alone arranging and navigating transportation to the WLA Grounds on a regular basis. *Id*. ¶ 21. Indeed, veterans placed in housing far from the WLA Medical Center often fall back into homelessness. Post-Trial Op. at 78, 82; Reynolds Decl. ¶ 20.

As the Court found, VA employs only thirteen outreach personnel for the West LA VA's 22,000 square mile catchment area. *Id*. at 99; *see also* Declaration of Jonathan Sherin ("Sherin

Decl.") ¶ 9. This woefully inadequate outreach places the burden of securing housing on unhoused veterans with mental illness—a model that does not work. Sherin Decl. ¶ 8 ("[M]any individuals living homeless on the streets are doing so because, at least in part, they are not able to tend to their own affairs. Placing on them the burden of finding and/or organizing their own access to housing sidesteps the core problem.").

Finally, even if 229 short-term placements near the WLA Grounds were sufficient—and they are not—many of those are emergency placements not suitable for more than a few months. Post-Trial Op. at 18; Reynolds Decl. ¶¶ 25–26. These placements include eight by ten foot "tiny sheds" and beds in a large, shared tent called A Bridge Home. Post-Trial Op. at 16-17. A Bridge Home is a congregate setting where veterans lack the privacy and security that an individual living unit affords—and that many veterans with mental health issues require. Reynolds Decl. ¶ *26.*

There is a "significant, urgent demand for temporary and permanent supportive housing on or near the WLA Campus to ensure veterans with disabilities can access their healthcare benefits." Post-Trial Op. at 83; *see also* Reynolds Decl. ¶ 14. Temporary supportive housing is specifically needed to "fill the gap between emergency programs … and permanent supportive housing." Post-Trial Op. at 113–14 (quoting trial testimony). VA has no intention to construct any temporary supportive housing if it were not for this Court's injunction. *Id*. at 100.

Since the very first hearing on injunctive relief, Plaintiffs and Federal Defendants have collaborated to identify and procure temporary supportive housing for unhoused veterans without disrupting operations on the WLA Grounds. *See* Minute Order Oct. 18, 2024, (Dkt. 375); Declaration of Roman Silberfeld ("Silberfeld Decl.") ¶¶ 2–5. This has involved identifying suitable sites for temporary supportive housing, as well as vendors and manufacturers who could timely provide housing at a reasonable cost. Silberfeld Decl. ¶¶ 3–4. Following an October 18, 2024, site visit, VA personnel and fifteen real estate experts concluded that sites 7 and Magenta B on the Campus had sufficient sewer, water, and electrical capacity to service these parcels, such that the placement of temporary housing thereon posed no insurmountable hurdles. Silberfeld Decl. ¶ 5.

As the Court found, "with fall and winter approaching and with thousands of homeless veterans still living on the streets of southern California," the need for temporary housing on the WLA Grounds is an "emergency." Emergency Order No. 1 ( Dkt. 341), at 2; Emergency Order No. 2 (Dkt. 342), at 2. This Court has now entered three emergency orders as a result of the current circumstance on the WLA Grounds. *See* Dkt Nos. 341, 342, 403. Without the rapid provision of easily accessible, high-quality temporary housing, unhoused veterans will be forced to continue to negotiate the harsh conditions and trauma of street living; more veterans will develop debilitating mental health issues, addictions, or physical disease, or see those conditions exacerbated; and more veterans will die in the streets, which every year claim more lives. *See* Sherin Decl. ¶ 4. Less than a month ago, Chelsea Black, Acting Chief of the VA Greater Los Angeles Healthcare System's (VAGLAHS) Office of Strategic Facility & Master Planning, stated to this Court that VA was "going to find the funding [for temporary supportive housing]. We want to do this." Transcript of October 18, 2024 Hearing (Dkt. 371), at 42:12–13.

Federal Defendants filed the present Motion for Immediate Administrative Stay and Partial Stay Pending Appeal ("Motion") (Dkt. 394) on October 30, 2024. To provide ample time for the Federal Defendants to seek a stay from the Ninth Circuit, the Court denied only a portion of the Motion—the request for Immediate Administrative Stay—on November 7, 2024. Order Denying Federal Defendants' Motion for Immediate Administrative Stay and Issuing an Order to Show Cause (Dkt. 401). On November 8, 2024, Plaintiffs filed their Opposition to Federal Defendants' Motion (Dkt. 405). The Court allowed the Parties to file additional briefing by November 12, 2024, at noon. Plaintiffs filed a sur-reply on November 12, 2024 (Dkt. 415). Federal Defendants did not submit further briefing. The Court heard oral arguments on November 13, 2024.

## III.    LEGAL STANDARD

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). Rather, whether to enter a stay is "an exercise of judicial discretion" requiring the individualized application of a four-factor balancing to a given case. *Id.* The factors are: "(1)

whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770–71 (1987)).

"The party requesting a stay bears the burden of showing that the circumstances justify" the court's exercise of discretion. *Nken*, 556 U.S. at 434. The movant must make a "strong showing" that it is likely to succeed on the merits; a "mere 'possibility'" is not enough. *Id*. at 434–35; *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F3d 817, 824 (9th Cir. 2020) (same). Similarly, "showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Id*. (quoting and overruling *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)); *see also Winter v. NRDC*, 555 U.S. 7, 22 (2008) (requiring showing "that irreparable injury is likely"). If the moving party can satisfy the first two factors, the court then considers whether the stay will substantially injure another party and where the public interest lies. *Nken*, 556 U.S. at 435. A showing of harm to the moving party does not "command[] the conclusion that the public interest weighs entirely in favor of whichever outcome the government seeks." *Index Newspapers*, 977 F.3d at 838. Rather, courts "balance[] the public interest on the side of the plaintiffs against the public interest on the side of the government to determine where the public interest lies." *Id*.

## IV.  DISCUSSION

Federal Defendants argue that all four factors favor a stay. The Court disagrees and discusses each factor in turn.

### A.  Federal Defendants Are Unlikely to Succeed on the Merits

Federal Defendants argue that they should be granted a stay because they are likely to succeed on the merits of their appeal. Motion at 5. More specifically, they argue that the Court erred in issuing relief on Plaintiff's Rehabilitation Act Claims. *Id*. They give two reasons for this: (1) the Court lacked jurisdiction over Plaintiffs' Rehabilitation Act Claims, and (2) Plaintiffs' Rehabilitation Act Claims fail on the merits. *Id*. This Court previously granted leave to file an

Amicus Brief by Amici Curiae Legal Scholars on this specific issue.[4] This Court decided the jurisdictional issues presented by Federal Defendants in the Order Denying Defendants' Motion to Dismiss finding that the Court did have jurisdiction over the Rehabilitation Act claims ("Order Denying Defendant's Motion to Dismiss") (Dkt. 106). Finding the same here, the Court holds that Federal Defendants are not likely to succeed on their claims because the Veterans' Judicial Review Act ("VJRA") does not deprive this Court of jurisdiction over Plaintiff's claims, and this Court's merits analysis was not flawed.

### 1. The Court Has Jurisdiction Over the Rehabilitation Act Claims

The Veterans' Judicial Review Act of 1988 created a new Article I federal appellate court, the United States Court of Veterans Appeals, which reviews final decisions of the Board of Veterans' Appeals. 38 U.S.C. § 7251. The Board is the Secretary of Veterans Affairs' final decisional body for review of VA benefits determinations. 38 U.S.C. § 7104(a). The VJRA contains a statutory bar to judicial review of VA benefits decisions in Section 511 of the VJRA. 38 U.S.C. § 511.

### a. How should the VJRA be interpreted?

The Supreme Court has stated that Congress drafts legislation against a "strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr,* 533 U.S. 289, 298 (2001). And "[e]ven where the ultimate result is to limit judicial review the narrower construction of jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc. V. Way,* 393 F. 3d 886, 891 (9th Cir. 2004); *see also Wong v. United States,* 373 F.3d 952, 963 (9th Cir. 2004) (jurisdiction-stripping language should not be read "broadly" where it can be "subject to a 'much narrower' interpretation") *overruled on other grounds by Wilkie v. Robbins,* 551 U.S. 537 (2007). The Supreme Court has also stated that statutory review schemes, like the VJRA, have to be read against the presumption that "the point of special review provisions" is

---

[4] *See* Amicus Briefs by Legal Scholars and Swords to Plowshares (Dkt. 92 and 98).

generally "to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Axon Enter., Inc. V. FTC,* 598 U.S. 175, 186 (2023).

Reading the jurisdiction-stripping statute, VJRA, narrowly as directed by the Ninth Circuit and looking to its plain language, Section 511 withdraws Article III jurisdiction over a specific subset of claims: it prohibits federal district courts from (1) "review[ing] any decision of the Secretary as to (2) questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans." 38 U.S.C. § 511(a)(internal citations omitted). This language therefore prohibits review by the Court of decisions that the Secretary has actually made in the context of an individual veteran's VA benefits proceedings. *See Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald,* 830 F.3d 570, 575 (D.C. Cir. 2016); *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1023 (9th Cir. 2012) (en banc) ("*VCS*").

Defendants heavily rely on the *VCS* case. *See generally* 678 F.3d; Motion. In the *VCS* case, the Ninth Circuit surveyed what types of claims Article III courts have jurisdiction over, and which claims they did not. *Id.* at 1023. From this survey, the Ninth Circuit was able to extract "some consistent, largely undisputed conclusions as to what §511 does and [does not] preclude." *Id.* at 1023. To give some examples, the Ninth Circuit held that Section 511 precluded Article III courts from reviewing VA's interpretation of a regulation that affected the denial of a veteran's disability benefit, *Chinnock v. Turnage,* 995 F.2d 889, 893 n.2 (9th Cir. 1993), it prevented an Article III court from considering a veteran's state tort claims brought against a VA doctor, *Hicks v. Small,* 69 F.3d 967, 970 (9th Cir. 1995), but it did not preclude an Article III court from considering a veteran's Federal Tort Claims Act claim alleging negligence against VA doctors because that did not "possibly have any effect on the benefits he has already been awarded." *Littlejohn v. United States,* 321 F.3d 915, 921 (9th Cir. 2003). As the Plaintiffs' Opposition points out, *VCS* references a case called *Broudy* which provides a helpful standard for the determination that could be relevant to this case. *Id.* at 1025; Opp'n at 12. In *Broudy*, the D.C. Circuit held that an Article III court could consider plaintiffs' claims because they did not require the district court "to decide whether any of the veterans whose claims the Secretary rejected [we]re entitled to benefits." *Id.*

The Ninth Circuit further synthesized the cases from its survey, including *Broudy,* to conclude that Section 511 "precludes jurisdiction over a claim if it requires the district court to review VA decisions that relate to benefits decisions, including any decision made by the Secretary in the court of making benefits determinations." *Id.* at 1025 (internal citation and quotations omitted). Further, the Ninth Circuit stated that "[t]his preclusion extends not only to cases where adjudicating veterans' claims requires the district court to determine whether the VA acted properly in handling a veteran's request for benefits, but also to those decisions that may affect such cases." *Id.* (internal citations omitted). But as the Amicus Brief submitted to this Court underscores, "Section 511 does not capture 'all action or inaction by the VA.' It encompasses only those benefits Congress has already provided for veterans through the agency, not any possible action the VA may take outside the precisely-delineated benefit schemes Congress gave it the power to administer." *See* Br. Of *Amicus Curiae* Legal Scholars (Dkt. 98), at 4. Thus, Section 511 does not reach all claims that would have any possible effect on benefits a veteran has been awarded, rather Section 511 simply does not allow this Court to touch the agency's pre-existing, individualized determinations. *Broudy,* 460 F.3d at 112.

### b. How does the Ninth Circuit's interpretation of the VJRA apply in this case?

Whether this Court has jurisdiction depends on what decisions the Court made in the present case.

Plaintiffs' claims challenged the absence of Permanent Supportive Housing on and near the WLA Grounds, alleging that it constituted disability discrimination. Post-Trial Op. at 12-13. These claims were made under the Rehabilitation Act of 1973, 29 U.S.C. § 794, more specifically under Section 504 of the Rehabilitation Act based on 28 U.S.C. § 1343(a)(4) and 1346(a)(2). The Rehabilitation Act of 1973 is a federal law that protects the rights of people with disabilities and promotes equal opportunity in employment and access to programs and services. 29 U.S.C § § 791 and 794a. Section 504 specifically prohibits discrimination in programs and activities that receive federal financial assistance. 29 U.S.C. § 794. And Section 504 prohibits discrimination applied to service availability and accessibility. *Id.*

Here the Court found that the failure of VA to provide sufficient temporary and permanent supportive housing on or near the WLA Grounds solely because of Plaintiffs' disabilities denies Plaintiffs the reasonable accommodations they need to access their VA benefits. Post-Trial Op at 34. The Court also found that without permanent supportive housing, veterans would be denied access to programs, services, benefits, or opportunities to participate as a result of physical barriers, which falls squarely within the purview of Section 504 of the Rehabilitation Act. Post-Trial Op at 14.

The Court's decision in this case is not a decision concerning Plaintiffs' VA benefits determinations, nor does the decision affect any determination by VA in handling a veteran's request for benefits. Defendants have not pointed out a single previous individualized benefits determination made by VA that was questioned by this Court, or even how this Court's decision would affect a pre-existing benefits determination made by VA. This Court ordered VA to stop discriminatory practices that deny disabled veterans the reasonable accommodations they need to access the benefits VA already determined they are entitled to. The Court did not question VA's decisions as to that entitlement. The Court took VA's eligibility decisions as a given.

Additionally, the Court's decision cannot be construed as one questioning benefits determinations because Plaintiffs are not seeking benefits in this case. A benefit under VA is defined as "any payment, service, … or status, entitlement to which is determined under laws administered by the department of Veterans Affairs pertaining to veterans and their dependents and survivors." 38 C.F.R. Section 20.3(e). Permanent supportive housing is not a benefit under this definition because it is not provided under the laws determined by the department of Veterans Affairs. *See* Br. Of *Amicus Curiae* Swords to Plowshares (Dkt. 92), at 12 n.2. Comparable existing programs fall chiefly under the direction of the Department of Housing and Urban Development not VA. *Id.*

Also, Section 511 does not dictate that the VJRA's review process gives exclusive jurisdiction over all Rehabilitation Act Claims to VA. Although a Rehabilitation Act claim may in the most literal sense affect the provision of veterans' benefits, the Ninth Circuit's direction to use narrow construction and common-sense weighs against the Court reading Section 511 to give

VA exclusive jurisdiction over all Rehabilitation Act Claims. Plaintiffs' claims for reasonable accommodations were made under a law of general applicability. This law was passed by Congress to hold the federal government accountable for discrimination, and that is what this Court's decision does. But providing exclusive jurisdiction of Rehabilitation Act claims to the agency that is being accused of the discrimination and not an Article III court would render Congress' intentions meaningless. *See Sierra v. City of Hallandale Beach,* 904 F.3d 1343, 1351-52 (11th Cir. 2018) (jurisdiction stripping statute did not give the FCC exclusive jurisdiction over Rehabilitation Act because "the FCC has no expertise" on "what constitutes a violation under the Rehabilition Act"); *Floyd-Mayers v. Am. Cab Co.,* 732 F. Supp. 243, 247 (D.D.C. 1990) (deciding Article III courts are "better equipped to resolve disputes arising" under "federal . . . civil rights statutes," despite the agency's "greater expertise in its specialized field"). To find that the Court has jurisdiction over Plaintiffs' claims in this case makes practical sense. If the Court were to find that it did not have jurisdiction because the Scope of 511 was so broad as to encompass any claim affecting a benefits determination, it would mean that a disabled veteran who sues VA under the Rehabilitation Act seeking wheelchair-friendly ramps at the entryway to an agency medical facility would be seeking "review" of a past benefit determination, which would strip all Article III courts of jurisdiction over such a claim. *See* Br. Of *Amicus Curiae* Legal Scholars (Dkt. 98), at 5.

Congress also has never indicated that VA has expertise as to claims outside benefits determinations. In *Johnson v. Robinson,* 415 U.S. 361, 370 (1974), the Supreme Court recognized that the purpose of Section 511' precursor was for the VA to make "technical and complex" benefits decisions. *See also Axon,* 598 U.S. at 186 (stating that the goal of a different jurisdiction-stripping statute was to "give the agency a heightened role in the matters it customarily handles and can apply distinctive knowledge to"). But VA holds no expertise in the decision of Plaintiffs' Rehabilitation Claims. And if permanent supportive housing is not a benefit under the laws being determined by VA, then it cannot be within the agency's expertise. Rather, as the Rehabilitation Act is a generally applicable anti-discrimination statute that applies to "any program or activity

conducted by any Executive agency," the expertise lies with the Article III courts. 29 U.S.C. § 794(a).

In conclusion, Ninth Circuit precedent and basic principles of statutory interpretation give the Court jurisdiction over Plaintiff's Rehabilitation Act Claims.

### c.  What would the Defendants' reading of the VJRA mean for veterans?

If the Court were to take the Federal Defendants' extremely literal position—that this Court does not have jurisdiction as to any decision that is related to the provision of veterans' benefits whether or not the claim was actually presented to VA—it would conflict with Supreme Court precedent and create a jurisdictional void.

First, as to Supreme Court precedent, before Section 511 was codified, its precursor was Section 211. VCS, 678 F.3d at 1020. Section 211 was originally a jurisdiction-stripping statute, similar to Section 511, that was narrowed over time by the D.C. Circuit. Id. After this narrowing, Congress then reemphasized a clear intent that the exemption from judicial review was to be all inclusive and wrote that "the decision of the Administrator on any question of law or fact under any law administered by the Veterans' Administration" shall be unreviewable. Id.  The Supreme Court responded to this broadened scope of Section 211 and held that it was too expansive. Id. The Supreme Court explained that construing Section 211 to eliminate all federal court review of constitutional challenges to veterans' benefits legislation would raise serious questions concerning the constitutionality of Section 211. Id. at 1021. Thus, the Supreme Court concluded that the district court had jurisdiction to consider a direct factual challenge to statutes affecting veterans' benefits. Id. Defendants' argument that we should expand the scope of Section 511 from only decisions that the agency has considered and decided to any decision that is related to the provision of veterans' benefits would be broadening the scope of Section 511 to a breadth analogous to the scope of Section 211 that the Supreme Court rejected.

Second, if this Court does not have jurisdiction, then Plaintiffs have nowhere to bring Rehabilitation Act claims. This is because even if it is true that the VJRA strips this Court of jurisdiction, this does not mean that Plaintiffs could bring their claims to the Article I courts under the VJRA. Plaintiffs cannot bring their Rehabilitation Act claims through the VJRA's multi-

layered system for adjudicating benefit awards. See generally 38 U.S.C. § 7104, 7251, 7261 (establishing only a limited framework for adjudication of veterans benefit claims). Under the VJRA, veterans first must file individual claims for benefits at a VA regional office ("VARO"). 38 C.F.R. § 20.3(a). Then, they can challenge these determinations through the VJRA's special statutory review scheme. Id. A claim is any "written or electronic communication requesting a determination of entitlement…to a specific benefit under the laws administered by the VA." 38 C.F.R. § 3.1(p). Most importantly, VA regulations allow the agency's processing offices to consider veterans' claims for benefits only "under the laws administered" by the VA. 38 C.F.R. Section 3.1(p). The Rehabilitation Act is not a law that creates benefits for veterans, so Plaintiffs' claims could not be presented as claims for benefits. This is further demonstrated by the fact that VA forms do not allow veterans to present Rehabilition Act "claims." 38 C.F.R. Section 3.1(p). And without being able to present a claim to a VARO, a veteran cannot access the higher levels of VJRA's review system, like the Court of Veterans Appeals and the Federal Circuit, because those courts' review is "premised on" the agency making a decision. Ledford v. West, 136 F.3d 776, 779 (Fed. Cir. 1998).

Accordingly, if we were to take the position of Federal Defendants, this Court would be creating a jurisdictional void—Plaintiffs could not bring their claims in an Article III Court or Article I Courts under the VJRA. The VA could therefore discriminate against veterans with disabilities and hide from accountability. Because "Congress rarely allow claims about agency action to escape effect judicial review," this lack of an alternative forum confirms that this Court has jurisdiction notwithstanding Section 511. Axon, 598 U.S. at 186; see VCS, 678 F.3d at 1034-35.

### 2.    Relief Was Proper under the Rehabilitation Act

Federal Defendants argue that they are likely to succeed on the merits by showing that the Court erred in its merits analysis of Plaintiffs' Rehabilitation Act claims. Motion at 9. They state that as to Plaintiffs' integration claims, the trial record does not support the Court's determination that an inability to reside in supportive housing on the WLA Campus places these unhoused veterans at risk of institutionalization. Id. Second, Federal Defendants claim that the Court's

findings are insufficient to support the relief that was ordered under Plaintiffs' meaningful access claim. *Id.* at 10. Lastly, Federal Defendants claim that the Court's proposed modification of building permanent supportive housing "fundamentally alter[s]" the nature of VA's programs and activities. *Id.* at 11. Each of these arguments will be discussed in turn.

First, as to the integration claims, Section 504 of the Rehabilitation Act requires that programs be administered in the most integrated setting possible. 28 CFR Section 35.130(d)(1998). Defendants claim there is not enough evidence in the record to support this Court's conclusion that Plaintiffs are at a serious risk of institutionalization without permanent supportive housing or that VA placed them at such a serious risk. Motion at 9. Defendants try to frame this entire lawsuit as one about veterans' living preferences rather than the necessity of veteran housing. It became apparent throughout trial that without housing on the West LA Campus, receiving the benefits that veterans have been given by VA was impossible. Testimony showed that without such housing, "[m]any homeless veterans" with disabilities accept institutionalization—including in "emergency departments, psychiatric institutions, and jails"— as their only means to "receive healthcare" and "mental healthcare services." *Id*. at 47. In other words, veterans "[w]ithout permanent supportive housing" are left with an ultimatum: either "accept institutionalization or go without [necessary] services." *Id*. That evidence plainly demonstrates a "serious risk" of institutionalization. *See V.L. v. Wagner,* 669 F. Supp. 2d 1106, 1120 (N.D. Cal. 2009) (finding that, without certain governmental program, elderly plaintiffs with certain mental disabilities were at "serious risk" of institutionalization because there was no feasible "alternative" for a "large portion of the class" to have healthcare needs met).

Second, Federal Defendants claim that the Court's findings are similarly insufficient to support the relief it ordered under Plaintiff's meaningful access claims. This Court found that Plaintiffs cannot meaningfully access their health benefits and are placed at risk of institutionalization without supportive housing at or near the Grounds. Post-Trial Op. at 33. But Federal Defendants state that just because it makes life easier for the veterans to access the facilities, that does not mean that they lack meaningful access. Motion at 10. The Court

wholeheartedly disagrees that this call for housing is merely about just "making veteran's lives easier."

The record before this Court established that, as stated above, if there is no permanent supportive housing on the West VA LA campus, many veterans have no access whatsoever to healthcare and mental health services. The best evidence to demonstrate this point is that when there was no housing available on the Grounds in the years following the 2016 Master Plan, unhoused veterans were forced to fend for themselves. Thus, beginning in May 2020, unhoused veterans who VA turned away from the West LA Campus's residential program created "Veterans Row," a collection of tents on San Vicente Boulevard right outside the West LA VA. Post-Trial Op. at 11. At this time, veteran homelessness in Los Angeles was increasing. *Id.* Because of the horrendous conditions on Veterans Row, advocates called for help which led to the creation of temporary shelter within the grounds through the Community Treatment and Reintegration Services (CTRS) program. *Id.* CTRS started as tents on the West Los Angeles campus, which were later replaced by "tiny sheds." *Id.*

The record demonstrates that when there was no housing available on the campus, veterans chose to live on the streets outside of the West LA Campus for many reasons. The first is that the medical care is of better quality at the West LA Campus. *Id.* at 14. And some of the services offered there are not offered at any other accessible sites for some Plaintiffs. *Id.* This is why Dr. Braverman, the Director of the VA Greater Los Angeles Healthcare System, stated that when clinics do not have the capacity to treat a veteran at their facility—if for example, the veteran needs specialty care that the clinic is not set up to provide—that veteran will likely be referred and transferred to the West LA Campus for more specialized treatment. *Id.*

If veterans could have obtained services elsewhere or lived in homes and still accessed the WLA Campus services, they would have. This point was made exceptionally clear by the fact that veterans who were in wheelchairs and walkers were getting on their hands and knees to crawl into their tents to sleep at night while living on Veterans Row just outside the gates of the VA Campus. *Id.* at 16. As Plaintiff Laurianne Wright stated, the Campus "was the only medical place I knew to go to" when she left the service and started drinking alcohol. Trial Transcript. Aug. 23,

2024 (Dkt. 271), at 189. She used the WLA Campus primarily for the women's clinic and gynecological services and at one point was homeless living outside the Campus. *Id.* When Wright was asked after being hospitalized at VA where she should go, she chose to live in Tent City because "she felt comfortable. I know the vets. I knew I would be okay, as long as I was on the VA property, I would be okay." *Id.* She had previously been sexually assaulted in the military and had some traumatic experiences on the street, but once she was on the WLA Campus she knew she was safe "[b]ecause any time I could reach out and somebody would be there for [her]." *Id.*

Laurianne Wright further testified that she cannot access her healthcare on the Campus while living in housing off-campus because "the hours-long journey" would be "excruciating" for her disabilities, causing her to forgo care altogether. Post-Trial Op. at 6-7. She also testified that the care she needs for all her conditions was located on the West LA Campus. *Id.* This testimony directly conflicts with Federal Defendants assertion that there are a range of other benefits besides supportive housing that could provide veterans with meaningful access to healthcare, because the unfortunate reality is that for many veterans permanent supportive housing is the only option. *Id.* at 44 (concluding, based on testimony, that "[t]he stress associated with traveling to the [Campus] for treatment and therapy is often an insurmountable barrier for veterans suffering from [serious mental illness][,] . . . [traumatic brain injury], co-occurring mental illness, and substance abuse").

Additionally, the declaration of Dr. Johnathan Sherin sheds light on why the Court's merits analysis was sound. *See generally* Sherin Decl. Dr. Sherin was formerly the head of mental health for Los Angeles County, oversaw all mental health programs on the West Los Angeles VA Campus, and the mental health services for the Miami VA Healthcare system. *Id.* ¶ 1. In fact, Dr. Sherin was the primary consultant working alongside VA Secretary Robert McDonald and his team to develop the 2016 Master Plan as part of the settlement in *Valentini*. *Id.* Dr. Sherin states that without the urgent implementation of easily accessible, high quality temporary housing that is occupied with immediacy through relentless outreach and engagement and serviced with intensive case management and care coordination, more Veterans will face the harsh conditions

and trauma of street living (which will predictably worsen in the coming winter months), more Veterans will develop mental health issues, addictions and physical disease, and more Veterans will die in the streets which have been claiming more lives each year. *Id*. ¶ 4. The Court agrees with Dr. Sherin's assertion that the long-standing emergency of veteran homelessness will never be eradicated if it is based on the premise that Veterans must find their own way to housing. *Id*. ¶ 8. And the Defendants' Motion is another example of VA, again, trying to shift the responsibility of recovery and reacclimating after military service to veterans who already are disadvantaged by living on the streets.

Federal Defendants claim that Plaintiffs' proposed modification of requiring the development of new permanent supportive housing units would "fundamentally alter" the nature of VA's programs and activities. Motion at 11. Defendants may be excused from liability under Plaintiffs' *Olmstead* claim if compliance would cause undue financial or administrative burdens or would fundamentally alter the program or service at issue. *Sch. Bd. Of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987). After considering Federal Defendants' position, the Court held that providing permanent supporting housing is not a fundamental alteration of the VA's programs. Post-Trial Op. at 22. This is because the Defendants "already administer" housing on or near the campus, so simply "[i]ncreasing the amount, speed, and quality of the Permanent Supportive Housing" does not impose an unreasonable burden on them. *Id*.

Defendants further claim that spending "massive resources" to develop temporary and permanent supportive housing would require the VA "to shift its finite resources away from existing community-wide efforts" to help homeless veterans. Motion at 11. But the approximately $15 million it would cost Federal Defendants to develop the first 100 temporary units amounts to only a small fraction of VA's $407 billion annual budget for 2024. Post-Trial Op. at 22; Silberfeld Decl. ¶ 10. And any costs to develop permanent supportive housing are more than reasonable "as these costs will be spread out over [a] six-year timeline." *Id*. Additionally, Federal Defendants' argument that permanent supportive housing will cause veterans to become more segregated from their communities is ill-founded. *See* Motion at 11-12. As the Federal Defendants well know, one of the goals of permanent supportive housing is to

create "connective tissue" for veterans—such as parks, "places to gather," job training opportunities, and recreational activities. Post-Trial Op. at 62. Indeed, "[m]any veterans want to live in a community with other veterans on the [Campus]": they feel they finally would be integrated in a community. *Id*. Where the alternative is the streets, the unsupported assertion is misguided.

Finally, Federal Defendants assert that they would incur other "immense burdens" in providing permanent supportive housing, such as "increasing . . . infrastructure on Campus" or "preparing a new environmental impact statement." Motion at 12. But Federal Defendants recently "invested over $100 million to upgrade and expand the . . . Campus's infrastructure." Post-Trial Op. at 49. And critically, as this Court found, most of the sites contemplated for additional permanent supportive housing would benefit from that upgrade. *Id.; see also id.* at 22 ("As to permanent housing, the Court finds that ample infrastructure exists on campus or could be developed in the six-year timeline requested by Plaintiffs."). In addition, Federal Defendants previously conducted an environmental report. *Id.* And that report "already demonstrated that at least 1,622 [housing] units can be constructed on campus." *Id.* And less than a month ago, Chelsea Black, Acting Chief of the VA Greater Los Angeles Health Care System's Office of Strategic Facility & Master Planning, stated to this Court that VA was "going to find the funding [for temporary supportive housing]. We want to do this." October 18, 2024 Transcript (Dkt. 371), at 42:121-13. In short, Federal Defendants' "burdens" are without evidence, and Plaintiffs proposed modification—requiring the VA to develop permanent supporting housing on Campus—is more than reasonable.

In conclusion, this Court not only has jurisdiction to decide Plaintiff's Rehabilitation Act claims, but the Court also properly granted relief on these claims. Thus, Federal Defendants are not likely to succeed on the merits of those claims on appeal.

### 3. Relief Was Proper on Plaintiffs' Land-Use Claims

Federal Defendants argue they are likely to prevail in their appeal on Plaintiffs' land-use claims. First, they contend that the finding of an enforceable trust was erroneous. Second, without disputing the Court's determination that the third-party leases on the Campus were unlawful, they

claim that the relief the Court has granted on the land-use claims is improper. The Court is
unpersuaded by Federal Defendants' arguments which have largely been brought and rejected
previously. *See* Post-Trial Op. at 47-71.

### a. An Enforceable Charitable Trust Was Properly Found

The Court granted partial summary judgment to Plaintiffs on their charitable trust claims.
Order on Motion for Summary Judgment (Dkt. 218), at 26. Specifically, the Court found that the
1888 Deed of the land that the West LA VA Grounds sits on was donated to the Government for
the benefit of disabled veterans and created a charitable trust. *Id*. The land was given "in
consideration" that the Government "should locate, establish, construct, and permanently
maintain a branch of said National Home for Disabled Volunteer Soldiers . . . ." 1888 Deed ¶ 3.
The 1866 Act, in turn, authorized the Government to accept the gift, and pursuant to that
authority, the Government did accept the gift. *See* 24 U.S.C. § 111, 14 Stat. 10 (1866). Relying
on the language of the 1888 Deed and the 1866 Act, the Court found that the government became
the trustee, and the disabled veterans became the beneficiaries of the trust. Order on Motion for
Summary Judgment at 26.

The Court then found that the Government assumed an enforceable fiduciary duty based
on the language and duties enshrined in the West Los Angeles Leasing Act of 2016 and the West
Los Angeles VA Campus Improvement Act of 2021. Order on Motion for Summary Judgment
at 27-28. The obligations to review, audit, and evaluate management of leases or land use on the
Campus to ensure benefits for veterans, as codified in the Leasing Act and its amendments,
evidence the Government's acceptance of the corresponding fiduciary duties. *Id*. at 28.

Now, the Government argues that Plaintiffs as private citizens lack standing to enforce
such a charitable trust. Motion at 13. While it is true that Attorneys General are the traditional
enforcers of charitable trusts, the Government acknowledges that Courts have recognized
exceptions to that norm. The Government argues that the class of beneficiaries here is not small
enough to qualify as a "special interest" exception. Motion at 13 (citing *He Depu v. Yahoo! Inc.*,
306 F. Supp. 3d 181, 185 (D.D.C. 2018)). However, the case the Government cites, while not
controlling authority, was reversed and the Court of Appeals for the District of Columbia Circuit

clarified that the class of beneficiaries need not be small but rather must be "sharply defined" and "limited in number" to have standing. *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 906 (D.C. Cir. 2020). In that case, the Court of Appeals found that people from China who have been imprisoned for expressing their views online could qualify as such a class even though there might be over a thousand people in the class and the number might grow. *Id*. at 906-908. The "essence of a 'special interest' in a charitable trust is a particularized interest distinct from that of members of the general public." *Id*. at 907 (quoting *Hooker v. Edes Home*, 579 A.2d 608, 613 (D.C. 1990)). Here, the class of beneficiaries might be large in number but is sharply defined based on veteran status and disability status. As such, the class is necessarily limited in number and has a distinct interest in the charitable trust protecting the Campus. The class of disabled veterans enforcing the trust here stands to benefit from the trust in ways that the general public could not. Accordingly, Plaintiffs are the intended beneficiaries of the trust and thus have standing. *See* Post-Trial Op. at 28.

Federal Defendants also briefly attempt to argue that Plaintiffs do not have Article III standing to enforce the trust because their injury is not concrete or particularized. To support this argument, Federal Defendants cite a case with distinct facts in which a *donor* did not have standing to challenge the use of property he had already donated. Motion at 13-14 (quoting *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1059 (9th Cir. 2022) (Bress. J., concurring in part and in the judgment). The Government fails to identify relevant controlling authority to persuade the Court to depart from its past decisions on this issue—namely, that Plaintiffs do have a special interest in the charitable trust that is concrete and distinct from the public's generalized interest.

Even if Plaintiffs have standing to enforce the trust, Federal Defendants still argue that the 1888 Deed did not create a charitable trust and that any such trust could not be enforceable against the Government absent explicit assumption of the trust duties. Motion at 14. These arguments were rejected at the summary judgment stage.

This Court and the court in *Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012*)("Valentini"),* found a charitable trust. "In order to create a charitable trust, there must be

an intention to convey the property for a charitable purpose." Order on Summary Judgment at 15 (Dkt. 218). The 1888 Deed granted the land to the Government on the condition that it "established, constructed, and permanently maintained" housing for disabled veterans. 1888 Deed (Dkt. 37-3). The 1888 Deed "expresse[d] far more than a hope" that the Government will use the land to house disabled veterans; it granted the Government the land "[only] on the condition" that it will do so "for all time." *Valentini*, 860 F. Supp. 2d at 1104. That restrictive language demonstrated the explicit intention to create a charitable trust.

Moreover, as this Court held in its summary judgment order, the West Los Angeles Leasing Act imposes fiduciary duties on the Government that make the trust enforceable. Order on Summary Judgment at 27-28. The Act explicitly regulates the Government's leases with third parties on the Campus, requiring the Government to review and evaluate the leases to ensure that they "principally benefit veterans and their families," among other requirements. WLALA §2(a) (listing other requirements); *see also* WLALA § 2(c) (prohibiting any "land-sharing agreement[s]" unless it "benefits veterans and their families"); WLALA § 2(j) (requiring the Government to prepare annual report describing the leases on the Campus in part to ensure compliance). As this Court previously stated, "the[se] statutory obligations [under the Act] mirror the types of fiduciary duties that trustees traditionally assume." Post-Trial Op. at 17. VA recognized this itself. In the 2016 "Draft Master Plan" for the Campus, the VA Secretary admitted the "land was deeded for the benefit of Veterans in 1888 to serve as a home for our nation's heroes," and that the land's "intended purpose" was to serve those veterans. Post-Trial Opinion at 43. The Executive Summary of the 2016 Draft Master Plan stated that the "intended purpose" of the Campus is to create a "home" and "vibrant community" that "includes the development of high quality housing tailored to priority Veteran subpopulations with robust support [services]." 2016 Draft Master Plan (Dkt. 193-53), at 7. Thus, through the WLALA, the Government unambiguously assumed fiduciary duties with respect to the charitable trust that VA has continued to recognize.

### b.  The Scope of Relief Was Proper

Federal Defendants next argue that even if the Court's conclusions on the merits of the land-use claims were correct, the Court still erred in forbidding VA from renegotiating its agreements with the leaseholders, Brentwood School, Bridgeland Resources, Safety Park, and UCLA. Federal Defendants argue that such an injunction was unnecessary. Motion at 15. They state that "Plaintiffs' injuries would be completely remedied by an order holding the agreements invalid, leaving VA free to negotiate new, more beneficial agreements." *Id*. But this contention entirely misses the point of the Court's Post-Trial Opinion, arrived at after a lengthy trial on these issues. Plaintiffs here brought their claims *after* the *Valentini* litigation left VA to do precisely what Federal Defendants advocate for now. This Court, observing VA's failures in the past, declined to allow those failures to be repeated and compounded. *See* Post-Trial Op. at 52 (finding that Congress enacted the Leasing Act specifically "to refocus the VA's efforts in West LA on veterans in need of services[,] particularly those who are homeless," because the "VA's [negotiated] land deals . . . were . . . 'misuses' of the land"); *id*. at 53 (finding that even after the VA's Office of Inspector General concluded that the leases "were noncompliant with federal law, the VA continued to allow leaseholders to occupy the land [unlawfully] and exercise renewal options"). It is within this Court's power to ensure that VA follows the law when entering land use agreements with third parties on the Campus. Overseeing any new agreements is the only way for the Court to prevent further injury to Plaintiffs.

Federal Defendants also argue that the Court's injunction against renegotiating leases has been "undercut" by the Court's later orders related to the Brentwood School's settlement, the SafetyPark operations, and an interim agreement with UCLA. Motion at 15-16. The Court's orders, however, are in line with the Post-Trial Opinion. The orders do not allow VA to unilaterally renegotiate land use agreements; they ensure VA complies with its fiduciary duties under the WLALA and advance temporary agreements until permanent and lawful agreements can be reached. *See* Dkt. 357 ("order[ing] [the VA] . . . to negotiate with and enter into an enhanced use/facilities sharing agreement/lease with Brentwood School," but requiring the terms to be "approved by the Court . . . with the input of Plaintiffs and the Class"); Dkt. 310 (as it relates

to Safety Park, merely ordering at this time the VA "[to] commence a re-compete process for the operation of the parking lots"); Dkt. 386 (outlining certain requirements for a "temporary lease" until a "holistic and long-lasting solution" can be reached). Requiring VA to comply with its duties under the law is not "usurp[ing]" VA's powers. Motion at 16.

Moreover, the temporary agreements put forth by Plaintiffs, Brentwood School, and UCLA are interim measures for no more than a one-year term and are necessary to ensure revenue for VA and benefits to veterans while preventing waste and degradation of facilities that would otherwise be abandoned absent agreements. While extensive hearings are held on housing plans, such short-term agreements provide benefits without locking up land in long-term leases, as VA has done in the past, that prevent the land from being used for housing.[5] This "exit strategy" breaks the cycle of VA entering unlawful, long-term leases that then make substantial amounts of Campus' land unavailable for veteran housing. Post-Trial Op. at 53, 72.

**B. Federal Defendants Fail to Establish Irreparable Harm Absent a Stay**

Federal Defendants argue that the Court's housing orders and lease-related injunction inflict irreparable harm on VA. First, Federal Defendants assert that they cannot afford the housing for veterans—not even the 100 emergency temporary housing units—the Court has ordered they provide. Federal Defendants' housing arguments misunderstand the Court's orders, rely on highly speculative costs, and fail to set forth facts that support irreparable harm, particularly in comparison to the life-threatening harms Plaintiffs face on the streets.

Federal Defendants fail to recognize that the Court's Final Judgment incorporated the following language: "As to both temporary and permanent supportive housing units, the Court retains jurisdiction to adjust the number of units in each category in order to closely approximate the actual need for housing." Post-Trial Opinion and Findings of Fact and Conclusions of Law ¶ 251(h); Final Judgment and Permanent Injunction at 4. Thus, the "tens of millions more" that

---

[5] "The VA argues they are out of space, and that the lack of available acreage precludes any increase to the 1,200 units they have promised to open on the West LA campus by 2030. They contend that any injunctive relief by the Court would burden the VA financially and deprive them of the flexibility they need to solve the complex issue of veteran homelessness. The problem, however, is one of the VA's own making." Post-Trial Opinion at 1.

Federal Defendants argue VA will have to pay for 650 more units of temporary housing by April 2026, is highly speculative and premature. Motion at 17. It is possible that 750 units of temporary housing will not be needed and may not be ordered by the Court. Moreover, the "$30 million" that Federal Defendants cite to complete and operate the 100 emergency temporary housing units is speculative. Motion at 17. These costs are provided without any explanation. Kuhn Decl. ¶ 7. Plaintiffs calculate that the cost for 100 units would instead be $15 million. Silberfeld Decl. ¶ 10.

Even if the costs cited by Federal Defendants are accurate, the costs are not unreasonable "in light of the VA's overall annual budget of approximately $407 billion." Post-Trial Opinion at 37. Federal Defendants insist that VA has a "$12 billion shortfall in its operating budget for Fiscal Year 2025." Motion at 18. With respect for the demands that the VA faces, the Court is hesitant to accept that allocating $30 million for temporary housing units would be impossible or require diversion of funds that would hurt veterans more than continued homelessness hurts them.[6]

Critically, the only irreparable harm that Federal Defendants allege is monetary harm, which is insufficient. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended are not enough." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (internal quotation marks and citations omitted) ("[D]iversion of the [government] agencies' time, resources, and personnel from other pressing immigration adjudication and enforcement priorities due to the need to ask additional questions and possibly review documentary evidence at bond hearings was minimal evidence of harm to the government."). Moreover, Federal Defendants frame the expenses on housing as money that will be wasted. That is not the case. The temporary housing and the upgraded infrastructure associated with the housing will continue

---

[6] VA recently clarified its finances to Congress and walked back its prior representation of a $12 billion shortfall. In an October 28, 2024 Briefing Paper to Congress, VA reported that the Veterans Benefits Administration carried over approximately $5.1 billion unspent from FY 2024 to FY 2025 and the Veterans Health Administration finished FY 2024 with unspent, carryover funds of "approximately what [VA] anticipated in the FY 2025 budget" rather than lower reserves previously reported. Department of Veterans Affairs, *Update on FY 2024 VBA Mandatory Funding budget execution and VHA budget execution*, October 28, 2024. This recent correction by VA calls into question the accuracy of reported deficits.

to provide benefits to veterans, no matter what happens on appeal. VA has already committed to providing significantly more housing in its 2022 Master Plan. Post-Trial Opinion at 9. The issue is not *if* VA resources will be expended on housing but *when*. VA has repeatedly failed to meet its own housing deadlines and deadlines agreed to in the *Valentini* Settlement.[7] Given these obligations and the VA's own failure to satisfy them, Federal Defendants' claim that VA will suffer irreparably if it must finally comply is unpersuasive.

Second, Federal Defendants assert that they face irreparable harm because the Court made inconsistent orders—mandating the Government not to renegotiate or enter into any new third-party leases but also requiring the Government to accept a negotiated settlement agreement with the Brentwood School. The Government frames these requirements as at odds with each other. They are not. The settlement agreement with the Brentwood School, which the Court preliminarily approved on October 18, 2024, is not inconsistent with the Court's injunction on leases. *See* Minutes of Hearing Re Injunctive Relief (Dkt. 374); *see also* Approved Plaintiffs' Motion for Preliminary Approval of Class Settlement as to Non-Party Brentwood School (Dkt. 376). As discussed, the settlement is part of the "exit strategy" contemplated by the Post-Trial Opinion. Post-Trial Op. at 53, 72. It is an interim agreement to ensure a partial status quo while the Parties continue to consider housing location options and if longer-term leases would be compatible with VA's housing obligations and the WLALA.

---

[7] The Court's Post-Trial Opinion explained: After a period for public comment, the VA created the 2016 Draft Master Plan. The plan "confirm[ed the VA's] intent to create a 21st Century campus" that would support "LA's Veteran community in the broadest sense[.]" ("2016 Draft Plan") (Trial Ex. 154) at 8. The Government "believe[d] it [was] reasonable to include" in the framework "approximately 1,200 units of permanent housing on the" West LA VA Grounds. *Id*. at 5. Seven hundred and seventy of these units were supposed to be complete by 2022. Id. In 2021, however, the VA Office of Inspector General ("OIG") reported that the VA had not constructed a single new unit of Permanent Supportive Housing pursuant to the settlement agreement. The OIG reported that the "VA envisions all phases of construction will be completed in the next 17 years." *See* 2021 OIG Report at 17. In April 2022, the VA released an updated Master Plan ("2022 Master Plan") (Trial Ex. 1), which finalized their plan for building housing on the Grounds.
Post-Trial Opinion at 8-9.

Federal Defendants, nevertheless, argue they suffer irreparable harm because VA is prevented from "negotiating for additional funds and services." Motion at 19. This is false. As the Court has made clear in numerous hearings, VA has been and is welcome to be an active participant in any potential agreements. VA simply may not unilaterally enter into land use agreements without Court approval at this time. It is ironic that VA now complains of not being able to obtain greater funds and services from third-party leaseholders after the Court invalidated leases VA entered into that were grossly below market value and did not comply with the WLALA. *See* Post-Trial Op. at 55 (discussing Brentwood School's agreement to use 22 acres of Campus land for $850,000 annually and in-kind services); *see also* Post-Trial Op. at 65 (discussing UCLA's agreement to use ten acres of Campus land for annual rent of $300,000 and in-kind services and UCLA's agreement prior to the *Valentini* litigation to pay only $56,000 in annual rent). The settlement with Brentwood School now before the Court would provide substantially more funding and services to VA than the agreement that VA had previously negotiated. Settlement Agreement with Brentwood School (Dkt. 363-2) (outlining an interim, one-year agreement with Brentwood School to include a $3 million cash payment to the VA Lease Revenue Fund within 60 days of final court approval, another $2 million cash payment within 365 days of final court approval, annual rent of $1 million, in-kind services worth of up to $1.5 million, and substantially expanded hours and access to Brentwood athletic facilities for veterans). The interim agreement with UCLA also provides VA with $600,000 in revenue for UCLA's use until July 2025, which is double what UCLA paid in rent for an entire year under its invalidated lease. Order Granting Interim Access to UCLA Baseball Facilities (Dkt. 386). Thus, the Court's orders redress VA's past mismanagement of land use agreements and ensure fair compensation for use of VA grounds on a short-term basis until housing plans are finalized.[8] VA is hardly being denied additional funds and services.

---

[8] VA's mismanagement of third-party leases included corruption. As discussed in the Post-Trial Opinion: "The scheme, which lasted for almost fifteen years and cost the government nearly $13 million in lost revenues, resulted in both the parking lot's manager and the high-up VA official pleading guilty to federal criminal charges. Both were sentenced to substantial prison terms." Post-Trial Op. at 52.

In sum, Federal Defendants fail to show they will suffer irreparable harm absent a stay pending appeal.

### C. Plaintiffs Will Suffer Irreparable Harm from Further Delays and the Public Interest Weighs Against a Stay

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. While Federal Defendants have not satisfied the first two factors, likelihood of success on the merits and irreparable harm, the Court still discusses the remaining two factors together.

Federal Defendants argue that Plaintiffs will suffer *no* harm from a stay of this Court's orders and assert that the "current supply of housing exceeds demand." Motion at 19. This Court has repeatedly found otherwise. Plaintiffs will suffer severe and irreparable harm if action is further delayed by a stay pending appeal.

Homelessness is deadly, and for those who survive, has devastating repercussions including exacerbation of existing disabilities and health conditions, and exposure to violence and other victimization. Post-Trial Op. at 88–89; Declaration of Robert Reynolds ("Reynolds Decl.") ¶¶ 22–23; Sherin Decl. ¶¶ 4–5 ("environmental exposure is life-threatening and has severe, long-lasting impacts on [homeless veterans'] physical, mental and spiritual health and wellbeing."). As Dr. Sherin, the former head of mental health programs at the West LA VA Campus, testified: "Irreparable harm is being caused to our Veterans in the streets every day of every year, and there is an inexcusably inadequate urgency, nay emergency, in taking care of their wellbeing as top priority, full stop." Sherin Decl. ¶ 7. The Court previously found the same: "Without temporary supportive housing, countless veterans may die on the streets or in shelters while waiting for permanent housing to be built." Post-Trial Op. at 40. The need for temporary supportive housing is even more urgent with the onset of winter. More homeless individuals die and develop serious illnesses in the winter months than at other times of the year due to harsh weather conditions. Sherin Decl. ¶ 6; Declaration of Benjamin Henwood ¶ 2; Reynolds Decl. ¶

24. The Court's recognition of these risks is the basis for its emergency orders. *See* Emergency Order Nos. 1 and 2 (Dkt. 341, 342).

For years, the Federal Defendants have failed to construct adequate housing for veterans on the Campus. *See* Post-Trial Opinion at 85 ("In 2021, . . . the VA OIG reported that, despite plans to construct 770 permanent supportive housing units on the WLA Grounds by 2022, the VA had only constructed 55 units of permanent supportive housing."). Due to the Federal Defendants' long inaction, Plaintiffs and other veterans have already suffered irreparable harm, including being denied access to the community-based VA healthcare and mental care for which they are eligible, experiencing exacerbation of existing disabilities and health conditions, and in some cases dying just streets away from the Campus. *Id*. at 88 (describing these "devastating consequences" from the Federal Defendants' inaction).

Looking to the experience of a veteran himself, the Declaration of Robert Reynolds further demonstrates the irreparable harm Plaintiffs continue to suffer. *See generally* Reynolds Decl. Reynolds receives PTSD treatment at the WLA Campus. *Id.* ¶ 3. When he first arrived at the Campus, he was turned away from an emergency bed because of his service dog. *Id*. ¶ 10. Having nowhere else to go, he began living on Veterans Row where he met dozens of other veterans who were seeking treatment and housing on the WLA grounds. *Id.* ¶ 11. He states, "I met hundreds of homeless and disabled veterans who sought treatment or housing on the West LA Grounds, and many were turned away by the VA due to a lack of temporary shelter and permanent housing." *Id.* ¶ 13. He also states that he is currently contacted by veterans on a weekly basis asking to get into permanent housing on the WLA Grounds. *Id.* ¶ 17. For many veterans with disabilities, it is extremely difficult to access medical care at the West LA VA Medical Center without nearby supportive housing. *Id*. ¶ 20. Placement in apartments far from the Medical Center, in locations like Pomona (46 miles) or Lancaster (65 miles) often creates insurmountable barriers to accessing specialized care in West LA. *Id.* In Reynolds' experience, many disabled veterans who are placed in housing far from the WLA Medical Center fall back into homelessness because they are not accessing the treatment and supportive services they need. *Id.* In fact, he has known veterans who

have given up housing far away from the West LA Grounds because they had such difficulty accessing essential healthcare from a distance. *Id.*

As the Court found after trial, "[t]here is significant, urgent demand for temporary and permanent supportive housing on or near the WLA Campus to ensure veterans with disabilities can access their healthcare benefits." Post-Trial Op. at 82-83, ¶ 47. The current number of temporary units on or near the Campus "is not sufficient to address the number of homeless veterans within VAGLAHS catchment area." *Id.* at 87, ¶ 70. Federal Defendants have failed to present facts that contradict the extensive record at trial supporting the need for additional veteran housing.

Federal Defendants rely on the Declaration of Dr. John Kuhn to support their assertion that temporary housing is not needed. Motion at 19. Dr. Kuhn states that on a typical night there are 45 vacant temporary housing units on Campus and that VA plans to provide 32 new temporary beds this year. Kuhn Decl. ¶ 6. Dr. Kuhn, however, does not provide details on these vacant temporary units and the adequacy of such units is directly contradicted by advocates and homeless veterans on the ground. *See* Reynolds Decl. ¶ 25 ("There is no temporary housing on the WLA Grounds that is intended for veterans to live in until more permanent supportive housing units are constructed"). The temporary "units" that exist on campus are either eight-foot by ten-foot sheds or congregate shelter beds. *Id.* ¶ 25-26. These are not housing. They are transitional beds. The tiny sheds do not have a bathroom and are difficult for veterans in wheelchairs to navigate. *Id.*; Post-Trial Op. at 90 ("These tiny sheds were not adequate housing for many veterans with disabilities, and worsened some individuals' disabilities"). Some class members still live in the tiny sheds on Campus. Post-Trial Op. at 90. Moreover, the beds in congregate settings lack the privacy and security that veterans with mental health issues require. *Id.* The 32 new beds referenced by Dr. Kuhn will also be congregate setting beds and thus inadequate to meet the thousands of homeless veterans' needs as this Court already found. Some beds also remain vacant because VA lacks adequate outreach personnel to fill them, and the beds place burdensome restrictions on veterans. Reynolds Decl. ¶ 19. For these reasons, limited vacancies in the VA's current temporary beds are not an adequate indication of demand for *quality*

temporary housing for veterans to live in with dignity until permanent units become available. These are precisely the issues that Plaintiffs' litigation and the Court's post-trial orders aimed to resolve. The temporary housing units that the Court ordered VA to provide are accessible, private, modular units not tiny sheds or beds in a shared tent. Reynolds Decl. ¶ 27. The modular units Plaintiffs and VA decided on and were pursuing to meet the Court's emergency order are about 400 square feet. Transcript of October 28, 2024 Hearing (Dkt. 390), at 24.

Given the extreme harms that Plaintiffs and other veterans on the streets continue to face as they wait for the housing VA promised them, the Court declines to further prolong their suffering. Additionally, the public is harmed by VA's inaction because veterans living on the streets with severe disabilities and mental health diagnoses pose risks to public health and safety. The public interest strongly favors providing housing and accessible services to veterans who served their country, are on the streets due to their service-related disabilities, and were promised care by the Government. The public interest also favors prompt enforcement of the Government's duties, accountability, and compliance with the law, particularly when top VA officials have publicly flouted the law.[9] Allowing a stay now of the progress achieved after years of litigation would unnecessarily harm veterans and the public.

## V.     CONCLUSION

This Court holds Federal Defendants are unlikely to succeed on the merits of their appeal and have failed to show they will suffer irreparable harm absent a stay pending appeal. Even if Federal Defendants were likely to succeed or were materially harmed by the Court's orders, the prolonged suffering of Plaintiffs and the public's interest in housing veterans compel the Court to deny a stay. It is time to deliver on the promise to veterans and treat the West LA VA Campus as the "Soldiers Home" it was intended to be. Post-Trial Op. at 3. The West LA VA Campus was intended to be a beacon of hope for veterans returning home. Instead, the Campus has repeatedly

---

[9] On March 15, 2022, Robert McKenrick, with Dr. Braverman present, told CNN reporters: "The arrangement with the [Brentwood] school is non-compliant. I'm sure if we terminated the lease, they would take us to court." *'Disgusting to see': Veterans sue to get back land being used as sports facilities*, https://www.cnn.com/videos/us/2022/11/17/los-angeles-veterans-homeless-land-lawsuit-nick-watt-ebof-pkg-contd-vpx.cnn?cid=ios_app (video at 2:36) (Dkt. 368-Exhibit 1).

shut its gates to the veterans sleeping on its doorstep. This Court is concerned that permitting VA to proceed without judicial oversight would result in further inaction and noncompliance with the law to the detriment of veterans.

## VI.    DISPOSITION

For the foregoing reasons, the Court hereby **DENIES** Defendants' Motion for Partial Stay Pending Appeal.


DATED: November 13, 2024

_David O. Carter_

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE