**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY POWERS; DEAVIN SESSOM; LAURIEANN WRIGHT; JOSEPH FIELDS; LAVON JOHNSON; JOSHUA ROBERT PETITT; NATIONAL VETERANS FOUNDATION, | No. 24-6338 |
| | D.C. No. 2:22-cv-08357-DOC-KS |
| *Plaintiffs - Appellees*, | |
| | OPINION |
| BRIDGELAND RESOURCES, LLC, | |
| *Intervenor-Plaintiff - Appellee*, | |
| v. | |
| DENIS RICHARD MCDONOUGH; STEVEN BRAVERMAN; KEITH HARRIS; MARCIA L. FUDGE; DOUGLAS GUTHRIE, | |
| *Defendants - Appellees*, | |
| v. | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |

| | |
|---|---|
| *Not Party in Lower Court - Appellant.* | |

| | |
|---|---|
| JEFFREY POWERS; DEAVIN SESSOM; LAURIEANN WRIGHT; JOSEPH FIELDS; LAVON JOHNSON; JOSHUA ROBERT PETITT; NATIONAL VETERANS FOUNDATION, | No. 24-6576 |
| | D.C. No. 2:22-cv-08357-DOC-KS |
| *Plaintiffs - Appellees*, | OPINION |
| and | |
| SAMUEL CASTELLANOS, SHARDAY ANYADIEGWU, BILLY EDWARDS, JESSICA MILES, GLENN SURRETTE, NARYAN STIBBIE, DOES 1-10, | |
| *Plaintiffs*, | |
| BRIDGELAND RESOURCES, LLC, | |
| *Intervenor-Plaintiff - Appellee*, | |
| v. | |
| DENIS RICHARD MCDONOUGH; STEVEN BRAVERMAN; KEITH HARRIS; MARCIA L. FUDGE, | |

*Defendants - Appellants*,

and

DOUGLAS GUTHRIE,

*Defendant - Appellee*,

-----------------------------------------

BRENTWOOD SCHOOL,

*Intervenor*.

JEFFREY POWERS; DEAVIN SESSOM; LAURIEANN WRIGHT; JOSEPH FIELDS; LAVON JOHNSON; JOSHUA ROBERT PETITT; NATIONAL VETERANS FOUNDATION,

*Plaintiffs - Appellees*,

and

SAMUEL CASTELLANOS, SHARDAY ANYADIEGWU, BILLY EDWARDS, JESSICA MILES, GLENN SURRETTE, NARYAN STIBBIE, DOES 1-10,

No. 24-6578

D.C. No. 2:22-cv-08357-DOC-KS

OPINION

4                          POWERS V. MCDONOUGH

---

*Plaintiffs*,

BRIDGELAND RESOURCES, LLC,

*Intervenor-Plaintiff -*
*Appellant*,

  v.

DENIS RICHARD MCDONOUGH;
STEVEN BRAVERMAN; KEITH
HARRIS; MARCIA L. FUDGE;
DOUGLAS GUTHRIE,

          *Defendants - Appellees.*

---

JEFFREY POWERS; DEAVIN
SESSOM; LAURIEANN WRIGHT;
JOSEPH FIELDS; LAVON
JOHNSON; JOSHUA ROBERT
PETITT; NATIONAL VETERANS
FOUNDATION,

          *Plaintiffs - Appellees*,

and

SAMUEL CASTELLANOS,
SHARDAY ANYADIEGWU, BILLY
EDWARDS, JESSICA MILES,
GLENN SURRETTE, NARYAN
STIBBIE, DOES 1-10,

No. 24-6603

D.C. No.
2:22-cv-08357-
DOC-KS

*Plaintiffs*,

BRIDGELAND RESOURCES, LLC,

*Intervenor-Plaintiff - Appellee*,

v.

DENIS RICHARD MCDONOUGH; STEVEN BRAVERMAN; KEITH HARRIS; MARCIA L. FUDGE; DOUGLAS GUTHRIE,

*Defendants - Appellees*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

*Not Party in Lower Court - Appellant*.

| | |
|---|---|
| JEFFREY POWERS; DEAVIN SESSOM; LAURIEANN WRIGHT; JOSEPH FIELDS; LAVON JOHNSON; JOSHUA ROBERT PETITT; NATIONAL VETERANS FOUNDATION, | No. 24-6888<br><br>D.C. No. 2:22-cv-08357-DOC-KS |

*Plaintiffs - Appellees*,

BRIDGELAND RESOURCES, LLC,

*Intervenor-Plaintiff -
Appellee*,

  v.

DENIS RICHARD MCDONOUGH;
STEVEN BRAVERMAN; KEITH
HARRIS; MARCIA L. FUDGE;
DOUGLAS GUTHRIE,

*Defendants - Appellees*,

  v.

BRENTWOOD SCHOOL, Proposed
Intervenor,

*Movant - Appellant*.

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted April 8, 2025
Pasadena, California

Filed December 23, 2025

Before: Consuelo M. Callahan, Roopali H. Desai, and Ana
de Alba, Circuit Judges.

Opinion by Judge de Alba

---

# SUMMARY[*]

## Veterans Affairs

The panel affirmed in part, reversed in part, vacated in part, and remanded to the district court to enter judgment in a class action brought by unhoused veterans with severe disabilities and mental illnesses against the United States Department of Veterans Affairs (VA) and the Department of Housing and Urban Development (HUD), seeking to return the West Los Angeles VA Grounds to its intended use of housing disabled veterans.

After a four-week bench trial, the district court found that the land-use leases the VA had with the Regents of the University of California, Los Angeles, Brentwood School, and Bridgeland Resources, LLC, were unlawful; voided these leases; and enjoined the VA from renegotiating them. The district court also ordered the VA to build supportive housing for veterans on the West Los Angeles VA Grounds.

Plaintiffs argued that the VA and HUD violated Section 504 of the Rehabilitation Act because (1) the VA's lack of supportive housing denies unhoused veterans with serious

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mental illness or traumatic brain injury meaningful access to
the VA's healthcare services; (2) under *Olmstead v. L.C. ex
rel. Zimring*, 527 U.S. 581 (1999), the VA failed to provide
class members their disability benefits "in the most
integrated setting appropriate to their needs," placing them
at a "serious risk of institutionalization"; and (3) the VA's
policy of contracting with housing developers who impose
Average Median Income (AMI) limitations is facially
discriminatory because it discriminates based on disability
by counting veterans' benefits as income. Next, Plaintiffs
claimed that the 1888 Deed that created the VA Grounds
created a charitable trust and that the VA breached
enforceable fiduciary duties to Plaintiffs. Last, Plaintiffs
claimed that certain land-use agreements violated the
Administrative Procedures Act.

The panel held that the Veterans Judicial Review Act did
not strip federal courts of jurisdiction to hear Plaintiffs'
Rehabilitation Act claims because Plaintiffs are not
collaterally attacking the VA's individual benefits
determinations.

Next, the panel held that the district court did not abuse
its discretion in certifying Plaintiffs' class for the meaningful
access and *Olmstead* claims, rejecting the VA's argument
that Plaintiffs did not meet the commonality element.

On the merits, the panel held that the district court did
not err in finding that the VA denied Plaintiffs "meaningful
access" to their healthcare, in finding in Plaintiffs' favor on
their *Olmstead* claim, and finding that the VA's policy of
contracting with third-party housing developers who impose
income limitations and count veterans' disability benefits as
income is facially discriminatory under the Rehabilitation
Act. However, the district court erred in entering judgment

against HUD on Plaintiffs' meaningful access, *Olmstead*,
and AMI claims.

Addressing the charitable trust claim, the panel held that
Plaintiffs had special interest standing to sue.  On the merits,
the panel held that the district court erred in finding that the
West Los Angeles Leasing Act of 2016 and its 2021
Amendment imposed judicially enforceable fiduciary duties
on the VA, and therefore reversed the district court's
judgment in favor of Plaintiffs on their charitable trust
claim.  Because judgment on Plaintiffs' charitable trust
claim was the only basis for which the district court
invalidated a UCLA lease on the VA Grounds and enjoined
UCLA, the panel dismissed UCLA's consolidated appeals as
moot, and vacated any injunctive relief with respect to
UCLA's lease and services.  To the extent that the district
court voided Brentwood School leases and Bridgeland
Resources, LLC's licenses on the VA Grounds and ordered
injunctive relief based on Plaintiffs' charitable trust claim,
the panel vacated that part of the district court's judgment as
well.

Next, the panel held that Brentwood's lease violated the
Leasing Act and the APA.  Because the lease principally
benefited Brentwood's students, not veterans, it violated the
Leasing Act.  Since Brentwood's lease was contrary to
statutory authority, it was in violation of the
APA.  Similarly, Bridgeland's revocable license violated the
Leasing Act and the APA.

Addressing the propriety of the district court's
permanent injunction with respect to the Rehabilitation Act
claims, the panel held that the district court did not abuse its
discretion by ordering the VA to construct 1,800 permanent
housing units and 750 temporary housing units to remedy its

discrimination as relief for the meaningful access and *Olmstead* violations, and by ordering the VA to build housing itself if it could not find developers willing to refrain from discrimination as relief for the AMI claim.

However, with respect to the APA claims, the district court abused its discretion in the scope of its injunction when the district court not only voided the unlawful leases with Brentwood and Bridgeland but also prohibited the VA from renegotiating them and, later, ordered the VA to enter into a settlement agreement with Brentwood.

---

# COUNSEL

Mark D. Rosenbaum (argued), Kathryn A. Eidmann, Amanda R. M. Savage, Amanda K. Pertusati, and Amelia Piazza, Public Counsel, Los Angeles, California; David Martinez, Roman M. Silberfeld, and Tommy H. Du, Robins Kaplan LLP, Los Angeles, California; Eve L. Hill and James Strawbridge, Brown Goldstein & Levy LLP, Baltimore, Maryland; T. E. Glenn, Amanda Powell, and Charles Kohorst, Inner City Law Center, Los Angeles, California; Keith E. Smith, Wood Smith Henning & Berman LLP, Riverside, California; Mark C. Priebe (argued), Carter G. Phillips, and Tacy F. Flint, Sidley Austin LLP, Chicago, Illinois; for Plaintiffs-Appellees.

Ernest J. Guadiana (argued), Sean A. McCormick, Julie Z. Kimball, Justin Trujillo, and Angela M. Butcher, Elkins Kalt Weintraub Reuben Gartside LLP, Los Angeles, California; for Intervenor-Plaintiff-Appellee.

Daniel L. Winik (argued), Charles W. Scarborough, and Amanda L. Mundell, Attorneys; Appellate Staff, Civil Division; Catherine M. A. Carrol, Deputy Assistant Attorney General; Bilal A. Essayli and E. Martin Estrada, United States Attorneys; Yaakov M. Roth, Acting Assistant Attorney General; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Raymond A. Cardozo (argued), Reed Smith LLP, San Francisco, California; Kasey J. Curtis and Corinne Fierro, Reed Smith LLP, Los Angeles, California; for Not Party in Lower Court-Appellant.

Eric D. Walther (argued) and Jonathan C. Sandler, Brownstein Hyatt Farber Schreck LLP, Los Angeles, California; Louis R. Miller and Colin Rolfs, Miller Barondess LLP, Los Angeles, California; for Intervenor.

Robin Meadow, Kent W. Toland, Alana Rotter, and Katarina Rusinas, Greines Martin Stein & Richland LLP, Los Angeles, California; for Amici Curiae Veterans Organizations.

Evelyn Danforth-Scott, American Civil Liberties Union Foundation, San Francisco, California; Bridget Lavender, American Civil Liberties Union Foundation, New York, New York; Michelle Fraling, American Civil Liberties Union Foundation, Washington, D.C.; for Amici Curiae Legal Scholars.

Peter E. Perkowski, Perkowski Legal PC, Los Angeles, California; Dana Montalto and Daniel Nagin, Legal Services Center, Harvard Law School, Jamaica Plain, Massachusetts; Rose C. Goldberg, Deborah L. Rhode Center on the Legal Profession, Stanford Law School, Stanford, California;

Maureen E. Siedor, Swords to Plowshares, San Francisco, California; for Amicus Curiae Swords to Plowshares.

Dan Marmalefsky, Christopher R. Adler, Vincent M. Benlloch, and Lillian M. McNeal, Morrison & Foerster LLP, Los Angeles, California; for Amici Curiae Peter W. Chiarelli, William H. McRaven, Michael G. Mullen, and David W. Sutherland.

John W. Keker, Maile Yeats-Rowe, Yegina Whang, and Matthew P. Guiang, Keker Van Nest & Peters LLP, San Francisco, California; for Amicus Curiae Vets Advocacy.

# OPINION

DE ALBA, Circuit Judge:

The United States Department of Veterans Affairs' ("VA") mission is "[t]o fulfill President Lincon's promise to care for those who have served in our nation's military and for their families, caregivers, and survivors."[1]  This class action lawsuit, and its numerous appeals, demonstrates just how far the VA has strayed from its mission.  There are now scores of unhoused veterans trying to survive in and around the greater Los Angeles area despite the acres of land deeded to the VA for their care.  Rather than use the West Los Angeles VA Grounds as President Lincoln intended, the VA has leased the land to third party commercial interests that do little to benefit the veterans.

---

[1] *See* U.S. Department of Veterans Affairs, https://department.va.gov/about/ (last visited May 19, 2025).

Through this plethora of litigation, Plaintiffs seek to return the West Los Angeles VA Grounds to its intended use: housing disabled veterans. The class of Plaintiffs consists of unhoused veterans who have severe disabilities and mental illnesses. After a four-week bench trial, the district court ruled in Plaintiffs' favor and found, *inter alia*, that the land-use leases the VA had with the Regents of the University of California, Los Angeles ("UCLA"), Brentwood School, and Bridgeland Resources, LLC, were unlawful. The district court voided these leases and enjoined the VA from renegotiating them. The district court also ordered the VA to build supportive housing for veterans on the West Los Angeles VA Grounds. The VA, the Department of Housing and Urban Development ("HUD"), and the third-party lessees appeal different parts of the district court's rulings. We have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons explained below, we affirm in part, reverse in part, vacate in part, and remand to the district court to enter judgment accordingly.

## I.  Background

## A.  History of the West Los Angeles VA Grounds

In 1888, Senator John P. Jones and Arcadia B. de Baker deeded 300 acres of land between Santa Monica and Los Angeles, California to the United States Government (the "1888 Deed"). "[I]n consideration" of the deed, the land was to be used to "locate, establish, construct, and permanently maintain a branch of [the] National Home for Disabled Volunteer Soldiers." Later in her life, Ms. de Baker donated an additional 300 acres to the Government for the same purpose. The West Los Angeles VA Grounds consists of these 600 acres (the "Campus"), whose intended use was to create a community for the benefit of disabled veterans.

After Ms. de Baker's donation, the development of the Campus commenced.  In the 1930s, at the Campus's peak, approximately 5,000 veterans resided there and received educational and vocational services.

In the 1970s, however, the Campus transitioned from primarily providing housing and educational services to serving as a condensed healthcare and research Campus, thereby leaving land, housing, and amenities unused and in disrepair.  Notwithstanding the influx of veterans returning from the Vietnam war, the VA stopped accepting new residents and, instead, began selling off parts of the Campus to private parties until only about half of the 600 acres remained.  This practice ended in 2007 when Congress expressly prohibited it.  *See* Pub. L. No. 110–161 § 224.

As private commercial interests moved into the Campus, unhoused (or any) veterans were no longer a priority.  As the VA described it in its 2022 Master Plan for the Campus:

> In the 70s, residential use declined, and the [Campus] began the practice of leasing land . . . to private commercial interests, including the UCLA baseball stadium, the Brentwood School athletic complex, Marriott Hotel Laundry, Enterprises car rentals, and rare bird sanctuary . . . . **The [Campus] generated millions of dollars from this leasing policy that provided little direct benefit to Veterans** (emphasis added).

Today the Campus consists of 388 acres and sits in one of the most expensive and exclusive neighborhoods in Los Angeles—Brentwood.  The Campus also houses the VA's Greater LA Medical Center (the "Medical Center"): the

centerpiece of the VA's Greater Los Angeles Healthcare System ("VAGLAHS"), providing some of the best treatment for serious mental illness, traumatic brain injury, and post-traumatic stress disorder.

Today, the Medical Center remains the premier healthcare facility for veterans in Southern California and is often described as the best of its kind in the nation. It houses a main hospital, research facilities, and two nursing homes. The Medical Center provides "the bulk of the specialty care" available to veterans in Los Angeles and acts as "a referral center for [other] clinics" that lack specialty care capabilities. The Medical Center also hosts a domiciliary for unhoused veterans in substance-abuse treatment. In short, the Medical Center provides specialized and critical services that veterans in the greater Los Angeles area can only access at that facility.

## B. The 2011 *Valentini* Lawsuit

In 2011, ten unhoused "severely disabled veterans with mental disabilities" and/or "brain injuries" sued the VA, alleging mismanagement of the Campus. *Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012). The claims in that lawsuit are almost identical to the claims Plaintiffs raised in this case, which, as in *Valentini*, fall into three main categories. *Id.* at 1087. First, the *Valentini* plaintiffs raised claims under Section 504 of the Rehabilitation Act, arguing that "without permanent supportive housing, veterans with severe mental illness are unable to access the" health benefits that the VA provides on the Campus. *Id.* at 1116. Second, the *Valentini* plaintiffs argued that the 1888 Deed created a judicially enforceable charitable trust and that the VA breached its fiduciary duties when it entered Campus-related land-use contracts with third parties that did not

benefit veterans. *Id.* Third, the *Valentini* plaintiffs claimed that these land-use contracts also violated the Administrative Procedures Act ("APA"). *Id.* at 1088.

The *Valentini* district court dismissed the plaintiffs' Rehabilitation Act and charitable trust claims. *Id.* at 1117; *Valentini v. Shinseki*, 2012 WL 12882704, at *6 (C.D. Cal. June 19, 2012). As for plaintiffs' APA claims, the district court held that the challenged land-use contracts were "unauthorized by law" and, therefore, void. *Valentini v. Shinseki,* 2013 WL 12121981, at *14 (C.D. Cal. Aug. 29, 2013). The VA, nonetheless, subsequently renewed some of those agreements, including those with UCLA and Brentwood School.

## C. The Master Plan and the West L.A. Leasing Act

In January 2015, while *Valentini* was on appeal, the VA settled with the plaintiffs, pledging to draft and implement a Master Plan that would provide permanent supportive housing and supportive services for veterans on the Campus.[2]

### 1. The Master Plan

After public notice and comment, the VA issued a Draft Master Plan for the Campus in 2016 (the "2016 Plan"). The 2016 Plan stated that the key objective was to "[r]evitalize the [Campus] to its intended purpose as a home; a vibrant community that includes the development of high-quality housing tailored to priority Veteran subpopulations." In the 2016 Plan, the VA committed to building 1,200 units of permanent supportive housing on the Campus by 2030, with 770 units to be completed by 2022. New housing was to

---

[2] The settlement agreement was not judicially enforceable.

include "robust supports that promote wellbeing and
holistic, strength-based services to augment [the VA's]
existing structure of healthcare services." Recognizing that
veterans living on the Campus would often require "ongoing
and proactive case management" for their "serious and
persistent mental illness," the 2016 Plan recommended
locating case managers and for "certain supportive services
. . . in the same buildings or neighborhoods as the residences
. . . to be easily accessible."

The 2016 Plan also discussed whether pre-existing land-
use agreements could fit within the plans to renovate the
Campus. The VA committed to reviewing and renegotiating
some contracts the court found unlawful by seeking "fair
market value rent" from those parties and "in-kind
consideration" that would provide for veterans' needs. The
2016 Plan reiterated that the VA was committed to making
the land-use agreements "veteran focused."

### 2.  West Los Angeles Leasing Act

Immediately after the VA developed the 2016 Plan,
Congress passed the West Los Angeles Leasing Act of 2016
(the "Leasing Act"), *see* Pub. L. No. 114-226, 130 Stat. 926,
"[t]o assist VA in carrying out" the 2016 Plan's goals to
create permanent supportive housing. H. Rep. No. 114-570,
at 6. The Leasing Act authorized the VA to enter into three
types of leases on the Campus: (1) "enhanced-use lease . . .
for purposes of providing supportive housing . . . that
principally benefit[s] veterans and their families[;]"
(2) "lease[s] to a third party to provide services that
principally benefit veterans and their families . . . [;]" and
(3) a lease to the "Regents of the University of
California, . . . on behalf of its [UCLA] campus[,]" subject
to specific enumerated requirements. Leasing Act § 2(b).

In 2021, Congress amended the Leasing Act, expanding
the permissible uses of lease revenue to include, *inter alia*,
"[s]upporting construction, maintenance, and services at the
Campus relating to temporary or permanent supportive
housing for homeless or at-risk veterans and their families."
West Los Angeles VA Campus Improvement Act of 2021,
Pub. L. No. 117-18, § (2)(a).

That same year, the VA Office of Inspector General
("VA OIG") reported to Congress that "the VA has not
constructed a single new unit of [permanent supportive
housing] pursuant to the [*Valentini*] settlement," and
"fail[ed] even to make essential infrastructure upgrades for
utilities like water, sewer, and stormwater systems[.]"[3]  In
April 2022, the VA released an updated Master Plan, which
finalized its plan for building housing on the Campus and
stated that all permanent supportive housing will not be
completed until 2030.

### 3.  Land-Use Agreements on the Campus

#### a.  Brentwood School

Brentwood School ("Brentwood") is a private school and
a 501(c)(3) nonprofit organization in West Los Angeles,
with approximately 1,100 students in kindergarten through
twelfth grade.  It has an endowment of $30 million and
tuition ranging from $45,000 to $53,000 per student per year
depending on grade level.  Brentwood has been present on
the Campus since the 1970s, when the VA allowed
Brentwood to use its property for student parking and school

---

[3] The Leasing Act directed the VA OIG to submit to Congress, after two
and five years, "a report on all leases carried out at the Campus,"
including the VA's 2016 Plan implementation.  Leasing Act § 2(j)(3).

and athletic events.   For the first two decades of the
agreement, Brentwood used the land for free.

In 1999, the VA and Brentwood entered into an
agreement for Brentwood to build its athletic facilities on 22
acres of the Campus.   Brentwood subsequently spent $15
million developing its athletic facilities, which now include
a football field, a track stadium, an aquatic center, three
baseball fields, a soccer field, a basketball court, a lacrosse
field, a volleyball and fencing pavilion, six tennis courts, a
softball field, and a workout and weights facility.   The
aquatic center includes an Olympic-sized swimming pool.

Brentwood fields athletic teams in all the sports listed
above, and it regularly schedules games, meets, and
tournaments with other schools which take place at these
facilities.  It also charges fees for students across the city to
attend summer camps utilizing the aquatic center and tennis
courts.   Brentwood also uses these athletic facilities and
programs as part of their student recruitment efforts.

In November 2016, after the *Valentini* settlement, the
VA entered into a new agreement with Brentwood.  Pursuant
to the agreement, the VA allowed Brentwood to continue
using the 22 acres in exchange for an annual payment of
$850,000 and $918,000 in in-kind annual consideration,
consisting primarily of upkeeping and maintaining the 22
acres and providing services to veterans.   Brentwood
provides veterans with access to its facilities, but Brentwood
decides when and how to grant access.   For example,
Brentwood allows veterans access to the swimming pool on
Mondays, Wednesdays, and Fridays from 5:30 a.m. to 7:30
a.m., and on the weekends from 11:00 a.m. to 3:00 p.m.;
veterans may use the track every weekday from 5:00 a.m. to
11:00 a.m.  Also, Brentwood operates a shuttle every day

from 9:00 a.m. to 2:00 p.m. to transport veterans from other areas of the Campus to the athletic facilities.

In 2018 and 2021, pursuant to the Leasing Act, the VA OIG audited Brentwood's lease, and concluded, in relevant part, that the lease violated the Leasing Act because it did not principally benefit veterans. It also found that the in-kind services Brentwood provided were not authorized by law and that the accepted consideration for the 22 acres was below the appraised rental price for the land. The VA OIG instructed the VA to terminate the lease, but the VA refused, stating that the VA OIG was misinterpreting the Leasing Act.

### b.  Bridgeland Resources, LLC

Bridgeland Resources, LLC ("Bridgeland") is an oil company that operates oil and gas wells and associated infrastructure on a three-acre portion on the Campus ("Sawtelle-2"). In the 1950s and 1960s, the U.S. Bureau of Land Management ("BLM")[4] entered leases with Bridgeland's predecessor in interest, allowing them to produce oil and gas from 670 acres of federally owned land beneath the Campus. Bridgeland's oil and gas production leases and subsurface rights are relevant here because the company slant-drills for oil in wells that pass through the subsurface of the Campus. In 2017, the VA renewed a revocable license that had expired in 2002 for Bridgeland to continue extracting oil and gas from below the Campus. In return, Bridgeland agreed to "donate a 2.5 percent royalty on the proceeds that is generate[d] from slant-drilling to the Los Angeles Chapter of the Disabled American Veterans." The

---

[4] The BLM is not a party to this case, and Bridgeland's leases with the BLM are not at issue.

charity organization would then use the royalties to provide transportation to veterans on and around the Campus. This royalty "hovered in the $75,000-$125,000 range." Private parties and Bridgeland retained the rest of the revenue from the drill site, which is over $6 million dollars per year.

In 2018 and 2022, the VA OIG audited this revocable license and concluded that it also violated the Leasing Act. Neither the VA nor Bridgeland took any steps to remedy the violations.

### c.  UCLA

UCLA has a long-standing relationship with the Campus. Beginning in 1963, UCLA has leased a 10-acre parcel, which today includes UCLA's Jackie Robinson Stadium, its practice infield, and an adjacent parking lot. Since then, UCLA's baseball team has played its home games at the stadium and trains, holds meetings, and hosts recruitment efforts in these facilities.

After the *Valentini* settlement, Congress approved UCLA's land-use lease pursuant to specific requirements. *See* Leasing Act § 2(b)(3). In December 2016, the VA and UCLA entered into a new agreement that expires in 2026. In exchange for using the 10-acres, UCLA pays an annual rent of $300,000 and $1,350,000 in recorded in-kind services. Although, as of 2015, the appraised annual rental value of the property was approximately $2.7 million, the 2018 and 2021 VA OIG reports have found the lease compliant with the Leasing Act.

Notwithstanding the VA OIG's findings, the district court questioned the value of the in-kind donations UCLA provides to veterans, as well as UCLA's commitment to providing veteran focused services. For example, trial

evidence shows that one of the main lease commitments—
to establish and operate a UCLA Veterans' Legal Clinic on
the Campus at a cost to UCLA of $4,000,000 over ten
years—is unfulfilled.  The clinic only enrolled six to eight
students per semester and none over the summer, provided a
very limited range of direct civil legal services, did not offer
consistent office hours, and provided no civil rights or
criminal defense services.  Additionally, during the COVID-
19 pandemic, UCLA refused to make the parking lot
adjacent to its practice infield available for emergency
housing for unhoused veterans because it would interfere
with UCLA's home game schedule.  There was also
evidence that the VA and UCLA secretly amended their
leasing agreement to enable UCLA to accept a two-million
donation to make improvements to its baseball complex.

## D.  Unhoused Veterans in the L.A. Area and Housing

### 1.  Unhoused Veterans in the Los Angeles Area

Beginning in May 2020, unhoused veterans that were
turned away from the Campus due to lack of housing
availability began to create their own community, known as
"Veterans Row."  Veterans Row was a collection of tents—
many of which were draped with the United States flag to
signal that a veteran lived there—on San Vicente Boulevard
right outside the Campus.  At the height of the COVID-19
pandemic, the VA declined to provide Veterans Row
residents with food, shelter, masks, sanitizers, bedding,
bathrooms, or dumpsters.  This prompted the local
community to try to support the unhoused veterans in place
of the VA.  Notably, permanent supportive housing is not a
"benefit" provided to veterans "under laws administered by
the [VA]."  *See* 38 U.S.C. § 20.3.  In November 2021, law
enforcement cleared out the Veterans Row encampment.

Since the clearing of Veterans Row, more veterans have moved into the Campus, and the VA's efforts in reducing the number of unhoused veterans has resulted in some slight improvements. Nonetheless, at the time of trial, there were approximately 3,000 unhoused veterans in the greater Los Angeles area. By the VA's own estimate, most of the unhoused veterans have serious mental illness ("SMI")[5] or traumatic brain injury ("TBI"). These disabilities frequently arise from veterans' military service, often in combat.

### 2. Temporary Shelters and Permanent Housing

The VA created the Care, Treatment, and Rehabilitation Services ("CTRS") program at the height of the COVID-19 pandemic, after community advocates pushed the VA to accept donated tents to help unhoused veterans living on Veterans Row. At first, the VA provided "child-size pup tents in a parking lot." However, after law enforcement cleared Veterans Row, the VA switched from tents to Tiny Sheds. Tiny Sheds are 8-by-10-foot sheds with no restroom or kitchen of their own, though there are communal showers and bathroom facilities in the area. Although the VA's intent is to transition veterans in the CTRS program to permanent housing within sixty to ninety days, some veterans have lived in these sheds for months and even years. Currently there are 147 sheds on the Campus.

Regarding permanent housing, there were 233 privately-operated units of permanent supportive housing on the Campus at the time of trial — all of which were occupied. Some of these units are reserved for veterans over the age of

---

[5] SMI is "a collection of psychological disorders like schizophrenia, bipolar disorders, severe forms of depression, anxiety, and other psychoses."

62 with SMI, and all of them have income eligibility
requirements. In addition to these units, there are 535
permanent units under construction. The remaining 479
supportive units projected for construction under the 2016
Plan will not be completed until 2030; none of these
remaining units have a set date for occupancy, nor has
construction started.

### 3. Area Median Income Eligibility Requirements

The VA and HUD offer a specific housing voucher
program to subsidize housing for veterans, provided
primarily through the HUD-Veterans Affairs Supportive
Housing ("HUD-VASH") program. HUD allocates
vouchers, and public housing agencies ("PHAs") distribute
them to qualifying veterans. This system is "use it or lose
it," which means that if a PHA does not use at least 70% of
the vouchers allocated to it, the PHA is generally unable to
obtain additional vouchers. In Los Angeles, these vouchers
were underused even though the city has one of the largest
populations of unhoused veterans in the country.

The program generally groups the housing opportunities
into two categories: tenant-based housing and project-based
housing. Tenant-based vouchers are tied to a tenant, which
means that veterans can use them to subsidize their rent on
the private market. Project-based vouchers are tied to a
specific unit or building.

The housing on the Campus uses project-based
vouchers. All permanent housing units developed according
to the 2016 Plan are subject to Enhanced Use Leases
between the VA and third-party housing developers who
build and lease housing on the Campus. These developers
can impose additional qualifying requirements to veterans
beyond those requirements under the voucher program.

#:18635

Most permanent housing available for veterans outside the
Campus is also distributed through the HUD-VASH
program.

The process to obtain permanent housing consists of two
steps. First, the VA refers a veteran to a PHA requiring the
veteran to demonstrate eligibility by filing a lengthy
application that generally requires detailed financial
information and documentation.[6] If the PHA deems the
veteran eligible, the veteran receives a voucher. Second, the
veteran takes the voucher to a landlord and must demonstrate
that he or she meets any additional requirements that
particular landlord imposes. If the veteran complies with
both steps, and housing is available, housing is provided.

Step two creates a major obstacle for veterans with
significant service-connected disability ratings to obtain
housing. Both HUD and private developers count disability
benefits as income. Roughly 70% of the HUD-VASH
project-based buildings in Los Angeles set aside for veterans
require that the veteran make less than 30% of the Area
Median Income ("AMI") to qualify for a unit. A single
veteran with no dependents and a 100% disability rating
receives approximately $40,000 in disability benefits, which
exceeds the Los Angeles' 30% AMI threshold of $25,000.
Veterans with lower service-connected disability ratings, but
who receive additional benefits like Social Security,
generally have a total income over 30% AMI. The VA

---

[6] Historically, PHAs have complained that the VA is not sending enough
referrals—they have vouchers to distribute, but not enough veterans to
receive them. For example, although the referral rate of one of the
biggest PHA has increased from four per week in 2023 to thirteen per
week in 2024, it still falls short of the twenty-five the PHA wants to
reach.

estimates that one in four veterans receives disability
compensation and other benefits that place them over the
threshold and disqualifies them from obtaining housing.

In an attempt to remedy this income illegibility problem,
on the third day of trial, HUD announced a policy change:
an alternative definition of annual income that excludes
veterans' service-connected disability benefits as income.
Despite this administrative change, the statutory definition
of income continued to include disability compensation.
The requirements for federal, state, and local tax credits also
use the statutory definition of income.  Since the eligibility
requirements third-party developers impose typically mirror
those imposed by federal, state, and local tax credits,
veterans with significant service-connected disability ratings
remain less likely to fall below the 30% AMI threshold.  This
problem is not limited to housing on the Campus; of the 46
buildings in Los Angeles providing permanent supportive
housing for veterans, 38 have either some or all their units
capped at 30 % AMI, significantly reducing the housing
supply available to disabled veterans.

**E.  Proceedings Below**

In November 2022, a putative class of unhoused veterans
with severe disabilities sued the VA and HUD.  The putative
class is defined as "[a]ll homeless veterans with [SMI] or
[TBI], who reside in Los Angeles County."   Plaintiffs
asserted that the VA and HUD violated Section 504 of the
Rehabilitation Act because (1) the VA's lack of supportive
housing denies unhoused veterans with SMI or TBI
meaningful access to the VA's healthcare services
("meaningful access claim"); (2) under *Olmstead v. L.C. ex
rel. Zimring*, 527 U.S. 581 (1999), the VA failed to provide
class members their disability benefits "in the most

integrated setting appropriate to their needs," placing them
at a "serious risk of institutionalization" ("*Olmstead* claim");
and (3) the VA's policy of contracting with housing
developers who impose AMI limitations is facially
discriminatory ("AMI claim") because it discriminates
based on disability by counting veterans' benefits as income.
Further, Plaintiffs claimed that the 1888 Deed created a
charitable trust and that the VA breached enforceable
fiduciary duties to Plaintiffs ("charitable trust claim"). Last,
Plaintiffs claimed that certain land-use agreements violated
the APA ("APA claim").[7]

## 1.   The Bench Trial and Relevant Rulings

In December 2023, the district court denied the VA and
HUD's motion to dismiss, which argued that the Veterans
Judicial Review Act ("VJRA") bars jurisdiction over
Plaintiffs' Rehabilitation Act claims. The district court
reasoned that the VJRA bars review of only issues the VA
Secretary has actually "considered and decided," which is
not the case here. In May 2024, the district court granted
Plaintiffs' class certification motion. In July 2024, the
district court granted summary judgment in Plaintiffs' favor
on their AMI claim and denied the VA and HUD's motion
for summary judgment on Plaintiffs' meaningful access and
*Olmstead* claims, permitting those claims to proceed to trial.
Additionally, the court granted partial summary judgment in
Plaintiffs' favor on their charitable trust claim, finding that
the VA assumed "enforceable fiduciary dut[ies]" but leaving
the question of breach to proceed to trial.

---

[7] The charitable trust claim and the APA claim were only raised against
the VA.

In August 2024, the district court presided over a four-week bench trial. After trial, as it relates to Plaintiffs' meaningful access and *Olmstead* claims, the district court entered judgment against the VA and HUD. It found that by not providing supportive housing on or near the Campus, the VA "denies veterans with [SMI] or [TBI] meaningful access to the community-based VA healthcare, mental healthcare, and other critical supportive services they need and for which they are eligible," and "places unhoused veterans at risk of institutionalization." Regarding the charitable trust claim, the court found that "each of the challenged land-use agreements are in violation of the Leasing Act, and therefore, are a breach of the VA's fiduciary duty." The court also found in Plaintiffs' favor on the APA claim.

As relief for Plaintiffs' meaningful access and *Olmstead* claims, the district court ordered the VA to construct additional temporary and permanent supportive housing on the Campus, to be overseen by a Special Monitor and adjusted according to need. Specifically, the district court ordered the construction of "1,800 additional permanent supportive housing units" beyond those contemplated by the 2016 Plan, "as well as 750 temporary supportive units to be used [while] permanent housing is constructed."

Regarding the AMI claim, the district court entered judgment against the VA and HUD holding that AMI restrictions on housing are discriminatory and ordered the VA to ensure that "a sufficient number of housing units at the [Campus] are free from discriminatory income restrictions[.]" The court stated that the VA could "contract with developers who rely on . . . conventional financing" rather than Government programs that require income restrictions on the housing they fund. The district court further noted that if that does not cover the entire costs of the

housing units, then the VA "can directly fund or subsidize permanent supportive housing[.]"

Additionally, as relevant here, the district court voided the VA's leases with Bridgeland and Brentwood School pursuant to the charitable trust and the APA claims. The court also voided UCLA's lease but solely on the charitable trust theory. Further, the court enjoined the VA from renegotiating those leases.

## 2. Injunctive Relief Hearings

After the district court issued its trial opinion, it held a series of additional hearings regarding the details and scope of its injunctive relief. The district court, the Special Monitor, and the parties worked together to identify suitable sites on the Campus for the building of temporary supportive housing, as well as vendors that could timely provide such housing at a reasonable cost. Additionally, the district court held hearings with intervenor Bridgeland and invited non-party leaseholders—such as Brentwood and UCLA—to the hearings to help plan an exit strategy. Concurrently, Brentwood and Plaintiffs began settlement discussions and ultimately reached one, which the district court preliminarily approved over the VA's objection.

Initially, the district court barred UCLA from using the baseball stadium and ordered Bridgeland to cap its oil well. After further discussions, however, the court modified its injunction, allowing UCLA to use the stadium through the end of the baseball season: July 4, 2025. Additionally, instead of capping the oil well, the district court modified its injunction to prohibit Bridgeland from slant drilling oil on the Campus.

### 3.  Appeal

These appeals followed.  In its appeal, the VA challenges (1) the district court's jurisdiction to review Plaintiffs' Rehabilitation Act claims; (2) the district court's grant of class certification; (3) the judgment in Plaintiffs' favor on the meaningful access, *Olmstead*, AMI, and charitable trust claims;[8] and (4) the scope of the district court's injunctive relief.[9]   HUD challenges the district court's judgment against it on the meaningful access, *Olmstead*, and AMI claims.   In separate appeals, Bridgeland and Brentwood challenge the district court's invalidation of their leases. Bridgeland also challenges the district court's order enjoining it from slant-drilling.  In two consolidated appeals, non-party UCLA challenges the district court's invalidation of its lease under the charitable trust claim, and the scope of the district court's injunction.  We address these challenges in turn.

## II.  Standards of Review

We review statutory construction de novo.    *In re Mitchell*, 977 F.2d 1318, 1320 (9th Cir. 1992).  A district court's class certification order is reviewed for abuse of discretion. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014).   Following a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo.  *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241–42 (9th Cir. 2021).   The district court's

---

[8] The VA and HUD obtained a partial stay pending appeal on the charitable trust and Rehabilitation Act claims.

[9] Notably, the VA does not challenge the district court's judgment voiding the land-use agreements under the APA.  Nor does it challenge the grant of class certification relating to the AMI claim.

grant of permanent injunctive relief is subject to three
separate standards of review: "we review the legal
conclusions de novo, the factual findings for clear error, and
the decision to grant a permanent injunction, as well as its
scope, for an abuse of discretion." *Oracle USA, Inc. v.
Rimini St., Inc.*, 879 F.3d 948, 964 (9th Cir. 2018) (citation
omitted), *rev'd in part on other grounds*, 586 U.S. 334
(2019).

## III.   Discussion

### A.  The VA and HUD's Appeal

#### 1.  Rehabilitation Act Claims

##### a.   Veterans Judicial Review Act and Jurisdiction

Upon the VA's creation, Congress enacted legislation
that precluded judicial review of the VA's benefits
determinations. *See Veterans for Common Sense v. Shinseki*,
678 F.3d 1013, 1020–23 (9th Cir. 2012) (en banc) ("*VCS*")
(explaining in detail the history of judicial review of the
VA's decision making and the VJRA effect on the scope of
that review).   After the Supreme Court interpreted the
preclusion provision as permitting certain constitutional and
legal challenges against the VA to be brought in federal
courts, *see Traynor v. Turnage*, 485 U.S. 535 (1988),
Congress enacted the VJRA establishing procedures for
judicial review of the VA decisions, *VCS*, 678 F.3d at 1020–
23; *see also* VJRA § 301, 102 Stat. 4105, 4113 (1988),
codified at Title 38 of the U.S. Code.

With the enactment of the VJRA, Congress also
broadened the scope of the preclusion provision to limit
federal court intervention in the VA's decision-making

process codified at Section 511.  *See VCS*, 678 F.3d at 1022.
Section 511 states:

> The Secretary shall decide all questions of
> law and fact necessary to a decision by the
> Secretary under a law that affects the
> provision of benefits by the Secretary to
> veterans or the dependents or survivors of
> veterans.  Subject to subsection (b), the
> decision of the Secretary as to any such
> question shall be final and conclusive and
> may not be reviewed by any other official or
> by any court, whether by an action in the
> nature of mandamus or otherwise.

38 U.S.C. § 511(a).  In other words, the VJRA created a
jurisdictional channel over *certain claims* that must follow
an administrative process and are kept away from federal
courts.  But not *all claims* fall within this jurisdictional
constraint.  For the following reasons, Plaintiffs'
Rehabilitation Act claims fall outside Section 511's
jurisdictional bar.

First, we construe jurisdiction-stripping statutes
narrowly.  "[E]xpress instructions of the Supreme Court, our
precedent, and common sense" all prescribe a narrow
construction of jurisdiction-stripping statutes except where
their meaning is clear and unequivocal.  *Acre v. United
States*, 899 F.3d 796, 800–01 (9th Cir. 2018); *see also I.N.S.
v. St. Cyr*, 533 U.S. 289, 298 (2001) (noting that when
Congress creates legislation, there is a "strong presumption
in favor of judicial review of administrative action").

The VA argues that the VJRA strips jurisdiction from
any action that "affect[s] the provision of benefits."

Adopting this interpretation would mean that the VA has exclusive and final authority to review *all* possible laws and statutes that conceivably touch veterans' benefits. This cannot be the case. *See Broudy v. Mather*, 460 F.3d 106, 112 (D.C. Cir. 2006) (noting that Section 511 "does not give the VA *exclusive* jurisdiction to construe laws affecting the provision of veterans benefits or to consider all issues that might somehow touch upon whether someone receives veterans benefits"). We decline to adopt the VA's broad reading of the statute.

Second, in *VCS*, we analyzed the scope of Section 511 and its jurisdictional limitations. 678 F.3d at 1022. We held "that § 511 precludes jurisdiction over a claim if it requires the district court to review VA decisions that relate to benefits decisions, including any decision made by the Secretary in the course of making benefits determinations." *Id.* at 1025 (internal quotation marks omitted) (quoting *Beamon v. Brown*, 125 F.3d 966, 971 (6th Cir. 1997) and *Broudy*, 460 F.3d at 115). "This preclusion extends not only to cases where adjudicating veterans' claims requires the district court to determine whether the VA acted properly in handling a veteran's request for benefits, but also to those decisions that may affect such cases." *Id.* (citing cases from various sister circuits). Important here, we explained in *VCS* that if adjudicating a claim "would not possibly have any effect on the benefits [the Plaintiffs] ha[ve] already been awarded," the VJRA's jurisdictional preclusion does not apply. *Id.* at 1023 (internal quotation marks and citation omitted).

In *VCS*, we considered whether we had jurisdiction over class-wide claims that veterans' advocacy groups brought against the VA challenging the length of time veterans had to wait to receive mental health treatment or to receive

disability benefits determinations. *Id.* at 1017. We also considered whether we had jurisdiction over the VA's internal agency procedures on due process grounds. *Id.* As to the first issue, we held that we did not have jurisdiction over the "claim that the VA unreasonably delayed mental health care" because "there is no way for the district court to resolve whether the VA acted in a timely and effective manner in regard to the provision of mental health care without evaluating the circumstances of individual veterans and their requests for treatment, and determining whether the VA handled those requests properly." *Id.* at 1026, 1028.

However, we determined that we had jurisdiction over the due process claim, which challenged the VA's lack of procedural safeguards when evaluating veterans' claims for service-related disability benefits. *Id.* at 1033–34. Unlike the first claim, this claim would not require us to review decisions affecting the provision of benefits to individual claimants, and thus we had jurisdiction to hear it. *Id.* at 1034. To support our reasoning, we highlighted our own institutional competence evaluating due process claims relative to the VA's competence by pointing out the VJRA's failure to "provide a mechanism" for plaintiffs to bring the claim through its exclusive administrative review. *Id.* at 1034 n.25, 1035.

Here, we have jurisdiction over Plaintiffs' Rehabilitation Act claims, and Section 511 does not strip us our power to review the claim. Plaintiffs allege that the absence of permanent supportive housing on or near the Campus constitutes discrimination based on disability. Plaintiffs do not argue that housing is a benefit, nor have Plaintiffs requested housing from the Secretary through an administrative process. Rather, Plaintiffs contend that housing is a reasonable accommodation that is necessary for

them to access the benefits the VA has already conferred to them.  Thus, reviewing Plaintiffs' Rehabilitation Act claims does "not require the district court to decide whether any veterans whose claims the Secretary rejected were entitled to benefits or to revisit any decisions made by the Secretary in the course of making benefits determinations." *Id.* at 1030 n.21 (internal quotations and citations omitted).  In other words, the district court's adjudication of Plaintiffs' Rehabilitation Act claims did not require it to second-guess the VA's previous benefits determinations.  Rather, the district court took the VA's previous determination of "law and fact" about veterans' individual benefits determinations as a given and analyzed the Plaintiffs' ability to *reach* those previously awarded benefits by looking at Plaintiffs' rights under a separate and distinct statutory framework that is not under the VA's purview: the Rehabilitation Act.

Third, the VA argues that Congress enacted the VJRA to overrule *Traynor*'s holding that federal courts could review a claim that the "VA's regulation conflicted with § 504 of the Rehabilitation Act."  *Traynor* is distinguishable.  In *Traynor*, the plaintiffs sought benefits under the G.I. Bill, a statute that the VA administered.  *See Traynor*, 485 U.S. at 538–39.  Here, however, Plaintiffs assert claims under the Rehabilitation Act, a law of general applicability.  Congress immediately reacted to *Traynor* because it viewed the Supreme Court as second-guessing the Secretary's determinations, thereby breaching the jurisdictional restraints prescribed by Section 511.  That is not the case here.  In this case, Plaintiffs are not challenging the Secretary's prior benefits determinations because no such request for supportive housing was, or could be, made by the veterans.

Fourth, if we were to hold that the VJRA strips us and the district court of jurisdiction in this case, we would leave veterans without judicial recourse to enforce their rights under the Rehabilitation Act. Neither the VJRA nor its implementing regulatory framework authorizes the VA to review veterans' Rehabilitation Act claims. In fact, the Veterans Court has recognized that "neither the Board nor [the Veterans Court] is authorized to hear actions brought under" the Rehabilitation Act or the American with Disabilities Act ("ADA"). *Camacho v. Nicholson*, 21 Vet. App. 360, 366 (2007). The VA suggests that veterans should submit claims requesting housing through the VA's ordinary benefits determination process yet fails to offer support demonstrating that this avenue for redress is indeed available to veterans. It is difficult to imagine how the VA would be able to provide veterans with permanent housing through an administrative process when housing is not a designated benefit under the VA's governing laws. *See* 38 U.S.C. § 20.3. Moreover, unlike federal courts, the VA's administrative claims-processing structure lacks the ability to produce an expansive and detailed judicial record that would otherwise provide the Federal Circuit Court a sufficient record for meaningful review. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023) (noting that when Congress creates a special process that directs judicial review of agency decisions into special channels, it does so in a manner that makes sure agencies are equipped to effectively "fill[] in for the district court['s]" job).

In sum, because Plaintiffs are not collaterally attacking the VA's individual benefits determinations, the VJRA does not strip federal courts of jurisdiction to hear Plaintiffs' Rehabilitation Act claims.

### b.  Class Certification

The VA challenges the district court's class certification for Plaintiffs' Rehabilitation Act claims.  Specifically, the VA challenges the commonality of Plaintiffs' meaningful access and *Olmstead* claims.  We address these claims only and do not reach the issue of class certification for the remaining claims.

The commonality requirement in class certification is satisfied when class members' claims "depend upon a common contention . . . . of such a nature that is capable of class-wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions' . . . but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citations omitted). Commonality does not require that "every question in the case, or even a preponderance of questions, is capable of class-wide resolution.  So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (internal quotation marks and citations omitted).  We have held that the commonality requirement is satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005).

The VA argues that Plaintiffs failed to meet the commonality element for their meaningful access and *Olmstead* claims because these claims turn on each veteran's individual circumstances and thus cannot generate common

answers that will resolve the litigation.   We disagree.
Plaintiffs' class is defined as homeless veterans with SMI or
TBI, and they allege that the VA's failure to provide
supportive housing on or near the Campus results in
systemic discrimination against them.  As a result, members
of Plaintiffs' putative class are denied meaningful access to
necessary healthcare services and placed at serious risk of
institutionalization.  *See Payan v. Los Angeles Cmty. Coll.
Dist.*, 11 F.4th 729, 733–35 (9th Cir. 2021) (noting that a
meaningful access claim may challenge "systemic
failures"); *Arc of Washington State Inc. v. Braddock*, 427
F.3d 615, 618 (9th Cir. 2005) (highlighting that, with respect
to integration claims under *Olmstead*, "states are required to
provide care in integrated environments for as many disabled
persons as is reasonably feasible").  Plaintiffs' claim that the
VA's "past and current practice" of not providing permanent
housing to the class of veterans represents discrimination
based on disability, placing them squarely within the
"system-wide practice or policy" requirement for
commonality. *Armstrong*, 275 F.3d at 868.

The VA's contention that to adjudicate these claims, the
court will have to analyze every single Plaintiffs' situation
individually is unavailing.  We have held that in civil-rights
suits challenging system-wide practices or policies,
"individual factual differences among the individual
litigants or groups of litigants will not preclude a finding of
commonality." *Id.* (citations omitted); *see also Gonzalez v.
United States Immigr. & Customs Enf't*, 975 F.3d 788, 807
(9th Cir. 2020) ("The existence of shared legal issues with
divergent factual predicates is sufficient." (citation
omitted)).

In *Armstrong*, we affirmed class certification of a group
of prisoners and parolees who suffered from six different

categories of disability. *Armstrong*, 275 F.3d at 854. The plaintiffs claimed that California's policies and practices for parole and parole-revocation discriminated against class members based on their disabilities. *Id.* at 854–55. Like the VA here, the defendant in *Armstrong* argued that the wide variation in the nature of the particular class members' disabilities precluded a finding of commonality. *Id.* at 868. We disagreed, holding that individual factual differences among the class members are not sufficient to negate a finding of commonality. *Id.* Because class members suffered a "similar harm" from the defendant's "failure to accommodate their disabilities, . . . . [t]he commonality requirement [wa]s met." *Id.*

So, too, here. Plaintiffs challenge the VA's failure to provide permanent housing on or near the Campus, a system-wide practice that Plaintiffs claim is discriminatory and that affects all of the putative class members. This suffices for commonality purposes.[10] *See id.* Accordingly, the district court did not abuse its discretion in certifying Plaintiffs' class for the meaningful access and *Olmstead* claims.

### c. Meaningful Access Claim

The Rehabilitation Act guarantees "meaningful access" to programs or activities receiving federal financial assistance for otherwise qualified handicapped individuals. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Any recipient of federal financial assistance, and any federal agency in conducting programs or activities under the Act, generally must "operate each program or activity so that the

---

[10] To be sure, individual veterans in the class have different needs according to their respective disabilities; but those differences merely relate to the *degree* to which each class member was denied meaningful access to healthcare and their risk of institutionalization.

program or activity, when viewed in its entirety, is readily
accessible to and usable by [persons with disabilities]." 28
C.F.R. §§ 39.150(a), 41.57(a). "[T]o assure meaningful
access, reasonable accommodations in the . . . program or
benefit may have to be made." *Alexander*, 469 U.S. at 301.

Here, the district court found that Plaintiffs—disabled
veterans with SMI or TBI—require access to on-site
healthcare at the Campus; yet without permanent supportive
housing on or near the Campus, Plaintiffs are unable to
access such treatment. Accordingly, the district court
concluded that the VA denied Plaintiffs "meaningful access"
to their healthcare.

As with the *Olmstead* and AMI claims, the VA raises
only factual challenges to the district court's judgment on
this claim. The VA contends that while housing on or near
the Campus may make it easier for veterans to access
healthcare facilities, Plaintiffs do not *lack* "meaningful
access." Although this may be one interpretation of the
evidence, that is not the standard on appeal. We must
determine whether the district court's findings of fact are
"illogical, implausible, or without support in inferences from
the record." *Yu*, 15 F.4th at 1241–42. They are not.

The evidence in the record supports the district court's
findings. For example, Dr. Steven Edward Braverman,
former VAGLAHS Director, testified that the bulk of
specialty care for veterans is only located on the Campus and
that the Campus is the referral point for veterans' specialty
care, which is often what the class of veterans require. Dr.
Benjamin Henwood, professor of Social Work and Director
of the Homelessness Center at the University of Southern
California, testified that unhoused veterans have "difficulty
accessing healthcare when they don't have a stable place to

live." Dr. Jonathan Edward Sherin, former Medical Center's Chief of Psychiatry and Mental Health Programs, testified that there needs to be permanent housing for veterans on or near the Campus to allow veterans to have more meaningful engagement with the healthcare system. Plaintiff Laurieann Wright testified that, due to her disabilities, she requires specialty care that is only provided on the Campus and that without housing on the Campus, she cannot access her healthcare benefits because it is very difficult for her to commute. Plaintiff Lavon Johnson testified that since living on the Campus, he gets regular visits from his nurse, doctors, and healthcare workers who could not find him when he was unhoused.

Because the district court's findings of fact are not "illogical, implausible, or without support in inferences from the record," the court did not err in its interpretation of the record. *Id*.

### d. *Olmstead* Claim

The Rehabilitation Act's integration mandate states that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). In 1999, the Supreme Court addressed this mandate in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)[11] and held that covered entities "are required to provide community-based treatment for persons with mental disabilities when . . . treatment professionals determine that such placement is appropriate, the affected person does not

---

[11] Although the *Olmstead* case decided an issue related to the ADA, courts interpret the Rehabilitation Act and the ADA similarly. *See Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the [agency] and the needs of others with mental disabilities." *Id.* at 607. To prove an *Olmstead* claim, "a plaintiff need only show that the challenged [agency] action creates a serious risk of institutionalization." *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012).

Here, the district court properly held that the VA violated the Rehabilitation Act by not providing class members their disability healthcare benefits "in the most integrated setting appropriate to their needs," placing "unhoused veterans at risk of institutionalization." There is sufficient supporting evidence in the record for this conclusion. For instance, Plaintiff Fields testified that the VA's failure to provide supportive housing puts veterans in a never-ending cycle of jail and hospitalization. Dr. Henwood also testified that the absence of stable housing places veterans with certain disabilities in an "institutional circuit" because they use a lot of "institutional care on and off," including hospitals, jails and prisons, and treatment programs. Likewise, Dr. Sherin acknowledge that there are "too many veterans . . . cycling in between homelessness and jails and the hospitals." The record also shows that the Medical Center on the Campus is one of the most well-equipped in the nation, if not the best, and often the only one in the greater Los Angeles area that can provide the necessary care for the class of veterans. The evidence shows that without supportive housing near or at the Campus, veterans are forced to either accept institutionalization or go without services. *See Olmstead*, 527 U.S. at 597 (holding that "[u]njustified isolation . . . is properly regarded as discrimination based on disability").

The VA argues that *Olmstead* has no place in Plaintiffs' claims because if the VA provides supportive housing on the

Campus, the veterans would arguably be more segregated from the broader community, not less. The record shows otherwise. First, Plaintiffs are requesting supportive housing "on or near the Campus," not just on the Campus. Second, Plaintiffs Petitt and Wright testified that they want to live on or near the Campus because other veterans live there, and they would be integrated into a community. Dr. Sherin testified that the goal of permanent supportive housing is to create a "connective tissue of community" for veterans, which includes "places to recreate, places to socialize, [and] places for opportunities and self-governance." As these Plaintiffs testified, they want to live in a community where they can harvest a sense of belonging while surrounded by other veterans who understand their struggles and where healthcare is readily available. Homelessness provides the opposite and places the class of veterans at serious risk of institutionalization. *See Olmstead*, 257 U.S. at 600 (noting that unnecessary segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"). Thus, the district court did not err in finding in Plaintiffs' favor on their *Olmstead* claim.

### e.  AMI Claim

The VA also challenges the district court's finding that the VA's policy of contracting with third-party housing developers who impose income limitations and count veterans' disability benefits as income is facially discriminatory under the Rehabilitation Act.

"A facially discriminatory policy is one which on its face applies less favorably to a protected group." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007). A facially discriminatory policy is a per se violation of the

Rehabilitation Act. *Bay Area Addiction Rsch. & Treatment,
Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999);
*see also Lovell v. Chandler*, 303 F.3d 1039, 1054 (9th Cir.
2002).

The VA does not dispute that under its current system,
the most disabled veterans may be priced out of housing. A
VA senior executive homelessness agent admitted as much.
Rather, it argues that since the system treats all income
equally, it is not per se discriminatory. Regardless of
whether income is treated equally, disability is used as a
basis to discriminate against veterans. Disability benefits are
directly correlated to a veteran's disabilities—the more
disabled a veteran is, the more disability benefits he or she
receives. A veteran with 100% disability rating does not
qualify for most housing under this program because they
receive more than 30% AMI in disability benefits, but a less
disabled veteran who received less in disability benefits
does. This constitutes facial discrimination. *See Townsend
v. Quasim*, 328 F.3d 511, 517–18 (9th Cir. 2003) (holding
that defendant's failure to provide long term care services in
a particular setting to one group of disabled individuals but
not another, solely on the basis of income, was
discrimination in violation of the ADA).

\* \* \* \*

The district court did, however, err in entering judgment
against HUD for Plaintiffs' meaningful access, *Olmstead*,
and AMI claims. The meaningful access and the *Olmstead*
claims are rooted in Plaintiffs' healthcare benefits, which the
VA is responsible for administering. *See* 38 U.S.C. § 303.
HUD has no say in the way the VA administers its laws. As
to the AMI claim, the claim is moot after HUD announced a
policy change excluding veterans' service-connected

disability benefits as income when determining supportive housing eligibility, and Plaintiffs concede as much. Thus, judgment against HUD is vacated.

### 2. Charitable Trust Claim

#### a. Standing

The Attorney General has primary, though not exclusive, responsibility for the supervision and enforcement of charitable trusts. In California, "[a] suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officers or by a co-trustee or successor trustee, by a settlor, or by another person who has a special interest in the enforcement of the trust." *Autonomous Region of Narcotics Anonymous v. Narcotics Anonymous World Servs., Inc.*, 292 Cal. Rptr. 3d 851, 861 (Ct. App. 2022) ("*ARNA*") (quoting Restatement (Third) of Trust § 94) (emphasis removed); *see also Holt v. Coll. of Osteopathic Physicians & Surgeons*, 394 P.2d 932, 934–37 (Cal. 1964) (creating the special interest standing and allowing minority trustees to sue majority trustees); *L.B. Rsch. & Educ. Found. v. UCLA Found.*, 29 Cal. Rptr. 3d 710, 716–17 (Ct. App. 2005) (relying on *Holt*, allowed a donor to sue where the charitable gift came with a reversionary interest); *Patton v. Sherwood*, 61 Cal. Rptr. 3d 289, 291 (Ct. App. 2007) (allowing a settler to sue because he had reserved the power to object to an accounting in the trust instrument). Thus, an intended beneficiary, such as a disabled veteran, would typically not have standing to sue for breach of fiduciary duties of the charitable trust unless he has a *special interest* in the trust.

In adopting, and later applying, special interest standing, courts have emphasized that its application "involve[s] a balancing of policy concerns and objectives." *ARNA*, 292

Cal. Rptr. 3d at 861 (citation omitted). The limited
application of this concept "arises from the need to protect
the trustee from vexatious litigation," by a large, changing,
and uncertain class of the public to be benefitted. *Patton*, 61
Cal. Rptr. 3d. at 291. But there is also the concern that due
to the Attorney General's "limitations (of information and
resources, plus other responsibilities and influence)"
charitable trusts will have no oversight which means they
can "lapse into inactivity and neglect and can be victimized
by trustee breaches of trust." *ARNA*, 292 Cal. Rptr. 3d at
861. Thus, allowing others with a special interest to sue can
"bring to light conduct detrimental to a charitable trust so
that remedial action may be taken." *Holt*, 394 P.2d at 935–
36.

Here, the VA argues that Plaintiffs do not have special
interest standing[12] as any trust created under the 1888 Deed
would benefit a "vast, ill-defined population—roughly
speaking, all Veterans in the Western United States."
Although this is true, the critical question is whether this
class of veterans who are suing have a sufficient special
interest to "enforce the trust on their own behalf." *ARNA*,
292 Cal. Rptr. 3d at 861. Here, the intended beneficiaries of
the trust are veterans with disabilities. But the putative class
is more specific—unhoused veterans with severe disabilities
and mental illnesses for whom receipt of the trust's benefits
(i.e., supportive housing and healthcare) can make the
difference between life and death. We have difficulty
imagining a more special interest than that.

---

[12] The VA and Plaintiffs cite *He Depu v. Yahoo! Inc.*, 950 F.3d 897 (D.C.
Cir. 2020), which is not controlling authority, and neither party engages
with California's common law application of special interest standing.

Additionally, balancing the policy concerns and
objectives supports finding special interest standing in this
specific case. *See ARNA*, 292 Cal. Rptr. 3d at 861. The
record shows that the VA has mismanaged the Campus for
decades by first selling off the Campus's land to third parties
until only about half of the donated land was left. The VA
only stopped this practice because Congress prohibited it.
Then, the VA leased the Campus's land to third parties for
well below the appraised market value and in certain cases
even leased it for free. Also, as explained *infra*, the VA's
current leases with third parties violate the Leasing Act
because those leases do not principally benefit veterans.
Plaintiffs have complained about the VA's deficiencies for
more than a decade and notwithstanding the *Valentini*
settlement, the VA has consistently failed to comply with its
pledge to return the Campus to its intended purpose of
benefitting disabled veterans. Further, this and the *Valentini*
litigations have been widely and publicly covered, and the
Attorney General has not taken any steps to ensure the
charitable trust is being properly managed. Thus, bringing
these problems to light, along with trying to address the
issues unhoused veterans face, is beneficial for the public
and confers a special interest sufficient to allow this class of
veterans to sue to enforce this charitable trust. *See ARNA*,
292 Cal. Rptr. 3d at 861 ("When charitable trusts are badly
or corruptly managed, underenforcement of the original
charitable purpose disserves the public interest in furthering
social betterment.").

Having found that Plaintiffs have special interest
standing to sue, we now address the charitable trust claim on
the merits.

### b.  Judicially Enforceable Fiduciary Duties[13]

"The United States or a State has capacity to take and
hold property in trust, but in the absence of a statute
otherwise providing the trust is unenforceable against the
United States or a State."  Restatement (Second) of Trusts
§ 95.  The Government owes judicially enforceable duties
"only to the extent it expressly accepts those
responsibilities."  *Arizona v. Navajo Nation*, 599 U.S. 555,
564 (2023) (quoting *United States v. Jicarilla Apache
Nation*, 564 U.S. 164, 177 (2011)).  "Whether the
Government has expressly accepted such obligations 'must
train on specific rights-creating or duty-imposing' language
in a treaty, statute, or regulation."  *Id.* (citation omitted)

Plaintiffs allege, and the district court ruled, that the VA
accepted judicially enforceable fiduciary duties through the
Leasing Act and its 2021 Amendment.  By its terms, the
Leasing Act "authorize[s] the Secretary of [VA] to enter into
certain leases at the [Campus], to make certain
improvements to the enhanced-use lease authority of the
Department, and for other purposes."  Further, the Leasing
Act prohibits the VA from entering leases that do not provide
"supportive housing . . . that principally benefit[s] veterans
and their families," and requires that "the provision of
services to veterans [be] the predominant focus of the
activities . . . during the term of the lease."  Leasing Act
§§ 2(b).     Contrary to Plaintiffs' assertion, the
aforementioned language does not demonstrate that the

---

[13] The parties dispute whether the 1888 Deed created a charitable trust.
But we need not reach this issue because even if it did, the VA does not
owe judicially enforceable fiduciary duties, and therefore Plaintiffs
cannot succeed on the merits of this claim.

United States unambiguously and expressly accepted judicially enforceable trust responsibilities.

While the United States was free to accept the land gifted to it by the 1888 Deed, *see United States v. Burnison*, 339 U.S. 87, 89 (1950), the Leasing Act does "not unambiguously provide that the United States has undertaken full fiduciary responsibilities" as to management of the Campus, *see United States v. Mitchell*, 445 U.S. 535, 542 (1980). Plaintiffs fail to identify provisions in the Leasing Act that include "specific rights-creating or duty-imposing language." *Navajo Nation*, 599 U.S. at 564. What is more, nothing in the Leasing Act suggests that any such duty is judicially enforceable. To the contrary, the Leasing Act expressly contemplates administrative and political remedies if the VA is found to be noncompliant "with all Federal laws relating to leases and land use at the Campus." *See, e.g.*, Leasing Act § 2(h)(1) (charging the VA OIG with determining the VA's compliance with the Leasing Act); *id.* (providing that if the VA is found not in compliance, the VA "may not enter into any lease or land-sharing agreement at the Campus, or renew any" non-compliant lease until the Secretary of the VA certifies to Congress that all of the VA OIG's recommendations have been implemented"); *but see* 2 U.S.C. § 159 (providing that the Library of Congress Trust Fund Board shall have "all the usual powers and obligations of a trustee" and that the Board "may be sued" in the district court "for the purpose of enforcing the provisions of any trust accepted by it").

Plaintiffs alternatively argue that because the Leasing Act creates duties that mirror those created by a trust at common law that is sufficient to impose enforceable fiduciary duties. Not so. The Supreme Court expressly rejected Plaintiffs' argument in *Navajo Nation*, holding that

the United States's trust obligations are "established and governed by treaty, statute, or regulation, rather than by the common law of trusts."  599 U.S. at 564 n.1 ("[T]he trust obligations of the United States . . . are established by Congress and the Executive, not created by the Judiciary.").

The district court thus erred in finding that the Leasing Act and its 2021 Amendment imposed judicially enforceable fiduciary duties on the VA.  We therefore reverse the district court's judgment in favor of Plaintiffs on their charitable trust claim.

Additionally, the parties agree that judgment on Plaintiffs' charitable trust claim was the only basis for which the district court invalidated UCLA's lease and enjoined UCLA.  Because we are reversing judgment on Plaintiffs' charitable trust claim, we dismiss UCLA's consolidated appeals as moot and vacate any injunctive relief with respect to UCLA's lease and services.[14] [15]  *See Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1303 (9th Cir. 2000).

To the extent the district court voided Brentwood and Bridgeland's leases and ordered injunctive relief based on Plaintiffs' charitable trust claim, we vacate that part of the district court's judgment as well.

## B.  Brentwood School's Appeal

### 1.  Interpretation of the Leasing Act

Brentwood School challenges the district court's order voiding its lease and asserts that the district court

---

[14] UCLA's motion for a stay pending appeal is denied as moot.  Dkt. 30.

[15] We express no opinion as to the impact of our opinion on the relationships between Plaintiffs, the VA, and UCLA.

misinterpreted the Leasing Act.[16]  "The APA specifies that
courts, not agencies, will decide '*all* relevant questions of
law' arising on review of agency action . . . even those
involving ambiguous laws." *Loper Bright Enters. v.
Raimondo*, 603 U.S. 369, 371 (2024).    Thus, agency
interpretation of statutes "are *not* entitled to deference." *Id.*
at 392.    In interpreting statutes, "the [c]ourt relies on
traditional rules of statutory interpretation." *POM
Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014).
The analysis begins and ends with the statutory text. *Hardt
v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).

As relevant here, the Leasing Act states that the VA
Secretary may carry out,

> Any lease of real property for a term not to
> exceed 50 years to a third party *to provide
> services that principally benefit veterans and
> their families* and that are limited to one or
> more of the following purposes:
>
> (A)    The promotion of health and
> wellness, including (B) nutrition and spiritual
> wellness.    (B) Education.    (C) Vocational
> training, skills building, or other training
> related to employment. (D) Peer activities,
> socialization, or physical recreation.
> (E) Assistance with legal issues and Federal

---

[16] We reject Plaintiffs' argument that Brentwood is judicially estopped
from bringing this appeal.  We find Brentwood did not misrepresent its
intentions below and its position is consistent on appeal.  *See Perez v.
Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023) ("A party's current
position is clearly inconsistent with its previous position if the current
position contradict[s] the previous position." (internal quotation marks
omitted)).

> benefits.    (F) Volunteerism.    (G) Family
> support services, including child care.
> (H) Transportation. (I) Services in support of
> one or more of the purposes specified in
> subparagraphs (A) through (H).

Leasing Act § 2(b)(2) (emphasis added).    It defines
"principally benefits veterans and their families" as,

> [S]ervices (A) provided exclusively to
> veterans and their families; or (B) that are
> designed for the particular needs of veterans
> and their families, as opposed to the general
> public, and any benefits of those services to
> the general public is distinct from the
> intended benefit to veterans and their
> families.

*Id.* at § 2(I)(1)(A)–(B).    Services that "principally benefit
veterans" excludes those "services in which the only benefit
to veterans and their families is the generation of revenue for
the [VA]." *Id.* § 2(I)(2).

The district court ruled that the plain text of the Leasing
Act is unambiguous and found that the phrase "principally
benefit veterans and their families" refers to and modifies the
sentence's subject, "lease," and not "services."   Thus, the
district court concluded that "Section 2(b)(2) of the Leasing
Act, by its plain text, requires that the underlying lease's
predominant purpose is to provide services that principally
benefit veterans and their families."  Brentwood argues that
the district court erred in its interpretation because the phrase
"principally benefit veterans and their families" clearly

modifies the word "services" by explaining which "services" are required.

Beginning with the text, both parties are correct that the text is plain and unambiguous. "The rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (cleaned up). Here the question is whether the restrictive clause "principally benefit veterans and their families" modifies "lease" or "services." *See United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (noting that the word "that" is often used to introduce restrictive or limiting clauses which are essential to the meaning of the sentence and are not set off by commas). Since here the restrictive clause is not set off by commas, "common grammar rules suggest that Congress intentionally tied it to the last antecedent," *id.* at 1022, thus modifying "services," not "leases." This supports Brentwood's reading of the statute which would mean that the lessees' services, not the lease, principally benefit veterans.

But this reading would create an absurd result. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (noting that if the plain meaning of the text would create an absurd result, the court would have to treat the statute as ambiguous). Under this reading, Congress would have authorized the VA to enter into *any* land-use lease with third parties as long as the leaseholder provides *some* services that principally benefit veterans. For example, given that the Campus sits on one of the most exclusive and expensive areas in Los Angeles, the VA would be authorized to enter into a land-use lease agreement with a luxurious hotel to build a resort for private use so long as they provide *some* services that principally benefit veterans. That cannot be the case; especially considering the legislative context of the Leasing

Act.  *See Nishiie*, 996 F.3d at 1024 ("In addition to exploring
the text of the statute itself, we examine the relevant
statutory context." (citation omitted)).

Congress created the Leasing Act in response to the
*Valentini* lawsuit and the VA's 2016 Plan to refocus the
Campus to provide services to veterans.  *See* H.R. Rep. 114–
570, 6 ("To assist VA in carrying out the tenets of the [2016
Plan], Section 2 of the bill would authorize VA to carry out
the certain leases on the [Campus]").  The Congressional
Committee Report, under a section called "Background and
Need for Legislation," described the leases the *Valentini*
court had found unlawful—which included Brentwood's
previous lease—as "providing services primarily to the
general public" and that "any use or benefit of the leased
space by veterans or their families was ancillary."  *Id.* at 5.
The report further stated that the Committee believed that if
the [2016 Plan] was fully implemented, it would "correct the
years of neglect, misuse, and mismanagement" of the
Campus and would refocus the VA's efforts at the Campus
"on veterans in need of services—particularly those who are
homeless or at risk of homelessness."  *Id.* at 6.  This makes
clear that the force that drove Congress to create the Leasing
Act was to assist the VA to refocus the Campus to its historic
intended use—authorizing specific land-use agreements
only when they principally benefit veterans and their
families.  Adopting Brentwood's interpretation would
potentially allow for leases that, although providing some
services that benefit veterans, are really "ancillary" to the
services provided to the general public or others, which is
the case under Brentwood's current lease.  Congress could
not have intended to allow land-use agreements that
principally benefit nonveterans overall and only provide

ancillary services to veterans.  Brentwood's arguments to the
contrary are ineffective.

Thus, the district court correctly interpreted the Leasing
Act as requiring that the underlying lease's predominant
purpose is to provide services that principally benefit
veterans and their families.

## 2. Brentwood's Lease Violates the Leasing Act and the APA

To comply with the Leasing Act, a land-use agreement
must (1) be for real property, (2) be shorter than 50 years,
(3) be to a third party, and (4) provide services that
principally benefit veterans and their families.  Leasing Act
§ 2(b)(2).  The parties only contest element number four.

The record shows that Brentwood's lease violates the
Leasing Act because the underlying predominant purpose of
the lease does not "principally benefit veterans."  Brentwood
allows veterans to use its athletic facilities, but Brentwood,
not the VA, decides the time and manner veterans are to use
them.  Not surprisingly, Brentwood allows veterans to use
its facilities only when it is more convenient for its students.
For example, veterans are allowed to use the pool on
Mondays, Wednesdays, and Fridays from 5:30 a.m. to 7:30
a.m. and on Saturdays and Sundays from 11:00 a.m. to 3:00
p.m.  Brentwood also allows veterans to use its track on
Wednesdays from 5:00 a.m. to 11:00 a.m.  As the district
court correctly found, this results in highly restricted access
for veterans in favor of access for students during school
hours and times for team practices and competitions.

Likewise, although Brentwood provides shuttle
transportation to the athletic facilities for veterans on the
Campus, the hours of shuttle operation—from 9:00 a.m. to

2:00 p.m.—do not align with the times Brentwood allows
veterans access to its facilities.  Considering the restricted
times Brentwood allows veterans to access its facilities and
the lack of adequate transportation, veterans' access to
Brentwood's athletic facilities is de minimis compared to the
access Brentwood students enjoy.    Since the lease
principally benefits Brentwood's students, not veterans, it
violates the Leasing Act.

As a result, the lease also violates the APA.  The APA
requires a court "to set aside agency action" that is "not in
accordance with law" or that is "in excess of statutory
jurisdiction, authority, or limitations."   5 U.S.C. § 706.
Pursuant to the APA, an agency's final action must be upheld
unless it is "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law."  *Id.* at § 706(2)(A).
Since Brentwood's lease is contrary to statutory authority, it
is in violation of the APA.  Thus, the district court correctly
voided Brentwood's lease under the APA.

## C.  Bridgeland Resources, LLC's Appeal

Making very similar arguments to those Brentwood
made, Bridgeland also argues that the district court erred in
its interpretation of the Leasing Act.  But as explained above,
the district court did not err in determining that the Leasing
Act requires that the land-use agreement's predominant
purpose is to provide services that principally benefit
veterans.  *See* Leasing Act § 2(b)(2).

Under this interpretation, Bridgeland's revocable license
violates the Leasing Act.    Bridgeland argues that the
revocable license is veteran-focused because they do not
need the license to slant drill oil—they *may* get the license
through the BLM—"the Government and veterans give up
virtually nothing in exchange for a 'generous' royalty."  That

is not so.  As Bridgeland conceded, they entered into the revocable licensing agreement with the VA because it protects them from the danger of future litigation.  Thus, the license is quite valuable to Bridgeland.  In any event, the test is whether the revocable license's purpose is to "principally benefit" veterans.  The record shows it is not.  The revocable license's purpose is to allow Bridgeland to pass underneath the Campus's grounds to slant drill oil.  The only thing veterans receive in return is a 2.5 percent royalty donated to a nonprofit who later uses that donation to provide transportation services to veterans; thus, the transportation services veterans receive are ancillary to drilling oil and gas.

As a result, the revocable license violates the Leasing Act.  Likewise, since the revocable license is contrary to statutory authority, it also violates the APA.  Accordingly, the district court correctly voided Bridgeland's revocable license under the APA.

## D.  Scope of Injunctive Relief

Having discussed the merits of the parties' claims above, now we turn into the propriety of the district court's permanent injunction.

### 1.  Relief for Rehabilitation Act Claims

#### a.  Relief for Meaningful Access and *Olmstead* Claims

As relief for the meaningful access and *Olmstead* violations, the district court ordered the VA to construct 1,800 permanent housing units and 750 temporary housing units to remedy its discrimination.  The VA, however, may be excused from discrimination if it can demonstrate that making the modifications the district court ordered would fundamentally alter the nature of its services, programs, or

activities. *See Townsend*, 328 F.3d at 518. *Olmstead* makes clear that the regulatory language only requires entities to make reasonable changes in existing policies to accommodate an individual's disabilities. *Olmstead*, 527 U.S. at 603. In evaluating this defense, we "must take into account financial and other logistical limitations on a[n agency]'s capacity to provide integrated services to the disabled." *Townsend*, 328 F.3d at 519.

The VA argues that constructing housing on the Campus would fundamentally change its program by forcing it to provide one single type of housing, thereby limiting veterans' options to decide where to live. According to the VA, this would harm the community of veterans the VA serves. We disagree.

The district court's order to build additional housing units simply expands—not alters—the program. There are approximately 3,000 veterans who do not have *any* type of housing. Constructing additional housing would not "limit" veterans' choices, it would expand them. Similarly, housing veterans on the Campus would not harm other veterans or create a "less hospitable" environment on the Campus because, as the record shows, many veterans want to live in a community with other veterans because they understand each other's struggles. Most importantly, the record supports the district court's finding that it is the *absence* of housing that creates a dangerous and inhospitable environment for veterans on or near the Campus. *See L.A. All. for Hum. Rts. v. Cnty. of L.A.*, 14 F.4th 947, 955 (9th Cir. 2021) (noting that L.A.'s homelessness crisis has resulted in "rising deaths of [the] unhoused, . . . unaddressed mental health disorders, . . . and the spread of uncommon diseases due to lack of sanitation").

As for budgetary constraints, the VA has not shown how
building the 1,800 permanent housing units and the 750
temporary units is financially unreasonable.  Building the
temporary housing has been estimated to cost $100 million,
which is only 0.02% of the VA's $407 billion annual budget
for 2024.  Notably, the VA failed to request any funding
from Congress to construct supportive housing for veterans
notwithstanding its pledge to provide housing for veterans'
pursuant to the *Valentini* lawsuit, and ended Fiscal Year
2024 "with unspent, carryover funds."

The district court properly considered the VA's financial
limitations.  It found that the necessary investment in this
construction would be "sequenced throughout [a] period" of
years to allow the VA to administer its funding.  The district
court also found that the reduction in costs homelessness
caused may "entirely offset" the construction costs.
Additionally, the VA had recently "invested over $100
million to upgrade and expand . . . infrastructure" on the
Campus to support the construction of housing according to
the VA's 2016 Plan.  Lastly, the district court retained
jurisdiction to adjust the amount of housing the VA is
required to construct to make sure that the number coincides
with housing needs.  In short, the VA fails to show that
complying with the district court's order would
fundamentally alter its programs.

### b.  Relief for AMI Claims

The VA also contends that the district court abused its
discretion by ordering the VA to build housing itself if it
could not find developers willing to refrain from

discrimination.[17] Contrary to the VA's assertion, the district
court did not "order" the VA to directly fund or subsidize
housing. Instead, the district court merely suggested that it
was an option available to the VA to remedy the
discrimination. The district court instead ordered the VA to
"ensure a sufficient number of housing units at [the Campus]
are free from income restrictions." It also ordered the VA,
Plaintiffs, and the Special Monitor to determine the precise
number of necessary units. After further hearings regarding
the scope of the injunction, the district court instructed the
VA to contract with developers that rely on conventional
financing—free from income restrictions. Then, the district
court suggested that only if traditional financing could not
cover the entire cost, the VA could directly fund or subsidize
the housing.[18] Thus, there is no abuse of discretion in
pointing out to the VA the various tools it can utilize to
refrain from discriminating any further against this class of
veterans.

### 2.  Relief for the APA Claims

#### a.  Renegotiation of Unlawful Land-Use Agreements

For the reasons explained *supra*, the district court
correctly concluded that the VA's land-use agreements with
Brentwood, Safety Park,[19] and Bridgeland violated the
Leasing Act and, therefore, were invalid under the APA. As

---

[17] As a facial discrimination claim, "the fundamental alteration test has
no application" to Plaintiffs' AMI claim. *Lovell*, 303 F.3d at 1054.

[18] The VA's argument that it does not have the expertise to build housing
conflicts with record evidence showing it has successfully built on the
Campus before.

[19] Safety Park is not a party to these appeals.

relief, the district court voided these leases and further
enjoined the VA from entering into new leases with the
entities in question, finding that the VA persistently made
unlawful leasing decisions and that allowing renegotiation
of the leases would be "futile."  Subsequently, in a series of
hearings, the district court backtracked its injunction on
lease renegotiation as to Brentwood.  Notably, the VA does
not appeal the district court's conclusion that these leases
violate the APA.  Rather, the VA challenges the scope of the
district court's injunctive relief, arguing that the court
abused its discretion by enjoining the VA from entering new
leases with the entities in question and then stepping into the
VA's shoes to decide with whom to renegotiate and under
what terms.

A district court, "as a court of equity conducting judicial
review under the APA, has broad powers to order mandatory
affirmative relief . . . if such relief is necessary to accomplish
complete justice."  *Nw. Env't Def. Ctr. v. Bonneville Power
Admin.*, 477 F.3d 668, 680–81 (9th Cir. 2007) (cleaned up).
"[D]istrict court[s] ha[ve] broad latitude in fashioning
equitable relief when necessary to remedy an established
wrong."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries
Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) (internal quotations
mark omitted).  In determining the scope of injunctive relief,
"[t]he district court must weigh the competing claims of
injury . . . and the effect on each party of granting or
withholding of the requested relief."  *Nat'l Wildlife Fed'n v.
Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (internal quotation
marks and citation omitted).

Here, the district court abused its discretion in the scope
of its injunction relating to the APA judgment.  The district
court found that the leases in question violated the APA and,
as a remedy, the district court not only voided the unlawful

leases but also prohibited the VA from renegotiating them and, later, ordered the VA to enter into a settlement agreement with Brentwood.  These actions went beyond remedying any injury to Plaintiffs.  By ordering the VA with whom and under what terms it should negotiate land-use contracts on the Campus, the district court impermissibly intruded into the VA's expressed powers to manage the Campus in accordance with the Leasing Act.  *See Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (noting that the "district court must act within the bounds of . . . statute and without intruding upon the administrative province [of agency action.]" (internal quotation marks and citation omitted)).

The district court's reasoning for imposing such a broad injunction is certainly understandable because the VA maintained the position, throughout the trial, that there was no available space for the construction of housing on the Campus.  *See Gill v. Whitford*, 585 U.S. 48, 72–73 (2018) (an injunction "must be tailored to redress the plaintiff's particular injury").  Also, the VA failed to construct housing according to the 2016 Plan for almost a decade.  Thus, the court believed that ordering Brentwood and the VA to settle with one-year contract and with a plan to return the leased land to the VA was necessary.  But Plaintiffs' harms are remedied by voiding the leases and allowing the VA to renegotiate them, if they can be brought into compliance with the Leasing Act.  This creates the right balance between remedying Plaintiff's injuries and not limiting the VA's options.

We find that the district court abused its discretion in prohibiting the VA to renegotiate the land-use agreements in question and in ordering the VA to settle with Brentwood. Instead, the right balance for the competing claims of the

POWERS V. MCDONOUGH                    63

parties and the effects of the requested relief is that the VA is free to renegotiate the leases if they can be brought into compliance with the Leasing Act. Thus, the land-use agreements are void unless and until renegotiated to comply with the Leasing Act.

## b. Bridgeland's Injunction

Bridgeland challenges the district court's power to enjoin it. Bridgeland alleges that the district court lacked jurisdiction in issuing the modified injunction because no party sued Bridgeland and because the injunction does not remedy any claims asserted by any party. Not so. As the Supreme Court has stated, "district courts whose equity powers have been properly invoked . . . have discretion in fashioning injunctive relief . . . . [W]hen district courts are properly acting as courts of equity, they have discretion unless a statute provides otherwise." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 495–96 (2001). Here, the Leasing Act does not have textual restraints or restrict injunctive relief. Also, the fact that no party sued Bridgeland does not strip the district court of equitable jurisdiction because Bridgeland was in privity with the VA. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (noting that an "injunction not only binds the party defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control"). The question is whether the district court abused its discretion in enjoining Bridgeland by prohibiting it to slant drill oil. We find that it did.

Here, similarly to Brentwood, the harm caused to Plaintiffs will be remedied by voiding the lease unless and until the VA can demonstrate that it is compliant with the Leasing Act. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018)

("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). But the district court abused its discretion when it went beyond the required remedy by improperly enjoining Bridgeland from slant drilling which exceeded the bounds of its injunctive power. Thus, the injunction prohibiting Bridgeland "to slant drilling private oil leases from the [Campus]" is vacated.

## IV.   Conclusion

For the reasons explained *supra*, we affirm in part, reverse in part, vacate in part, and remand to the district court to enter judgment in accordance with this opinion.[20] Thus, we affirm the district court's grant of class certification; the APA judgment in Plaintiffs' favor; and the judgment in Plaintiffs' favor on their meaningful access, *Olmstead*, and AMI claims, and the equitable relief granted for these claims. We reverse the district court's judgment in Plaintiffs' favor on their charitable trust claim. We dismiss UCLA's consolidated appeals as moot and vacate any injunctive relief with respect to UCLA's lease and services. We vacate the judgment against HUD for the meaningful access, *Olmstead*, and AMI claims; and vacate the equitable relief granted for the APA claims. The parties shall bear their own costs on appeal.

---

[20] Appellees' motion for judicial notice, Dkt. No. 104, is granted. Appellants' motion for judicial notice, Dkt. No. 116, is granted. Appellees' motion to lift the stay of proceedings, Dkt. No. 119, is denied as moot.